ORIGINAL                          Judge Pauley

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

                                        **INFORMATION**

UNITED STATES OF AMERICA          :

            - v. -                :     18 Cr. ___ (WHP)

MICHAEL COHEN,                    :      **18 CRIM   602**

            Defendant.            :

                                  :     ┌─────────────────────────┐
                                        │ USDC SDNY               │
- - - - - - - - - - - - - - - - - - x   │ DOCUMENT                │
                                        │ ELECTRONICALLY FILED    │
        The United States Attorney charges:  │ DOC #:_____   │
                                        │ DATE FILED: AUG 2 1 2018│
                     **Background**      └─────────────────────────┘

                   The Defendant

        1.    From in or about 2007 through in or about January

2017, MICHAEL COHEN, the defendant, was an attorney and employee

of a Manhattan-based real estate company (the "Company").  COHEN

held the title of "Executive Vice President" and "Special Counsel"

to the owner of the Company ("Individual-1").

        2.    In or about January 2017, COHEN left the Company

and began holding himself out as the "personal attorney" to

Individual-1, who at that point had become the President of the

United States.

        3.    In addition to working for and earning income from

the Company, at all times relevant to this Information, MICHAEL

COHEN, the defendant, owned taxi medallions in New York City and

Chicago worth millions of dollars.  COHEN owned these taxi

medallions as investments and leased the medallions to operators who paid COHEN a portion of the operating income.

## Tax Evasion Scheme

4.   Between tax years 2012 and 2016, MICHAEL COHEN, the defendant, engaged in a scheme to evade income taxes by failing to report more than $4 million in income, resulting in the avoidance of taxes of more than $1.4 million due to the IRS.

5.   In or about late 2013, MICHAEL COHEN, the defendant, retained an accountant ("Accountant-1") for the purpose of handling COHEN's personal and entity tax returns.  After being retained, Accountant-1 filed amended 2011 and 2012 Form 1040 tax returns for COHEN with the Internal Revenue Service ("IRS").  For tax years 2013 through 2016, Accountant-1 prepared individual returns for COHEN and returns for COHEN's medallion and real estate entities.  To confirm he had reviewed and approved these returns, both COHEN and his wife signed a Form 8879 for tax years 2013 through 2016, and filed manually for tax year 2012.  Each Form 8879 contained an affirmation, "[u]nder penalties of perjury," that COHEN "examined a copy of [his] electronic individual Income tax return and accompanying schedules and statements" and "to the best of [his] knowledge and belief, it is true, correct, and accurately lists all amounts and sources of income [COHEN] received during the tax year."

6.    Between 2012 and the end of 2016, MICHAEL COHEN, the defendant, earned more than $2.4 million in income from a series of personal loans made by COHEN to a taxi operator to whom COHEN leased certain of his Chicago taxi medallions ("Taxi Operator-1"), none of which he disclosed to the IRS.

7.    Specifically, in March 2012, pursuant to a loan agreement, Taxi Operator-1 solicited a $2 million personal loan from MICHAEL COHEN, the defendant, so that Taxi Operator-1 could cover various personal and taxi business-related expenses.  On April 28, 2014, Taxi Operator-1 and his wife entered into a new loan agreement with COHEN, increasing the $2 million loan, the principal of which remained unpaid, to $5 million.  Finally, in 2015, Taxi Operator-1 and his wife entered into an amended loan agreement with COHEN, increasing the principal amount of the loan to $6 million.  Each loan was interest-only, carried an interest rate in excess of 12 percent, and was collateralized by either Chicago taxi medallions or a property in Florida owned by Taxi Operator-1 and his family.  COHEN funded the majority of his loans to Taxi Operator-1 from a line of credit with an interest rate of less than 5 percent.

8.    For each of the loans, at the direction of MICHAEL COHEN, the defendant, Taxi Operator-1 made the interest payment checks out to COHEN personally, and the checks were deposited in

3

COHEN's personal bank account, or an account in the name of his wife.   COHEN did not provide records that would have allowed Accountant-1 to reasonably identify this income.

9.   Pursuant to the terms of the loan agreements between MICHAEL COHEN, the defendant, and Taxi Operator-1, COHEN received more than $2.4 million in interest payments from Taxi Operator-1 between 2012 and 2016, and reported none of that income to the IRS.   COHEN intended to hide the income from the IRS in order to evade taxes.

