UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    :

   -v.-                                              :          18 Cr. 602 (WHP)

MICHAEL COHEN,                                   :

               Defendant.                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

### THE GOVERNMENT'S SENTENCING MEMORANDUM

ROBERT KHUZAMI
Acting United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Andrea M. Griswold
Rachel Maimin
Thomas McKay
Nicolas Roos
Assistant United States Attorneys
      -Of Counsel-

## TABLE OF CONTENTS

BACKGROUND ......................................................................................................... 2

   A.   COHEN'S OFFENSE CONDUCT ............................................................ 2

      1.   Background .................................................................................... 3

      2.   Cohen's Willful Tax Evasion ........................................................ 4

      3.   Cohen's False Statements to Financial Institutions ...................... 8

      4.   Cohen's Illegal Campaign Contributions ..................................... 11

      5.   Cohen's False Statements to Congress ........................................ 14

   B.   COHEN'S MEETINGS WITH LAW ENFORCEMENT ............................ 14

APPLICATION OF THE SENTENCING GUIDELINES ................................. 17

   A.   THE PROBATION DEPARTMENT'S CALCULATION ......................... 17

   B.   COHEN'S CHALLENGES TO THE GUIDELINES CALCULATION ....... 17

      1.   The PSR's Grouping Analysis is Correct ..................................... 17

      2.   The Guidelines Enhancements Are Not "Overlapping" ............... 20

   C.   THE PROBATION DEPARTMENT'S RECOMMENDATION ................. 22

DISCUSSION ........................................................................................................... 22

   A.   A SUBSTANTIAL TERM OF IMPRISONMENT IS WARRANTED ........ 22

      1.   The Nature and Seriousness of the Offenses ............................... 22

      2.   The Need to Promote Respect for the Law and to Afford Adequate Deterrence ........ 28

   B.   COHEN'S REQUEST FOR A SENTENCE OF TIME SERVED IS MERITLESS ............. 30

   CONCLUSION ............................................................................................... 38

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                      :

   -v.-                                                    :        18 Cr. 602 (WHP)

MICHAEL COHEN,                                  :

           Defendant.                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

## PRELIMINARY STATEMENT

Defendant Michael Cohen is scheduled to be sentenced on December 12, 2018.  The United States Attorney's Office for the Southern District of New York (the "Office") respectfully submits this memorandum in connection with that sentencing and in response to the defendant's sentencing memorandum dated November 30, 2018 ("Def. Mem.").

Cohen, an attorney and businessman, committed four distinct federal crimes over a period of several years.  He was motivated to do so by personal greed, and repeatedly used his power and influence for deceptive ends.  Now he seeks extraordinary leniency – a sentence of no jail time – based principally on his rose-colored view of the seriousness of the crimes; his claims to a sympathetic personal history; and his provision of certain information to law enforcement.  But the crimes committed by Cohen were more serious than his submission allows and were marked by a pattern of deception that permeated his professional life (and was evidently hidden from the friends and family members who wrote on his behalf).

Cohen did provide information to law enforcement, including information that assisted the Special Counsel's Office ("SCO") in ongoing matters, as described in the SCO's memorandum to the Court, and the Office agrees that this is a factor to be considered by the Court pursuant to Title

18, United States Code, Section 3553(a).  But Cohen's description of those efforts is overstated in some respects and incomplete in others.  To be clear:  Cohen does not have a cooperation agreement and is not receiving a Section 5K1.1 letter either from this Office or the SCO, and therefore is not properly described as a "cooperating witness," as that term is commonly used in this District.

As set forth in the Probation Department's Presentence Investigation Report ("PSR"), the applicable United States Sentencing Guidelines ("Guidelines") range is 51 to 63 months' imprisonment.  This range reflects Cohen's extensive, deliberate, and serious criminal conduct, and this Office submits that a substantial prison term is required to vindicate the purposes and principles of sentencing as set forth in Section 3553(a).  And while the Office agrees that Cohen should receive credit for his assistance in the SCO investigation, that credit should not approximate the credit a traditional cooperating witness would receive, given, among other reasons, Cohen's affirmative decision not to become one.  For these reasons, the Office respectfully requests that this Court impose a substantial term of imprisonment, one that reflects a modest downward variance from the applicable Guidelines range.[1]

## BACKGROUND

### A.     Cohen's Offense Conduct

As described in the PSR, in Criminal Information 18 Cr. 602, as well as in Criminal Information 18 Cr. 850, Cohen committed four separate and serious crimes over the course of several years.  These crimes – willful tax evasion, making false statements to a financial institution, illegal campaign contributions, and making false statements to Congress – were distinct in their harms, but bear a common set of characteristics:  They each involve deception, and were each

---

[1] The Probation Department has similarly recommended a modest variance from the Guidelines range, recommending a sentence of 42 months' imprisonment, albeit for different reasons.

motivated by personal greed and ambition.  While Cohen – as his own submission makes clear – already enjoyed a privileged life, his desire for even greater wealth and influence precipitated an extensive course of criminal conduct, described below.

### 1.  Background

Cohen is a licensed attorney and has been since 1992.  (PSR ¶ 149.)  Until 2007, Cohen practiced as an attorney for multiple law firms, working on, among other things, negligence and malpractice cases.  (PSR ¶¶ 156-157.)  For that work, Cohen earned approximately $75,000 per year.  (*Id.*)  In 2007, Cohen seized on an opportunity.  The board of directors of a condominium building in which Cohen lived was attempting to remove from the building the name of the owner ("Individual-1") of a Manhattan-based real estate company (the "Company").  (PSR ¶ 155.)  Cohen intervened, secured the backing of the residents of the building, and was able to remove the entire board of directors, thereby fixing the problem for Individual-1.  (*Id.*)  Not long after, Cohen was hired by the Company to the position of "Executive Vice President" and "Special Counsel" to Individual-1.  (*Id.*)  He earned approximately $500,000 per year in that position.  (*Id.*)

In January 2017, Cohen formally left the Company and began holding himself out as the "personal attorney" to Individual-1, who at that point had become the President of the United States.  In January 2017, Cohen also launched two companies: Michael D. Cohen and Associates, P.C., a legal practice, and Essential Consultants LLC, a consulting firm.  (PSR ¶ 152.)  Both businesses were operated from the offices of a major law firm located in New York, and that firm paid Cohen $500,000 per year as salary.  (*Id.*)  Cohen also secured a substantial amount of consulting business for himself throughout 2017 by marketing to corporations what he claimed to be unique insights about and access to Individual-1.  But while Cohen made millions of dollars from these consulting arrangements, his promises of insight and access proved essentially hollow.

Documents obtained by the Government and witness interviews revealed that Cohen performed minimal work, and many of the consulting contracts were ultimately terminated.

During and subsequent to his employment with the Company, Cohen also maintained additional sources of income. Most significantly, Cohen owned taxi medallions in New York City and Chicago worth millions of dollars. Cohen held these medallions as investments and leased them to operators who paid Cohen a specified monthly rate per medallion. (PSR ¶¶ 158-160.) Cohen has also made substantial investments in real estate and other business ventures. (PSR ¶¶ 161-162.)

### 2. Cohen's Willful Tax Evasion

Between tax years 2012 and 2016, Cohen evaded taxes by failing to report more than $4 million in income to the Internal Revenue Service ("IRS"), which resulted in the avoidance of more than $1.4 million due to the United States Treasury Department. Specifically, Cohen failed to report several different streams of income on his tax returns, which he swore were true and accurate. (PSR ¶¶ 18-19.)

The largest source of undisclosed income was more than $2.4 million that Cohen received from a series of personal loans that he made to a taxi operator to whom Cohen leased certain of his Chicago taxi medallions ("Taxi Operator-1"), between 2012 and 2015, for a total principal of $6 million. Each of these loans carried an interest rate in excess of 12 percent. Cohen funded the majority of these loans from a line of credit with an interest rate of less than 5 percent (such that Cohen was earning a substantial spread on the difference between the two loan rates). At Cohen's direction, Taxi Operator-1 made the interest payment checks to Cohen personally. The checks were deposited in Cohen's personal bank account or in an account in his wife's name. In total, Cohen received more than $2.4 million in interest payments from Taxi Operator-1 between 2012

and 2016.  Cohen did not inform his accountant of this arrangement or provide him with documentation in support of these loans and interest payments, and intentionally reported none of that income to the IRS in order to hide it and evade paying taxes.  (PSR ¶¶ 20-23.)

