UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - 

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : 18cr602 |
| -against- | : |
| | : OPINION & ORDER |
| MICHAEL COHEN, | : |
| | : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - 

WILLIAM H. PAULEY III, Senior United States District Judge:

Various media organizations seek an order unsealing documents relating to

searches conducted by the Federal Bureau of Investigation on April 9, 2018 in connection with a

grand jury investigation by the United States Attorney's Office for the Southern District of New

York (the "Government") of Defendant Michael Cohen and others.  The media organizations

assert a right of access to these warrant materials under the common law and the First

Amendment to the U.S. Constitution.  For the reasons that follow, their applications are granted

in part and denied in part.

BACKGROUND

These applications implicate the familiar tension between public access to judicial

records and the integrity of law enforcement investigations—interests arguably magnified by the

intense scrutiny of Cohen's criminal case by the media, the general public, and even the

President of the United States.  On April 9, 2018, the FBI executed searches of Cohen's

residence, hotel room, office, safe deposit box, cell phones, and electronic communications

pursuant to warrants authorized under Rule 41 of the Federal Rules of Criminal Procedure and

18 U.S.C. § 2703.  These searches, according to the Government, represented the first public step

in what was by then a months-long investigation into Cohen's business dealings and potential

campaign finance violations.  Following the searches, Cohen pled guilty on August 21, 2018 to

five counts of tax evasion based on his failure to report over $4 million in taxable income to the

Internal Revenue Service, one count of making false statements to financial institutions to obtain

a $500,000 home equity line of credit, and two counts of campaign finance violations based on

his involvement with hush payments to women who threatened to disclose details of their extra-

marital affairs with a candidate for federal office.[1]

Subsequently, The New York Times Company, the American Broadcasting

Companies, Inc., the Associated Press, Cable News Network, Inc., Daily News, L.P., Dow Jones

& Co., Inc., Newsday LLC, NYP Holdings, Inc., and CBS Broadcasting, Inc. (the "Media

Organizations") filed letter applications to unseal documents relating to the April 9, 2018

searches.  (See ECF No. 9 ("Times Letter"); ECF No. 11 ("News Organizations Letter"); ECF

No. 19 ("CBS Letter").)  In particular, the applications seek to unseal copies of the warrants,

warrant applications, and supporting affidavits and riders in connection with these searches (the

"Materials").  The Government opposed the applications on the basis that disclosure would

jeopardize an ongoing investigation and prejudice the privacy rights of uncharged third parties.

In addition to a publicly filed brief (ECF No. 14), the Government submitted a supplemental ex

parte submission articulating the factual bases for its opposition and also provided the Materials

for in camera review.  Cohen did not submit any opposition papers.

<u>DISCUSSION</u>

The "notion that the public should have access to the proceedings and documents

---

[1]    On November 29, 2018, after briefing on these applications completed, Cohen pled guilty before another judge in this district to one count of making false statements to the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence relating to an ongoing investigation by the Special Counsel's Office of the U.S. Department of Justice.  (See United States v. Cohen, 18cr850 (S.D.N.Y.).)  On consent of the parties, that case was transferred to this Court for sentencing on December 12, 2018 in tandem with this case.

of courts is integral to our system of government." United States v. Erie Cty., 763 F.3d 235, 238-39 (2d Cir. 2014). This long-standing precept is embodied in two "related but distinct presumptions"—"a strong form rooted in the First Amendment and a slightly weaker form based in federal common law." Newsday LLC v. Cty. of Nassau, 730 F.3d 156, 163 (2d Cir. 2013); accord Erie Cty., 763 F.3d at 239 (noting that "the First Amendment protection has been understood to be stronger than its common law ancestor and counterpart"). Each presumption implicates a separate framework governing when it attaches and when it may be overcome. Ultimately, the "decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 599 (1978).

I.      Common Law Right of Access

As a threshold matter, this Court must first examine whether the pertinent provisions of Title II of the Electronic Communications Privacy Act—commonly referred to as the Stored Communications Act ("SCA") and codified at 18 U.S.C. §§ 2701-2712—supersede the common law right of access to § 2703 warrants, applications, and affidavits. In re N.Y. Times Co. to Unseal Wiretap & Search Warrant Materials, 577 F.3d 401, 405-06 & n.3 (2d Cir. 2009) (instructing that where an applicable statute speaks to the accessibility of the documents in question, courts should begin with the statute). For instance, the Second Circuit has evaluated whether to unseal Title III wiretap applications by reference to the applicable statutory standard in 18 U.S.C. § 2518(8)(b) without engaging in a common law analysis, concluding that Title III "revealed a manifest congressional intent that . . . clearly negated a presumption in favor of disclosure" of wiretap applications. In re N.Y. Times Co., 577 F.3d at 406-09 & n.3; see 18 U.S.C. § 2518(8)(b) (providing in relevant part that "[wiretap applications] made and orders

3

granted . . . shall be sealed by the judge" and that "[s]uch applications and orders shall be disclosed <u>only</u> upon a showing of good cause before a judge of competent jurisdiction" (emphasis added)).

By contrast, the SCA contains no provision mandating the sealing of § 2703 warrants, applications, or supporting affidavits.  <u>See</u> <u>In re Application of Leopold to Unseal Certain Elec. Surveillance Applications & Orders</u>, 300 F. Supp. 3d 61, 85 (D.D.C. 2018).  To be sure, the SCA "explicitly relieves the government of any obligation to notify a subscriber or customer about the compelled disclosure pursuant to an SCA warrant."  <u>In re Application of Leopold</u>, 300 F. Supp. 3d at 85 (citing 18 U.S.C. § 2703(b)(1)(A)).  It also permits the Government to apply for an order requiring a service provider in receipt of a § 2703 warrant "not to notify any other person" of the warrant's existence "for such period as the court deems appropriate."  18 U.S.C. § 2705(b).  But these statutory provisions hardly evince a clear congressional intent against disclosure that would undermine a common law presumption of access to § 2703 warrants, applications, and supporting affidavits.  <u>See</u> <u>United States v. Texas</u>, 507 U.S. 529, 534 (1993) (expressing the longstanding principle that "[s]tatutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident" (alterations in original)); <u>cf.</u> <u>In re N.Y. Times Co.</u>, 577 F.3d at 407 n.3 (noting that "the plain language of the [wiretap statute] indicates that there is a categorical presumption <u>against</u> disclosure of sealed wiretap applications").

