# 18 MAG    2877

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of a Warrant for All Content and Other Information Associated with the Email Accounts ▆▆▆@gmail.com, ▆▆▆@gmail.com, and ▆▆▆, Maintained at Premises Controlled by Google, Inc., USAO Reference No. 2018R00127 | **TO BE FILED UNDER SEAL**<br><br>**AGENT AFFIDAVIT** |

**Agent Affidavit in Support of Application for a Search Warrant
for Stored Electronic Communications**

STATE OF NEW YORK    )
                     ) ss.
COUNTY OF NEW YORK   )

Special Agent ▆▆▆ of the United States Attorney's Office for the Southern District of New York, being duly sworn, deposes and states:

## I. Introduction

▆▆▆

2.   I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703 for all content and other information associated with the email accounts ▆▆▆@gmail.com, ▆▆▆@gmail.com, and ▆▆▆ (the "Subject Accounts"), maintained and controlled by Google, Inc. (the "Provider"), headquartered at 1600

Amphitheatre Parkway, Mountain View, California 94043. The information to be searched is described in the following paragraphs and in Attachments A and B to the proposed warrant.

3. On or about February 28, 2018, I submitted an Affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703 for all content and other information associated with the Subject Accounts maintained and controlled by the "Provider, a true and correct copy of which is attached hereto as Exhibit A (the "Original Affidavit"), and which is incorporated by reference as if fully set forth herein.[1]

4. On that same date, the Honorable Gabriel W. Gorenstein, United States Magistrate Judge, issued a search warrant for the requested data, a true and correct copy of which is attached hereto as Exhibit B (the "Original Search Warrant"). Shortly thereafter, the Provider was served with the Original Search Warrant. On or about March 7, 2018, the Provider provided a response to the Original Search Warrant. That return was incomplete because the Provider declined to produce data that it stored on computer servers located outside of the United States. It is my understanding, from speaking with the Assistant United States Attorney assigned to this matter as well as other law enforcement agents, that the Provider's refusal to provide foreign stored data was in light of the Second Circuit's decision in which it held that Microsoft Corporation was not required to produce foreign stored data pursuant to a warrant issued under the Stored Communications Act. *See Matter of Warrant to Search a Certain E-Mail Account Controlled and Maintained by Microsoft Corporation*, 829 F.3d 197 (2d Cir. 2016), *cert. granted* 138 S. Ct. 356 (2017) (the "Microsoft Litigation").

---

[1] The Original Affidavit also sought content information for two additional email accounts hosted by different providers. This affidavit only requests a search warrant with respect to the Subject Accounts described herein.

2

2017.03.25

5. On March 23, 2018, the Clarifying Lawful Overseas Use of Data Act (the "CLOUD Act") was enacted and became law. The CLOUD Act clarifies that in responding to legal process issued under the Stored Communications Act, providers are required to disclose data even if it is stored abroad. Specifically, section 103 of the CLOUD Act amended 18 U.S.C. § 2713 as follows:

> § 2713. Required preservation and disclosure of communications and records
> A provider of electronic communication service or remote computing service shall comply with the obligations of this chapter to preserve, backup, or disclose the contents of a wire or electronic communication and any record or other information pertaining to a customer or subscriber within such provider's possession, custody, or control, regardless of whether such communication, record, or other information is located within or outside of the United States.

6. From my background, training, and experience in this investigation and in others, I know that, in general, any email (which can include attachments such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form in the account, is maintained on the Provider's servers unless and until the subscriber deletes the email. If the subscriber does not delete the email, it can remain on the Provider's computers indefinitely. Even if the subscriber deletes the email, it may continue to be available on the Provider's servers for a certain period of time. In addition, from my review of other search warrant returns in this investigation, I know that the subjects of the investigation maintained email data relevant to the investigation in email accounts for many months after the email was sent or received.

7. Accordingly, I respectfully submit this Affidavit seeking the issuance of the attached proposed search warrant which seeks the same data as was sought in the Original Search Warrant, for the reasons set forth in the Original Affidavit and herein.

## II.  Request for Non-Disclosure and Sealing Order

8. The existence and scope of this ongoing criminal investigation are not publicly known. As a result, premature public disclosure of this affidavit or the requested warrants could alert target

2017.03.25

subject Michael Cohen that he is under investigation, causing him to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.  In particular, based on my experience investigating white collar cases, including cases featuring documents such as agreements, drafts of agreements, notes of conversations, and other documentary evidence, premature disclosure of an investigation may cause the target of the investigation to attempt to destroy or conceal such evidence. In addition, as set forth in the Original Affidavit, Cohen uses computers and electronic communications in furtherance of his activity and thus could easily delete, encrypt, or otherwise conceal such digital evidence from law enforcement were he to learn of the Government's investigation. *See* 18 U.S.C. § 2705(b)(3). Cohen also appears to have the financial means that would facilitate his flight from prosecution. *See* 18 U.S.C. § 2705(b)(2), (5).

9.   Accordingly, there is reason to believe that, were the Provider to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Provider not to notify any person of the existence of the warrant for a period of 180 days from issuance, subject to extension upon application to the Court, if necessary.

10. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

4

2017.03.25

### III.   Conclusion

11. Based on the foregoing, I respectfully request that the Court issue the warrant sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.

United States Attorney's Office
Southern District of New York

Sworn to before me this
_____ day of April, 2018

HONORABLE HENRY B. PITMAN
United States Magistrate Judge
Southern District of New York

5

2017.03.25

# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of a Warrant for All
Content and Other Information
Associated with the Email Accounts
████████ @gmail.com,
████████ Maintained at
Premises Controlled by Google, Inc.,
the Email Account ████████
Maintained at Premises Controlled by
Oath, Inc., and the Email Account
████ █ ████ maintained at
Premises Controlled by 1 & 1 Internet,
Inc., USAO Reference No.
2018R00127

**TO BE FILED UNDER SEAL**

**AGENT AFFIDAVIT**

**18 MAG   169 6**

**Agent Affidavit in Support of Application for a Search Warrant
for Stored Electronic Communications**

STATE OF NEW YORK      )
                                           ) ss.
COUNTY OF NEW YORK   )

    Special Agent ████████ of the United States Attorney's Office for the Southern

District of New York, being duly sworn, deposes and states:

**I. Introduction**

    **A. Affiant**

**B. The Provider, the Subject Account and the Subject Offenses**

2. I make this affidavit in support of an application for a search warrant pursuant to 18 U.S.C. § 2703 for all content and other information associated with the email accounts ▓▓▓▓▓@gmail.com (the "Cohen Account"), ▓▓▓▓▓▓ (the "MDCPC Account"), ▓▓▓@gmail.com (the "▓▓▓▓▓ Account"), ▓▓▓▓▓▓▓ (the ▓▓▓▓▓ Account"), and ▓▓▓@aol.com (the "▓▓▓ Account") (collectively, the "Subject Accounts"). The Cohen Account, ▓▓▓▓▓Account, and ▓▓▓▓▓▓ Account are maintained and controlled by Google, Inc., headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043 ("Google"), the MDCPC Account is maintained and controlled by 1 & 1 Internet, Inc., headquartered at 701 Lee Road, Suite 300, Chesterbrook, Pennsylvania 19087 ("1 & 1"), and th▓▓ Account is maintained and controlled by Oath, Inc., 22000 AOL Way, Dulles, Virginia 20166 ("Oath") (together, the "Providers"). The information to be searched is described in the following paragraphs and in Attachments A, B, C and D to the proposed warrants.

3. As detailed below, there is probable cause to believe that the Subject Accounts contain evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 371 (conspiracy to defraud the United States), 1005 (false bank entries), 1014 (false statements to a financial institution), 1343 (wire fraud), and 1344 (bank fraud) (collectively, the "Subject Offenses"). The Target Subjects of this investigation are MICHAEL COHEN ("Cohen") and others known and unknown. This affidavit is based upon my personal knowledge, my review of documents produced pursuant to grand jury subpoenas and prior search warrants, my review of interview reports prepared by other law enforcement officers, and my conversations with other law enforcement officers, as well as

02.28.2018

my training and experience concerning the use of email in criminal activity. Because this affidavit

is being submitted for the limited purpose of establishing probable cause, it does not include all

the facts I have learned during my investigation. Where the contents of documents and the actions,

statements, and conversations of others are reported herein, they are reported in substance and in

part, except where otherwise indicated.

### C. Services and Records of the Provider

4. I have learned the following about the Providers:

a. The Providers offer email services to the public. In particular, Google permits

subscribers to maintain email accounts under the domain name gmail.com. Google also allows a

subscriber to maintain email accounts under any domain name under the subscriber's control. For

example, if a subscriber controls the domain name '███████' Google enables the subscriber

to host any email address under this domain name on servers operated by Google. Oath permits

subscribers to maintain email accounts under the domain name aol.com. 1 & 1 permits subscribers

to maintain email accounts under any domain name under the subscriber's control. For example,

if a subscriber controls the domain name ███████' 1 & 1 enables the subscriber to host any

email address under this domain name on servers operated by 1 & 1. A subscriber using the

Providers' services can access his or her email account from any computer connected to the

Internet.

b. The Providers maintain the following records and information with respect to every

subscriber account:

i. *Email contents.* In general, any email (which can include attachments such

as documents, images, and videos) sent to or from a subscriber's account, or stored in draft form

in the account, is maintained on the Providers' servers unless and until the subscriber deletes the

email. If the subscriber does not delete the email, it can remain on the Providers' computers

3

indefinitely. Even if the subscriber deletes the email, it may continue to be available on the Provider's servers for a certain period of time.

      ii.   *Address book.* The Providers also allow subscribers to maintain the equivalent of an address book, comprising email addresses and other contact information of other email users.

      iii.   *Subscriber and billing information.* The Providers collect and maintain (typically unverified) identifying information about each subscriber, including, for example, name, username, address, telephone number, and alternate email addresses. The Providers also maintain records concerning the date on which the account was created, the Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (*e.g.*, active or closed), the length of service, and the types of services utilized by the subscriber. Additionally, for paying subscribers, the Providers maintain records of the subscriber's means and source of payment, including any credit card or bank account number.

      iv.   *Transactional information.* The Providers also typically retain certain transactional information about the use of each account on its system. This information can include records of login (*i.e.*, session) times and durations and the methods used to connect to the account (such as logging into the account through the Providers' website).

      v.   *Customer correspondence.* The Providers also typically maintain records of any customer service contacts with or about the subscriber, including any inquiries or complaints concerning the subscriber's account.

      vi.   *Search history.* Google and Oath also typically maintain records of any search history or web history associated with the subscriber's account.

4

      vii.    *Associated content.* Google also typically maintains content and records relating to the following applications that are associated with its e-mail accounts: (A) "Google Docs," which provides document-editing software that can be used to create, share, store, and manage documents online; (B) "Google Drive," which enables users to store files on Google servers, where they can be accessed remotely by the user and others; and (C) "Gchat" or "Instant Messenger," which provides a chat interface through which users can communicate with each other in real time. Oath also typically maintains content and records relating to AOL instant message, which provides a chat interface through which users can communicate with each other in real time.

      viii.    *Preserved and backup records.* The Providers also maintain preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f). The Providers may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

### D. Jurisdiction and Authority to Issue Warrant

    5. Pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A), the Government may require a provider of an electronic communications service or a remote computing service, such as the Providers, to disclose all stored content and all non-content records or other information pertaining to a subscriber, by obtaining a warrant issued using the procedures described in the Federal Rules of Criminal Procedure.

    6. A search warrant under § 2703 may be issued by "any district court of the United States (including a magistrate judge of such a court)" that "has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

02.28.2018

7.   When the Government obtains records under § 2703 pursuant to a search warrant, the Government is not required to notify the subscriber of the existence of the warrant. 18 U.S.C. § 2703(a), (b)(1)(A), (c)(2) & (3).   Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other person of the warrant, for such period as the Court deems appropriate, where there is reason to believe that such notification will seriously jeopardize an investigation.   18 U.S.C. § 2705(b).

