# UNITED STATES DISTRICT COURT

### for the
Southern District of New York

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. **18 MAG 2968** |
| Loews Regency Hotel, 540 Park Avenue, Room 1628 | ) |
| | ) |

## APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Loews Regency Hotel, 540 Park Avenue, Room 1628, a Suite that Encompasses Rooms 1628, 1629, and 1630 New York, New York 10065

located in the _____ Southern _____ District of _____ New York _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attached Affidavit and its Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section(s) | Offense Description(s) |
|---|---|
| 18 USC 371, 1005, 1014, 1343, 1344; 52 USC 30116 and 30109 | Conspiracy, false bank entries, false statements to a financial institution, wire fraud, bank fraud, and illegal campaign contributions |

The application is based on these facts:

See Attached Affidavit and its Attachment A

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Sworn to before me and signed in my presence.

Date: 4/9/18

City and state: New York, NY

_____
*Judge's signature*

Honorable Henry Pitman
*Printed name and title*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of the United States of America for a Search and Seizure Warrant for the Premises Known and Described as Loews Regency Hotel, 540 Park Avenue, Room 1628, a Suite that Encompasses Rooms 1628, 1629, and 1630 New York, New York 10065, and Any Closed Containers/Items Contained Therein<br>Reference No. 2018R00127 | **TO BE FILED UNDER SEAL**<br><br>**Agent Affidavit in Support of Application for Search and Seizure Warrant** |

SOUTHERN DISTRICT OF NEW YORK) ss.:

⬛ Special Agent, Federal Bureau of Investigation, being duly sworn,

deposes and says:

## I. Introduction

### A. Affiant

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been a Special Agent with the FBI since 2009. In the course of my experience and training in these positions, I have participated in criminal investigations into federal offenses involving a wide array of financial crimes, including frauds on financial institutions, as well as into offenses involving public corruption. I also have training and experience executing search warrants, including those involving electronic evidence.

2.     On or about April 8, 2018, the Honorable Henry B. Pitman, United States Magistrate Judge, issued a search and seizure warrant for the premises known and described as Loews Regency Hotel, 540 Park Avenue, Room 1728, New York, New York 10065, and Any Closed Containers/Items Contained Therein. The warrant and my supporting affidavit (the "Affidavit") are appended hereto. The Affidavit is incorporated herein by reference in its entirety as Exhibit A.

2

2017.08.02

3.     On or about April 9, 2018, based upon a conversation with another law enforcement agent who spoke to an employee of Loews Regency Hotel, I learned that Michael Cohen is in fact staying in Room 1628 (in a suite encompassing rooms 1628, 1629, and 1630) (collectively, "Room 1628"), not Room 1728.     Accordingly, I respectfully submit the attached amended warrant pursuant to Rule 41 of the Federal Rules of Criminal Procedure for the following Subject Premises: Loews Regency Hotel, 540 Park Avenue, Room 1628, New York, New York 10065, and Any Closed Containers/Items Contained Therein ("Subject Premises-4").     For the reasons detailed in the Affidavit and herein, I believe that there is probable cause to believe that Subject Premises-4 contains evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1005 (false bank entries), 1014 (false statements to a financial institution), 1343 (wire fraud), and 1344 (bank fraud) (collectively, the "Bank Fraud Offenses"), 52 U.S.C. §§ 30116(a)(1)(A) and 30109(d)(1)(A)(1) (illegal campaign contributions) (the "Campaign Finance Offenses"), and 18 U.S.C. §§ 371 (conspiracy as it pertains to the other Subject Offenses) (collectively, the "Subject Offenses").

4.     Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

3

2017.08.02

5.     In light of the confidential nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

Special Agent
FBI

Sworn to before me on          *BY TELEPHONE*
9th day of April, 2018

HON. HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE

4

2017.08.02

**ATTACHMENT A**

**I. Premises to be Searched—Subject Premises-4**

The premises to be searched ("Subject Premises-4") are described as follows, and include electronic devices, and all locked and closed containers found therein:

Room 1628 (a suite encompassing rooms 1628, 1629, and 1630) (collectively, "Room 1628"), located inside the Loews Regency Hotel at 540 Park Avenue, New York, New York 10065. The building is a luxury hotel located on Park Avenue and 61st Street. Subject Premises-4 is located on the 16th floor of the hotel.

**II. Items to Be Seized**

**A. Evidence, Fruits, and Instrumentalities of the Subject Offenses**

The items to be seized from Subject Premises-4 are evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 371 (conspiracy, as it pertains to the other Subject Offenses), 1005 (false bank entries), 1014 (false statements to a financial institution), 1343 (wire fraud), and 1344 (bank fraud), and 52 U.S.C. §§ 30116(a)(1)(A) and 30109(d)(1)(A)(1) (illegal campaign contributions) (the "Subject Offenses"), described as follows:

a. Evidence relating to Sterling National Bank, Melrose Credit Union, and/or taxi medallions, from January 1, 2013 to the present.

b. Evidence relating to a plan, proposal, or agreement for Michael Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to others, including to _____ and/or entities associated with him.

c. Evidence relating to a plan, proposal, or agreement to modify loans that Cohen has with Sterling and/or Melrose.

d. Evidence relating to Essential Consultants, LLC, including any documents that indicate the nature and purpose of payments made to or from Essential Consultants or the nature of any work done by Cohen or any other individuals in connection with Essential Consultants.

e. Evidence of income to Michael D. Cohen & Associates, including any documents that indicate the nature and purpose of payments made to or from Michael D. Cohen & Associates, or evidence of the purpose of accounts opened in the name of Michael D. Cohen & Associates.

f. Evidence relating to Cohen's net worth, available cash and cash equivalents, monthly and annual income, income sources, and other assets, whether held personally or through entities, including tax returns, personal financial statements, and bank records, from January 1, 2013 to the present.

g. Evidence relating to agreements, loans, and/or financial transactions between Cohen and _____ and/or entities controlled by _____

2

2017.08.02

[REDACTED] and any payments by [REDACTED] to Cohen, from January 1, 2012 to the present.

h. Evidence relating to payments to Stephanie Clifford, Karen McDougal, or their agents or legal representatives, including any nondisclosure agreements and related documents, and any communications related to such agreements.

i. Evidence of communications involving Michael Cohen, Donald Trump and/or agents or associates of the Trump Campaign about Stephanie Clifford or Karen McDougal, or payments to Stephanie Clifford or Karen McDougal.

j. Evidence of communications between Michael Cohen and American Media, Inc., David Pecker, and/or Dylan Howard about Donald Trump, the Trump Campaign, Stephanie Clifford, and/or Karen McDougal.

k. Evidence relating to Cohen's role in the Trump Campaign, and coordination or consultation with the Trump Campaign.

l. Evidence of communications with Donald Trump and/or agents or associates of the Trump Campaign about the *Access Hollywood* tape and other potential sources of negative publicity involving Trump's relationship in the run up to the election.

m. Evidence relating to any reimbursement or other promises made to Cohen for payment to Clifford or others in connection with the election.

n. Evidence relating to Cohen's knowledge of the campaign finance laws, campaign contribution reporting requirements, and campaign contribution limits.

o. Communications with others, including Jeffrey Getzel and/or other accountants, relating to Cohen's bank accounts, taxes, debts, and/or finances, from January 1, 2013 to the present.

p. Communications, records, documents, and other files reflecting false representations to a financial institution related to the intended purpose of an account or loan at that financial institution; the nature of any business or entity associated with an account at a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution, from January 1, 2013 to the present.

q. Evidence of Cohen's intent as it relates to the Subject Offenses under investigation.

## B. Search and Seizure of Electronically Stored Information

The items to be seized from Subject Premises-4 also include any computer devices and storage media that may contain any electronically stored information falling within the categories set forth in Section II.A of this Attachment above, including, but not limited to, a MacBook Pro, any other desktop and laptop computers, any Apple iPhone or other cellphone or smartphone

3

belonging to Michael Cohen or in his possession, an Apple iPad Mini, portable hard drives, disk drives, thumb drives, and personal digital assistants.  In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

The items to be seized from Subject Premises-4 also include:

1. Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2. Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3. Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

## C. Review of ESI

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (which may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

4

2017.08.02

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections II.A and II.B of this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

Additionally, review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege. When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

2017.08.02

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In the Matter of the Application of the United States of America for a Search and Seizure Warrant for the Premises Known and Described as (1) 502 Park Avenue, ███████ New York, New York 10022, (2) Michael Cohen's Office at 30 Rockefeller Plaza, 23rd Floor, New York, New York 10112, (3) Safe Deposit Box # ███ Located at the TD Bank Branch at 500 Park Avenue, New York, New York 10019, and (4) Loews Regency Hotel, 540 Park Avenue, Room 1728, New York, New York 10065, and Any Closed Containers/Items Contained Therein, and the Electronic Devices Known and Described as (1) an Apple iPhone with Phone Number ███ ██████ and (2) an Apple iPhone with Phone Number . Reference No. 2018R00127 | **TO BE FILED UNDER SEAL**<br><br>**Agent Affidavit in Support of Application for Search and Seizure Warrant** |

SOUTHERN DISTRICT OF NEW YORK) ss.:

███████████████, Special Agent, Federal Bureau of Investigation, being duly sworn, deposes and says:

## I. Introduction

### A. Affiant

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been a Special Agent with the FBI since 2009. In the course of my experience and training in these positions, I have participated in criminal investigations into federal offenses involving a wide array of financial crimes, including frauds on financial institutions, as well as into offenses involving public corruption. I also have training and experience executing search warrants, including those involving electronic evidence.

2.    I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises specified below (the "Subject

2

2017.08.02

Premises") and the electronic devices specified below (the "Subject Devices") for, and to seize, the items and information described in Attachments A, B, C, D, E and F. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of electronic devices in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### B.  The Subject Premises and Subject Devices

3.      Subject Premises-1, Subject Premises-2, Subject Premises-3 and Subject Premises-4 (collectively, the "Subject Premises") are particularly described as:

a.      Subject Premises-1 is Apartment ███ located inside the building at 502 Park Avenue, New York, New York 10022.  The building located at 502 Park Avenue is a 32-floor brick residential building.  Subject Premises-1 is located on the ███ loor of the building. Based on my review of New York City property records, I have learned that Michael Cohen and Laura Cohen own Subject Premises-1.[1]  Additionally, as described below, Subject Premises-1 is Cohen's full-time residence.

b.      Subject Premises-2 is an office located on the 23rd floor of the building at 30 Rockefeller Plaza, New York, New York 10112.  The building located at 30 Rockefeller Plaza

---

[1] As noted *infra*, I have learned that on or about October 28, 2015, Cohen transferred Subject Premises-1 into a trust.

2017.08.02

is a 66-floor office building that spans the entire block between Sixth Avenue and Rockefeller Plaza.  Subject Premises-2 is located on the 23rd floor of the building inside of the offices of the law firm Squire Patton Boggs.  The office is assigned to Michael Cohen.  As described below, Michael Cohen works and conducts meetings at Subject Premises-2.

       c.     Subject Premises-3 is a safety deposit box located inside the TD Bank branch location at 500 Park Avenue, New York, New York 10019.  Based on my review of records maintained by TD Bank, I have learned that the safety deposit box is approximately five inches by ten inches in size, and is marked as box      The safety deposit box is in the name of Michael Cohen and Laura Cohen.

       d.     Subject Premises-4 is Room 1728 located inside the Loews Regency Hotel at 540 Park Avenue, New York, New York 10065.  The building is a luxury hotel located on Park Avenue and 61st Street.  Subject Premises-4 is located on the 17th floor of the hotel.  Based on my review of emails obtained pursuant to search warrants described below, I have learned that on or about January 5, 2018, Cohen received an email from an employee of Loews Regency, which included a price quote for a long-term stay suite based on a three-month stay from January 8 to April 8, 2018.[2]  On or about January 29, 2018, Cohen sent an email to a Loews Regency employee, stating, in pertinent part: "I just spoke to my wife and she has scheduled the move for Thursday. Please mark down that we will be taking possession on Thursday, February 1st."  Based on my review of cell phone location data, I have learned that, over the past 24 hours, two cellular phones used by Cohen have been located in the vicinity of Subject Premises-4.  In particular, on or about

---

[2] Although the quoted price contemplated a three-month stay from January 8 to April 8, it appears that Cohen did not move in until February 1, and as of today, April 8, cellphone location information demonstrates that Cohen's cellular phones are in still in the vicinity of Subject Premises-4.

2017.08.02

April 8, 2018, law enforcement agents using a "triggerfish" device identified Room 1728 as the room within the hotel in which the Subject Devices are most likely present.[3]

e. Therefore, I believe that Cohen is temporarily residing in Subject Premises-4.

4. Subject Device-1 and Subject Device-2 (collectively, the "Subject Devices") are particularly described as:

a. Subject Device-1 is an Apple iPhone serviced by AT&T with the telephone number ▇▇▇▇▇▇ Based on my review of records maintained by AT&T, I have learned that Subject Device-1 is subscribed to Michael Cohen. Based on my review of cellphone location information maintained by AT&T, I have learned that Subject Device-1 is presently located in the Southern District of New York.

b. Subject Device-2 is an Apple iPhone serviced by AT&T with the telephone number ▇▇▇▇▇▇ Based on my review of records maintained by AT&T, I have learned that Subject Device-2 is subscribed to Michael Cohen. Based on my review of cellphone location information maintained by AT&T, I have learned that Subject Device-2 is presently located in the Southern District of New York.

c. Based on my training, experience, and research, and from consulting the manufacturer's and service providers' advertisements and product technical specifications available online, I know that the Subject Devices have capabilities that allow them to, among other things: make and receive telephone calls; save and store contact information; send and receive

---

[3] Based on my conversations with these agents, I understand that it is also possible that the Subject Devices are one floor below, in Room 1628. However, as noted, I understand that Cohen received a price quote for a long-term stay suite and is residing there with his family. Based on my conversations with FBI agents conducting surveillance, I understand that Room 1728 appears to be a suite, whereas Room 1628 appears to be a standard room.

2017.08.02

emails and text messages; download and run mobile telephone applications, including encrypted call and messaging application such as WhatsApp, Signal, and Dust; take, send, and receive pictures and videos; save and store notes and passwords; and store documents.

### C. The Subject Offenses

5.      For the reasons detailed below, I believe that there is probable cause to believe that the Subject Premises and Subject Devices contain evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1005 (false bank entries), 1014 (false statements to a financial institution), 1343 (wire fraud), and 1344 (bank fraud) (collectively, the "Bank Fraud Offenses"), 52 U.S.C. §§ 30116(a)(1)(A) and 30109(d)(1)(A)(i) (illegal campaign contributions) (the "Campaign Finance Offenses"), and 18 U.S.C. §§ 371 (conspiracy as it pertains to the other Subject Offenses) (collectively, the "Subject Offenses").

### D. Prior Applications

6.      The FBI and the United States Attorney's Office for the Southern District of New York ("USAO") have been investigating several courses of criminal conduct by Michael Cohen. Cohen is an attorney who currently holds himself out as the personal attorney for President Donald Trump, and who previously served for over a decade as an executive in the Trump Organization, an international conglomerate with real estate and other holdings.

7.      In connection with an investigation then being conducted by the Office of the Special Counsel ("SCO"), the FBI sought and obtained from the Honorable Beryl A. Howell, Chief United States District Judge for the District of Columbia, three search warrants for emails and other content information associated with two email accounts used by Cohen, and one search warrant for stored content associated with an iCloud account used by Cohen. Specifically:

2017.08.02

a.      On or about July 18, 2017, the FBI sought and obtained a search warrant for emails in the account ▮▮▮▮▮@gmail.com (the "Cohen Gmail Account") sent or received between January 1, 2016 and July 18, 2017 (the "First Cohen Gmail Warrant").

b.      On or about August 8, 2017, the FBI sought and obtained a search warrant for content stored in the iCloud account associated with Apple ID ▮▮▮▮▮@gmail.com (the "Cohen iCloud Account" and the "Cohen iCloud Warrant").

c.      On or about November 13, 2017, the FBI sought and obtained a search warrant for emails in the Cohen Gmail Account sent or received between June 1, 2015 and November 13, 2017 (the "Second Cohen Gmail Warrant").

d.      On or about November 13, 2017, the FBI sought and obtained a search warrant for emails in the account ▮▮▮▮▮ (the "Cohen MDCPC Account") sent or received between the opening of the Cohen MDCPC Account[4] and November 13, 2017 (the "First Cohen MDCPC Warrant").

8.      The SCO has since referred certain aspects of its investigation into Cohen to the USAO, which is working with the FBI's New York Field Office.  As part of that referral, on or about February 8, 2018, the SCO provided the USAO with all non-privileged emails and other content information obtained pursuant to the First Cohen Gmail Warrant, Second Cohen Gmail Warrant, and Cohen MDCPC Warrant. On or about March 7, 2018, the SCO provided the USAO

---

[4] Based on my review of this warrant and the affidavit in support of it, I know that the warrant did not specify a time period, but the affidavit indicated that, pursuant to court order, the service provider had provided non-content information for the Cohen MDCPC Account that indicated that the account contained emails from the approximate period of March 2017 through the date of the warrant.

2017.08.02

with all non-privileged content obtained pursuant to the Cohen iCloud Warrant.[5] A filter team working with the SCO had previously reviewed the content produced pursuant to these warrants for privilege.

9.      On or about February 28, 2018, the USAO sought and obtained search warrants for emails in the Cohen Gmail Account and the Cohen MDCPC Account, among other accounts, sent or received between November 14, 2017 and February 28, 2018 (the "Third Cohen Gmail Warrant" and the "Second Cohen MDCPC Warrant"). The content produced pursuant to these warrants is subject to an ongoing review for privilege by an SDNY filter team.[6]

10.     The emails search warrants described above are referred to collectively as the "Cohen Email Warrants."

11. .     On or about April 7, 2018, the USAO and FBI sought and obtained a warrant for prospective and historical cellphone location information for Subject Device-1 and Subject Device-2. On or about April 8, 2018, the USAO and FBI sought and obtained authority to employ an electronic technique, commonly known as a "triggerfish," to determine the location of Subject Device-1 and Subject Device-2.

## II.  Probable Cause

### A.  Overview

12.     The United States Attorney's Office for the Southern District of New York and FBI are investigating, among other things, schemes by Target Subject Michael Cohen (a) to defraud multiple banks from in or about 2016 up to and including the present, and (b) to make an illegal

---

[5] The SCO had previously provided a subset of this non-privileged content on or about February 2, 2018.

[6] On or about February 28, 2018 and April 7, 2018, the USAO and FBI sought and obtained Rule 41 search warrants authorizing the search of emails and content obtained pursuant to previously issued warrants for additional subject offenses.

8

2017.08.02

campaign contribution in October 2016 to then-presidential candidate Donald Trump. As noted, Cohen is an attorney who currently holds himself out as the personal attorney for President Donald Trump, and who previously served for over a decade as an executive in the Trump Organization, an international conglomerate with real estate and other holdings.

13.     The investigation has revealed that Cohen has made affirmative misrepresentations in and omitted material information from financial statements and other disclosures that Cohen provided to multiple banks in connection with a transaction intended to relieve Cohen of approximately $22 million in debt he owed on taxi medallion loans from the banks. As set forth in detail below, in these financial statements, and in his oral and other written statements to these banks, Cohen appears to have (i) intentionally misrepresented his ability to pay cash by failing to disclose cash he began receiving in 2017 from new consulting work; (ii) significantly understated his *total* holdings of cash and cash equivalents; (iii) failed to disclose tens of thousands of dollars he received in monthly interest income, and (iv) failed to inform the banks from which he was seeking debt relief that he had agreed to make a $3.8 million cash payment to a third party, ▆▆▆ ▆▆▆ in connection with ▆▆▆ acquisition of the taxi medallions securing Cohen's debt. By making these misrepresentations and material omissions, Cohen avoided making monthly payments on his loans, and attempted to fraudulently induce the banks to relieve him of certain repayment obligations and personal guarantees that Cohen and his wife had signed.

14.     Additionally, the investigation has revealed that shortly before the 2016 presidential election, Cohen made a payment of $130,000 from a limited liability corporation ("LLC") to Stephanie Clifford, an individual who is alleged to have had an extramarital affair with then-candidate Trump. This payment was made to Clifford in exchange for an agreement not to make any public disclosures about her alleged affair with Trump. As set forth below, there is

9

2017.08.02

probable cause to believe that Cohen made this payment to Clifford for the purpose of influencing the presidential election, and therefore that the payment was an excessive in-kind contribution to the Trump campaign.

15.     Based on my review of emails obtained from the Cohen Email Warrants, information obtained pursuant to the iCloud Warrant, and documents produced pursuant to subpoenas, as well as my review of public sources, I have learned that Cohen has used the Subject Premises to (a) receive documents related to the transaction intended to relieve Cohen of his taxi medallion debt, (b) receive documents and/or conduct meetings related to his consulting work, (c) receive documents and/or conduct meetings relating to his finances and assets, some of which, as noted above and as detailed further herein, he has concealed from the banks in connection with the refinancing of his taxi medallion debt, (d) receive and send documents relating to his payment to Clifford, and (e) house and operate electronic devices that were utilized in connection with, among other things, the taxi medallion transaction, Cohen's consulting work, and his payment to Clifford. Specifically, as described below, Subject Premises-1 likely contains evidence concerning Cohen's taxi medallion loans, his negotiations with banks, his personal finances, his consulting work, his tax returns, and his payment to Clifford, as well as electronic devices containing such evidence, all of which constitute or contain evidence of the Subject Offenses.  Additionally, as described below, Subject Premises-2 likely contains evidence relating to Cohen's consulting work, his finances, and his payment to Clifford, as well as electronic devices containing such evidence. Subject Premises-3, as described below, likely contains evidence relating to Cohen's assets and finances, including assets that may not have been disclosed to banks in connection with the refinancing of Cohen's taxi medallion debt or documents relating to such assets, and documents or evidence related to Cohen's payment to Clifford.  Subject Premises-4 likely contains electronic

10

devices, including Subject Device-1 and Subject Device-2, which themselves contain evidence of the Subject Offenses, including concerning Cohen's taxi medallion loans, his negotiations with banks, his personal finances, his consulting work, his tax returns, and his payment to Clifford. Accordingly, and as set forth in more detail below, there is probable cause to believe that the Subject Premises and Subject Devices will include evidence of the Subject Offenses.

## B.   Probable Cause Regarding Subjects' Commission of the Subject Offenses[7]

### The Bank Fraud Scheme

#### (i)   Cohen's Statements to Sterling National Bank

16.    As set forth in detail below, in 2014, Cohen, through LLCs controlled by him and his wife, Laura Cohen, entered into a series of loans from Sterling National Bank ("Sterling") and the Melrose Credit Union ("Melrose"), secured by taxi medallions, for approximately $20 million. Though entered into by LLCs, the loans were also secured by personal guarantees in the names of both Cohen and his wife.  Over time, as the taxi industry weakened and the medallions lost value, Cohen sought to renegotiate the terms of those loans and/or relieve himself from their obligations, including the personal guarantees.  As part of that effort, Cohen made a series of representations to Sterling and Melrose about his net worth, assets, available cash and income, among other things. Specifically, based on my review of records maintained by Sterling and Melrose, and public sources concerning the taxi industry and the value of taxi medallions, as well as my participation in interviews with a Sterling executive vice-president (the "Sterling Employee-1") and two other

---

[7] In the following recitation of probable cause, I frequently refer to phone calls or text messages involving Cohen.  The text messages described herein as sent or received by Cohen were all sent or received from the telephone numbers associated with Subject Device-1 or Subject Device-2. The vast majority of the phone calls described herein made or received by Cohen were made or received by the telephone numbers associated with Subject Device-1 or Subject Device-2, although in certain limited instances Cohen used a landline or other phone.

11

2017.08.02

Sterling employees ("Sterling Employee-2" and "Sterling Employee-3"), I have learned, among other things, the following:

a. Taxi medallions are small metal plaques affixed to taxis. Without a medallion, it is illegal to operate a taxi in cities with medallion systems, such as New York City. Cohen and his wife own multiple LLCs that collectively own 32 taxi medallions (each LLC owns two medallions).[8] Cohen's purchase of these New York taxi medallions was originally financed by loans from Capital One bank, for which the medallions served as collateral. Cohen was not a taxi operator, and leased his medallions to a third party. That third party made monthly payments to Cohen, who in turn used some of those proceeds to make his monthly loan payments to Capital One.

b. In early 2014, Cohen became a customer of Sterling when he sought to refinance a mortgage on a rental property that he owned. In or around April 2014, Cohen raised with Sterling the prospect of refinancing his taxi medallion loans, which were then at Capital One. By in or about September 2014, Cohen began negotiating a lending transaction with Sterling that would allow Cohen to pay off his loans at Capital One and borrow more money from the then-increase in value of the medallions. According to Sterling Employee-1, in 2014, prior to the recent upheaval in the taxi industry—as a result of the emergence of ride-sharing services, such as Uber—taxi medallion loans were viewed by banks and investors as safe, short term credits, as the market value of taxi medallions was consistently rising. Consequently, taxi medallion loans—like the loans held by Cohen—were frequently refinanced at increasing amounts as the value of the medallions rose. According to Sterling Employee-1, borrowers typically cashed out the increase in the loan amount

---

[8] One of these companies, Mad Dog Cab Corp., was jointly owned by Sondra Cohen, who I believe is Cohen's mother.

2017.08.02

and used the additional funds for other purposes. Cohen appears to have followed this approach in 2014, when he agreed to refinance his medallion loans for approximately $22 million, which—according to letters from Capital One in Sterling's files—was greater than his previous debt at Capital One Bank ($21 million, of which $14.6 million was a line of credit to Cohen). This allowed Cohen to cash out the proceeds from the transaction.

c.    Based on my review of records maintained by Sterling, I have learned that on or about December 8, 2014, each of Cohen's sixteen taxi medallion LLCs entered into loan agreements and promissory notes with Sterling for the principal sum of $1,375,000, with repayment due on December 8, 2016. Each loan was signed by Michael or Laura Cohen, depending on who was the sole shareholder of the LLC. The address listed for each of the LLCs was the address for Subject Premises-1. The loans were also each secured by a security agreement, dated the same day, making the medallions collateral for the notes. To give Sterling additional security, Michael and Laura Cohen signed personal guarantees and confessions of judgment, giving Sterling the right to pursue collection against the Cohens' personal assets were their corporations to default under the loan agreements. The personal guaranty agreements stated that the LLCs had offices at the address for Subject Premises-1, and contained a notice provision that stated that any notices required by the agreements should be mailed to Subject Premises-1. In total, Sterling agreed to lend approximately $22 million to the Cohens' companies.

d.    Pursuant to participation agreements, Sterling transferred 45 percent of Cohen's taxi medallion debt to Melrose.[9]

---

[9] Melrose, which had a business principally focused on taxi medallion loans, is now in conservatorship by the National Credit Union Administration ("NCUA").

13

2017.08.02

e.    In evaluating Cohen's requested refinancing of the taxi medallions, Sterling (and Melrose, consistent with its participation in the deal) conducted due diligence. At Sterling's request, Cohen provided Sterling with a statement of financial condition, dated August 1, 2014 (the "August 2014 Financial Statement"), which indicated that Cohen had $100,740,000 in total assets, $23,550,000 in total liabilities, and a net worth of $77,190,000.[10] From my review of a Sterling credit memorandum, dated September 29, 2014, I know that Sterling viewed the transaction favorably because, accounting for loan payments, cash flows from the medallions were projected to be positive, the value of the collateral (as estimated by Sterling) exceeded $42 million, and the net worth of Cohen—who was the direct obligor under the guarantee agreements—was over $77 million. An internal Sterling credit and risk rating analysis report, dated October 20, 2014, recommended approval of the loans for substantially the same reasons.

f.    Based on my review of records maintained by Sterling and public sources, I have learned that over time, the collateral backing Cohen's loans (taxi medallions) lessened in value due to the rise in ride-sharing companies. Additionally, Cohen began falling behind on loan payments to Sterling and Melrose. I know from records maintained by Sterling and an interview with Sterling Employee-2 that, beginning in or around September 2015, Cohen told Sterling, in sum and substance, that the individual leasing Cohen's medallions had fallen behind in making payments to Cohen, and that as a result, the monthly cash flow from his taxi medallions had been reduced, leaving him with a shortfall of approximately $16,000 each month. For instance, I have reviewed an email from Sterling Employee-2, dated September 9, 2015, summarizing a call with Cohen— which according to the email and toll records for Cohen's cellphone occurred on September 8,

---

[10] Cohen subsequently provided Sterling with a revised statement of financial condition, also dated August 1, 2014, which reported assets of $99,420,000, total liabilities of $23,550,000, and a net worth of $75,870,000.

14

2015—during which Cohen told Sterling Employee-2, in sum and substance, about his cash flow problems and a monthly shortfall of approximately $16,000. In that same email, Sterling Employee-2 commented that despite Cohen's statements, his personal financial information "indicate[d] a strong ability to make up the difference in payments." Cohen, however, according to Sterling Employee-2, pushed the bank for a reduction in Cohen's monthly payments.

g. From my review of records maintained by Sterling and my participation in an interview with Sterling Employee-2, I have learned that Cohen and Sterling Employee-2 spoke again on September 28, 2015, and that during the call Cohen stated, in sum and substance, that the individual to whom Cohen leases the medallions had again reduced monthly payments to Cohen. I know from my review of records maintained by Sterling that between in or about September 2015 and November 2015, Sterling raised the possibility—both internally and with Cohen—of Cohen posting his real estate holdings, personal residence, or some other collateral as additional security for the banks.[11] According to these records, however, Cohen resisted these requests. From my review of loan documents and records maintained by Sterling, I know that in or about November 2015, as a result of Cohen's representation that he was not earning sufficient returns on his medallions to cover monthly interest payments, Sterling and Melrose agreed to amend their loans with Cohen by, among other things, reducing the interest rate Cohen paid to Melrose and extending the loan maturity date to December 8, 2017.

h. I know from interviews with Sterling Employee-1 and Sterling Employee-2, as well as emails I have reviewed, that in or about October 2016, Cohen told Sterling Employee-1 that Cohen had a potential buyer of his taxi medallions, named ▮▮▮▮▮▮▮▮ who would agree to

---

[11] Based on my review of property records, I know that on or about October 28, 2015, around the time period when Sterling raised the possibility of Cohen posting his personal residence—Subject Premises-1—as collateral, Cohen transferred Subject Premises-1 into a trust.

15

2017.08.02

assume Cohen's debt with Sterling and Melrose. Based on my review of records maintained by Sterling, as well as the interviews with Sterling Employee-1 and Sterling Employee-2 referenced above, I know that by or before October 2016, Cohen had entered into negotiations to sell his sixteen corporate taxi medallion entities to ▮▮▮▮▮▮▮▮▮▮▮▮ for the balance of the loans, which at the time was $21,376,000. I know from my review of records maintained by Sterling, and my participation in an interview with Sterling Employee-2, that as a condition of the transfer of the medallion loans—and because Sterling was unfamiliar with ▮▮▮ ▮▮▮▮▮▮-Sterling requested that Cohen make a substantial principal payment on the loan, of approximately one million dollars, prior to the transfer. Cohen rejected this request initially. But on or about January 31, 2017, Cohen told Sterling Employee-1, in sum and substance, that he would make a one million dollar principal reduction payment in order to move forward with the medallion transfer deal with ▮▮▮▮▮▮ Indeed, in an email sent by Cohen to Sterling Employee-2 on or about February 22, 2017, Cohen confirmed that he "agreed to pay down 1 million from the loan amount."

      i. Pursuant to the participation agreements between Sterling and Melrose, Sterling was required to secure Melrose's agreement to participate in the transfer of the taxi medallion debt from Cohen to ▮▮▮▮▮▮▮ On or about April 17, 2017, Sterling sent a memorandum to Melrose summarizing the terms of the proposed transaction, and noting the requirement that Melrose agree to the terms. On or about May 2, 2017, Sterling Employee-1 told ▮▮▮▮▮▮▮ that Melrose had agreed to the deal in principle, and that Sterling would be sending the parties a term sheet shortly.

      j. In order for the banks to conduct diligence and evaluate the proposed transaction fully, they requested financial information from the parties. On or about June 7, 2017, Sterling

16

Employee-1 emailed Cohen to request an "updated personal financial statement," completed jointly with Cohen's wife, and Cohen's most recent federal income tax return. On or about June 8, 2017, Cohen emailed Sterling Employee-1 a Sterling personal financial statement form that had been filled out by hand, which referenced a statement of financial condition, dated May 1, 2017 (the "May 2017 Financial Statement") that was also attached. The May 2017 Financial Statement included a cover letter from Cohen's accountant, Jeffrey Getzel, stating, in sum and substance, that the information in the statement came from Cohen and that Getzel had not confirmed its accuracy or completeness. The May 2017 Financial Statement stated that Cohen had total assets of $41,955,000, total liabilities of $39,130,000, and a net worth of $2,825,000. The May 2017 Financial Statement indicated that Cohen's assets were comprised of $1,250,000 in cash, $26,155,000 in closely held companies (such as the taxi medallion entities and his real estate holdings), $3,200,000 in real estate investments, and his $11,000,000 personal residence.[12]

k. Based on my review of reports of law enforcement interviews of Sterling Employee-1, I have learned that Sterling Employee-1 reviewed the May 2017 Financial Statement with Cohen to, among other things, verify its accuracy, and Sterling Employee-1 asked Cohen about specific line items on the financial statement, including the cash amount, value of medallions, and total liabilities. Cohen stated to Sterling Employee-1, in sum and substance, that the May 2017 Financial Statement was accurate.

l. On or about August 16, 2017, Sterling Employee-1 emailed Cohen and ▉▉▉▉ ▉▉▉▉▉ ttaching a non-binding term sheet memorializing the potential transaction between

---

[12] Based on my review of Cohen's financial statements, I know that the precipitous decline in assets from his 2014 financial statement to his 2017 financial statements can be explained primarily by reported depreciation in the value of Cohen's real estate assets and medallion investments.

17

2017.08.02

Sterling, Melrose, Cohen, an ▓▓▓▓▓▓▓  The term sheet included a cover letter addressed

to Cohen at Subject Premises-1.  The parties negotiated the provisions of the term sheet and, on or

about September 5, 2017, Sterling Employee-1 sent ▓▓▓▓▓▓ and Cohen a copy of the

executed term sheet.  According to the term sheet, ▓▓▓▓▓▓ would borrow $20,000,000

from Sterling and Melrose, to be secured by the medallions that ▓▓▓▓▓ was to acquire from

Cohen.

      m.  As part of the agreement, according to the term sheet, $1,265,913 in principal (which

is what would remain after the $20,000,000 payment on the outstanding loan balance) would be

repaid by Cohen and the two banks, with Cohen paying fifty percent and the banks dividing the

remaining half of the balance.  Based on my review of an internal Sterling credit memorandum,

dated October 4, 2017, the parties reached a preliminary agreement that Cohen would pay $632,956

of the remaining $1,265,912 principal loan balance, and Sterling and Melrose would absorb

$357,167 and $275,789, respectively, in the form of charge-offs.  According to Sterling Employee-

1, Sterling was willing to divide the repayment of the outstanding principal balance—despite its

prior insistence that Cohen make a principal pay-down of at least one million dollars—because

Cohen represented on a telephone call with Sterling Employee-1, in sum and substance, that he had

insufficient liquidity to pay the full outstanding principal balance.  As part of the agreement, Sterling

and Melrose also agreed to relieve Cohen and his wife of the personal guarantees that they made

on behalf of the LLCs.  Thus, after completing the ▓▓▓▓▓ transaction, Cohen would no longer

have had any outstanding obligations to Sterling or Melrose.

      n.  Based on my review of emails sent by Sterling employees, I have learned that

because the transaction between the parties was subject to full credit underwriting by Sterling and

Melrose (as well as Melrose's regulators at NCUA), in August and September 2017, Sterling

18

2017.08.02

required and requested additional financial statements and tax returns for Cohen and ▮▮▮▮▮▮

for its credit underwriting process. In response to Sterling's requests, on or about September 25,

2017, Cohen emailed Sterling Employee-2 a copy of his 2016 tax return. The tax return listed

Cohen's mailing address as Subject Premises-1. Additionally, on or about October 5, 2017, Cohen

re-sent Sterling Employee-2 a copy of his May 2017 Financial Statement. A day later, on October

6, 2017, Cohen emailed Sterling Employee-2 a statement of financial condition, dated September

30, 2017 (the "September 2017 Financial Statement").

      o. Like the May 2017 Financial Statement, the September 2017 Financial Statement

included a cover letter from Jeffrey Getzel, Cohen's accountant, stating, in sum and substance, that

the information in the statement came from Cohen, and that Getzel had not confirmed its accuracy

or completeness. The September 2017 Financial Statement stated that Cohen had total assets of

$33,430,000, total liabilities of $45,630,000, and a negative net worth of $12,200,000.[13] Notably,

unlike Cohen's May 2017 Financial Statement, the September 2017 Financial Statement

represented to Sterling that Cohen had a negative net worth. The September 2017 Financial

Statement indicated that Cohen's assets were comprised of $1,250,000 in cash, $17,630,000 in

closely held companies (including the taxi medallion entities and his real estate holdings),[14]

$3,200,000 in real estate investments, and his $11,000,000 personal residence (which, for the first

---

[13] Based on my review of Cohen's financial statements, I know that this further decline in assets can be explained primarily by reported depreciation in the value of Cohen's real estate assets and medallion investments.