10.   As a further part of the scheme to evade paying income taxes, MICHAEL COHEN, the defendant, also concealed more than $1.3 million in income he received from another taxi operator to whom COHEN leased certain of his New York medallions ("Taxi Operator-2").   This income took two forms.   First, COHEN did not report the substantial majority of a bonus payment of at least $870,000, which was made by Taxi Operator-2 in or about 2012 to induce COHEN to allow Taxi Operator-2 to operate certain of COHEN's medallions.   Second, between 2012 and 2016, COHEN concealed substantial additional taxable income he received from Taxi Operator-2's operation of certain of COHEN's taxi medallions.

11.   To ensure the concealment of this additional operator income, MICHAEL COHEN, the defendant, arranged to receive a portion of the medallion income personally, as opposed to having

the income paid to COHEN's medallion entities. Paying the medallion entities would have alerted Accountant-1, who prepared the returns for those entities, to the existence of the income such that it would have been included on COHEN's tax returns.

12. As a further part of his scheme to evade taxes, MICHAEL COHEN, the defendant, also hid the following additional sources of income from Accountant-1 and the IRS:

a. A $100,000 payment received, in 2014, for brokering the sale of a piece of property in a private aviation community in Ocala, Florida.

b. Approximately $30,000 in profit made, in 2015, for brokering the sale of a Birkin Bag, a highly coveted French handbag that retails for between $11,900 to $300,000, depending on the type of leather or animal skin used.

c. More than $200,000 in consulting income earned in 2016 from an assisted living company purportedly for COHEN's "consulting" on real estate and other projects.

## COUNTS 1 THROUGH 5
### (Evasion of Assessment of Income Tax Liability)

The United States Attorney further charges:

13. The allegations contained in paragraphs 1 through 12 are repeated and realleged as though fully set forth herein.

14.   From on or about January 1 of each of the calendar years set forth below, through the present, in the Southern District of New York and elsewhere, MICHAEL COHEN, the defendant, who during each calendar year set forth below was married, did willfully and knowingly attempt to evade and defeat a substantial part of the income tax due and owing by COHEN and his wife to the United States by various means, including by committing and causing to be committed the following affirmative acts, among others: preparing and causing to be prepared, signing and causing to be signed, and filing and causing to be filed with the IRS, in or about the month of April of each said calendar year, a U.S. Individual Income Tax Return, Form 1040, for each of the calendar years set forth below, on behalf of himself and his wife, which falsely omitted substantial amounts of income in or about the years listed below.

| Count | Tax Year | Unreported Income | Tax Loss |
|-------|----------|-------------------|-----------|
| 1 | 2012 | $893,750 | $192,188 |
| 2 | 2013 | $499,400 | $299,229 |
| 3 | 2014 | $670,667 | $232,883 |
| 4 | 2015 | $969,616 | $375,390 |
| 5 | 2016 | $1,100,618 | $395,615 |

(Title 26, United States Code, Section 7201.)

6

## **False Statements to a Bank**

The United States Attorney further charges:

15.  In or about 2010, MICHAEL COHEN, the defendant, through companies he controlled, executed a $6.4 million promissory note with a bank ("Bank-1"), collateralized by COHEN's taxi medallions and personally guaranteed by COHEN. A year later, in 2011, COHEN personally obtained a $6 million line of credit from Bank-1 (the "Line of Credit"), also collateralized by his taxi medallions. By February 2013, COHEN had increased the Line of Credit from $6 million to $14 million, thereby increasing COHEN's personal medallion liabilities at Bank-1 to more than $20 million.

16.  In or about November 2014, MICHAEL COHEN, the defendant, refinanced his medallion debt at Bank-1 with another bank ("Bank-2"), which shared the debt with a New York-based credit union (the "Credit Union"). The transaction was structured as a package of individual loans to the entities that owned COHEN's New York medallions, personally guaranteed by COHEN. Following the loans' closing, COHEN's medallion debt at Bank-1 was paid off with funds from Bank-2 and the Credit Union, and the Line of Credit with Bank-1 was closed.

17.  In or about 2013, in connection with a successful application for a mortgage from another Bank ("Bank-3") for his

7

Park Avenue condominium (the "2013 Application"), MICHAEL COHEN, the defendant, disclosed only the $6.4 million medallion loan he had with Bank-1 at the time. As noted above, COHEN also had a larger, $14 million Line of Credit with Bank-1 secured by his medallions, which COHEN did not disclose in the 2013 Application.