Cohen also concealed more than $1.3 million in income he received from another taxi operator to whom Cohen leased some of his New York taxi medallions ("Taxi Operator-2").  This income took two forms.  First, in 2012, Taxi Operator-2 paid Cohen a bonus of at least $870,000 to induce Cohen to allow him to operate some of Cohen's taxi medallions.  Cohen did not report $710,000 of this bonus payment.  (PSR ¶ 25).  In addition, Cohen arranged with Taxi Operator-2 to receive a portion of the medallion income personally – as opposed to having the income paid to Cohen's medallion entities.  That is, while most of the medallion income was paid to Cohen's medallion entities – whose bank statements were provided to his accountant for the purpose of calculating the income for these entities and preparing Cohen's tax returns – certain income was provided by Taxi Operator-2 directly to Cohen personally and deposited into his personal account. Cohen again chose not to notify his accountant of this arrangement or identify this additional income to be reported.  (PSR ¶ 26).

Finally, Cohen hid several other sources of income from his accountant and the IRS.  For example, in 2014, Cohen received $100,000 for brokering the sale of a piece of property in a private aviation community in Florida.  In 2015, Cohen made approximately $30,000 in profit from the sale of a rare and highly valuable French handbag.  In 2016, Cohen received more than $200,000 in consulting income from an assisted living company.  Cohen reported none of this to the IRS or his accountant.  (PSR ¶ 27.)

Cohen's evasion of these taxes was willful.  In his sentencing submission and his submissions to the Probation Department in connection with the preparation of the PSR, Cohen

repeatedly attempted to minimize the seriousness of his decision not to report millions of dollars of income over a period of years by blaming his accountant for not uncovering the unreported income. Specifically, Cohen's submission to the Probation Department asserted that "all relevant bank records were provided annually by Cohen to [his accountant] for the relevant years." (PSR at 45). Cohen repeats these efforts to blame his accountant in his sentencing submission:

> Michael's case stands out for comparative purposes in that a failure to reasonably identify all income to a tax preparer *who received all client-related bank statements* is quite different in kind from the sophisticated and complex schemes typical of criminal tax evasion cases.

(Def. Mem. at 15) (emphasis added). Cohen's assertions are simply false. As the Government was prepared to prove at trial, the defendant did *not* provide his accountant with "all client-related bank statements" (Def. Mem. at 15 n.8), and the information Cohen did provide to his accountant could not have led his accountant to uncover the unreported income. Between 2014 and 2016, but not for 2012 or 2013, Cohen provided his accountant with certain bank records and instructed his accountant to identify potential tax deductions. Cohen's accountant did not go through Cohen's bank statements looking for potential sources of income, nor did Cohen ever request this. Indeed, Cohen routinely refused to pay for any work by his accountant not specifically approved by Cohen.

In addition, even if Cohen's accountant had gone beyond the agreed scope of the assignment, the accountant was not provided with records that would have allowed him to reasonably identify the unreported income. Specifically, the bank records Cohen provided to his accountant were limited to monthly statements and did not include images of deposited checks or deposit slips. The records thus included reference to certain "deposit" or "credit" entries in particular amounts, but did not include additional detail that would have allowed the accountant to identify the source of these deposits or credits. For example, a page from Cohen's bank records from May 12, 2015 included a $15,312.50 "deposit." While the Office's investigation identified

6

this as a loan interest payment from Taxi Operator-1 to Cohen, his accountant had no information indicating the source of the deposit, nor that it concerned interest income that source was paying to Cohen. In sum, any bank records provided by Cohen to his accountant "were insufficient for [the accountant] to identify additional sources of income absent additional information from Cohen." (PSR at 47.) As the Probation Department noted in evaluating Cohen's efforts to blame his accountant for Cohen's voluntary and intentional efforts to evade taxes, "the defendant's contention that he provided the accountant with all relevant bank records appears to minimize his responsibility in the instant offense and attempts to place the burden on his accountant." (PSR at 46).

Finally, not only did Cohen fail to identify the unreported income for Accountant-1, on at least two occasions Cohen took steps to conceal the interest income he was receiving from Taxi Operator-1. Specifically, in a memorandum that Cohen's accountant prepared in 2013 when Cohen became a client, the accountant flagged the fact that a personal financial statement prepared by Cohen's prior accountant "shows Loans Receivables of $4,250,000, but there is no related interest income reported on your 2012 personal income tax returns relative to this loan." Cohen and his accountant did not discuss the "loans receivables" further at the time because Cohen told his accountant he did not ask for and would not pay for the memorandum. Later, when Cohen's accountant was helping him prepare an updated personal financial statement to provide to Bank-2, discussed below, in connection with the renegotiation of certain medallion loans, Cohen crossed out the "loans receivable" line item altogether from his personal financial statement, leading his accountant to conclude that the entry was mistaken and there was no outstanding personal loan, or that it had been paid off, neither of which was true.

### 3. Cohen's False Statements to Financial Institutions

In December 2015, Cohen contacted a bank ("Bank-3") to apply for a home equity line of credit ("HELOC").  In his application for the HELOC, Cohen made false statements about his net worth and monthly expenses.  Specifically, Cohen failed to disclose more than $20 million in debt he owed to another bank ("Bank-2"), and also materially understated his monthly expenses to Bank-3 by omitting at least $70,000 in monthly interest payments due to Bank-2 on that debt. (PSR ¶ 34).  These statements were the latest in a series of false statements Cohen made to financial institutions in connection with credit applications.

By way of background, by February 2013, Cohen had obtained a $14 million line of credit from another bank ("Bank-1"), collateralized by his taxi medallions.[2]  In November 2014, Cohen refinanced this medallion debt at Bank-1 with Bank-2.[3]  The transaction was structured as a package of individual loans to the entities that owned Cohen's New York medallions, totaling more than $20 million, and personally guaranteed by Cohen.  Following the closing of these loans, the $14 million line of credit with Bank-1 was closed.  (PSR ¶¶ 28-30.)

In 2013, Cohen made a successful application to Bank-3 – the bank to which he later would make false statements in connection with the HELOC application – for a mortgage on his Park Avenue condominium.  In that application, Cohen did not disclose the $14 million line of credit he had with Bank-1 at the time.  (PSR ¶ 31.)

In February 2015, Cohen attempted to secure financing from Bank-3 to purchase a summer home for approximately $8.5 million.  Once again, he concealed the $14 million line of credit,

---

[2] Cohen separately maintained a $6.4 million medallion-related loan with Bank-1.  This loan was disclosed in Cohen's subsequent credit applications to Bank-2 and Bank-3.

[3] Bank-2 shared the debt with a New York-based credit union, pursuant to a participation agreement.  For ease of reference, this memorandum will simply refer to the debt at Bank-2.

which by this point took the form of the $20 million in refinanced loans with Bank-2. In connection with the summer home application, Cohen had to go to great and deliberate lengths to keep the debt hidden from Bank-3. Specifically, in connection with this proposed transaction, Bank-3 obtained a personal financial statement that Cohen had provided to Bank-2 in connection with the $20 million refinancing with Bank-2 in 2014. This personal statement listed the $14 million line of credit Cohen was seeking to refinance and increase with Bank-2. A representative of Bank-3 specifically asked Cohen about the $14 million line of credit reflected on that statement (which, as noted, had not been reflected on Cohen's 2013 application to Bank-3 for a mortgage). Cohen falsely stated that the $14 million line of credit was undrawn and that he would close it. In truth, Cohen had effectively overdrawn the line of credit, by swapping it out for a fully drawn, larger $20 million loan from Bank-2. Moreover, when Bank-3 informed Cohen that it would only provide financing if Cohen closed the line of credit, Cohen lied again, misleadingly stating in an email that "[t]he medallion line was closed in the middle of November 2014." (PSR ¶¶ 32-33.)

This series of lies culminated in Cohen's application for a HELOC. As noted, Cohen failed to disclose the more than $20 million in refinanced medallion liability on that application, and Bank-3 had no reason to question Cohen about the omission of this liability, because he had affirmatively told the bank that the $14 line of credit was closed.

In addition to failing to disclose more than $20 million in medallion liability, Cohen also intentionally omitted the tens of thousands in monthly interest payments he was making on that debt. Cohen's monthly cash flow or "debt ratio" of expenses to income was a core component of Bank-3's underwriting processes that considered an applicant's ability to make loan payments and guard against the bank's need to enter into lengthy foreclosure proceedings. In evaluating prospective loans, Bank-3 typically required that a borrower's monthly expenses represent no more

than 45 percent of his monthly income.  Based on the incomplete information contained in the HELOC application, Cohen's debt ratio appeared to be below the benchmark set by Bank-3.  Had Cohen truthfully disclosed his expenses, including the extent of the monthly interest payments he was required to make to Bank-3, Cohen's debt ratio would have significantly exceeded the benchmark.  In April 2016, Bank-3 approved Cohen for a $500,000 HELOC, which it would not have approved but for Cohen's concealment of truthful information about his financial condition. (PSR ¶¶ 34-35.)