    A.  <u>Legal Standards</u>

Having found no statutory presumption against disclosure that obviates consideration of the common law for the Media Organizations' applications, this Court turns to

whether a common law presumption applies to the Materials.  The common law right of access to court records has a "long history" that has been said to "predate even the Constitution itself." Erie Cty., 763 F.3d at 239 (citing United States v. Amodeo ("Amodeo I"), 44 F.3d 141, 145 (2d Cir. 1995)).  This "presumption of access is based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice."  United States v. Amodeo ("Amodeo II"), 71 F.3d 1044, 1048 (2d Cir. 1995); see also Erie Cty., 763 F.3d at 239 (explaining that the common law right of access stems from the need for the public to "have the ability to learn of, monitor, and respond to the actions of their representatives and representative institutions," including the courts).

In analyzing whether the common law right of access warrants the unsealing of court records, courts in this circuit first ask whether the document is a "judicial document" presumed to be accessible.  Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir. 2006).  If the document is a judicial document to which the common law presumption of access applies, the court must then "determine the weight of that presumption."  Lugosch, 435 F.3d at 119.  Finally, a court must balance the weight of the presumption against countervailing considerations, such as "the danger of impairing law enforcement or judicial efficiency" and "the privacy interests of those resisting disclosure."  Amodeo II, 71 F.3d at 1050.  Access to judicial documents may only be denied when competing interests outweigh the presumption.  Erie Cty., 763 F.3d at 239.

As a prefatory note, the Media Organizations seek to unseal materials in connection with warrants authorized pursuant to both Rule 41 and § 2703.  But this Court discerns little meaningful distinction between Rule 41 warrants and § 2703 warrants for purposes

of the common law right of access analysis.  In particular, both types of warrants play largely the same role in the judicial process—that is, both ultimately reflect judicial determinations of probable cause for governmental intrusion on individual rights.  It also follows that the value of such judicial determinations would be substantially the same to those monitoring the work of federal courts.  Thus, this Court's discussion of the common law right of access does not distinguish between Rule 41 warrants and § 2703 warrants and refers collectively to both as "search warrants."

B.  Whether the Materials Are Judicial Documents

The threshold inquiry of whether a document is a "judicial document" turns on its "relevan[ce] to the performance of the judicial function and useful[ness] in the judicial process." Lugosch, 435 F.3d at 119 (quotation mark omitted); see also Erie Cty., 763 F.3d at 239 (explaining that the inquiry "emphasize[s] the role of the document in the judicial process"). Search warrants are unquestionably judicial documents because they themselves embody the performance of judicial functions.  See Joy v. North, 692 F.2d 880, 892 (2d Cir. 1982) ("An adjudication is a formal act of government, the basis of which should, absent exceptional circumstances, be subject to public scrutiny."); accord In re Application of the U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D), 707 F.3d 283, 290 (4th Cir. 2013) ("[I]t is commonsensical that judicially authored or created documents are judicial records."); EEOC v. Nat'l Children's Ctr., Inc., 98 F.3d 1406, 1409 (D.C. Cir. 1996) ("A court's decrees, its judgments, its orders, are the quintessential business of the public's institutions.").

The search warrant applications and supporting affidavits are also judicial documents to which the common law presumption of public access applies.  Indeed, the Second Circuit has observed that a document is a judicial document "not only if the judge actually relied

6

upon it, but also if 'the judge <u>should</u> have considered or relied upon [it], but did not." <u>Bernstein</u>

<u>v. Bernstein Litowitz Berger & Grossmann LLP</u>, 814 F.3d 132, 140 n.3 (2d Cir. 2016) (citing

<u>Lugosch</u>, 435 F.3d at 119).  Because a court necessarily relies upon search warrant applications

and supporting affidavits in assessing whether there is probable cause to issue a search warrant,

they are certainly relevant to the performance of that judicial function.  <u>Accord</u> <u>United States v.</u>

<u>Pirk</u>, 282 F. Supp. 3d 585, 596 (W.D.N.Y. 2017) (collecting cases); <u>see also</u> <u>United States v. All</u>

<u>Funds on Deposit at Wells Fargo Bank in S.F. in Account No. 7986104185, Held in the Name of</u>

<u>Account Servs. Inc., & All Prop. Traceable Thereto ("Wells Fargo Bank")</u>, 643 F. Supp. 2d 577,

583 (S.D.N.Y. 2009) (explaining that affidavits in support of search or seizure warrants, which

"are central to a court's probable cause determination," "clearly fall within the definition of

'judicial documents'" (citation omitted)).

      C.  <u>Weight of the Common Law Presumption</u>

         Evaluating the weight of the presumption of access entails an examination of "the

role of the material at issue in the exercise of Article III judicial power and the resultant value of

such information to those monitoring the federal courts."  <u>Amodeo II</u>, 71 F.3d at 1049.  Although

the Second Circuit noted the "difficulty in defining the weight to be given the presumption of

access," it has offered helpful guideposts that illuminate where a particular document falls on the

continuum between "matters that directly affect an adjudication" and "matters that come within a

court's purview solely to insure their irrelevance."  <u>Amodeo II</u>, 71 F.3d at 1049.  For example,

the strength of the public's right to access judicial documents is at its zenith when the documents

play a role "in determining litigants' substantive rights"—that is, "conduct at the heart of Article

III" that implicates "the need for public monitoring."  <u>Amodeo II</u>, 71 F.3d at 1049.  At the other

end of the spectrum, documents that "play only a negligible role in the performance of Article III

duties" receive a weak presumption of access that "amounts to little more than a prediction of public access absent a countervailing reason."  Amodeo II, 71 F.3d at 1050.  For documents that lie "in the middle of the continuum," the "weight to be accorded to the presumption of access must be determined by the exercise of judgment."  Amodeo II, 71 F.3d at 1049-50.  This exercise of judgment may be informed by whether "filing with the court is unusual or is generally under seal," in which case a weightier presumption applies than when "such documents are usually filed with the court and are generally available."  Amodeo II, 71 F.3d at 1050.

        Like other courts in this circuit, this Court concludes that search warrants and search warrant materials are entitled to a strong presumption of public access.  See, e.g., In re Search Warrant, 2016 WL 7339113, at *3 (S.D.N.Y. Dec. 19, 2016) (determining that "[t]he common law presumption of access to the search warrant and related materials" is "entitled to great weight"); Wells Fargo Bank, 643 F. Supp. 2d at 584-85 (affording search warrant affidavits a common law presumption "of the highest" weight); In re Sealed Search Warrants Issued June 4 & 5, 2008 ("Sealed Search Warrants"), 2008 WL 5667021, at *3 (N.D.N.Y. July 14, 2008) (concluding that the presumption of access attaching to search warrant materials "carries the maximum possible weight").  Indeed, search warrants are not merely "matters that directly affect an adjudication," Amodeo II, 71 F.3d at 1049; they themselves represent a judicial determination that probable cause exists for governmental intrusion.  And the information contained in search warrant applications and affidavits necessarily plays a direct role in a court's determination of whether probable cause exists to support issuance of the warrant.  See Wells Fargo Bank, 643 F. Supp. 2d at 584; see also Bernstein, 814 F.3d at 142 (citing Amodeo II, 71 F.3d at 1050) (describing the "locus of the inquiry" as "whether the document 'is presented to the court to invoke its powers or affect its decisions'").