### E.  Prior Applications

8.   On or about July 18, 2017, in connection with an investigation being conducted by the Office of the Special Counsel ("SCO"), the Federal Bureau of Investigation ("FBI") sought and obtained from the Honorable Beryl A. Howell, Chief United States District Judge for the District of Columbia, a search warrant for emails in the Cohen Account sent or received between January 1, 2016 and July 18, 2017.   On or about November 13, 2017, the FBI sought and obtained from Judge Howell search warrants for emails in the Cohen Account sent or received between June 1, 2015 and November 13, 2017, and emails in the MDCPC Account sent or received between the opening of the account and November 13, 2017.   The SCO has since referred certain aspects of their investigation into Cohen to the USAO, which is working with the FBI's New York Field Office.   As part of that referral, the SCO provided the USAO with emails and other content information obtained pursuant to the search warrants executed by the SCO, which had already been reviewed for privilege.[1]   As discussed below, this affidavit is based in part on my review of

---

[1] In an abundance of caution, in a separate application the USAO has sought authorization, pursuant to Fed. R. Crim. P. 41, to review the emails obtained pursuant to the Prior Cohen Account Warrants for evidence related to certain additional conduct that was not the focus of the Prior Cohen Account Warrants.  The emails obtained from the Prior Cohen Account Warrants that relate to that additional conduct do not form a basis for the instant application.

02.28.2018

responsive materials produced pursuant to the July 18 and November 13, 2017 warrants (the "Prior Cohen Account Warrants").

9. On or about November 7, 2017, and January 4, 2018, as well as certain prior dates, the SCO sought and obtained from Judge Howell orders authorizing and extending the installation and use of pen registers and trap and trace devices to record communications sent to or from the Cohen Account. The SCO has provided pen register data obtained pursuant to those orders to the USAO. This affidavit, as discussed below, is based in part on my review of the pen register data obtained pursuant to the November 7, 2017 and January 4, 2018 orders (the "Pen Register Data").

10. On or about February 16, 2018, the USAO sought and obtained from the Honorable Debra Freeman, United States Magistrate Judge for the Southern District of New York, an order pursuant to 18 U.S.C. § 2703(d) for email header information associated with the MDCPC Account. This affidavit, as discussed below, is based in part on my review of email header information produced by 1 & 1 in response to that order (the "MDCPC Header Information").

## II. Probable Cause

### A. Overview

11. The United States Attorney's Office for the Southern District of New York and FBI are investigating, among other things, a scheme by Target Subject Michael Cohen to defraud multiple banks. Cohen is an attorney who currently holds himself out as the personal attorney for President Donald Trump, and who previously served for over a decade as an executive in the Trump Organization, an international conglomerate with real estate and other holdings.

12. The investigation has revealed that Cohen has made affirmative misrepresentations in and omitted material information from financial statements and other disclosures that Cohen provided to multiple banks in connection with a transaction intended to relieve Cohen of approximately $22 million in debt he owed on taxi medallion loans from the banks. As set forth

7

in detail below, in these financial statements, and in his oral and other written statements to these banks, Cohen appears to have (i) intentionally omitted cash assets that he began receiving in 2017 from new consulting work; (ii) significantly understated his *total* holdings of cash and cash equivalents; and (iii) failed to inform the banks from which he was seeking debt relief that he had agreed to make a $3.8 million cash payment to a third party,        in connection with        acquisition of the taxi medallions securing Cohen's debt.  By making these misrepresentations and material omissions, Cohen avoided making monthly payments on his loans, and attempted to and had secured proposed agreements from the banks to relieve him of certain repayment obligations worth millions of dollars.

13. Based on my review of emails obtained from the Prior Cohen Account Warrants, MDCPC Header Information, and documents produced pursuant to subpoenas, I have learned that Cohen has used the Cohen Account and/or MDCPC Account to, among other things, (i) communicate with        and their attorney        about the proposed transfer of Cohen's medallions and associated debts; (ii) negotiate a pay-down of the principal amount of the taxi medallion loans; (iii) communicate with his accountant about the contents of the false financial statements at issue; and (iv) send those false financial statements to banks.  Additionally,        used the        Account,        Account and    Account, respectively, to communicate with Cohen about the status of the taxi medallion transaction, and to send relevant financial statements to banks.  Accordingly, and as set forth in more detail below, there is probable cause to believe that the Subject Accounts will include evidence of the Subject Offenses.

### B. Cohen's Statements to Sterling National Bank

14. As set forth in detail below, in 2014, Cohen, through limited liability corporations ("LLCs") controlled by him and his wife, Laura Cohen, entered into a series of loans from Sterling

8

National Bank ("Sterling") and the Melrose Credit Union ("Melrose"), secured by taxi medallions, for approximately $20 million. Though entered into by LLCs, the loans were also secured by personal guarantees in the names of both Cohen and his wife. Over time, as the taxi industry weakened and the medallions were devalued, Cohen sought to renegotiate the terms of those loans and/or relieve himself from their obligations, including the personal guarantees. As part of that effort, Cohen made a series of representations to Sterling and Melrose about his net worth, assets, available cash, and financial outlook. Specifically, based on my review of records maintained by Sterling and Melrose, and public sources concerning the taxi industry and the value of taxi medallions, as well as my review of reports prepared by law enforcement officers of interviews with a Sterling executive vice-president (the "Sterling Employee-1") and my participation in an interview with a Sterling employee (the "Sterling Employee-2"), I have learned, among other things, the following:

a.   Taxi medallions are small metal plaques affixed to taxis. Without a medallion, it is illegal to operate a taxi in cities with medallion systems, such as New York City. Cohen and his wife own multiple LLCs that collectively own 32 taxi medallions (each LLC owns two medallions).[2] Cohen's purchase of these New York taxi medallions was originally financed by loans from Capital One Bank, for which the medallions served as collateral. Cohen was not a taxi operator, and leased his medallions to a third party. That third party made monthly payments to Cohen, who in turn used some of those proceeds to pay his monthly loan payments.

b.   In early 2014, Cohen became a customer of Sterling when he sought to refinance a mortgage on a rental property that he owned. In or around April 2014, Cohen raised with Sterling

---

[2] One of these companies, Mad Dog Cab Corp., was jointly owned by Sondra Cohen, who I believe is Cohen's mother.

02.28.2018

the prospect of refinancing his taxi medallion loans, which were then at Capital One Bank. By in or about September 2014, Cohen began negotiating a lending transaction with Sterling that would allow Cohen to pay off his loans at Capital One and borrow more money from the then-increase in value of the medallions. According to Sterling Employee-1, in 2014, prior to the recent upheaval in the taxi industry—as a result of the emergence of ride-sharing services, such as Uber—taxi medallion loans were viewed by banks and investors as safe, short term credits, as the market value of taxi medallions was consistently rising. Consequently, taxi medallion loans—like the loans held by Cohen—were frequently refinanced at increasing amounts as the value of the medallions rose. According to Sterling Employee-1, borrowers typically cashed out the increase in the loan amount and used the additional funds for other purposes. Cohen appears to have followed this approach in 2014, when he agreed to refinance his medallion loans for approximately $22 million, which—according to letters from Capital One Bank in Sterling's files—was greater than his previous debt at Capital One Bank ($21 million, of which $14.6 million was a line of credit to Cohen). This allowed Cohen to cash out the proceeds from the transaction.

c. Based on my review of records maintained by Sterling, I have learned that on or about December 8, 2014, each of Cohen's sixteen taxi medallion corporations entered into loan agreements and promissory notes with Sterling for the principal sum of $1,375,000, with repayment due on December 8, 2016. Each loan was signed by Michael or Laura Cohen, depending on who was the sole shareholder of the corporation. The loans were also each secured by a security agreement, dated the same day, making the medallions collateral for the notes. To give Sterling additional security, Michael and Laura Cohen signed personal guarantees and confessions of judgment, giving Sterling the right to pursue collection against the Cohens' personal assets were their corporations to default under the loan agreements. In total, Sterling agreed to lend

approximately $22 million to the Cohens' companies. Pursuant to participation agreements, Sterling transferred 45 percent of that debt to Melrose.[3] Under the terms of Sterling's participation agreements with Melrose, Sterling was precluded from amending or modifying the loans without the consent of Melrose.

       d. In evaluating Cohen's requested refinancing of the taxi medallions, Sterling (and Melrose, consistent with its participation in the deal) conducted due diligence. At Sterling's request, Cohen provided Sterling with a statement of financial condition, dated August 1, 2014 (the "August 2014 Financial Statement"), which indicated that Cohen had $100,740,000 in total assets, $23,550,000 in total liabilities, and a net worth of $77,190,000.[4] From my review of a Sterling credit memorandum, dated September 29, 2014, I know that Sterling viewed the transaction favorably because, accounting for loan payments, cash flows from the medallions were projected to be positive, the value of the collateral (as estimated by Sterling) exceeded $42 million, and the net worth of Cohen—who was the direct obligor under the guarantee agreements—was over $77 million. An internal Sterling credit and risk rating analysis report, dated October 20, 2014, recommended approval of the loans for substantially the same reasons.

       e. Based on my review of records maintained by Sterling and public sources, I have learned that over time, the collateral backing Cohen's loans (taxi medallions) lessened in value due to the rise in ride-sharing companies and significant devaluation of taxi medallions. Additionally, Cohen began falling behind on loan payments to Sterling and Melrose. I know from records maintained by Sterling and an interview with Sterling Employee-2 that, beginning in or around

---

[3] Melrose, which had a business principally focused on taxi medallion loans, is now in conservatorship by the National Credit Union Administration ("NCUA").

[4] Cohen subsequently provided Sterling with a revised statement of financial condition, also dated August 1, 2014, which reported assets of $99,420,000, total liabilities of $23,550,000, and a net worth of $75,870,000.