[14] Notably, the September 2017 Financial Statement valued each of Cohen's thirty-two New York taxi medallions at approximately $180,187.50, which was considerably less than the $650,000 valuation ascribed to each medallion in the Cohen-▮▮▮▮▮▮ term sheet.

2017.08.02

time, he indicated was held by a trust).[15]  The September 2017 Financial Statement included assets and liabilities not held in Cohen's name, such as various entities associated with his taxi medallions and some of his real estate investment entities.

     p.  From my participation in an interview with Sterling Employee-2, and my review of records maintained by Sterling, I have also learned that around the time Cohen provided Sterling with these financial statements—i.e., in or around September 2017—Cohen stopped paying monthly loan payments on his taxi medallion loans altogether.  According to Sterling Employee-2, Cohen informed Sterling, in sum and substance, that he had insufficient funds to pay the monthly principal and interest payments on his medallion loans.  By in or about December 2017, Sterling and Melrose had not been paid approximately $276,937.92 in monthly principal and interest payments on the medallion loans.  Based on Cohen's financial condition as conveyed in the September 2017 Financial Statement, and his delinquency in making payments to Sterling, among other things, the bank's credit underwriting committee determined (and memorialized in a December 2017 memorandum) that the Cohen ███████ transaction was favorable for the bank — that is, that ███████ would be a better borrower than Cohen.

     q.  On or about December 26, 2017, Sterling sent Cohen a demand letter requesting the immediate receipt of past-due loan payments.  The demand letter was addressed to Cohen at Subject Premises-1.  On December 29, 2017, Sterling sent Cohen a letter stating that he was in default under the loans between Sterling and Cohen's medallion corporations.  The notice of default was addressed to Cohen at Subject Premises-1.  Cohen did not make an immediate payment on the loans, but instead sent an e-mail to Sterling Employee-1 on or about January 24, 2018,

---

[15] Based on my review of property records maintained by the City of New York, and my participation in an interview with Getzel, I know that in 2015, Cohen transferred his residence to a trust.  He did not disclose that transaction to Getzel or Sterling until in or about September 2017.

2017.08.02

stating that during the closing of the Cohen-████████ transaction, Cohen would "bring all payments up to date as well as deposit the payoff differential."  Cohen also requested by email on January 24, 2018, that at the closing of the Cohen-████████ transaction, Sterling provide a letter stating that all of Cohen's debts have been satisfied and that Cohen's personal guarantees of the medallion loans had been terminated.

     r.  The Cohen ████████ transaction, however, did not close.  On or about January 29, 2018, the ████████ attorney emailed attorneys for Sterling and stated that "at this time there is no deal with Michael Cohen.  Some of the numbers have changed and we are not prepared to go forward."

     s.  Based on my participation in the interview with Sterling Employee-2 and my review of records maintained by Sterling, I know that after the Cohen-████████ deal fell apart, Sterling assigned Cohen's loans to Sterling Employee-3, who specializes in collecting on defaulting loans.  From my participation in an interview with Sterling Employee-3, my review of telephone call notes taken by Sterling Employee-3, and my review of telephone records, I know that Sterling Employee-3 spoke several times to Cohen on or about January 30, 2018 about paying down and/or restructuring Cohen's outstanding taxi medallion loans.  On the calls, which in total lasted more than an hour, Cohen stated in sum and substance that he did not have more than $1,250,000 to pay toward the medallion loans.  On the call, in the course of reviewing the failed Cohen-████████ transaction, Sterling Employee-3 questioned Cohen about the price ████████ was to have paid for each medallion, and whether there was a side agreement between Cohen and ████████ Cohen denied that there was any side agreement with ████████

     t.  On or about January 31, 2018, Cohen emailed Sterling Employee-3 and proposed paying $500,000 to bring the loans current and $750,000 to bring the principal balance to

21

2017.08.02

$20,500,000. Cohen also suggested revised monthly interest payment amounts. The signature block on the email indicated that Cohen's address was the address for Subject Premises-2. On or about January 31, 2018, Sterling Employee-3 responded to Cohen and stated, in sum and substance, that Cohen would need to pay the entirety of the overdue payments and pay down the principal balance of the loan to $20,000,000 (in total, a payment of approximately $1,750,000), and would need to make larger monthly interest payments.

u.   On or about February 1, 2018, Cohen emailed Sterling Employee-3 and proposed "[p]ayment of $1.250m which ALL can be used to pay down principal, if [Sterling] will waive past due amounts," but stated "I do NOT have more than the $1.250m." (Emphasis in original.) Cohen also stated, in sum and substance, that he had insufficient financial resources to post additional collateral or pre-fund monthly payments. The signature block on the email indicated that Cohen's address was the address for Subject Premises-2. Based on my participation in an interview with Sterling Employee-3, I have learned that since January 30, 2018, Sterling has continued to renegotiate the medallion loans with Cohen based on Cohen's representations about his current financial position. In particular, according to Sterling Employee-3, Cohen and Sterling have an agreement in principal to restructure Cohen's loans based in part of Cohen's agreement to make a principal payment of approximately $750,000, to make a payment of $500,000 to become current on interest payments, and to post $192,000 in cash collateral for his future monthly payments on the loan. Cohen also agreed to pledge an interest he had in a property. Sterling Employee-3 has stated that had Cohen indicated he had more than $1,250,000 available to him, Sterling would have, among other things, negotiated for a larger reduction to the principal amount of the loan.

22

### (ii)   Cohen Made Material Misrepresentations About His Finances to Banks

<u>Cohen Concealed from Sterling and Melrose Cash Derived from Consulting Work</u>

17.      As set forth in detail below, despite multiple written and oral representations by Cohen to Sterling (and, by extension, Melrose[16]) that he had insufficient funds to pay down the principal balance of the medallion loans, make monthly interest payments, or pay past-due amounts, it appears that between 2016 and the present, Cohen opened and maintained bank accounts at First Republic Bank ("First Republic"), and then received millions of dollars in consulting payments in these accounts, which he did not disclose to Sterling.  Cohen set up these accounts and received these funds during the very period in which he made disclosures to Sterling about his personal finances (including his assets and liabilities) and his ability to make payments on the medallion loans.  In these disclosures to Sterling—and despite being asked about these bank accounts by his accountant—Cohen misled the bank by claiming he had insufficient liquidity to satisfy his obligations or meet the bank's demands, while withholding information about these ongoing revenue streams and liquid financial assets at First Republic.

18.      Specifically, based on my review of documents and bank records produced pursuant to a subpoena by First Republic, and my participation in and review of reports of interviews with a First Republic sales manager ("First Republic Employee-1") and a First Republic senior managing director ("First Republic Employee-2"), I have learned, among other things, the following:

---

[16] Based on my review of a report of an interview conducted with an employee of Melrose, I have learned that, pursuant to the participation agreement between Sterling and Melrose, Cohen's financial statements and other records in Sterling's possession were forwarded to Melrose so that Melrose could make a determination as to whether to approve of the Cohen-████████ transaction.  Based on my review of reports of interviews with Melrose employees, I also know that Cohen called employees at Melrose regarding the Cohen████████ransaction.

23

a.   Cohen and his wife have been customers of First Republic since approximately June 2011.  Cohen controls several checking and loan accounts at First Republic, some in his own name and others in the names of corporate entities.  According to First Republic's know-your-customer records on Cohen,[17] his primary physical address is the address for Subject Premises-1.

b.   On or about October 26, 2016, in Manhattan, New York, Cohen opened a new checking account at First Republic in the name of Essential Consultants LLC (the "Essential Consultants Account").  Cohen was the only authorized signatory on the account.  According to account opening documents, the primary address for Essential Consultants LLC was the address for Subject Premises-1.  When Cohen opened the Essential Consultants Account, First Republic Employee-1 conducted an in-person interview of Cohen.  In response to a series of know-your-customer questions about the purpose of the account—the answers to which First Republic Employee-1 entered into a form[18]—Cohen stated, in sum and substance, that he was opening Essential Consultants as a real estate consulting company to collect fees for investment consulting work, and all of his consulting clients would be domestic individuals based in the United States.  Cohen also stated, in sum and substance, that his purpose in setting up the account was to keep the revenue from his consulting business—which he said was not his main source of income—separate from his personal finances.  As set forth below, there is probable cause to believe that Cohen's statements about the intended purpose of the account and source of funds for the account were false.  Specifically, as described below, the account was not intended to receive—and does not

---

[17] Certain financial institutions are required to conduct such procedures pursuant to the Bank Secrecy Act and its implementing regulations. *See* 31 U.S.C. § 5318; 31 C.F.R. § 1020.220.

[18] First Republic Employee-1 first filled out the form on the day he interviewed Cohen, October 26, 2016.  On or about December 19, 2016, at the request of bank compliance personnel, First Republic Employee-1 updated the form to add more detail about Cohen's statements.

24

2017.08.02

appear to have received—money in connection with real estate consulting work; in addition, the account has received substantial payments from foreign sources.

c.   I know from my review of First Republic bank records that were scheduled by an FBI forensic accountant that after Cohen opened the Essential Consultants Account, Cohen received payments into that account from foreign businesses and entities that do not reflect the stated client profile for the residential and commercial real-estate consulting services. Specifically, from my review of the Essential Consultants Account schedule and public sources, I know the following:

i.   Beginning on or about January 31, 2017, Cohen began receiving monthly payments of $83,333 into the Essential Consultants Account from an entity called Columbus Nova LLC. According to public sources, Columbus Nova is an investment management firm controlled by Renova Group, an industrial holding company based in Zurich, Switzerland that is controlled by Russian national Viktor Vekselberg.  From January 2017 to August 2017, the Essential Consultants Account received seven payments totaling $583,332.98 from Columbus Nova LLC.

ii.   Beginning on or about April 5, 2017, the Essential Consultants Account began receiving payments from Novartis Investments, SARL, which I believe to be the in-house financial subsidiary of the Swiss pharmaceutical company Novartis International AG ("Novartis"). Between April 2017 and February 2018, the Essential Consultants Account received eleven wire payments from a Swiss bank account held in the name of Novartis, each in the amount of $99,980, for a total of $1,099,780.

iii.   Beginning in or about April 2017, the Essential Consultants Account started receiving wire payments from a bank account associated with the telecommunications company AT&T Inc. ("AT&T").  Specifically, on or about April 14, 2017, AT&T sent $100,000 to the

25

2017.08.02

Essential Consultants Account and, from in or about June 2017 to in or about January 2018, the Essential Consultants Account received ten $50,000 payments from AT&T. In total, AT&T sent $600,000 to the Essential Consultants Account.

   iv. On or about May 10, 2017, June 9, 2017, July 10, 2017, and November 27, 2017, the Essential Consultants Account received four deposits in the amount $150,000 (totaling $600,000) from a bank account in South Korea. The account holder from which the money was sent is Korea Aerospace Industries Ltd. ("KAI"). KAI is a South Korea-based company that produces and sells fixed-wing aircraft, helicopter aircraft, and satellites to the United States Department of Defense, among other customers.

   v. On or about May 22, 2017, the Essential Consultants Account received a $150,000 deposit from an account at Kazkommertsbank, a Kazakhstani bank. The listed account holder at Kazkommertsbank was a second Kazakhstani bank named BTA Bank, AO. A message accompanying the wire payment indicated that the payment was a "monthly consulting fee as per Inv BTA-101 DD May 10, 2017 consulting agreement W/N DD 08 05 2017 CNTR W/NDD 08/05/2017."

   vi. In total, from on or about January 31, 2017 to on or about February 1, 2018, the Essential Consultants Account received approximately $3,033,112.98 in transfers and checks from the aforementioned entities. As of on or about January 10, 2018, the balance in the Essential Consultants Account was $1,369,474.23. Cohen's withdrawals from the Essential Consultants account reveal that it was used for largely personal purposes, including to pay, among other things, American Express bills and fees from "the Core Club," a private social club in New York.

   d. On or about April 4, 2017, Cohen opened another new checking account at First Republic, this one in the name of Michael D. Cohen & Associates, P.C. (the "MDC&A Account").

26

2017.08.02

Cohen was the only authorized signatory on the account.   According to account opening documents, the primary address for MDC&A Account was the address for Subject Premises-1. Among other things, the MDC&A Account received ten wire transfers and one check from an account in the name of Squire Patton Boggs, a law firm.  As noted above, Subject Premises-2 is located inside the New York office of Squire Patton Boggs.  In total, from on or about April 5, 2017, to on or about January 2, 2018, the MDC&A Account received $426,097.70 in deposits, and the balance in the account as of January 2, 2018, was $344,541.35.  As discussed below, Cohen never disclosed any of the balance in the Essential Consultants or MDC&A accounts to Sterling during the negotiations with respect to the ███████ ansaction or the subsequent loan refinancing negotiations, including in his May 2017 Financial Statement and September 2017 Financial Statement.

19.     Based on my review of emails that were seized pursuant to the Cohen Email Warrants, and my review of reports of interviews with employees of AT&T and Novartis, it appears that the aforementioned payments to the Essential Consultants Account and MDC&A Account were for political consulting work, including consulting for international clients on issues pending before the Trump administration.  Specifically, from my review of emails from the Cohen Gmail Account, the Cohen MDCPC Account, and public sources, I have learned the following:

a.  On or about April 28, 2017, Cohen sent an email to an individual whom I believe is affiliated with KAI.  In the email, Cohen attached a "Consulting Agreement" between KAI and Essential Consultants dated as of about May 1, 2017.  The agreement indicates that Essential Consultants had the address of Subject Premises-2.  The document indicates that Essential Consultants would render "consulting and advisory services, as requested" by KAI, and that KAI would pay Essential Consultants "a consulting fee of One Million Two Hundred Thousand

27

($1,200,000.00) US Dollars," disbursed through eight $150,000 installments between May 2017 and December 2017. I have also reviewed invoices in amounts of $150,000 that Cohen emailed to an individual whom I believe is affiliated with KAI. At the top of the invoices the address listed for Essential Consultants is the address for Subject Premises-2.

        b. On or about May 8, 2017, Cohen sent an email to an individual whom I believe is affiliated with BTA Bank. The signature block on Cohen's email listed "Essential Consultants LLC" and "Michael D. Cohen & Associates, PC" and provided the address for Subject Premises-2. In the email, Cohen attached a document purporting to be a "Consulting Agreement" between BTA Bank and Essential Consultants dated as of about May 8, 2017. The agreement indicates that Essential Consultants had the address of Subject Premises-2. The document indicates that Essential Consultants would render "consulting and advisory services" to BTA Bank, and that BTA Bank would pay Essential Consultants "a consulting fee of One Million Eight Hundred Thousand ($1,800,000.00) US Dollars," disbursed through monthly payments of $150,000. On or about May 10, 2017, Cohen sent an email to an employee of BTA Bank, and attached to the email an invoice to BTA Bank in the name of Essential Consultants, with the address of Subject Premises-2. The invoice contemplated a $150,000 payment to Essential Consultants for a "monthly consulting fee."

        c. On or about January 23, 2017, Cohen appears to have entered into a consulting agreement with AT&T, which contemplates that Essential Consultants "shall render consulting and advisory services to [AT&T]" and that AT&T would "advise [Essential Consultants] of those issues and matters with respect to which AT&T Services desires [Essential Consultants]'s assistance and advice." The agreement indicates that Essential Consultants had the address of Subject Premises-1. The contract calls for AT&T "to pay the Consultant for his services . . . a consulting fee of Fifty

2017.08.02

Thousand ($50,000) Dollars . . . per month." Based on my review of reports of interviews with AT&T employees, I have learned that AT&T retained Cohen to consult on political issues, including net neutrality, the merger between AT&T and Time Warner, and tax reform.

    d.   On or about March 1, 2017, Cohen appears to have entered into a contract between Novartis and Essential Consultants, which provides that Essential Consultants will "provide consulting and advisory services to Novartis on matters that relate to the repeal and replacement of the Affordable Care Act in the US and any other issues mutually agreeable to [Essential Consultants] and Novartis." The contract provides for a "consulting fee of One Million Two Hundred Thousand ($1,200,000) US dollars," to be paid to Essential Consultants in equal monthly installments over the course of a year. Based on my review of reports of interviews with Novartis employees, I have learned that Novartis retained Cohen to provide political consulting services and to gain access to relevant policymakers in the Trump Administration.

    e.   In or about February 2017, Cohen began negotiating the terms of a "strategic alliance" with Squire Patton Boggs. On or about March 4, 2017, Squire Patton Boggs emailed Cohen a "strategic alliance agreement." Under the terms of the agreement, Cohen agreed to generate business for the law firm, and Squire Patton Boggs agreed to pay to Cohen "an annual strategic alliance fee of $500,000, payable in twelve (12) equal monthly installments." Squire Patton Boggs also agreed to provide Cohen with "dedicated and segregated office space in [Squire Patton Boggs's] New York and Washington D.C. offices, which office space shall be physically separate from [Squire Patton Boggs's] offices and have locked doors and its own locked file cabinets." On or about April 3, 2017, Squire Patton Boggs announced on its website that is had formed a "strategic alliance" with Michael D. Cohen & Associates and would "jointly represent clients."

2017.08.02

20.    Despite the significant amount of money that Cohen received into the Essential Consultants Account and the MDC&A Account, and the cash balance in both accounts, Cohen did not disclose that information to Sterling or Melrose. Specifically, based on my review of documents provided by Getzel (as noted above, Cohen's accountant at the time), my participation in an interview with Getzel, and my review of notes and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I have learned the following:

a.    In or about May 2017, Getzel met with Cohen at Subject Premises-2. At the meeting, Cohen told Getzel, in sum and substance, that he had set up a law practice called Michael D. Cohen & Associates P.C., and a consulting company called Essential Consultants LLC. Cohen told Getzel, in sum and substance, that he expected to earn $75,000 per month in connection with his law practice, and that he expected gross revenues for the consulting business to be between five and six million dollars annually.

b.    In or about October 2017, if not earlier, Getzel was preparing a personal financial statement for Cohen. On or about October 6, 2017, Getzel sent an email to Cohen in which Getzel wrote that "[a]ttached is a draft of the new PFS as of September 30, 2017" and attached a draft of the September 2017 Financial Statement. The draft statement reflected that as of September 30, 2017, Cohen had only $1,250,000 in cash, total assets of approximately $33,430,000 (comprised of taxi medallion interests, real estate interests, and his personal residence and property), and liabilities of approximately $45,630,000, leaving him purportedly over $12 million in debt. In the same email, Getzel questioned Cohen, in sum and substance, about the fact that the financial statement did not list any value associated with either the Essential Consultants Account or the MDC&A Account: "[w]e did not add any value for you[r] two operating entities – Michael D. Cohen & Associates

30

POC [*sic*] and Essential Consultants LLC.  Please advise whether or not these should be disclosed and what value."

   c. On or about October 6, 2017, Cohen called Getzel by telephone—which is reflected on toll records for Cohen's cellphone—and told Getzel, in sum and substance, not to include Essential Consultants or MDC&A in the September 2017 Financial Statement because they had no value.  On or about October 6, 2017, following the call with Getzel, Cohen, using the Cohen Account, responded to Getzel's email with the answer "[l]ooks good to me."  Cohen never directed Getzel to make any changes to his cash position as listed in the September 2017 Financial Statement.  In a letter dated October 6, 2017, addressed to Getzel, Cohen stated, "I have reviewed the attached statement of financial condition and find it to be correct and consistent with the representations that I made to your firm.  The attached is an accurate reflection of my assets, liabilities and net worth (deficit) as of September 30, 2017."  Attached to that letter was the September 2017 Financial Statement, which, as noted above, was then transmitted to Sterling in connection with the proposed taxi medallion transaction between Sterling, Cohen, and ▒▒▒▒▒

  21. Based on my review of a report of an interview with Sterling Employee-1, I have learned that Cohen did not disclose his income stream from Essential Consultants to Sterling Employee-1 or, to his knowledge, anyone else at Sterling.  According to Sterling Employee-1, knowledge of such an income stream would have affected Sterling's demands during the negotiations, particularly with respect to the amount of a principal paydown of Cohen's debt.

<u>Cohen Understated His Available Cash</u>

  22. In addition to withholding the existence of his Essential Consultants income from Sterling and Melrose, it appears that Cohen also substantially understated his available cash and cash equivalents in his financial disclosures.  Specifically, I know from my review of the September

31

2017.08.02

2017 Financial Statement that Cohen provided to Sterling that Cohen represented that he had $1,250,000 in cash as of September 30, 2017. I also know that on or about January 30, 2018, in a telephone call with Sterling Employee-3, and on February 1, 2018, in an email to Sterling Employee-3, Cohen represented that he did not have more than $1,250,000 in cash. But, from my review of a summary of bank records that were scheduled by forensic accountants, I have learned that Cohen had approximately $5,000,000 in cash and cash equivalents as of September 30, 2017. Additionally, as of February 1, 2018, Cohen had approximately $6,000,000 in cash and cash equivalents. Specifically, from my review of the account schedule and bank records, I have learned the following:

a. Cohen has three checking and/or savings accounts at Capital One Bank, one of which is in his wife's name. As of September 30, 2017, Cohen had $1,105,680.35 in his savings account, and $1,262,982.29 in total in the three accounts at Capital One Bank. As of February 1, 2018, Cohen had a total of $1,389,245.78 in these accounts.

b. Cohen has three accounts at Morgan Stanley in his name. As of September 30, 2017, the combined total in cash and cash equivalents in those three accounts was $1,270,600.41. As of February 1, 2018, Cohen had $1,284.996.13 in these accounts.

c. As of September 30, 2017, Cohen had $260,689.18 in an account at Signature Bank. As of February 1, 2018, Cohen had $261,517.55 in this account.

d. In addition to the Essential Consultants Account and MDC&A Account at First Republic, Cohen also had two joint checking accounts with Laura Cohen at First Republic. In total, as of September 30, 2017, Cohen had at least $1,876,209.27 in total in his four accounts at First Republic. As of February 1, 2018, Cohen had $3,332,992.95 in these accounts.

32

2017.08.02

e. Cohen has an account at Bethpage Credit Union with $25,931.39 in it as of September 30, 2017.

f. As of September 30, 2017, Cohen had $17,542.54 in accounts at Sterling.

g. Cohen has two accounts at TD Bank—one in his name and one held jointly with his wife. Cohen also has a safety deposit box at TD Bank—Subject Premises-3. The safety deposit box was opened on December 13, 2017 in the names of Michael and Laura Cohen.

h. In total, as of September 30, 2017, Cohen had at least $4,713,935.08 in his accounts at Capital One Bank, City National Bank, Signature Bank, Sterling Bank, Bethpage Credit Union, First Republic, and Morgan Stanley. As of February 1, 2018, Cohen had $6,268,732.59 in his accounts at Capital One Bank, City National Bank, Signature Bank, First Republic, and Morgan Stanley.[19]

23.    Accordingly, based on the foregoing, it appears that Cohen's written and oral representations to Sterling and Melrose that he did not have more than $1,250,000 were false, and that Cohen withheld information regarding approximately $5 million in funds from Sterling and Melrose in order to secure favorable terms in his renegotiation of his medallion loan. Based on my participation in an interview with Sterling Employee-2, and my review of reports of interviews with Sterling Employee-1 and two Melrose employees, it is my understanding that that Sterling and Melrose would view Cohen's understating of his assets as material to its decision whether to renegotiate Cohen's medallion loans and on what terms, or to its decision whether approve of the transfer of those loans to ▆▆▆▆▆▆

---

[19] Based on my review of the account schedules described above, I know that, as of the date of this affidavit, the account balances for TD Bank have not yet been included in the schedule for either date and the account balances for Sterling National Bank and Bethpage Credit Union have not yet been included in the schedule for February 1, 2018. Thus, to the extent that these accounts have positive balances, Cohen's total balances in fact were even higher on these dates.

33

2017.08.02

## Cohen Has Unreported Interest Income

24.     It appears that Cohen also hid from Sterling interest income that he was receiving in connection with a six million dollar loan he made to another individual.  Specifically, I know from my review of the May 2017 Financial Statement and September 2017 Financial Statement that Cohen provided to Sterling that Cohen did not disclose that he had made a note receivable in the amount of approximately $6 million, or that he was earning approximately $60,000 per month in interest income in connection with that loan.  But, from my review of a summary of bank records that were reviewed by another law enforcement agent, my review of property records and documents obtained pursuant to the Cohen Email Warrants, and my participation in an interview with Getzel, I have learned the following:

a.    Based on my review of property records, I have learned that on or about March 12, 2012, Cohen agreed to lend ██████████████████ approximately $2,000,000.[20]  It appears that the promissory note was unsecured by any real property.  On or about April 28, 2014, Cohen and ████ amended the promissory note, and restructured the loan to increase the principal amount to approximately $5,000,000.  Under the terms of the amended promissory note, the loan was secured by ████ apartment in Sunny Isles Beach, Florida.  On or about April 8, 2015, Cohen an ██████ restated the promissory note to increase the principal amount to $6,000,000.[21]

b.    Based on my review of a copy of the restated note, which was obtained pursuant to the Cohen Email Warrants, I have learned that under the terms of the amended and restated

---

[20] I learned from Getzel that ███████████████████████████████

[21] The note states that the loan is to ████████████████ husband and wife, jointly and severally.  For ease of reference, I refer simply to ' ████ herein.

2017.08.02

promissory note, Cohen's loan to ███████ is an interest-only loan, and that the principal balance of the loan bears interest at an annual rate of 12.25 percent. I also know that the amended and restated promissory note includes a schedule of payments that require ███████ to pay Cohen approximately $61,250 per month beginning in April 2015 and ending in April 2019. The note also requires that ███████ repay the principal balance of $6,000,000 on April 28, 2019.

     c. Based on my review of bank records, I have learned that, consistent with the terms of the amended and restated promissory note, ███████ has made monthly payments of approximately $61,250 since April 2015. Specifically, based on my review of records maintained by Capital One Bank, I have learned that from April 2015 to October 2015, Cohen received checks from an entity called ███████████████████████ totaling $61,250 per month, which he deposited into his personal bank account at Capital One Bank.[22] It appears from my review of bank records and public sources that ███████ is the owner of ████████████████████████ From my review of records maintained by Capital One Bank, I have also learned that since October 2015, Cohen has received checks from an entity called ████████████████ totaling $61,250 per month, which he deposited into his personal bank account at Capital One Bank. It appears from my review of bank records and public sources that ███████ is also the owner of ████ ████████████████ In total, it appears that Cohen receives approximately $735,000 per year in interest payments from ███████.

     d. Based on my review of Cohen's May 2017 and September 2017 Financial Statements, my review of his 2015 and 2016 tax returns obtained via subpoena and from the Cohen Email Warrants, and my participation in an interview with Getzel, I have learned that Cohen did

---

[22] In April 2015, Cohen received a pro-rated payment. For all months thereafter, the total payment equaled $61,250, but ███████ often made the payment in multiple checks.

2017.08.02

not disclose this interest income he was receiving from ▢ to Sterling or Melrose, or list it on his tax returns. I have also learned that while this interest income is taxable, Cohen did not tell Getzel—his accountant—about the income, and Getzel only learned about the income because he began doing ▢ taxes in 2017.[23]

25.    Accordingly, based on the foregoing, it appears that Cohen's representations to Sterling and Melrose that he did not have more than $1,250,000 were false, and that Cohen withheld information relating to the interest income he is receiving from ▢ in order to secure favorable terms in his renegotiation of his medallion loan.

<u>Cohen Had a Side Agreement With ▢</u>

26.    As set forth in detail below, during the course of Cohen's negotiations to sell his interest in taxi medallions and the associated debt to ▢ Cohen not only misrepresented his financial position to Sterling, but also failed to disclose a side agreement he had negotiated with ▢ : it appears that ▢ agreed to pay an above-market price for Cohen's taxi cab medallions, and in exchange, Cohen agreed to pay ▢ approximately $3.8 million in cash. Specifically, from my review of documents produced pursuant to a subpoena by Sterling, and my participation in interviews with Sterling Employee-1, Sterling Employee-2, and Sterling Employee-3, I have learned, among other things, the following:

a.    On or about September 5, 2017, an executed term sheet was circulated by Sterling Employee-1 to Cohen and ▢ The term sheet listed Cohen's address as the address for Subject Premises-1. According to the term sheet, ▢ would borrow $20,000,000 from Sterling and Melrose, to be secured by the medallions that ▢ was to acquire from

---

[23] Accordingly, this interest income—which should have been reported as such on Cohen's tax returns—is included herein in calculations of Cohen's true cash position.

2017.08.02

Cohen. At a price of $20 million for thirty-two taxi medallions, the proposed transaction valued

each medallion as worth $625,000. The term sheet also contemplated a $1,265,913 pay-down of

the principal balance of the loan. The term sheet made no mention of a $3.8 million payment from

Cohen to ▮▮▮▮▮▮ or any other form of payment or financial transaction between the parties.

      b. Additionally, an internal Sterling credit memorandum, dated October 4, 2017,

describing the terms of the Cohen-▮▮▮▮▮▮ transaction and the new loan to ▮▮▮▮▮▮ id

not mention any payments from Cohen to ▮▮▮▮▮▮ including a $3.8 million payment. The

memorandum also noted that the "loan amount of $20MM indicates a $625M purchase price per

medallion" but "it is recognized that this is not in line with current market values." Indeed,

according to an internal Sterling memorandum dated February 5, 2018, in the month of January

2018, taxi medallions sold for amounts ranging from $120,000 to $372,000. According to Sterling

Employee-1 and Sterling Employee-2, they were never told that ▮▮▮▮▮▮ agreed to a purchase

price of $625,000 in exchange for a lump sum payment from Cohen, or that Cohen would make

any payment to ▮▮▮▮▮▮

      c. On or about January 30, 2018, Sterling Employee-3 asked Cohen whether Cohen

had a side agreement with ▮▮▮▮▮▮ to pay ▮▮▮▮▮▮ sum of money for entering into the

medallion transaction. Sterling Employee-3 asked Cohen about such an arrangement because,

according to Sterling Employee-3, the price that ▮▮▮▮▮▮ /as paying for each medallion

appeared to be well above the market price. Cohen stated, in sum and substance, that he had no

side agreement—and never had a side agreement—with ▮▮▮▮▮▮

    27.    While Cohen and ▮▮▮▮▮▮ did not disclose any payment from Cohen to

▮▮▮▮▮▮ n communications with Sterling, it appears that such a payment was contemplated.

Indeed, based on my review of records maintained by Getzel, and my participation in an interview

2017.08.02

with Getzel, I have learned the following, in substance and in part, regarding the proposed side payment from Cohen to ▮▮▮▮▮

     a.  On or about September 19, 2017, Getzel prepared a memorandum for Cohen entitled, "Sale of NYC Medallion Entities and Debt Assumption" (the "Getzel Memorandum"). The Getzel Memorandum summarized the proposed transaction between Cohen and ▮▮▮▮▮ in part, as follows: "Michael and Laura Cohen will transfer ownership of their 13 NYC medallion entities to a Buyer who will assume their bank indebtedness, upon the [Cohens'] paying down the debt portfolio of the 13 entities by $500,000 and a cash payment to the Buyer of $3,800,000."[24]

     b.  According to Getzel, Cohen told him the parameters of the deal, including the payment of $3,800,000 to ▮▮▮▮▮ but Getzel did not know where Cohen was going to obtain $3,800,000 to p▮▮▮▮▮ As noted above, Cohen had more than $5,000,000 in cash and cash equivalents as of September 2017, but had only disclosed in his September 2017 Financial Statement that he had $1.25 million in cash.

28.    Based on my review of records maintained by Sterling (as well as Melrose, the bank with the participating interest in the loans) and reports of interviews of representatives of Sterling (and Melrose), I have seen no evidence that Sterling, Melrose, or any other financial institution involved in the potential deal with Cohen and ▮▮▮▮▮ was aware of the planned $3.8 million side payment from Cohen to ▮▮▮▮▮

### The Illegal Campaign Contribution Scheme

29.    The USAO and FBI are also investigating a criminal violation of campaign finance laws by Michael Cohen.  As set forth below, there is probable cause to believe that Cohen made

---

[24] The reference to thirteen medallions appears to be an error by Getzel.  Cohen and his wife together owned sixteen corporations, which in turn owned 32 taxi medallions.

2017.08.02

an excessive in-kind contribution to the presidential election campaign of then-candidate Donald Trump in the form of a $130,000 payment to Stephanie Clifford, an individual who was rumored to have had an extramarital affair with Trump, in exchange for her agreement not to disclose that alleged affair. As set forth below, there is probable cause to believe that this payment was intended to keep Clifford from making public statements about the rumored affair on the eve of the 2016 presidential election, and thus constitutes a campaign contribution in excess of the applicable limit.

30.    From my review of public sources, I have learned the following:

a.    In or around October 2011, there were rumors published on the gossip websites *TheDirty.com* that Trump had had an extramarital affair with Clifford, an adult film actress whose screen name is Stormy Daniels, in or around July 2006. In or about October 2011, *Life & Style Magazine*, a tabloid sold in supermarkets, also published an article, based on the report in *TheDirty.com*, alleging an affair had occurred between Trump and Clifford. Both Trump and Clifford, through their representatives, issued denials in response to the articles.

b.    Specifically, on or about October 11, 2011, Keith Davidson, who identified himself as Clifford's attorney, sent a cease and desist letter to *TheDirty.com*, demanding that the article regarding Trump and Clifford be removed from the website. Additionally, on or about October 12, 2011, Cohen, who was then Executive Vice-President and Special Counsel to the Trump Organization, stated to *E! News* that "[t]he totally untrue and ridiculous story . . . emanated from a sleazy and disgusting website. . . . The Trump Organization and Donald J. Trump will be bringing a lawsuit . . . [and] Mr. Trump and the Trump Organization would like to thank and commend Stormy Daniels and her attorneys for their honesty and swift actions."

31.    On or about June 16, 2015, Trump formally launched his 2016 presidential campaign. On or about May 4, 2016, Trump became the presumptive Republican Party nominee

39

for president, and on July 19, 2016, Trump officially became the nominee. Based on my review of public sources, I have learned that while it does not appear that Cohen had an official title as part of the Trump campaign, on multiple occasions Cohen made public statements on behalf of Trump or his campaign. For instance, on or about August 18, 2016, Cohen appeared on CNN to defend Trump's polling numbers.

32.     On or about October 7, 2016, *The Washington Post* published online a video and accompanying audio in which Trump referred to women in what the article described as "vulgar terms" in a 2005 conversation with Billy Bush, who was then the host of *Access Hollywood*. The following day, on October 8, 2016, Trump appeared in a video in which he stated, among other things, "I've said and done things I regret and words released today on this more than a decade old video are one of them. Anyone who knows me knows these words don't reflect who I am. I said it. I was wrong and I apologize." Based on my review of public sources, I also know that representatives of the Trump Campaign stated, in sum and substance, that the *Access Hollywood* comment was an old and isolated incident.