18.   In or around February 2015, MICHAEL COHEN, the defendant, in an attempt to secure financing from Bank-3 to purchase a summer home for approximately $8.5 million, again concealed the $14 million Line of Credit. Specifically, in connection with this proposed transaction, Bank-3 obtained a 2014 personal financial statement COHEN had provided to Bank-2 while refinancing his medallion debt. Bank-3 questioned COHEN about the $14 million Line of Credit reflected on that personal financial statement, because COHEN had omitted that debt from the 2013 Application to Bank-3. COHEN misled Bank-3, stating, in substance, that the $14 million Line of Credit was undrawn and that he would close it. In truth and in fact, COHEN had effectively *overdrawn* the Line of Credit, having swapped it out for a fully drawn, larger group of loans shared by Bank-2 and the Credit Union upon refinancing his medallion debt. When Bank-3 informed COHEN that it would only provide financing if COHEN closed the Line of Credit, COHEN lied again, misleadingly stating in an

email: "The medallion line was closed in the middle of November 2014."

19.   In or around December 2015, MICHAEL COHEN, the defendant, contacted Bank-3 to apply for a home equity line of credit ("HELOC").   In so doing, COHEN again significantly understated his medallion debt.

20.   Specifically, in the HELOC application, MICHAEL COHEN, the defendant, together with his wife, represented a positive net worth of more than $40 million, again omitting the $14 million in medallion debt with Bank-2 and the Credit Union. Because COHEN had previously confirmed in writing to Bank-3 that the $14 million Line of Credit had been closed, Bank-3 had no reason to question COHEN about the omission of this liability on the HELOC application. In addition, in seeking the HELOC, COHEN substantially and materially understated his monthly expenses to Bank-3 by omitting at least $70,000 in monthly interest payments due to Bank-2 on the true amount of his medallion debt.

21.   In or about April 2016, Bank-3 approved MICHAEL COHEN, the defendant, for a $500,000 HELOC.   By fraudulently concealing truthful information about his financial condition, MICHAEL COHEN, the defendant, obtained a HELOC that Bank-3 would otherwise not have approved.

## COUNT 6
### (False Statements to a Bank)

The United States Attorney further charges:

22. The allegations contained in paragraphs 1 through 3 and 15 through 21 are repeated and realleged as though fully set forth herein.

23. From at least in or about December 2015 through at least in or about April 2016, in the Southern District of New York and elsewhere, MICHAEL COHEN, the defendant, willfully and knowingly made false statements for the purpose of influencing the action of a financial institution, as defined in Title 18, United States Code, Section 20, upon an application, advance, discount, purchase, purchase agreement, repurchase agreement, commitment, loan, or insurance agreement or application for insurance or a guarantee, or any change or extension of any of the same, by renewal, deferment of action or otherwise, or the acceptance, release, or substitution of security therefore, to wit, in connection with an application for a home equity line of credit, COHEN made false statements to Bank-3 about his true financial condition, including about debts for which he was personally liable, and about his cash flow.

(Title 18, United States Code, Sections 1014 and 2.)

## Campaign Finance Violations

The United States Attorney further charges:

24. The Federal Election Campaign Act of 1971, as amended, Title 52, United States Code, Section 30101, *et seq.*, (the "Election Act"), regulates the influence of money on politics. At all times relevant to the Information, the Election Act set forth the following limitations, prohibitions, and reporting requirements, which were applicable to MICHAEL COHEN, the defendant, Individual-1, and his campaign:

a. Individual contributions to any presidential candidate, including expenditures coordinated with a candidate or his political committee, were limited to $2,700 per election, and presidential candidates and their committees were prohibited from accepting contributions from individuals in excess of this limit.

b. Corporations were prohibited from making contributions directly to presidential candidates, including expenditures coordinated with candidates or their committees, and candidates were prohibited from accepting corporate contributions.

25. On or about June 16, 2015, Individual-1 began his presidential campaign. While MICHAEL COHEN, the defendant, continued to work at the Company and did not have a formal title with the campaign, he had a campaign email address and, at various times, advised the campaign, including on matters of interest to

11

the press, and made televised and media appearances on behalf of the campaign.

26. At all times relevant to this Information, Corporation-1 was a media company that owns, among other things, a popular tabloid magazine ("Magazine-1").

27. In or about August 2015, the Chairman and Chief Executive of Corporation-1 ("Chairman-1"), in coordination with MICHAEL COHEN, the defendant, and one or more members of the campaign, offered to help deal with negative stories about Individual-1's relationships with women by, among other things, assisting the campaign in identifying such stories so they could be purchased and their publication avoided. Chairman-1 agreed to keep COHEN apprised of any such negative stories.

28. Consistent with the agreement described above, Corporation-1 advised MICHAEL COHEN, the defendant, of negative stories during the course of the campaign, and COHEN, with the assistance of Corporation-1, was able to arrange for the purchase of two stories so as to suppress them and prevent them from influencing the election.