Notably, each of the foregoing false statements involved Cohen overstating his assets or understating his liabilities, as in these instances it served his purposes to appear to have a higher net worth.  In contrast, when it served Cohen's purposes to understate his net worth to financial institutions, he did so by concealing income and assets from his creditors.  Specifically, documents and witness interviews from the Government's investigation revealed that in 2017 and early 2018, Cohen wanted Bank-2 to restructure his more than $20 million in medallion debt on terms more favorable to Cohen.  Cohen thus shifted gears, halting monthly payments to Bank-2 and falsely representing orally and in writing that he had a negative net worth and less than $1.5 million in cash, despite his receipt of nearly $4 million in "consulting" fees between January 2017 and March 2018.  By early April 2018, Bank-2 and Cohen reached a deal in principle, premised on Bank-2's receipt of an updated personal financial statement confirming, in writing, the negative financial information represented by Cohen.  On April 9, 2018, the FBI executed a series of search warrants on Cohen, including at his residence, hotel, and office, which put him on notice that he was being investigated for, among other things, bank fraud and explicitly referenced Bank-2.  Following the execution of the warrants, counsel for Cohen informed Bank-2 that Cohen would be unable at that time to provide the previously promised updated personal financial statement.  To save the deal,

Cohen agreed to post his Park Avenue residence as collateral, which he had previously refused to do.  An updated financial statement Cohen provided at closing reflected a positive $17 million net worth in addition to previously undisclosed liquid assets, a nearly $20 million increase from the false financial information Cohen had provided to Bank-2 just weeks earlier in the negotiations.

Thus, the false statement to Bank-3 to which Cohen pleaded guilty was far from an isolated event:  It was one in a long-series of self-serving lies Cohen told to numerous financial institutions.

### 4.  Cohen's Illegal Campaign Contributions

On approximately June 16, 2015, Individual-1, for whom Cohen worked at the time, began an ultimately successful campaign for President of the United States.  Cohen had no formal title with the campaign, but had a campaign email address, and, at various times advised the campaign, including on matters of interest to the press.  Cohen also made media appearances as a surrogate and supporter of Individual-1.  (PSR ¶ 39).

During the campaign, Cohen played a central role in two similar schemes to purchase the rights to stories – each from women who claimed to have had an affair with Individual-1 – so as to suppress the stories and thereby prevent them from influencing the election.  With respect to both payments, Cohen acted with the intent to influence the 2016 presidential election. Cohen coordinated his actions with one or more members of the campaign, including through meetings and phone calls, about the fact, nature, and timing of the payments.  (PSR ¶ 51).  In particular, and as Cohen himself has now admitted, with respect to both payments, he acted in coordination with and at the direction of Individual-1.  (PSR ¶¶ 41, 45).  As a result of Cohen's actions, neither woman spoke to the press prior to the election.  (PSR ¶ 51).

<u>Cohen Causes the Magazine to Pay Woman-1</u>

In approximately June 2016, a model and actress ("Woman-1") began attempting to sell

her story of her alleged extramarital affair with Individual-1.  Woman-1 knew that the story would be of considerable value because of Individual-1's candidacy for president.  Woman-1 retained an attorney ("Attorney-1") to represent her in this matter.  (PSR ¶ 41).

Attorney-1 then contacted the editor-in-chief ("Editor-1") of a popular tabloid magazine ("Magazine-1") and offered to sell the story to Magazine-1.  The Chairman and Chief Executive Officer ("Chairman-1") of the media company that owns Magazine-1 ("Corporation-1") had a prior relationship with Individual-1 and Cohen.  In August 2014, Chairman-1 had met with Cohen and Individual-1, and had offered to help deal with negative stories about Individual-1's relationships with women by identifying such stories so that they could be purchased and "killed."  Consistent with that offer, after Editor-1 told Chairman-1 about Woman-1's story, they contacted Cohen to tell him about the offer.  (PSR ¶¶ 40-41).

At Cohen's urging and with his promise that Corporation-1 would be reimbursed, Editor-1 began negotiating the purchase of Woman-1's story.  On August 5, 2016, Corporation-1 entered into an agreement with Woman-1 to acquire the "limited life rights" to the story of her relationship with "any then-married man," in exchange for $150,000 and a commitment to feature her on two magazine covers and publish over one hundred magazine articles authored by her.   The agreement's principal purpose was to suppress Woman-1's story so as to prevent the story from influencing the election.  (PSR ¶¶ 41-42).

Between August 2016 and September 2016, Cohen agreed with Chairman-1 to assign the rights to the non-disclosure portion of Corporation-1's agreement with Woman-1 to Cohen for $125,000.  Cohen then incorporated a shell entity called "Resolution Consultants LLC" to be used in the transaction.  Both Chairman-1 and Cohen ultimately signed the agreement, and a consultant for Corporation-1, using his own shell entity, provided Cohen with an invoice for the payment of

$125,000.  That assignment was never completed, however.  (PSR ¶¶ 43-44).

Cohen Pays Woman-2

On October 8, 2016, an agent for an adult film actress ("Woman-2") informed Editor-1 that Woman-2 was willing to make public statements and confirm on the record her alleged past affair with Individual-1.  Chairman-1 and Editor-1 contacted Cohen and put him in touch with Attorney-1, who was also representing Woman-2.  Over the course of the next few days, Cohen negotiated a $130,000 agreement with Attorney-1 to purchase Woman-2's silence.  Cohen received a signed confidential settlement agreement and a separate side letter from Attorney-1.  (PSR ¶ 45).

Cohen did not immediately execute the settlement agreement, nor did he pay Woman-2. On the evening of October 25, 2016, with no final deal in place with Woman-2, Attorney-1 told Editor-1 that Woman-2 was close to completing a deal with a media outlet, under which she would make her story public.  Editor-1 texted Cohen that "[w]e have to coordinate something on the matter [Attorney-1 is] calling you about or it could look awfully bad for everyone."  Chairman-1 and Editor-1 then called Cohen through an encrypted telephone application.  Cohen agreed to make the payment and then called Attorney-1 to finalize the deal.  (PSR ¶ 46).

On October 26, 2016, Cohen emailed an incorporating service to obtain the corporate formation documents for another shell corporation, Essential Consultants, LLC, which he had incorporated a few days prior.  That afternoon, he directed that $131,000 from his HELOC – the same HELOC he had obtained by means of false statements, *see* p. 8-10, *supra* – be deposited into an account he had just opened in the name of Essential Consultants LLC.  The next day, Cohen wired $130,000 from that account to Attorney-1.  On the wire form, Cohen falsely indicated that the purpose of the wire was to pay a "retainer."  On November 1, 2016, Cohen received copies of the final, signed confidential settlement agreement and side letter agreement from Attorney-1.

(PSR ¶¶ 47-50).

After the election, Cohen sought reimbursement for election-related expenses, including the $130,000 payment he had made to Woman-2.  Cohen presented an executive of the Company with a copy of a bank statement reflecting the $130,000 wire transfer.  Cohen also requested reimbursement of an additional $50,000, which represented a claimed payment for campaign-related "tech services."  Executives of the Company agreed to reimburse Cohen by adding $130,000 and $50,000, "grossing up" that amount to $360,000 for tax purposes, and adding a $60,000 bonus, such that Cohen would be paid $420,000 in total.  Executives of the Company decided to pay the $420,000 in monthly installments of $35,000 over the course of a year.  (PSR ¶¶ 52-53).

At the instruction of an executive for the Company, Cohen sent monthly invoices to the Company for these $35,000 payments, falsely indicating that the invoices were being sent pursuant to a "retainer agreement."  The Company then falsely accounted for these payments as "legal expenses."  In fact, no such retainer agreement existed and these payments were not "legal expenses" – Cohen in fact provided negligible legal services to Individual-1 or the Company in 2017 – but were reimbursement payments.  Cohen then received the $420,000 during the course of 2017.  (PSR ¶¶ 54-56).

### 5. *Cohen's False Statements to Congress*

Cohen also deliberately made false statements to the Congress.  The offense conduct regarding Cohen's false statements in set forth in the sentencing submission being filed by the SCO in 18 Cr. 850 (WHP).  (*See also* PSR ¶¶ 62-73).