To be sure, as the Media Organizations point out, (see Times Letter, at 2, 3; News Organizations Letter, at 1; CBS Letter, at 1), the public interest in the underlying subject matter of the Materials—which implicates the integrity of the 2016 presidential election—is substantial, cf. Bernstein, 814 F.3d at 143 (recognizing the public's interest in the substantive allegations of a complaint sought to be unsealed).  However, the analysis is a functional one—that is, the presumption of access is at its core tethered to the need for public monitoring of the federal courts and their exercise of judicial power.  Cf. SEC v. Van Waeyenberghe, 990 F.2d 845, 847 (5th Cir. 1993) (explaining that "[t]he public's right to information does not protect the same interests that the right of access is designed to protect").   As the Second Circuit explained,

> Monitoring both provides judges with critical views of their work and deters arbitrary judicial behavior.  Without monitoring, moreover, the public could have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings.  Such monitoring is not possible without access to testimony and documents that are used in the performance of Article III functions.

Amodeo II, 71 F.3d at 1050.

Thus, the public's right of access to summary judgment materials in a mine-run case is not afforded any less weight based on its pedestrian nature.  And conversely, the public has no presumption of access to discovery materials exchanged between the parties—no matter how sensational—if they play no role in the exercise of judicial power.  Cf. Amodeo II, 71 F.3d at 1050 ("Documents that play no role in the performance of Article III functions, such as those passed between the parties in discovery, lie entirely beyond the presumption's reach . . . .").  Moreover, premising the weight of the common law presumption on the degree of public interest in the underlying substance of the document would require a court to engage in an inherently subjective determination as to the newsworthiness of particular information.  Accordingly, this Court sees no basis to afford additional weight to the Materials simply by virtue of their subject matter.  Cf. In re Application of the U.S., 707 F.3d at 294 (explaining that "[t]he mere fact that a

case is high profile in nature does not necessarily justify public access").

    D.  <u>Countervailing Factors</u>

        The final step of the common law analysis requires an evaluation of whether any countervailing factors outweigh the presumption of access to the Materials.  The constellation of relevant factors includes both public and private considerations, such as guarding against risks to national security, protecting the privacy and reputation of crime victims, and minimizing the danger of an unfair trial from adverse publicity.  <u>See</u> <u>Amodeo I</u>, 44 F.3d at 147.  One cluster of considerations particularly germane to the Media Organizations' applications centers on the risk of impairing law enforcement investigations and the interests in preventing disclosure of law enforcement techniques and procedures, preserving the confidentiality of sources, protecting witnesses and law enforcement personnel, safeguarding the privacy of individuals involved in an investigation, and otherwise preventing interference with or disclosure of the details of an ongoing investigation.  <u>Amodeo I</u>, 44 F.3d at 147 (citing <u>In re Dep't of Investigation</u>, 856 F.2d 481, 484 (2d Cir. 1988)).

        This Court concludes that disclosure of the Materials with redactions strikes an appropriate balance between the strong presumption of public access to search warrant materials and the countervailing interests identified by the Government.  In particular, the Government represents that aspects of its investigation remain ongoing, including those pertaining to or arising from Cohen's campaign finance crimes.  <u>See</u> <u>Wells Fargo Bank</u>, 643 F. Supp. 2d at 585 (collecting cases) (noting that concerns over compromising ongoing criminal investigations have "frequently [been] found by courts to be sufficiently compelling to warrant some measure of closure").  Indeed, the search warrant applications and affidavits catalogue an assortment of uncharged individuals and detail their involvement in communications and transactions

connected to the campaign finance charges to which Cohen pled guilty.  According to the

Government's ex parte submissions, these individuals include those cooperating with the

Government, those who have provided information to the Government, and other subjects of the

investigation.  Moreover, although the search warrants do not themselves detail the

Government's ongoing investigation to the same level of granularity as the applications and

affidavits, they nonetheless enumerate topics of inquiry relating to the campaign finance charges.

At this stage,[2] wholesale disclosure of the Materials would reveal the scope and

direction of the Government's ongoing investigation.  It would also unveil subjects of the

investigation and the potential conduct under scrutiny, the full volume and nature of the evidence

gathered thus far, and the sources of information provided to the Government.  As courts have

regularly observed in the context of ongoing investigations, the disclosure of such information

may enable uncharged individuals to coordinate or tailor their testimony and interactions with

the Government.  See Sealed Search Warrants, 2008 WL 5667021, at *4.  And if the past is any

prologue, unmasking those who are cooperating with the Government's investigation or who

have otherwise provided information to the Government could deter further cooperation with the

investigation by "subject[ing] those individuals to witness tampering, harassment, or retaliation."

Sealed Search Warrants, 2008 WL 5667021, at *4 (citing Amodeo II, 71 F.3d at 1051-52).

Accordingly, the portions of the Materials relating to Cohen's campaign finance crimes shall be

redacted.  Further, in view of the ongoing investigation, the names of the special agents who

signed the search warrant applications and submitted supporting affidavits may also be redacted,

---

[2]     Although the Media Organizations correctly observe that the Government's interest in protecting the
integrity of its investigation may in some circumstances diminish after certain stages of a criminal prosecution have
occurred, see In re Sealed Search Warrant, 2006 WL 3690639, at *4-5 (N.D.N.Y. Dec. 11, 2006), this Court credits
the Government's representation that aspects of the Government's investigation, including those relating to or
arising from Cohen's campaign finance violations, are continuing.

along with the paragraphs of the search warrant affidavits describing the agents' experience or law enforcement techniques and procedures.  Accord In re Search Warrant, 2016 WL 7339113, at *4.

On the other hand, disclosure is justified as to those portions of the Materials relating to Cohen's charges for tax evasion and false statements to financial institutions, as well as Cohen's conduct that did not result in criminal charges.  Cf. United States v. Aref, 533 F.3d 72, 83 (2d Cir. 2008) (reinforcing in dicta "the requirement that district courts avoid sealing judicial documents in their entirety unless necessary," based on the importance of transparency to "public perception of the judiciary's legitimacy and independence").  Based on a review of the Government's ex parte submissions, its investigation as to those charges appears to have concluded.  Cf. United States v. Bus. of Custer Battlefield Museum & Store Located at Interstate 90, Exit 514, S. of Billings, 658 F.3d 1188, 1194 (9th Cir. 2011) (holding that "the public has a qualified common law right of access to warrant materials after an investigation has been terminated").  And although at least some of these charges share a factual nexus with the conduct underlying Cohen's campaign finance violations, this Court is not persuaded that they are so factually interconnected that disclosure of the sections of the Materials relating to Cohen's personal business dealings would impair the areas of the Government's investigation that have not concluded.