02.28.2018

September 2015, Cohen told Sterling, in sum and substance, that the individual leasing Cohen's medallions had fallen behind in making payments to Cohen, and that as a result, the monthly cash flow from his taxi medallions had been reduced, leaving him with a shortfall of approximately $16,000 each month. For instance, I have reviewed an email from Sterling Employee-2, dated September 9, 2015, summarizing a call with Cohen—which according to the email and toll records for Cohen's cellphone occurred on September 8, 2015—during which Cohen told Sterling Employee-2, in sum and substance, about his cash flow problems and a monthly shortfall of approximately $16,000. In that same email, Sterling Employee-2 commented that despite Cohen's statements, his personal financial information "indicate[d] a strong ability to make up the difference in payments." Cohen, however, according to Sterling Employee-2, pushed the bank for a reduction in Cohen's monthly payments.

      f.  From my review of records maintained by Sterling and my participation in an interview with Sterling Employee-2, I have learned that Cohen and Sterling Employee-2 spoke again on September 28, 2015, and that during the call Cohen stated, in sum and substance, that the individual to whom Cohen leases the medallions had again reduced monthly payments to Cohen. I know from my review of records maintained by Sterling that between in or about September 2015 and November 2015, Sterling raised the possibility—both internally and with Cohen—of Cohen posting his real estate holdings, personal residence, or some other collateral as additional security for the banks. According to these records, however, Cohen resisted these requests. From my review of loan documents and records maintained by Sterling, I know that in or about November 2015, as a result of Cohen's representation that he was not earning sufficient returns on his medallions to cover monthly interest payments, Sterling and Melrose agreed to amend their loans with Cohen by,

among other things, reducing the interest rate Cohen paid to Melrose and extending the loan maturity date to December 8, 2017.

       g.  I know from interviews with Sterling Employee-1 and Sterling Employee-2, as well as emails I have reviewed, that in or about October 2016, Cohen told Sterling Employee-1 that Cohen had a potential buyer of his taxi medallions, named ▮▮▮▮▮▮ who would agree to assume Cohen's debt with Sterling and Melrose. Based on my review of records maintained by Sterling, as well as the interviews with Sterling Employee-1 and Sterling Employee-2 referenced above, I know that by or before October 2016, Cohen had entered into negotiations to sell his sixteen corporate taxi medallions to ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ for the balance of the loans, which at the time was $21,376,000. I know from my review of records maintained by Sterling, and my participation in an interview with Sterling Employee-2, that as a condition of the transfer of the medallion loans—and because Sterling was unfamiliar with▮▮▮ ▮▮▮▮▮▮—Sterling requested that Cohen make a substantial principal payment on the loan, of approximately one million dollars, prior to the transfer. Cohen rejected this request initially. But on or about January 31, 2017, Cohen told Sterling Employee-1, in sum and substance, that he would make a one million dollar principal reduction payment in order to move forward with the medallion transfer deal with ▮▮▮▮▮▮ Indeed, in an email sent from the Cohen Account to Sterling Employee-2 on or about February 22, 2017, Cohen confirmed that he "agreed to pay down 1 million from the loan amount."

       h.  Pursuant to the participation agreements between Sterling and Melrose, Sterling was required to secure Melrose's agreement to participate in the transfer of the taxi medallion debt from Cohen to ▮▮▮▮▮▮ On or about April 17, 2017, Sterling sent a memorandum to Melrose summarizing the terms of the proposed transaction, and noting the requirement that

02.28.2018

Melrose agree to the terms.  On or about May 2, 2017, [redacted] emailed Sterling Employee-1 from the [redacted] Account to inquire about the status of the transaction. Sterling Employee-1 responded to [redacted] at the [redacted] Account that Melrose had agreed to the deal, and that Sterling would be sending [redacted] a term sheet shortly.

      i.  In order for the banks to evaluate the proposed transaction fully, they requested financial information from the parties.  On or about October 26, 2016, a Sterling employee emailed the [redacted] Account about the "Cohen Medallion Purchase," and stated "[i]n order to proceed with the assumption of Michael's loans," Sterling needed certain financial information from [redacted] responded from the [redacted] Account, copying [redacted] at the [redacted] Account, that he would send a financial statement and tax returns shortly.  Additionally, on or about June 7, 2017, Sterling Employee-1 emailed Cohen to request an "updated personal financial statement," completed jointly with Cohen's wife, and Cohen's most recent federal income tax return.  On or about June 8, 2017, Cohen emailed Sterling Employee-1 from the Cohen Account, attaching a Sterling personal financial statement form that had been filled out by hand, which referenced a statement of financial condition, dated May 1, 2017 (the "May 2017 Financial Statement"), that was also attached.  The May 2017 Financial Statement included a cover letter from Cohen's accountant [redacted] stating, in sum and substance, that the information in the statement came from Cohen and that [redacted] had not confirmed its accuracy or completeness.  The May 2017 Financial Statement stated that Cohen had total assets of $41,955,000, total liabilities of $39,130,000, and a net worth of $2,825,000.  The May 2017 Financial Statement indicated that Cohen's assets were comprised of $1,250,000 in

14

cash, $26,155,000 in closely held companies (such as the taxi medallion entities and his real estate holdings), $3,200,000 in real estate investments, and his $11,000,000 personal residence.

j.   Based on my review of reports of law enforcement interviews of Sterling Employee-1, I have learned that Sterling Employee-1 reviewed each line of the May 2017 Financial Statement with Cohen to, among other things, verify its accuracy, and Sterling Employee-1 asked Cohen about the cash amount listed on the May 2017 Financial Statement. Cohen stated to Sterling Employee-1, in sum and substance, that the May 2017 Financial Statement was accurate.

k.   On or about August 16, 2017, Sterling Employee-1 emailed Cohen at the Cohen Account and          at the          Account, attaching a non-binding term sheet memorializing the potential transaction between Sterling, Melrose, Cohen, and          On or about August 29, 2017,      emailed Sterling Employee-1 from the      Account, requesting that he be included on "all future e-mails to          and/or          concerning this matter," and providing proposed edits to the term sheet. On or about August 30, 2017, Sterling Employee-1 emailed          at the          Account, Cohen at the Cohen Account, and     at the     Account, and provided them with a revised term sheet. On or about September 5, 2017, Sterling Employee-1 sent          at the          Account, Cohen at the Cohen Account, and     at the     Account a copy of the executed term sheet. According to the term sheet,          would borrow $20,000,000 from Sterling and Melrose, to be secured by the medallions that          was to acquire from Cohen.

l.   As part of the agreement, according to the term sheet, $1,265,913 in principal (which is what would remain after the $20,000,000 payment on the outstanding loan balance) would be repaid by Cohen and the two banks, with Cohen paying fifty percent and the banks dividing the

remaining half of the balance. Based on my review of an internal Sterling credit memorandum, dated October 4, 2017, the parties reached a preliminary agreement that Cohen would pay $632,956 of the remaining $1,265,912 principal loan balance, and Sterling and Melrose would absorb $357,167 and $275,789 respectively in the form of charge-offs. According to Sterling Employee-1, Sterling was willing to divide the repayment of the outstanding principal balance—despite its prior insistence that Cohen make a principal pay-down of at least one million dollars—because Cohen represented on a telephone call with Sterling Employee-1, in sum and substance, that he had insufficient liquidity to pay the full outstanding principal balance. As part of the agreement, Sterling and Melrose also agreed to relieve Cohen and his wife of the personal guarantees that they made on behalf of the LLCs. Thus, after completing the ▓▓▓▓▓ transaction, Cohen would no longer have had any outstanding obligations to Sterling or Melrose.

m. Based on my review of emails sent by Sterling employees, I have learned that because the transaction between the parties was subject to full credit underwriting by Sterling and Melrose (as well as Melrose's regulators at NCUA), in August and September 2017, Sterling required and requested additional financial statements for Cohen and ▓▓▓▓▓ for its credit underwriting process. In response to Sterling's requests, on or about October 5, 2017, ▓▓▓ ▓▓▓▓▓ sent from the ▓▓▓▓▓ Account to a Sterling employee a copy of ▓▓ ▓▓▓▓▓ personal financial statement. The financial statement lists the ▓▓▓▓▓ Account as the email contact for ▓▓▓▓▓. Additionally, on or about October 5, 2017, Cohen, using the Cohen Account, re-sent Sterling Employee-2 a copy of his May 2017 Financial Statement. A day later, on October 6, 2017, Cohen, using the Cohen Account, emailed Sterling Employee-2 a statement of financial condition, dated September 30, 2017 (the "September 2017 Financial Statement").

16

n.  Like the May 2017 Financial Statement, the September 2017 Financial Statement included a cover letter from ███████ Cohen's accountant, stating, in sum and substance, that the information in the statement came from Cohen, and that ████ had not confirmed its accuracy or completeness.  The September 2017 Financial Statement stated that Cohen had total assets of $33,430,000, total liabilities of $45,630,000, and a negative net worth of $12,200,000.  Notably, unlike Cohen's May 2017 Financial Statement, the September 2017 Financial Statement represented to Sterling that Cohen had a negative net worth.  The September 2017 Financial Statement indicated that Cohen's assets were comprised of $1,250,000 in cash, $17,630,000 in closely held companies (such as the taxi medallion entities and his real estate holdings),[5] $3,200,000 in real estate investments, and his $11,000,000 personal residence (which, for the first time, he indicated was held in trust).  The September 2017 Financial Statement included assets and liabilities not held in Cohen's name, such as various entities associated with his taxi medallions and some of his real estate investment entities.

o.  From my participation in an interview with Sterling Employee-2, and my review of records maintained by Sterling, I have also learned that at or around the time Cohen provided Sterling with these financial statements—in or around September 2017—Cohen stopped paying monthly loan payments on his taxi medallion loans altogether.  According to Sterling Employee-2, Cohen informed Sterling, in sum and substance, that he had insufficient funds to pay the monthly principal and interest payments on his medallion loans.  By in or about December 2017, Sterling and Melrose had not been paid approximately $276,937.92 in monthly principal and interest payments on the medallion loans.  Based on Cohen's financial condition as conveyed in the

---

[5] Notably, the September 2017 Financial Statement valued each of Cohen's thirty-two New York taxi medallions at approximately $180,187.50, which was considerably less than the $650,000 valuation ascribed to each medallion in the Cohen-████ term sheet.

17

September 2017 Financial Statement, and his delinquency in making payments to Sterling, among other things, the bank's credit underwriting committee determined (and memorialized in a December 2017 memorandum) that the Cohen-█████ transaction was favorable for the bank – that is, that █████ would be a better borrower than Cohen.

     p.  On or about December 26, 2017, Sterling sent Cohen a demand letter requesting the immediate receipt of past-due loan payments. On December 29, 2017, Sterling sent Cohen a letter stating that he was in default under the loans between Sterling and Cohen's medallion corporations. Cohen did not make an immediate payment on the loans, but instead sent an e-mail to Sterling Employee-1 on or about January 24, 2018, from the Cohen Account, stating that during the closing of the Cohen-█████ transaction, Cohen would "bring all payments up to date as well as deposit the payoff differential." Cohen also requested by email sent from the Cohen Account on January 24, 2018, that at the closing of the Cohen-█████ transaction, Sterling provide a letter stating that all of Cohen's debts have been satisfied and that Cohen's personal guarantees of the medallion loans had been terminated.

     q.  The Cohen-█████ transaction, however, did not close. On or about January 29, 2018, █████ the █████ attorney, emailed attorneys for Sterling from the █████ Account and stated that "at this time there is no deal with Michael Cohen. Some of the numbers have changed and we are not prepared to go forward."

     r.  Based on my participation in the interview with Sterling Employee-2 and my review of records maintained by Sterling, I know that after the Cohen-█████ deal fell apart, Sterling assigned Cohen's loans to an employee at Sterling who specializes in collecting on defaulting loans ("Sterling Employee-3"). From my review of telephone call notes, I know that Sterling Employee-3 spoke to Cohen on or about January 30, 2018 about paying down and/or

02.28.2018

restructuring Cohen's outstanding taxi medallion loans. Based on my review of an email between Sterling Employee-3 and Cohen, I know that on the January 30, 2018 call, Cohen stated that he would send a "corrected current" version of his personal financial statement. Following that call, on or about January 31, 2018, Cohen emailed Sterling Employee-3 from the Cohen Account a copy of the September 2017 Financial Statement. Later that day, Cohen again emailed Sterling Employee-3 from the Cohen Account and proposed paying $500,000 to bring the loans current and $750,000 to bring the principal balance to $20,500,000. Cohen also suggested revised monthly interest payment amounts. On or about January 31, 2018, Sterling Employee-3 responded to Cohen at the Cohen Account and stated, in sum and substance, that Cohen would need to pay the entirety of the overdue payments and pay down the principal balance of the loan to $20,000,000 (in total, a payment of approximately $1,750,000), and would need to make larger monthly interest payments.

s. On or about February 1, 2018, Cohen emailed Sterling Employee-3 from the Cohen Account and proposed "[p]ayment of $1.250m which ALL can be used to pay down principal, if [Sterling] will waive past due amounts," but stated "I do NOT have more than the $1.250m." (Emphasis in original.) Cohen also stated, in sum and substance, that he had insufficient financial resources to post additional collateral or pre-fund monthly payments. Based on my participation in an interview with Sterling Employee-2, I have learned that Sterling continues to renegotiate the medallion loans with Cohen based on Cohen's representations about his current financial position.