33.     Based on my review of public sources, including an article published in *Slate* magazine by a reporter who interviewed Clifford, I have learned that around this same time, in or about October 2016, Clifford was in discussions with ABC's *Good Morning America* show and *Slate* magazine, among other media sources, to provide these media outlets with her statement about her alleged relationship with Trump. According to the article in *Slate*, which the author based on conversations with Clifford over the telephone and by text message, Clifford wanted to be paid for her story or be paid by Trump not to disclose her accusation. As Cohen summarized in a 2018 email obtained pursuant to the Cohen Email Warrants: "In October 2016, I was contacted

2017.08.02

by counsel for Ms. Clifford stating that news outlets, including *ABC News*, were pursuing the 2011 story of an alleged affair between Mr. Trump and Ms. Clifford."

34.     From my review of telephone toll records[25] and information produced pursuant to the iCloud Warrant and Cohen Email Warrants, I have learned that in the days following the *Access Hollywood* video, Cohen exchanged a series of calls, text messages, and emails with Keith Davidson, who was then Clifford's attorney, David Pecker and Dylan Howard of American Media, Inc. ("AMI"), the publisher of the *National Enquirer*,[26] Trump, and Hope Hicks, who was then press secretary for Trump's presidential campaign. Based on the timing of these calls, and the content of the text messages and emails, I believe that at least some of these communications concerned the need to prevent Clifford from going public, particularly in the wake of the *Access Hollywood* story. In particular, I have learned the following:

a.     On October 8, 2016, at approximately 7:20 p.m., Cohen received a call from Hicks. Sixteen seconds into the call, Trump joined the call, and the call continued for over four minutes.[27] Based on the toll records that the USAO has obtained to date, I believe that this was the first call

---

[25] My attribution of certain telephone numbers to certain individuals as described in this affidavit is based on my review of the vCard (virtual contact file) and text messages obtained from Cohen's telephone pursuant to the iCloud Warrant.

[26] Pecker is President of AMI and, according to his own statements in public reports, a personal friend of Trump. Howard is the chief content officer of AMI, who according to public records reports directly to Pecker.

[27] I believe that Trump joined the call between Cohen and Hicks based on my review of toll records. Specifically, I know that a call was initiated between Cohen's telephone number and Trump's telephone number at the same time the records indicate that Cohen was talking to Hicks. After the Cohen-Trump call was initiated, it lasted the same period of time as the Cohen-Hicks call. Additionally, the toll records indicate a "-1" and then Trump's telephone number, which, based on my training and experience, means that the call was either transferred to Trump, or that Trump was added to the call as a conference or three-way call participant. In addition, based on my conversations with an FBI agent who has interviewed Hicks, I have learned that Hicks stated, in substance, that to the best of her recollection, she did not learn about the allegations made by Clifford until early November 2016. Hicks was not specifically asked about this three-way call.

41

Cohen had received or made to Hicks in at least multiple weeks, and that Cohen and Trump spoke about once a month prior to this date – specifically, prior to this call on October 8, 2016, Cohen and Trump had spoken once in May, once in June, once in July, zero times in August, and twice in September.

b.  Approximately ten minutes after the call ended, Hicks and Cohen spoke again for about two minutes.

c.  At 7:39 p.m., immediately after the second call with Hicks ended, Cohen called David Pecker (as noted above, the President of American Media Inc., or AMI) and they connected for thirty seconds. Approximately four minutes later, Cohen called Pecker again and they spoke for more than a minute. Three minutes after ending his call with Pecker, Cohen received a call from Dylan Howard (as noted above, the Chief Content Officer of AMI), and they spoke for approximately a minute. According to toll records, it does not appear that Cohen and Howard spoke regularly prior to October 8, 2016, as it had been over a month since they had called each other.

d.  At 7:56 p.m., approximately eight minutes after his call with Howard ended, Cohen called Hicks and they connected for two minutes. At approximately the same time this call ended, Cohen received a call from Pecker, and they spoke for about two minutes. At 8:03 p.m., about three minutes after ending his call with Pecker, Cohen called Trump, and they spoke for nearly eight minutes.

e.  At 8:39 p.m. and 8:57 p.m., Cohen received calls from Howard and spoke to him for about four and six minutes, respectively. At 9:13 p.m., about ten minutes after Cohen and Howard hung up from the second of these calls, Howard sent Cohen a text message that said: "Keith will do it. Let's reconvene tomorrow." Based on my involvement in this investigation, I

42

believe that when Howard wrote "Keith," he was referring to Keith Davidson, the attorney for Stephanie Clifford. At 3:31 a.m., now on October 9, 2016, Cohen sent Howard a text message in response that said: "Thank you." Eight minutes later, Cohen sent Howard a text message that said: "Resolution Consultants LLC. is the name of the entity I formed a week ago. Whenever you wake, please call my cell."

    f.  The following day, on October 10, 2016, at 10:58 a.m., Howard sent a text message to Cohen and Davidson, which stated: "Keith/Michael: connecting you both in regards to that business opportunity. Spoke to the client this AM and they're confirmed to proceed with the opportunity. Thanks. Dylan. Over to you two." At 12:25 p.m., Davidson sent Cohen a text message that stated: "Michael – if we are ever going to close this deal – In my opinion, it needs to be today. Keith." Davidson and Cohen then spoke by phone for about three minutes. Based on my participation in this investigation, I believe that when Howard wrote that the "client" was "confirmed to proceed with the opportunity," he was referring to Clifford's agreement in principle to accept money from Cohen in exchange for her agreement not to discuss any prior affair with then-candidate Trump.[28]

    g.  Based on my review of records obtained pursuant to the Cohen Email Warrants, I know that on or about October 10, 2016, Clifford and Davidson appear to have signed a "side letter agreement" that stated it was an exhibit to a "confidential settlement agreement and mutual release" between "Peggy Peterson" and "David Dennison." The purpose of the document,

---

[28] As set forth below, AMI was also involved in a payment to model Karen McDougal. However, because these communications were in close temporal proximity to the events involving the negotiation of a payment to Clifford, the execution of the agreement with Clifford, and the payment of money to Clifford, I believe that these communications were related to Clifford. Additionally, based on my review of public statements by McDougal, I have learned that she negotiated an agreement with AMI several months prior to these communications between Cohen and Pecker, Howard, and Davidson.

43

according to the agreement, was to define the "true name and identity" of persons named by pseudonym in "confidential settlement agreement and mutual release." The side letter agreement specifies the identity of "Peggy Peterson" to be Clifford, but the space for "Dennison's" identity is blank. The agreement also includes a signature page for "Peterson," "Dennison," and their attorneys. The signature page is signed by "Peterson" and his attorney, Davidson, but the document is unsigned by "Dennison" and his attorney. Based on my involvement in this investigation, I believe that Davidson sent Cohen this partially-signed "side letter agreement" in order to facilitate the closing of a deal between Davidson's client and Cohen or his client on October 10, 2016.

35.     It appears that on October 13, 2016, and the days that followed, Cohen took steps to complete a transaction with Davidson, including attempting to open an account from which Cohen could transfer funds to Davidson. Specifically, from my review of toll records, information obtained pursuant to the iCloud Warrant and Cohen Email Warrants, records maintained by First Republic, as well as my participation in interviews with First Republic employees, I have learned the following:

a.     On the morning of October 13, 2016, at 8:54 a.m., Cohen sent Pecker a text message that stated: "I need to talk to you." At 9:06 a.m., Pecker sent a text message to Cohen that stated, "I called please call me back." The tolls between Cohen and Pecker do not show a telephone call between 8:54 a.m. and 9:06 a.m. However, based on my review of text messages, I have learned that Cohen and Pecker communicate with each other over Signal, which is an encrypted communications cellphone application that allows users to send encrypted text messages and make encrypted calls.

44

2017.08.02

b.  At 9:23 a.m., Cohen sent an email that stated "call me" to First Republic Employee-2. The email attached documents from the Secretary of State of Delaware indicating that Cohen had formed a limited liability company called "Resolution Consultants LLC" on September 30, 2016. As noted above, "Resolution Consultants" is the name of the entity that Cohen had told Howard he had formed recently after Howard said Davidson would "do it." At 10:44 a.m., Cohen called First Republic Employee-2 and told him, in sum and substance, that he needed an account in the name of "Resolution Consultants" opened immediately, and that he did not want an address on the checks written out of the account. Later that day, another employee at First Republic emailed Cohen account-opening paperwork to complete. Cohen returned the account opening documents partially completed, but failed to provide a copy of his driver's license or passport, and did not respond to the employee's question of how he wanted to fund the account. As a result, the account was never opened.

c.  On October 17, 2016, Cohen incorporated Essential Consultants LLC in Delaware. That same day, he filed paperwork to dissolve Resolution Consultants LLC.

36.     Despite these steps taken by Cohen, it appears that the negotiation between Cohen and Davidson was not progressing sufficiently fast enough for Davidson or his client, Clifford, and they threatened to go public with Clifford's allegations just days before the presidential election. Specifically, based on my review of toll records, information obtained pursuant to the iCloud Warrant, and public sources, I know the following:

a.  According to an article in *The Washington Post,* which quoted emails sent from Cohen's email account hosted by the Trump Organization, on October 17, 2016, Davidson emailed Cohen and threatened to cancel the aforementioned "settlement agreement" by the end of the day

45

if Cohen did not complete the transaction.[29]  According to the article, Davidson sent Cohen a second email later in the day that stated in part, "Please be advised that my client deems her settlement agreement canceled and void."  At 4:00 p.m. that day, Cohen called Davidson and they spoke for over five minutes.

       b.  Cohen's 4:00 p.m. call with Davidson and/or Davidson's threats to cancel the "settlement agreement" appear to have touched off a flurry of communications about the settlement agreement and whether Clifford would go public.  Specifically:

         i.  At 4:43 p.m., Howard sent Cohen a text message that stated: "I'm told they're going with DailyMail.  Are you aware?"  One minute later, Cohen responded: "Call me." Based on my involvement in this investigation, I understand Howard's text to mean that he heard that Clifford was going to take her story of an extramarital affair with Trump to the *Daily Mail*, a tabloid newspaper.

        ii.  At 4:45 p.m., Howard called Cohen and they spoke for over two minutes. Moments later, Davidson and Cohen spoke for about two minutes.

        iii.  At 5:03 p.m., Cohen attempted to call Trump, but the call only lasted eight seconds. This was Cohen's first call after he spoke with Davidson.

        iv.  At 5:25 p.m., Cohen texted Howard, stating: "Well???"

        v.  At 6:44 p.m., Howard responded to Cohen's text, stating: "Not taking my calls."  Cohen responded one minute later: "You're kidding. Who are you trying to reach?" Howard responded one minute later: "The 'agent.'"  Based on my involvement in this

---

[29] Due to the partially covert nature of the investigation to this date, the USAO has not requested documents from the Trump Organization or Davidson, and thus does not possess the email referenced in this article.

46

2017.08.02

investigation, I understand Howard's text messages to mean that he attempted to contact Davidson about the matter involving Clifford, but that Davidson was not taking Howard's calls.

vi.    At 6:49 p.m., Cohen called Howard and they spoke for nearly four minutes.

c.    The following day, on October 18, 2016, *TheSmokingGun.com*, a website that publishes legal documents and mugshots, published an article called: "Donald Trump and the Porn Superstar," which alleged that Trump had an extramarital affair with Clifford.    However, the article noted that Clifford had declined to comment.

37.    On or about October 25, 2016, the communications between Cohen, Davidson, Howard and Pecker picked up again, apparently concerning a transaction involving Clifford. Specifically, based on my review of toll records, information obtained pursuant to the Cohen Email Warrants and iCloud Warrant, as well as my review of public sources, I have learned the following:

a.    On October 25, 2016, at 6:09 p.m., Howard sent Cohen a text message stating: "Keith calling you urgently. We have to coordinate something on the matter he's calling you about or its [sic] could look awfully bad for everyone." One minute later, Davidson sent Cohen a text message stating "Call me." Cohen and Davidson called each other several times over the next half hour but appear not to have connected. At 6:42 p.m., Cohen and Davidson spoke for about eight minutes. At 7:11 p.m., they spoke for another two minutes.

b.    The next morning, on or about October 26, 2016, at 8:26 a.m., Cohen called Trump and spoke to him for approximately three minutes. At 8:34 a.m., Cohen called Trump again and connected for a minute and a half.

c.    At approximately 9:04 a.m.—less than thirty minutes after speaking with Trump— Cohen sent two emails to the person who had incorporated Resolution Consultants and Essential Consultants for him, and stated "can you send me asap the filing receipt" and then, in the second

47

2017.08.02

email, "for Essential Consultants LLC." That person responded with the filing receipt two minutes later at 9:06 a.m. and with the certification of formation 23 minutes later, at 9:27 a.m.

      d.  Shortly after that, Cohen contacted First Republic Employee-2 and told him, in sum and substance, that he decided not to open an account in the name of "Resolution Consulting" and instead would be opening a real estate consulting company in the name of "Essential Consultants." Cohen told First Republic Employee-2 that he was at Trump Tower, and wanted to go to a First Republic branch across the street to open the account, so First Republic Employee-2 called First Republic Employee-1, a preferred banker at that branch, assist Cohen.  At 11:00 a.m., First Republic Employee-1 called Cohen.  I know from my participation in an interview with First Republic Employee-1, that around the time of the call he went to Cohen's office in Trump Tower—on the same floor as the Trump Organization—and went through account opening questions, including know your customer questions, with Cohen.  In response to a series of know-your-customer questions about the purpose of the account—the answers to which First Republic Employee-1 entered into a form—Cohen stated, in sum and substance, that he was opening Essential Consultants as a real estate consulting company to collect fees for investment consulting work, and all of his consulting clients would be domestic individuals based in the United States. Based on my review of records obtained from First Republic, it appears that this account (the "Essential Consultants Account") was created at a time between 11:00 a.m. and 1:00 p.m.

      e.  At 1:47 p.m., Cohen called Davidson and they spoke for approximately two minutes.  At approximately 1:49 p.m., Davidson emailed Cohen wiring instructions for an attorney client trust account at City National Bank.

      f.  After the Essential Consultants Account was opened on October 26, 2016, Cohen transferred $131,000 from a home equity line of credit that Cohen had at First Republic to the

2017.08.02

Essential Consultants Account. Following the transfer, at approximately 4:15 p.m. on October 26, 2016, First Republic Employee-2's assistant emailed Cohen at his Trump Organization email address to tell him that the funds had been deposited into the Essential Consultants Account. Cohen forwarded that email to the Cohen Gmail Account and then forwarded it to Davidson.

      g.   At 6:37 p.m., Cohen asked Pecker by text message, "Can we speak? Important." Cohen called Pecker at 6:49 p.m. and connected for thirty seconds. At 6:57 p.m., Cohen sent Howard a text message, stating: "Please call me. Important." Cohen called Howard at 7:00 p.m. and connected for about thirty seconds. At 7:06 p.m., Cohen called Pecker again and they spoke for nearly thirteen minutes. At 7:24 p.m., Howard sent a text message to Cohen that: "He said he'd call me back in 20 minutes. I told him what you are asking for his [sic] reasonable. I'll get it sorted." Approximately an hour later, at 8:23 p.m., Howard told Cohen by text message to "check your Gmail for email from my private account." In an email sent at 8:23 p.m. by Howard to Cohen and Davidson, with the subject line "Confirmation," Howard stated, "Thank you both for chatting with me earlier. Confirming agreement on: - Executed agreement, hand-signed by Keith's client and returned via overnight or same-day FedEx to Michael, - Change of agreement to reflect the correct LLC, - Transfer of funds on Thursday AM to be held in escrow until receipt of agreement." After receiving that email, at approximately 8:27 p.m., Cohen asked Howard by text message, "Can you and David [Pecker] give me a call." Howard promptly responded: "David is not around I think. I'll call." At 8:28 p.m., Howard called Cohen and they spoke for three minutes.

      38.   On October 27, 2016, Cohen made a payment to Davidson of $130,000—with the funds intended for Clifford—for the purpose of securing her ongoing silence with respect to the allegations that she had an extramarital affair with Trump. Specifically, based on my review of

49

2017.08.02

toll records, bank records, and information obtained pursuant to the iCloud Warrant and Cohen Email Warrants, I have learned the following:

a.  At 9:47 a.m., Cohen sent Davidson an email, stating: "Keith, kindly confirm that the wire received today, October 27, 2016 shall be held by you in your attorney's trust account until such time as directed for release by me, in writing. Additionally, please ensure that all paperwork contains the correct name of Essential Consultants LLC. I thank you in advance for your assistance and look forward to hearing from you later."

b.  At approximately 10:01 a.m., according to records provided by First Republic Bank, Cohen completed paperwork to wire $130,000 from the Essential Consultants Account—which had been funded a day prior from Cohen's home equity line of credit—to the attorney client trust account at City National Bank that Davidson had specified in the wiring instructions he sent to Cohen.  The wire transfer was made shortly thereafter.

c.  At 10:02 a.m., Davidson responded to Cohen's email from 9:47 a.m., stating: "I confirm that I will work in good faith & that no funds shall be disbursed unless & until the plaintiff personally signs all necessary settlement paperwork, (the form of which will match the prior agreement). The settlement docs will name the correct corporation, (Essential Consultants LLC). Plaintiff's signature will be notarized and returned to you via FedEx. Only after you receive FedEx will I disburse. Fair?"

d.  At 10:50 a.m., First Republic Employee-1 sent Cohen an email confirming that the payment had been sent and providing him with the wire number.

39.  On October 28, 2016, and the days that followed, Cohen finalized the transaction with Davidson.  Specifically, based on my review of toll records, information obtained pursuant to the iCloud Warrant, public sources, and bank records, I know the following:

50

2017.08.02

a. On October 28, 2016, at 11:48 a.m., Cohen spoke to Trump for approximately five minutes. Beginning at 1:21 p.m., Cohen attempted a series of phone calls to Davidson, Pecker, and Howard throughout the day, although it appears he may only have connected with Howard.

b. Later that day, at approximately 7:01 p.m., Davidson stated to Cohen by text message that "all is AOK. I should have signed, notarized docs on Monday. You should have them on Tuesday." Cohen thanked him and said "I hope we are good." Davidson responded, "I assure you. We are very good." Howard also texted Cohen at 7:08 p.m., "Keith [Davidson] says we are good." Cohen then responded "OK" to Howard and "Excellent" to Davidson. At approximately 10:30 p.m., Cohen spoke to Hicks for three minutes.

c. On October 31, 2016, Cohen called Howard at 8:22 p.m. and they spoke for over three minutes. At 8:32 p.m., Cohen received text messages from both Howard and Davidson. Howard said: "You'll have paperwork tomorrow says KD." Davidson said: "We are AOK. You will be receiving a package tomorrow." Cohen responded "Thank you" to Howard and "Thanks Keith. Will call you then" to Davidson. From my involvement in this investigation, I believe Davidson was referring to a signed nondisclosure agreement when he told Cohen that he would receive a package.

d. Based on my review of court filings that became public in 2018, I have learned that on or about October 28, 2016, "EC, LLC and/or David Dennison" entered into a "confidential settlement agreement and mutual release" with "Peggy Peterson," pursuant to which "Peterson" agreed not to disclose certain "confidential information pertaining to [Dennison]" in exchange for $130,000. The agreement provided that "EC, LLC" would wire the funds to "Peterson's" attorney, who would then transfer funds to "Peterson." Cohen signed the agreement on behalf of "EC,

51

LLC." The agreement stated that the address for "EC, LLC," which was later referred to in the agreement as "Essential Consultants, LLC," was Cohen's residence.

e.   Consistent with the "confidential settlement agreement and mutual release," on or about November 1, 2016, Davidson transferred $96,645 from his attorney client trust account at City National Bank to a bank account in Clifford's name. The wire had the annotation "net settlement." On the same day, at approximately 9:48 a.m. Davidson sent Cohen a text message with a picture of a FedEx delivery confirmation, stating that at approximately 9:09 a.m. a package shipped by Davidson the previous day had arrived for Cohen at his Trump Organization address. On the same day, at approximately 6:14 p.m., Davidson sent Cohen an email with an audio file attached and said "Give this a lesson [sic] and then call me." The audio attachment was titled "Stormy.mp3" and was a five-minute recording of Davidson interviewing Clifford about recent public allegations made by an adult film star named Jessica Drake regarding her alleged past affair with Trump; in the recording, Clifford explained the reasons she believed that Drake was not credible. Less than an hour later, at approximately 7:05 p.m., Cohen called Trump, but it appears that they did not connect. Cohen then called a telephone number belonging to Kellyanne Conway, who at the time was Trump's campaign manager. They did not connect. At approximately 7:44 p.m., however, Cohen received a return call from Conway, which lasted for approximately six minutes.

40.   On November 4, 2016, just three days after the Clifford transaction was completed and just four days before the presidential election, the *Wall Street Journal* published an article alleging that the *National Enquirer* had "Shielded Donald Trump" from allegations by *Playboy* model Karen McDougal that she and Trump had an affair. The article alleged that AMI had agreed to pay McDougal to bury her story. McDougal, like Clifford, had been represented by Davidson.

52

2017.08.02

Based on my review of toll records, information obtained pursuant to the Cohen Email Warrants and iCloud Warrant, and public sources, it appears that Cohen spoke frequently to Davidson, Howard, Pecker, and Hicks around the time of this article's publication—just days before Election Day—about the importance of preventing the McDougal and Clifford stories from gaining national traction. Specifically, I have learned the following:

a. Between 4:30 and 8:00 p.m. on November 4, Cohen communicated several times with Howard, Pecker and Davidson. For instance, at approximately 4:49 p.m., Cohen sent Howard a text message with a screenshot of an email forwarded to him by another Trump Organization lawyer. The forwarded email was from a Wall Street Journal reporter, and asked for comment from Trump and/or the campaign on the story. Cohen also spoke with Hicks several times, including shortly before and/or after calls with Pecker, Howard and Davidson. Indeed, at approximately 7:33 p.m., using two different cellphones subscribed to him, Cohen appears to have been talking to Davidson and Hicks at the same time.

b. At approximately 8:51 p.m., Cohen sent Howard a message, stating: "She's being really difficult with giving Keith a statement. Basically went into hiding and unreachable." One minute later, Howard responded: "I'll ask him again. We just need her to disappear." Cohen responded, "She definitely disappeared but refuses to give a statement and Keith cannot push her." At approximately 8:55 p.m., Howard responded to Cohen's text: "Let's let the dust settle. We don't want to push her over the edge. She's on side at present and we have a solid position and a plausible position that she is rightfully employed as a columnist." Based on my involvement in this investigation, I believe Cohen and Howard were referring to Karen McDougal when they were discussing "she" and "her." Additionally, I believe Howard's statement that "we have . . . a

53

plausible position that she is rightfully employed as a columnist" was a reference to the fact that AMI had given McDougal payments for her role as a purported columnist for the company.

      c.   At approximately 8:58 p.m. on November 4, 2016, Howard attempted to reassure Cohen about the effect of the forthcoming *Wall Street Journal* article, texting, "I think it'll be ok pal. I think it'll fade into the distance." Cohen responded, "He's pissed." Howard wrote back, "I'm pissed! You're pissed. Pecker is pissed. Keith is pissed. Not much we can do." Based on my involvement in this investigation, I believe Cohen was referring to Trump when he stated "he's pissed." Cohen asked Howard at approximately 9:00 p.m. how the *Wall Street Journal* could publish its article if "everyone denies." Howard responded, "Because there is the payment from AMI. It looks suspicious at best."

      d.   At approximately 9:03 p.m., Hicks called Cohen and they spoke for two minutes. At approximately 9:11 p.m., Cohen called Howard and spoke to him for five minutes. At approximately 9:15 p.m., Hicks called Cohen and they spoke for nearly seven minutes. Again, Cohen used different phones for these two calls, such that he appears to have been on both calls for about a minute of overlap. At approximately 9:32 p.m., Cohen texted Pecker, "The boss just tried calling you. Are you free?" A minute later, Cohen texted Howard, "Is there a way to find David quickly?"

      e.   At approximately 9:50 p.m., the *Wall Street Journal* article was published online. Howard and Hicks both sent web links for the article to Cohen. Over the next half hour, Cohen and Howard exchanged several text messages commenting on how the story came across. The next morning on November 5, 2016, at approximately 7:35 a.m., Cohen texted Hicks, "So far I see only 6 stories. Getting little to no traction." Hicks responded, "Same. Keep praying!! It's working!" Cohen wrote back, "Even CNN not talking about it. No one believes it and if necessary, I have a

54

statement by Storm denying everything and contradicting the other porn stars statement. I wouldn't use it now or even discuss with him as no one is talking about this or cares!"  Based on my involvement in this investigation, I believe Cohen was referring to the above-referenced recorded audio statement by Clifford that he obtained from Davidson, and was stating that such a statement could be used to influence potential negative media relating to Trump, but was unnecessary at that time.  Based on a text message from Hicks to Cohen, I believe that later that morning, Pecker spoke to Trump.

41.     On or about November 8, 2016, Trump won the election for President of the United States.

42.     On or about January 12, 2018, the *Wall Street Journal* first reported that Cohen arranged a payment to Clifford.  On or about January 22, 2018, Common Cause, a government watchdog group, filed a complaint with the Federal Election Commission, alleging that Cohen had violated campaign finance laws by making the payment to Clifford.  Based on my review public sources following that report, as well as emails obtained pursuant to the Cohen Email Warrants, I have learned the following:

a.     On or about January 23, 2018, the day after Common Cause filed its complaint, Cohen began emailing himself drafts of statements describing his payment to Clifford. Additionally, on January 23, 2018, Cohen emailed the following draft of that statement to an individual who appears to be writing a book on Cohen's behalf:

> In October 2016, I was contacted by counsel for Ms. Clifford stating that news outlets, including ABC news, were pursuing the 2011 story of an alleged affair between Mr. Trump and Ms. Clifford. Despite the fact that both parties had already denied the allegation, as Mr. Trump's longtime special counsel and protector, I took it upon myself to match the offer and *keep the story from breaking.* I knew the allegation to be false, but *I am also a realist who understands that just because something is false doesn't mean that it doesn't create harm and damage. I could not allow this to*

55

2017.08.02

*occur.* I negotiated a non-disclosure agreement with Ms. Clifford's counsel and tendered the funds. I did this through my Delaware LLC and transferred personal funds to cover the agreement. I was not reimbursed any monies from Mr. Trump, the Trump Organization, any third party or the Presidential campaign. At no point did I ever advise Mr. Trump of my communications or actions regarding this agreement. As outlandish and unusual as this may appear, the Trumps have been like family to me for over a decade. It's what you do for family.

(Emphasis added.) Based on my involvement in this investigation, I believe that the above email is an acknowledgement that the allegation of the affair had existed for some time ("...*the 2011 story...*"), but that Cohen was motivated to "keep the story from breaking" again in October 2016.

b. On or about February 13, 2018, Cohen said in a statement to *The New York Times* that "Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford. The payment to Ms. Clifford was lawful, and was not a campaign contribution or a campaign expenditure by anyone." Cohen declined to answer follow-up questions including whether Trump had been aware of the payment, why Cohen made the payment, or whether similar payments had been made to other people.

c. On or about February 14, 2018, Cohen was asked by *The New York Times* whether Trump had reimbursed him, whether he and Trump had made any arrangement at the time of the payment, or whether he had made payments to other women. Cohen stated in response, "I can't get into any of that." On or about February 14, 2018, Cohen also stated to *The Washington Post* that: "In a private transaction in 2016, I used my own personal funds to facilitate a payment of $130,000 to Ms. Stephanie Clifford. Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford, and neither reimbursed me for the payment, either directly or indirectly."

43.     On or about March 9, 2018, Cohen stated to *ABC News* that "the funds were taken from my home equity line and transferred internally to my LLC account in the same bank."

56

44.     Accordingly, for the foregoing reasons, there is probable cause to believe that Cohen committed violations of the Campaign Finance Offenses by making an in-kind contribution to Trump or the Trump campaign in the form of a $130,000 payment to Clifford on the eve of the election.  Indeed, while he denies having given an unlawful contribution, in his own statements Cohen has admitted that he paid $130,000 of his "personal funds" to Clifford and that the payment occurred less than two weeks before the election, as Trump was facing negative media allegations about his behavior toward women, even though allegations of an affair between Trump and Clifford existed since 2011.  In addition, the communication records set forth above make evident that Cohen communicated with members of the Trump campaign about his negotiation with Clifford's attorney and the need to preclude Clifford from making a statement that would have reflected negatively on the candidate in advance of the forthcoming election.

## C.  Probable Cause Justifying Search of the Subject Premises and Subject Devices

45.     Based on the foregoing, my review of records produced pursuant to subpoenas and the Cohen Email Warrants, and the iCloud Warrant, and my training and experience, there is probable cause to believe that the Subject Premises and Subject Devices have been used in furtherance of the Subject Offenses and are likely to contain instrumentalities, evidence, and fruits of the Subject Offenses.  Specifically, there is probable cause to believe that Cohen permanently resides at Subject Premises-1 and, at least in part, works at both Subject Premises-1 and Subject Premises-2, and that those locations contain evidence relating to the Sterling taxi medallion transaction, Cohen's assets, Cohen's consulting work for Essential Consultants LLC, and his payment to Clifford.  Additionally, there is probable cause to believe that Subject Premises-3 contains evidence of Cohen's assets and his payment to Clifford.  Finally, there is probable cause to believe that Subject Premises-4, in which Cohen is temporarily residing, contains electronic

57

devices, including Subject Device-1 and Subject Device-2, which, in turn, contain evidence of the Subject Offenses, such as evidence relating to the Sterling taxi medallion transaction, Cohen's assets, Cohen's consulting work for Essential Consultants LLC, and his payment to Clifford.

46.     First, there is probable cause to believe that Cohen lives and operates his businesses, at least in part, at Subject Premises-1. Specifically, from my review of property records, I know that Michael Cohen and Laura Cohen own (in trust) Subject Premises-1. From my review of Cohen's tax returns, I know he lists his primary residence as Subject Premises-1. Additionally, from my review of emails produced pursuant to the Cohen Email Warrants, I know that Cohen routinely refers to Subject Premises-1 as his home. For example, on or about September 28, 2017 and October 6, 2017, Cohen emailed individuals that his home address is the address for Subject Premises-1. I also know from my review of emails that Cohen receives package delivery notifications that list Cohen's address as the address for Subject Premises-1. Cohen has also provided the address of Subject Premises-1 as the address for Essential Consultants and Michael D. Cohen & Associates, P.C. For example, the certificates of incorporation and account opening documents at First Republic for both entities list their addresses as the address for Subject Premises-1. *See supra* ¶¶ 18(b), 18(d). The consulting agreement between Essential Consultants and AT&T also indicated the address for Essential Consultants is the address for Subject Premises-1. *See supra* ¶ 19(c).

47.     There is also probable cause to believe that Subject Premises-1 is likely to contain instrumentalities, evidence, and fruits of the Subject Offenses. Specifically, from my review of emails produced pursuant to subpoena and the Cohen Email Warrants and iCloud Warrant, as well as my training and experience, I know the following:

2017.08.02

a. According to records maintained by Sterling, the address for all of Cohen's taxi medallion LLCs is the address for Subject Premises-1. *See supra* ¶ 16(c). Additionally, the medallion loan documents indicate that any mailings related to the loans should be sent to Subject Premises-1. *See id.* Based on my training and experience, as well as my review of public sources, I know that individuals keep records of properties and assets in which they have ownership interests. Accordingly, I submit that Subject Premises-1 likely contains evidence of Cohen's ownership of the taxi medallion LLCs, the revenue that those medallions generate, and the transaction with Sterling in 2014 to re-finance the medallion loans that were then with Capital One Bank.

b. From my review of records maintained by Sterling, I also know that Sterling addressed documents relating to the ▮▮▮▮ transaction and Cohen's attempts to modify the terms of the medallion loans to Subject Premises-1. For instance, Sterling addressed the transaction term sheet, *see supra* ¶ 16(l), and its demand letter and notice of default, *see supra* ¶ 16(q), to Subject Premises-1. Accordingly, Subject Premises-1 likely contains evidence concerning the ▮▮▮▮ transaction and Cohen's negotiations with Sterling. Some of those records—such as records relating to a payment from Cohen to ▮▮▮▮—were concealed from Sterling and cannot be obtained via subpoena to Sterling. Additionally, even where documents were sent to Cohen by Sterling (and therefore are available from Sterling via subpoena), the fact that they may be found in Subject Premises-1 will be relevant to Cohen's possession or knowledge of the documents.

c. From my review of records maintained by First Republic, I know that Cohen provided the address for Subject Premises-1 as the mailing addresses for the Essential Consultants Account and MDC&A Account. *See supra* ¶¶ 18(b), 18(e). Accordingly, it is likely that Subject

Premises-1 contains records relating to the Essential Consultants Account and MDC&A Account, including, among other things, account opening documents, bank statements, documents provided as part of the know-your-customer process, any notes made by Cohen when he was opening the accounts, wire transfer records, and canceled checks. Even where these records can be obtained from First Republic, the fact that they may be found in Subject Premises-1 will be relevant to, among other things, Cohen's ownership of the accounts, or his knowledge of transactions or the existence of funds in accounts.

       d.  Based on my review of records maintained by Capital One Bank, TD Bank, Morgan Stanley, City National Bank, Signature Bank, and Bethpage Credit Union, I know that Cohen provided the address for Subject Premises-1 as the mailing for his accounts at each of these financial institutions. Accordingly, it is likely that Subject Premises-1 contains records relating to these accounts, including, among other things, bank statements that list account balances. The existence of these records in Subject Premises-1 will be relevant to, among other things, Cohen's ownership of the accounts and his knowledge of the balances in these accounts.

       e.  Additionally, Cohen may have records of other bank accounts or assets that were not disclosed to Sterling and are not presently known by law enforcement. For example, as described above, Cohen has received interest income since 2015 that he has not disclosed to Sterling or paid taxes on. Also, on Cohen's August 2014 Financial Statement, *see supra* ¶ 16(e), he disclosed $10,000,000 in "investments in overseas entities."[30] The value of these investments was omitted from subsequent financial statements. However, for the reasons outlined above, there is probable cause to believe that Cohen omitted the value of those investments from his 2017

---

[30] Based on my participation in an interview with Sterling Employee-3, I have learned that Cohen told Sterling Employee-3 that the reference to "investments in overseas entities" on his 2014 Financial Statement was to serve merely as a "placeholder" for potential future investments.