29. *First*, in or about June 2016, a model and actress ("Woman-1") began attempting to sell her story of her alleged extramarital affair with Individual-1 that had taken place in 2006 and 2007, knowing the story would be of considerable value because

12

of the election. Woman-1 retained an attorney ("Attorney-1"), who in turn contacted the editor-in-chief of Magazine-1 ("Editor-1"), and offered to sell Woman-1's story to Magazine-1. Chairman-1 and Editor-1 informed MICHAEL COHEN, the defendant, of the story. At COHEN's urging and subject to COHEN's promise that Corporation-1 would be reimbursed, Editor-1 ultimately began negotiating for the purchase of the story.

30. On or about August 5, 2016, Corporation-1 entered into an agreement with Woman-1 to acquire her "limited life rights" to the story of her relationship with "any then-married man," in exchange for $150,000 and a commitment to feature her on two magazine covers and publish over one hundred magazine articles authored by her. Despite the cover and article features to the agreement, its principal purpose, as understood by those involved, including MICHAEL COHEN, the defendant, was to suppress Woman-1's story so as to prevent it from influencing the election.

31. Between in or about late August 2016 and September 2016, MICHAEL COHEN, the defendant, agreed with Chairman-1 to assign the rights to the non-disclosure portion of Corporation-1's agreement with Woman-1 to COHEN for $125,000. COHEN incorporated a shell entity called "Resolution Consultants LLC" for use in the transaction. Both Chairman-1 and COHEN ultimately signed the agreement, and a consultant for Corporation-1, using

13

his own shell entity, provided COHEN with an invoice for the payment of $125,000. However, in or about early October 2016, after the assignment agreement was signed but before COHEN had paid the $125,000, Chairman-1 contacted COHEN and told him, in substance, that the deal was off and that COHEN should tear up the assignment agreement. COHEN did not tear up the agreement, which was later found during a judicially authorized search of his office.

32. *Second*, on or about October 8, 2016, an agent for an adult film actress ("Woman-2") informed Editor-1 that Woman-2 was willing to make public statements and confirm on the record her alleged past affair with Individual-1. Chairman-1 and Editor-1 then contacted MICHAEL COHEN, the defendant, and put him in touch with Attorney-1, who was also representing Woman-2. Over the course of the next few days, COHEN negotiated a $130,000 agreement with Attorney-1 to himself purchase Woman-2's silence, and received a signed confidential settlement agreement and a separate side letter agreement from Attorney-1.

33. MICHAEL COHEN, the defendant, did not immediately execute the agreement, nor did he pay Woman-2. On the evening of October 25, 2016, with no deal with Woman-2 finalized, Attorney-1 told Editor-1 that Woman-2 was close to completing a deal with another outlet to make her story public. Editor-1, in turn, texted

14

MICHAEL COHEN, the defendant, that "[w]e have to coordinate something on the matter [Attorney-1 is] calling you about or it could look awfully bad for everyone." Chairman-1 and Editor-1 then called COHEN through an encrypted telephone application. COHEN agreed to make the payment, and then called Attorney-1 to finalize the deal.

34. The next day, on October 26, 2016, MICHAEL COHEN, the defendant, emailed an incorporating service to obtain the corporate formation documents for another shell corporation, Essential Consultants LLC, which COHEN had incorporated a few days prior. Later that afternoon, COHEN drew down $131,000 from the fraudulently obtained HELOC, discussed above in paragraphs 19 through 21, and requested that it be deposited into a bank account COHEN had just opened in the name of Essential Consultants. The next morning, on October 27, 2016, COHEN went to Bank-3 and wired approximately $130,000 from Essential Consultants to Attorney-1. On the bank form to complete the wire, COHEN falsely indicated that the "purpose of wire being sent" was "retainer." On or about November 1, 2016, COHEN received from Attorney-1 copies of the final, signed confidential settlement agreement and side letter agreement.

35. MICHAEL COHEN, the defendant, caused and made the payments described herein in order to influence the 2016

15

presidential election.   In so doing, he coordinated with one or more members of the campaign, including through meetings and phone calls, about the fact, nature, and timing of the payments.

36.   As a result of the payments solicited and made by MICHAEL COHEN, the defendant, neither Woman-1 nor Woman-2 spoke to the press prior to the election.