## B. Cohen's Meetings with Law Enforcement

Since his guilty plea, Cohen has provided information to various law enforcement entities,

including representatives of this Office and the SCO.  As set forth in the submission being filed by the SCO in 18 Cr. 850 (WHP), this Office understands that the information provided by Cohen to the SCO was ultimately credible and useful to its ongoing investigation.

To be clear, neither the SCO nor this Office is making a motion under U.S.S.G. § 5K1.1. No such motion is being made because, as detailed herein, Cohen repeatedly declined to provide full information about the scope of any additional criminal conduct in which he may have engaged or had knowledge.  However, this Office acknowledges and agrees that Cohen's provision of information to the SCO in connection with its investigation is a mitigating factor that the Court should consider in imposing sentence.  Indeed, Cohen's provision of information to the SCO is the reason that this Office is not seeking a Guidelines sentence here, but rather is acknowledging that a modest variance is appropriate.

While Cohen's provision of information to the SCO merits credit, his description of his actions as arising solely from some "personal resolve" – as opposed to arising from the pendency of criminal charges and the desire for leniency – ignores that Cohen first reached out to meet with the SCO at a time when he knew he was under imminent threat of indictment in this District.  As such, any suggestion by Cohen that his meetings with law enforcement reflect a selfless and unprompted about-face are overstated.

With respect to Cohen's provision of information to this Office, in its two meetings with him, this Office assessed Cohen to be forthright and credible, and the information he provided was largely consistent with other evidence gathered.  Had Cohen actually cooperated, it could have been fruitful:  He did provide what could have been useful information about matters relating to ongoing investigations being carried out by this Office.  But as Cohen partially acknowledges, it was *his* decision not to pursue full cooperation, and his professed willingness to continue to provide

information at some later unspecified time is of limited value to this Office, both because he is under no obligation to do so, and because the Office's inability to fully vet his criminal history and reliability impact his utility as a witness.

Indeed, his proffer sessions with the SCO aside, Cohen only met with the Office about the participation of others in the campaign finance crimes to which Cohen had already pleaded guilty. Cohen specifically declined to be debriefed on other uncharged criminal conduct, if any, in his past.[4]  Cohen further declined to meet with the Office about other areas of investigative interest. As the Court is undoubtedly aware, in order to successfully cooperate with this Office, witnesses must undergo full debriefings that encompass their entire criminal history, as well as any and all information they possess about crimes committed by both themselves and others.  This process permits the Office to fully assess the candor, culpability, and complications attendant to any potential cooperator, and results in cooperating witnesses who, having accepted full responsibility for any and all misconduct, are credible to law enforcement and, hopefully, to judges and juries. Cohen affirmatively chose not to pursue this process.  Cohen's efforts thus fell well short of cooperation, as that term is properly used in this District.[5]

For this reason, Cohen is not being offered a cooperation agreement or a 5K1.1 letter.

---

[4] At the time that Cohen met twice with this Office, through his attorneys, he had expressed that he was considering – but not committing to – full cooperation.  Cohen subsequently determined not to fully cooperate.

[5] Cohen's provision of information to the Office of the New York Attorney General ("NY AG") warrants little to no consideration as a mitigating factor.  This Office's understanding is that the information Cohen provided was useful only to the extent that he corroborated information already known to the NY AG.  More importantly, Cohen provided information to the NY AG not as a cooperating witness who was exposing himself to potential criminal or civil liability but instead as a witness who could have been compelled to provide that testimony.  Fulfilling that basic legal responsibility voluntarily does not warrant a reduced sentence – particularly when one waits until he is charged with federal crimes before doing so. Similarly, this Office's understanding is that the New York State Department of Taxation and Financial Services ("NYSDTF") subpoenaed Cohen for information about the payment *of his own state taxes*, and any claimed "cooperation" with NYSDTF  appears to consist solely of providing that entity information that they would otherwise have obtained via subpoena.

Within the confines of the SCO investigation itself, the Office does not dispute that Cohen's assistance to the SCO was significant.  But because Cohen elected not to pursue more fulsome cooperation with this Office, including on other subjects and on his own history, the Office cannot assess the *overall* level of Cohen's cooperation to be significant.  Therefore, the Office submits that, in fashioning a sentence on *its* case, the Court afford Cohen credit for his efforts with the SCO, but credit that accounts for only a modest variance from the Guidelines range and does not approach the credit typically given to actual cooperating witnesses in this District.

## APPLICATION OF THE SENTENCING GUIDELINES

**A.    The Probation Department's Calculation**

The Office agrees with the Probation Department's calculation of the total offense level as 24, *see* PSR ¶ 110, and the Criminal History Category as I, *see* PSR ¶ 114.  Based upon these calculations, Cohen's advisory Guidelines range is 51 to 63 months' imprisonment. (PSR ¶ 174.)

**B.    Cohen's Challenges to the Guidelines Calculation**

Cohen challenges the Probation Department's calculation on two grounds.  (Def. Mem. at 22-26.)  Each claim is meritless.

### 1.    The PSR's Grouping Analysis is Correct

Cohen claims that the Probation Department's grouping of the tax evasion counts with the other counts in Information 18 Cr. 602 was incorrect because the counts are not "closely related." This argument is contrary to the text of the applicable Guidelines and controlling Second Circuit precedent.

The PSR groups all eight counts in Information 18 Cr. 602 pursuant to U.S.S.G. § 3D1.2, which provides that "[a]ll counts involving substantially the same harm shall be grouped together

17

into a single Group."[6]  Subsection (d) of the Guideline specifies that "substantially the same harm" includes "[w]hen the offense level is determined largely on the basis of the total amount of harm or loss."  U.S.S.G. § 3D1.2(d).  The subsection also includes a list of specifically enumerated Guidelines that are to be grouped.  *Id.*  All three of the Guidelines at issue here – U.S.S.G. § 2B1.1, which applies to the false statements count, § 2C1.8, which applies to the illegal campaign contribution counts, and § 2T1.1, which applies to the tax evasion counts – are included on that list.  Thus, using the plain text of the Guidelines, all of the offenses here should be grouped.[7]  The commentary to the Guidelines further supports this conclusion.  It states that "counts involving offenses to which different offense guidelines apply are grouped together under subsection (d) if the offenses are of the same general type," and further specifies that "[t]he 'same general type' of offense is to be construed broadly."  U.S.S.G. § 3D1.2 app. n. 6.

Second Circuit case law supports the plain-text reading of the Guidelines. The Second Circuit has held that Section 3D1.2(d) must be used to group tax crimes with fraud and other offenses for which the offense level is principally determined by the amount of loss.  *United States v. Gordon*, 291 F.3d 181, 192 (2d Cir. 2002); *see also United States v. Fitzgerald*, 232 F.3d 315, 320 (2d Cir. 2000) (holding that tax evasion, fraud and conversion should be grouped under Section 3D1.2(d) because they are offenses of the same general type); *United States v. Petrillo*,

---

[6] The false statements to Congress count charged in 18 Cr. 850 does not group with the other counts, but it does not affect the Guidelines calculation.  (PSR ¶ 88).

[7] Cohen argues that the listing of specific Guidelines in this subsection does not make grouping mandatory.  *See* Def. Mem. at 23 (citing *United States v. Napoli*, 179 F.3d 1, 9 n.4 (2d Cir. 1999)).  But saying that grouping is not *mandatory* does not mean that it is not *appropriate* – particularly where, as here, the Guidelines in question are each ones in which the offense level is determined largely on the basis of the total amount of loss.  *See Napoli*, 179 F.3d at 9 n.4 (citing as an example where grouping would not be appropriate fraud and drug counts, because one measures harm by dollar losses whereas the other measures harm by drug weights).  Here, each of the listed offenses measures harm by dollar amounts, meaning that *Napoli*, cited by Cohen, actually supports the Office's position.