Nonetheless, the privacy interests of uncharged third parties named in the portions of the Materials relating to the Government's investigation into Cohen's personal business dealings also warrant consideration.  Amodeo II, 71 F.3d at 1050-51 (reiterating that "[t]he privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation").  Despite the Government's generalized representations that the uncharged third

12

parties possess a substantial privacy interest that would be prejudiced by disclosure, this Court independently assesses their privacy interests based on a review of the Materials.  Accord In re N.Y. Times Co., 828 F.2d 110, 116 (2d Cir. 1987) ("The job of protecting such [privacy] interests rests heavily upon the shoulders of the trial judge, since all the parties who may be harmed by disclosure are typically not before the court.").  In particular, the Materials identify (1) individuals who purportedly engaged in business transactions or contemplated business transactions with Cohen relating to taxi medallions; (2) entities that paid Cohen "consulting fees"; and (3) financial institutions to which Cohen made false statements.  The search warrant affidavits also describe in greater detail the course of conduct among Cohen and these individuals or entities.  Further, the affidavits reference several other individuals or entities to varying degrees.

In determining the weight of an asserted privacy interest, the Second Circuit has instructed courts to first consider "the degree to which the subject matter is traditionally considered private rather than public."  Amodeo II, 71 F.3d at 1051 (explaining that "financial records of a wholly owned business, family affairs, illnesses, embarrassing conduct with no public ramifications, and similar matters will weigh more heavily against access than conduct affecting a substantial portion of the public").  In this regard, cognizable privacy interests are not limited strictly to "'intimate relations' such as bedroom or other intimate conversations." Amodeo II, 71 F.3d at 1051 n.1.  Courts must also weigh the "nature and degree of injury," which implicates "the sensitivity of the information and the subject" and "how the person seeking access intends to use the information."  Amodeo II, 71 F.3d at 1051.  Other factors that may be evaluated include the "reliability of the information" and "whether the nature of the materials is such that there is a fair opportunity for the subject to respond to any accusations

contained therein." Amodeo II, 71 F.3d at 1051.

       Here, the parties involved with business transactions relating to Cohen's taxi medallions seem to be "peripheral characters" for whom the Materials raise little discernable inference of criminal conduct. Cf. Amodeo II, 71 F.3d at 1051 n.1 (citing In re Application of Newsday, No. 88-286, slip op., at 10 (E.D.N.Y. June 27, 1989), aff'd, 895 F.2d 74 (2d Cir. 1990)) (endorsing district court's redaction of "the names of both corporations and individuals because they 'at least appear[ed] to [the court] to be peripheral characters and as to whose [criminal] complicity [the court] had some doubt'" (alterations in original)). The relevant considerations weigh in favor of redacting the names and descriptions of these uncharged individuals, who may nonetheless be "stigmatized from sensationalized and potentially out-of-context insinuations of wrongdoing, combined with the inability of these third parties to clear their names at trial."[3] United States v. Smith, 985 F. Supp. 2d 506, 526 (S.D.N.Y. 2013); see United States v. Huntley, 943 F. Supp. 2d 383, 388 (E.D.N.Y. 2013) (recognizing the danger of "lead[ing] some members of the public to find—wrongly—'fire' when nothing but 'smoke' exists"). For the same reasons, references to those around Cohen from which the public might infer criminal complicity—as opposed to references to individuals or entities mentioned only in passing—should also be redacted.

       This Court reaches a different conclusion with respect to the affidavits' descriptions of the taxi medallion transactions. Although the subject matter involves business transactions between private citizens that do not inherently affect members of the public, the nature of the transactions does not present the same sensitivity that may be raised by the types of matters identified in Amodeo II, such as confidential financial, medical, or personal information.

---

[3]     These concerns are not unfounded—some of the email accounts subject to the Government's 18 U.S.C. § 2703 warrants are associated with some of these uncharged individuals.

In this Court's view, the privacy interests in the descriptions of the taxi medallion transactions are insufficient to overcome the public's right of access. The balance skews even more heavily in favor of disclosure as to the affidavits' descriptions of the consulting arrangements and the entities who paid Cohen for consulting work. These arrangements—some of which were made by publicly traded companies—involved payments for consulting on various political issues that affect the general public. In addition, the cursory descriptions of the arrangements appear to be minimally sensitive, and in any event, almost all of the entities have already publicly confirmed the existence of the payments. Accord United States v. Basciano, 2010 WL 1688510, at *4 (E.D.N.Y. Apr. 23, 2010) ("Shielding third parties from unwanted attention arising from an issue that is already public knowledge is not a sufficiently compelling reason to justify withholding judicial documents from public scrutiny.").

With respect to the names of financial institutions to whom Cohen made false statements, the public's strong presumption of access to search warrant materials also outweighs any privacy interests of those institutions that may be gleaned from the Materials. To be sure, there is no suggestion that the financial institutions—the victims of Cohen's misrepresentations—were believed to have engaged in criminal activity.[4] But at its core, the "venerable" privacy-interest exception to the presumption of access exists to avert "cater[ing] 'to a morbid craving for that which is sensational and impure.'" Amodeo II, 71 F.3d at 1051 (citation omitted); cf. Nixon, 435 U.S. at 598 (noting that courts have the power to "insure that its records are not 'used to gratify private spite or promote public scandal'" or "serve as

---

[4]   Certainly, the privacy and reputation of crime victims has been recognized to be a countervailing interest to the presumption of public access. See, e.g., United States v. Belfort, 2014 WL 2612508, at *3 (E.D.N.Y. June 11, 2014). However, the potential harm from disclosing the names and addresses of private individuals who were defrauded, for example, is less readily apparent as applied to large financial institutions. See Belfort, 2014 WL 2612508, at *4 (describing the substantial harms of "embarrassment at being identified as a victim of a boiler-room scam, media contacts that may well be unwelcome, and . . . further victimization by fraudsters").

reservoirs of libelous statements for press consumption" (internal citations omitted)).  There is

minimal risk that the information relating to the financial institutions—who were passive victims

of Cohen's criminal conduct—is of the sort that would animate the concerns identified by

Amodeo II and Nixon.  Further, the Government's objection that the search warrant affidavits

include more detail than what has already been reported by the media is immaterial because the

Government fails to articulate any privacy interest that may be harmed by disclosure.

II.     First Amendment Right of Access

        Because the Media Organizations root their applications in the common law and

the First Amendment, this Court also evaluates whether the latter compels unsealing the

Materials.  Admittedly, the Second Circuit has counseled that in determining whether a right to

access court records exists, "[courts] first look to the common law, for [they] need not, and

should not, reach the First Amendment issue if judgment can be rendered on some other basis."