19

02.28.2018

## C. Cohen Made Material Misrepresentations About His Finances to Banks

Cohen Concealed from Sterling and Melrose Cash Derived from Consulting Work

15. As set forth in detail below, despite multiple representations by Cohen to Sterling (and, by extension, Melrose[6]) that he had insufficient funds to pay down the principal balance of the medallion loans, make monthly interest payments, or pay past-due amounts, it appears that between 2016 and the present, Cohen opened and maintained bank accounts at First Republic Bank ("First Republic"), and then received millions of dollars in purported consulting payments in these accounts, which he did not disclose to Sterling. Cohen set up these accounts and received these funds during the very period in which he made disclosures to Sterling about his personal finances (including his assets and liabilities) and his ability to make payments on the medallion loans. In these disclosures to Sterling—and despite being asked about these bank accounts by his accountant—Cohen withheld information about liquid financial assets at First Republic.

16. Specifically, based on my review of documents and bank records produced pursuant to a subpoena by First Republic, and my participation in and review of reports of interviews with two First Republic employees, I have learned, among other things, the following:

a. Cohen and his wife have been customers of First Republic since approximately June 2011. Cohen controls several checking and loan accounts, some in his own name and others in the names of corporate entities.

---

[6] Based on my review of a report of an interview conducted with an employee of Melrose, I have learned that, pursuant to the participation agreement between Sterling and Melrose, Cohen's financial statements and other records in Sterling's possession were forwarded to Melrose so that Melrose could make a determination as to whether to approve of the Cohen- ▮▮▮▮▮ transaction. Based on my review of reports of interviews with Melrose employees, I also know that Cohen called employees at Melrose regarding the Cohen ▮▮▮▮▮ transaction.

b.  On or about October 26, 2016, in Manhattan, New York, Cohen opened a new checking account at First Republic in the name of Essential Consultants LLC (the "Essential Consultants Account").  Cohen was the only authorized signatory on the account.  When Cohen opened the Essential Consultants Account, a First Republic employee ("First Republic Employee-1") conducted an in-person interview of Cohen.  In response to a series of know-your-customer questions[7] about the purpose of the account—the answers to which First Republic Employee-1 entered into a form[8]—Cohen stated, in sum and substance, that he was opening Essential Consultants as a real estate consulting company to collect fees for investment consulting work, and all of his consulting clients would be domestic individuals based in the United States.  Cohen also stated, in sum and substance, that his purpose in setting up the account was to keep the revenue from his consulting business—which he said was not his main source of income—separate from his personal finances.  As set forth below, there is probable cause to believe that Cohen's statements about the intended purpose of the account and source of funds for the account were false.  Specifically, the account was not intended to receive—and does not appear to have received—money in connection with real estate consulting work; in addition, the account has received substantial payments from foreign sources.



---

[7] Certain financial institutions are required to conduct such procedures pursuant to the Bank Secrecy Act and its implementing regulations. *See* 31 U.S.C. § 5318; 31 C.F.R. § 1020.220.

[8] First Republic Employee-1 first filled out the form on the day he interviewed Cohen, October 26, 2016.  On or about December 19, 2016, at the request of bank compliance personnel, First Republic Employee-1 updated the form to add more detail about Cohen's statements.

02.28.2018

d.  Second, I know from my review of First Republic bank records that were scheduled by an FBI forensic accountant that after Cohen opened the Essential Consultants Account, Cohen received payments into that account from foreign businesses and entities that do not reflect the stated client profile for the residential and commercial real-estate consulting services.  Specifically, from my review of the Essential Consultants Account schedule and public sources, I know the following:

i.  Beginning on or about January 31, 2017, Cohen began receiving monthly payments of $83,333 from an entity called Columbus Nova LLC, which were deposited into the Essential Consultants Account.  According to public sources, Columbus Nova is an investment management firm controlled by Renova Group, an industrial holding company based in Zurich, Switzerland that is controlled by Russian national Viktor Vekselberg.  From January 2017 to August 2017, the Essential Consultants Account received seven payments totaling $583,332.98 from Columbus Nova LLC.

ii. Beginning on or about April 5, 2017, Cohen began receiving payments from Novartis Investments, SARL, which I believe to be the in-house financial subsidiary of the Swiss pharmaceutical company Novartis International AG ("Novartis"). Between April 2017 and January 2018, the Essential Consultants Account received ten wire payments from a Swiss bank account held in the name of Novartis, each in the amount of $99,980, for a total of $999,800.

iii. Beginning in or about April 2017, the Essential Consultants Account started receiving wire payments from a bank account associated with the telecommunications company AT&T Inc. ("AT&T"). Specifically, on or about April 14, 2017, AT&T wired $100,000 to the Essential Consultants Account and, from in or about June 2017 to in or about January 2018, the Essential Consultants Account received nine $50,000 payments from AT&T. In total, AT&T wired $550,000 to the Essential Consultants Account.

iv. On or about May 10, 2017, June 9, 2017, July 10, 2017, and November 27, 2017, the Essential Consultants Account received four deposits in the amount $150,000 (totaling $600,000) from a bank account in South Korea. The account holder from which the money was sent is Korea Aerospace Industries Ltd. ("KAI"). KAI is a South Korea-based company that produces and sells fixed-wing aircraft, helicopter aircraft, and satellites to the United States Department of Defense, among other customers.

v. On or about May 22, 2017, the Essential Consultants Account received a $150,000 deposit from an account at Kazkommertsbank, a Kazakhstani bank. The listed account holder at Kazkommertsbank was a second Kazakhstani bank named BTA Bank, AO. A message accompanying the wire payment indicated that the payment was a "monthly consulting fee as per Inv BTA-101 DD May 10, 2017 consulting agreement W/N DD 08 05 2017 CNTR W/NDD 08/05/2017."

02.28.2018

vi.   In total, from on or about January 31, 2017 to on or about January 10, 2018, the Essential Consultants Account received approximately $2,883,132.98 in transfers and checks from the aforementioned entities.  As of on or about January 10, 2018, the balance in the Essential Consultants Account was $1,369,474.23.

e.   On or about April 4, 2017, Cohen opened another new checking account at First Republic, this one in the name of Michael D. Cohen & Associates, P.C. (the "MDC&A Account"). Cohen was the only authorized signatory on the account.  Among other things, the MDC&A Account received ten wire transfers and one check from an account in the name of Squire Patton Boggs, a law firm.  In total, from on or about April 5, 2017, to on or about January 2, 2018, the MDC&A Account received $426,097.70 in deposits, and the balance in the account as of January 2, 2018, was $344,541.35.  As discussed below, Cohen never disclosed any of the balance in the Essential Consultants or MDC&A accounts to Sterling during the negotiations with respect to the ▉▉▉▉▉ transaction, including in his May 2017 Financial Statement and September 2017 Financial Statement.

17. Based on my review of emails from the Cohen Account that were seized pursuant to the Prior Cohen Account Warrants, and my review of reports of interviews with employees of AT&T and Novartis, it appears that the aforementioned payments to the Essential Consultants Account and MDC&A Account ostensibly were for political consulting work, including consulting for international clients on issues pending before the Trump administration.[10]  Specifically, from my review of emails from the Cohen Account and public sources, I have learned the following:

---

[10] Based on my review of public sources, I have learned that Cohen is not registered as a lobbyist or as a person acting as an agent of foreign principals, as may have been required by the Foreign Agents Registration Act.

02.28.2018

a. On or about April 28, 2017, Cohen sent an email from the Cohen Account to an individual whom I believe is affiliated with KAI. In the email, Cohen attached a document purporting to be a "Consulting Agreement" between KAI and Essential Consultants dated as of about May 1, 2017. The document indicates that Essential Consultants would render "consulting and advisory services, as requested" by KAI, and that KAI would pay Essential Consultants "a consulting fee of One Million Two Hundred Thousand ($1,200,000.00) US Dollars," disbursed through eight $150,000 installments between May 2017 and December 2017.

b. On or about May 10, 2017, Cohen sent an email from an alternate email address, copying the Cohen Account, to an employee of BTA Bank. To the email, Cohen attached an invoice to BTA Bank in the name of Essential Consultants. The invoice contemplated a $150,000 payment to Essential Consultants for a "monthly consulting fee."

c. On or about February 13, 2017, Cohen emailed an AT&T employee from the Cohen Account what appears to be a consulting agreement, which contemplates that Essential Consultants "shall render consulting and advisory services to [AT&T]" and that AT&T would "advise [Essential Consultants] of those issues and matters with respect to which AT&T Services desires [Essential Consultants]'s assistance and advice." The contract calls for AT&T "to pay the Consultant for his services . . . a consulting fee of Fifty Thousand ($50,000) Dollars . . . per month." Based on my review of reports of interviews with AT&T employees, I have learned that AT&T retained Cohen to consult on political issues, including net neutrality, the merger between AT&T and Time Warner, and tax reform.

d. On or about January 17, 2017, Cohen emailed to a representative of Novartis from the Cohen Account a contract between Novartis and Essential Consultants, which provides that Essential Consultants will "provide consulting and advisory services to Novartis on matters that

02.28.2018

relate to the repeal and replacement of the Affordable Care Act in the US and any other issues mutually agreeable to [Essential Consultants] and Novartis." The contract provides for a "consulting fee of One Million Two Hundred Thousand ($1,200,000) US dollars," to be paid to Essential Consultants in even monthly installments over the course of a year. Based on my review of reports of interviews with Novartis employees, I have learned that Novartis retained Cohen to provide political consulting services and to gain access to relevant policymakers in the Trump Administration.

    e. On or about April 3, 2017, Squire Patton Boggs, a law firm, announced on its website that is had formed a "strategic alliance" with Michael D. Cohen & Associates and would "jointly represent clients."

18. Despite the significant amount of money that Cohen received into the Essential Consultants Account and the MDC&A Account, and the cash balance in both accounts, Cohen did not disclose that information to Sterling or Melrose. Specifically, based on my review of documents provided by ▮▮▮ and my review of notes and a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I have learned the following:

    a. In or about May 2017, ▮▮▮ met with Cohen at a law firm in Manhattan, New York. At the meeting, Cohen told ▮▮▮ in sum and substance, that he had set up a law practice called Michael D. Cohen & Associates P.C., and a consulting company called Essential Consultants LLC. Cohen told ▮▮▮ in sum and substance, that he expected to earn $75,000 per month in connection with his law practice, and that he expected gross revenues for the consulting business to be between five and six million dollars annually.

    b. In or about October 2017, if not earlier, ▮▮▮ was preparing a personal financial statement for Cohen. On or about October 6, 2017, ▮▮▮ sent an email to Cohen at the Cohen

26

Account in which [redacted] wrote that "[a]ttached is a draft of the new PFS as of September 30, 2017" and attached a draft of the September 2017 Financial Statement. The draft statement reflected that as of September 30, 2017, Cohen had only $1,250,000 in cash, total assets of approximately $33,430,000 (comprised of taxi medallion interests, real estate interests, and his personal residence and property), and liabilities of approximately $45,630,000, leaving him purportedly over $12 million in debt. In the same email, [redacted] questioned Cohen, in sum and substance, about the fact that the financial statement did not list any assets associated with either the Essential Consultants Account or the MDC&A Account: "[w]e did not add any value for you[r] two operating entities – Michael D. Cohen & Associates POC [sic] and Essential Consultants LLC. Please advise whether or not these should be disclosed and what value."

     c.  On or about October 6, 2017, Cohen called [redacted] by telephone—which is reflected on toll records for Cohen's cellphone—and told [redacted] in sum and substance, not to include Essential Consultants or MDC&A in the September 2017 Financial Statement because they had no value.

     d.  On or about October 6, 2017, following the call with [redacted] Cohen, using the Cohen Account, responded to [redacted] email with the answer "[l]ooks good to me." Cohen never directed [redacted] to make any changes to his cash position as listed in the September 2017 Financial Statement. Neither Essential Consultants nor MDC&A was listed on the September 2017 Financial Statement that was provided to Sterling.