2017.08.02

financial statements in order to understate his assets. As Subject Premises-1 is Cohen's primary residence and he uses Subject Premises-1 as the mailing address for bank records, there is probable cause to believe that account statements for unknown bank accounts or assets concealed from Sterling are likely to be found in Subject Premises-1.

f.   Based on my review of records maintained by AT&T and produced pursuant to the Cohen Email Warrants, I know that the address Cohen provided to AT&T for Essential Consultants is the address for Subject Premises-1. *See supra* ¶ 19(c). Therefore, there is probable cause to believe that Subject Premises-1 will contain evidence concerning the operation of Essential Consultants or money that Cohen received, through Essential Consultants, from AT&T. Additionally, because Cohen used the address for Subject Premises-1 for at least one consulting arrangement involving Essential Consultants, there is probable cause to believe that Subject Premises-1 may contain records of other consulting arrangements that Cohen, through Essential Consultants, has with other individuals or entities.

g.   Based on my review of records maintained by Getzel's accounting firm, and emails produced pursuant to the Cohen Email Warrants, I have learned that Getzel's accounting firm sent documents to Subject Premises-1 and used the address for Subject Premises-1 as the address listed on Cohen's personal and corporate tax returns. *See supra* ¶ 16(n). For instance, on or about October 6, 2017, an employee at Getzel's accounting firm emailed Cohen that she had sent Cohen's September 2017 Financial Statement by FedEx to Cohen's attention. Accordingly, Cohen's tax records are likely to be found in Subject Premises-1.

h.   Based on my review of bank records and publicly-available documents, I know that Cohen used $130,000 from a home equity line of credit on Subject Premises-1 to pay Clifford. I also know that on the settlement and nondisclosure agreement between "Peggy Peterson" and "EC,

61

LLC," the address for Essential Consultants is Subject Premises-1. Accordingly, Subject Premises-1 is likely to contain evidence of the Campaign Finance Offenses, including settlement and nondisclosure agreements, payment records, written and email correspondence, and records pertaining to the home equity line of credit.

i.   Based on my review of emails produced pursuant to the Cohen Email Warrants and iCloud Warrant, I know that Cohen used at least one Apple iPhone, an Apple iPad Mini, and a MacBook Pro to access his iCloud account. Based on my review of location records provided by Apple pursuant to the iCloud Warrant, I know that electronic devices linked to Cohen's iCloud account were used at Subject Premises-1 to, among other things, place telephone calls and backup files to Cohen's iCloud account. Accordingly, there is probable cause to believe that Subject Premises-1 contains electronic devices, including certain Apple products, that for reasons discussed below are likely to contain evidence of the Subject Offenses.

j.   Based on my review of emails produced pursuant to the Cohen Email Warrants, I understand that Subject Premises-1 recently sustained water damage to certain parts of the premises, and that Cohen has engaged contractors to perform certain remediation work on the premises. In addition, as set forth above, I believe that Cohen and his family are temporarily residing at Subject Premises-4 in the Loew's Regency Hotel, which is approximately two blocks from Subject Premises-1. However, based on my review of a work order sent to Cohen's email by a contractor, I understand that the first phase of the work order called for the contractor to "Pack & Remove all items & furnishings in Living Room, Kitchen, Sons Room & Dining Room" and store them off-site. In addition, based on my review of drawings sent to Cohen by the contractor, it appears that the work is primarily being done in these rooms. Thus, I believe that the construction – to the extent it is still ongoing – would not necessarily have caused Cohen to move

62

all documents or evidence responsive to the warrant out of Subject Premises-1, because it does not appear that work is being done to the portion of Subject Premises-1, such as a home office or Cohen's own room, where such documents or evidence would most likely be found.[31]

48.    Second, there is probable cause to believe that Cohen uses Subject Premises-2 as office space, and also that Subject Premises-2 contains certain electronic devices. Specifically, from my review of the "strategic alliance agreement" between Squire Patton Boggs and Cohen, and my review of the press release on Squire Patton Boggs's website, I know that Cohen has an office at Subject Premises-2. *See supra* ¶¶ 18(d), 19(e). Indeed, I have learned that pursuant to Cohen's agreement with the law firm, he has "dedicated and segregated office space" in Squire Patton Boggs's offices on the 23rd floor of 30 Rockefeller Plaza, and that the space is "physically separate" from the firm's offices and has "locked doors and its own locked file cabinets." *See supra* ¶ 19(e). Additionally, I know that under the terms of the agreement, Cohen agreed to "arrange for [his] own computer server system that is not connected to [Squire Patton Boggs's] computer network system." I know from my participation in an interview with Getzel, who met Cohen at Subject Premises-2 in 2017, that Subject Premises-2 is an office with a door, it appears to be used only by Cohen, and it contains, among other things, a computer and paper files. According to Getzel, when Getzel saw Cohen at Subject Premises-2, he had two cellular telephones in Subject Premises-2. I also know from my review of emails produced pursuant to the Cohen Email Warrants that Cohen uses the address for Subject Premises-2 in the signature block

---

[31] As noted below, based on my training and experience, I believe that individuals who travel or stay in hotels for short-term periods commonly bring some items with them, such as portable electronic devices or sensitive items, meaning that Cohen has likely taken some evidence from Subject Premises-1 to Subject Premises-4. Nevertheless, given the temporary nature of Cohen's stay at Subject Premises-4 and the scope of the work being done at Subject Premises-1, I believe it is unlikely that Cohen has taken *all* evidence that would be subject to seizure out of Subject Premises-1.

2017.08.02

on his emails. Based on my review of notes of a call between Cohen and First Republic Employee-2 (which notes were taken by another First Republic employee, who was participating in the call and taking notes), I know that, on or about November 15, 2017, Cohen told First Republic Employee-2 that he had a new office at 30 Rock. Moreover, I know from an article in *Vanity Fair* published on or about February 14, 2018, that Cohen was interviewed by the magazine in Subject Premises-2 in or about February 2018.

49.     There is also probable cause to believe that Subject Premises-2 is likely to contain instrumentalities, evidence, and fruits of the Subject Offenses. Specifically, from my review of emails produced pursuant to subpoena and the Cohen Email Warrants and iCloud Warrant, as well as my training and experience, I know the following:

a.     According to records maintained by Sterling, when Cohen was emailing with Sterling Employee-3 in 2018 about a modification to his existing loan from Sterling, Cohen listed his address in his email as the address for Subject Premises-2. *See supra* ¶ 16(t), 16(u). Accordingly, Subject Premises-2 likely contains evidence concerning Cohen's loan modification negotiations with Sterling.

b.     Based on my review of records obtained pursuant to the Cohen Email Warrants, I know that the address Cohen provided to KAI and BTA for Essential Consultants is the address for Subject Premises-2. *See supra* ¶¶ 19(a), 19(b). Therefore, there is probable cause to believe that Subject Premises-2 will contain evidence concerning the operation of Essential Consultants or money that Cohen received, through Essential Consultants, from KAI and BTA, among other entities with which Cohen had a consulting arrangement. Additionally, based on my review of emails sent in 2018 that were obtained pursuant to the Cohen Email Warrants, I know that Cohen continues to enter into consulting arrangements through Essential Consultants, and agreements

64

relating to those arrangements indicate that Essential Consultants is located at Subject Premises-2. Additionally, because Cohen used the address for Subject Premises-2 for multiple consulting arrangements involving Essential Consultants, there is probable cause to believe that Subject Premises-2 may contain records of other unknown consulting arrangements that Cohen has with other individuals or entities.

c.   Based on my review of records maintained by Getzel's accounting firm, and emails produced pursuant to the Cohen Email Warrants, as well as my participation in an interview with Getzel, I have learned that Getzel visited Subject Premises-2 to meet with Cohen about his taxes. *See supra* ¶ 20(a). At that meeting, Getzel discussed with Cohen whether Cohen should disclose Essential Consultants on his personal financial statement to banks. According, there is probable cause to believe that Subject Premises-2 will contain evidence relating to Cohen's taxes, or notes of his conversation with Getzel. Moreover, the fact that Cohen used Subject Premises-2 for a meeting regarding his personal financial matters provides probable cause to believe that documents and information regarding his finances will be found in Subject Premises-2.

d.   Based on my participation in an interview with Getzel, I know that Cohen maintains a computer in Subject Premises-2. From my review of IP data produced pursuant to a subpoena and pen register to Google, it appears that Cohen is logging into his Gmail account from Subject Premises-2. Accordingly, there is probable cause to believe that Subject Premises-2 contains electronic devices, that for reasons discussed below are likely to contain evidence of the Subject Offenses.

e.   Based upon my training and experience, I have learned that individuals who maintain businesses typically keep records relating to the business—such as contracts with clients and records of payments—at the business' identified location. I am not aware of any addresses

65

associated with Essential Consultants other than Subject Premises-1 and Subject Premises-2. Accordingly, there is probable cause to believe that Subject Premises-1 and Subject Premises-2 will contain business records for Essential Consultants.

50.      Third, there is probable cause to believe that Subject Premises-3 is likely to contain instrumentalities, evidence, and fruits of the Subject Offenses.  In particular:

a.   As noted above, Cohen has two bank accounts at TD Bank.  In or about November 2017, as Cohen was receiving substantial income from consulting work—which he did not disclose to Sterling—Cohen opened the safety deposit box at TD Bank, which is Subject Premises-3.  In light of the aforementioned evidence that Cohen conceals assets, including assets at TD Bank, there is probable cause to believe that Subject Premises-3 contains financial assets, objects of value and/or documents relating to such assets or objects of value that Cohen likely did not disclose to Sterling.  Indeed, based on my training and experience, I am aware that people often conceal valuable items in safety deposit boxes.  Accordingly, there is probable cause to believe that Subject Premises-3 will contain evidence of the Bank Fraud Offenses.

b.   In addition, based on my review of records produced by TD Bank, I know that Cohen has accessed the vault in which Subject Premises-3 is stored on two occasions.  The first such occasion was on November 10, 2017.  Cohen signed into the vault at approximately 5:35 and out of vault at approximately 5:39 on that date.[32]  Based on my review of toll records, I know that Cohen's first call after he signed out of the safety deposit box – approximately 45 minutes later – was to Keith Davidson.  Specifically, at 6:25 p.m. Cohen called Davidson and they spoke for less than a minute; three minutes later, Davidson called Cohen back and they spoke for approximately

---

[32] The entry in the bank's log book does not specify whether this is A.M. or P.M.  However, I infer that it is P.M., because it is unlikely that the bank would have been open at 5:35 and 5:39 a.m.

2017.08.02

22 minutes. The second such occasion was on February 2, 2018, which is during the time period numerous media reports about Cohen's payment to Clifford were being published, and is one day after it appears that Cohen's family moved into Subject Premises-4, as set forth above. The timing of Cohen's two visits to the vault – one shortly before a call to Keith Davidson and the other around the time that Cohen came under media scrutiny in connection with the payment to Davidson's client – gives rise to probable cause to believe that Subject Premises-3 will contain evidence of the Campaign Finance Offenses, such as documents relevant to the Cohen's dealing with Keith Davidson and the payment to Clifford, including documents or evidence that Cohen did not want to leave in his apartment where construction workers would be present.[33]

51.     Based on my review of emails obtained pursuant to the Cohen Email Warrants and cell phone location information, I believe that Cohen is temporarily residing in Subject Premises-4. *See supra* ¶¶ 3(d). There is also probable cause to believe that Subject Premises-4 contains instrumentalities and evidence of the Subject Offenses, including, the following:

a.     As described above, it appears that Cohen moved to Subject Premises-4 on or about February 1, 2018, at which time numerous media reports about Cohen's involvement in the payment to Clifford were being published. *See supra* ¶¶ 3(d). During this time same period, Cohen was frequently corresponding with the media and sent himself and others statements about his involvement in the payment to Clifford. *See supra* ¶¶ 42(a)-(c). Thus, there is probable cause that Cohen took at least some documents and evidence relating to the Clifford payment with him to Subject Premises-4, in order to reference and consult them in connection with these statements.

---

[33] As noted above, Subject Premises-3 is approximately five inches by ten inches. Accordingly, I do not believe that it would fit a large volume of hard copy documents; however, a small number of hard-copy documents, or a large volume of documents contained on a flash drive or other portable storage device, would fit in Subject Premises-3.

2017.08.02

b.  As described above, at the time Cohen moved to Subject Premises-4, he was also in the midst of ongoing negotiations with Sterling regarding the refinancing of his medallion debts. For example, on January 30, 2018, Cohen had a lengthy phone call with Sterling Employee-3 about his finances and the proposed restructuring, and on February 1, 2018, Cohen sent an email to Sterling Employee-3 claiming that he did not have more than $1.25 million in cash. *See supra* ¶¶ 16(u). Thus, there is probable cause that Cohen took at least some documents and evidence relating to his ongoing negotiations with Sterling with him to Subject Premises-4, in order to reference and consult them in connection with these negotiations.

c.  As described above, Cohen used at least one Apple iPhone, an Apple iPad Mini, and a MacBook Pro to access his iCloud account, and these electronic devices linked to Cohen's iCloud account were used at Subject Premises-1 – Cohens' permanent residence – to place telephone calls and backup files to Cohen's iCloud account. *See supra* ¶¶ 47(i). Although Cohen's stay at Subject Premises-4 is temporary, based on my training and experience I know that individuals who travel or stay in hotels for short-term periods commonly bring portable electronic devices with them, such as cellular phones, tablets, or laptops. Accordingly, there is probable cause to believe that Subject Premises-4, where Cohen currently appears to be residing, contains electronic devices, including Subject Device-1, Subject Device-2, and/or certain Apple products, that for the reasons discussed herein are likely to contain evidence of the Subject Offenses.

d.  Moreover, as set forth above, based on cellphone location information I know that Subject Device-1 and Subject Device-2 were in the vicinity of Subject Premises-4 as recently as this morning (April 8, 2018). As set forth above, there is probable cause to believe that Cohen used the Subject Devices in furtherance of the Subject Offenses, including to communicate with Sterling employees regarding the medallion transaction, with First Republic employees regarding

68

the Essential Consultants Account, with his accountant regarding his finances, and with individuals, such as Davidson, Howard and Pecker, involved in the $130,000 payment to Clifford.

52.     Although Cohen appears to be residing currently in Subject Premises-4, it is unknown whether Cohen will be physically present within Subject Premises-4 at the moment the warrant sought herein are executed. If Cohen is within Subject Premises-4 at that moment, Subject Device-1 and Subject Device-2 – his cellphones – will likely also be within Subject Premises-4. If Cohen is not within Subject Premises-4 at that moment, the devices will likely be on his person, wherever he is located (which, based on location data for Subject Device-1 and Subject Device-2 as recently as today, is likely to be in the Southern District of New York). As such, this warrant seeks separate authority to seize Subject Device-1 and Subject Device-2, in the event that those devices are not located within Subject Premises-4 (or another Subject Premises) at the moment the warrants sought herein are executed.

### D.  Probable Cause Justifying Search of ESI

53.     Based on the foregoing, there is probable cause to believe that Subject Premises-1, Subject Premises-2 and Subject Premises-4 contain electronic devices that are likely to contain evidence, fruits, and instrumentalities of the Subject Offenses (and, as set forth above, that Subject Device-1 and Subject Device-2 are themselves electronic devices that are likely to contain evidence of the Subject Offenses).  Specifically, based on my review of information produced pursuant to the Cohen Email Warrants, the iCloud Warrant, and subpoenas, as well as pen register data, I submit that there is probable cause that Subject Premises-1 contains an Apple iPad Mini, a MacBook Pro, and has, at various times, contained Apple cellphones;  similarly, there is probable cause that Subject Premises-2 contains a computer and has, at various times, contained Apple

69

cellphones.  These devices are likely to include evidence, fruits, and instrumentalities of the Subject Offenses for the following reasons:

a.   As described throughout this affidavit, Cohen used email to send and receive communications related to the Subject Offenses.  In particular, Cohen used email to send and receive communications with Sterling, First Republic, Getzel, the entities to which he is providing consulting services, Davidson, and Howard, among others.  While some of these emails have already been obtained via subpoenas and search warrants, I know from my training and experience that individuals can and do delete emails from their Internet-based inboxes but retain copies of those emails on their hard drives.  I also know that individuals often have multiple email accounts, some of which may not be known to law enforcement, and as a result electronic devices can be a unique repository of all emails relevant to certain Subject Offenses.  Indeed, from my involvement in this investigation, I know that Cohen had an email account with the Trump Organization, but the USAO and FBI have not been able to obtain the contents of that account to date.  Thus, emails relevant to the Subject Offenses are likely stored on electronic devices in Subject Premises-1, Subject Premises-2 and/or Subject Premises-4.

b.   Additionally, Subject Premises-1, Subject Premise-2 and Subject Premises-4 likely contain electronic copies of documents relevant to the Subject Offenses.  Indeed, I know from my training and experience that individuals often retain copies of important documents on their computers or other electronic devices capable of storing information, including cellphones (such as the Subject Devices) and tablets.  Here, there are a number of documents that Cohen has likely retained that will be relevant to the Subject Offenses.  For example, electronic devices may include documentation of Cohen's true net worth, a listing of his assets, an accounting of his available

70

cash, consulting agreements with third parties, and documentation of his payment to Clifford, among other evidence of the Subject Offenses.

      c.   Third, I know from my review of emails obtained pursuant to the Cohen Email Warrants that Cohen sent up online banking with First Republic.  Based on my training and experience, I know that individuals who set up online banking often receive electronic notices concerning financial transactions and, on occasion, save records of their financial transactions to their devices.  Accordingly, there is probable cause to believe that Cohen's electronic devices contain evidence of banking activity, including the existence of bank accounts or assets that Cohen did not disclose to Sterling or Melrose.

      d.   Fourth, from my review of records produced by Apple, I know that Cohen communicates using text message as well as encrypted communications applications.  These applications that Cohen has downloaded onto a phone include, but are not limited to, WhatsApp, Signal, and Dust.  I know from my review of toll records and text messages that, in particular, Cohen communicated with Pecker using these encrypted applications.  Accordingly, there is probable cause to believe that Cohen's cellphones – the Subject Devices – will contain encrypted messages that are not otherwise accessible relating to the Subject Offenses.

     54.   Based on my training and experience, I know that individuals who engage in financial crimes commonly use computers to communicate with co-conspirators, keep financial ledgers, and retain fraudulent documents.  As a result, they often store data on their computers related to their illegal activity, which can include logs of online or cellphone-based "chats" with co-conspirators; email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social medial accounts; bank account numbers; and/or records of uses of funds.

71

2017.08.02

55.   Based on my training and experience, I also know that, where computers are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred.  This is typically true because:

- Electronic files can be stored on a hard drive for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

- Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When a file is "deleted" on a home computer, the data contained in the file does not actually disappear, but instead remains on the hard drive, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the computer. Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages. Thus, the ability to retrieve from a hard drive or other electronic storage media depends less on when the file was created or viewed than on a particular user's operating system, storage capacity, and computer habits.

- In the event that a user changes computers, the user will typically transfer files from the old computer to the new computer, so as not to lose data.  In addition, users often keep backups of their data on electronic storage media such as thumb drives, flash memory cards, CD-ROMs, or portable hard drives.

56.   Based on the foregoing, I respectfully submit there is probable cause to believe that Cohen engaged in the Subject Offenses, and that evidence of this criminal activity is likely to be found in the Subject Premises, on computers and electronic media found in the Subject Premises, and on the Subject Devices.  In particular, there is probable cause to believe that the Subject Premises and Subject Devices will contain evidence, fruits, and instrumentalities of violations of the Subject Offenses, as more fully described in Section II of Attachments A, B, C, D, E and F to the proposed warrants, including the following:

a.   Evidence necessary to establish the occupancy or ownership of the Subject Premises, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, bank statements, identification documents, and keys.

b.   Evidence relating to Sterling, Melrose, and/or taxi medallions.

72

2017.08.02

c. Evidence relating to a plan, proposal, or agreement for Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to others, including to ████████ and/or entities associated with him.

d. Evidence relating to a plan, proposal, or agreement to modify loans that Cohen has with Sterling and/or Melrose.

e. Evidence relating to Essential Consultants, LLC, including any documents that indicate the nature and purpose of payments made to or from Essential Consultants or the nature of any work done by Cohen or any other individuals in connection with Essential Consultants.

f. Evidence of income to Michael D. Cohen & Associates, including any documents that indicate the nature and purpose of payments made to or from Michael D. Cohen & Associates, or evidence of the purpose of accounts opened in the name of Michael D. Cohen & Associates.

g. Evidence relating to Cohen's net worth, available cash and cash equivalents, monthly and annual income, income sources, and other assets, whether held personally or through entities, including tax returns, personal financial statements, and bank records.

h. Evidence relating to agreements, loans, and/or financial transactions between Cohen and ████████ and any payments by ████ to Cohen.

i. Evidence relating to payments to Stephanie Clifford, Karen McDougal, or their agents or legal representatives, including any nondisclosure agreements and related documents, and any communications related to such agreements.

j. Evidence of communications involving Michael Cohen, Donald Trump and/or agents or associates of the Trump Campaign about Stephanie Clifford or Karen McDougal, or payments to Stephanie Clifford or Karen McDougal.

73

2017.08.02

k. Evidence of communications involving Michael Cohen, American Media, Inc., David Pecker, and/or Dylan Howard about Donald Trump, the Trump Campaign, Stephanie Clifford, and/or Karen McDougal.

l. Evidence relating to Cohen's role in the Trump Campaign, and coordination or consultation with the Trump Campaign.

m. Evidence of communications with Donald Trump and/or agents or associates of the Trump Campaign about the *Access Hollywood* tape and other potential sources of negative publicity involving Trump's relationship in the run up to the election.

n. Evidence relating to any reimbursement or other promises made to Cohen for payment to Clifford or others in connection with the election.

o. Evidence relating to Cohen's knowledge of the campaign finance laws, campaign contribution reporting requirements, and campaign contribution limits.

p. Communications with others, including Jeffrey Getzel and/or other accountants, relating to Cohen's bank accounts, taxes, debts, and/or finances;

q. Communications, records, documents, and other files reflecting false representations to a financial institution related to the intended purpose of an account or loan at that financial institution; the nature of any business or entity associated with an account at a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution;

r. Evidence of Cohen's intent as it relates to the Subject Offenses under investigation.

### III.  Procedures for Searching ESI

#### A.  Execution of Warrant for ESI

57.     Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or

2017.08.02

copying of electronically stored information . . . for later review." Consistent with Rule 41, this application requests authorization to seize any computer devices and storage media and transport them to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

- First, the volume of data on computer devices and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

- Second, because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

- Third, there are so many types of computer hardware and software in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying computer data.

- Fourth, many factors can complicate and prolong recovery of data from a computer device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the computer, which often take considerable time and resources for forensic personnel to detect and resolve.

58.      As discussed herein, Squire Patton Boggs is a functioning law firm that conducts legitimate business unrelated to Cohen's commission of the Subject Offenses. Subject Premises-2 is an office located inside of Squire Patton Boggs's New York office. In order to execute the warrant in the most reasonable fashion, law enforcement personnel will attempt to investigate on the scene of what computers or storage media, if any, must be seized or copied, and what computers or storage media need not be seized or copied. Law enforcement personnel will speak with Squire Patton Boggs personnel on the scene as may be appropriate to determine which files and electronic devices within Subject Premises-2 belong to or were used by Cohen. While, based on the foregoing, it does not appear that Cohen shared electronic devices or a server with Squire Patton Boggs, where appropriate, law enforcement personnel will copy data, rather than physically seize

75

2017.08.02

computers, to reduce the extent of any disruption of Squire Patton Boggs's operations. If, after inspecting the seized computers off-site, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the Government will return it.

59.     Additionally, because Cohen is an attorney, and claims to serve as a personal attorney for Trump, the review of evidence seized from the Subject Premises and Subject Devices will be conducted pursuant to established screening procedures to ensure that the law enforcement personnel involved in the investigation, including attorneys for the Government, collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege. When appropriate, the procedures will include use of a designated "filter team," separate and apart from the investigative team, in order to review potentially privileged communications and determine which communications to release to the investigation and prosecution team.

## B. Accessing ESI on the Subject Devices

60.     As described above, the Subject Devices are both Apple brand devices.

61.     I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID. I also know that the Apple iPhone X offers its users the ability to unlock the device via the use of facial recognition (through infrared and visible light scans) in lieu of a numeric or alphanumeric passcode or password. This feature is called Face ID.

62.     If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered

2017.08.02

fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device. If a user enables Face ID on a given Apple device, he or she can unlock the device by raising the iPhone to his or her face, or tapping the screen. In my training and experience, users of Apple devices that offer Touch ID or Face ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents.

63.     In some circumstances, Touch ID or Face ID cannot be used to unlock a device that has either security feature enabled, and a passcode or password must be used instead. These circumstances include: (1) when the device has just been turned on or restarted; (2) when more than 48 hours has passed since the last time the device was unlocked; (3) when the passcode or password has not been entered in the last 6 days, and the device has not been unlocked via Touch ID in the last 8 hours or the device has not been unlocked via Face ID in the last 4 hours; (4) the device has received a remote lock command; or (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made.

64.     The passcodes or passwords that would unlock the Subject Devices are not known to law enforcement. Thus, it will likely be necessary to press the fingers of the user of the Subject Devices to the devices' Touch ID sensor, or hold the Subject Devices in front of the user's face to activate the Face ID sensor, in an attempt to unlock the devices for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant Apple devices via Touch ID with the use of the fingerprints of the user, or via Face ID by holding the device in front of the user's face, is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

77

65.     Based on these facts and my training and experience, it is likely that Cohen is the user of the Subject Devices, and thus that his fingerprints are among those that are able to unlock the Subject Devices via Touch ID or his face is able to unlock the Subject Devices via Face ID.

66.     Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the Subject Devices as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

67.     I also know from my training and experience, and my review of publicly available materials published by Apple that Apple brand devices, such as the Subject Devices, have a feature that allows a user to erase the contents of the device remotely.   By logging into the Internet, the user or any other individual who possesses the user's account information can take steps to completely wipe the contents of the device, thereby destroying evidence of criminal conduct, along with any other information on the device.   The only means to prevent this action is to disable the device's ability to connect to the Internet immediately upon seizure, which requires either access to the device itself to alter the settings, or the use of specialized equipment that is not consistently available to law enforcement agents at every arrest.

68.     Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of Cohen to the Touch ID sensors the Subject Devices, or hold the Subject Devices in front of Cohen's face, for the purpose of attempting to unlock the Subject Devices via Touch ID or Face ID in order to search the contents as authorized by this warrant.

2017.08.02

## C.  Review of ESI

69.     Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

70.     In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation[34]; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

---

[34] Keyword searches alone are typically inadequate to detect all relevant data. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

79

71.     Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.   Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

### D.   Return of ESI

72.     If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items, upon request. Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

2017.08.02

AO 93 (SDNY Rev. 05/10) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of New York

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No. |
| | ) |
| Loews Regency Hotel, 540 Park Avenue, Room 1728, | ) |
| New York, New York 10065, and any closed | ) |
| containers/items contained therein, See Attachment D | ) |

## SEARCH AND SEIZURE WARRANT

To: ·   Any authorized law enforcement officer

        An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Southern _____ District of _____ New York _____
*(Identify the person or describe the property to be searched and give its location):*
  Loews Regency Hotel, 540 Park Avenue, Room 1728, New York, New York 10065, and any closed containers/items contained therein, See Attachment D

        The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*

  See Attachment D

        I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

        **YOU ARE COMMANDED** to execute this warrant on or before   4-22-18
                                                                    *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.        ☐ at any time in the day or night as I find reasonable cause has been established.

        Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

        The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the Clerk of the Court.
        Upon its return, this warrant and inventory should be filed under seal by the Clerk of the Court. _____
                                                                                                    *USMJ Initials*

        ☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*  ☐ for _____ days *(not to exceed 30)*.
                                                      ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   4-8-18  7:59 p.m.   /s/ Henry B. Pitman
                                                        *Judge's signature*

City and state:   New York, NY _____        Hon. Henry B. Pitman, U.S. Magistrate Judge _____
                                                        *Printed name and title*

AO 93  (Rev. 01/09) Search and Seizure Warrant (Page 2)

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the Court.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT D

### I. Premises to be Searched—Subject Premises-4

The premises to be searched ("Subject Premises-4") are described as follows, and include electronic devices, and all locked and closed containers found therein:

Room 1728 located inside the Loews Regency Hotel at 540 Park Avenue, New York, New York 10065. The building is a luxury hotel located on Park Avenue and 61st Street. Subject Premises-4 is located on the 17th floor of the hotel.

### II. Items to Be Seized

#### A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from Subject Premises-4 are evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 371 (conspiracy, as it pertains to the other Subject Offenses), 1005 (false bank entries), 1014 (false statements to a financial institution), 1343 (wire fraud), and 1344 (bank fraud), and 52 U.S.C. §§ 30116(a)(1)(A) and 30109(d)(1)(A)(1) (illegal campaign contributions) (the "Subject Offenses"), described as follows:

a. Evidence relating to Sterling National Bank, Melrose Credit Union, and/or taxi medallions, from January 1, 2013 to the present.

b. Evidence relating to a plan, proposal, or agreement for Michael Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to others, including to ▮▮▮▮▮▮▮ and/or entities associated with him.

c. Evidence relating to a plan, proposal, or agreement to modify loans that Cohen has with Sterling and/or Melrose.

d. Evidence relating to Essential Consultants, LLC, including any documents that indicate the nature and purpose of payments made to or from Essential Consultants or the nature of any work done by Cohen or any other individuals in connection with Essential Consultants.

e. Evidence of income to Michael D. Cohen & Associates, including any documents that indicate the nature and purpose of payments made to or from Michael D. Cohen & Associates, or evidence of the purpose of accounts opened in the name of Michael D. Cohen & Associates.

f. Evidence relating to Cohen's net worth, available cash and cash equivalents, monthly and annual income, income sources, and other assets, whether held personally or through entities, including tax returns, personal financial statements, and bank records, from January 1, 2013 to the present.

g. Evidence relating to agreements, loans, and/or financial transactions between Cohen and ▮▮▮▮▮▮▮▮▮▮ and/or entities controlled by ▮▮▮▮▮▮▮

13

2017.08.02

███████████████████████ and any payments by ██████████ to Cohen, from January 1, 2012 to the present.

     h.  Evidence relating to payments to Stephanie Clifford, Karen McDougal, or their agents or legal representatives, including any nondisclosure agreements and related documents, and any communications related to such agreements.

     i.  Evidence of communications involving Michael Cohen, Donald Trump and/or agents or associates of the Trump Campaign about Stephanie Clifford or Karen McDougal, or payments to Stephanie Clifford or Karen McDougal.

     j.  Evidence of communications between Michael Cohen and American Media, Inc., David Pecker, and/or Dylan Howard about Donald Trump, the Trump Campaign, Stephanie Clifford, and/or Karen McDougal.

     k.  Evidence relating to Cohen's role in the Trump Campaign, and coordination or consultation with the Trump Campaign.

     l.  Evidence of communications with Donald Trump and/or agents or associates of the Trump Campaign about the *Access Hollywood* tape and other potential sources of negative publicity involving Trump's relationship in the run up to the election.

     m.  Evidence relating to any reimbursement or other promises made to Cohen for payment to Clifford or others in connection with the election.

     n.  Evidence relating to Cohen's knowledge of the campaign finance laws, campaign contribution reporting requirements, and campaign contribution limits.

     o.  Communications with others, including Jeffrey Getzel and/or other accountants, relating to Cohen's bank accounts, taxes, debts, and/or finances, from January 1, 2013 to the present.

     p.  Communications, records, documents, and other files reflecting false representations to a financial institution related to the intended purpose of an account or loan at that financial institution; the nature of any business or entity associated with an account at a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution, from January 1, 2013 to the present.

     q.  Evidence of Cohen's intent as it relates to the Subject Offenses under investigation.

**B.  Search and Seizure of Electronically Stored Information**

The items to be seized from Subject Premises-4 also include any computer devices and storage media that may contain any electronically stored information falling within the categories set forth in Section II.A of this Attachment above, including, but not limited to, a MacBook Pro, any other desktop and laptop computers, any Apple iPhone or other cellphone or smartphone

14

belonging to Michael Cohen or in his possession, an Apple iPad Mini, portable hard drives, disk drives, thumb drives, and personal digital assistants. In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

The items to be seized from Subject Premises-4 also include:

1.     Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.     Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3.     Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

## C.  Review of ESI

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (which may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

15

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections II.A and II.B of this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

Additionally, review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege. When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In the Matter of the Application of the United States of America for a Search and Seizure Warrant for the Premises Known and Described as Loews Regency Hotel, 540 Park Avenue, Room 1628, a Suite that Encompasses Rooms 1628, 1629, and 1630 New York, New York 10065, and Any Closed Containers/Items Contained Therein<br>Reference No. 2018R00127 | **TO BE FILED UNDER SEAL**<br><br>**Agent Affidavit in Support of Application for Search and Seizure Warrant** |

SOUTHERN DISTRICT OF NEW YORK) ss.:

███████████  Special Agent, Federal Bureau of Investigation, being duly sworn,

deposes and says:

## I. Introduction

### A. Affiant

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI").  I have been a Special Agent with the FBI since 2009.  In the course of my experience and training in these positions, I have participated in criminal investigations into federal offenses involving a wide array of financial crimes, including frauds on financial institutions, as well as into offenses involving public corruption.  I also have training and experience executing search warrants, including those involving electronic evidence.

2.     On or about April 8, 2018, the Honorable Henry B. Pitman, United States Magistrate Judge, issued a search and seizure warrant for the premises known and described as Loews Regency Hotel, 540 Park Avenue, Room 1728, New York, New York 10065, and Any Closed Containers/Items Contained Therein.  The warrant and my supporting affidavit (the "Affidavit") are appended hereto.  The Affidavit is incorporated herein by reference in its entirety as Exhibit A.

2

2017.08.02

3.      On or about April 9, 2018, based upon a conversation with another law enforcement agent who spoke to an employee of Loews Regency Hotel, I learned that Michael Cohen is in fact staying in Room 1628 (in a suite encompassing rooms 1628, 1629, and 1630) (collectively, "Room 1628"), not Room 1728.   Accordingly, I respectfully submit the attached amended warrant pursuant to Rule 41 of the Federal Rules of Criminal Procedure for the following Subject Premises: Loews Regency Hotel, 540 Park Avenue, Room 1628, New York, New York 10065, and Any Closed Containers/Items Contained Therein ("Subject Premises-4").   For the reasons detailed in the Affidavit and herein, I believe that there is probable cause to believe that Subject Premises-4 contains evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1005 (false bank entries), 1014 (false statements to a financial institution), 1343 (wire fraud), and 1344 (bank fraud) (collectively, the "Bank Fraud Offenses"), 52 U.S.C. §§ 30116(a)(1)(A) and 30109(d)(1)(A)(1) (illegal campaign contributions) (the "Campaign Finance Offenses"), and 18 U.S.C. §§ 371 (conspiracy as it pertains to the other Subject Offenses) (collectively, the "Subject Offenses").

4.      Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachment A to this affidavit and to the Search and Seizure Warrant.

3

5.    In light of the confidential nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.



Special Agent
FBI

Sworn to before me on
9th day of April, 2018

*Henry B. Pitman*

HON. HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE

4

2017.08.02

**ATTACHMENT A**

## I. Premises to be Searched—Subject Premises-4

The premises to be searched ("Subject Premises-4") are described as follows, and include electronic devices, and all locked and closed containers found therein:

Room 1628 (a suite encompassing rooms 1628, 1629, and 1630) (collectively, "Room 1628"), located inside the Loews Regency Hotel at 540 Park Avenue, New York, New York 10065. The building is a luxury hotel located on Park Avenue and 61st Street. Subject Premises-4 is located on the 16th floor of the hotel.

## II. Items to Be Seized

### A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from Subject Premises-4 are evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 371 (conspiracy, as it pertains to the other Subject Offenses), 1005 (false bank entries), 1014 (false statements to a financial institution), 1343 (wire fraud), and 1344 (bank fraud), and 52 U.S.C. §§ 30116(a)(1)(A) and 30109(d)(1)(A)(1) (illegal campaign contributions) (the "Subject Offenses"), described as follows:

a. Evidence relating to Sterling National Bank, Melrose Credit Union, and/or taxi medallions, from January 1, 2013 to the present.

b. Evidence relating to a plan, proposal, or agreement for Michael Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to others, including to ▮▮▮▮▮▮ and/or entities associated with him.

c. Evidence relating to a plan, proposal, or agreement to modify loans that Cohen has with Sterling and/or Melrose.

d. Evidence relating to Essential Consultants, LLC, including any documents that indicate the nature and purpose of payments made to or from Essential Consultants or the nature of any work done by Cohen or any other individuals in connection with Essential Consultants.

e. Evidence of income to Michael D. Cohen & Associates, including any documents that indicate the nature and purpose of payments made to or from Michael D. Cohen & Associates, or evidence of the purpose of accounts opened in the name of Michael D. Cohen & Associates.

f. Evidence relating to Cohen's net worth, available cash and cash equivalents, monthly and annual income, income sources, and other assets, whether held personally or through entities, including tax returns, personal financial statements, and bank records, from January 1, 2013 to the present.

g. Evidence relating to agreements, loans, and/or financial transactions between Cohen and ▮▮▮▮▮▮▮▮▮▮ and/or entities controlled by t▮▮▮▮▮▮▮

2

2017.08.02

███████████████████████ and any payments by ███████ to Cohen, from January 1, 2012 to the present.

h. Evidence relating to payments to Stephanie Clifford, Karen McDougal, or their agents or legal representatives, including any nondisclosure agreements and related documents, and any communications related to such agreements.

i. Evidence of communications involving Michael Cohen, Donald Trump and/or agents or associates of the Trump Campaign about Stephanie Clifford or Karen McDougal, or payments to Stephanie Clifford or Karen McDougal.

j. Evidence of communications between Michael Cohen and American Media, Inc., David Pecker, and/or Dylan Howard about Donald Trump, the Trump Campaign, Stephanie Clifford, and/or Karen McDougal.

k. Evidence relating to Cohen's role in the Trump Campaign, and coordination or consultation with the Trump Campaign.

l. Evidence of communications with Donald Trump and/or agents or associates of the Trump Campaign about the *Access Hollywood* tape and other potential sources of negative publicity involving Trump's relationship in the run up to the election.

m. Evidence relating to any reimbursement or other promises made to Cohen for payment to Clifford or others in connection with the election.

n. Evidence relating to Cohen's knowledge of the campaign finance laws, campaign contribution reporting requirements, and campaign contribution limits.

o. Communications with others, including Jeffrey Getzel and/or other accountants, relating to Cohen's bank accounts, taxes, debts, and/or finances, from January 1, 2013 to the present.

p. Communications, records, documents, and other files reflecting false representations to a financial institution related to the intended purpose of an account or loan at that financial institution; the nature of any business or entity associated with an account at a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution, from January 1, 2013 to the present.

q. Evidence of Cohen's intent as it relates to the Subject Offenses under investigation.