37.   In or about January 2017, MICHAEL COHEN, the defendant, in seeking reimbursement for election-related expenses, presented executives of the Company with a copy of a bank statement from the Essential Consultants bank account, which reflected the $130,000 payment COHEN had made to the bank account of Attorney-1 in order to keep Woman-2 silent in advance of the election, plus a $35 wire fee, adding, in handwriting, an additional "$50,000." The $50,000 represented a claimed payment for "tech services," which in fact related to work COHEN had solicited from a technology company during and in connection with the campaign.   COHEN added these amounts to a sum of $180,035.   After receiving this document, executives of the Company "grossed up" for tax purposes COHEN's requested reimbursement of $180,000 to $360,000, and then added a bonus of $60,000 so that COHEN would be paid $420,000 in total. Executives of the Company also determined that the $420,000 would be paid to COHEN in monthly amounts of $35,000 over the course of

16

twelve months, and that COHEN should send invoices for these payments.

38. On or about February 14, 2017, MICHAEL COHEN, the defendant, sent an executive of the Company ("Executive-1") the first of his monthly invoices, requesting "[p]ursuant to [a] retainer agreement, . . . payment for services rendered for the months of January and February, 2017." The invoice listed $35,000 for each of those two months. Executive-1 forwarded the invoice to another executive of the Company ("Executive-2") the same day by email, and it was approved. Executive-1 forwarded that email to another employee at the Company, stating: "Please pay from the Trust. Post to legal expenses. Put 'retainer for the months of January and February 2017' in the description."

39. Throughout 2017, MICHAEL COHEN, the defendant, sent to one or more representatives of the Company monthly invoices, which stated, "Pursuant to the retainer agreement, kindly remit payment for services rendered for" the relevant month in 2017, and sought $35,000 per month. The Company accounted for these payments as legal expenses. In truth and in fact, there was no such retainer agreement, and the monthly invoices COHEN submitted were not in connection with any legal services he had provided in 2017.

17

40. During 2017, pursuant to the invoices described above, MICHAEL COHEN, the defendant, received monthly $35,000 reimbursement checks, totaling $420,000.

### COUNT 7
### (Causing an Unlawful Corporate Contribution)

The United States Attorney further charges:

41. The allegations contained in paragraphs 1 through 3, and 24 through 40 are repeated and realleged as though fully set forth herein.

42. From in or about June 2016, up to and including in or about October 2016, in the Southern District of New York and elsewhere, MICHAEL COHEN, the defendant, knowingly and willfully caused a corporation to make a contribution and expenditure, aggregating $25,000 and more during the 2016 calendar year, to the campaign of a candidate for President of the United States, to wit, COHEN caused Corporation-1 to make and advance a $150,000 payment to Woman-1, including through the promise of reimbursement, so as to ensure that Woman-1 did not publicize damaging allegations before the 2016 presidential election and thereby influence that election.

(Title 52, United States Code, Sections 30118(a) and 30109(d)(1)(A), and Title 18, United States Code, Section 2(b).)

18

## COUNT 8
### (Excessive Campaign Contribution)

The United States Attorney further charges:

43.   The allegations contained in paragraphs 1 through 3, and 24 through 40 are repeated and realleged as though fully set forth herein.

44.   On or about October 27, 2016, in the Southern District of New York and elsewhere, MICHAEL COHEN, the defendant, knowingly and willfully made and caused to be made a contribution to Individual-1, a candidate for Federal office, and his authorized political committee in excess of the limits of the Election Act, which aggregated $25,000 and more in calendar year 2016, and did so by making and causing to be made an expenditure, in cooperation, consultation, and concert with, and at the request and suggestion of one or more members of the campaign, to wit, COHEN made a $130,000 payment to Woman-2 to ensure that she did not publicize damaging allegations before the 2016 presidential election and thereby influence that election.

(Title 52, United States Code, Sections 30116(a)(1)(A),
30116(a)(7), and 30109(d)(1)(A), and Title 18, United States
Code, Section 2(b).)

19

## **FORFEITURE ALLEGATION**

45. As a result of committing the offense alleged in Count Six of this Information, MICHAEL COHEN, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), any property constituting or derived from proceeds obtained directly or indirectly as a result of the commission of said offense.

### **Substitute Assets Provision**

46. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

> a. cannot be located upon the exercise of due diligence;
>
> b. has been transferred or sold to, or deposited with, a third person;
>
> c. has been placed beyond the jurisdiction of the Court;
>
> d. has been substantially diminished in value; or
>
> e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code,

20

Section 2461(c), to seek forfeiture of any other property of the
defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Section 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

ROBERT KHUZAMI
Acting United States Attorney

21

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**- v. -**

**MICHAEL COHEN,**

**Defendant.**

**INFORMATION**

18 Cr. ___ (WHP)

ROBERT KHUZAMI
Acting United States Attorney