237 F.3d 119, 124-25 (2d Cir. 2000) (holding that tax evasion and mail fraud should be grouped under Section 3D1.2(d)); *United States v. Bernstein*, 43 Fed. App'x 429, 431 (2d Cir. 2002) (affirming grouping of mail fraud and tax fraud offenses under Section 3D1.2(d)).[8]

Cohen attempts to distinguish *Petrillo*, arguing that the tax and mail fraud offenses in that case were factually intertwined and that it was decided at a time when the tax and fraud tables had the same thresholds. (Def Mem. at 24). But even if *Petrillo* were read as limited to the facts of that case, *Gordon* resolves any uncertainty. Analyzing *Petrillo* and *Fitzgerald*, the Second Circuit held in *Gordon* that even if those cases do not require grouping under Section 3D1.2(d), the structure of the Guidelines does in fact "require" that "crimes falling within the special category of quantifiable-harm offenses" be grouped under § 3D1.2(d). *Gordon*, 291 F.3d at 193. That was so even though, at the time, the tax and fraud offense tables no longer had identical thresholds. Nevertheless, the Circuit held that the district court committed clear and obvious error by not applying Section 3D1.2(d) to group the fraud and tax evasion offenses in that case. *Id.*[9]

Moreover, Cohen's position – that the campaign finance and false statements counts should group, but the tax evasion counts should not – does not make sense. All three sets of counts are offenses for which the offense level is based principally on a quantifiable amount of harm or loss, and qualify as offenses of "the same general type" as each other. But even if the foregoing precedent were set aside, and the phrase "general type" were construed narrowly so that tax crimes were not of the same general type as false statements or campaign finance offenses, then the false

---

[8] Cohen argues that the "vast majority of Circuit courts" have held otherwise, citing *United States v. Doxie*, 813 F.3d 1340, 1345 (11th Cir. 2016). But as *Doxie* recognizes, the Second Circuit has concluded that "fraud counts and tax counts should be grouped together under § 3D1.2(d)." *Id.* at n.3. That holding is binding here in the Second Circuit.

[9] The concurrence in *Gordon* cited by Cohen did not command a majority of the panel and thus is not controlling precedent.

statements and campaign finance crimes would similarly not be of the same "general type." Indeed, the false statements and campaign finance crimes are no more similar as a general matter or related as a factual matter than the tax crimes are with the other offenses.  Thus, there is no rational basis to group some but not all of the offenses in this case. [10]

###    2.    *The Guidelines Enhancements Are Not "Overlapping"*

In the plea agreement, the parties have stipulated that two-level enhancements are warranted for both (i) Cohen's used of "sophisticated means," and (ii) his use of his "special skill" as a licensed attorney in a manner that significantly facilitated the commission and concealment of his crimes.  The PSR also applies these enhancements.  (PSR ¶¶ 92, 94).  While not contesting their applicability as a legal matter, Cohen argues that they address overlapping conduct, such that the resulting Guidelines range overstates the offense. (Def. Mem. at 24-25).  This argument is meritless.  The "sophisticated means" and "special skill" enhancements address different aspects of Cohen's conduct, and each serves a unique purpose under the Guidelines.

The "sophisticated means" enhancement is addressed to Cohen's use of complex means to carry out and disguise his crimes.  For example, Cohen created shell companies for his commission of the campaign finance crimes, including one shell entity (Resolution Consultants) for use in the transaction with Woman-1 and another shell entity (Essential Consultants) for use in the transaction with Woman-2.  (PSR ¶¶ 43, 47.)  Cohen also agreed to structure the reimbursement for his payment to Woman-2 in monthly installments, and to disguise those payments by creating fake invoices that referenced a non-existent "retainer."   (PSR ¶ 54.)  These actions clearly constitute the use of "sophisticated means," and Cohen does not and cannot argue to the contrary. *See, e.g.*, U.S.S.G. § 2B1.1 cmt. n. 9(B) ("[c]onduct such as hiding assets or transactions, or both,

---

[10] If that were the case – that *none* of the counts grouped – then the total offense level would likely be 27, yielding a much higher Guidelines range of 70 to 87 months' imprisonment.

through the use of fictitious entities [or] corporate shells . . . ordinarily indicates sophisticated means"); *United States v. Amico*, 416 F.3d 163, 169 (2d Cir. 2005) (creation of false bank documents, appraisals, and blueprints constituted sophisticated means); *see also United States v. Regensberg*, 381 F. App'x 60, 62 (2d Cir. 2010) (creation of fake loan documents and fraudulent earnings statements constituted sophisticated means).

By contrast, the "special skill" enhancement is directed at a different aspect of Cohen's conduct – his use of his education, training, and licensure as an attorney to facilitate and conceal the campaign finance crimes.  For example, in order to facilitate the hush money payment to Woman-2, Cohen used his skills and experience as an attorney to negotiate and finalize a settlement agreement with Woman-2, which included both a principal agreement and a separate side letter that was designed specifically to conceal the identities of the parties.  (PSR ¶ 45).  Moreover, Cohen's role as the attorney for one of the individuals involved in both settlement agreements allowed him to use his position to attempt to cloak his criminal conduct under the veil of attorney-client privilege.  Indeed, in conversations he recorded with reporters, he claimed that beyond his public statements on the matter, he could not answer questions about his role in the payments because of attorney-client privilege.  This sort of conduct implicates the "special skill" enhancement.  *See, e.g.*, *United States v. Mancuso*, 428 Fed. Appx. 73, 2011 WL 2580228, at *7 (2d Cir. June 30, 2011) (enhancement warranted where attorney used legal skills to create a power of attorney, draft a backdated partnership agreement, and form a company in furtherance of the offense); *United States v. Kelly*, 147 F.3d 172, 178 (2d Cir. 1998) (defendant used his skill as an experienced attorney to prepare an assignment of income in an effort to avoid income tax).

These two enhancements are thus directed at different actions that carry unique harms.  For that reason, Cohen's argument that the enhancements are "overlapping" and should thus be

discounted is meritless.  *See, e.g.*, *United States v. Minneman*, 143 F.3d 274, 283 (7th Cir. 1998) (rejecting "double-counting" argument where the special skill adjustment focused on the defendant's use of his legal training, while the sophisticated means enhancement was based on his use of multiple accounts and corporate names); *United States v. Rice*, 52 F.3d 843, 851 (10th Cir. 1995) (noting that "[t]he purpose of the special skill enhancement is to punish those criminals who use their special talents to commit crime," whereas the sophisticated means enhancement is "designed to target criminals who engage in complicated criminal activity because their actions are considered more blameworthy and deserving of greater punishment than a perpetrator of a simple version of the crime").

## C.      The Probation Department's Recommendation

Taking into account the factors set forth in 18 U.S.C. § 3553(a), including Cohen's age and background, the nature and circumstances of his offenses, and the need to avoid unwarranted sentencing disparities, the Probation Department recommends a sentence of 42 months' imprisonment and a $100,000 fine. (PSR at 53-54.)  The Probation Department's recommendation does not, however, consider Cohen's provision of information to the SCO.

## <u>DISCUSSION</u>

## A.      A Substantial Term of Imprisonment Is Warranted

As set forth herein, consideration of the factors set forth in 18 U.S.C. § 3553(a) weighs heavily in favor of a substantial term of imprisonment.  In particular, the nature and seriousness of the offenses and the need to promote respect for the law and afford adequate deterrence are especially weighty considerations.

### *1.  The Nature and Seriousness of the Offenses*

In his submission, Cohen states that "the facts and circumstances surrounding this case are

unique and unprecedented." (Def. Mem. at 28-29.) That may be so, but it is not exclusively for the reasons given by Cohen. It is also unique because Cohen managed to commit a panoply of serious crimes, all while holding himself out as a licensed attorney and upstanding member of the bar. His offenses strike at several pillars of our society and system of government: the payment of taxes; transparent and fair elections; and truthfulness before government and in business.

*First*, Cohen's commission of two campaign finance crimes on the eve of the 2016 election for President of the United States struck a blow to one of the core goals of the federal campaign finance laws: transparency. While many Americans who desired a particular outcome to the election knocked on doors, toiled at phone banks, or found any number of other legal ways to make their voices heard, Cohen sought to influence the election from the shadows. He did so by orchestrating secret and illegal payments to silence two women who otherwise would have made public their alleged extramarital affairs with Individual-1. In the process, Cohen deceived the voting public by hiding alleged facts that he believed would have had a substantial effect on the election.

It is this type of harm that Congress sought to prevent when it imposed limits on individual contributions to candidates. To promote transparency and prevent wealthy individuals like Cohen from circumventing these limits, Congress prohibited individuals from making expenditures on behalf of and coordinated with candidates. Cohen clouded a process that Congress has painstakingly sought to keep transparent. The sentence imposed should reflect the seriousness of Cohen's brazen violations of the election laws and attempt to counter the public cynicism that may arise when individuals like Cohen act as if the political process belongs to the rich and powerful.