In re Application of Newsday, Inc., 895 F.2d at 78.  But such guidance—ostensibly grounded in

constitutional avoidance principles—appears out of vogue with the weight of more recent circuit

precedent.  See Erie Cty., 763 F.3d at 241 (declining to engage in the common law analysis

based on the conclusion that the documents at issue were "subject to a First Amendment right of

access, which is stronger and can only be overcome under more stringent circumstances");

Newsday LLC, 730 F.3d at 165 (applying only the First Amendment standard based on its

applicability and favorability to the party seeking access); Lugosch, 435 F.3d at 124 ("Having

concluded that the common law presumption of access exists in this context, we may not avoid

the question of whether a First Amendment presumption of access also exists, for the

[newspapers] ask us to impose the higher constitutional burden in requiring disclosure.").

A.  Legal Standards

Unquestionably, the First Amendment affords the media and public a qualified

right to access certain judicial documents.  Lugosch, 435 F.3d at 120 (citing Hartford Courant

Co. v. Pellegrino, 380 F.3d 83, 91 (2d Cir. 2004)).  This qualified presumption "protects the

public against the government's arbitrary interference with access to important information."

N.Y. Civil Liberties Union v. N.Y.C. Transit Auth. ("NYCTA"), 684 F.3d 286, 298 (2d Cir.

2012); see Newsday LLC, 730 F.3d at 164-65 (noting that "'[w]hat offends the First Amendment

is the attempt to [exclude the public] without sufficient justification,' not the simple act of

exclusion itself" (alterations in original) (internal citation omitted)).  As with the common law

rubric, the public interest in the underlying subject matter is of marginal relevance.  See United

States v. Smith, 776 F.2d 1104, 1114-15 (3d Cir. 1985) ("When resolving issues involving [the

common law and First Amendment rights of access], the Supreme Court has not examined

whether there has been a tradition of access with respect to information of the particular

character involved or whether that information is of significant public interest.").

The constitutional analysis begins with a threshold determination of whether the

court records are "judicial documents," Erie Cty., 763 F.3d at 239-40, a necessary but not

sufficient condition for the First Amendment presumption to attach.  Where (as here) a court has

determined that a document is judicial in nature, the Second Circuit articulates two approaches

for ascertaining whether the First Amendment right of access applies.  First, under the

"experience and logic" approach applied by the Supreme Court in Press-Enterprise Co. v.

Superior Court of California for Riverside County, courts consider whether the documents "have

historically been open to the press and the general public" (experience) and whether "public

access plays a significant positive role in the functioning of the particular process in question"

(logic).  Hartford Courant, 380 F.3d at 92 (quoting Press-Enter. Co. v. Super. Ct., 478 U.S. 1, 8

(1986)).  The second approach "considers the extent to which the judicial documents are 'derived

from or [are] a necessary corollary of the capacity to attend . . . relevant proceedings'" to which

the First Amendment right of access attaches.  Lugosch, 435 F.3d at 120 (citation omitted)

(alteration in original); see Newsday LLC, 730 F.3d at 164 (observing that the Second Circuit

adopts this approach "only when analyzing judicial documents related to judicial proceedings

covered by the First Amendment right").

        Upon concluding that a qualified First Amendment right of access exists under

either approach, continued sealing is warranted "only with specific, on-the-record findings that

sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to

achieve that aim."  Lugosch, 435 F.3d at 110 (citing In re N.Y. Times Co., 828 F.2d at 113); cf.

NYCTA, 684 F.3d at 304 (enumerating four requirements to close a proceeding subject to a First

Amendment right of access, i.e., an "overriding interest that is likely to be prejudiced," a closure

"no broader than necessary to protect that interest," judicial consideration of "reasonable

alternatives to closing the proceeding," and judicial "findings adequate to support the closure").

    B.  Application

        As a preliminary matter, the First Amendment framework—unlike its common

law counterpart—looks to historical access to the documents or proceedings in question.

Because such an inquiry may differ between Rule 41 warrant materials and § 2703 warrant

materials, this Court examines the applicability of a constitutional right of access separately.

        1.  Rule 41 Search Warrant Materials

            a.  Experience and Logic

        The Government and the Media Organizations take opposing sides in a circuit

split about whether and in what circumstances experience and logic support a First Amendment

right of access to Rule 41 search warrants, search warrant applications, and supporting affidavits.

The majority of circuits have circumscribed in some fashion the applicability of the First

Amendment right of access to search warrant materials in deference to ongoing investigations.

For instance, the Ninth Circuit has adopted a bright-line rule that no public right of access

attaches to search warrants and supporting affidavits "when an investigation is ongoing but

before indictments have been returned," whether under the First Amendment or otherwise.

Times Mirror Co. v. United States, 873 F.2d 1210, 1218 (9th Cir. 1989).  Similarly, the Fourth

Circuit has held that no First Amendment right of access exists for search warrant affidavits, at

least between execution of the warrants and indictment.  Balt. Sun Co. v. Goetz, 886 F.2d 60, 64

(4th Cir. 1989).  Finally, the Sixth Circuit has concluded that no First Amendment right of access

applies to documents filed in search warrant proceedings "based in part on the lack of any

evidence that there is a historical tradition of such access and in part because that access would

be detrimental to the search warrant application and criminal investigatory processes."  In re

Search of Fair Finance, 692 F.3d 424, 433 (6th Cir. 2012).

By contrast, the Eighth Circuit is the lone federal court of appeals that has

affirmatively recognized a First Amendment right of access to documents filed in support of

search warrant applications after execution of the warrant, even if the investigation is ongoing.

Specifically, it reasoned that those materials are "routinely filed with the clerk of court without

seal" and that access to such documents "is important to the public's understanding of the

function and operation of the judicial process and the criminal justice system and may operate as

a curb on prosecutorial or judicial misconduct."  In re Search Warrant for Secretarial Area

Outside Office of Gunn ("Gunn"), 855 F.2d 569, 573 (8th Cir. 1988).  The Eighth Circuit further

noted the centrality of search warrant materials to pre-trial suppression hearings, which—like other pre-trial criminal proceedings—have been recognized to be within the First Amendment's ambit.  Gunn, 855 F.2d at 573.

Although the Second Circuit has not yet spoken,[5] this Court holds that neither experience nor logic support a First Amendment right of access to search warrant materials.

i.   Experience

The Media Organizations correctly observe that search warrant materials are often accessible to the extent that they are publicly filed with the clerk of court under Rule 41(i).  See Balt. Sun, 886 F.2d at 64 (noting that search warrant materials are "probably most frequently" open for inspection after execution).  But this does not necessarily equate to a long-standing, national tradition of accessibility to warrant materials when judicial issuance of a warrant is sought.  See In re Search of Fair Finance, 692 F.3d at 430 ("To preserve this interest in secrecy [of warrant proceedings], any documents filed in connection with the application process are also, by necessity, submitted confidentially."); Pirk, 282 F. Supp. 3d at 600 (explaining that "the affidavits supporting a search warrant application are typically filed under seal and remain under seal at least while the investigation is ongoing").