    19. Based on the foregoing, and from my review of bank records and emails sent by Cohen to Sterling, I know that the September 2017 Financial Statement made no mention whatsoever of assets that Cohen held in the Essential Consultants Account or the MDC&A Account. As of September 30, 2017—the date of the September 2017 Financial Statement—Cohen had

02.28.2018

approximately $673,729.95 in the Essential Consultants Account and $248,619.28 in the MDC&A Account. As of October 6, 2017, the date when ▆▆▆▆ asked Cohen about the two accounts, Cohen had approximately $823,709.95 in the Essential Consultants Account and $248,619.28 in the MDC&A Account.

### Cohen Understated His Available Cash

20. In addition to withholding the existence of the Essential Consultants Account and the MDC&A Account from Sterling and Melrose, it appears that Cohen also substantially understated his available cash and cash equivalents in his financial disclosures. Specifically, I know from my review of the September 2017 Financial Statement that Cohen provided to Sterling that Cohen represented that he had $1,250,000 in cash as of September 30, 2017. But, from my review of a summary of bank records that were scheduled by an FBI forensic accountant, I have learned that Cohen had over $5,000,000 in cash and cash equivalents as of September 30, 2017. Specifically, from my review of the account schedule and bank records, I have learned the following:

a. Cohen has three checking and/or savings accounts at Capital One Bank, one of which is in his wife's name. As of September 30, 2017, Cohen had $1,105,680.35 in his savings account, and $1,262,982.29 in total in the three accounts at Capital One Bank.

b. Cohen has three accounts at Morgan Stanley in his name. As of September 30, 2017, the combined total in cash and cash equivalents in those three accounts was $1,270,600.41.

c. As of September 30, 2017, Cohen had $260,689.18 in an account at Signature Bank.

d. In addition to the Essential Consultants Account and MDC&A Account at First Republic, Cohen also had two joint checking accounts with Laura Cohen at First Republic. In total, as of September 30, 2017, Cohen had at least $1,876,209.27 in total in his four accounts at First Republic.

02.28.2018

e. Cohen has an account at Bethpage Credit Union with $25,931.39 in it as of September 30, 2017.

f. As of September 30, 2017, Cohen had $17,542.54 in accounts at Sterling.

g. Cohen has two accounts at TD Bank—one in his name and one held jointly with his wife—and the total balance across the two accounts as of September 30, 2017 was $300,096.72.

h. In total, as of September 30, 2017, Cohen had at least $5,014,051.80 in his accounts at Capital One Bank, Signature Bank, TD Bank, Bethpage Credit Union, First Republic, and Morgan Stanley.

21. Accordingly, based on the foregoing, it appears that Cohen's representations to Sterling and Melrose that he did not have more than $1,250,000 were false, and that Cohen withheld information regarding approximately $5 million in funds from Sterling and Melrose in order to secure favorable terms in his renegotiation of his medallion loan. Based on my participation in an interview with Sterling Employee-2, and my review of reports of interviews with Sterling Employee-1 and two Melrose employees, it is my understanding that that Sterling and Melrose would view Cohen's understating of his assets as material to its decision whether to renegotiate Cohen's medallion loans and on what terms, or approve of the transfer of those loans to ▮▮▮▮▮▮

### Cohen Had a Side Agreement With ▮▮▮▮▮▮

22. As set forth in detail below, it appears that during the course of Cohen's negotiations to sell his interest in taxi medallions and the associated debt to ▮▮▮▮▮▮, Cohen not only misrepresented his financial position to Sterling, but also failed to disclose a side deal he had negotiated with ▮▮▮▮▮▮ it appears that ▮▮▮▮▮▮ agreed to pay an above-market price for Cohen's taxi cab medallions, and in exchange, Cohen agreed to pay ▮▮▮▮▮▮ approximately

$3.8 million in cash.  Specifically, from my review of documents produced pursuant to a subpoena by Sterling, and reports prepared by law enforcement officers of interviews with Sterling Employee-1, as well as my participation in an interview with Sterling Employee-2, I have learned, among other things, the following:

      a.  On or about September 5, 2017, an executed term sheet was circulated by Sterling Employee-1 to Cohen and █████  *See supra* ¶ 14(k).  According to the term sheet, ███ ███ would borrow $20,000,000 from Sterling and Melrose, to be secured by the medallions that ███ was to acquire from Cohen.  At a price of $20 million for thirty-two taxi medallions, the proposed transaction valued each medallion as worth $625,000.  The term sheet also contemplated a $1,265,913 pay-down of the principal balance of the loan.  The term sheet made no mention of a $3.8 million payment from Cohen to ███ or any other form of payment or financial transaction between the parties.

      b.  Additionally, an internal Sterling credit memorandum, dated October 4, 2017, describing the terms of the Cohen-███ transaction and the new loan to ███ did not mention any payments from Cohen to ███, including a $3.8 million payment.  The memorandum also noted that the "loan amount of $20MM indicates a $625M purchase price per medallion" but "it is recognized that this is not in line with current market values."  Indeed, according to an internal Sterling memorandum dated February 5, 2018, in the month of January 2018, taxi medallions sold for amounts ranging from $120,000 to $372,000.  According to Sterling Employee-1 and Sterling Employee-2, they were never told that ███ agreed to a purchase price of $625,000 in exchange for a lump sum payment from Cohen, or that Cohen would make any payment to ███.

02.28.2018

23. While Cohen and [ ] did not disclose any payment from Cohen to [ ] in communications with Sterling, it appears that such a payment was contemplated. Indeed, based on my review of records maintained by [ ] and a report prepared by law enforcement agents of an interview with [ ] I have learned the following, in substance and in part, regarding the proposed side-payment from Cohen to [ ]

a. On or about September 19, 2017, [ ] prepared a memorandum for Cohen entitled, "Sale of NYC Medallion Entities and Debt Assumption" (the "[ ]Memorandum"). The [ ] Memorandum summarized the proposed transaction between Cohen and [ ] in part, as follows: "Michael and Laura Cohen will transfer ownership of their 13 NYC medallion entities to a Buyer who will assume their bank indebtedness, upon the [Cohens'] paying down the debt portfolio of the 13 entities by $500,000 and a cash payment to the Buyer of $3,800,000."[11]

b. According to [ ] Cohen told him the parameters of the deal, including the payment of $3,800,000 to [ ] but [ ] did not know where Cohen was going to obtain $3,800,000 to pay [ ] As noted above, Cohen had more than $5,000,000 in cash and cash equivalents as of September 2017, but had only disclosed in his September 2017 Financial Statement that he had $1.25 million in cash.

24. Based on my review of records maintained by Sterling (as well as Melrose, the bank with the participating interest in the loans) and reports of interviews of representatives of Sterling (and Melrose), I have seen no evidence that Sterling, Melrose, or any other financial institution involved in the potential deal with Cohen and [ ] was aware of the planned $3.8 million side payment from Cohen to [ ]

---

[11] The reference to thirteen medallions appears to be an error by [ ] Cohen and his wife together owned sixteen corporations, which in turn owned 32 taxi medallions.

02.28.2018

### D.  Probable Cause Regarding the Subject Accounts

25. As set forth above, since at least September 2015, if not earlier, Cohen has told Sterling that he has difficulty making payments on his medallion loans and, since at least October 2016, Cohen has been actively engaged in an attempt to sell his taxi medallions and the associated debts to ⬛⬛⬛⬛⬛⬛ In the course of doing so, Cohen has used the Cohen Account and/or MDCPC Account to engage in email communications regarding the terms of the transactions and the undisclosed side-payment with ⬛⬛⬛⬛⬛ at the ⬛⬛⬛⬛⬛ Account, ⬛⬛⬛⬛ ⬛⬛⬛⬛ at the ⬛⬛⬛⬛ Account, and ⬛⬛⬛⬛ at the ⬛⬛ Account. Specifically, as described above, there is probable cause to believe that the Subject Accounts have been used regarding the proposed Cohen-⬛⬛⬛ transaction with Sterling:

a.  Cohen has used the Cohen Account to, among other things, negotiate a pay-down of the principal amount of the loan, *see supra* ¶ 14(g), to send term sheets to Sterling, *see supra* ¶ 14(j), to communicate with his accountant about the contents of financial statements, *see supra* ¶ 16, to send financial statements to Sterling, *see supra* ¶ 14(i), (l), to check on the status of the transaction as of January 24, 2018, *see supra* ¶ 14(n), to negotiate a reduction of his debt with Sterling on or around January 31, 2018, *see supra* ¶ 14(o), to tell Sterling on February 1, 2018, he does not have the ability to pay more than $1,250,000, *see supra* ¶ 14(p), and to communicate with individuals responsible for sources of payments to the Essential Consultants Account, *see supra* ¶ 15.  In other words, from the communications described above, it appears likely that the Cohen Account will contain recent evidence of the Subject Offenses, including communications and potential misrepresentations to Sterling, and evidence indicating that statements made to Sterling are false or misleading.

b.  ⬛⬛⬛⬛⬛ has used the ⬛⬛⬛⬛⬛⬛ Account to communicate about the proposed taxi medallion transaction with Cohen, which appears to have been discussed as early

32

as October 2016. *See supra* ¶ 14(g).[12] Specifically, as described above, as early as May 2, 2017, ███████ used the ████████ Account to inquire about the status of the transaction, *see supra* ¶ 14(h). He used the ████████ Account to exchange drafts of the proposed term sheet with Cohen, ███ and Sterling, *see supra* ¶ 14(j). The ████████ Account was also used by ████████ to send a personal financial statement for ████████ to Sterling, *see supra* ¶ 14(l). The ████████ Account was copied on emails from the ████████ Account about the transaction, *see supra* ¶ 14(i), and was listed on ████████ financial statement as the contact email for ████████ *see supra* ¶ 14(m). Additionally, based on my review of MDCPC Header Information, I know that on or about September 1, 2017—at or around the time the ████████ and Cohen were negotiating a term sheet—████████ used the ████████ Account to send and receive eight emails from Cohen at the MDCPC Account.

c. ████ has used the ████ Account to communicate with Sterling employees, Cohen, and ████████ about the proposed taxi medallion transaction since at least December 2016. *See supra* ¶¶ 14(g), 24(c). Specifically, on or about August 29, 2017, ████ told Sterling that he should be included on "all future e-mails" involving the proposed transaction, *see supra* ¶ 14(j). Additionally, ████ was involved in making revisions to the parties' term sheets, and he told Sterling on January 29, 2018 that ████████ would not go forward with the planned transaction, *see supra* ¶ 14(j), (n). Accordingly, there is probable cause to believe that the ████ Account will contain evidence of the negotiations between Sterling and the parties, evidence of a payment from Cohen to ████████ and the reasons for the collapse of the Cohen-████████ transaction.

---

[12] For instance, from records provided by Sterling, I know that on or about December 2, 2016, ████████ sent an email to a Sterling employee using the ████████ Account. The email forwarded correspondence between ████ who was using the ████████ Account, and an employee of Capital One regarding extending ████████ loan with Capital One.