## B. Search and Seizure of Electronically Stored Information

The items to be seized from Subject Premises-4 also include any computer devices and storage media that may contain any electronically stored information falling within the categories set forth in Section II.A of this Attachment above, including, but not limited to, a MacBook Pro, any other desktop and laptop computers, any Apple iPhone or other cellphone or smartphone

2017.08.02

belonging to Michael Cohen or in his possession, an Apple iPad Mini, portable hard drives, disk drives, thumb drives, and personal digital assistants. In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

The items to be seized from Subject Premises-4 also include:

1.    Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.    Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3.    Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

## C.   Review of ESI

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (which may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

4

2017.08.02

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections II.A and II.B of this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

Additionally, review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege. When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

5

2017.08.02

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------

In the Matter of the Application of the United
States of America for a Search and Seizure
Warrant for the Premises Known and Described
as (1) 502 Park Avenue, ███████████ New
York, New York 10022, (2) Michael Cohen's
Office at 30 Rockefeller Plaza, 23rd Floor, New
York, New York 10112, (3) Safe Deposit Box #
███ Located at the TD Bank Branch at 500 Park
Avenue, New York, New York 10019, and (4)
Loews Regency Hotel, 540 Park Avenue, Room
1728, New York, New York 10065, and Any
Closed Containers/Items Contained Therein, and
the Electronic Devices Known and Described as
(1) an Apple iPhone with Phone Number ██████
████████ and (2) an Apple iPhone with Phone
Number ██████
Reference No. 2018R00127

--------------------------------------------------------

**TO BE FILED UNDER SEAL**

**Agent Affidavit in Support of
Application for Search and Seizure
Warrant**

SOUTHERN DISTRICT OF NEW YORK) ss.:

███████████████████ Special Agent, Federal Bureau of Investigation, being duly sworn,

deposes and says:

## I.  Introduction

### A.  Affiant

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been

a Special Agent with the FBI since 2009.  In the course of my experience and training in these

positions, I have participated in criminal investigations into federal offenses involving a wide array

of financial crimes, including frauds on financial institutions, as well as into offenses involving

public corruption.  I also have training and experience executing search warrants, including those

involving electronic evidence.

2.     I make this Affidavit in support of an application pursuant to Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises specified below (the "Subject

2

2017.08.02

Premises") and the electronic devices specified below (the "Subject Devices") for, and to seize, the items and information described in Attachments A, B, C, D, E and F. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of electronic devices in criminal activity and the forensic analysis of electronically stored information ("ESI"). Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**B. The Subject Premises and Subject Devices**

3.      Subject Premises-1, Subject Premises-2, Subject Premises-3 and Subject Premises-4 (collectively, the "Subject Premises") are particularly described as:

a.      Subject Premises-1 is Apartment ▮▮▮ located inside the building at 502 Park Avenue, New York, New York 10022. The building located at 502 Park Avenue is a 32-floor brick residential building. Subject Premises-1 is located on the ▮▮▮ floor of the building. Based on my review of New York City property records, I have learned that Michael Cohen and Laura Cohen own Subject Premises-1.[1] Additionally, as described below, Subject Premises-1 is Cohen's full-time residence.

b.      Subject Premises-2 is an office located on the 23rd floor of the building at 30 Rockefeller Plaza, New York, New York 10112. The building located at 30 Rockefeller Plaza

---

[1] As noted *infra*, I have learned that on or about October 28, 2015, Cohen transferred Subject Premises-1 into a trust.

3

is a 66-floor office building that spans the entire block between Sixth Avenue and Rockefeller Plaza. Subject Premises-2 is located on the 23rd floor of the building inside of the offices of the law firm Squire Patton Boggs. The office is assigned to Michael Cohen. As described below, Michael Cohen works and conducts meetings at Subject Premises-2.

c.      Subject Premises-3 is a safety deposit box located inside the TD Bank branch location at 500 Park Avenue, New York, New York 10019. Based on my review of records maintained by TD Bank, I have learned that the safety deposit box is approximately five inches by ten inches in size, and is marked as box # ▉ The safety deposit box is in the name of Michael Cohen and Laura Cohen.

d.      Subject Premises-4 is Room 1728 located inside the Loews Regency Hotel at 540 Park Avenue, New York, New York 10065. The building is a luxury hotel located on Park Avenue and 61st Street. Subject Premises-4 is located on the 17th floor of the hotel. Based on my review of emails obtained pursuant to search warrants described below, I have learned that on or about January 5, 2018, Cohen received an email from an employee of Loews Regency, which included a price quote for a long-term stay suite based on a three-month stay from January 8 to April 8, 2018.[2] On or about January 29, 2018, Cohen sent an email to a Loews Regency employee, stating, in pertinent part: "I just spoke to my wife and she has scheduled the move for Thursday. Please mark down that we will be taking possession on Thursday, February 1st." Based on my review of cell phone location data, I have learned that, over the past 24 hours, two cellular phones used by Cohen have been located in the vicinity of Subject Premises-4. In particular, on or about

---

[2] Although the quoted price contemplated a three-month stay from January 8 to April 8, it appears that Cohen did not move in until February 1, and as of today, April 8, cellphone location information demonstrates that Cohen's cellular phones are in still in the vicinity of Subject Premises-4.

4

2017.08.02

April 8, 2018, law enforcement agents using a "triggerfish" device identified Room 1728 as the room within the hotel in which the Subject Devices are most likely present.[3]

  e.  Therefore, I believe that Cohen is temporarily residing in Subject Premises-4.

  4. Subject Device-1 and Subject Device-2 (collectively, the "Subject Devices") are particularly described as:

  a. Subject Device-1 is an Apple iPhone serviced by AT&T with the telephone number ▮▮▮▮▮▮▮ Based on my review of records maintained by AT&T, I have learned that Subject Device-1 is subscribed to Michael Cohen. Based on my review of cellphone location information maintained by AT&T, I have learned that Subject Device-1 is presently located in the Southern District of New York.

  b. Subject Device-2 is an Apple iPhone serviced by AT&T with the telephone number ▮▮▮▮▮▮▮ Based on my review of records maintained by AT&T, I have learned that Subject Device-2 is subscribed to Michael Cohen. Based on my review of cellphone location information maintained by AT&T, I have learned that Subject Device-2 is presently located in the Southern District of New York.

  c. Based on my training, experience, and research, and from consulting the manufacturer's and service providers' advertisements and product technical specifications available online, I know that the Subject Devices have capabilities that allow them to, among other things: make and receive telephone calls; save and store contact information; send and receive

---

[3] Based on my conversations with these agents, I understand that it is also possible that the Subject Devices are one floor below, in Room 1628. However, as noted, I understand that Cohen received a price quote for a long-term stay suite and is residing there with his family. Based on my conversations with FBI agents conducting surveillance, I understand that Room 1728 appears to be a suite, whereas Room 1628 appears to be a standard room.

2017.08.02

emails and text messages; download and run mobile telephone applications, including encrypted call and messaging application such as WhatsApp, Signal, and Dust; take, send, and receive pictures and videos; save and store notes and passwords; and store documents.

## C.  The Subject Offenses

5.       For the reasons detailed below, I believe that there is probable cause to believe that the Subject Premises and Subject Devices contain evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 1005 (false bank entries), 1014 (false statements to a financial institution), 1343 (wire fraud), and 1344 (bank fraud) (collectively, the "Bank Fraud Offenses"), 52 U.S.C. §§ 30116(a)(1)(A) and 30109(d)(1)(A)(1) (illegal campaign contributions) (the "Campaign Finance Offenses"), and 18 U.S.C. §§ 371 (conspiracy as it pertains to the other Subject Offenses) (collectively, the "Subject Offenses").

## D.  Prior Applications

6.       The FBI and the United States Attorney's Office for the Southern District of New York ("USAO") have been investigating several courses of criminal conduct by Michael Cohen. Cohen is an attorney who currently holds himself out as the personal attorney for President Donald Trump, and who previously served for over a decade as an executive in the Trump Organization, an international conglomerate with real estate and other holdings.

7.       In connection with an investigation then being conducted by the Office of the Special Counsel ("SCO"), the FBI sought and obtained from the Honorable Beryl A. Howell, Chief United States District Judge for the District of Columbia, three search warrants for emails and other content information associated with two email accounts used by Cohen, and one search warrant for stored content associated with an iCloud account used by Cohen.  Specifically:

2017.08.02

     a.    On or about July 18, 2017, the FBI sought and obtained a search warrant for emails in the account ███████@gmail.com (the "Cohen Gmail Account") sent or received between January 1, 2016 and July 18, 2017 (the "First Cohen Gmail Warrant").

     b.    On or about August 8, 2017, the FBI sought and obtained a search warrant for content stored in the iCloud account associated with Apple ID ███████@gmail.com (the "Cohen iCloud Account" and the "Cohen iCloud Warrant").

     c.    On or about November 13, 2017, the FBI sought and obtained a search warrant for emails in the Cohen Gmail Account sent or received between June 1, 2015 and November 13, 2017 (the "Second Cohen Gmail Warrant").

     d.    On or about November 13, 2017, the FBI sought and obtained a search warrant for emails in the account ███████ the "Cohen MDCPC Account") sent or received between the opening of the Cohen MDCPC Account[4] and November 13, 2017 (the "First Cohen MDCPC Warrant").

     8.    The SCO has since referred certain aspects of its investigation into Cohen to the USAO, which is working with the FBI's New York Field Office. As part of that referral, on or about February 8, 2018, the SCO provided the USAO with all non-privileged emails and other content information obtained pursuant to the First Cohen Gmail Warrant, Second Cohen Gmail Warrant, and Cohen MDCPC Warrant. On or about March 7, 2018, the SCO provided the USAO

---

[4] Based on my review of this warrant and the affidavit in support of it, I know that the warrant did not specify a time period, but the affidavit indicated that, pursuant to court order, the service provider had provided non-content information for the Cohen MDCPC Account that indicated that the account contained emails from the approximate period of March 2017 through the date of the warrant.

2017.08.02

with all non-privileged content obtained pursuant to the Cohen iCloud Warrant.[5] A filter team working with the SCO had previously reviewed the content produced pursuant to these warrants for privilege.

9.      On or about February 28, 2018, the USAO sought and obtained search warrants for emails in the Cohen Gmail Account and the Cohen MDCPC Account, among other accounts, sent or received between November 14, 2017 and February 28, 2018 (the "Third Cohen Gmail Warrant" and the "Second Cohen MDCPC Warrant").  The content produced pursuant to these warrants is subject to an ongoing review for privilege by an SDNY filter team.[6]

10.     The emails search warrants described above are referred to collectively as the "Cohen Email Warrants."

11.     On or about April 7, 2018, the USAO and FBI sought and obtained a warrant for prospective and historical cellphone location information for Subject Device-1 and Subject Device-2.  On or about April 8, 2018, the USAO and FBI sought and obtained authority to employ an electronic technique, commonly known as a "triggerfish," to determine the location of Subject Device-1 and Subject Device-2.

## II.  Probable Cause

### A.  Overview

12.     The United States Attorney's Office for the Southern District of New York and FBI are investigating, among other things, schemes by Target Subject Michael Cohen (a) to defraud multiple banks from in or about 2016 up to and including the present, and (b) to make an illegal

---

[5] The SCO had previously provided a subset of this non-privileged content on or about February 2, 2018.

[6] On or about February 28, 2018 and April 7, 2018, the USAO and FBI sought and obtained Rule 41 search warrants authorizing the search of emails and content obtained pursuant to previously issued warrants for additional subject offenses.

8

campaign contribution in October 2016 to then-presidential candidate Donald Trump. As noted, Cohen is an attorney who currently holds himself out as the personal attorney for President Donald Trump, and who previously served for over a decade as an executive in the Trump Organization, an international conglomerate with real estate and other holdings.

13.    The investigation has revealed that Cohen has made affirmative misrepresentations in and omitted material information from financial statements and other disclosures that Cohen provided to multiple banks in connection with a transaction intended to relieve Cohen of approximately $22 million in debt he owed on taxi medallion loans from the banks. As set forth in detail below, in these financial statements, and in his oral and other written statements to these banks, Cohen appears to have (i) intentionally misrepresented his ability to pay cash by failing to disclose cash he began receiving in 2017 from new consulting work; (ii) significantly understated his *total* holdings of cash and cash equivalents; (iii) failed to disclose tens of thousands of dollars he received in monthly interest income, and (iv) failed to inform the banks from which he was seeking debt relief that he had agreed to make a $3.8 million cash payment to a third party, ▮▮ ▮▮ in connection wit ▮▮▮ acquisition of the taxi medallions securing Cohen's debt. By making these misrepresentations and material omissions, Cohen avoided making monthly payments on his loans, and attempted to fraudulently induce the banks to relieve him of certain repayment obligations and personal guarantees that Cohen and his wife had signed.

14.    Additionally, the investigation has revealed that shortly before the 2016 presidential election, Cohen made a payment of $130,000 from a limited liability corporation ("LLC") to Stephanie Clifford, an individual who is alleged to have had an extramarital affair with then-candidate Trump. This payment was made to Clifford in exchange for an agreement not to make any public disclosures about her alleged affair with Trump. As set forth below, there is

9

2017.08.02

probable cause to believe that Cohen made this payment to Clifford for the purpose of influencing the presidential election, and therefore that the payment was an excessive in-kind contribution to the Trump campaign.

15.     Based on my review of emails obtained from the Cohen Email Warrants, information obtained pursuant to the iCloud Warrant, and documents produced pursuant to subpoenas, as well as my review of public sources, I have learned that Cohen has used the Subject Premises to (a) receive documents related to the transaction intended to relieve Cohen of his taxi medallion debt, (b) receive documents and/or conduct meetings related to his consulting work, (c) receive documents and/or conduct meetings relating to his finances and assets, some of which, as noted above and as detailed further herein, he has concealed from the banks in connection with the refinancing of his taxi medallion debt, (d) receive and send documents relating to his payment to Clifford, and (e) house and operate electronic devices that were utilized in connection with, among other things, the taxi medallion transaction, Cohen's consulting work, and his payment to Clifford. Specifically, as described below, Subject Premises-1 likely contains evidence concerning Cohen's taxi medallion loans, his negotiations with banks, his personal finances, his consulting work, his tax returns, and his payment to Clifford, as well as electronic devices containing such evidence, all of which constitute or contain evidence of the Subject Offenses.  Additionally, as described below, Subject Premises-2 likely contains evidence relating to Cohen's consulting work, his finances, and his payment to Clifford, as well as electronic devices containing such evidence. Subject Premises-3, as described below, likely contains evidence relating to Cohen's assets and finances, including assets that may not have been disclosed to banks in connection with the refinancing of Cohen's taxi medallion debt or documents relating to such assets, and documents or evidence related to Cohen's payment to Clifford.  Subject Premises-4 likely contains electronic

10

devices, including Subject Device-1 and Subject Device-2, which themselves contain evidence of the Subject Offenses, including concerning Cohen's taxi medallion loans, his negotiations with banks, his personal finances, his consulting work, his tax returns, and his payment to Clifford. Accordingly, and as set forth in more detail below, there is probable cause to believe that the Subject Premises and Subject Devices will include evidence of the Subject Offenses.

## B. Probable Cause Regarding Subjects' Commission of the Subject Offenses[7]

### The Bank Fraud Scheme

#### (i)  Cohen's Statements to Sterling National Bank

16.      As set forth in detail below, in 2014, Cohen, through LLCs controlled by him and his wife, Laura Cohen, entered into a series of loans from Sterling National Bank ("Sterling") and the Melrose Credit Union ("Melrose"), secured by taxi medallions, for approximately $20 million. Though entered into by LLCs, the loans were also secured by personal guarantees in the names of both Cohen and his wife.  Over time, as the taxi industry weakened and the medallions lost value, Cohen sought to renegotiate the terms of those loans and/or relieve himself from their obligations, including the personal guarantees.  As part of that effort, Cohen made a series of representations to Sterling and Melrose about his net worth, assets, available cash and income, among other things. Specifically, based on my review of records maintained by Sterling and Melrose, and public sources concerning the taxi industry and the value of taxi medallions, as well as my participation in interviews with a Sterling executive vice-president (the "Sterling Employee-1") and two other

---

[7] In the following recitation of probable cause, I frequently refer to phone calls or text messages involving Cohen.  The text messages described herein as sent or received by Cohen were all sent or received from the telephone numbers associated with Subject Device-1 or Subject Device-2. The vast majority of the phone calls described herein made or received by Cohen were made or received by the telephone numbers associated with Subject Device-1 or Subject Device-2, although in certain limited instances Cohen used a landline or other phone.

11

Sterling employees ("Sterling Employee-2" and "Sterling Employee-3"), I have learned, among other things, the following:

     a. Taxi medallions are small metal plaques affixed to taxis. Without a medallion, it is illegal to operate a taxi in cities with medallion systems, such as New York City. Cohen and his wife own multiple LLCs that collectively own 32 taxi medallions (each LLC owns two medallions).[8] Cohen's purchase of these New York taxi medallions was originally financed by loans from Capital One bank, for which the medallions served as collateral. Cohen was not a taxi operator, and leased his medallions to a third party. That third party made monthly payments to Cohen, who in turn used some of those proceeds to make his monthly loan payments to Capital One.

     b. In early 2014, Cohen became a customer of Sterling when he sought to refinance a mortgage on a rental property that he owned. In or around April 2014, Cohen raised with Sterling the prospect of refinancing his taxi medallion loans, which were then at Capital One. By in or about September 2014, Cohen began negotiating a lending transaction with Sterling that would allow Cohen to pay off his loans at Capital One and borrow more money from the then-increase in value of the medallions. According to Sterling Employee-1, in 2014, prior to the recent upheaval in the taxi industry—as a result of the emergence of ride-sharing services, such as Uber—taxi medallion loans were viewed by banks and investors as safe, short term credits, as the market value of taxi medallions was consistently rising. Consequently, taxi medallion loans—like the loans held by Cohen—were frequently refinanced at increasing amounts as the value of the medallions rose. According to Sterling Employee-1, borrowers typically cashed out the increase in the loan amount

---

[8] One of these companies, Mad Dog Cab Corp., was jointly owned by Sondra Cohen, who I believe is Cohen's mother.

2017.08.02

and used the additional funds for other purposes. Cohen appears to have followed this approach in 2014, when he agreed to refinance his medallion loans for approximately $22 million, which—according to letters from Capital One in Sterling's files—was greater than his previous debt at Capital One Bank ($21 million, of which $14.6 million was a line of credit to Cohen). This allowed Cohen to cash out the proceeds from the transaction.

     c.  Based on my review of records maintained by Sterling, I have learned that on or about December 8, 2014, each of Cohen's sixteen taxi medallion LLCs entered into loan agreements and promissory notes with Sterling for the principal sum of $1,375,000, with repayment due on December 8, 2016. Each loan was signed by Michael or Laura Cohen, depending on who was the sole shareholder of the LLC. The address listed for each of the LLCs was the address for Subject Premises-1. The loans were also each secured by a security agreement, dated the same day, making the medallions collateral for the notes. To give Sterling additional security, Michael and Laura Cohen signed personal guarantees and confessions of judgment, giving Sterling the right to pursue collection against the Cohens' personal assets were their corporations to default under the loan agreements. The personal guaranty agreements stated that the LLCs had offices at the address for Subject Premises-1, and contained a notice provision that stated that any notices required by the agreements should be mailed to Subject Premises-1. In total, Sterling agreed to lend approximately $22 million to the Cohens' companies.

     d.  Pursuant to participation agreements, Sterling transferred 45 percent of Cohen's taxi medallion debt to Melrose.[9]

---

[9] Melrose, which had a business principally focused on taxi medallion loans, is now in conservatorship by the National Credit Union Administration ("NCUA").

2017.08.02

e. In evaluating Cohen's requested refinancing of the taxi medallions, Sterling (and Melrose, consistent with its participation in the deal) conducted due diligence. At Sterling's request, Cohen provided Sterling with a statement of financial condition, dated August 1, 2014 (the "August 2014 Financial Statement"), which indicated that Cohen had $100,740,000 in total assets, $23,550,000 in total liabilities, and a net worth of $77,190,000.[10] From my review of a Sterling credit memorandum, dated September 29, 2014, I know that Sterling viewed the transaction favorably because, accounting for loan payments, cash flows from the medallions were projected to be positive, the value of the collateral (as estimated by Sterling) exceeded $42 million, and the net worth of Cohen—who was the direct obligor under the guarantee agreements—was over $77 million. An internal Sterling credit and risk rating analysis report, dated October 20, 2014, recommended approval of the loans for substantially the same reasons.

f. Based on my review of records maintained by Sterling and public sources, I have learned that over time, the collateral backing Cohen's loans (taxi medallions) lessened in value due to the rise in ride-sharing companies. Additionally, Cohen began falling behind on loan payments to Sterling and Melrose. I know from records maintained by Sterling and an interview with Sterling Employee-2 that, beginning in or around September 2015, Cohen told Sterling, in sum and substance, that the individual leasing Cohen's medallions had fallen behind in making payments to Cohen, and that as a result, the monthly cash flow from his taxi medallions had been reduced, leaving him with a shortfall of approximately $16,000 each month. For instance, I have reviewed an email from Sterling Employee-2, dated September 9, 2015, summarizing a call with Cohen—which according to the email and toll records for Cohen's cellphone occurred on September 8,

---

[10] Cohen subsequently provided Sterling with a revised statement of financial condition, also dated August 1, 2014, which reported assets of $99,420,000, total liabilities of $23,550,000, and a net worth of $75,870,000.

14

2015—during which Cohen told Sterling Employee-2, in sum and substance, about his cash flow problems and a monthly shortfall of approximately $16,000.  In that same email, Sterling Employee-2 commented that despite Cohen's statements, his personal financial information "indicate[d] a strong ability to make up the difference in payments."  Cohen, however, according to Sterling Employee-2, pushed the bank for a reduction in Cohen's monthly payments.

 g.  From my review of records maintained by Sterling and my participation in an interview with Sterling Employee-2, I have learned that Cohen and Sterling Employee-2 spoke again on September 28, 2015, and that during the call Cohen stated, in sum and substance, that the individual to whom Cohen leases the medallions had again reduced monthly payments to Cohen.  I know from my review of records maintained by Sterling that between in or about September 2015 and November 2015, Sterling raised the possibility—both internally and with Cohen—of Cohen posting his real estate holdings, personal residence, or some other collateral as additional security for the banks.[11]  According to these records, however, Cohen resisted these requests.  From my review of loan documents and records maintained by Sterling, I know that in or about November 2015, as a result of Cohen's representation that he was not earning sufficient returns on his medallions to cover monthly interest payments, Sterling and Melrose agreed to amend their loans with Cohen by, among other things, reducing the interest rate Cohen paid to Melrose and extending the loan maturity date to December 8, 2017.

 h.  I know from interviews with Sterling Employee-1 and Sterling Employee-2, as well as emails I have reviewed, that in or about October 2016, Cohen told Sterling Employee-1 that Cohen had a potential buyer of his taxi medallions, named ████████ who would agree to

---

[11] Based on my review of property records, I know that on or about October 28, 2015, around the time period when Sterling raised the possibility of Cohen posting his personal residence—Subject Premises-1—as collateral, Cohen transferred Subject Premises-1 into a trust.

2017.08.02

assume Cohen's debt with Sterling and Melrose. Based on my review of records maintained by Sterling, as well as the interviews with Sterling Employee-1 and Sterling Employee-2 referenced above, I know that by or before October 2016, Cohen had entered into negotiations to sell his sixteen corporate taxi medallion entities to ███████████████ for the balance of the loans, which at the time was $21,376,000. I know from my review of records maintained by Sterling, and my participation in an interview with Sterling Employee-2, that as a condition of the transfer of the medallion loans—and because Sterling was unfamiliar with ██████ ███████—Sterling requested that Cohen make a substantial principal payment on the loan, of approximately one million dollars, prior to the transfer. Cohen rejected this request initially. But on or about January 31, 2017, Cohen told Sterling Employee-1, in sum and substance, that he would make a one million dollar principal reduction payment in order to move forward with the medallion transfer deal with ██████████ Indeed, in an email sent by Cohen to Sterling Employee-2 on or about February 22, 2017, Cohen confirmed that he "agreed to pay down 1 million from the loan amount."

    i.  Pursuant to the participation agreements between Sterling and Melrose, Sterling was required to secure Melrose's agreement to participate in the transfer of the taxi medallion debt from Cohen to ██████████ On or about April 17, 2017, Sterling sent a memorandum to Melrose summarizing the terms of the proposed transaction, and noting the requirement that Melrose agree to the terms. On or about May 2, 2017, Sterling Employee-1 told ██████████ that Melrose had agreed to the deal in principle, and that Sterling would be sending the parties a term sheet shortly.

    j.  In order for the banks to conduct diligence and evaluate the proposed transaction fully, they requested financial information from the parties. On or about June 7, 2017, Sterling

16

2017.08.02

Employee-1 emailed Cohen to request an "updated personal financial statement," completed jointly with Cohen's wife, and Cohen's most recent federal income tax return. On or about June 8, 2017, Cohen emailed Sterling Employee-1 a Sterling personal financial statement form that had been filled out by hand, which referenced a statement of financial condition, dated May 1, 2017 (the "May 2017 Financial Statement") that was also attached. The May 2017 Financial Statement included a cover letter from Cohen's accountant, Jeffrey Getzel, stating, in sum and substance, that the information in the statement came from Cohen and that Getzel had not confirmed its accuracy or completeness. The May 2017 Financial Statement stated that Cohen had total assets of $41,955,000, total liabilities of $39,130,000, and a net worth of $2,825,000. The May 2017 Financial Statement indicated that Cohen's assets were comprised of $1,250,000 in cash, $26,155,000 in closely held companies (such as the taxi medallion entities and his real estate holdings), $3,200,000 in real estate investments, and his $11,000,000 personal residence.[12]

k.   Based on my review of reports of law enforcement interviews of Sterling Employee-1, I have learned that Sterling Employee-1 reviewed the May 2017 Financial Statement with Cohen to, among other things, verify its accuracy, and Sterling Employee-1 asked Cohen about specific line items on the financial statement, including the cash amount, value of medallions, and total liabilities. Cohen stated to Sterling Employee-1, in sum and substance, that the May 2017 Financial Statement was accurate.

l.   On or about August 16, 2017, Sterling Employee-1 emailed Cohen and ▆▆▆▆ ▆▆▆▆ attaching a non-binding term sheet memorializing the potential transaction between

---

[12] Based on my review of Cohen's financial statements, I know that the precipitous decline in assets from his 2014 financial statement to his 2017 financial statements can be explained primarily by reported depreciation in the value of Cohen's real estate assets and medallion investments.

2017.08.02

Sterling, Melrose, Cohen, and ████████    The term sheet included a cover letter addressed to Cohen at Subject Premises-1.  The parties negotiated the provisions of the term sheet and, on or about September 5, 2017, Sterling Employee-1 sent ████████ nd Cohen a copy of the executed term sheet.  According to the term sheet ████████ would borrow $20,000,000 from Sterling and Melrose, to be secured by the medallions that ████████ vas to acquire from Cohen.

m.  As part of the agreement, according to the term sheet, $1,265,913 in principal (which is what would remain after the $20,000,000 payment on the outstanding loan balance) would be repaid by Cohen and the two banks, with Cohen paying fifty percent and the banks dividing the remaining half of the balance.  Based on my review of an internal Sterling credit memorandum, dated October 4, 2017, the parties reached a preliminary agreement that Cohen would pay $632,956 of the remaining $1,265,912 principal loan balance, and Sterling and Melrose would absorb $357,167 and $275,789, respectively, in the form of charge-offs.  According to Sterling Employee-1, Sterling was willing to divide the repayment of the outstanding principal balance—despite its prior insistence that Cohen make a principal pay-down of at least one million dollars—because Cohen represented on a telephone call with Sterling Employee-1, in sum and substance, that he had insufficient liquidity to pay the full outstanding principal balance.  As part of the agreement, Sterling and Melrose also agreed to relieve Cohen and his wife of the personal guarantees that they made on behalf of the LLCs.  Thus, after completing the ████████ ransaction, Cohen would no longer have had any outstanding obligations to Sterling or Melrose.

n.  Based on my review of emails sent by Sterling employees, I have learned that because the transaction between the parties was subject to full credit underwriting by Sterling and Melrose (as well as Melrose's regulators at NCUA), in August and September 2017, Sterling

18

2017.08.02

required and requested additional financial statements and tax returns for Cohen and � ▓▓▓▓ for its credit underwriting process. In response to Sterling's requests, on or about September 25, 2017, Cohen emailed Sterling Employee-2 a copy of his 2016 tax return. The tax return listed Cohen's mailing address as Subject Premises-1. Additionally, on or about October 5, 2017, Cohen re-sent Sterling Employee-2 a copy of his May 2017 Financial Statement. A day later, on October 6, 2017, Cohen emailed Sterling Employee-2 a statement of financial condition, dated September 30, 2017 (the "September 2017 Financial Statement").

o.   Like the May 2017 Financial Statement, the September 2017 Financial Statement included a cover letter from Jeffrey Getzel, Cohen's accountant, stating, in sum and substance, that the information in the statement came from Cohen, and that Getzel had not confirmed its accuracy or completeness. The September 2017 Financial Statement stated that Cohen had total assets of $33,430,000, total liabilities of $45,630,000, and a negative net worth of $12,200,000.[13] Notably, unlike Cohen's May 2017 Financial Statement, the September 2017 Financial Statement represented to Sterling that Cohen had a negative net worth. The September 2017 Financial Statement indicated that Cohen's assets were comprised of $1,250,000 in cash, $17,630,000 in closely held companies (including the taxi medallion entities and his real estate holdings),[14] $3,200,000 in real estate investments, and his $11,000,000 personal residence (which, for the first

---

[13] Based on my review of Cohen's financial statements, I know that this further decline in assets can be explained primarily by reported depreciation in the value of Cohen's real estate assets and medallion investments.

[14] Notably, the September 2017 Financial Statement valued each of Cohen's thirty-two New York taxi medallions at approximately $180,187.50, which was considerably less than the $650,000 valuation ascribed to each medallion in the Cohen- ▓▓▓▓▓▓ term sheet.

19

time, he indicated was held by a trust).[15]   The September 2017 Financial Statement included assets and liabilities not held in Cohen's name, such as various entities associated with his taxi medallions and some of his real estate investment entities.

     p.   From my participation in an interview with Sterling Employee-2, and my review of records maintained by Sterling, I have also learned that around the time Cohen provided Sterling with these financial statements—i.e., in or around September 2017—Cohen stopped paying monthly loan payments on his taxi medallion loans altogether.   According to Sterling Employee-2, Cohen informed Sterling, in sum and substance, that he had insufficient funds to pay the monthly principal and interest payments on his medallion loans.   By in or about December 2017, Sterling and Melrose had not been paid approximately $276,937.92 in monthly principal and interest payments on the medallion loans.   Based on Cohen's financial condition as conveyed in the September 2017 Financial Statement, and his delinquency in making payments to Sterling, among other things, the bank's credit underwriting committee determined (and memorialized in a December 2017 memorandum) that the Cohen-▮▮▮▮ transaction was favorable for the bank — that is, that ▮▮▮▮ would be a better borrower than Cohen.

     q.   On or about December 26, 2017, Sterling sent Cohen a demand letter requesting the immediate receipt of past-due loan payments.   The demand letter was addressed to Cohen at Subject Premises-1.   On December 29, 2017, Sterling sent Cohen a letter stating that he was in default under the loans between Sterling and Cohen's medallion corporations.   The notice of default was addressed to Cohen at Subject Premises-1.   Cohen did not make an immediate payment on the loans, but instead sent an e-mail to Sterling Employee-1 on or about January 24, 2018,

---

[15] Based on my review of property records maintained by the City of New York, and my participation in an interview with Getzel, I know that in 2015, Cohen transferred his residence to a trust.   He did not disclose that transaction to Getzel or Sterling until in or about September 2017.

2017.08.02

stating that during the closing of the Cohen ███████ transaction, Cohen would "bring all payments up to date as well as deposit the payoff differential." Cohen also requested by email on January 24, 2018, that at the closing of the Cohen-███████ transaction, Sterling provide a letter stating that all of Cohen's debts have been satisfied and that Cohen's personal guarantees of the medallion loans had been terminated.

r.   The Cohen-███████ transaction, however, did not close. On or about January 29, 2018, the ███████ attorney emailed attorneys for Sterling and stated that "at this time there is no deal with Michael Cohen. Some of the numbers have changed and we are not prepared to go forward."

s.   Based on my participation in the interview with Sterling Employee-2 and my review of records maintained by Sterling, I know that after the Cohen-███████ deal fell apart, Sterling assigned Cohen's loans to Sterling Employee-3, who specializes in collecting on defaulting loans. From my participation in an interview with Sterling Employee-3, my review of telephone call notes taken by Sterling Employee-3, and my review of telephone records, I know that Sterling Employee-3 spoke several times to Cohen on or about January 30, 2018 about paying down and/or restructuring Cohen's outstanding taxi medallion loans. On the calls, which in total lasted more than an hour, Cohen stated in sum and substance that he did not have more than $1,250,000 to pay toward the medallion loans. On the call, in the course of reviewing the failed Cohen-███████ transaction, Sterling Employee-3 questioned Cohen about the price ███████ was to have paid for each medallion, and whether there was a side agreement between Cohen and ███████ Cohen denied that there was any side agreement with ███████

t.   On or about January 31, 2018, Cohen emailed Sterling Employee-3 and proposed paying $500,000 to bring the loans current and $750,000 to bring the principal balance to

21

2017.08.02

$20,500,000. Cohen also suggested revised monthly interest payment amounts. The signature block on the email indicated that Cohen's address was the address for Subject Premises-2. On or about January 31, 2018, Sterling Employee-3 responded to Cohen and stated, in sum and substance, that Cohen would need to pay the entirety of the overdue payments and pay down the principal balance of the loan to $20,000,000 (in total, a payment of approximately $1,750,000), and would need to make larger monthly interest payments.

u. On or about February 1, 2018, Cohen emailed Sterling Employee-3 and proposed "[p]ayment of $1.250m which ALL can be used to pay down principal, if [Sterling] will waive past due amounts," but stated "I do NOT have more than the $1.250m." (Emphasis in original.) Cohen also stated, in sum and substance, that he had insufficient financial resources to post additional collateral or pre-fund monthly payments. The signature block on the email indicated that Cohen's address was the address for Subject Premises-2. Based on my participation in an interview with Sterling Employee-3, I have learned that since January 30, 2018, Sterling has continued to renegotiate the medallion loans with Cohen based on Cohen's representations about his current financial position. In particular, according to Sterling Employee-3, Cohen and Sterling have an agreement in principal to restructure Cohen's loans based in part of Cohen's agreement to make a principal payment of approximately $750,000, to make a payment of $500,000 to become current on interest payments, and to post $192,000 in cash collateral for his future monthly payments on the loan. Cohen also agreed to pledge an interest he had in a property. Sterling Employee-3 has stated that had Cohen indicated he had more than $1,250,000 available to him, Sterling would have, among other things, negotiated for a larger reduction to the principal amount of the loan.

### (ii)   *Cohen Made Material Misrepresentations About His Finances to Banks*

Cohen Concealed from Sterling and Melrose Cash Derived from Consulting Work

17.     As set forth in detail below, despite multiple written and oral representations by Cohen to Sterling (and, by extension, Melrose[16]) that he had insufficient funds to pay down the principal balance of the medallion loans, make monthly interest payments, or pay past-due amounts, it appears that between 2016 and the present, Cohen opened and maintained bank accounts at First Republic Bank ("First Republic"), and then received millions of dollars in consulting payments in these accounts, which he did not disclose to Sterling.  Cohen set up these accounts and received these funds during the very period in which he made disclosures to Sterling about his personal finances (including his assets and liabilities) and his ability to make payments on the medallion loans.  In these disclosures to Sterling—and despite being asked about these bank accounts by his accountant—Cohen misled the bank by claiming he had insufficient liquidity to satisfy his obligations or meet the bank's demands, while withholding information about these ongoing revenue streams and liquid financial assets at First Republic.