Cohen's submission suggests that this was but a brief error in judgment. Not so. Cohen knew exactly where the line was, and he chose deliberately and repeatedly to cross it. Indeed, he

was a licensed attorney with significant political experience and a history of campaign donations, and who was well-aware of the election laws.[11]  In fact, Cohen publicly and privately took credit for Individual-1's political success, claiming – in a conversation that he secretly recorded – that he "started the whole thing . . . started the whole campaign" in 2012 when Individual-1 expressed an interest in running for President.  Moreover, not only was Cohen well aware of what he was doing, but he used sophisticated tactics to conceal his misconduct.   He arranged one of the payments through a media company and disguised it as a services contract, and executed the second non-disclosure agreement with aliases and routed the six-figure payment through a shell corporation.  After the election, he arranged for his own reimbursement via fraudulent invoices for non-existent legal services ostensibly performed pursuant to a non-existent "retainer" agreement.  And even when public reports of the payments began to surface, Cohen told shifting and misleading stories about the nature of the payment, his coordination with the candidate, and the fact that he was reimbursed.

This was not a blind act of loyalty, as Cohen has also suggested.  His actions suggest that Cohen relished the status of ultimate fixer – a role that he embraced as recently as May 2018.[12] Cohen was driven by a desire to further ingratiate himself with a potential future President—for whose political success Cohen himself claimed credit—and arranged for the payments in an attempt to increase his power and influence.  Indeed, after Cohen caused the media company to

---

[11] Cohen was previously the subject of an FEC complaint for making unlawful contributions to Donald Trump's nascent campaign for the 2012 presidency.  The complaint was dismissed for jurisdictional reasons, but it certainly put Cohen on notice of the applicable campaign finance regulations.  *See In the Matter of Donald J. Trump, Michael Cohen, et al.*, MUR 6462 (Sept. 18, 2013).

[12]    Michael Cohen (@michaelcohen212), Twitter (May 8, 2018, 6:19 PM), https://twitter.com/michaelcohen212/status/971933570146201600?lang=en (thanking @CNN "for your accurate depiction of me and my role for our @POTUS @realDonaldTrump!  #loyalty #RayDonovan #fixer).  The phrase "#RayDonovan" is a reference to the fictional "fixer" character on the Showtime television crime drama *Ray Donovan*.

make an illegal expenditure, in a secretly recorded meeting Cohen took credit for the payment and assured Individual-1 that he was "all over" the transaction.  And after making the payment to the second woman, and after Individual-1 was elected President, Cohen privately bragged to friends and reporters, including in recorded conversations, that he had made the payment to spare Individual-1 from damaging press and embarrassment.

Cohen's criminal violations of the federal election laws were also stirred, like his other crimes, by his own ambition and greed.  During and after the campaign, Cohen privately told friends and colleagues, including in seized text messages, that he expected to be given a prominent role and title in the new administration.  When that did not materialize, Cohen found a way to monetize his relationship with and access to the President.  Cohen successfully convinced numerous major corporations to retain him as a "consultant" who could provide unique insights about and access to the new administration.  Some of these corporations were then stuck making large up-front or periodic payments to Cohen, even though he provided little or no real services under these contracts.  Bank records reflect that Cohen made more than $4 million dollars before the contracts were terminated.

*Second*, Cohen undertook similar acts of deception in his private life.  He concealed significant amounts of income from the IRS, and lied about his financial status in his dealings with banks.  These offenses warrant significant punishment.  For at least half a decade, Cohen willfully evaded paying taxes.  Cohen, who himself studied tax in law school and displayed an awareness of complicated tax laws in real estate transactions, took purposeful steps to avoid paying taxes on millions of dollars in income over a five-year period.  He made private loans at double-digit interest rates and did not report the millions of dollars in income it generated.  The fact that these loans were cash generators was not lost on Cohen:  At one point, he offered to sell the loans to other

investors. Cohen also failed to report hundreds of thousands of dollars in consulting income and legal work, and underreported payments he received from his ownership of taxi medallions.

Cohen's sentencing memorandum attempts to downplay the seriousness of this conduct, labeling it "unsophisticated" because this case does not involve unreported cash transactions, offshore accounts, phony deductions, or obstructive conduct. (Def. Mem. at 14.) But the nature of Cohen's criminal conduct is apparent from the manner in which he dealt with his own accountant: Cohen provided incomplete information to his accountant, lied about the existence or value of certain assets and income sources, and rebuffed questions that would have revealed income he deliberately concealed. Moreover, Cohen's crimes were not ones of necessity. To the contrary, he relied on his unreported income to maintain his opulent lifestyle and purchase luxury items. Indeed, in some years, the amount of money that Cohen spent on expenses – including credit card bills, fine art purchases, and payments for private school – exceeded the gross amount of income listed on Cohen's tax returns.

*Third,* Cohen similarly flouted his obligation to be truthful in business when seeking financing. To secure loans, Cohen falsely understated the amount of debt he was carrying, and omitted information from his personal financial statements, to induce a bank to lend based on incomplete information. To explain why he submitted a false statement to a bank that failed to disclose more than $20 million in liabilities as well as tens of thousands in monthly expenses, Cohen notes that it was his private banker who provided Cohen with an inaccurate application, which Cohen failed to correct. But this was no mere error of omission: As noted above, Cohen was specifically asked about the omission, and covered it up by misleadingly telling Bank-3 that the liabilities had been expunged, when in fact they had been re-established at another bank. This false statement was the latest in a series of false statements Cohen had made to this banker and

others.  *See* p. 8-11, *supra*.  And indeed it was one of these prior false statements – in which Cohen told the banker that he had closed the $14 million line of credit in question – that led the banker to omit that liability from the draft of his application.

Cohen is loath to acknowledge these false statements to banks.  Likewise at his guilty plea proceeding, the Court had to press Cohen to acknowledge that he understood he was lying to a bank.  This signals that Cohen's consciousness of wrongdoing is fleeting, that his remorse is minimal, and that his instinct to blame others is strong.  While he has legally accepted responsibility, the Court should consider at sentencing these transparent efforts at minimizing Cohen's false statements and criminal conduct.  As the Probation Department recognized in rejecting these arguments, Cohen is attempting "to lessen [his] culpability and place the burden on Bank-3."  (PSR at 48.)[13]

*Finally*, Cohen has pled guilty to making false statements to Congress in connection with a congressional investigation.  This offense is described in detail in the SCO's sentencing submission.

Taken alone, these are each serious crimes worthy of meaningful punishment. Taken together, these offenses reveal a man who knowingly sought to undermine core institutions of our democracy.  His motivation to do so was not borne from naiveté, carelessness, misplaced loyalty, or political ideology.  Rather, these were knowing and calculated acts – acts Cohen executed in

---

[13]   In a further attempt at undermining the seriousness of this offense, Cohen observes that there has been no monetary loss to any bank.  (Def. Mem. at 18.)  Financial loss, however, should not be the only measure of the seriousness of the offense.  Cohen's argument fails to recognize the important federal interest at stake, which is reflected in the purpose and history of 18 U.S.C. § 1014.  Section 1014 was designed to "protect federally insured institutions from losses stemming from false statements or misrepresentations that mislead the institutions into making financial commitments, advances, or loans," and thereby to "protect the integrity of the system of credit generated and maintained by federally insured banks."  *United States v. Zahavi*, No. 12 Cr. 288 (JPO), 2012 WL 5288743, at *2 (S.D.N.Y. Oct. 26, 2012).  If borrowers obtain loans based on false information, and cannot fulfill their obligations, that can have tremendous negative effects on lenders and the banking system as a whole.

order to profit personally, build his own power, and enhance his level of influence.  The nature and seriousness of each of Cohen's crimes warrant a substantial sentence in this case.  *See* 18 U.S.C. § 3553(a)(1), (2)(A).

### 2.  *The Need to Promote Respect for the Law and to Afford Adequate Deterrence*

The need for the sentence to promote respect for the law and to afford adequate deterrence further supports imposition of a significant sentence of imprisonment.  Congress provided for strong criminal sanctions as a general deterrent to tax evasion, false statements to financial institutions, and campaign finance violations.  Given the magnitude and brazenness of the conduct in this case, the interests of deterrence are best served by the imposition of a substantial term of imprisonment.

Cohen's years-long pattern of deception, and his attempts to minimize certain of that conduct even now, make it evident that a lengthy custodial sentence is necessary to specifically deter him from further fraudulent conduct, whether out of greed or for power, in the future.  Certainly, Cohen has no prior convictions, and is well-educated and professionally successful.  Generally, such characteristics suggest that a defendant is unlikely to re-offend in the future.  But where, as here, the nature, multitude, and temporal span of criminal behavior betray a man whose outlook on life was often to cheat – an outlook that succeeded for some time – his professional history and lack of prior convictions are not a significant mitigating factor.