Moreover, Rule 41(i) itself sets no time limit for when search warrant materials must be filed, and in any event, whether they are filed publicly is committed to the discretion of the issuing magistrate.  In re Application of Newsday, Inc., 895 F.2d at 79; see also Balt. Sun, 886 F.2d at 64-65 (noting that the "need for sealing affidavits may remain after execution and in some instances even after indictment" if they "describe continuing investigations, disclose

---

[5]    In In re N.Y. Times Co., the Times sought to unseal wiretap and search warrant applications.  Because the government agreed to disclose the search warrant applications, however, the Second Circuit did not reach the issue of public access to the search warrant materials in that case.  See In re N.Y. Times Co., 577 F.3d at 404.

information from wiretaps that have not yet been terminated, or reveal the identity of informers whose lives would be endangered").  Against this backdrop, Rule 41(i) does not "establish any tradition of public access" to warrant materials.  In re Search of Fair Finance, 692 F.3d at 430.

The Times counters that the relevant frame of reference is whether search warrant materials have historically been available at "the conclusion of a criminal proceeding."  (See Times Letter, at 2.)  To be certain, courts have often looked to the status of the criminal proceeding at the time of the request for access in determining whether a First Amendment presumption attaches to search warrant materials.  See, e.g., Times Mirror Co., 873 F.2d at 1221 (cabining holding to "the pre-indictment stage of an ongoing criminal investigation" without deciding whether the public has a right of access when "an investigation has been terminated" or when "an investigation is still ongoing, but an indictment has been returned"); Balt. Sun, 886 F.3d at 62 (considering the public's right of access "in the interval between execution of the warrants and indictment").  However, the Second Circuit's approach in the analogous context of Title III wiretap applications suggests that historical experience is more aptly determined by reference to the warrant application stage as opposed to a case's procedural posture at the time that the documents in question are requested.[6]

In In re New York Times, the Second Circuit recognized no First Amendment right of access to Title III wiretap applications as a categorical matter based on the statutory presumption against disclosure "at the wiretap application stage."  Wells Fargo Bank, 643 F.

---

[6]     Even assuming that the "experience" inquiry turns on the latter, the result would be the same.  The Government represents that the investigation to which the Materials relate is ongoing as to persons other than Cohen, some of whom the Government has identified in its ex parte submissions.  See, e.g., United States v. Paloscio, 2002 WL 1585835, at *3 (S.D.N.Y. July 17, 2002) (finding no First Amendment right of access where "[t]he government represents that the warrants, and the materials submitted in support of their issuance, relate to an ongoing investigation of persons other than defendant . . . , and that disclosure might jeopardize the ongoing investigation").  Thus, cases recognizing a First Amendment right to access after an investigation has concluded are not to the contrary.  See, e.g., Loughner, 769 F. Supp. 2d at 1191-92; In re Application of N.Y. Times Co. for Access to Certain Sealed Court Records, 585 F. Supp. 2d 83, 86, 88 & n.7 (D.D.C. 2008).

Supp. 3d at 582 n.6; see In re N.Y. Times Co., 577 F.3d at 410.  The Second Circuit reached this conclusion despite the fact that at the time of the request for access, all of the individuals charged as a result of the investigation had pled guilty.  See In re N.Y. Times Co., 577 F.3d at 403, 410. Put differently, the In re New York Times panel found no historical access to wiretap applications, even though those materials were requested at a stage of the proceedings in which the need to protect ongoing criminal investigations would presumably be less.  And notably, the Second Circuit determined that no tradition of openness existed notwithstanding its observation that "[i]n the ordinary course, wiretap orders and applications are unsealed during criminal proceedings or discovery."  In re N.Y. Times Co., 577 F.3d at 403.  Of course, this is unsurprising because of the Second Circuit's temporal focus on the wiretap application stage— an investigatory process veiled in secrecy.

Indeed, the purpose underlying the First Amendment presumption, guidance from the Supreme Court and the federal courts of appeals, and practical considerations are all congruent with analyzing any tradition of openness by reference to the point when judicial authority is invoked to seal a document—here, at the warrant application stage—and not when access to those documents is requested.  Cf. Wells Fargo Bank, 643 F. Supp. 2d at 582-83 (concluding that "it is appropriate to look, in determining the relevant historical context . . . , to the type of proceeding in connection with which the documents became sealed judicial records"). First, the constitutional right of access is rooted in preventing arbitrary government interference with the public's access to information about governmental affairs.  See NYCTA, 684 F.3d at 298; Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 587 (1980) (Brennan, J., concurring in the judgment) (explaining that the First Amendment plays a structural role in "securing and fostering our republican system of self-government" by ensuring informed public debate).

Moreover, the Supreme Court has reiterated in the context of judicial proceedings that the "experience" inquiry "does not look to the particular practice of any one jurisdiction, but instead 'to the experience in that <u>type</u> or <u>kind</u> of hearing throughout the United States.'" <u>El Vocero de P.R. (Caribbean Int'l News Corp.) v. Puerto Rico</u>, 508 U.S. 147, 150 (1993) (per curiam) (citation omitted) (emphasis in original).  Sister circuits have also observed that the presumptive First Amendment right of access is "categorical and do[es] not depend on the circumstances of any particular case," instead deferring case-specific considerations to the assessment of whether sealing is required to preserve higher values.[7]  <u>See</u> <u>United States v. Index Newspapers LLC</u>, 766 F.3d 1072, 1085 (9th Cir. 2014); <u>accord</u> <u>In re Bos. Herald, Inc.</u>, 321 F.3d 174, 186 n.7 (1st Cir. 2003) (noting that the First Circuit "do[es] not rely on factors which are atypical to a process when considering whether the right attaches to that process in general," but that "[o]nce a First Amendment right attaches, . . . when the court decides whether the qualified right is overcome, it considers factors relevant to a particular case").  In this Court's view, the particular posture of a criminal case at the moment access is sought is more akin to a case-specific circumstance than a broadly applicable aspect of the search warrant process, such as when warrant materials are sought to be sealed.  <u>Cf.</u> <u>Index Newspapers LLC</u>, 766 F.3d at 1085 (remarking that case-specific circumstances relevant to considering whether sealing is "nevertheless required to prevent harm to a compelling interest" include "whether [a] grand jury investigation is ongoing, and if not, how much time has passed since its completion").