26. Additionally, it appears that Cohen set up the MDCPC Account to receive emails he was previously receiving at the Cohen Account. Specifically, based on my review of records maintained by AT&T, I have learned that on or about May 5, 2017, Cohen sent an email from the MDCPC Account to a blind copy list of recipients stating that "[d]ue to the overwhelming volume of phone calls and emails coming into my previous cellular number and e-mail address, I have elected to create for Clients Only the following. Kindly use this new information for all future contact and communications." The signature line on the email listed "Essential Consultants LLC" and "Michael D. Cohen & Associates, PC," as well as the MDCPC Account as the email address.[13]

27. In addition, based on my review of emails from the MDCPC Account produced pursuant to the Prior Cohen Account Warrants and the MDCPC Header Information, I have learned that Cohen has used the MDCPC Account to send and receive emails from the Cohen Account, to communicate with the ⬛⬛ Account, and to send and receive emails from other email accounts about his political consulting business. Additionally, from my review of the MDCPC Header Information, it appears that since the ⬛⬛⬛⬛⬛⬛ Cohen has continued to send and receive emails at the MDCPC Account that appear likely to be relevant to the commission of the Subject Offenses. For example, emails obtained pursuant to the Prior Cohen Account Warrants, as well as the MDCPC Header Information have revealed the following:

    a. On approximately eight occasions in August and September 2017, while Cohen, ⬛⬛⬛⬛⬛⬛⬛ were communicating about a term sheet for the Cohen-⬛⬛⬛ taxi

---

[13] Based on my review of emails from the MDCPC Account obtained pursuant to subpoena, I have learned that Cohen has used the account to communicate with numerous individuals with whom he does not enjoy an attorney-client privilege, including some of the individuals described below. *See infra* ¶ 27.

02.28.2018

medallion transaction, *see supra* ¶ 14(k), Cohen used the MDCPC Account to send or receive emails from ▉▉▉ at the ▉▉▉ Account. For instance, on or about August 22, 2017, ▉▉▉ used the ▉▉▉ Account to send an email to Sterling Employee-1 and copied Cohen on the email at the MDCPC Account. On the same day, Sterling Employee-1 responded to ▉▉▉ at the ▉▉▉ Account and Cohen at the MDCPC Account. On or about August 22, 2017, Cohen also used the MDCPC Account to send an email to Sterling Employee-1.

      b.  As noted above, on or about September 1, 2017, Cohen used the MDCPC Account to send or receive eight emails with the ▉▉▉ Account.

      c.  Cohen used the MDCPC Account to send and receive emails from individuals who work at companies with whom it appears Cohen has a political consulting agreement. For example, beginning in April 2017—the same month when Cohen began receiving payments from AT&T, *see supra* ¶¶ 16(d), 17(c)—Cohen used the MDCPC Account to send and receive emails from AT&T employees. These emails contain, among other things, invoices from Cohen to AT&T for consulting work by Cohen. Similarly, beginning in April 2017—which is also the month Cohen began receiving payments from Novartis for consulting work, *see supra* ¶¶ 16(d), 17(d)— Cohen used the MDCPC Account to send and receive emails from employees of Novartis. These emails concern, among other things, invoices from Cohen and requests for Novartis for Cohen's assistance on an initiative relating to drug pricing.

      d.  From my review of the MDCPC Header Information, I have learned that Cohen has continued to use the MDCPC Account to send and receive emails from individuals who work at companies with whom it appears Cohen had a political consulting agreement, such as Novartis and AT&T. For instance, on approximately six occasions between November 28, 2017 and January 30, 2018, the MDCPC Account was used to send and receive emails from accounts belonging to

individuals using @att.com email addresses. Similarly, on approximately seventeen occasions between December 1, 2017 and February 20, 2018, the MDCPC Account was used to send and receive emails from accounts belonging to individuals using @novartis.com email addresses. Since November 15, 2017, the MDCPC Account has also sent and received emails with individuals using the email domains @bta.kz, which I believe is the email domain used by employees of BTA Bank, *see supra* ¶¶ 16(d), 17(b), and @squirepb.com, which I believe is the email domain used by employees of the law firm Squire Patton Boggs—both of which Cohen appears to have a consulting relationship with, *see supra* ¶¶ 16(e), 17(e). Accordingly, it appears that Cohen continues to use the MDCPC Account to send and receive emails that will be relevant to whether he is maintaining a consulting business, what type of consulting work he is doing, and whether he is receiving money for that consulting work.

28. In addition to the foregoing, based on my review of the Pen Register Data, *see supra* ¶ 9, it appears that since the date of the last search warrant on the Cohen Account (*i.e.*, November 13, 2017), Cohen has continued to use the Cohen Account to communicate with the ▮▮▮▮▮ ▮▮▮▮▮▮ Account, the ▮▮▮ Account, and other email accounts that appear likely to be relevant to the commission of the Subject Offenses described above. For example, the Pen Register Data has revealed the following:

a. Emails sent by the Cohen Account to the ▮▮▮ Account on or about December 18, 2017 at 8:26 p.m., December 21, 2017 at 9:35 p.m., December 22, 2017 at 4:32 p.m., January 3, 2018 at 8:01 a.m., January 3, 2018 at 2:56 p.m., and January 4, 2018 at 3:31 p.m.

b. An email sent by the Cohen Account to the ▮▮▮▮▮▮ Account on or about January 25, 2018 at 8:55 p.m.

02.28.2018

c. Emails from the Cohen Account to the email account ⬛⬛⬛⬛⬛⬛ on or about December 1, 2017 at 2:14 p.m., December 29, 2017 at 10:20 p.m., January 2, 2018 at 3:52 p.m., January 2, 2018 at 5:44 p.m., and January 8, 2018 at 6:38 p.m. Based upon my review of emails contained in the Cohen Account, I have learned that the ⬛⬛⬛⬛⬛ email account belongs to ⬛⬛⬛⬛ Cohen's accountant, through whom Cohen made misrepresentations to financial institutions, as discussed above.

d. Emails from the Cohen Account to email accounts belonging to Sterling employees, including Sterling Employee-1, on or about January 25, 2018 at 10:23 p.m., January 26, 2018 at 12:55 a.m., January 29, 2018 at 5:30 p.m., January 29, 2018 at 8:29 p.m., January 30, 2018 at 6:44 p.m.

e. An email sent from the Cohen Account to the email account clientserviceny@firstrepublic.com on or about January 25, 2018 at 5:29 p.m. As stated above, First Republic is the bank at which the Essential Consultants Account is held.

f. Numerous emails sent from the Cohen Account to the email account ⬛⬛⬛⬛⬛⬛⬛ including emails on or about December 4, 2017 at 2:17 p.m. and January 29, 2018 at 5:43 p.m. Based upon the email address and domain name, as well as my review of reports of interviews and documents reflecting that Cohen's taxi medallions were leased and operated by ⬛⬛⬛⬛⬛⬛, I believe that the ⬛⬛⬛⬛⬛⬛ email address belongs to ⬛⬛⬛⬛.

29. Based on my review of records maintained by Sterling, I know that Cohen used the Cohen Account to send and receive documents related to the Cohen-⬛⬛⬛⬛ transaction. Based on my training and experience, I know that Google allows users of e-mail accounts to easily save documents to file sharing and retention platforms such as Google Docs and Google Drive. I

37

also know, from my training and experience, that users of e-mail accounts often use instant messaging interfaces linked to their email accounts. Further, I have learned that the Providers maintain records of search and web histories associated with email accounts and, based on my training and experience, users of e-mail accounts use associated web search browsers associated with a subscriber's account to research topics they are e-mailing about. Accordingly, there is probable cause to believe that content information associated with the Subject Accounts will also contain evidence related to the Subject Offenses.

30. Thus, I respectfully submit that there is probable cause to believe that emails and other content information from the Subject Accounts will contain evidence of Cohen's efforts to sell his taxi medallions and the associated debt, and his misrepresentations and omissions to Sterling and Melrose in connection with these negotiations. Although Cohen appears to have communicated with ████████████████████████, and ████ primarily through the Cohen Account and MDCPC Account, I know, based on my involvement in the investigation, that Cohen also used at least one other email account associated with his position at the Trump Organization. Thus, I respectfully submit that there is probable cause to believe that emails and other content information from the ████████████ Account, ████████████ Account and ████ Account since on or about October 1, 2016—the approximate date of when Cohen's efforts to sell his taxi medallions and the associated debt began—will reflect communications with the Cohen Account, MDCPC Account, and possibly one or more additional accounts used by Cohen, and probable cause to believe that such emails will constitute evidence of Cohen's commission of the Subject Offenses, including the extent to which Cohen did or did not inform other individuals involved in the conduct described above—such as ████████████████████████████—of his misstatements and omissions to financial institutions.

02.28.2018

31. <u>Temporal Limitation</u>.  This application seeks all emails and other requested content information specified in Attachments A, B, C, and D for the following periods:

       a.  For the Cohen Account, this application seeks all emails sent, created, or received between November 14, 2017, and the date of the proposed warrant, inclusive.  As described above, pursuant to the Prior Cohen Account Warrants, the SCO obtained and provided to the USAO emails from the Cohen Account that were sent, created, or received before November 14, 2017.  This application also seeks other information specified above associated with the Cohen Account that was created between December 1, 2014 (the month when Cohen entered into the medallion loans with Sterling), and the date of the proposed warrant, inclusive.

       b.  For the MDCPC Account, this application seeks all emails sent, created, or received between November 14, 2017, and the date of the proposed warrant, inclusive.  As described above, pursuant to a prior warrant, the SCO obtained and provided to the USAO emails from the MDCPC Account that were sent, created, or received before November 14, 2017.

       c.  For the ████ Account and ████ Account, this application seeks emails and all other content information specified above sent, created, or received between October 1, 2016, and the date of the proposed warrant, inclusive.  As described above, October 2016 is the month in which Cohen began negotiating the taxi medallion sale with the ████

       d.  For the ██ Account, this application seeks emails and all other content information specified above sent, created, or received between December 1, 2016, and the date of the proposed warrant, inclusive.  As described above, December 2016 is the month in which ███ began representing the ███ n relation to the taxi medallion transaction.

**E.  Evidence, Fruits and Instrumentalities**

32. Based upon the foregoing, I respectfully submit there is probable cause to believe that information stored on Google's servers associated with the Cohen Account will contain evidence,

fruits, and instrumentalities of violations of the Subject Offenses, as more fully described in Section II of Attachment A to the proposed warrant for the Cohen Account and MDCPC Account, including the following:

a. Communications, records, documents, and other files necessary to establish the identity of the person(s) who created or used the Cohen Account or MDCPC Account.

b. Communications, records, documents, and other files involving Sterling, Melrose, and/or taxi medallions;

c. Communications, records, documents, and other files involving a plan, proposal, or agreement for Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to others, including to ████████████ and/or entities associated with him;

d. Communications, records, documents, and other files involving Essential Consultants, LLC or Michael D. Cohen & Associates, including those which indicate the nature and purpose of payments made to or from Essential Consultants or Michael D. Cohen & Associates;

e. Communications, records, documents, and other files necessary to establish the identity of any person(s) – including records that reveal the whereabouts of the person(s) – who communicated with the Cohen Account and/or MDCPC Account about any matters relating to Essential Consultants, LLC, or about any plan or proposal or agreement for Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to others, including to ████████████ and/or entities associated with him;

f. Communications between the Cohen Account and/or MDCPC Account and ████████████ ████████ relating to Cohen's bank accounts, taxes, debts, and/or finances;

40

g. Communications, records, documents, and other files reflecting false representations to a financial institution with relation to the intended purpose of an account or loan at that financial institution; the nature of any business or entity associated with an account at a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution;

h. Evidence indicating how and when the Cohen Account and MDCPC Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner; and

i. Evidence indicating the Cohen Account and MDCPC Account owner's intent as it relates to the Subject Offenses under investigation.