18.     Specifically, based on my review of documents and bank records produced pursuant to a subpoena by First Republic, and my participation in and review of reports of interviews with a First Republic sales manager ("First Republic Employee-1") and a First Republic senior managing director ("First Republic Employee-2"), I have learned, among other things, the following:

---

[16] Based on my review of a report of an interview conducted with an employee of Melrose, I have learned that, pursuant to the participation agreement between Sterling and Melrose, Cohen's financial statements and other records in Sterling's possession were forwarded to Melrose so that Melrose could make a determination as to whether to approve of the Cohen-██ transaction.  Based on my review of reports of interviews with Melrose employees, I also know that Cohen called employees at Melrose regarding the Cohen ███████ transaction.

2017.08.02

a. Cohen and his wife have been customers of First Republic since approximately June 2011. Cohen controls several checking and loan accounts at First Republic, some in his own name and others in the names of corporate entities. According to First Republic's know-your-customer records on Cohen,[17] his primary physical address is the address for Subject Premises-1.

b. On or about October 26, 2016, in Manhattan, New York, Cohen opened a new checking account at First Republic in the name of Essential Consultants LLC (the "Essential Consultants Account"). Cohen was the only authorized signatory on the account. According to account opening documents, the primary address for Essential Consultants LLC was the address for Subject Premises-1. When Cohen opened the Essential Consultants Account, First Republic Employee-1 conducted an in-person interview of Cohen. In response to a series of know-your-customer questions about the purpose of the account—the answers to which First Republic Employee-1 entered into a form[18]—Cohen stated, in sum and substance, that he was opening Essential Consultants as a real estate consulting company to collect fees for investment consulting work, and all of his consulting clients would be domestic individuals based in the United States. Cohen also stated, in sum and substance, that his purpose in setting up the account was to keep the revenue from his consulting business—which he said was not his main source of income—separate from his personal finances. As set forth below, there is probable cause to believe that Cohen's statements about the intended purpose of the account and source of funds for the account were false. Specifically, as described below, the account was not intended to receive—and does not

---

[17] Certain financial institutions are required to conduct such procedures pursuant to the Bank Secrecy Act and its implementing regulations. *See* 31 U.S.C. § 5318; 31 C.F.R. § 1020.220.

[18] First Republic Employee-1 first filled out the form on the day he interviewed Cohen, October 26, 2016. On or about December 19, 2016, at the request of bank compliance personnel, First Republic Employee-1 updated the form to add more detail about Cohen's statements.

24

appear to have received—money in connection with real estate consulting work; in addition, the account has received substantial payments from foreign sources.

c.  I know from my review of First Republic bank records that were scheduled by an FBI forensic accountant that after Cohen opened the Essential Consultants Account, Cohen received payments into that account from foreign businesses and entities that do not reflect the stated client profile for the residential and commercial real-estate consulting services. Specifically, from my review of the Essential Consultants Account schedule and public sources, I know the following:

i.  Beginning on or about January 31, 2017, Cohen began receiving monthly payments of $83,333 into the Essential Consultants Account from an entity called Columbus Nova LLC. According to public sources, Columbus Nova is an investment management firm controlled by Renova Group, an industrial holding company based in Zurich, Switzerland that is controlled by Russian national Viktor Vekselberg.  From January 2017 to August 2017, the Essential Consultants Account received seven payments totaling $583,332.98 from Columbus Nova LLC.

ii.  Beginning on or about April 5, 2017, the Essential Consultants Account began receiving payments from Novartis Investments, SARL, which I believe to be the in-house financial subsidiary of the Swiss pharmaceutical company Novartis International AG ("Novartis"). Between April 2017 and February 2018, the Essential Consultants Account received eleven wire payments from a Swiss bank account held in the name of Novartis, each in the amount of $99,980, for a total of $1,099,780.

iii.  Beginning in or about April 2017, the Essential Consultants Account started receiving wire payments from a bank account associated with the telecommunications company AT&T Inc. ("AT&T").  Specifically, on or about April 14, 2017, AT&T sent $100,000 to the

25

2017.08.02

Essential Consultants Account and, from in or about June 2017 to in or about January 2018, the Essential Consultants Account received ten $50,000 payments from AT&T. In total, AT&T sent $600,000 to the Essential Consultants Account.

   iv.   On or about May 10, 2017, June 9, 2017, July 10, 2017, and November 27, 2017, the Essential Consultants Account received four deposits in the amount $150,000 (totaling $600,000) from a bank account in South Korea. The account holder from which the money was sent is Korea Aerospace Industries Ltd. ("KAI"). KAI is a South Korea-based company that produces and sells fixed-wing aircraft, helicopter aircraft, and satellites to the United States Department of Defense, among other customers.

   v.   On or about May 22, 2017, the Essential Consultants Account received a $150,000 deposit from an account at Kazkommertsbank, a Kazakhstani bank. The listed account holder at Kazkommertsbank was a second Kazakhstani bank named BTA Bank, AO. A message accompanying the wire payment indicated that the payment was a "monthly consulting fee as per Inv BTA-101 DD May 10, 2017 consulting agreement W/N DD 08 05 2017 CNTR W/NDD 08/05/2017."

   vi.   In total, from on or about January 31, 2017 to on or about February 1, 2018, the Essential Consultants Account received approximately $3,033,112.98 in transfers and checks from the aforementioned entities. As of on or about January 10, 2018, the balance in the Essential Consultants Account was $1,369,474.23. Cohen's withdrawals from the Essential Consultants account reveal that it was used for largely personal purposes, including to pay, among other things, American Express bills and fees from "the Core Club," a private social club in New York.

   d.   On or about April 4, 2017, Cohen opened another new checking account at First Republic, this one in the name of Michael D. Cohen & Associates, P.C. (the "MDC&A Account").

Cohen was the only authorized signatory on the account.  According to account opening documents, the primary address for MDC&A Account was the address for Subject Premises-1. Among other things, the MDC&A Account received ten wire transfers and one check from an account in the name of Squire Patton Boggs, a law firm.  As noted above, Subject Premises-2 is located inside the New York office of Squire Patton Boggs.  In total, from on or about April 5, 2017, to on or about January 2, 2018, the MDC&A Account received $426,097.70 in deposits, and the balance in the account as of January 2, 2018, was $344,541.35.  As discussed below, Cohen never disclosed any of the balance in the Essential Consultants or MDC&A accounts to Sterling during the negotiations with respect to the ████████ transaction or the subsequent loan refinancing negotiations, including in his May 2017 Financial Statement and September 2017 Financial Statement.

19.    Based on my review of emails that were seized pursuant to the Cohen Email Warrants, and my review of reports of interviews with employees of AT&T and Novartis, it appears that the aforementioned payments to the Essential Consultants Account and MDC&A Account were for political consulting work, including consulting for international clients on issues pending before the Trump administration.  Specifically, from my review of emails from the Cohen Gmail Account, the Cohen MDCPC Account, and public sources, I have learned the following:

a.    On or about April 28, 2017, Cohen sent an email to an individual whom I believe is affiliated with KAI.  In the email, Cohen attached a "Consulting Agreement" between KAI and Essential Consultants dated as of about May 1, 2017.  The agreement indicates that Essential Consultants had the address of Subject Premises-2.  The document indicates that Essential Consultants would render "consulting and advisory services, as requested" by KAI, and that KAI would pay Essential Consultants "a consulting fee of One Million Two Hundred Thousand

2017.08.02

($1,200,000.00) US Dollars," disbursed through eight $150,000 installments between May 2017 and December 2017. I have also reviewed invoices in amounts of $150,000 that Cohen emailed to an individual whom I believe is affiliated with KAI. At the top of the invoices the address listed for Essential Consultants is the address for Subject Premises-2.

      b.  On or about May 8, 2017, Cohen sent an email to an individual whom I believe is affiliated with BTA Bank. The signature block on Cohen's email listed "Essential Consultants LLC" and "Michael D. Cohen & Associates, PC" and provided the address for Subject Premises-2. In the email, Cohen attached a document purporting to be a "Consulting Agreement" between BTA Bank and Essential Consultants dated as of about May 8, 2017. The agreement indicates that Essential Consultants had the address of Subject Premises-2. The document indicates that Essential Consultants would render "consulting and advisory services" to BTA Bank, and that BTA Bank would pay Essential Consultants "a consulting fee of One Million Eight Hundred Thousand ($1,800,000.00) US Dollars," disbursed through monthly payments of $150,000. On or about May 10, 2017, Cohen sent an email to an employee of BTA Bank, and attached to the email an invoice to BTA Bank in the name of Essential Consultants, with the address of Subject Premises-2. The invoice contemplated a $150,000 payment to Essential Consultants for a "monthly consulting fee."

      c.  On or about January 23, 2017, Cohen appears to have entered into a consulting agreement with AT&T, which contemplates that Essential Consultants "shall render consulting and advisory services to [AT&T]" and that AT&T would "advise [Essential Consultants] of those issues and matters with respect to which AT&T Services desires [Essential Consultants]'s assistance and advice." The agreement indicates that Essential Consultants had the address of Subject Premises-1. The contract calls for AT&T "to pay the Consultant for his services . . . a consulting fee of Fifty

28

Thousand ($50,000) Dollars . . . per month." Based on my review of reports of interviews with AT&T employees, I have learned that AT&T retained Cohen to consult on political issues, including net neutrality, the merger between AT&T and Time Warner, and tax reform.

      d.   On or about March 1, 2017, Cohen appears to have entered into a contract between Novartis and Essential Consultants, which provides that Essential Consultants will "provide consulting and advisory services to Novartis on matters that relate to the repeal and replacement of the Affordable Care Act in the US and any other issues mutually agreeable to [Essential Consultants] and Novartis." The contract provides for a "consulting fee of One Million Two Hundred Thousand ($1,200,000) US dollars," to be paid to Essential Consultants in equal monthly installments over the course of a year. Based on my review of reports of interviews with Novartis employees, I have learned that Novartis retained Cohen to provide political consulting services and to gain access to relevant policymakers in the Trump Administration.

      e.   In or about February 2017, Cohen began negotiating the terms of a "strategic alliance" with Squire Patton Boggs. On or about March 4, 2017, Squire Patton Boggs emailed Cohen a "strategic alliance agreement." Under the terms of the agreement, Cohen agreed to generate business for the law firm, and Squire Patton Boggs agreed to pay to Cohen "an annual strategic alliance fee of $500,000, payable in twelve (12) equal monthly installments." Squire Patton Boggs also agreed to provide Cohen with "dedicated and segregated office space in [Squire Patton Boggs's] New York and Washington D.C. offices, which office space shall be physically separate from [Squire Patton Boggs's] offices and have locked doors and its own locked file cabinets." On or about April 3, 2017, Squire Patton Boggs announced on its website that is had formed a "strategic alliance" with Michael D. Cohen & Associates and would "jointly represent clients."

2017.08.02

20.   Despite the significant amount of money that Cohen received into the Essential Consultants Account and the MDC&A Account, and the cash balance in both accounts, Cohen did not disclose that information to Sterling or Melrose.  Specifically, based on my review of documents provided by Getzel (as noted above, Cohen's accountant at the time), my participation in an interview with Getzel, and my review of notes and a ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ I have learned the following:

a.  In or about May 2017, Getzel met with Cohen at Subject Premises-2.  At the meeting, Cohen told Getzel, in sum and substance, that he had set up a law practice called Michael D. Cohen & Associates P.C., and a consulting company called Essential Consultants LLC.  Cohen told Getzel, in sum and substance, that he expected to earn $75,000 per month in connection with his law practice, and that he expected gross revenues for the consulting business to be between five and six million dollars annually.

b.  In or about October 2017, if not earlier, Getzel was preparing a personal financial statement for Cohen.  On or about October 6, 2017, Getzel sent an email to Cohen in which Getzel wrote that "[a]ttached is a draft of the new PFS as of September 30, 2017" and attached a draft of the September 2017 Financial Statement.  The draft statement reflected that as of September 30, 2017, Cohen had only $1,250,000 in cash, total assets of approximately $33,430,000 (comprised of taxi medallion interests, real estate interests, and his personal residence and property), and liabilities of approximately $45,630,000, leaving him purportedly over $12 million in debt.  In the same email, Getzel questioned Cohen, in sum and substance, about the fact that the financial statement did not list any value associated with either the Essential Consultants Account or the MDC&A Account: "[w]e did not add any value for you[r] two operating entities – Michael D. Cohen & Associates

30

POC [*sic*] and Essential Consultants LLC.  Please advise whether or not these should be disclosed and what value."

      c.  On or about October 6, 2017, Cohen called Getzel by telephone—which is reflected on toll records for Cohen's cellphone—and told Getzel, in sum and substance, not to include Essential Consultants or MDC&A in the September 2017 Financial Statement because they had no value.  On or about October 6, 2017, following the call with Getzel, Cohen, using the Cohen Account, responded to Getzel's email with the answer "[l]ooks good to me."  Cohen never directed Getzel to make any changes to his cash position as listed in the September 2017 Financial Statement.  In a letter dated October 6, 2017, addressed to Getzel, Cohen stated, "I have reviewed the attached statement of financial condition and find it to be correct and consistent with the representations that I made to your firm.  The attached is an accurate reflection of my assets, liabilities and net worth (deficit) as of September 30, 2017."  Attached to that letter was the September 2017 Financial Statement, which, as noted above, was then transmitted to Sterling in connection with the proposed taxi medallion transaction between Sterling, Cohen, and ▇▇▇▇

      21.    Based on my review of a report of an interview with Sterling Employee-1, I have learned that Cohen did not disclose his income stream from Essential Consultants to Sterling Employee-1 or, to his knowledge, anyone else at Sterling.  According to Sterling Employee-1, knowledge of such an income stream would have affected Sterling's demands during the negotiations, particularly with respect to the amount of a principal paydown of Cohen's debt.

### Cohen Understated His Available Cash

      22.    In addition to withholding the existence of his Essential Consultants income from Sterling and Melrose, it appears that Cohen also substantially understated his available cash and cash equivalents in his financial disclosures.  Specifically, I know from my review of the September

31

2017 Financial Statement that Cohen provided to Sterling that Cohen represented that he had $1,250,000 in cash as of September 30, 2017. I also know that on or about January 30, 2018, in a telephone call with Sterling Employee-3, and on February 1, 2018, in an email to Sterling Employee-3, Cohen represented that he did not have more than $1,250,000 in cash. But, from my review of a summary of bank records that were scheduled by forensic accountants, I have learned that Cohen had approximately $5,000,000 in cash and cash equivalents as of September 30, 2017. Additionally, as of February 1, 2018, Cohen had approximately $6,000,000 in cash and cash equivalents. Specifically, from my review of the account schedule and bank records, I have learned the following:

a.  Cohen has three checking and/or savings accounts at Capital One Bank, one of which is in his wife's name. As of September 30, 2017, Cohen had $1,105,680.35 in his savings account, and $1,262,982.29 in total in the three accounts at Capital One Bank. As of February 1, 2018, Cohen had a total of $1,389,245.78 in these accounts.

b.  Cohen has three accounts at Morgan Stanley in his name. As of September 30, 2017, the combined total in cash and cash equivalents in those three accounts was $1,270,600.41. As of February 1, 2018, Cohen had $1,284.996.13 in these accounts.

c.  As of September 30, 2017, Cohen had $260,689.18 in an account at Signature Bank. As of February 1, 2018, Cohen had $261,517.55 in this account.

d.  In addition to the Essential Consultants Account and MDC&A Account at First Republic, Cohen also had two joint checking accounts with Laura Cohen at First Republic. In total, as of September 30, 2017, Cohen had at least $1,876,209.27 in total in his four accounts at First Republic. As of February 1, 2018, Cohen had $3,332,992.95 in these accounts.

32

e.  Cohen has an account at Bethpage Credit Union with $25,931.39 in it as of September 30, 2017.

f.  As of September 30, 2017, Cohen had $17,542.54 in accounts at Sterling.

g.  Cohen has two accounts at TD Bank—one in his name and one held jointly with his wife.  Cohen also has a safety deposit box at TD Bank—Subject Premises-3.  The safety deposit box was opened on December 13, 2017 in the names of Michael and Laura Cohen.

h.  In total, as of September 30, 2017, Cohen had at least $4,713,935.08 in his accounts at Capital One Bank, City National Bank, Signature Bank, Sterling Bank, Bethpage Credit Union, First Republic, and Morgan Stanley.  As of February 1, 2018, Cohen had $6,268,732.59 in his accounts at Capital One Bank, City National Bank, Signature Bank, First Republic, and Morgan Stanley.[19]

23.  Accordingly, based on the foregoing, it appears that Cohen's written and oral representations to Sterling and Melrose that he did not have more than $1,250,000 were false, and that Cohen withheld information regarding approximately $5 million in funds from Sterling and Melrose in order to secure favorable terms in his renegotiation of his medallion loan.  Based on my participation in an interview with Sterling Employee-2, and my review of reports of interviews with Sterling Employee-1 and two Melrose employees, it is my understanding that that Sterling and Melrose would view Cohen's understating of his assets as material to its decision whether to renegotiate Cohen's medallion loans and on what terms, or to its decision whether approve of the transfer of those loans to

---

[19] Based on my review of the account schedules described above, I know that, as of the date of this affidavit, the account balances for TD Bank have not yet been included in the schedule for either date and the account balances for Sterling National Bank and Bethpage Credit Union have not yet been included in the schedule for February 1, 2018.  Thus, to the extent that these accounts have positive balances, Cohen's total balances in fact were even higher on these dates.

33

2017.08.02

<u>Cohen Has Unreported Interest Income</u>

24.      It appears that Cohen also hid from Sterling interest income that he was receiving in connection with a six million dollar loan he made to another individual.  Specifically, I know from my review of the May 2017 Financial Statement and September 2017 Financial Statement that Cohen provided to Sterling that Cohen did not disclose that he had made a note receivable in the amount of approximately $6 million, or that he was earning approximately $60,000 per month in interest income in connection with that loan.  But, from my review of a summary of bank records that were reviewed by another law enforcement agent, my review of property records and documents obtained pursuant to the Cohen Email Warrants, and my participation in an interview with Getzel, I have learned the following:

a.   Based on my review of property records, I have learned that on or about March 12, 2012, Cohen agreed to lend ████████████████ approximately $2,000,000.[20]  It appears that the promissory note was unsecured by any real property.  On or about April 28, 2014, Cohen and ████████ amended the promissory note, and restructured the loan to increase the principal amount to approximately $5,000,000.  Under the terms of the amended promissory note, the loan was secured by ████████ apartment in Sunny Isles Beach, Florida.  On or about April 8, 2015, Cohen and ████████ restated the promissory note to increase the principal amount to $6,000,000.[21]

b.   Based on my review of a copy of the restated note, which was obtained pursuant to the Cohen Email Warrants, I have learned that under the terms of the amended and restated

---

[20] I learned from Getzel that ████████████████████████████ ████████

[21] The note states that the loan is to ████████████████████████, husband and wife, jointly and severally.  For ease of reference, I refer simply to ████████ herein.

2017.08.02

promissory note, Cohen's loan to ▮▮▮▮ is an interest-only loan, and that the principal balance of the loan bears interest at an annual rate of 12.25 percent.  I also know that the amended and restated promissory note includes a schedule of payments that require ▮▮▮▮ pay Cohen approximately $61,250 per month beginning in April 2015 and ending in April 2019.  The note also requires that ▮▮▮▮ epay the principal balance of $6,000,000 on April 28, 2019.

     c.  Based on my review of bank records, I have learned that, consistent with the terms of the amended and restated promissory note, ▮▮▮▮ has made monthly payments of approximately $61,250 since April 2015.  Specifically, based on my review of records maintained by Capital One Bank, I have learned that from April 2015 to October 2015, Cohen received checks from an entity called ▮▮▮▮ totaling $61,250 per month, which he deposited into his personal bank account at Capital One Bank.[22]  It appears from my review of bank records and public sources that ▮▮▮▮ s the owner of ▮▮▮▮ From my review of records maintained by Capital One Bank, I have also learned that since October 2015, Cohen has received checks from an entity called ▮▮▮▮ totaling $61,250 per month, which he deposited into his personal bank account at Capital One Bank.  It appears from my review of bank records and public sources that ▮▮▮▮ is also the owner of ▮ ▮▮▮▮ In total, it appears that Cohen receives approximately $735,000 per year in interest payments from ▮▮▮▮

     d.  Based on my review of Cohen's May 2017 and September 2017 Financial Statements, my review of his 2015 and 2016 tax returns obtained via subpoena and from the Cohen Email Warrants, and my participation in an interview with Getzel, I have learned that Cohen did

---

[22] In April 2015, Cohen received a pro-rated payment.  For all months thereafter, the total payment equaled $61,250, but ▮▮▮▮ often made the payment in multiple checks.

not disclose this interest income he was receiving from [REDACTED] to Sterling or Melrose, or list it on his tax returns. I have also learned that while this interest income is taxable, Cohen did not tell Getzel—his accountant—about the income, and Getzel only learned about the income because he began doing [REDACTED] taxes in 2017.[23]

 25. Accordingly, based on the foregoing, it appears that Cohen's representations to Sterling and Melrose that he did not have more than $1,250,000 were false, and that Cohen withheld information relating to the interest income he is receiving from [REDACTED] in order to secure favorable terms in his renegotiation of his medallion loan.

<u>Cohen Had a Side Agreement With [REDACTED]</u>

 26. As set forth in detail below, during the course of Cohen's negotiations to sell his interest in taxi medallions and the associated debt to [REDACTED] Cohen not only misrepresented his financial position to Sterling, but also failed to disclose a side agreement he had negotiated with [REDACTED] t appears tha [REDACTED] greed to pay an above-market price for Cohen's taxi cab medallions, and in exchange, Cohen agreed to pay [REDACTED] approximately $3.8 million in cash. Specifically, from my review of documents produced pursuant to a subpoena by Sterling, and my participation in interviews with Sterling Employee-1, Sterling Employee-2, and Sterling Employee-3, I have learned, among other things, the following:

 a. On or about September 5, 2017, an executed term sheet was circulated by Sterling Employee-1 to Cohen and [REDACTED] The term sheet listed Cohen's address as the address for Subject Premises-1. According to the term sheet, [REDACTED] would borrow $20,000,000 from Sterling and Melrose, to be secured by the medallions tha [REDACTED] was to acquire from

---

[23] Accordingly, this interest income—which should have been reported as such on Cohen's tax returns—is included herein in calculations of Cohen's true cash position.

36

Cohen. At a price of $20 million for thirty-two taxi medallions, the proposed transaction valued each medallion as worth $625,000. The term sheet also contemplated a $1,265,913 pay-down of the principal balance of the loan. The term sheet made no mention of a $3.8 million payment from Cohen to [redacted] or any other form of payment or financial transaction between the parties.

      b.  Additionally, an internal Sterling credit memorandum, dated October 4, 2017, describing the terms of the Cohen-[redacted] transaction and the new loan to [redacted] did not mention any payments from Cohen to [redacted] including a $3.8 million payment. The memorandum also noted that the "loan amount of $20MM indicates a $625M purchase price per medallion" but "it is recognized that this is not in line with current market values." Indeed, according to an internal Sterling memorandum dated February 5, 2018, in the month of January 2018, taxi medallions sold for amounts ranging from $120,000 to $372,000. According to Sterling Employee-1 and Sterling Employee-2, they were never told that [redacted] agreed to a purchase price of $625,000 in exchange for a lump sum payment from Cohen, or that Cohen would make any payment to [redacted].

      c.  On or about January 30, 2018, Sterling Employee-3 asked Cohen whether Cohen had a side agreement with [redacted] o pay [redacted] a sum of money for entering into the medallion transaction. Sterling Employee-3 asked Cohen about such an arrangement because, according to Sterling Employee-3, the price that [redacted] was paying for each medallion appeared to be well above the market price. Cohen stated, in sum and substance, that he had no side agreement—and never had a side agreement—with [redacted].

      27.  While Cohen and [redacted] id not disclose any payment from Cohen to [redacted] communications with Sterling, it appears that such a payment was contemplated. Indeed, based on my review of records maintained by Getzel, and my participation in an interview

2017.08.02

with Getzel, I have learned the following, in substance and in part, regarding the proposed side payment from Cohen to ▮▮▮▮

    a.  On or about September 19, 2017, Getzel prepared a memorandum for Cohen entitled, "Sale of NYC Medallion Entities and Debt Assumption" (the "Getzel Memorandum"). The Getzel Memorandum summarized the proposed transaction between Cohen and ▮▮▮▮ in part, as follows: "Michael and Laura Cohen will transfer ownership of their 13 NYC medallion entities to a Buyer who will assume their bank indebtedness, upon the [Cohens'] paying down the debt portfolio of the 13 entities by $500,000 and a cash payment to the Buyer of $3,800,000."[24]

    b.  According to Getzel, Cohen told him the parameters of the deal, including the payment of $3,800,000 to ▮▮▮▮ but Getzel did not know where Cohen was going to obtain $3,800,000 to pay ▮▮▮▮ As noted above, Cohen had more than $5,000,000 in cash and cash equivalents as of September 2017, but had only disclosed in his September 2017 Financial Statement that he had $1.25 million in cash.

    28.  Based on my review of records maintained by Sterling (as well as Melrose, the bank with the participating interest in the loans) and reports of interviews of representatives of Sterling (and Melrose), I have seen no evidence that Sterling, Melrose, or any other financial institution involved in the potential deal with Cohen and ▮▮▮▮ was aware of the planned $3.8 million side payment from Cohen to ▮▮▮▮

### The Illegal Campaign Contribution Scheme

    29.  The USAO and FBI are also investigating a criminal violation of campaign finance laws by Michael Cohen. As set forth below, there is probable cause to believe that Cohen made

---

[24] The reference to thirteen medallions appears to be an error by Getzel. Cohen and his wife together owned sixteen corporations, which in turn owned 32 taxi medallions.

2017.08.02

an excessive in-kind contribution to the presidential election campaign of then-candidate Donald Trump in the form of a $130,000 payment to Stephanie Clifford, an individual who was rumored to have had an extramarital affair with Trump, in exchange for her agreement not to disclose that alleged affair. As set forth below, there is probable cause to believe that this payment was intended to keep Clifford from making public statements about the rumored affair on the eve of the 2016 presidential election, and thus constitutes a campaign contribution in excess of the applicable limit.

30.   From my review of public sources, I have learned the following:

a.   In or around October 2011, there were rumors published on the gossip websites *TheDirty.com* that Trump had had an extramarital affair with Clifford, an adult film actress whose screen name is Stormy Daniels, in or around July 2006. In or about October 2011, *Life & Style Magazine*, a tabloid sold in supermarkets, also published an article, based on the report in *TheDirty.com*, alleging an affair had occurred between Trump and Clifford. Both Trump and Clifford, through their representatives, issued denials in response to the articles.

b.   Specifically, on or about October 11, 2011, Keith Davidson, who identified himself as Clifford's attorney, sent a cease and desist letter to *TheDirty.com*, demanding that the article regarding Trump and Clifford be removed from the website. Additionally, on or about October 12, 2011, Cohen, who was then Executive Vice-President and Special Counsel to the Trump Organization, stated to *E! News* that "[t]he totally untrue and ridiculous story . . . emanated from a sleazy and disgusting website. . . . The Trump Organization and Donald J. Trump will be bringing a lawsuit . . . [and] Mr. Trump and the Trump Organization would like to thank and commend Stormy Daniels and her attorneys for their honesty and swift actions."

31.   On or about June 16, 2015, Trump formally launched his 2016 presidential campaign. On or about May 4, 2016, Trump became the presumptive Republican Party nominee

2017.08.02

for president, and on July 19, 2016, Trump officially became the nominee. Based on my review of public sources, I have learned that while it does not appear that Cohen had an official title as part of the Trump campaign, on multiple occasions Cohen made public statements on behalf of Trump or his campaign. For instance, on or about August 18, 2016, Cohen appeared on CNN to defend Trump's polling numbers.

32.    On or about October 7, 2016, *The Washington Post* published online a video and accompanying audio in which Trump referred to women in what the article described as "vulgar terms" in a 2005 conversation with Billy Bush, who was then the host of *Access Hollywood*. The following day, on October 8, 2016, Trump appeared in a video in which he stated, among other things, "I've said and done things I regret and words released today on this more than a decade old video are one of them. Anyone who knows me knows these words don't reflect who I am. I said it. I was wrong and I apologize." Based on my review of public sources, I also know that representatives of the Trump Campaign stated, in sum and substance, that the *Access Hollywood* comment was an old and isolated incident.

33.    Based on my review of public sources, including an article published in *Slate* magazine by a reporter who interviewed Clifford, I have learned that around this same time, in or about October 2016, Clifford was in discussions with ABC's *Good Morning America* show and *Slate* magazine, among other media sources, to provide these media outlets with her statement about her alleged relationship with Trump. According to the article in *Slate*, which the author based on conversations with Clifford over the telephone and by text message, Clifford wanted to be paid for her story or be paid by Trump not to disclose her accusation. As Cohen summarized in a 2018 email obtained pursuant to the Cohen Email Warrants: "In October 2016, I was contacted

40

2017.08.02

by counsel for Ms. Clifford stating that news outlets, including *ABC News*, were pursuing the 2011 story of an alleged affair between Mr. Trump and Ms. Clifford."

34.    From my review of telephone toll records[25] and information produced pursuant to the iCloud Warrant and Cohen Email Warrants, I have learned that in the days following the *Access Hollywood* video, Cohen exchanged a series of calls, text messages, and emails with Keith Davidson, who was then Clifford's attorney, David Pecker and Dylan Howard of American Media, Inc. ("AMI"), the publisher of the *National Enquirer*,[26] Trump, and Hope Hicks, who was then press secretary for Trump's presidential campaign. Based on the timing of these calls, and the content of the text messages and emails, I believe that at least some of these communications concerned the need to prevent Clifford from going public, particularly in the wake of the *Access Hollywood* story. In particular, I have learned the following:

a.    On October 8, 2016, at approximately 7:20 p.m., Cohen received a call from Hicks. Sixteen seconds into the call, Trump joined the call, and the call continued for over four minutes.[27] Based on the toll records that the USAO has obtained to date, I believe that this was the first call

---

[25] My attribution of certain telephone numbers to certain individuals as described in this affidavit is based on my review of the vCard (virtual contact file) and text messages obtained from Cohen's telephone pursuant to the iCloud Warrant.

[26] Pecker is President of AMI and, according to his own statements in public reports, a personal friend of Trump. Howard is the chief content officer of AMI, who according to public records reports directly to Pecker.

[27] I believe that Trump joined the call between Cohen and Hicks based on my review of toll records. Specifically, I know that a call was initiated between Cohen's telephone number and Trump's telephone number at the same time the records indicate that Cohen was talking to Hicks. After the Cohen-Trump call was initiated, it lasted the same period of time as the Cohen-Hicks call. Additionally, the toll records indicate a "-1" and then Trump's telephone number, which, based on my training and experience, means that the call was either transferred to Trump, or that Trump was added to the call as a conference or three-way call participant. In addition, based on my conversations with an FBI agent who has interviewed Hicks, I have learned that Hicks stated, in substance, that to the best of her recollection, she did not learn about the allegations made by Clifford until early November 2016. Hicks was not specifically asked about this three-way call.

41

2017.08.02

Cohen had received or made to Hicks in at least multiple weeks, and that Cohen and Trump spoke about once a month prior to this date -- specifically, prior to this call on October 8, 2016, Cohen and Trump had spoken once in May, once in June, once in July, zero times in August, and twice in September.

b. Approximately ten minutes after the call ended, Hicks and Cohen spoke again for about two minutes.

c. At 7:39 p.m., immediately after the second call with Hicks ended, Cohen called David Pecker (as noted above, the President of American Media Inc., or AMI) and they connected for thirty seconds. Approximately four minutes later, Cohen called Pecker again and they spoke for more than a minute. Three minutes after ending his call with Pecker, Cohen received a call from Dylan Howard (as noted above, the Chief Content Officer of AMI), and they spoke for approximately a minute. According to toll records, it does not appear that Cohen and Howard spoke regularly prior to October 8, 2016, as it had been over a month since they had called each other.

d. At 7:56 p.m., approximately eight minutes after his call with Howard ended, Cohen called Hicks and they connected for two minutes. At approximately the same time this call ended, Cohen received a call from Pecker, and they spoke for about two minutes. At 8:03 p.m., about three minutes after ending his call with Pecker, Cohen called Trump, and they spoke for nearly eight minutes.

e. At 8:39 p.m. and 8:57 p.m., Cohen received calls from Howard and spoke to him for about four and six minutes, respectively. At 9:13 p.m., about ten minutes after Cohen and Howard hung up from the second of these calls, Howard sent Cohen a text message that said: "Keith will do it. Let's reconvene tomorrow." Based on my involvement in this investigation, I

42

believe that when Howard wrote "Keith," he was referring to Keith Davidson, the attorney for Stephanie Clifford. At 3:31 a.m., now on October 9, 2016, Cohen sent Howard a text message in response that said: "Thank you." Eight minutes later, Cohen sent Howard a text message that said: "Resolution Consultants LLC. is the name of the entity I formed a week ago. Whenever you wake, please call my cell."

    f.   The following day, on October 10, 2016, at 10:58 a.m., Howard sent a text message to Cohen and Davidson, which stated: "Keith/Michael: connecting you both in regards to that business opportunity. Spoke to the client this AM and they're confirmed to proceed with the opportunity. Thanks. Dylan. Over to you two." At 12:25 p.m., Davidson sent Cohen a text message that stated: "Michael – if we are ever going to close this deal – In my opinion, it needs to be today. Keith." Davidson and Cohen then spoke by phone for about three minutes. Based on my participation in this investigation, I believe that when Howard wrote that the "client" was "confirmed to proceed with the opportunity," he was referring to Clifford's agreement in principle to accept money from Cohen in exchange for her agreement not to discuss any prior affair with then-candidate Trump.[28]

    g.   Based on my review of records obtained pursuant to the Cohen Email Warrants, I know that on or about October 10, 2016, Clifford and Davidson appear to have signed a "side letter agreement" that stated it was an exhibit to a "confidential settlement agreement and mutual release" between "Peggy Peterson" and "David Dennison." The purpose of the document,

---

[28] As set forth below, AMI was also involved in a payment to model Karen McDougal. However, because these communications were in close temporal proximity to the events involving the negotiation of a payment to Clifford, the execution of the agreement with Clifford, and the payment of money to Clifford, I believe that these communications were related to Clifford. Additionally, based on my review of public statements by McDougal, I have learned that she negotiated an agreement with AMI several months prior to these communications between Cohen and Pecker, Howard, and Davidson.

according to the agreement, was to define the "true name and identity" of persons named by pseudonym in "confidential settlement agreement and mutual release." The side letter agreement specifies the identity of "Peggy Peterson" to be Clifford, but the space for "Dennison's" identity is blank. The agreement also includes a signature page for "Peterson," "Dennison," and their attorneys. The signature page is signed by "Peterson" and his attorney, Davidson, but the document is unsigned by "Dennison" and his attorney. Based on my involvement in this investigation, I believe that Davidson sent Cohen this partially-signed "side letter agreement" in order to facilitate the closing of a deal between Davidson's client and Cohen or his client on October 10, 2016.

35.     It appears that on October 13, 2016, and the days that followed, Cohen took steps to complete a transaction with Davidson, including attempting to open an account from which Cohen could transfer funds to Davidson. Specifically, from my review of toll records, information obtained pursuant to the iCloud Warrant and Cohen Email Warrants, records maintained by First Republic, as well as my participation in interviews with First Republic employees, I have learned the following:

a.   On the morning of October 13, 2016, at 8:54 a.m., Cohen sent Pecker a text message that stated: "I need to talk to you." At 9:06 a.m., Pecker sent a text message to Cohen that stated, "I called please call me back." The tolls between Cohen and Pecker do not show a telephone call between 8:54 a.m. and 9:06 a.m. However, based on my review of text messages, I have learned that Cohen and Pecker communicate with each other over Signal, which is an encrypted communications cellphone application that allows users to send encrypted text messages and make encrypted calls.