For much the same reasons, the time-served sentence that Cohen seeks would send precisely the wrong message to the public.  General deterrence is a significant factor here.  Campaign finance crimes, because they are committed in secret and hidden from the victims, are difficult to identify and prosecute.  Nonetheless, they have tremendous social cost, described above, as they erode faith in elections and perpetuate political corruption.  Effective deterrence of

such offenses requires incarceratory sentences that signal to other individuals who may contemplate conduct similar to Cohen's that violations of campaign finance laws will not be tolerated. Particularly in light of the public interest in this case, the Court's sentence may indeed have a cognizable impact on that problem by deterring future candidates, and their "fixers," all of whom are sure to be aware of the Court's sentence here, from violating campaign finance laws.

Additionally, a significant sentence of imprisonment would also generally deter tax evasion and other financial crimes by sending the important message that even powerful individuals cannot cheat on their taxes and lie to financial institutions with impunity, because they will be subject to serious federal penalties. This is particularly important in the context of a tax evasion prosecution. Hundreds of billions of dollars are lost annually because people like Cohen – who otherwise take full advantage of all that taxes bring, such as schools, paved roads, transit systems, and Government buildings – shirk their responsibilities as American taxpayers. Meaningful sentences – that is, ones that, through their terms, speak loudly and clearly – must be given in cases like this one so that others are forewarned of the consequences for engaging in tax crimes. As the United States Sentencing Commission has explained, "[b]ecause of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would be violators." U.S.S.G. Ch. 2, Part T, intro. Cmt. Where the incidence of prosecution is lower, the level of punishment must be higher to obtain the same level of deterrence. *See generally* Louis Kaplow and Steven Shavell, "Fairness Versus Welfare," 114 Harv. L. Rev. 961, 1225-1303 (2001); *see also United States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a within-Guidelines 32-month sentence for a tax

evader when the district court explained that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it").   Indeed, "[s]tudies have shown that salient examples of tax-enforcement actions against specific taxpayers, especially those that involve criminal sanctions, have a significant and positive deterrent effect." Joshua D. Blank, *In Defense of Individual Tax Privacy*, 61 Emory L.J. 265, 321 (2011-2012).   Our system of voluntary compliance would be undermined if wealthy and successful individuals such as Cohen come to believe that the most severe sanctions that they will face, in the relatively unlikely case that they are caught cheating on their taxes, are the payment of back taxes, interest, and penalties.   The Guidelines therefore recognize the harm tax crimes inflict on society and recommend prison sentences for cases like this one.

In sum, the nature of Cohen's conduct underscores the need for a substantial period of incarceration as a means both to promote respect for the law and to deter future abuses by other individuals seeking improperly to influence the electoral process, evade taxes, or lie to financial institutions. 18 U.S.C. § 3553(a)(2)(A) & (a)(2)(B).

**B.    Cohen's Request for a Sentence of Time Served is Meritless**

In his submission, Cohen requests a sentence of time served, which would effectively be a sentence of a matter of hours – 99.5% lower than what the Sentencing Guidelines and Probation Department recommend.   When considering "the kinds of sentences available," 18 U.S.C. § 3553(a)(3), this Court should view with great skepticism a request for a non-incarceratory sentence when the Guidelines recommend a substantial prison term.   *See United States v. Goldberg*, 491 F.3d 668, 673 (7th Cir. 2007) ("When the guidelines, drafted by a respected public body with access to the best knowledge and practices of penology, recommend that a defendant be sentenced to a number of years in prison, a sentence involving no . . . imprisonment

can be justified only by a careful, impartial weighing of the statutory sentencing factors."). Cohen presses four principal arguments in support of his request, but none warrants the extraordinary variance that he seeks.

*First*, Cohen argues that the emotional toll of his convictions on him and his family, the loss of his law license and other business, and civil tax penalties, "amount[] to an alternative form of punishment," which warrants a sentence of time served. (Def. Mem. at 26.) They do not. Congress, through the Guidelines, has pointedly addressed and rejected this "I've been punished enough" argument from privileged citizens who bemoan the collateral consequences of a guidelines sentence to persons like themselves. *See* 28 U.S.C. § 994(d) ("The Commission shall assure that the guidelines and policy statements are entirely neutral as to . . . socioeconomic status of offenders."); U.S.S.G. § 5H1.10 (socioeconomic status not relevant); see also U.S.S.G. § 5H1.2 (vocational skills and education not ordinarily relevant); U.S.S.G. § 5H1.5 (employment record not ordinarily relevant); U.S.S.G. § 5H1.6 (family ties and responsibilities not ordinarily relevant). The federal courts have repeatedly agreed. *See, e.g.*, *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); *United States v. Musgrave*, 761 F.3d 602, 608–09 (6th Cir. 2014) (impermissible for the district court to rely heavily on the fact that the defendant had already "been punished extraordinarily" through years of legal process, the loss of his CPA license, and his felony conviction).

There is nothing about Cohen's family circumstances warranting the extraordinary sentence that he seeks. On the contrary, rather than a factor warranting any decreased imprisonment, Cohen's education, resources and opportunities should, in the event that they are

relevant at all, weigh in favor of holding him to an exacting standard.  Cohen did not need to

commit the crimes that he did, yet he committed them for personal gain.  He was motivated in part

by greed and the desire to live an opulent and lavish lifestyle.  And for all of Cohen's outward

rectitude, he has lived a double life, which weighs heavily against a variance.  While Cohen has

submitted letters describing his good nature, the evidence collected and witnesses interviewed in

this investigation paint a decidedly different picture – a picture of someone who was threatening

and abusive when he wanted to get his way.  For instance, in 2015, Cohen threatened a journalist

for investigating a negative story about Individual-1, telling him:

> I will make sure that you and I meet one day while we're in the courthouse. And I
> will take you for every penny you still don't have. And I will come after your
> [employer] and everybody else that you possibly know. . . . So I'm warning you,
> tread very fucking lightly, because what I'm going to do to you is going to be
> fucking disgusting. You understand me?[14]

On another call – which Cohen secretly recorded – with bankers from Bank-2 with whom Cohen

was seeking to renegotiate his medallion debt on terms more favorable to him, Cohen threatened:

> I'm gonna teach [the bank and its government conservator] a lesson they've never
> seen before in their life. Because I'm gonna hit everybody up with a lawsuit that's
> gonna spin everyone's head. And I'm looking forward to that, by the way. And I'm
> not saying it as a threat. It's a fact.

Cohen himself said in an interview in 2011 that, "If you do something wrong, I'm going to come

at you, grab you by the neck and I'm not going to let you go until I'm finished."[15]  These are just

a few of the many examples of Cohen's abuse of both his standing as an attorney and his

relationship to a powerful individual – examples of the type of conduct that is repugnant from

anyone, let alone an attorney of the bar.  They stand in marked contrast to the letters of support for

---

[14] The full recording is available at: www.npr.org/player/embed/615843930/615845621.

[15] *See* ABC News, *Meet Michael Cohen* (Apr. 16, 2011), *available at*:
https://abcnews.go.com/Politics/donald-trumps-political-pit-bull-meet-michael-cohen/story?id=13386747.

Cohen.

On balance, like most others who stand before this Court for sentence, Cohen is neither all good nor all bad. His personal interactions in private life should not be this Court's principal consideration. Rather, it is Cohen's serious crimes that should be the Court's lodestar.

*Second*, in support of his argument for a time-served sentence, Cohen makes mention of his financial support and fundraising for his children's former school, as well as his support for other charitable causes. (Def. Mem. at 9-11.) But charitable "and similar prior good works are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." U.S.S.G. § 5H1.11. For good reason: Prior charitable works, however commendable and extensive, by professionally successful defendants rarely, if ever, are materially mitigating factors at sentencing because courts recognize that it is not extraordinary for such defendants to be involved in charities and to have strong professional and personal relationships. *See, e.g.*, *United States v. Barbera*, No. 02 Cr. 1268 (RWS), 2005 WL 2709112, at *12-13 (S.D.N.Y. Oct. 21, 2005); *see also United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009) (a defendant's "good name and good works" should not serve as "the human shield he raises to seek immunity or dramatic mitigation of punishment when he is caught"). Moreover, it is no doubt far easier to give generously to charities when the donor is simultaneously evading the payment of taxes on millions of dollars in income. Cohen was, in effect, donating other people's money. As Chief Judge McMahon has explained, "Using other people's money to do what qualifies as good works by your likes and then suggesting to me that I give you credit for the fact that you didn't use the money to buy a Lamborghini is something that I find and have always found to be contemptible, especially since all too frequently charity is a means to bolster the esteem in which one is held by others." *United States v. Binday*, 12 Cr. 152 (CM), Dkt. 349, at 44-45.