Finally, as a practical matter, examining historical access to search warrant

---

[7]      This is not to say that the stage of the criminal proceeding is <u>never</u> relevant to the antecedent determination of whether the First Amendment presumption applies to a class of documents.  <u>Accord</u> <u>In re Bos. Herald, Inc.</u>, 321 F.3d 174, 186 (1st Cir. 2003).  Indeed, the conclusion that experience and logic do not support a First Amendment right of access to search warrant materials rests precisely on the observations that warrant materials are generally sealed at the warrant application stage and that the search warrant process typically occurs in the investigatory phases of a criminal proceeding, when secrecy is the norm.

materials based on case-specific circumstances at the time of the request for access would require

courts to engage in potentially arbitrary judgments as to which circumstances are relevant. E.g.,

Pirk, 282 F. Supp. 3d at 600 (analyzing historical access to "[a] search warrant affidavit related

to an ongoing investigation that pertains to unchallenged searches of property in which no

indicted defendant has claimed a reasonable expectation of privacy interest"); see United States

v. Loughner, 769 F. Supp. 2d 1188, 1192 (D. Ariz. 2011) (recognizing that the case law on

historical access to search warrants "post-investigation and post-indictment, but pretrial" is

"thin"). Such an approach creates the potential for patchwork determinations of whether the

First Amendment presumption applies to search warrant materials in the context of each

individual case—or worse, inconsistent determinations of whether the presumption applies to

search warrants in similarly situated cases.

ii.    <u>Logic</u>

Considerations of logic also counsel against recognizing a First Amendment right

to access search warrant materials. Of course, public access to search warrant materials may

promote the integrity of the criminal justice system or judicial proceedings in a generalized

sense. United States v. Huntley, 943 F. Supp. 2d 383, 385 (E.D.N.Y. 2013) (remarking that "the

light of the press shining into the innards of government is necessary to inhibit violation of the

public trust"). But such an argument cuts too wide a swath—taken to its extreme, considerations

of logic would always validate public access to any judicial document or proceeding. Cf. Times

Mirror Co., 873 F.2d at 1213 (rejecting as overbroad the argument that the First Amendment

mandates access to any proceeding or document that implicates "self-governance or the integrity

of the criminal fact-finding process"); In re Bos. Herald, Inc., 321 F.3d at 187 ("In isolation, the

[rationale that the public must have a full understanding to serve as an effective check] proves

24

too much—under it, even grand jury proceedings would be public.").  As the Ninth Circuit aptly observed, "[e]very judicial proceeding, indeed every governmental process, arguably benefits from public scrutiny to some degree, in that openness leads to a better-informed citizenry and tends to deter government officials from abusing the powers of government." Times Mirror Co., 873 F.2d at 1213.

Rather, the relevant inquiry is whether public access to the Rule 41 Materials would play a "significantly positive" role in the functioning of the search warrant process in particular. Press-Enter. Co., 478 U.S. at 8-9 ("Although many governmental processes operate best under public scrutiny, it takes little imagination to recognize that there are some kinds of government operations that would be totally frustrated if conducted openly.").  This Court cannot conclude that public scrutiny of search warrants and supporting materials would significantly benefit the proper functioning of a process aimed at uncovering the fruits, instrumentalities, or other evidence of crime without also introducing "the potential of witness corruption, the destruction of evidence, and the flight of persons under investigation." In re S.F. Chronicle, 2007 WL 2782753, at *2 (E.D.N.Y. Sept. 24, 2007); accord Wells Fargo Bank, 643 F. Supp. 2d at 583 n.6 (noting that "it is often crucial that probable cause determinations in connection with search and seizure warrants be shielded from public scrutiny at the time they are made in order to preserve the integrity and effectiveness of the related criminal investigations").

Finally, the Times also asserts that public access would assist in monitoring the use of the Government's search and seizure power.  (See, e.g., Times Letter, at 5.)  Certainly, the knowledge that the public might scrutinize a search warrant affidavit may well deter potential abuses of the search warrant process by law enforcement.  But it may just as easily incentivize the government to selectively disclose or under-disclose information in warrant applications to

protect the integrity of its investigations, which could in turn subvert the proper functioning of the investigatory process by "imped[ing] [a magistrate judge's] ability to accurately determine probable cause." In re Fair Finance, 692 F.3d at 432.  On balance, disclosure would not play "a particularly significant role in the actual functioning" of the search warrant process or the larger investigatory process. Press-Enter. Co., 478 U.S. at 11.  Accordingly, neither experience nor logic points to a First Amendment right to access the Rule 41 Materials.

### b.   Attendance at Proceedings

Likewise, the consensus of courts acknowledges that the attendance-at-judicial-proceedings approach affords no basis for the First Amendment to attach to the Rule 41 Materials because no constitutional right of access covers proceedings to obtain search warrants. Accord, e.g., Pirk, 282 F. Supp. 3d at 597; In re Search Warrant, 2016 WL 7339113, at *3. Whether the First Amendment affords a right of access to a particular judicial proceeding is determined by the same "experience and logic" approach that applies to judicial documents. See Newsday LLC, 730 F.3d at 164.  History and experience indicate that proceedings to obtain search warrants traditionally involve in camera determinations of ex parte applications. See, e.g., Gunn, 855 F.2d at 573 ("[H]istorically the process of issuing search warrants involves an ex parte application by the government and in camera consideration by the judge or magistrate."); Balt. Sun, 886 F.2d at 64 (observing that "[t]wice the Supreme Court has recognized that proceedings for the issuance of search warrants are not open"); cf. In re N.Y. Times Co., 577 F.3d at 410 (finding no First Amendment right of access to Title III wiretap applications in part because "the public and the press are not permitted to attend the ex parte, in camera proceedings where wiretap applications are presented to a district judge").

Nor does logic dictate that a First Amendment presumption of access should

apply to search warrant proceedings, whose objective of obtaining evidence in a criminal investigation would be undermined if those involved with criminal activity had foreknowledge of an impending search.  See Gunn, 855 F.2d at 573 ("[T]he very objective of the search warrant process, the seizure of evidence of crime, would be frustrated if conducted openly."); Balt. Sun, 886 F.2d at 64 (explaining that "the proceeding for issuing a search warrant 'is necessarily ex parte, since the subject of the search cannot be tipped off to the application for a warrant lest he destroy or remove the evidence'" (citing Franks v. Delaware, 438 U.S. 154, 169 (1978)).