33. Based upon the foregoing, I further submit there is probable cause to believe that information stored on Google's servers associated with the ▇▇▇▇▇▇▇ Account and ▇▇▇▇▇▇ ▇▇▇▇▇▇ Account will contain evidence, fruits, and instrumentalities of violations of the Subject Offenses, including the following:

a. Communications, records, documents, and other files necessary to establish the identity of the person(s) who created or used the ▇▇▇▇▇▇ Account and ▇▇▇▇▇▇▇ Account;

b. Communications, records, documents, and other files involving a plan or proposal or agreement for Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to ▇▇▇▇▇▇ and/or entities associated with him;

c. Communications, records, documents, and other files necessary to establish the identity of any person(s) – including records that reveal the whereabouts of the person(s) – who

41

communicated with the ▓▓▓▓▓ Account and ▓▓▓▓▓ Account about any matters relating to any plan or proposal or agreement for Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to ▓▓ ▓▓▓▓ and/or entities associated with him;

   d. Communications between the ▓▓▓▓▓ Account and ▓▓▓▓▓ Account and others, including employees or representatives of Sterling, Melrose, or other financial institution(s), regarding Cohen's finances;

   e. Communications, records, documents, and other files reflecting false representations to a financial institution with relation to the intended purpose of an account or loan at that financial institution; the nature of any business or entity associated with an account at a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution;

   f. Evidence indicating how and when the ▓▓▓▓▓ Account and ▓▓▓▓ ▓▓▓ Account were accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner;

   g. Evidence indicating the ▓▓▓▓▓ Account and ▓▓▓▓▓ Account owners' intent as it relates to the Subject Offenses under investigation.

34. Based upon the foregoing, I further submit there is probable cause to believe that information stored on Oath's servers associated with the ▓▓▓ Account will contain evidence, fruits, and instrumentalities of violations of the Subject Offenses, including the following:

   a. Communications, records, documents, and other files necessary to establish the identity of the person(s) who created or used the ▓▓▓ Account;

42

b.  Communications, records, documents, and other files involving a plan or proposal or agreement for Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to [redacted] and/or entities associated with him;

c.  Communications, records, documents, and other files necessary to establish the identity of any person(s) – including records that reveal the whereabouts of the person(s) – who communicated with the [redacted] Account about any matters relating to any plan or proposal or agreement for Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to [redacted] and/or entities associated with him;

d.  Communications between the [redacted] Account and others, including employees or representatives of Sterling, Melrose, or other financial institution(s), regarding Cohen's finances; and

e. Communications, records, documents, and other files reflecting false representations to a financial institution with relation to the intended purpose of an account or loan at that financial institution; the nature of any business or entity associated with an account at a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution.

**III.    Review of the Information Obtained Pursuant to the Warrant**

35. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for service of a search warrant issued under § 2703, or for the collection or production of responsive records.  Accordingly, the warrant requested herein will be transmitted to the Providers, which shall be directed to produce a digital copy of any responsive records to law enforcement personnel within 30 days from the date of service.  Law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the

43

status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will retain the records and review them for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Section III of Attachments A, B and C to the proposed warrant.

36. In conducting this review, law enforcement personnel may use various methods to locate evidence, fruits, and instrumentalities of the Subject Offenses, including but not limited to undertaking a cursory inspection of all emails within the Subject Account. This method is analogous to cursorily inspecting all the files in a file cabinet in an office to determine which paper evidence is subject to seizure. Although law enforcement personnel may use other methods as well, particularly including keyword searches, I know that keyword searches and similar methods are typically inadequate to detect all information subject to seizure. As an initial matter, keyword searches work only for text data, yet many types of files commonly associated with emails, including attachments such as scanned documents, pictures, and videos, do not store data as searchable text. Moreover, even as to text data, keyword searches cannot be relied upon to capture all relevant communications in an account, as it is impossible to know in advance all of the unique words or phrases that investigative subjects will use in their communications, and consequently there are often many communications in an account that are relevant to an investigation but that do not contain any keywords that an agent is likely to search for.

37. Because Cohen and ▮▮▮▮ re attorneys, the review of the content within the Subject Accounts will be conducted pursuant to established screening procedures to ensure that the law enforcement personnel involved in the investigation, including attorneys for the Government, collect evidence in a manner reasonably designed to protect any attorney-client or other applicable

44

privilege. When appropriate, the procedures will include use of a designated "filter team," separate and apart from the investigative team, in order to review potentially privileged communications and determine which communications to release to the investigation and prosecution team.

## IV.   Request for Non-Disclosure and Sealing Order

38. The existence and scope of this ongoing criminal investigation are not publicly known. As a result, premature public disclosure of this affidavit or the requested warrants could alert Cohen that he is under investigation, causing him to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. In particular, based on my experience investigating white collar cases, including cases featuring documents such as agreements, drafts of agreements, notes of conversations, and other documentary evidence, premature disclosure of an investigation may cause the target of the investigation to attempt to destroy or conceal such evidence. In addition, as also set forth above, Cohen uses computers and electronic communications in furtherance of his activity and thus could easily delete, encrypt, or otherwise conceal such digital evidence from law enforcement were he to learn of the Government's investigation. *See* 18 U.S.C. § 2705(b)(3). Cohen also appears to have the financial means that would facilitate his flight from prosecution. *See* 18 U.S.C. § 2705(b)(2), (5).

39. Accordingly, there is reason to believe that, were the Providers to notify the subscriber or others of the existence of the warrant, the investigation would be seriously jeopardized. Pursuant to 18 U.S.C. § 2705(b), I therefore respectfully request that the Court direct the Providers not to notify any person of the existence of the warrant for a period of 180 days from issuance, subject to extension upon application to the Court, if necessary.

40. For similar reasons, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to provide copies of the warrant and affidavit as

02.28.2018

need be to personnel assisting it in the investigation and prosecution of this matter, and to disclose those materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

**V.      Conclusion**

41. Based on the foregoing, I respectfully request that the Court issue the warrants sought herein pursuant to the applicable provisions of the Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) (for contents) and § 2703(c)(1)(A) (for records and other information), and the relevant provisions of Federal Rule of Criminal Procedure 41.

United States Attorney's Office
Southern District of New York

Sworn to before me this
28th day of February, 2018

HONORABLE GABRIEL W. GORENSTEIN
Chief United States Magistrate Judge
Southern District of New York

46

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

18 MAG    169 6

In the Matter of a Warrant for All
Content and Other Information
Associated with the Email Accounts
███████████@gmail.com,
██████@gmail.com, and
███████████████Maintained at
Premises Controlled by Google, Inc.,
USAO Reference No. 2018R00127

## SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO:    Google, Inc. ("Provider")

United States Attorney's Office for the Southern District of New York and the Federal
Bureau of Investigation (collectively, the "Investigative Agencies")

**1. Warrant.** Upon an affidavit of Special Agent ████████████ of the United States

Attorney's Office for the Southern District of New York, and pursuant to the provisions of the

Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant

provisions of Federal Rule of Criminal Procedure 41, the Court hereby finds there is probable

cause to believe the email accounts ██████@gmail.com, █████@gmail.com, and

███████████ maintained at premises controlled by Google, Inc., contain evidence,

fruits, and instrumentalities of crime, all as specified in Attachments A and B hereto. Accordingly,

the Provider is hereby directed to provide to the Investigative Agencies, within 7 days of the date

of service of this Warrant and Order, the records specified in Section II of Attachments A and B

hereto, for subsequent review by law enforcement personnel as authorized in Sections III and IV

of Attachments A and B.  The Government is required to serve a copy of this Warrant and Order

on the Provider within 7 days of the date of issuance.  The Warrant and Order may be served via

electronic transmission or any other means through which the Provider is capable of accepting service.

**2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is reason to believe that notification of the existence of this warrant will result in destruction of or tampering with evidence or flight from prosecution, or otherwise will seriously jeopardize an ongoing investigation. Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber or to any other person for a period of 180 days from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

**3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

Feb 28, 2018
_____
Date Issued

10:44 am
_____
Time Issued

_____
HONORABLE GABRIEL W. GORENSTEIN
Chief United States Magistrate Judge
Southern District of New York

2

02.28.2018

**Email Search Attachment A**

**I.   Subject Account and Execution of Warrant**

This warrant is directed to Google, Inc. (the "Provider"), headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, and applies to all content and other information within the Provider's possession, custody, or control associated with the email account ███████@gmail.com (the "Subject Account") for the time period referenced below.

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

**II.   Information to be Produced by the Provider**

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Account:

a.   *Email content.* All emails sent to or from, stored in draft form in, or otherwise associated with the Subject Account, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email) limited to items sent, received, or created between November 14, 2017 and the date of this warrant, inclusive.

b.   *Address book information.* All address book, contact list, or similar information associated with the Subject Account.

c.   *Subscriber and payment information.* All subscriber and payment information regarding the Subject Account, including but not limited to name, username, address, telephone

number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

     d. *Transactional records.* All transactional records associated with the Subject Account, including any IP logs or other records of session times and durations, limited to items sent, received, or created between December 1, 2014 and the date of this warrant, inclusive.

     e. *Customer correspondence.* All correspondence with the subscriber or others associated with the Subject Account, including complaints, inquiries, or other contacts with support services and records of actions taken, limited to items sent, received, or created between December 1, 2014 and the date of this warrant, inclusive.

     f. *Search History.* All search history and/or web history associated with the Subject Account, limited to items sent, received, or created between December 1, 2014 and the date of this warrant, inclusive.

     g. *Associated content.* All Google Docs, files maintained on Google Drive, and instant messages or Gchats associated with the Subject Account, limited to items sent, received, or created between December 1, 2014 and the date of this warrant, inclusive.

     h. *Preserved or backup records.* Any preserved or backup copies of any of the foregoing categories of records, whether created in response to a preservation request issued pursuant to 18 U.S.C. § 2703(f) or otherwise.

**III.    Review of Information by the Government**

     Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 371 (conspiracy to commit offense or to defraud

2

02.28.2018

the United States), 1005 (false bank entries); 1014 (false statements to a financial institution), 1343 (wire fraud), and 1344 (bank fraud),  including the following:

      a.  Communications, records, documents, and other files necessary to establish the identity of the person(s) who created or used the Subject Account;

      b.  Communications, records, documents, and other files involving Sterling National Bank, Melrose Credit Union, and/or taxi medallions;

      c.  Communications, records, documents, and other files involving a plan, proposal, or agreement for Michael D. Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to others, including to ▮▮▮▮▮▮ and/or entities associated with him;

      d.  Communications, records, documents, and other files involving Essential Consultants, LLC or Michael D. Cohen & Associates, including those which indicate the nature and purpose of payments made to or from Essential Consultants or Michael D. Cohen & Associates;

      e.  Communications, records, documents, and other files necessary to establish the identity of any person(s) – including records that reveal the whereabouts of the person(s) – who communicated with the Subject Account about any matters relating to Essential Consultants, LLC, or about any plan or proposal or agreement for Michael D. Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to others, including to ▮▮▮▮▮▮ and/or entities associated with him;

      f.  Communications between the Subject Account and ▮▮▮▮▮▮ relating to Michael D. Cohen's bank accounts, taxes, debts, and/or finances;

      g.  Communications, records, documents, and other files reflecting false representations to a financial institution with relation to the intended purpose of an account or loan at that financial

3

institution; the nature of any business or entity associated with an account at a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution;

      h. Evidence indicating how and when the Subject Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner; and

      i. Evidence indicating the Subject Account owner's intent as it relates to the Subject Offenses under investigation.

## IV. Review Protocols

      Review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege. When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

02.28.2018

**Email Search Attachment B**

I.    **Subject Account and Execution of Warrant**

This warrant is directed to Google, Inc. (the "Provider"), headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, and applies to all content and other information within the Provider's possession, custody, or control associated with the email accounts ████@gmail.com and ████████████ (the "Subject Accounts") for the time period between October 1, 2016 and the date of this warrant, inclusive.