44

2017.08.02

b. At 9:23 a.m., Cohen sent an email that stated "call me" to First Republic Employee-2. The email attached documents from the Secretary of State of Delaware indicating that Cohen had formed a limited liability company called "Resolution Consultants LLC" on September 30, 2016. As noted above, "Resolution Consultants" is the name of the entity that Cohen had told Howard he had formed recently after Howard said Davidson would "do it." At 10:44 a.m., Cohen called First Republic Employee-2 and told him, in sum and substance, that he needed an account in the name of "Resolution Consultants" opened immediately, and that he did not want an address on the checks written out of the account. Later that day, another employee at First Republic emailed Cohen account opening paperwork to complete. Cohen returned the account opening documents partially completed, but failed to provide a copy of his driver's license or passport, and did not respond to the employee's question of how he wanted to fund the account. As a result, the account was never opened.

c. On October 17, 2016, Cohen incorporated Essential Consultants LLC in Delaware. That same day, he filed paperwork to dissolve Resolution Consultants LLC.

36. Despite these steps taken by Cohen, it appears that the negotiation between Cohen and Davidson was not progressing sufficiently fast enough for Davidson or his client, Clifford, and they threatened to go public with Clifford's allegations just days before the presidential election. Specifically, based on my review of toll records, information obtained pursuant to the iCloud Warrant, and public sources, I know the following:

a. According to an article in *The Washington Post*, which quoted emails sent from Cohen's email account hosted by the Trump Organization, on October 17, 2016, Davidson emailed Cohen and threatened to cancel the aforementioned "settlement agreement" by the end of the day

2017.08.02

if Cohen did not complete the transaction.[29]   According to the article, Davidson sent Cohen a second email later in the day that stated in part, "Please be advised that my client deems her settlement agreement canceled and void." At 4:00 p.m. that day, Cohen called Davidson and they spoke for over five minutes.

     b.   Cohen's 4:00 p.m. call with Davidson and/or Davidson's threats to cancel the "settlement agreement" appear to have touched off a flurry of communications about the settlement agreement and whether Clifford would go public.  Specifically:

     i.   At 4:43 p.m., Howard sent Cohen a text message that stated: "I'm told they're going with DailyMail.  Are you aware?"  One minute later, Cohen responded: "Call me." Based on my involvement in this investigation, I understand Howard's text to mean that he heard that Clifford was going to take her story of an extramarital affair with Trump to the *Daily Mail*, a tabloid newspaper.

     ii.   At 4:45 p.m., Howard called Cohen and they spoke for over two minutes. Moments later, Davidson and Cohen spoke for about two minutes.

     iii.   At 5:03 p.m., Cohen attempted to call Trump, but the call only lasted eight seconds.  This was Cohen's first call after he spoke with Davidson.

     iv.   At 5:25 p.m., Cohen texted Howard, stating: "Well???"

     v.   At 6:44 p.m., Howard responded to Cohen's text, stating: "Not taking my calls."  Cohen responded one minute later: "You're kidding. Who are you trying to reach?" Howard responded one minute later: "The 'agent.'"   Based on my involvement in this

---

[29] Due to the partially covert nature of the investigation to this date, the USAO has not requested documents from the Trump Organization or Davidson, and thus does not possess the email referenced in this article.

2017.08.02

investigation, I understand Howard's text messages to mean that he attempted to contact Davidson about the matter involving Clifford, but that Davidson was not taking Howard's calls.

vi.      At 6:49 p.m., Cohen called Howard and they spoke for nearly four minutes.

c.  The following day, on October 18, 2016, *TheSmokingGun.com*, a website that publishes legal documents and mugshots, published an article called: "Donald Trump and the Porn Superstar," which alleged that Trump had an extramarital affair with Clifford.     However, the article noted that Clifford had declined to comment.

37.     On or about October 25, 2016, the communications between Cohen, Davidson, Howard and Pecker picked up again, apparently concerning a transaction involving Clifford. Specifically, based on my review of toll records, information obtained pursuant to the Cohen Email Warrants and iCloud Warrant, as well as my review of public sources, I have learned the following:

a.  On October 25, 2016, at 6:09 p.m., Howard sent Cohen a text message stating: "Keith calling you urgently. We have to coordinate something on the matter he's calling you about or its [sic] could look awfully bad for everyone." One minute later, Davidson sent Cohen a text message stating "Call me." Cohen and Davidson called each other several times over the next half hour but appear not to have connected.  At 6:42 p.m., Cohen and Davidson spoke for about eight minutes.  At 7:11 p.m., they spoke for another two minutes.

b.  The next morning, on or about October 26, 2016, at 8:26 a.m., Cohen called Trump and spoke to him for approximately three minutes.  At 8:34 a.m., Cohen called Trump again and connected for a minute and a half.

c.  At approximately 9:04 a.m.—less than thirty minutes after speaking with Trump— Cohen sent two emails to the person who had incorporated Resolution Consultants and Essential Consultants for him, and stated "can you send me asap the filing receipt" and then, in the second

47

email, "for Essential Consultants LLC." That person responded with the filing receipt two minutes later at 9:06 a.m. and with the certification of formation 23 minutes later, at 9:27 a.m.

  d. Shortly after that, Cohen contacted First Republic Employee-2 and told him, in sum and substance, that he decided not to open an account in the name of "Resolution Consulting" and instead would be opening a real estate consulting company in the name of "Essential Consultants." Cohen told First Republic Employee-2 that he was at Trump Tower, and wanted to go to a First Republic branch across the street to open the account, so First Republic Employee-2 called First Republic Employee-1, a preferred banker at that branch, assist Cohen. At 11:00 a.m., First Republic Employee-1 called Cohen. I know from my participation in an interview with First Republic Employee-1, that around the time of the call he went to Cohen's office in Trump Tower—on the same floor as the Trump Organization—and went through account opening questions, including know your customer questions, with Cohen. In response to a series of know-your-customer questions about the purpose of the account—the answers to which First Republic Employee-1 entered into a form—Cohen stated, in sum and substance, that he was opening Essential Consultants as a real estate consulting company to collect fees for investment consulting work, and all of his consulting clients would be domestic individuals based in the United States. Based on my review of records obtained from First Republic, it appears that this account (the "Essential Consultants Account") was created at a time between 11:00 a.m. and 1:00 p.m.

  e. At 1:47 p.m., Cohen called Davidson and they spoke for approximately two minutes. At approximately 1:49 p.m., Davidson emailed Cohen wiring instructions for an attorney client trust account at City National Bank.

  f. After the Essential Consultants Account was opened on October 26, 2016, Cohen transferred $131,000 from a home equity line of credit that Cohen had at First Republic to the

48

Essential Consultants Account. Following the transfer, at approximately 4:15 p.m. on October 26, 2016, First Republic Employee-2's assistant emailed Cohen at his Trump Organization email address to tell him that the funds had been deposited into the Essential Consultants Account. Cohen forwarded that email to the Cohen Gmail Account and then forwarded it to Davidson.

g.   At 6:37 p.m., Cohen asked Pecker by text message, "Can we speak? Important." Cohen called Pecker at 6:49 p.m. and connected for thirty seconds. At 6:57 p.m., Cohen sent Howard a text message, stating: "Please call me. Important." Cohen called Howard at 7:00 p.m. and connected for about thirty seconds. At 7:06 p.m., Cohen called Pecker again and they spoke for nearly thirteen minutes. At 7:24 p.m., Howard sent a text message to Cohen that: "He said he'd call me back in 20 minutes. I told him what you are asking for his [sic] reasonable. I'll get it sorted." Approximately an hour later, at 8:23 p.m., Howard told Cohen by text message to "check your Gmail for email from my private account." In an email sent at 8:23 p.m. by Howard to Cohen and Davidson, with the subject line "Confirmation," Howard stated, "Thank you both for chatting with me earlier. Confirming agreement on: - Executed agreement, hand-signed by Keith's client and returned via overnight or same-day FedEx to Michael, - Change of agreement to reflect the correct LLC, - Transfer of funds on Thursday AM to be held in escrow until receipt of agreement." After receiving that email, at approximately 8:27 p.m., Cohen asked Howard by text message, "Can you and David [Pecker] give me a call." Howard promptly responded: "David is not around I think. I'll call." At 8:28 p.m., Howard called Cohen and they spoke for three minutes.

38.   On October 27, 2016, Cohen made a payment to Davidson of $130,000—with the funds intended for Clifford—for the purpose of securing her ongoing silence with respect to the allegations that she had an extramarital affair with Trump. Specifically, based on my review of

49

toll records, bank records, and information obtained pursuant to the iCloud Warrant and Cohen Email Warrants, I have learned the following:

   a.  At 9:47 a.m., Cohen sent Davidson an email, stating: "Keith, kindly confirm that the wire received today, October 27, 2016 shall be held by you in your attorney's trust account until such time as directed for release by me, in writing. Additionally, please ensure that all paperwork contains the correct name of Essential Consultants LLC. I thank you in advance for your assistance and look forward to hearing from you later."

   b.  At approximately 10:01 a.m., according to records provided by First Republic Bank, Cohen completed paperwork to wire $130,000 from the Essential Consultants Account—which had been funded a day prior from Cohen's home equity line of credit—to the attorney client trust account at City National Bank that Davidson had specified in the wiring instructions he sent to Cohen. The wire transfer was made shortly thereafter.

   c.  At 10:02 a.m., Davidson responded to Cohen's email from 9:47 a.m., stating: "I confirm that I will work in good faith & that no funds shall be disbursed unless & until the plaintiff personally signs all necessary settlement paperwork, (the form of which will match the prior agreement). The settlement docs will name the correct corporation, (Essential Consultants LLC). Plaintiff's signature will be notarized and returned to you via FedEx. Only after you receive FedEx will I disburse. Fair?"

   d.  At 10:50 a.m., First Republic Employee-1 sent Cohen an email confirming that the payment had been sent and providing him with the wire number.

   39.    On October 28, 2016, and the days that followed, Cohen finalized the transaction with Davidson. Specifically, based on my review of toll records, information obtained pursuant to the iCloud Warrant, public sources, and bank records, I know the following:

2017.08.02

a. On October 28, 2016, at 11:48 a.m., Cohen spoke to Trump for approximately five minutes. Beginning at 1:21 p.m., Cohen attempted a series of phone calls to Davidson, Pecker, and Howard throughout the day, although it appears he may only have connected with Howard.

b. Later that day, at approximately 7:01 p.m., Davidson stated to Cohen by text message that "all is AOK. I should have signed, notarized docs on Monday. You should have them on Tuesday." Cohen thanked him and said "I hope we are good." Davidson responded, "I assure you. We are very good." Howard also texted Cohen at 7:08 p.m., "Keith [Davidson] says we are good." Cohen then responded "OK" to Howard and "Excellent" to Davidson. At approximately 10:30 p.m., Cohen spoke to Hicks for three minutes.

c. On October 31, 2016, Cohen called Howard at 8:22 p.m. and they spoke for over three minutes. At 8:32 p.m., Cohen received text messages from both Howard and Davidson. Howard said: "You'll have paperwork tomorrow says KD." Davidson said: "We are AOK. You will be receiving a package tomorrow." Cohen responded "Thank you" to Howard and "Thanks Keith. Will call you then" to Davidson. From my involvement in this investigation, I believe Davidson was referring to a signed nondisclosure agreement when he told Cohen that he would receive a package.

d. Based on my review of court filings that became public in 2018, I have learned that on or about October 28, 2016, "EC, LLC and/or David Dennison" entered into a "confidential settlement agreement and mutual release" with "Peggy Peterson," pursuant to which "Peterson" agreed not to disclose certain "confidential information pertaining to [Dennison]" in exchange for $130,000. The agreement provided that "EC, LLC" would wire the funds to "Peterson's" attorney, who would then transfer funds to "Peterson." Cohen signed the agreement on behalf of "EC,

51

LLC." The agreement stated that the address for "EC, LLC," which was later referred to in the agreement as "Essential Consultants, LLC," was Cohen's residence.

e. Consistent with the "confidential settlement agreement and mutual release," on or about November 1, 2016, Davidson transferred $96,645 from his attorney client trust account at City National Bank to a bank account in Clifford's name. The wire had the annotation "net settlement." On the same day, at approximately 9:48 a.m. Davidson sent Cohen a text message with a picture of a FedEx delivery confirmation, stating that at approximately 9:09 a.m. a package shipped by Davidson the previous day had arrived for Cohen at his Trump Organization address. On the same day, at approximately 6:14 p.m., Davidson sent Cohen an email with an audio file attached and said "Give this a lesson [sic] and then call me." The audio attachment was titled "Stormy.mp3" and was a five-minute recording of Davidson interviewing Clifford about recent public allegations made by an adult film star named Jessica Drake regarding her alleged past affair with Trump; in the recording, Clifford explained the reasons she believed that Drake was not credible. Less than an hour later, at approximately 7:05 p.m., Cohen called Trump, but it appears that they did not connect. Cohen then called a telephone number belonging to Kellyanne Conway, who at the time was Trump's campaign manager. They did not connect. At approximately 7:44 p.m., however, Cohen received a return call from Conway, which lasted for approximately six minutes.

40. On November 4, 2016, just three days after the Clifford transaction was completed and just four days before the presidential election, the *Wall Street Journal* published an article alleging that the *National Enquirer* had "Shielded Donald Trump" from allegations by *Playboy* model Karen McDougal that she and Trump had an affair. The article alleged that AMI had agreed to pay McDougal to bury her story. McDougal, like Clifford, had been represented by Davidson.

52

2017.08.02

Based on my review of toll records, information obtained pursuant to the Cohen Email Warrants and iCloud Warrant, and public sources, it appears that Cohen spoke frequently to Davidson, Howard, Pecker, and Hicks around the time of this article's publication—just days before Election Day—about the importance of preventing the McDougal and Clifford stories from gaining national traction. Specifically, I have learned the following:

     a. Between 4:30 and 8:00 p.m. on November 4, Cohen communicated several times with Howard, Pecker and Davidson. For instance, at approximately 4:49 p.m., Cohen sent Howard a text message with a screenshot of an email forwarded to him by another Trump Organization lawyer. The forwarded email was from a Wall Street Journal reporter, and asked for comment from Trump and/or the campaign on the story. Cohen also spoke with Hicks several times, including shortly before and/or after calls with Pecker, Howard and Davidson. Indeed, at approximately 7:33 p.m., using two different cellphones subscribed to him, Cohen appears to have been talking to Davidson and Hicks at the same time.

     b. At approximately 8:51 p.m., Cohen sent Howard a message, stating: "She's being really difficult with giving Keith a statement. Basically went into hiding and unreachable." One minute later, Howard responded: "I'll ask him again. We just need her to disappear." Cohen responded, "She definitely disappeared but refuses to give a statement and Keith cannot push her." At approximately 8:55 p.m., Howard responded to Cohen's text: "Let's let the dust settle. We don't want to push her over the edge. She's on side at present and we have a solid position and a plausible position that she is rightfully employed as a columnist." Based on my involvement in this investigation, I believe Cohen and Howard were referring to Karen McDougal when they were discussing "she" and "her." Additionally, I believe Howard's statement that "we have . . . a

53

plausible position that she is rightfully employed as a columnist" was a reference to the fact that AMI had given McDougal payments for her role as a purported columnist for the company.

c. At approximately 8:58 p.m. on November 4, 2016, Howard attempted to reassure Cohen about the effect of the forthcoming *Wall Street Journal* article, texting, "I think it'll be ok pal. I think it'll fade into the distance." Cohen responded, "He's pissed." Howard wrote back, "I'm pissed! You're pissed. Pecker is pissed. Keith is pissed. Not much we can do." Based on my involvement in this investigation, I believe Cohen was referring to Trump when he stated "he's pissed." Cohen asked Howard at approximately 9:00 p.m. how the *Wall Street Journal* could publish its article if "everyone denies." Howard responded, "Because there is the payment from AMI. It looks suspicious at best."

d. At approximately 9:03 p.m., Hicks called Cohen and they spoke for two minutes. At approximately 9:11 p.m., Cohen called Howard and spoke to him for five minutes. At approximately 9:15 p.m., Hicks called Cohen and they spoke for nearly seven minutes. Again, Cohen used different phones for these two calls, such that he appears to have been on both calls for about a minute of overlap. At approximately 9:32 p.m., Cohen texted Pecker, "The boss just tried calling you. Are you free?" A minute later, Cohen texted Howard, "Is there a way to find David quickly?"

e. At approximately 9:50 p.m., the *Wall Street Journal* article was published online. Howard and Hicks both sent web links for the article to Cohen. Over the next half hour, Cohen and Howard exchanged several text messages commenting on how the story came across. The next morning on November 5, 2016, at approximately 7:35 a.m., Cohen texted Hicks, "So far I see only 6 stories. Getting little to no traction." Hicks responded, "Same. Keep praying!! It's working!" Cohen wrote back, "Even CNN not talking about it. No one believes it and if necessary, I have a

54

statement by Storm denying everything and contradicting the other porn stars statement. I wouldn't use it now or even discuss with him as no one is talking about this or cares!"  Based on my involvement in this investigation, I believe Cohen was referring to the above-referenced recorded audio statement by Clifford that he obtained from Davidson, and was stating that such a statement could be used to influence potential negative media relating to Trump, but was unnecessary at that time.  Based on a text message from Hicks to Cohen, I believe that later that morning, Pecker spoke to Trump.

41.    On or about November 8, 2016, Trump won the election for President of the United States.

42.    On or about January 12, 2018, the *Wall Street Journal* first reported that Cohen arranged a payment to Clifford.  On or about January 22, 2018, Common Cause, a government watchdog group, filed a complaint with the Federal Election Commission, alleging that Cohen had violated campaign finance laws by making the payment to Clifford.  Based on my review public sources following that report, as well as emails obtained pursuant to the Cohen Email Warrants, I have learned the following:

a.    On or about January 23, 2018, the day after Common Cause filed its complaint, Cohen began emailing himself drafts of statements describing his payment to Clifford. Additionally, on January 23, 2018, Cohen emailed the following draft of that statement to an individual who appears to be writing a book on Cohen's behalf:

> In October 2016, I was contacted by counsel for Ms. Clifford stating that news outlets, including ABC news, were pursuing the 2011 story of an alleged affair between Mr. Trump and Ms. Clifford.  Despite the fact that both parties had already denied the allegation, as Mr. Trump's longtime special counsel and protector, I took it upon myself to match the offer and *keep the story from breaking.*  I knew the allegation to be false, but *I am also a realist who understands that just because something is false doesn't mean that it doesn't create harm and damage. I could not allow this to*

*occur.* I negotiated a non-disclosure agreement with Ms. Clifford's counsel and tendered the funds. I did this through my Delaware LLC and transferred personal funds to cover the agreement. I was not reimbursed any monies from Mr. Trump, the Trump Organization, any third party or the Presidential campaign. At no point did I ever advise Mr. Trump of my communications or actions regarding this agreement. As outlandish and unusual as this may appear, the Trumps have been like family to me for over a decade. It's what you do for family.

(Emphasis added.) Based on my involvement in this investigation, I believe that the above email is an acknowledgement that the allegation of the affair had existed for some time ("*...the 2011 story...*"), but that Cohen was motivated to "keep the story from breaking" again in October 2016.

b.   On or about February 13, 2018, Cohen said in a statement to *The New York Times* that "Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford. The payment to Ms. Clifford was lawful, and was not a campaign contribution or a campaign expenditure by anyone." Cohen declined to answer follow-up questions including whether Trump had been aware of the payment, why Cohen made the payment, or whether similar payments had been made to other people.

c.   On or about February 14, 2018, Cohen was asked by *The New York Times* whether Trump had reimbursed him, whether he and Trump had made any arrangement at the time of the payment, or whether he had made payments to other women. Cohen stated in response, "I can't get into any of that." On or about February 14, 2018, Cohen also stated to *The Washington Post* that: "In a private transaction in 2016, I used my own personal funds to facilitate a payment of $130,000 to Ms. Stephanie Clifford. Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford, and neither reimbursed me for the payment, either directly or indirectly."

43.   On or about March 9, 2018, Cohen stated to *ABC News* that "the funds were taken from my home equity line and transferred internally to my LLC account in the same bank."

56

2017.08.02

44. Accordingly, for the foregoing reasons, there is probable cause to believe that Cohen committed violations of the Campaign Finance Offenses by making an in-kind contribution to Trump or the Trump campaign in the form of a $130,000 payment to Clifford on the eve of the election. Indeed, while he denies having given an unlawful contribution, in his own statements Cohen has admitted that he paid $130,000 of his "personal funds" to Clifford and that the payment occurred less than two weeks before the election, as Trump was facing negative media allegations about his behavior toward women, even though allegations of an affair between Trump and Clifford existed since 2011. In addition, the communication records set forth above make evident that Cohen communicated with members of the Trump campaign about his negotiation with Clifford's attorney and the need to preclude Clifford from making a statement that would have reflected negatively on the candidate in advance of the forthcoming election.

## C. Probable Cause Justifying Search of the Subject Premises and Subject Devices

45. Based on the foregoing, my review of records produced pursuant to subpoenas and the Cohen Email Warrants, and the iCloud Warrant, and my training and experience, there is probable cause to believe that the Subject Premises and Subject Devices have been used in furtherance of the Subject Offenses and are likely to contain instrumentalities, evidence, and fruits of the Subject Offenses. Specifically, there is probable cause to believe that Cohen permanently resides at Subject Premises-1 and, at least in part, works at both Subject Premises-1 and Subject Premises-2, and that those locations contain evidence relating to the Sterling taxi medallion transaction, Cohen's assets, Cohen's consulting work for Essential Consultants LLC, and his payment to Clifford. Additionally, there is probable cause to believe that Subject Premises-3 contains evidence of Cohen's assets and his payment to Clifford. Finally, there is probable cause to believe that Subject Premises-4, in which Cohen is temporarily residing, contains electronic

57

devices, including Subject Device-1 and Subject Device-2, which, in turn, contain evidence of the Subject Offenses, such as evidence relating to the Sterling taxi medallion transaction, Cohen's assets, Cohen's consulting work for Essential Consultants LLC, and his payment to Clifford.

46.     First, there is probable cause to believe that Cohen lives and operates his businesses, at least in part, at Subject Premises-1. Specifically, from my review of property records, I know that Michael Cohen and Laura Cohen own (in trust) Subject Premises-1. From my review of Cohen's tax returns, I know he lists his primary residence as Subject Premises-1. Additionally, from my review of emails produced pursuant to the Cohen Email Warrants, I know that Cohen routinely refers to Subject Premises-1 as his home. For example, on or about September 28, 2017 and October 6, 2017, Cohen emailed individuals that his home address is the address for Subject Premises-1. I also know from my review of emails that Cohen receives package delivery notifications that list Cohen's address as the address for Subject Premises-1. Cohen has also provided the address of Subject Premises-1 as the address for Essential Consultants and Michael D. Cohen & Associates, P.C. For example, the certificates of incorporation and account opening documents at First Republic for both entities list their addresses as the address for Subject Premises-1. *See supra* ¶¶ 18(b), 18(d). The consulting agreement between Essential Consultants and AT&T also indicated the address for Essential Consultants is the address for Subject Premises-1. *See supra* ¶ 19(c).

47.     There is also probable cause to believe that Subject Premises-1 is likely to contain instrumentalities, evidence, and fruits of the Subject Offenses. Specifically, from my review of emails produced pursuant to subpoena and the Cohen Email Warrants and iCloud Warrant, as well as my training and experience, I know the following:

2017.08.02

a.  According to records maintained by Sterling, the address for all of Cohen's taxi medallion LLCs is the address for Subject Premises-1.  *See supra* ¶ 16(c).  Additionally, the medallion loan documents indicate that any mailings related to the loans should be sent to Subject Premises-1.  *See id.*  Based on my training and experience, as well as my review of public sources, I know that individuals keep records of properties and assets in which they have ownership interests.  Accordingly, I submit that Subject Premises-1 likely contains evidence of Cohen's ownership of the taxi medallion LLCs, the revenue that those medallions generate, and the transaction with Sterling in 2014 to re-finance the medallion loans that were then with Capital One Bank.

b.  From my review of records maintained by Sterling, I also know that Sterling addressed documents relating to the ▇▇▇▇ transaction and Cohen's attempts to modify the terms of the medallion loans to Subject Premises-1.  For instance, Sterling addressed the transaction term sheet, *see supra* ¶ 16(l), and its demand letter and notice of default, *see supra* ¶ 16(q), to Subject Premises-1.  Accordingly, Subject Premises-1 likely contains evidence concerning the ▇▇▇▇ transaction and Cohen's negotiations with Sterling.  Some of those records—such as records relating to a payment from Cohen to ▇▇▇▇ were concealed from Sterling and cannot be obtained via subpoena to Sterling.  Additionally, even where documents were sent to Cohen by Sterling (and therefore are available from Sterling via subpoena), the fact that they may be found in Subject Premises-1 will be relevant to Cohen's possession or knowledge of the documents.

c.  From my review of records maintained by First Republic, I know that Cohen provided the address for Subject Premises-1 as the mailing addresses for the Essential Consultants Account and MDC&A Account.  *See supra* ¶¶ 18(b), 18(e).  Accordingly, it is likely that Subject

Premises-1 contains records relating to the Essential Consultants Account and MDC&A Account, including, among other things, account opening documents, bank statements, documents provided as part of the know-your-customer process, any notes made by Cohen when he was opening the accounts, wire transfer records, and canceled checks. Even where these records can be obtained from First Republic, the fact that they may be found in Subject Premises-1 will be relevant to, among other things, Cohen's ownership of the accounts, or his knowledge of transactions or the existence of funds in accounts.

d. Based on my review of records maintained by Capital One Bank, TD Bank, Morgan Stanley, City National Bank, Signature Bank, and Bethpage Credit Union, I know that Cohen provided the address for Subject Premises-1 as the mailing for his accounts at each of these financial institutions. Accordingly, it is likely that Subject Premises-1 contains records relating to these accounts, including, among other things, bank statements that list account balances. The existence of these records in Subject Premises-1 will be relevant to, among other things, Cohen's ownership of the accounts and his knowledge of the balances in these accounts.

e. Additionally, Cohen may have records of other bank accounts or assets that were not disclosed to Sterling and are not presently known by law enforcement. For example, as described above, Cohen has received interest income since 2015 that he has not disclosed to Sterling or paid taxes on. Also, on Cohen's August 2014 Financial Statement, *see supra* ¶ 16(e), he disclosed $10,000,000 in "investments in overseas entities."[30] The value of these investments was omitted from subsequent financial statements. However, for the reasons outlined above, there is probable cause to believe that Cohen omitted the value of those investments from his 2017

---

[30] Based on my participation in an interview with Sterling Employee-3, I have learned that Cohen told Sterling Employee-3 that the reference to "investments in overseas entities" on his 2014 Financial Statement was to serve merely as a "placeholder" for potential future investments.

60

financial statements in order to understate his assets. As Subject Premises-1 is Cohen's primary residence and he uses Subject Premises-1 as the mailing address for bank records, there is probable cause to believe that account statements for unknown bank accounts or assets concealed from Sterling are likely to be found in Subject Premises-1.

f. Based on my review of records maintained by AT&T and produced pursuant to the Cohen Email Warrants, I know that the address Cohen provided to AT&T for Essential Consultants is the address for Subject Premises-1. *See supra* ¶ 19(c). Therefore, there is probable cause to believe that Subject Premises-1 will contain evidence concerning the operation of Essential Consultants or money that Cohen received, through Essential Consultants, from AT&T. Additionally, because Cohen used the address for Subject Premises-1 for at least one consulting arrangement involving Essential Consultants, there is probable cause to believe that Subject Premises-1 may contain records of other consulting arrangements that Cohen, through Essential Consultants, has with other individuals or entities.

g. Based on my review of records maintained by Getzel's accounting firm, and emails produced pursuant to the Cohen Email Warrants, I have learned that Getzel's accounting firm sent documents to Subject Premises-1 and used the address for Subject Premises-1 as the address listed on Cohen's personal and corporate tax returns. *See supra* ¶ 16(n). For instance, on or about October 6, 2017, an employee at Getzel's accounting firm emailed Cohen that she had sent Cohen's September 2017 Financial Statement by FedEx to Cohen's attention. Accordingly, Cohen's tax records are likely to be found in Subject Premises-1.

h. Based on my review of bank records and publicly-available documents, I know that Cohen used $130,000 from a home equity line of credit on Subject Premises-1 to pay Clifford. I also know that on the settlement and nondisclosure agreement between "Peggy Peterson" and "EC,

2017.08.02

LLC," the address for Essential Consultants is Subject Premises-1. Accordingly, Subject Premises-1 is likely to contain evidence of the Campaign Finance Offenses, including settlement and nondisclosure agreements, payment records, written and email correspondence, and records pertaining to the home equity line of credit.

i. Based on my review of emails produced pursuant to the Cohen Email Warrants and iCloud Warrant, I know that Cohen used at least one Apple iPhone, an Apple iPad Mini, and a MacBook Pro to access his iCloud account. Based on my review of location records provided by Apple pursuant to the iCloud Warrant, I know that electronic devices linked to Cohen's iCloud account were used at Subject Premises-1 to, among other things, place telephone calls and backup files to Cohen's iCloud account. Accordingly, there is probable cause to believe that Subject Premises-1 contains electronic devices, including certain Apple products, that for reasons discussed below are likely to contain evidence of the Subject Offenses.

j. Based on my review of emails produced pursuant to the Cohen Email Warrants, I understand that Subject Premises-1 recently sustained water damage to certain parts of the premises, and that Cohen has engaged contractors to perform certain remediation work on the premises. In addition, as set forth above, I believe that Cohen and his family are temporarily residing at Subject Premises-4 in the Loew's Regency Hotel, which is approximately two blocks from Subject Premises-1. However, based on my review of a work order sent to Cohen's email by a contractor, I understand that the first phase of the work order called for the contractor to "Pack & Remove all items & furnishings in Living Room, Kitchen, Sons Room & Dining Room" and store them off-site. In addition, based on my review of drawings sent to Cohen by the contractor, it appears that the work is primarily being done in these rooms. Thus, I believe that the construction – to the extent it is still ongoing – would not necessarily have caused Cohen to move

2017.08.02

all documents or evidence responsive to the warrant out of Subject Premises-1, because it does not appear that work is being done to the portion of Subject Premises-1, such as a home office or Cohen's own room, where such documents or evidence would most likely be found.[31]

48.     Second, there is probable cause to believe that Cohen uses Subject Premises-2 as office space, and also that Subject Premises-2 contains certain electronic devices. Specifically, from my review of the "strategic alliance agreement" between Squire Patton Boggs and Cohen, and my review of the press release on Squire Patton Boggs's website, I know that Cohen has an office at Subject Premises-2. *See supra* ¶¶ 18(d), 19(e). Indeed, I have learned that pursuant to Cohen's agreement with the law firm, he has "dedicated and segregated office space" in Squire Patton Boggs's offices on the 23rd floor of 30 Rockefeller Plaza, and that the space is "physically separate" from the firm's offices and has "locked doors and its own locked file cabinets." *See supra* ¶ 19(e). Additionally, I know that under the terms of the agreement, Cohen agreed to "arrange for [his] own computer server system that is not connected to [Squire Patton Boggs's] computer network system." I know from my participation in an interview with Getzel, who met Cohen at Subject Premises-2 in 2017, that Subject Premises-2 is an office with a door, it appears to be used only by Cohen, and it contains, among other things, a computer and paper files. According to Getzel, when Getzel saw Cohen at Subject Premises-2, he had two cellular telephones in Subject Premises-2. I also know from my review of emails produced pursuant to the Cohen Email Warrants that Cohen uses the address for Subject Premises-2 in the signature block

---

[31] As noted below, based on my training and experience, I believe that individuals who travel or stay in hotels for short-term periods commonly bring some items with them, such as portable electronic devices or sensitive items, meaning that Cohen has likely taken some evidence from Subject Premises-1 to Subject Premises-4. Nevertheless, given the temporary nature of Cohen's stay at Subject Premises-4 and the scope of the work being done at Subject Premises-1, I believe it is unlikely that Cohen has taken *all* evidence that would be subject to seizure out of Subject Premises-1.

2017.08.02

on his emails. Based on my review of notes of a call between Cohen and First Republic Employee-2 (which notes were taken by another First Republic employee, who was participating in the call and taking notes), I know that, on or about November 15, 2017, Cohen told First Republic Employee-2 that he had a new office at 30 Rock. Moreover, I know from an article in *Vanity Fair* published on or about February 14, 2018, that Cohen was interviewed by the magazine in Subject Premises-2 in or about February 2018.

49.     There is also probable cause to believe that Subject Premises-2 is likely to contain instrumentalities, evidence, and fruits of the Subject Offenses. Specifically, from my review of emails produced pursuant to subpoena and the Cohen Email Warrants and iCloud Warrant, as well as my training and experience, I know the following:

a.     According to records maintained by Sterling, when Cohen was emailing with Sterling Employee-3 in 2018 about a modification to his existing loan from Sterling, Cohen listed his address in his email as the address for Subject Premises-2. *See supra* ¶ 16(t), 16(u). Accordingly, Subject Premises-2 likely contains evidence concerning Cohen's loan modification negotiations with Sterling.

b.     Based on my review of records obtained pursuant to the Cohen Email Warrants, I know that the address Cohen provided to KAI and BTA for Essential Consultants is the address for Subject Premises-2. *See supra* ¶¶ 19(a), 19(b). Therefore, there is probable cause to believe that Subject Premises-2 will contain evidence concerning the operation of Essential Consultants or money that Cohen received, through Essential Consultants, from KAI and BTA, among other entities with which Cohen had a consulting arrangement. Additionally, based on my review of emails sent in 2018 that were obtained pursuant to the Cohen Email Warrants, I know that Cohen continues to enter into consulting arrangements through Essential Consultants, and agreements

64

relating to those arrangements indicate that Essential Consultants is located at Subject Premises-2. Additionally, because Cohen used the address for Subject Premises-2 for multiple consulting arrangements involving Essential Consultants, there is probable cause to believe that Subject Premises-2 may contain records of other unknown consulting arrangements that Cohen has with other individuals or entities.

c.  Based on my review of records maintained by Getzel's accounting firm, and emails produced pursuant to the Cohen Email Warrants, as well as my participation in an interview with Getzel, I have learned that Getzel visited Subject Premises-2 to meet with Cohen about his taxes. *See supra* ¶ 20(a).  At that meeting, Getzel discussed with Cohen whether Cohen should disclose Essential Consultants on his personal financial statement to banks.  According, there is probable cause to believe that Subject Premises-2 will contain evidence relating to Cohen's taxes, or notes of his conversation with Getzel.  Moreover, the fact that Cohen used Subject Premises-2 for a meeting regarding his personal financial matters provides probable cause to believe that documents and information regarding his finances will be found in Subject Premises-2.

d.  Based on my participation in an interview with Getzel, I know that Cohen maintains a computer in Subject Premises-2.  From my review of IP data produced pursuant to a subpoena and pen register to Google, it appears that Cohen is logging into his Gmail account from Subject Premises-2.  Accordingly, there is probable cause to believe that Subject Premises-2 contains electronic devices, that for reasons discussed below are likely to contain evidence of the Subject Offenses.

e.  Based upon my training and experience, I have learned that individuals who maintain businesses typically keep records relating to the business—such as contracts with clients and records of payments—at the business' identified location.  I am not aware of any addresses

65

associated with Essential Consultants other than Subject Premises-1 and Subject Premises-2. Accordingly, there is probable cause to believe that Subject Premises-1 and Subject Premises-2 will contain business records for Essential Consultants.