*Third*, in support of his request for a time-served sentence, Cohen cites several cases in which the defendant received little or no jail time. (Def. Mem. at 15-17, 19-20.)  The cases selected by Cohen do not bear any particular factual similarity to the instant case.  Indeed, in none of the cases cited by Cohen did the defendant commit the particular array of crimes that Cohen has.  As set forth below, the Court can just as easily identify numerous examples of cases where more substantial sentences were imposed.  Thus, the cases cited by Cohen do not provide a template for sentencing in this matter, and the Court must decide it based on the particular facts and circumstances of this case.

For instance, Cohen highlights *United States v. Lacy Doyle* as a case in which Judge Carter imposed a non-incarceratory term of four years' probation.  Cohen fails, however, to acknowledge that the advisory guidelines range in that case was just 6 to 12 months' imprisonment based on a guilty plea to one count of subscribing to a false and fraudulent tax return for a single year.[16] Cohen also highlights the sentence imposed in the prosecution of Earl Simmons, a tax evasion case in which the defendant received a year of imprisonment.  In that case, Judge Rakoff focused on the need for imprisonment in tax evasion cases, regardless of their complexity, to ensure general deterrence: "People who are considering tax evasion . . . greatly exaggerate their chances of getting away with it . . . .  That is why prison is important."  Sent. Tr. at 32, *United States v. Earl Simmons*, 17 Cr. 172 (JSR) (S.D.N.Y. Mar. 23, 2018) (ECF No. 39).  While it is true that the methods by which Simmons evaded taxes may have been more complex than here, both men made the calculated decision that they could get away with not paying taxes.  Finally, in contrast to Simmons, tax evasion is but one of the crimes for which sentence is to be imposed in this case.

Cohen also overlooks several tax evasion cases in which courts have recently imposed

---

[16] In addition, because the advisory guidelines in *Doyle* were in Zone B, a term of probation was considered explicitly authorized.  U.S.S.G. § 5B1.1(a)(2).

custodial terms.  *See United States v. Trupin*, 475 F.3d 71, 76 (2d Cir. 2007) (holding that seven-month prison sentence for multi-year tax evasion scheme with a tax loss of $1.2 million failed to reflect seriousness of offense, observing that a tax evader, in effect, "steal[s] from his fellow taxpayers through his deceptions"); Sent. Tr. at 22-23, *United States v. Joseph Ciccarella*, 16 Cr. 738 (AKH) (S.D.N.Y. March 3, 2017) (imposing an 18-month sentence for a defendant who caused a tax loss between $250,000 and $550,000, noting that "the obligation to pay taxes is basic to our civilization").  Finally, in *United States v. Erwin Mayer*, 09 Cr. 581 (WHP), this Court imposed a custodial term of imprisonment on a cooperating defendant whose level of cooperation was described as "unequaled in [that] case, and essentially in any other white-collar case, in which the[] experienced prosecutors had been engaged."  Sent. Tr. at 32, *United States v. Erwin Mayer*, 09 Cr. 581 (WHP) (S.D.N.Y. Aug. 19, 2014) (ECF No. 849).  In imposing a custodial sentence on such a cooperating defendant, this Court noted the "need in these kinds of cases for general deterrence."  (*Id.*)

Cohen also asserts that "numerous allegations of unpaid taxes are routinely asserted by the IRS outside of the criminal context," and cites to news articles about individuals who failed to pay their taxes.  (Def. Mem. at 16-17.)  But Cohen did not just fail to pay assessed taxes.  He willfully evaded taxes by hiding entire income streams over a period of years.  His acts were fraudulent and evasive, and not the product of mistake, negligence, or a failure of his accountant.  Cohen's suggestion that his case should have been handled outside the criminal process ignores the fact that his tax crimes were uncovered in the midst of an investigation of his numerous *other* crimes.  And his complaints about pre-charge process ignore the fact that Cohen was well aware he was under investigation for months before he was charged, and his counsel was given several opportunities to present to the Office as to why he should not be charged and in fact made such a

presentation.  Finally, Cohen's complaints about process and his attempts to blame his accountant make evident the need for an incarceratory sentence to reflect what Cohen still plainly does not perceive: His actions were not just technically criminal, but serious offenses against the Government and the public.

The two unlawful campaign contribution cases cited by Cohen are similarly of little value in crafting an appropriate sentence here.  (Def. Mem. at 19.)  The defendants in those cases made excessive contributions through straw donors, but the amounts of money involved were less substantial, and the effect of the crimes were less severe.  Cohen's crimes are particularly serious because they were committed on the eve of a Presidential election, and they were intended to affect that election.  Thus, the gravity of the offense is considerably greater than the offenses committed in *United States v. Dinesh D'Souza*, No. 14 Cr. 34 (RMB), or *United States v. Jia Hou and Xing Wu Pan*, No. 12 Cr. 153 (RJS).  Moreover, neither case related to the making of a coordinated expenditure – a different offense under the campaign finance laws.

Cohen omits the numerous campaign finance cases, including many more analogous to the facts here, where substantial custodial sentences were imposed for campaign finance offenses. *See, e.g.*, *United States v. Stephen Stockman*, No. 17 Cr. 116 (S.D. Tex. 2018) (defendant sentenced to 120 months' incarceration for making excessive campaign contributions, wire fraud, money laundering, and filing false tax returns); *United States v. Tyler Harber*, No. 14 Cr. 373 (LO) (E.D. Va. 2015) (defendant sentenced to 24 months' incarceration following guilty plea for making coordinated expenditures and false statements to the FBI); *United States v. John Rowland*, No. 14 Cr. 79 (JBA) (D. Conn. 2015) (defendant sentenced to 30 months' incarceration for making illegal campaign contributions, falsifying records, and causing false statements to be made to the FEC); *United States v. Joseph Bigica*, No. 2:12 Cr. 318 (FSH) (D.N.J. 2012) (defendant sentenced to 60

months' incarceration following guilty plea to tax violation and conduit scheme involving $98,600 in illegal contributions); *United States v. Robert Braddock, Jr.,* No. 3:12 Cr. 58 (LRH) (D. Conn. 2013) (defendant sentenced to 38 months' incarceration following jury trial involving nearly $28,000 conduit scheme).  As these cases amply demonstrate, custodial sentences for serious violations of the campaign finance laws are a regular occurrence, and the Court should impose such a sentence here for the reasons stated above.

*Lastly*, Cohen places heavy reliance on his provision of information to law enforcement. (Def. Mem. at 1-5).  To be sure, this case is in some respects unique, and Cohen's decision to plead guilty and provide information to law enforcement in matters of national interest is deserving of credit.  Indeed, it is the principal reason the Office is not seeking a Guidelines sentence here.  But as noted in more detail above, Cohen was well aware of the standard debriefing process in which cooperators in this District regularly participate, and declined to participate.  While he answered questions about the charged conduct, he refused to discuss other uncharged criminal conduct, if any, in which he may have participated.  This precludes him from being given credit for "substantial assistance" and obtaining a 5K1.1 letter.  The Court should not sentence Cohen as if he has one.  That is, the credit given to Cohen should not approximate the credit that a witness with a cooperation agreement and a 5K1.1 letter would merit.

Finally, Cohen's further assertion that he is deserving of leniency because he "could have fought the government and continued to hold the party line, positioning himself for a pardon or clemency" reflects a continuation of his mindset that, at his own option, he is above the laws reflected in his crimes of conviction.  (Def. Mem. at 5).  Every defendant in every criminal case has the right to fight the charges against him.  But where, as here, the evidence of their guilt is overwhelming, defendants often make the choice to plead guilty.  After cheating the IRS for years,

lying to banks and to Congress, and seeking to criminally influence the Presidential election, Cohen's decision to plead guilty – rather than seek a pardon for his manifold crimes – does not make him a hero.

## **CONCLUSION**

For the reasons set forth above, the Office respectfully requests that this Court impose a substantial term of imprisonment, one that reflects a modest variance from the applicable Guidelines range.  The Office also requests that the Court impose forfeiture in the amount of $500,000, and a fine.

Dated:   December 7, 2018
          New York, New York

Respectfully submitted,

ROBERT KHUZAMI
Acting United States Attorney

By:   _Nicolas Roos_____

Andrea M. Griswold
Rachel Maimin
Thomas McKay
Nicolas Roos
Assistant United States Attorneys