    2. Section 2703 Warrant Materials

    The applicability of the First Amendment right of access to warrant materials under § 2703 appears to be a question of first impression in this circuit.  As a threshold matter, this Court is not persuaded that a "long 'tradition of accessibility'" exists with respect to either § 2703 warrants or proceedings to obtain § 2703 warrants.  The scarce precedent relating to the First Amendment right to access § 2703 warrant materials suggests that they have been non-accessible in practice, despite the SCA's lack of statutory provisions expressly mandating sealing or nondisclosure as a default.  See In re Application of Leopold, 300 F. Supp. 3d at 86 (stating that "SCA materials historically have not been [publicly] available" and noting the petitioners' acknowledgement that such materials are generally maintained under seal).  Indeed, much like traditional search warrant materials, § 2703 warrant materials are typically kept under seal until they are produced in discovery pursuant to Rule 16 of the Federal Rules of Criminal Procedure.

    To be sure, § 2703 warrants—having been introduced by the SCA in 1986—are "in terms of 'tradition,' . . . fairly recent development[s]."  United States v. Suarez, 880 F.2d 626, 631 (2d Cir. 1989) (discussing the Criminal Justice Act, then in existence for almost 25 years). But see In re Application of Leopold, 300 F. Supp. 3d at 87-88 (doubting that the SCA was of

such recent vintage in 2018 as to constitute a "new procedure that substituted for an older one [and that] would presumably be evaluated by the tradition of access to the older procedure" (quoting United States v. El-Sayegh, 131 F.3d 158, 161 (D.C. Cir. 1997))).[8]  And the Second Circuit has instructed that the lack of a long tradition of openness to a novel process does not necessarily obviate the applicability of the First Amendment right of access.  See Suarez, 880 F.2d at 631 (explaining that the lack of a "long 'tradition of accessibility'" to Criminal Justice Act forms "does not detract from the public's strong interest in how its funds are being spent in the administration of criminal justice and what amounts of public funds are paid to particular private attorneys or firms").

Suarez is inapposite, however, because it merely stands for the proposition that a strong showing that logic supports public access may compensate for the absence of a tradition of openness based on the novelty of a process.  Cf. NYCTA, 684 F.3d at 301 n.10 (noting that the Supreme Court "has not specified how much weight courts should give each prong" and declining to determine the issue).[9]  The § 2703 warrant context differs in at least two meaningful

---

[8]        In the D.C. Circuit, "[a]nalytical substitution of one judicial procedure for another is appropriate only when the procedure to which petitioners assert a right of access is 'new.'"  In re Application of Leopold, 300 F. Supp. 3d at 87 (citing El-Sayegh, 131 F.3d at 161).  As noted above, the Leopold court expressed skepticism as to the novelty of SCA materials, instead finding no tradition of openness to SCA materials based on historical practice, the text of the statute, and statutory context.  See In re Application of Leopold, 300 F. Supp. 3d at 86-87.  It reasoned that even if analytical substitution were appropriate, no tradition of openness would exist because SCA warrant materials are most functionally analogous to grand jury subpoenas based on their execution and opportunity for pre-disclosure challenge.  See In re Application of Leopold, 300 F. Supp. 3d at 88-91.  The Second Circuit does not appear to have adopted the D.C. Circuit's analytical substitution approach either explicitly or in practice.

[9]        Some federal circuits have held that "experience and logic" must both be satisfied for the qualified First Amendment right of access to attach.  See, e.g., Fair Finance, 692 F.3d at 431; El-Sayegh, 131 F.3d at 161; Balt. Sun, 886 F.2d at 64.  Others have adopted or suggested a disjunctive approach.  See, e.g., In re Copley Press, Inc., 518 F.3d 1022, 1026 (9th Cir. 2008) (acknowledging that "logic alone, even without experience, may be enough to establish the [First Amendment] right"); In re Bos. Herald, Inc., 321 F.3d at 182 (expressing doubt that the conjunctive approach "is the correct reading of the 'complementary considerations' of [Press-Enterprise]," but declining to decide the issue); United States v. Gonzales, 150 F.3d 1246, 1258 (10th Cir. 1998) (proceeding to the "logic" inquiry based on the novelty of the process in question).  Although the Second Circuit has remarked in dicta that the First Amendment right of access requires both logic and experience to be established, In re N.Y. Times Co., 577 F.3d at 410, Suarez and NYCTA suggest a more nuanced approach.

respects.  First, § 2703 warrant materials have been subject to a practice of secrecy at the warrant

application stage despite their comparatively recent vintage.  Accord In re N.Y. Times Co., 577

F.3d at 410 (concluding that wiretap applications have not been historically open because they

"have been subject to a statutory presumption against disclosure" since their creation in 1968,

despite its characterization of wiretap applications as a "more modern invention" compared to

wiretaps themselves (emphasis in original)).  Second, considerations of logic do not strongly

support openness as in Suarez—to the contrary, they weigh against a presumption of access to

§ 2703 warrant materials or proceedings.

          In particular, applications for § 2703 warrants, supporting affidavits, and

proceedings to obtain § 2703 warrants serve a similar investigatory function as their analogues

under Rule 41.  See NYCTA, 684 F.3d at 299 (instructing that the First Amendment question

"focus[es] not on formalistic descriptions of the government proceeding but on the kind of work

the proceeding actually does and on the First Amendment principles at stake").  And as in the

Rule 41 context, public access to § 2703 warrant materials or proceedings would not play a

significant salutary role in the functioning of the investigatory process, where secrecy is the

norm to ensure the integrity and effectiveness of a criminal investigation.  Cf. In re Application

of the U.S., 707 F.3d at 292 ("[O]penness of the [§ 2703(d)] orders does not play a significant

role in the functioning of investigations.  Section 2703(d) proceedings consist of the issuance of

and compliance with § 2703(d) orders, are ex parte in nature, and occur at the investigative, pre-

grand jury, pre-indictment phase of what may or may not mature into an indictment."); see also

In re Leopold, 327 F. Supp. 3d 1, 19 (D.D.C. 2018).  Thus, under either the "experience and

logic" or "attendance at proceedings" approach, the Media Organizations do not enjoy a First

Amendment right of access to the § 2703 Materials.

CONCLUSION

For the foregoing reasons, the Media Organizations' applications are granted in part and denied in part.  The Government is directed to submit a sealed, ex parte copy of the Materials by February 28, 2019 with proposed redactions in highlights consistent with this Opinion & Order.  After reviewing the proposed redactions, this Court will direct the Government to file the redacted Materials on the public docket in this action.

The Government is further directed to submit a status report, ex parte and under seal, by May 15, 2019 identifying the individuals or entities subject to any ongoing investigations and explaining any need for continued redaction of the Materials.  Cf. United States v. E. Side Ophthalmology, 1996 WL 384891, at *2 (S.D.N.Y. July 9, 1996) ("The caselaw in this circuit indicates that search warrants and supporting documentation may not be sealed indefinitely.").  If any intervening event obviates the need for continued redactions, the Government shall advise this Court forthwith.  The Clerk of Court is directed to terminate the motions pending at ECF Nos. 11 and 19.

Dated:  February 7, 2019
          New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

30