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

II.    **Information to be Produced by the Provider**

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Accounts:

a.    *Email content.*  All emails sent to or from, stored in draft form in, or otherwise associated with the Subject Accounts, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email).

b.    *Address book information.*  All address book, contact list, or similar information associated with the Subject Accounts.

c.    *Subscriber and payment information.*  All subscriber and payment information regarding the Subject Accounts, including but not limited to name, username, address, telephone

number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

d. *Transactional records.* All transactional records associated with the Subject Accounts, including any IP logs or other records of session times and durations.

e. *Customer correspondence.* All correspondence with the subscriber or others associated with the Subject Accounts, including complaints, inquiries, or other contacts with support services and records of actions taken.

f. *Search History.* All search history and/or web history associated with the Subject Accounts.

g. *Associated content.* All Google Docs, files maintained on Google Drive, and instant messages or Gchats associated with the Subject Accounts.

h. *Preserved or backup records.* Any preserved or backup copies of any of the foregoing categories of records, whether created in response to a preservation request issued pursuant to 18 U.S.C. § 2703(f) or otherwise.

**III.     Review of Information by the Government**

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 371 (conspiracy to commit offense or to defraud the United States), 1005 (false bank entries); 1014 (false statements to a financial institution), 1343 (wire fraud), and 1344 (bank fraud), including the following:

a. Communications, records, documents, and other files necessary to establish the identity of the person(s) who created or used the Subject Accounts;

2

b.  Communications, records, documents, and other files involving a plan or proposal or agreement for Michael D. Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to ████████████ nd/or entities associated with him;

c.  Communications, records, documents, and other files necessary to establish the identity of any person(s) − including records that reveal the whereabouts of the person(s) − who communicated with the Subject Accounts about any matters relating to any plan or proposal or agreement for Michael D. Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to ████████████ nd/or entities associated with him;

d.  Communications between the Subject Accounts and others, including employees or representatives of Sterling National Bank, Melrose Credit Union, or other financial institution(s), regarding Michael D. Cohen's finances;

e.  Communications, records, documents, and other files reflecting false representations to a financial institution with relation to the intended purpose of an account or loan at that financial institution; the nature of any business or entity associated with an account at a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution;

f.  Evidence indicating how and when the Subject Accounts was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner;

g.  Evidence indicating the Subject Accounts owners' intent as it relates to the Subject Offenses under investigation.

02.28.2018

## IV. Review Protocols

Review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege. When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

02.28.2018

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**18 MAG    2877**

In the Matter of a Warrant for All
Content and Other Information
Associated with the Email Accounts
███████████@gmail.com,
█████████@gmail.com,          and
████████████, Maintained at
Premises Controlled by Google, Inc.,
USAO Reference No. 2018R00127

## SEARCH WARRANT AND NON-DISCLOSURE ORDER

TO:    Google, Inc. ("Provider")

United States Attorney's Office for the Southern District of New York and the Federal
Bureau of Investigation (collectively, the "Investigative Agencies")

**1. Warrant.** Upon an affidavit of Special Agent ████████████ of the United States

Attorney's Office for the Southern District of New York, and pursuant to the provisions of the

Stored Communications Act, 18 U.S.C. § 2703(b)(1)(A) and § 2703(c)(1)(A), and the relevant

provisions of Federal Rule of Criminal Procedure 41, the Court hereby finds there is probable

cause to believe the email accounts ████████@gmail.com, ██████@gmail.com, and

████████████████, maintained at premises controlled by Google, Inc., contain evidence,

fruits, and instrumentalities of crime, all as specified in Attachments A and B hereto. Accordingly,

the Provider is hereby directed to provide to the Investigative Agencies, within 7 days of the date

of service of this Warrant and Order, the records specified in Section II of Attachments A and B

hereto, for subsequent review by law enforcement personnel as authorized in Sections III and IV

of Attachments A and B.  The Government is required to serve a copy of this Warrant and Order

on the Provider within 14 days of the date of issuance.  The Warrant and Order may be served via

electronic transmission or any other means through which the Provider is capable of accepting service.

   **2. Non-Disclosure Order.** Pursuant to 18 U.S.C. § 2705(b), the Court finds that there is reason to believe that notification of the existence of this warrant will result in in destruction of or tampering with evidence or flight from prosecution, or otherwise will seriously jeopardize an ongoing investigation.  Accordingly, it is hereby ordered that the Provider shall not disclose the existence of this Warrant and Order to the listed subscriber or to any other person for a period of 180 days from the date of this Order, subject to extension upon application to the Court if necessary, except that Provider may disclose this Warrant and Order to an attorney for Provider for the purpose of receiving legal advice.

   **3. Sealing.** It is further ordered that this Warrant and Order, and the Affidavit upon which it was issued, be filed under seal, except that the Government may without further order of this Court serve the Warrant and Order on the Provider; provide copies of the Affidavit or Warrant and Order as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

_____4-5-18_____          _____5:01 PM_____
Date Issued                    Time Issued

                                   _____
                                   HONORABLE HENRY B. PITMAN
                                   UNITED STATES MAGISTRATE JUDGE
                                   Southern District of New York

2017.03.25

2

**Email Search Attachment A**

## I. Subject Account and Execution of Warrant

This warrant is directed to Google, Inc. (the "Provider"), headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, and applies to all content and other information within the Provider's possession, custody, or control associated with the email account ████████@gmail.com (the "Subject Account") for the time period referenced below.

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below. Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

## II. Information to be Produced by the Provider

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Account:

a. *Email content.* All emails sent to or from, stored in draft form in, or otherwise associated with the Subject Account, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email) limited to items sent, received, or created between November 14, 2017 and February 28, 2018, inclusive.

b. *Address book information.* All address book, contact list, or similar information associated with the Subject Account.

c. *Subscriber and payment information.* All subscriber and payment information regarding the Subject Account, including but not limited to name, username, address, telephone

number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

d. *Transactional records.* All transactional records associated with the Subject Account, including any IP logs or other records of session times and durations, limited to items sent, received, or created between December 1, 2014 and February 28, 2018, inclusive.

e. *Customer correspondence.* All correspondence with the subscriber or others associated with the Subject Account, including complaints, inquiries, or other contacts with support services and records of actions taken, limited to items sent, received, or created between December 1, 2014 and February 28, 2018, inclusive.

f. *Search History.* All search history and/or web history associated with the Subject Account, limited to items sent, received, or created between December 1, 2014 and February 28, 2018, inclusive.

g. *Associated content.* All Google Docs, files maintained on Google Drive, and instant messages or Gchats associated with the Subject Account, limited to items sent, received, or created between December 1, 2014 and February 28, 2018, inclusive.

h. *Preserved or backup records.* Any preserved or backup copies of any of the foregoing categories of records, whether created in response to a preservation request issued pursuant to 18 U.S.C. § 2703(f) or otherwise.

**III. Review of Information by the Government**

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits,

2

and instrumentalities of 18 U.S.C. §§ 371 (conspiracy to commit offense or to defraud the United States), 1005 (false bank entries); 1014 (false statements to a financial institution), 1343 (wire fraud), and 1344 (bank fraud), including the following:

    a.   Communications, records, documents, and other files necessary to establish the identity of the person(s) who created or used the Subject Account;

    b.   Communications, records, documents, and other files involving Sterling National Bank, Melrose Credit Union, and/or taxi medallions;

    c.   Communications, records, documents, and other files involving a plan, proposal, or agreement for Michael D. Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to others, including to ▮▮▮▮▮ and/or entities associated with him;

    d.   Communications, records, documents, and other files involving Essential Consultants, LLC or Michael D. Cohen & Associates, including those which indicate the nature and purpose of payments made to or from Essential Consultants or Michael D. Cohen & Associates;

    e.   Communications, records, documents, and other files necessary to establish the identity of any person(s) – including records that reveal the whereabouts of the person(s) – who communicated with the Subject Account about any matters relating to Essential Consultants, LLC, or about any plan or proposal or agreement for Michael D. Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to others, including to ▮▮▮▮▮ and/or entities associated with him;

    f.   Communications between the Subject Account and ▮▮▮▮▮ relating to Michael D. Cohen's bank accounts, taxes, debts, and/or finances;

g.  Communications, records, documents, and other files reflecting false representations to a financial institution with relation to the intended purpose of an account or loan at that financial institution; the nature of any business or entity associated with an account at a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution;

h.  Evidence indicating how and when the Subject Account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner; and

i.  Evidence indicating the Subject Account owner's intent as it relates to the Subject Offenses under investigation.

**IV. Review Protocols**

Review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege. When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

4

2017.03.25

**Email Search Attachment B**

## I.  Subject Account and Execution of Warrant

This warrant is directed to Google, Inc. (the "Provider"), headquartered at 1600 Amphitheatre Parkway, Mountain View, California 94043, and applies to all content and other information within the Provider's possession, custody, or control associated with the email accounts ▮▮▮@gmail.com and ▮▮▮▮▮▮ (the "Subject Accounts") for the time period between October 1, 2016 and February 28, 2018, inclusive.

A law enforcement officer will serve this warrant by transmitting it via email or another appropriate manner to the Provider. The Provider is directed to produce to the law enforcement officer an electronic copy of the information specified in Section II below.  Upon receipt of the production, law enforcement personnel will review the information for items falling within the categories specified in Section III below.

## II.  Information to be Produced by the Provider

To the extent within the Provider's possession, custody, or control, the Provider is directed to produce the following information associated with the Subject Accounts:

a.  *Email content.*   All emails sent to or from, stored in draft form in, or otherwise associated with the Subject Accounts, including all message content, attachments, and header information (specifically including the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email).

b.  *Address book information.*   All address book, contact list, or similar information associated with the Subject Accounts.

5

2017.03.25

  c. *Subscriber and payment information.* All subscriber and payment information regarding the Subject Accounts, including but not limited to name, username, address, telephone number, alternate email addresses, registration IP address, account creation date, account status, length of service, types of services utilized, means and source of payment, and payment history.

  d. *Transactional records.* All transactional records associated with the Subject Accounts, including any IP logs or other records of session times and durations.

  e. *Customer correspondence.* All correspondence with the subscriber or others associated with the Subject Accounts, including complaints, inquiries, or other contacts with support services and records of actions taken.

  f. *Search History.* All search history and/or web history associated with the Subject Accounts.

  g. *Associated content.* All Google Docs, files maintained on Google Drive, and instant messages or Gchats associated with the Subject Accounts.

  h. *Preserved or backup records.* Any preserved or backup copies of any of the foregoing categories of records, whether created in response to a preservation request issued pursuant to 18 U.S.C. § 2703(f) or otherwise.

**III. Review of Information by the Government**

  Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate any evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 371 (conspiracy to commit offense or to defraud

2017.03.25

the United States), 1005 (false bank entries); 1014 (false statements to a financial institution), 1343 (wire fraud), and 1344 (bank fraud),  including the following:

    a.   Communications, records, documents, and other files necessary to establish the identity of the person(s) who created or used the Subject Accounts;

    b.   Communications, records, documents, and other files involving a plan or proposal or agreement for Michael D. Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to ███████████ and/or entities associated with him;

    c.   Communications, records, documents, and other files necessary to establish the identity of any person(s) – including records that reveal the whereabouts of the person(s) – who communicated with the Subject Accounts about any matters relating to any plan or proposal or agreement for Michael D. Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to ███████████ and/or entities associated with him;

    d.   Communications between the Subject Accounts and others, including employees or representatives of Sterling National Bank, Melrose Credit Union, or other financial institution(s), regarding Michael D. Cohen's finances;

    e.   Communications, records, documents, and other files reflecting false representations to a financial institution with relation to the intended purpose of an account or loan at that financial institution; the nature of any business or entity associated with an account at a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution;

2017.03.25

f. Evidence indicating how and when the Subject Accounts was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner;

g. Evidence indicating the Subject Accounts owners' intent as it relates to the Subject Offenses under investigation.

**IV. Review Protocols**

Review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege. When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

8

2017.03.25