50.    Third, there is probable cause to believe that Subject Premises-3 is likely to contain instrumentalities, evidence, and fruits of the Subject Offenses. In particular:

a.   As noted above, Cohen has two bank accounts at TD Bank. In or about November 2017, as Cohen was receiving substantial income from consulting work—which he did not disclose to Sterling—Cohen opened the safety deposit box at TD Bank, which is Subject Premises-3. In light of the aforementioned evidence that Cohen conceals assets, including assets at TD Bank, there is probable cause to believe that Subject Premises-3 contains financial assets, objects of value and/or documents relating to such assets or objects of value that Cohen likely did not disclose to Sterling. Indeed, based on my training and experience, I am aware that people often conceal valuable items in safety deposit boxes. Accordingly, there is probable cause to believe that Subject Premises-3 will contain evidence of the Bank Fraud Offenses.

b.   In addition, based on my review of records produced by TD Bank, I know that Cohen has accessed the vault in which Subject Premises-3 is stored on two occasions. The first such occasion was on November 10, 2017. Cohen signed into the vault at approximately 5:35 and out of vault at approximately 5:39 on that date.[32] Based on my review of toll records, I know that Cohen's first call after he signed out of the safety deposit box – approximately 45 minutes later – was to Keith Davidson. Specifically, at 6:25 p.m. Cohen called Davidson and they spoke for less than a minute; three minutes later, Davidson called Cohen back and they spoke for approximately

---

[32] The entry in the bank's log book does not specify whether this is A.M. or P.M. However, I infer that it is P.M., because it is unlikely that the bank would have been open at 5:35 and 5:39 a.m.

66

22 minutes. The second such occasion was on February 2, 2018, which is during the time period numerous media reports about Cohen's payment to Clifford were being published, and is one day after it appears that Cohen's family moved into Subject Premises-4, as set forth above. The timing of Cohen's two visits to the vault – one shortly before a call to Keith Davidson and the other around the time that Cohen came under media scrutiny in connection with the payment to Davidson's client – gives rise to probable cause to believe that Subject Premises-3 will contain evidence of the Campaign Finance Offenses, such as documents relevant to the Cohen's dealing with Keith Davidson and the payment to Clifford, including documents or evidence that Cohen did not want to leave in his apartment where construction workers would be present.[33]

51.    Based on my review of emails obtained pursuant to the Cohen Email Warrants and cell phone location information, I believe that Cohen is temporarily residing in Subject Premises-4. *See supra* ¶¶ 3(d). There is also probable cause to believe that Subject Premises-4 contains instrumentalities and evidence of the Subject Offenses, including, the following:

a.    As described above, it appears that Cohen moved to Subject Premises-4 on or about February 1, 2018, at which time numerous media reports about Cohen's involvement in the payment to Clifford were being published. *See supra* ¶¶ 3(d). During this time same period, Cohen was frequently corresponding with the media and sent himself and others statements about his involvement in the payment to Clifford. *See supra* ¶¶ 42(a)-(c). Thus, there is probable cause that Cohen took at least some documents and evidence relating to the Clifford payment with him to Subject Premises-4, in order to reference and consult them in connection with these statements.

---

[33] As noted above, Subject Premises-3 is approximately five inches by ten inches. Accordingly, I do not believe that it would fit a large volume of hard copy documents; however, a small number of hard-copy documents, or a large volume of documents contained on a flash drive or other portable storage device, would fit in Subject Premises-3.

2017.08.02

b.   As described above, at the time Cohen moved to Subject Premises-4, he was also in the midst of ongoing negotiations with Sterling regarding the refinancing of his medallion debts. For example, on January 30, 2018, Cohen had a lengthy phone call with Sterling Employee-3 about his finances and the proposed restructuring, and on February 1, 2018, Cohen sent an email to Sterling Employee-3 claiming that he did not have more than $1.25 million in cash. *See supra* ¶¶ 16(u). Thus, there is probable cause that Cohen took at least some documents and evidence relating to his ongoing negotiations with Sterling with him to Subject Premises-4, in order to reference and consult them in connection with these negotiations.

c.   As described above, Cohen used at least one Apple iPhone, an Apple iPad Mini, and a MacBook Pro to access his iCloud account, and these electronic devices linked to Cohen's iCloud account were used at Subject Premises-1 – Cohens' permanent residence – to place telephone calls and backup files to Cohen's iCloud account. *See supra* ¶¶ 47(i). Although Cohen's stay at Subject Premises-4 is temporary, based on my training and experience I know that individuals who travel or stay in hotels for short-term periods commonly bring portable electronic devices with them, such as cellular phones, tablets, or laptops. Accordingly, there is probable cause to believe that Subject Premises-4, where Cohen currently appears to be residing, contains electronic devices, including Subject Device-1, Subject Device-2, and/or certain Apple products, that for the reasons discussed herein are likely to contain evidence of the Subject Offenses.

d.   Moreover, as set forth above, based on cellphone location information I know that Subject Device-1 and Subject Device-2 were in the vicinity of Subject Premises-4 as recently as this morning (April 8, 2018). As set forth above, there is probable cause to believe that Cohen used the Subject Devices in furtherance of the Subject Offenses, including to communicate with Sterling employees regarding the medallion transaction, with First Republic employees regarding

2017.08.02

the Essential Consultants Account, with his accountant regarding his finances, and with individuals, such as Davidson, Howard and Pecker, involved in the $130,000 payment to Clifford.

52.     Although Cohen appears to be residing currently in Subject Premises-4, it is unknown whether Cohen will be physically present within Subject Premises-4 at the moment the warrant sought herein are executed.  If Cohen is within Subject Premises-4 at that moment, Subject Device-1 and Subject Device-2 – his cellphones – will likely also be within Subject Premises-4. If Cohen is not within Subject Premises-4 at that moment, the devices will likely be on his person, wherever he is located (which, based on location data for Subject Device-1 and Subject Device-2 as recently as today, is likely to be in the Southern District of New York).  As such, this warrant seeks separate authority to seize Subject Device-1 and Subject Device-2, in the event that those devices are not located within Subject Premises-4 (or another Subject Premises) at the moment the warrants sought herein are executed.

### D.  Probable Cause Justifying Search of ESI

53.     Based on the foregoing, there is probable cause to believe that Subject Premises-1, Subject Premises-2 and Subject Premises-4 contain electronic devices that are likely to contain evidence, fruits, and instrumentalities of the Subject Offenses (and, as set forth above, that Subject Device-1 and Subject Device-2 are themselves electronic devices that are likely to contain evidence of the Subject Offenses).  Specifically, based on my review of information produced pursuant to the Cohen Email Warrants, the iCloud Warrant, and subpoenas, as well as pen register data, I submit that there is probable cause that Subject Premises-1 contains an Apple iPad Mini, a MacBook Pro, and has, at various times, contained Apple cellphones;  similarly, there is probable cause that Subject Premises-2 contains a computer and has, at various times, contained Apple

2017.08.02

cellphones. These devices are likely to include evidence, fruits, and instrumentalities of the Subject Offenses for the following reasons:

      a.   As described throughout this affidavit, Cohen used email to send and receive communications related to the Subject Offenses. In particular, Cohen used email to send and receive communications with Sterling, First Republic, Getzel, the entities to which he is providing consulting services, Davidson, and Howard, among others. While some of these emails have already been obtained via subpoenas and search warrants, I know from my training and experience that individuals can and do delete emails from their Internet-based inboxes but retain copies of those emails on their hard drives. I also know that individuals often have multiple email accounts, some of which may not be known to law enforcement, and as a result electronic devices can be a unique repository of all emails relevant to certain Subject Offenses. Indeed, from my involvement in this investigation, I know that Cohen had an email account with the Trump Organization, but the USAO and FBI have not been able to obtain the contents of that account to date. Thus, emails relevant to the Subject Offenses are likely stored on electronic devices in Subject Premises-1, Subject Premises-2 and/or Subject Premises-4.

      b.   Additionally, Subject Premises-1, Subject Premise-2 and Subject Premises-4 likely contain electronic copies of documents relevant to the Subject Offenses. Indeed, I know from my training and experience that individuals often retain copies of important documents on their computers or other electronic devices capable of storing information, including cellphones (such as the Subject Devices) and tablets. Here, there are a number of documents that Cohen has likely retained that will be relevant to the Subject Offenses. For example, electronic devices may include documentation of Cohen's true net worth, a listing of his assets, an accounting of his available

cash, consulting agreements with third parties, and documentation of his payment to Clifford, among other evidence of the Subject Offenses.

c.  Third, I know from my review of emails obtained pursuant to the Cohen Email Warrants that Cohen sent up online banking with First Republic. Based on my training and experience, I know that individuals who set up online banking often receive electronic notices concerning financial transactions and, on occasion, save records of their financial transactions to their devices. Accordingly, there is probable cause to believe that Cohen's electronic devices contain evidence of banking activity, including the existence of bank accounts or assets that Cohen did not disclose to Sterling or Melrose.

d.  Fourth, from my review of records produced by Apple, I know that Cohen communicates using text message as well as encrypted communications applications. These applications that Cohen has downloaded onto a phone include, but are not limited to, WhatsApp, Signal, and Dust. I know from my review of toll records and text messages that, in particular, Cohen communicated with Pecker using these encrypted applications. Accordingly, there is probable cause to believe that Cohen's cellphones – the Subject Devices – will contain encrypted messages that are not otherwise accessible relating to the Subject Offenses.

54.  Based on my training and experience, I know that individuals who engage in financial crimes commonly use computers to communicate with co-conspirators, keep financial ledgers, and retain fraudulent documents. As a result, they often store data on their computers related to their illegal activity, which can include logs of online or cellphone-based "chats" with co-conspirators; email correspondence; contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social medial accounts; bank account numbers; and/or records of uses of funds.

71

2017.08.02

55.    Based on my training and experience, I also know that, where computers are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred. This is typically true because:

- Electronic files can be stored on a hard drive for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

- Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When a file is "deleted" on a home computer, the data contained in the file does not actually disappear, but instead remains on the hard drive, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the computer. Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages. Thus, the ability to retrieve from a hard drive or other electronic storage media depends less on when the file was created or viewed than on a particular user's operating          system,          storage          capacity,          and          computer          habits.

- In the event that a user changes computers, the user will typically transfer files from the old computer to the new computer, so as not to lose data. In addition, users often keep backups of their data on electronic storage media such as thumb drives, flash memory cards, CD-ROMs, or portable hard drives.

56.    Based on the foregoing, I respectfully submit there is probable cause to believe that Cohen engaged in the Subject Offenses, and that evidence of this criminal activity is likely to be found in the Subject Premises, on computers and electronic media found in the Subject Premises, and on the Subject Devices. In particular, there is probable cause to believe that the Subject Premises and Subject Devices will contain evidence, fruits, and instrumentalities of violations of the Subject Offenses, as more fully described in Section II of Attachments A, B, C, D, E and F to the proposed warrants, including the following:

a. Evidence necessary to establish the occupancy or ownership of the Subject Premises, including without limitation, utility and telephone bills, mail envelopes, addressed correspondence, bank statements, identification documents, and keys.

b. Evidence relating to Sterling, Melrose, and/or taxi medallions.

72

2017.08.02

c. Evidence relating to a plan, proposal, or agreement for Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to others, including to ████████ and/or entities associated with him.

d. Evidence relating to a plan, proposal, or agreement to modify loans that Cohen has with Sterling and/or Melrose.

e. Evidence relating to Essential Consultants, LLC, including any documents that indicate the nature and purpose of payments made to or from Essential Consultants or the nature of any work done by Cohen or any other individuals in connection with Essential Consultants.

f. Evidence of income to Michael D. Cohen & Associates, including any documents that indicate the nature and purpose of payments made to or from Michael D. Cohen & Associates, or evidence of the purpose of accounts opened in the name of Michael D. Cohen & Associates.

g. Evidence relating to Cohen's net worth, available cash and cash equivalents, monthly and annual income, income sources, and other assets, whether held personally or through entities, including tax returns, personal financial statements, and bank records.

h. Evidence relating to agreements, loans, and/or financial transactions between Cohen and ████████ and any payments by ████ Cohen.

i. Evidence relating to payments to Stephanie Clifford, Karen McDougal, or their agents or legal representatives, including any nondisclosure agreements and related documents, and any communications related to such agreements.

j. Evidence of communications involving Michael Cohen, Donald Trump and/or agents or associates of the Trump Campaign about Stephanie Clifford or Karen McDougal, or payments to Stephanie Clifford or Karen McDougal.

73

k.  Evidence of communications involving Michael Cohen, American Media, Inc., David Pecker, and/or Dylan Howard about Donald Trump, the Trump Campaign, Stephanie Clifford, and/or Karen McDougal.

l.  Evidence relating to Cohen's role in the Trump Campaign, and coordination or consultation with the Trump Campaign.

m. Evidence of communications with Donald Trump and/or agents or associates of the Trump Campaign about the *Access Hollywood* tape and other potential sources of negative publicity involving Trump's relationship in the run up to the election.

n.  Evidence relating to any reimbursement or other promises made to Cohen for payment to Clifford or others in connection with the election.

o.  Evidence relating to Cohen's knowledge of the campaign finance laws, campaign contribution reporting requirements, and campaign contribution limits.

p.  Communications with others, including Jeffrey Getzel and/or other accountants, relating to Cohen's bank accounts, taxes, debts, and/or finances;

q.  Communications, records, documents, and other files reflecting false representations to a financial institution related to the intended purpose of an account or loan at that financial institution; the nature of any business or entity associated with an account at a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution;

r.  Evidence of Cohen's intent as it relates to the Subject Offenses under investigation.

## III.  Procedures for Searching ESI

### A.  Execution of Warrant for ESI

57.    Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or

2017.08.02

copying of electronically stored information . . . for later review." Consistent with Rule 41, this application requests authorization to seize any computer devices and storage media and transport them to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

- First, the volume of data on computer devices and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

- Second, because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

- Third, there are so many types of computer hardware and software in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying computer data.

- Fourth, many factors can complicate and prolong recovery of data from a computer device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the computer, which often take considerable time and resources for forensic personnel to detect and resolve.

58.    As discussed herein, Squire Patton Boggs is a functioning law firm that conducts legitimate business unrelated to Cohen's commission of the Subject Offenses. Subject Premises-2 is an office located inside of Squire Patton Boggs's New York office. In order to execute the warrant in the most reasonable fashion, law enforcement personnel will attempt to investigate on the scene of what computers or storage media, if any, must be seized or copied, and what computers or storage media need not be seized or copied. Law enforcement personnel will speak with Squire Patton Boggs personnel on the scene as may be appropriate to determine which files and electronic devices within Subject Premises-2 belong to or were used by Cohen. While, based on the foregoing, it does not appear that Cohen shared electronic devices or a server with Squire Patton Boggs, where appropriate, law enforcement personnel will copy data, rather than physically seize

75

2017.08.02

computers, to reduce the extent of any disruption of Squire Patton Boggs's operations. If, after inspecting the seized computers off-site, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the Government will return it.

59.    Additionally, because Cohen is an attorney, and claims to serve as a personal attorney for Trump, the review of evidence seized from the Subject Premises and Subject Devices will be conducted pursuant to established screening procedures to ensure that the law enforcement personnel involved in the investigation, including attorneys for the Government, collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege. When appropriate, the procedures will include use of a designated "filter team," separate and apart from the investigative team, in order to review potentially privileged communications and determine which communications to release to the investigation and prosecution team.

## B. Accessing ESI on the Subject Devices

60.    As described above, the Subject Devices are both Apple brand devices.

61.    I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices such as iPhones and iPads offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID. I also know that the Apple iPhone X offers its users the ability to unlock the device via the use of facial recognition (through infrared and visible light scans) in lieu of a numeric or alphanumeric passcode or password. This feature is called Face ID.

62.    If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered

76

2017.08.02

fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device. If a user enables Face ID on a given Apple device, he or she can unlock the device by raising the iPhone to his or her face, or tapping the screen. In my training and experience, users of Apple devices that offer Touch ID or Face ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents.

63.     In some circumstances, Touch ID or Face ID cannot be used to unlock a device that has either security feature enabled, and a passcode or password must be used instead. These circumstances include: (1) when the device has just been turned on or restarted; (2) when more than 48 hours has passed since the last time the device was unlocked; (3) when the passcode or password has not been entered in the last 6 days, and the device has not been unlocked via Touch ID in the last 8 hours or the device has not been unlocked via Face ID in the last 4 hours; (4) the device has received a remote lock command; or (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made.

64.     The passcodes or passwords that would unlock the Subject Devices are not known to law enforcement. Thus, it will likely be necessary to press the fingers of the user of the Subject Devices to the devices' Touch ID sensor, or hold the Subject Devices in front of the user's face to activate the Face ID sensor, in an attempt to unlock the devices for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant Apple devices via Touch ID with the use of the fingerprints of the user, or via Face ID by holding the device in front of the user's face, is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

77

2017.08.02

65.    Based on these facts and my training and experience, it is likely that Cohen is the user of the Subject Devices, and thus that his fingerprints are among those that are able to unlock the Subject Devices via Touch ID or his face is able to unlock the Subject Devices via Face ID.

66.    Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training and experience I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the Subject Devices as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

67.    I also know from my training and experience, and my review of publicly available materials published by Apple that Apple brand devices, such as the Subject Devices, have a feature that allows a user to erase the contents of the device remotely.  By logging into the Internet, the user or any other individual who possesses the user's account information can take steps to completely wipe the contents of the device, thereby destroying evidence of criminal conduct, along with any other information on the device.  The only means to prevent this action is to disable the device's ability to connect to the Internet immediately upon seizure, which requires either access to the device itself to alter the settings, or the use of specialized equipment that is not consistently available to law enforcement agents at every arrest.

68.    Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of Cohen to the Touch ID sensors the Subject Devices, or hold the Subject Devices in front of Cohen's face, for the purpose of attempting to unlock the Subject Devices via Touch ID or Face ID in order to search the contents as authorized by this warrant.

78

2017.08.02

## C. Review of ESI

69.   Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

70.   In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses. Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation[34]; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

---

[34] Keyword searches alone are typically inadequate to detect all relevant data. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

79

71.     Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.  Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

### D.  Return of ESI

72.     If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items, upon request. Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

80

## IV.  Conclusion and Ancillary Provisions

73.    Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachments A, B, C, D, E and F to this affidavit and to the Search and Seizure Warrants.

74.    In light of the confidential nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

Special Agent
FBI

Sworn to before me on
8th day of April, 2018

/s/ Henry B. Pitman

HON. HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE

81

AO 93 (SDNY Rev. 05/10) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )   Case No. |
| | ) |
| Loews Regency Hotel, 540 Park Avenue, Room 1728, | ) |
| New York, New York 10065, and any closed | ) |
| containers/items contained therein, See Attachment D | ) |

## SEARCH AND SEIZURE WARRANT

To:  ·  Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Southern_____ District of _____New York_____
*(identify the person or describe the property to be searched and give its location)*:
Loews Regency Hotel, 540 Park Avenue, Room 1728, New York, New York 10065, and any closed containers/items contained therein, See Attachment D

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment D

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before    4-22-18
*(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.    ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the Clerk of the Court.
Upon its return, this warrant and inventory should be filed under seal by the Clerk of the Court. _____
*USMJ Initials*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for _____ days *(not to exceed 30)*.
☐until, the facts justifying, the later specific date of _____ .

Date and time issued:   4-8-18 7:59 p.m.    /s/ Henry B. Pitman
                                                          *Judge's signature*

City and state:   New York, NY _____          Hon. Henry B. Pitman, U.S. Magistrate Judge
                                                          *Printed name and title*

AO 93  (Rev. 01/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

### Certification

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the Court.


Date: _____

                                        _____
                                               *Executing officer's signature*

                                        _____
                                               *Printed name and title*

ATTACHMENT D

# I.  Premises to be Searched—Subject Premises-4

The premises to be searched ("Subject Premises-4") are described as follows, and include electronic devices, and all locked and closed containers found therein:

Room 1728 located inside the Loews Regency Hotel at 540 Park Avenue, New York, New York 10065.  The building is a luxury hotel located on Park Avenue and 61st Street.  Subject Premises-4 is located on the 17th floor of the hotel.

# II.  Items to Be Seized

## A.  Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from Subject Premises-4 are evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 371 (conspiracy, as it pertains to the other Subject Offenses), 1005 (false bank entries), 1014 (false statements to a financial institution), 1343 (wire fraud), and 1344 (bank fraud), and 52 U.S.C. §§ 30116(a)(1)(A) and 30109(d)(1)(A)(1) (illegal campaign contributions) (the "Subject Offenses"), described as follows:

a.  Evidence relating to Sterling National Bank, Melrose Credit Union, and/or taxi medallions, from January 1, 2013 to the present.

b.  Evidence relating to a plan, proposal, or agreement for Michael Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to others, including to ▅▅▅▅▅▅ and/or entities associated with him.

c.  Evidence relating to a plan, proposal, or agreement to modify loans that Cohen has with Sterling and/or Melrose.

d.  Evidence relating to Essential Consultants, LLC, including any documents that indicate the nature and purpose of payments made to or from Essential Consultants or the nature of any work done by Cohen or any other individuals in connection with Essential Consultants.

e.  Evidence of income to Michael D. Cohen & Associates, including any documents that indicate the nature and purpose of payments made to or from Michael D. Cohen & Associates, or evidence of the purpose of accounts opened in the name of Michael D. Cohen & Associates.

f.  Evidence relating to Cohen's net worth, available cash and cash equivalents, monthly and annual income, income sources, and other assets, whether held personally or through entities, including tax returns, personal financial statements, and bank records, from January 1, 2013 to the present.

g.  Evidence relating to agreements, loans, and/or financial transactions between Cohen and ▅▅▅▅▅▅▅▅▅▅ and/or entities controlled by ▅▅▅▅▅▅▅▅

13

███████████████████████ and any payments by ████████ to Cohen, from January ~~1, 2012 to the present.~~

h. Evidence relating to payments to Stephanie Clifford, Karen McDougal, or their agents or legal representatives, including any nondisclosure agreements and related documents, and any communications related to such agreements.

i. Evidence of communications involving Michael Cohen, Donald Trump and/or agents or associates of the Trump Campaign about Stephanie Clifford or Karen McDougal, or payments to Stephanie Clifford or Karen McDougal.

j. Evidence of communications between Michael Cohen and American Media, Inc., David Pecker, and/or Dylan Howard about Donald Trump, the Trump Campaign, Stephanie Clifford, and/or Karen McDougal.

k. Evidence relating to Cohen's role in the Trump Campaign, and coordination or consultation with the Trump Campaign.

l. Evidence of communications with Donald Trump and/or agents or associates of the Trump Campaign about the *Access Hollywood* tape and other potential sources of negative publicity involving Trump's relationship in the run up to the election.

m. Evidence relating to any reimbursement or other promises made to Cohen for payment to Clifford or others in connection with the election.

n. Evidence relating to Cohen's knowledge of the campaign finance laws, campaign contribution reporting requirements, and campaign contribution limits.

o. Communications with others, including Jeffrey Getzel and/or other accountants, relating to Cohen's bank accounts, taxes, debts, and/or finances, from January 1, 2013 to the present.

p. Communications, records, documents, and other files reflecting false representations to a financial institution related to the intended purpose of an account or loan at that financial institution; the nature of any business or entity associated with an account at a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution, from January 1, 2013 to the present.

q. Evidence of Cohen's intent as it relates to the Subject Offenses under investigation.

## B. Search and Seizure of Electronically Stored Information

The items to be seized from Subject Premises-4 also include any computer devices and storage media that may contain any electronically stored information falling within the categories set forth in Section II.A of this Attachment above, including, but not limited to, a MacBook Pro, any other desktop and laptop computers, any Apple iPhone or other cellphone or smartphone

14

belonging to Michael Cohen or in his possession, an Apple iPad Mini, portable hard drives, disk drives, thumb drives, and personal digital assistants. In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

The items to be seized from Subject Premises-4 also include:

1.     Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.     Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3.     Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

## C.   Review of ESI

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (which may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

15

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections II.A and II.B of this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

Additionally, review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege. When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

16

## IV. Conclusion and Ancillary Provisions

73.     Based on the foregoing, I respectfully request the court to issue a warrant to seize the items and information specified in Attachments A, B, C, D, E and F to this affidavit and to the Search and Seizure Warrants.

74.     In light of the confidential nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

Special Agent
FBI

Sworn to before me on
8th day of April, 2018   *BY TELEPHONE*

HON. HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE

81

2017.08.02

ORIGINAL

AO 93  (SDNY Rev. 05/10) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Loews Regency Hotel, 540 Park Avenue, Room 1628,<br>New York, New York 10065, and any closed<br>containers/items contained therein, See Attachment A | ) ) ) ) ) ) | 

**18 MAG   2968**

Case No.

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Southern_____ District of _____New York_____
*(identify the person or describe the property to be searched and give its location):*
Loews Regency Hotel, 540 Park Avenue, Room 1628 (a suite encompassing rooms 1628, 1629, and 1630) (collectively, "Room 1628"), New York, New York 10065, and any closed containers/items contained therein, See Attachment A
The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____4 - 1 8 - 4 8_____
(not to exceed 14 days)

☑ in the daytime  6:00 a.m. to 10 p.m.     ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the Clerk of the Court. _____
☐ Upon its return, this warrant and inventory should be filed under seal by the Clerk of the Court. _____
*USMJ Initials*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30)*.
☐ until, the facts justifying, the later specific date of _____.

Date and time issued:    _____4 - 9 - 18_____
_____7:18 AM_____

_____
Judge's signature

City and state:    _____New York, NY_____

_____Hon. Henry B. Pitman, U.S. Magistrate Judge_____
*Printed name and title*

AO 93  (Rev. 01/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

**Certification**

    I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the Court.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A

## I.  Premises to be Searched—Subject Premises-4

The premises to be searched ("Subject Premises-4") are described as follows, and include electronic devices, and all locked and closed containers found therein:

Room 1628 (a suite encompassing rooms 1628, 1629, and 1630) (collectively, "Room 1628"), located inside the Loews Regency Hotel at 540 Park Avenue, New York, New York 10065.  The building is a luxury hotel located on Park Avenue and 61st Street.  Subject Premises-4 is located on the 16th floor of the hotel.

## II.  Items to Be Seized

### A.  Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from Subject Premises-4 are evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 371 (conspiracy, as it pertains to the other Subject Offenses), 1005 (false bank entries), 1014 (false statements to a financial institution), 1343 (wire fraud), and 1344 (bank fraud), and 52 U.S.C. §§ 30116(a)(1)(A) and 30109(d)(1)(A)(1) (illegal campaign contributions) (the "Subject Offenses"), described as follows:

a.  Evidence relating to Sterling National Bank, Melrose Credit Union, and/or taxi medallions, from January 1, 2013 to the present.

b.  Evidence relating to a plan, proposal, or agreement for Michael Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to others, including to ⬛⬛⬛ and/or entities associated with him.

c.  Evidence relating to a plan, proposal, or agreement to modify loans that Cohen has with Sterling and/or Melrose.

d.  Evidence relating to Essential Consultants, LLC, including any documents that indicate the nature and purpose of payments made to or from Essential Consultants or the nature of any work done by Cohen or any other individuals in connection with Essential Consultants.

e.  Evidence of income to Michael D. Cohen & Associates, including any documents that indicate the nature and purpose of payments made to or from Michael D. Cohen & Associates, or evidence of the purpose of accounts opened in the name of Michael D. Cohen & Associates.

f.  Evidence relating to Cohen's net worth, available cash and cash equivalents, monthly and annual income, income sources, and other assets, whether held personally or through entities, including tax returns, personal financial statements, and bank records, from January 1, 2013 to the present.

g.  Evidence relating to agreements, loans, and/or financial transactions between Cohen and ⬛⬛⬛ and/or entities controlled by ⬛⬛⬛

2

████████████████████, and any payments by ███████ to Cohen, from January 1, 2012 to the present.

h. Evidence relating to payments to Stephanie Clifford, Karen McDougal, or their agents or legal representatives, including any nondisclosure agreements and related documents, and any communications related to such agreements.

i. Evidence of communications involving Michael Cohen, Donald Trump and/or agents or associates of the Trump Campaign about Stephanie Clifford or Karen McDougal, or payments to Stephanie Clifford or Karen McDougal.

j. Evidence of communications between Michael Cohen and American Media, Inc., David Pecker, and/or Dylan Howard about Donald Trump, the Trump Campaign, Stephanie Clifford, and/or Karen McDougal.

k. Evidence relating to Cohen's role in the Trump Campaign, and coordination or consultation with the Trump Campaign.

l. Evidence of communications with Donald Trump and/or agents or associates of the Trump Campaign about the *Access Hollywood* tape and other potential sources of negative publicity involving Trump's relationship in the run up to the election.

m. Evidence relating to any reimbursement or other promises made to Cohen for payment to Clifford or others in connection with the election.

n. Evidence relating to Cohen's knowledge of the campaign finance laws, campaign contribution reporting requirements, and campaign contribution limits.

o. Communications with others, including Jeffrey Getzel and/or other accountants, relating to Cohen's bank accounts, taxes, debts, and/or finances, from January 1, 2013 to the present.

p. Communications, records, documents, and other files reflecting false representations to a financial institution related to the intended purpose of an account or loan at that financial institution; the nature of any business or entity associated with an account at a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution, from January 1, 2013 to the present.

q. Evidence of Cohen's intent as it relates to the Subject Offenses under investigation.

**B. Search and Seizure of Electronically Stored Information**

The items to be seized from Subject Premises-4 also include any computer devices and storage media that may contain any electronically stored information falling within the categories set forth in Section II.A of this Attachment above, including, but not limited to, a MacBook Pro, any other desktop and laptop computers, any Apple iPhone or other cellphone or smartphone

3

belonging to Michael Cohen or in his possession, an Apple iPad Mini, portable hard drives, disk drives, thumb drives, and personal digital assistants. In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

The items to be seized from Subject Premises-4 also include:

1.    Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.    Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3.    Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

## C.   Review of ESI

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (which may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

4

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections II.A and II.B of this Attachment.  However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

Additionally, review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege. When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

5

2017.08.02

AO 93  (SDNY Rev. 05/10) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of New York

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. |
| | ) | |
| Loews Regency Hotel, 540 Park Avenue, Room 1628, | ) | |
| New York, New York 10065, and any closed | ) | |
| containers/items contained therein, See Attachment A | ) | |

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Southern_____ District of _____New York_____
*(identify the person or describe the property to be searched and give its location)*:
Loews Regency Hotel, 540 Park Avenue, Room 1628 (a suite encompassing rooms 1628, 1629, and 1630) (collectively, "Room 1628"), New York, New York 10065, and any closed containers/items contained therein, See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before    4-16-18

*(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.        ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the Clerk of the Court.

☐ Upon its return, this warrant and inventory should be filed under seal by the Clerk of the Court. _____

*USMJ Initials*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐for _____ days *(not to exceed 30)*.

☐until, the facts justifying, the later specific date of    _____ .

Date and time issued:    4-9-18  7:18 a.m.     /s/  Henry B. Pitman

*Judge's signature*

City and state:    New York, NY    _____    Hon. Henry B. Pitman, U.S. Magistrate Judge

*Printed name and title*

AO 93  (Rev. 01/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| Certification |
|---|

        I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the Court.


Date: _____

                                                                    _____
                                                                    *Executing officer's signature*

                                                                    _____
                                                                    *Printed name and title*

## ATTACHMENT A

### I.   Premises to be Searched—Subject Premises-4

The premises to be searched ("Subject Premises-4") are described as follows, and include electronic devices, and all locked and closed containers found therein:

Room 1628 (a suite encompassing rooms 1628, 1629, and 1630) (collectively, "Room 1628"), located inside the Loews Regency Hotel at 540 Park Avenue, New York, New York 10065. The building is a luxury hotel located on Park Avenue and 61st Street. Subject Premises-4 is located on the 16th floor of the hotel.

### II.   Items to Be Seized

#### A.   Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from Subject Premises-4 are evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 371 (conspiracy, as it pertains to the other Subject Offenses), 1005 (false bank entries), 1014 (false statements to a financial institution), 1343 (wire fraud), and 1344 (bank fraud), and 52 U.S.C. §§ 30116(a)(1)(A) and 30109(d)(1)(A)(1) (illegal campaign contributions) (the "Subject Offenses"), described as follows:

a. Evidence relating to Sterling National Bank, Melrose Credit Union, and/or taxi medallions, from January 1, 2013 to the present.

b. Evidence relating to a plan, proposal, or agreement for Michael Cohen and/or entities associated with him to transfer any interest in taxi medallions, and any associated debts or liabilities, to others, including to _____ and/or entities associated with him.

c. Evidence relating to a plan, proposal, or agreement to modify loans that Cohen has with Sterling and/or Melrose.

d. Evidence relating to Essential Consultants, LLC, including any documents that indicate the nature and purpose of payments made to or from Essential Consultants or the nature of any work done by Cohen or any other individuals in connection with Essential Consultants.

e. Evidence of income to Michael D. Cohen & Associates, including any documents that indicate the nature and purpose of payments made to or from Michael D. Cohen & Associates, or evidence of the purpose of accounts opened in the name of Michael D. Cohen & Associates.

f. Evidence relating to Cohen's net worth, available cash and cash equivalents, monthly and annual income, income sources, and other assets, whether held personally or through entities, including tax returns, personal financial statements, and bank records, from January 1, 2013 to the present.

g. Evidence relating to agreements, loans, and/or financial transactions between Cohen and _____ and/or entities controlled by _____

2

2017.08.02

██████████████████████ and any payments by ██████ to Cohen, from January 1, 2012 to the present.

h.  Evidence relating to payments to Stephanie Clifford, Karen McDougal, or their agents or legal representatives, including any nondisclosure agreements and related documents, and any communications related to such agreements.

i.  Evidence of communications involving Michael Cohen, Donald Trump and/or agents or associates of the Trump Campaign about Stephanie Clifford or Karen McDougal, or payments to Stephanie Clifford or Karen McDougal.

j.  Evidence of communications between Michael Cohen and American Media, Inc., David Pecker, and/or Dylan Howard about Donald Trump, the Trump Campaign, Stephanie Clifford, and/or Karen McDougal.

k.  Evidence relating to Cohen's role in the Trump Campaign, and coordination or consultation with the Trump Campaign.

l.  Evidence of communications with Donald Trump and/or agents or associates of the Trump Campaign about the *Access Hollywood* tape and other potential sources of negative publicity involving Trump's relationship in the run up to the election.

m.  Evidence relating to any reimbursement or other promises made to Cohen for payment to Clifford or others in connection with the election.

n.  Evidence relating to Cohen's knowledge of the campaign finance laws, campaign contribution reporting requirements, and campaign contribution limits.

o.  Communications with others, including Jeffrey Getzel and/or other accountants, relating to Cohen's bank accounts, taxes, debts, and/or finances, from January 1, 2013 to the present.

p.  Communications, records, documents, and other files reflecting false representations to a financial institution related to the intended purpose of an account or loan at that financial institution; the nature of any business or entity associated with an account at a financial institution; the source of funds flowing into an account; or the purpose or nature of any financial transactions involving that financial institution, from January 1, 2013 to the present.

q.  Evidence of Cohen's intent as it relates to the Subject Offenses under investigation.

## B.  Search and Seizure of Electronically Stored Information

The items to be seized from Subject Premises-4 also include any computer devices and storage media that may contain any electronically stored information falling within the categories set forth in Section II.A of this Attachment above, including, but not limited to, a MacBook Pro, any other desktop and laptop computers, any Apple iPhone or other cellphone or smartphone

3

belonging to Michael Cohen or in his possession, an Apple iPad Mini, portable hard drives, disk drives, thumb drives, and personal digital assistants. In lieu of seizing any such computer devices or storage media, this warrant also authorizes the copying of such devices or media for later review.

The items to be seized from Subject Premises-4 also include:

1.     Any items or records needed to access the data stored on any seized or copied computer devices or storage media, including but not limited to any physical keys, encryption devices, or records of login credentials, passwords, private encryption keys, or similar information.

2.     Any items or records that may facilitate a forensic examination of the computer devices or storage media, including any hardware or software manuals or other information concerning the configuration of the seized or copied computer devices or storage media.

3.     Any evidence concerning the identities or locations of those persons with access to, control over, or ownership of the seized or copied computer devices or storage media.

## C.  Review of ESI

Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (which may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained therein for information responsive to the warrant.

In conducting this review, law enforcement personnel may use various techniques to locate information responsive to the warrant, including, for example:

- surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- opening or cursorily reading the first few "pages" of such files in order to determine their precise contents;

- scanning storage areas to discover and possibly recover recently deleted files or deliberately hidden files;

- performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

4

2017.08.02

Law enforcement personnel will make reasonable efforts to search only for files, documents, or other electronically stored information within the categories identified in Sections II.A and II.B of this Attachment. However, law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate its contents and to locate all data responsive to the warrant.

Additionally, review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege. When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the investigative team, in order to address potential privileges.

5

2017.08.02