# 18 MAG   2957

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In re: Warrant and Order For Prospective
and Historical Location Information and
Pen Register Information for the
Cellphones Assigned Call Numbers
▓▓▓▓▓▓▓   and   ▓▓▓▓▓▓▓,
USAO Reference No. 2018R00127

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**WARRANT AND ORDER**

**18 Mag. _____**

**Warrant and Order
for Cellphone Location Information and Pen Register Information
and for Sealing and Non-Disclosure**

TO:   AT&T ("Service Provider"), and any subsequent provider of service to the Target
Cellphones specified below ("Subsequent Service Provider")

United States Attorney's Office and Federal Bureau of Investigation ("Investigative
Agencies")

Upon the Application and Agent Affidavit submitted by the Government in this matter:

## I.   Findings

The Court hereby finds:

1.   The Target Cellphones (the "Target Cellphones") that are the subject of this Order are
assigned call numbers ▓▓▓▓▓ and ▓▓▓▓▓, are subscribed to in the name of Michael
Cohen (the "Subscriber") and are currently serviced by the Service Provider.

2.   Pursuant to 18 U.S.C. § 2703(c)(1)(A) and the applicable provisions of Rule 41 of the
Federal Rules of Criminal Procedure, the Government's application sets forth probable cause to
believe that the prospective and historical location information for the Target Cellphone will reveal
evidence, fruits, or instrumentalities of suspected violations of 52 U.S.C. §§ 30116(a)(1)(A) and
30109(d)(1)(A)(1) ("the Subject Offense").

3.   Pursuant to 18 U.S.C. § 2703(d), the Government's application also sets forth specific
and articulable facts showing that there are reasonable grounds to believe that the historical

location information and toll records for the Target Cellphone are relevant and material to an ongoing criminal investigation.

    4.  Pursuant to 18 U.S.C. § 3123(b)(1), the Government has certified that the pen register information for the Target Cellphones is relevant to an ongoing investigation by the Investigating Agencies of Michael Cohen and others unknown in connection with suspected violations of the Subject Offense.

    5.  Pursuant to 18 U.S.C. § 2705(b), there is reason to believe that notification of the existence of this Warrant and Order will result in destruction of or tampering with evidence, danger to the physical safety of an individual, flight from prosecution, and/or intimidation of potential witnesses, or otherwise will seriously jeopardize an ongoing investigation.

    NOW, THEREFORE, pursuant to Fed. R. Crim. P. 41, 18 U.S.C. §§ 3121 *et seq.*, 18 U.S.C. §§ 2701 *et seq.*, and 18 U.S.C. § 3103a, IT IS HEREBY ORDERED:

## II.  Order to Service Provider

    6.  **Service Provider.** This Order shall apply to the Service Provider specified above, and to any subsequent provider of service to the Target Cellphones without need for further Order of this Court.

    7.  **Prospective Location Information**. The Service Provider shall provide to the Investigating Agencies on a prospective basis, for a period of 45 days from the date of this Order (or the date that the Target Cellphones are seized, whichever comes first), information concerning the location of the Target Cellphones ("Prospective Location Information"), including all available:

        a.  precision location information, including GPS data, E-911 Phase II data, and latitude-longitude data; and

2017.02.09

b. cell site data, including any data reflecting (a) the cell towers and sectors thereof utilized in routing any phone, text, or data communication to or from the Target Cellphones, and (b) the approximate range of the target phone from the cell towers during the communication (including per-call measurement ("PCM") or round-trip time ("RTT" or "NELOS") data);

8. **Historical Location Information and Toll Records**. The Service Provider shall provide to the Investigating Agency all available historical cell site location information reflecting the cell towers and sectors thereof utilized in routing any phone, text, or data communication to or from the Target Cellphones, and the approximate range of the target phone from the cell towers during the communication (PCM/RTT or NELOS data), for the period from October 1, 2016 ~~through the date of this Order~~, as well as all available toll records (including call detail, SMS detail, or data session detail records) for the communications.

*[handwritten margin note: through November 8, 2016 and January 1, 2018 to present]*

9. **Pen register with caller identification and/or trap and trace device.** The Service Provider shall provide to the Investigating Agencies, for a period of 60 days from the date of this order (or the date that the Target Cellphones are seized, whichever comes first), all dialing, routing, addressing, or signaling information associated with each voice, text, or data communication transmitted to or from the Target Cellphones, including but not limited to:

a. any unique identifiers associated with the phone, including ESN, MEIN, MSISDN, IMSI, IMEI, SIM, MIN, or MAC address;

b. source and destination telephone numbers and/or Internet protocol ("IP") addresses;[1]

---

[1] The Service Provider is not required to provide post-cut-through dialed digits ("PCTDD"), or digits that are dialed after a telephone call from the Target Phone has been connected. If possible, the Service Provider will forward only pre-cut-through-dialed digits to the Investigative Agency. However, if the Service Provider's technical capabilities require it to forward all dialed digits, including PCTDD, to the Investigative Agency, the Investigative Agency will only decode and

3

    c.   date, time, and duration of the communication; and

    d.   cell-site information as specified above.

10.  **Technical Assistance.** The Service Provider shall furnish the Investigating Agency all information, facilities, and technical assistance necessary to accomplish the disclosure of all of the foregoing information relating to the Target Cellphones unobtrusively and with the minimum interference to the service presently provided to the Subscriber.

11. **Non-Disclosure to Subscriber.** The Service Provider, including its affiliates, officers, employees, and agents, shall not disclose the existence of this Warrant and Order, or the underlying investigation, to the Subscriber or any other person, for a period of 180 days from the date of this Warrant and Order, subject to extension upon application to the Court, if necessary.

## III.  Additional Provisions

12. **Compensation for Costs.** The Investigating Agency shall compensate the Service Provider for reasonable expenses incurred in complying with the Warrant and this Order.

13. **Sealing.** This Warrant and Order, and the supporting Application and Agent Affidavit, shall be sealed until otherwise ordered by the Court, except that the Government may without further order of this Court: serve this Warrant and Order on the Service Provider; provide copies of the Warrant and Order or the supporting Application and Agent Affidavit as need be to

---

forward to the agents assigned to the investigation, the numbers that are dialed before the call is cut through.

2017.02.09

personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

_4-7-18_
Date Issued

_1:58 PM_
Time Issued

UNITED STATES MAGISTRATE JUDGE
Southern District of New York

2017.02.09

5

# 18 MAG 2957

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In re: Warrant and Order For
Prospective and Historical Location
Information and Pen Register
Information for the Cellphones
Assigned Call Numbers �altext
and ▮▮▮▮▮▮▮ USAO Reference
No. 2018R00127

**APPLICATION**

**18 Mag. _____**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**Application for Warrant and Order**
**for Cellphone Location and Pen Register Information**

The United States of America, by its attorney, Robert Khuzami, Attorney for the United States Acting Under Authority Conferred by 28 U.S.C. § 515, ▮▮▮▮▮▮ Assistant United States Attorney, of counsel, respectfully requests that the Court issue the accompanying proposed Warrants and Orders for prospective and historical location information and pen register information for two cellphones (the "Target Cellphones"). As grounds for this Application the Government relies on the following facts and authorities.

## I. Introduction

1. I am an Assistant United States Attorney in the U.S. Attorney's Office for the Southern District of New York. This Application is submitted in conjunction with the accompanying affidavit of a law enforcement agent ("Agent Affidavit"), to be sworn before this Court, and incorporated by reference herein. I make this Application based on information and belief, including the Agent Affidavit, my review of other documents in the case, and information received from investigative personnel.

2.   The Investigating Agency, Target Cellphones, Subscriber, Target Subject(s), Service Provider, Subject Offenses, Successor Service Provider, and Successor Cellphones referenced in this Application are as specified in the Agent Affidavit.

## II.  Legal Authority

### A.  Prospective Location Information

3.   The Government seeks to obtain both precision location information and cell site data for the Target Cellphones on a prospective basis (the "Prospective Location Information") for a period of 45 days from the date of this order – the same period of time for which a warrant for a tracking device may be granted under Rule 41(e)(2)(C).  It bears noting, however, that while the Prospective Location Information may permit "tracking" the user of the phone in the colloquial sense, this is not an application for a warrant for a "tracking device" as defined in Fed. R. Crim. P. 41(a)(2)(E) and 18 U.S.C. § 3117(b).  Those provisions only apply where an agent is seeking to physically install a tracking device on a given object.   Instead, the Prospective Location Information will be obtained by requiring the Service Provider to provide the information.

4.   The authority for this application is found in 18 U.S.C. §§ 2703(c)(1), which authorizes a court of competent jurisdiction to require any electronic communication service provider (which includes a cellular telephone service provider[1]) to disclose any "record or other information pertaining to a subscriber" other than the "contents of communications," when the government obtains, *inter alia*, a warrant under the procedures of Rule 41.  *See* 18 U.S.C. § 2703(c)(1)(A).[2]

---

[1] *See* 18 U.S.C. § 2711(1) (incorporating by cross-reference statutory definitions set forth in 18 U.S.C. § 2510); 18 U.S.C. § 2510(15) (defining "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications").

[2] Another provision of 18 U.S.C. § 2703(c)(1), specifically, § 2703(c)(1)(B), enables the Government to compel an electronic communication service provider to disclose non-content information pertaining to a subscriber by obtaining an order issued under 18 U.S.C. § 2703(d),

2017.02.09

Because data concerning a subscriber's location, such as precision location information and cell site data, constitutes "information pertaining to a subscriber" that does not include the "contents of communications," that data is among the types of information available under § 2703(c)(1)(A).[3] Further, as specified in 18 U.S.C. § 2711(3), this Court is a court of competent jurisdiction under the Stored Communications Act because it has jurisdiction over the Subject Offenses.

5.     The Government's request for cell site data also implicates the pen register statute, because such data constitutes signaling information used by the Service Provider to route communications to and from the Target Cellphones. In order to collect such data, a valid pen register order is required.[4] Accordingly, I hereby certify pursuant to 18 U.S.C. § 3122 that such

---

instead of a warrant. Rather than requiring a showing of probable cause, a § 2703(d) order requires only a showing that there are reasonable grounds to believe that the information sought is relevant and material to an ongoing criminal investigation. However, given that continued monitoring of an individual's specific location through precision location information arguably implicates Fourth Amendment interests, *see United States v. Jones*, 565 U.S. 400, 418 (2012) (Alito, J., concurring in the judgment), the Government here seeks to obtain the Precision Location Information sought herein by a § 2703(c) warrant rather than a § 2703(d) order.

[3] *See In re Application*, 460 F. Supp. 2d 448, 459–60 & n. 55 (S.D.N.Y. 2006) (Kaplan, J.) (cellphone location information falls within § 2703(c)(1)); *accord, e.g.*, *United States v. Caraballo*, 963 F. Supp. 2d 341, 361 (D.Vt. 2013); *In re Order*, 632 F. Supp. 2d 202, 207 (E.D.N.Y. 2008); *In re Application*, 405 F. Supp. 2d 435, 444-45 (S.D.N.Y. 2005). *But see In re Application*, 849 F. Supp. 2d 526, 574 (D.Md. 2011) (rejecting view that cellular location data falls within the scope of the SCA and finding that phone must be treated as "tracking device" for purposes of Rule 41 where used to collect location data); *In re Application*, 2009 WL 159187, at *5-*6 (S.D.N.Y. Jan.13, 2009) (McMahon, J.) (same).

[4] *See* 18 U.S.C. § 3121 (prohibiting use of pen register or trap and trace device without an order under the pen register statute); 3127(3) & (4) (defining pen register and trap and trace device to include devices or processes that record, *inter alia*, signaling information). Although cell site data constitutes "signaling" information within the meaning of the pen register statute, a separate statute precludes the Government from relying "solely" on the authority provided by the pen register statute to ascertain a subscriber's location. 47 U.S.C. § 1002(a). Here, the Government seeks to obtain such data pursuant to 18 U.S.C. § 2703(c) as well as the pen register statute, rather than "solely" under the latter statute. *See In re Application*, 460 F. Supp. 2d at 456-59.

signaling information is relevant to an ongoing investigation being conducted by the Investigating

Agency into suspected violations of the Subject Offenses by the Target Subject(s).

**B.   Historical Location Information**

6.   The Government also seeks historical cell site data for the Target Cellphones for the

period from October 1, 2016 to ~~the present~~ *through November 8, 2016 and January 1, 2018 to present* (the "Historical Location Information"). Because such

data constitutes non-content information concerning a subscriber, the Court is authorized to order

the Service Provider to provide this data pursuant to a warrant application under 18 U.S.C. §

2703(c) or an application for an order under 18 U.S.C. § 2703(d).   *See* 18 U.S.C. § 2703(c)(1)(B).

Pursuant to 18 U.S.C. § 2703(d), I respectfully submit that the Agent Affidavit offers specific and

articulable facts showing that there are reasonable grounds to believe that the Historical Location

Information is relevant and material to an ongoing criminal investigation.   Further, although a

warrant for the Historical Location Information is not required, I respectfully submit that the same

probable cause supporting the Government's request for a warrant to obtain the Prospective

Location Information requested above also supports the issuance of a warrant under § 2703(c) for

the Historical Location Information.[5]   In addition, the Government seeks toll records for the same

---

[5] A warrant is not required to obtain historical cell site information.   Individuals do not have a reasonable expectation of privacy in historical cell site information because individuals voluntarily convey that information to third-party service providers. *See United States v. Graham*, 824 F.3d 421, 424-25 (4th Cir. 2016) (*en banc*); *United States v. Davis*, 785 F.3d 498, 511-13 (11th Cir. 2015) (*en banc*), *cert. denied*, 136 S. Ct. 479 (2015); *In re Application of U.S. for Historical Cell Site Data*, 724 F.3d 600, 614-15 (5th Cir. 2013); *United States v. Guerrero*, 768 F.3d 351, 358-59 (5th Cir. 2014); *see also United States v. Pascual*, 502 F. App'x 75, 80 & n.6 (2d Cir. 2012), *cert. denied,* 134 S. Ct. 231 (2013) ("general principles" of third-party doctrine "point[ ]" toward this conclusion regarding cell-site records); *but see United States* v. *Ulbricht*, 858 F.3d 71, 97 n.29 (2d Cir. 2017) (declining to express its view as to whether the Fourth Amendment applies to historical cell site location information).   Moreover, because historical cell site information does not enable law enforcement to conduct live monitoring of a person's location within private spaces such as "the interior of the [person's] home," it is not comparable to prospective precision location information, for which a warrant is arguably required.   *See In re Application of U.S. for Order Directing Provider of Elec. Commc'n Serv. to Disclose Records to Gov't*, 620 F.3d 304, 312-15 (3d Cir. 2010).   Nevertheless, because the Supreme Court has recently granted certiorari to review

3

period as the Historical Location Information is requested, which the Government is also authorized to obtain pursuant to 18 U.S.C. §2703(d).

### C. Pen Register Information

7.  Finally, the Government seeks an order pursuant to 18 U.S.C. §§ 3121-26 authorizing the use of a pen register on the Target Cellphones for a period of 60 days from the date of this order (or the date that the Target Cellphones are seized, whichever comes first). Specifically, the Government seeks an order directing the Service Provider to furnish any information, facilities, and technical assistance necessary to operate, unobtrusively and with minimum disruption of service, a pen register and trap and trace device to capture all dialing, routing, addressing, or signaling information associated with each call transmitted to or from the Target Cellphones, as specified further in the proposed Warrant and Order (the "Pen Register Information").[6]

8.  I hereby certify pursuant to 18 U.S.C. § 3122 that the Pen Register Information is relevant to an ongoing investigation being conducted by the Investigating Agency into suspected violations of the Subject Offenses by the Target Subject(s).

---

the Sixth Circuit's decision in *United States* v. *Carpenter*, 819 F.3d 880, 887-90 (6th Cir. 2016) (holding Government's collection of business records containing historical cell site data did not constitute search under Fourth Amendment), *cert. granted*, 137 S. Ct. 2211 (June 5, 2017) (No. 16-402), the Government, in an abundance of caution, requests a warrant under 18 U.S.C. § 2703(c), upon articulation of probable cause as set forth in the Agent Affidavit.

[6] The Government is also not seeking authorization to obtain post-cut-through dialed digits ("PCTDD"), or digits that are dialed after a telephone call from the Target Phone has been connected. Pursuant to the attached Order, if possible, the Provider will forward only pre-cut-through-dialed digits to the Investigating Agency. However, if the Provider's technical capabilities require it to forward all dialed digits, including PCTDD, to the Investigating Agency, the Investigating Agency will only decode and forward to the agents assigned to the investigation the numbers that are dialed before the call is cut through.

2017.02.09

### D. Sealing and Non-Disclosure Order to Service Provider

9. When the Government obtains records or information under § 2703(c), it is not required to notify the subscriber or customer. 18 U.S.C. § 2703(c)(3). Additionally, the Government may obtain an order precluding the Provider from notifying the subscriber or any other third-party of the warrant or order obtained, for such period as the Court deems appropriate, where there is reason to believe that such notification will result in endangering the life or physical safety of an individual, flight from prosecution, destruction of or tampering with evidence, or intimidation of potential witnesses, or will otherwise seriously jeopardize the investigation. 18 U.S.C. § 2705(b).

10. Further, 18 U.S.C. § 3123(d) provides that an order directing installation of a pen register or trap and trace device shall direct the pertinent service provider "not to disclose the existence of the pen register or trap and trace device or the existence of the investigation to the listed subscriber, or to any other person unless or until otherwise ordered by the Court."

11. Accordingly, as explained further in the Agent Affidavit, in light of the confidential nature of the continuing criminal investigation and the adverse consequences expected in the event of premature notification, the Government respectfully requests that the Court direct the Service Provider not to notify the Subscriber or any other person of the Warrant and Order sought herein for a period of 180 days, subject to extension upon application to the Court, if necessary.

12. For similar reasons, I respectfully request that the proposed Warrant and Order, this Application, and the accompanying Agent Affidavit, be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to serve this Warrant and Order on the Service Provider; provide copies of the Warrant and Order or the supporting Application and Agent Affidavit as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

5

2017.02.09

## III.  Prior Requests

14. Except as may be set forth above, no prior request for the relief requested herein has

been made.

Dated: New York, New York
       April 7, 2018



Assistant United States Attorney
Tel.: (212) 637-

6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

# 18 MAG   2957

In re: Warrant and Order For Prospective
and Historical Location Information and
Pen Register Information for the
Cellphones Assigned Call Numbers
███████ and ███████
USAO Reference No. 2018R00127

**AGENT AFFIDAVIT**

**18 Mag. _____**

**Agent Affidavit in Support of Warrant and Order
for Cellphone Location and Pen Register Information**

---

STATE OF NEW YORK      )
                                       ) ss.
COUNTY OF NEW YORK  )

Special Agent ███████ of the United States Attorney's Office for the Southern
District of New York, being duly sworn, deposes and states:

## I. Introduction

1.   I am a Special Agent with the United States Attorney's Office for the Southern District
of New York ("Investigating Agency"). As such, I am a "federal law enforcement officer" within
the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent
engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a
search warrant. I have been a Special Agent with the USAO since August 2016.  I previously
served as a Special Agent with the United States Department of Labor Inspector General from
May 2011 to August 2016.  In the course of my experience and training in these positions, I have
participated in numerous investigations involving the use of cellphone location data.

2.   **Requested Information.** I respectfully submit this Affidavit pursuant to 18 U.S.C.
§§ 2703(c) and (c)(1)(A) and the applicable procedures of Federal Rule of Criminal Procedure 41;
18 U.S.C. §§ 2703(d) & 2705; and 18 U.S.C. §§ 3121-3126, in support of a warrant and order for
prospective location information, historical location information, toll records, and pen register

information, for the Target Cellphones identified below (collectively, the "Requested Information").

3. **Basis for Knowledge.** This Affidavit is based upon my participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals, as well as my training and experience. Because this Affidavit is being submitted for the limited purpose of obtaining the Requested Information, it does not include all the facts that I have learned during the course of this investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. In addition, unless otherwise indicated, statements by others referenced in this Affidavit were not necessarily made to me, but may have been provided to me by someone else to whom I have spoken or whose report I have read (and who in turn may have had either direct or indirect knowledge of the statement). Similarly, unless otherwise indicated, information in this Affidavit resulting from surveillance does not necessarily set forth my personal observations, but may have been provided to me by other law enforcement agents who observed the events, and to whom I have spoken or whose report I have read.

4. **Target Cellphones, Subscriber, Target Subject, and Service Provider.** The Target Cellphones referenced in this Affidavit are the cellphones assigned call numbers ▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮ As further discussed below, the Target Cellphones are subscribed to in the name of Michael Cohen (the "Subscriber"). The Subscriber is believed to use the Target Cellphones and is a Target Subject of this investigation. AT&T is the Service Provider for the Target Cellphones.

2

5. **Precision Location Capability.** Cellphone service providers have technical capabilities that allow them to collect at least two kinds of information about the locations of the cellphones to which they provide service: (a) precision location information, also known as E-911 Phase II data, GPS data, or latitude-longitude data, and (b) cell site data, also known as "tower/face" or "tower/sector" information. Precision location information provides relatively precise location information about a cellphone, which a provider can typically collect either via GPS tracking technology built into the phone or by triangulating the device's signal as received by the provider's nearby cell towers. Cell site data, by contrast, reflects only the cell tower and sector thereof utilized in routing any communication to and from the cellphone, as well as the approximate range of the cellphone from the tower during the communication (sometimes referred to as "per-call measurement" ("PCM") or "round-trip time" ("RTT" or "NELOS" data). Because cell towers are often a half-mile or more apart, even in urban areas, and can be ten or more miles apart in rural areas, cell site data is typically less precise than precision location information. Based on my training and experience, I know that the Service Provider has the technical ability to collect precision location information from any cellphone on its network, including by initiating a signal on the Service Provider's network to determine the phone's location. I further know that cell site data is routinely collected by the Service Provider in the course of routing calls placed to or from any cellphone on its network.[1]

6. **Successor Service Provider.** Because it is possible that the Target Subject may change cellphone service provider during the course of this investigation, it is requested that the warrant

---

[1] Toll records are sometimes necessary or helpful in order to obtain or interpret historical cell site data and are therefore also requested herein.

3

and investigative order requested apply without need for further order to any Successor Service Provider who may provide service to the Target Cellphones during the time frames at issue herein.

## II.  Facts Establishing Probable Cause

7.  Although I understand that probable cause is not necessary to obtain all of the Requested Information, I respectfully submit that probable cause exists to believe that the Requested Information will lead to evidence of the crime of 52 U.S.C. §§ 30116(a)(1)(A) and 30109(d)(1)(A)(1) (illegal campaign contributions) (the "Subject Offense"), as well as the location of the Target Subject who is engaged in the Subject Offense.

### Introduction

8.  The USAO and the Federal Bureau of Investigation (the "FBI") are investigating a criminal violation of the campaign finance laws by Michael Cohen, a lawyer who holds himself out as the personal attorney for President Donald J. Trump.  As detailed below, there is probable cause to believe that Cohen made an excessive in-kind contribution to the presidential election campaign of then-candidate Donald Trump in the form of a $130,000 payment to Stephanie Clifford, an individual who was rumored to have had an extramarital affair with Trump, in exchange for her agreement not to disclose that alleged affair on the eve of the 2016 presidential election.

### Prior Relevant Process

9.  In connection with an investigation then being conducted by the Office of the Special Counsel ("SCO"), the FBI sought and obtained from the Honorable Beryl A. Howell, Chief United States District Judge for the District of Columbia, three search warrants for emails and other content information associated with two email accounts used by Cohen, and one search warrant for stored content associated with an iCloud account used by Cohen.  Specifically:

4

a.  On or about July 18, 2017, the FBI sought and obtained a search warrant for emails in the account ▓▓▓▓▓@gmail.com (the "Cohen Gmail Account") sent or received between January 1, 2016 and July 18, 2017 (the "First Cohen Gmail Warrant").

b.  On or about August 8, 2017, the FBI sought and obtained a search warrant for content stored in the iCloud account associated with Apple ID ▓▓▓▓▓@gmail.com (the "Cohen iCloud Account" and the "Cohen iCloud Warrant").

c.  On or about November 13, 2017, the FBI sought and obtained a search warrant for emails in the Cohen Gmail Account sent or received between June 1, 2015 and November 13, 2017 (the "Second Cohen Gmail Warrant").

d.  On or about November 13, 2017, the FBI sought and obtained a search warrant for emails in the account ▓▓▓▓▓ (the "Cohen MDCPC Account") sent or received between the opening of the Cohen MDCPC Account[2] and November 13, 2017 (the "First Cohen MDCPC Warrant").

10.  The SCO has since referred certain aspects of its investigation into Cohen to the USAO, which is working with the FBI's New York Field Office.

11.  On or about February 28, 2018, the USAO sought and obtained search warrants for emails in Cohen Gmail Account and Cohen MDCPC Account, among other accounts, sent or received between November 14, 2017 and February 28, 2018 (the "Third Cohen Gmail Warrant" and "Second Cohen MDCPC Warrant").

---

[2] Based on my review of this warrant and the affidavit in support of it, I know that the warrant did not specify a time period, but the affidavit indicated that, pursuant to court order, the service provider had provided non-content information for the Cohen MDCPC Account that indicated that the account contained emails from the approximate period of March 2017 through the date of the warrant.

5

12. The above-described warrants are referred to herein as the "Cohen Emails Warrants" and, with respect to the iCloud Warrant, the "Cohen iCloud Warrant."

## The Illegal Campaign Contribution Scheme

13. From my review of public sources, I have learned the following:

a. In or around October 2011, there were rumors published on the gossip website *TheDirty.com* that Trump had had an extramarital affair with Clifford, an adult film actress whose screen name is Stormy Daniels, in or around July 2006. In or about October 2011, *Life & Style Magazine*, a tabloid sold in supermarkets, also published an article, based on the report in *TheDirty.com*, alleging an affair had occurred between Trump and Clifford. Both Trump and Clifford, through their representatives, issued denials in response to the articles.

b. Specifically, on or about October 11, 2011, Keith Davidson, who identified himself as Clifford's attorney, sent a cease and desist letter to *TheDirty.com*, demanding that the article regarding Trump and Clifford be removed from the website. Additionally, on or about October 12, 2011, Cohen, who was then Executive Vice-President and Special Counsel to the Trump Organization, stated to *E! News* that "[t]he totally untrue and ridiculous story . . . emanated from a sleazy and disgusting website. . . . The Trump Organization and Donald J. Trump will be bringing a lawsuit . . . [and] Mr. Trump and the Trump Organization would like to thank and commend Stormy Daniels and her attorneys for their honesty and swift actions."

14. On or about June 16, 2015, Trump formally launched his 2016 presidential campaign. On or about May 4, 2016, Trump became the presumptive Republican Party nominee for president, and on July 19, 2016, Trump officially became the nominee. Based on my review of public sources, I have learned that while it does not appear that Cohen had an official title as part of the Trump campaign, on multiple occasions Cohen made public statements on behalf of Trump or his

6

campaign. For instance, on or about August 18, 2016, Cohen appeared on CNN to defend Trump's polling numbers.

15. On or about October 7, 2016, *The Washington Post* published online a video and accompanying audio in which Trump referred to women in what the article described as "vulgar terms" in a 2005 conversation with Billy Bush, who was then the host of *Access Hollywood*. The following day, on October 8, 2016, Trump appeared in a video in which he stated, among other things, "I've said and done things I regret and words released today on this more than a decade old video are one of them. Anyone who knows me knows these words don't reflect who I am. I said it. I was wrong and I apologize." Based on my review of public sources, I also know that representatives of the Trump Campaign stated, in sum and substance, that the *Access Hollywood* comment was an old and isolated incident.

16. Based on my review of public sources, including an article published in *Slate* magazine by a reporter who interviewed Clifford, that around this same time, in or about October 2016, Clifford was in discussions with ABC's *Good Morning America* show and *Slate* magazine, among other media sources, to provide these media outlets with her statement about her alleged relationship with Trump. According to the article in *Slate*, which the author based on conversations with Clifford over the telephone and by text message, Clifford wanted to be paid for her story or be paid by Trump not to disclose her accusation. As Cohen summarized in a 2018 email obtained pursuant to the Cohen Email Warrants: "In October 2016, I was contacted by counsel for Ms. Clifford stating that news outlets, including *ABC News*, were pursuing the 2011 story of an alleged affair between Mr. Trump and Ms. Clifford."

7

17. From my review of telephone toll records[3] and information produced pursuant to the iCloud Warrant and Cohen Email Warrants, I have learned that in the days following the *Access Hollywood* video, Cohen exchanged a series of calls, text messages, and emails with Keith Davidson, who was then Clifford's attorney, David Pecker and Dylan Howard of American Media, Inc. ("AMI"), the publisher of the *National Enquirer*,[4] Trump, and Hope Hicks, who was then press secretary for Trump's presidential campaign. For these text messages and calls—as well as all of the text messages and calls referenced in this affidavit involving Cohen—Cohen used one of the Target Cellphones for the communication.

18. Based on the timing of the calls in the days following the *Access Hollywood* story, and the content of the text messages and emails, I believe that at least some of these communications concerned the need to prevent Clifford from going public, particularly in the wake of the *Access Hollywood* story. In particular, I have learned the following:

a. On October 8, 2016, at approximately 7:20 p.m., Cohen received a call from Hicks. Sixteen seconds into the call, Trump joined the call, and the call continued for over four minutes.[5]

---

[3] My attribution of certain telephone numbers to certain individuals as described in this affidavit is based on my review of the vCard (virtual contact file) obtained from Cohen's telephone pursuant to the iCloud Warrant.

[4] Pecker is President of AMI and, according to his own statements in public reports, a personal friend of Trump. Howard is the chief content officer of AMI, who according to public records reports directly to Pecker.

[5] I believe that Trump joined the call between Cohen and Hicks based on my review of toll records. Specifically, I know that a call was initiated between Cohen's telephone number and Trump's telephone number at the same time the records indicate that Cohen was talking to Hicks. After the Cohen-Trump call was initiated, it lasted the same period of time as the Cohen-Hicks call. Additionally, the toll records indicate a "-1" and then Trump's telephone number, which, based on my training and experience, means that the call was either transferred to Trump, or that Trump was added to the call as a conference or three-way call participant. In addition, based on my conversations with an FBI agent who has interviewed Hicks, I have learned that Hicks stated, in substance, that to the best of her recollection, she did not learn about the allegations made by Clifford until early November 2016. Hicks was not specifically asked about this three-way call.

Based on the toll records that the USAO has obtained to date, I believe that this was the first call Cohen had received or made to Hicks in at least multiple weeks, and that Cohen and Trump spoke about once a month prior to this date – specifically, prior to this call on October 8, 2016, Cohen and Trump had spoken once in May, once in June, once in July, zero times in August, and twice in September.

      b.  Approximately ten minutes after the call ended, Hicks and Cohen spoke again for about two minutes.

      c.  At 7:39 p.m., immediately after the second call with Hicks ended, Cohen called David Pecker (as noted above, the President of American Media Inc., or AMI) and they connected for thirty seconds. Approximately four minutes later, Cohen called Pecker again and they spoke for more than a minute. Three minutes after ending his call with Pecker, Cohen received a call from Dylan Howard (as noted above, the Chief Content Officer of AMI), and they spoke for approximately a minute. According to toll records, it does not appear that Cohen and Howard spoke regularly prior to October 8, 2016, as it had been over a month since they had called each other.

      d.  At 7:56 p.m., approximately eight minutes after his call with Howard ended, Cohen called Hicks and they connected for two minutes. At approximately the same time this call ended, Cohen received a call from Pecker, and they spoke for about two minutes. At 8:03 p.m., about three minutes after ending his call with Pecker, Cohen called Trump, and they spoke for nearly eight minutes.

      e.  At 8:39 p.m. and 8:57 p.m., Cohen received calls from Howard and spoke to him for about four and six minutes, respectively. At 9:13 p.m., about ten minutes after Cohen and Howard hung up from the second of these calls, Howard sent Cohen a text message that said:

2018-04-07017.02.09

"Keith will do it. Let's reconvene tomorrow." Based on my involvement in this investigation, I believe that when Howard wrote "Keith," he was referring to Keith Davidson, the attorney for Stephanie Clifford. At 3:31 a.m., now on October 9, 2016, Cohen sent Howard a text message in response that said: "Thank you." Eight minutes later, Cohen sent Howard a text message that said: "Resolution Consultants LLC. is the name of the entity I formed a week ago. Whenever you wake, please call my cell."

  f. The following day, on October 10, 2016, at 10:58 a.m., Howard sent a text message to Cohen and Davidson, which stated: "Keith/Michael: connecting you both in regards to that business opportunity. Spoke to the client this AM and they're confirmed to proceed with the opportunity. Thanks. Dylan. Over to you two." At 12:25 p.m., Davidson sent Cohen a text message that stated: "Michael – if we are ever going to close this deal – In my opinion, it needs to be today. Keith." Davidson and Cohen then spoke by phone for about three minutes. Based on my participation in this investigation, I believe that when Howard wrote that the "client" was "confirmed to proceed with the opportunity," he was referring to Clifford's agreement in principle to accept money from Cohen in exchange for her agreement not to discuss any prior affair with then-candidate Trump.[6]

  g. Based on my review of records obtained pursuant to the Cohen Email Warrants, I know that on or about October 10, 2016, Clifford and Davidson appear to have signed a "side letter agreement" that stated it was an exhibit to a "confidential settlement agreement and mutual

---

[6] As set forth below, AMI was also involved in a payment to model Karen McDougal. However, because these communications were in close temporal proximity to the events involving the negotiation of a payment to Clifford, the execution of the agreement with Clifford, and the payment of money to Clifford, I believe that these communications were related to Clifford. Additionally, based on my review of public statements by McDougal, I have learned that she negotiated an agreement with AMI several months prior to these communications between Cohen and Pecker, Howard, and Davidson.

release" between "Peggy Peterson" and "David Dennison." The purpose of the document, according to the agreement, was to define the "true name and identity" of persons named by pseudonym in "confidential settlement agreement and mutual release." The side letter agreement specifies the identity of "Peggy Peterson" to be Clifford, but the space for "Dennison's" identity is blank. The agreement also includes a signature page for "Peterson," "Dennison," and their attorneys. The signature page is signed by "Peterson" and his attorney, Davidson, but the document is unsigned by "Dennison" and his attorney. Based on my involvement in this investigation, I believe that Davidson sent Cohen this partially-signed "side letter agreement" in order to facilitate the closing of a deal between Davidson's client and Cohen or his client on October 10, 2016.

19. It appears that on October 13, 2016, and the days that followed, Cohen took steps to complete a transaction with Davidson, including attempting to open an account from which Cohen could transfer funds to Davidson. Specifically, from my review of toll records, information obtained pursuant to the iCloud Warrant and Cohen Email Warrants, records maintained by First Republic Bank ("First Republic"), as well as my participation in interviews with employees of First Republic, I have learned the following:

a. On the morning of October 13, 2016, at 8:54 a.m., Cohen sent Pecker a text message that stated: "I need to talk to you." At 9:06 a.m., Pecker sent a text message to Cohen that stated, "I called please call me back." The tolls between Cohen and Pecker do not show a telephone call between 8:54 a.m. and 9:06 a.m. However, based on my review of text messages, I have learned that Cohen and Pecker communicate with each other over Signal, which is an encrypted communications cellphone application that allows users to send encrypted text messages and make encrypted calls.

2018-04-07017.02.09

b.   At 9:23 a.m., Cohen sent an email that stated "call me" to a banker at First Republic

Bank ("First Republic Employee-2").  The email attached documents from the Secretary of State

of Delaware indicating that Cohen had formed a limited liability company called "Resolution

Consultants LLC" on September 30, 2016.  As noted above, "Resolution Consultants" is the name

of the entity that Cohen had told Howard he had formed recently after Howard said Davidson

would "do it."  At 10:44 a.m., Cohen called First Republic Employee-2 and told him, in sum and

substance, that he needed an account in the name of "Resolution Consultants" opened immediately,

and that he did not want an address on the checks written out of the account.  Later that day, another

employee at First Republic emailed Cohen account opening paperwork to complete.   Cohen

returned the account opening documents partially completed, but failed to provide a copy of his

driver's license or passport, and did not respond to the employee's question of how he wanted to

fund the account.  As a result, the account was never opened.

c.   On October 17, 2016, Cohen incorporated Essential Consultants LLC in Delaware.

That same day, he filed paperwork to dissolve Resolution Consultants LLC.

20. Despite these steps taken by Cohen, it appears that the negotiation between Cohen and

Davidson was not progressing sufficiently fast enough for Davidson or his client, Clifford, and

they threatened to go public with Clifford's allegations just days before the presidential election.

Specifically, based on my review of toll records, information obtained pursuant to the iCloud

Warrant, and public sources, I know the following:

a.   According to an article in *The Washington Post*, which quoted emails sent from

Cohen's email account hosted by the Trump Organization, on October 17, 2016, Davidson emailed

Cohen and threatened to cancel the aforementioned "settlement agreement" by the end of the day

if Cohen did not complete the transaction.[7] According to the article, Davidson sent Cohen a second email later in the day that stated in part, "Please be advised that my client deems her settlement agreement canceled and void." At 4:00 p.m. that day, Cohen called Davidson and they spoke for over five minutes.

  b. Cohen's 4:00 p.m. call with Davidson and/or Davidson's threats to cancel the "settlement agreement" appear to have touched off a flurry of communications about the settlement agreement and whether Clifford would go public. Specifically:

   i. At 4:43 p.m., Howard sent Cohen a text message that stated: "I'm told they're going with DailyMail. Are you aware?" One minute later, Cohen responded: "Call me." Based on my involvement in this investigation, I understand Howard's text to mean that he heard that Clifford was going to take her story of an extramarital affair with Trump to the *Daily Mail*, a tabloid newspaper.

   ii. At 4:45 p.m., Howard called Cohen and they spoke for over two minutes. Moments later, Davidson and Cohen spoke for about two minutes.

   iii. At 5:03 p.m., Cohen attempted to call Trump, but the call only lasted eight seconds. This was Cohen's first call after he spoke with Davidson.

   iv. At 5:25 p.m., Cohen texted Howard, stating: "Well???"

   v. At 6:44 p.m., Howard responded to Cohen's text, stating: "Not taking my calls." Cohen responded one minute later: "You're kidding. Who are you trying to reach?" Howard responded one minute later: "The 'agent.'" Based on my involvement in this investigation, I

---

[7] Due to the partially covert nature of the investigation to this date, the Government has not requested documents from the Trump Organization or Davidson, and thus does not possess the email referenced in this article.

understand Howard's text messages to mean that he attempted to contact Davidson about the matter involving Clifford, but that Davidson was not taking Howard's calls.

   vi. At 6:49 p.m., Cohen called Howard and they spoke for nearly four minutes.

   c. The following day, on October 18, 2016, *TheSmokingGun.com*, a website that publishes legal documents and mugshots, published an article called: "Donald Trump and the Porn Superstar," which alleged that Trump had an extramarital affair with Clifford. However, the article noted that Clifford had declined to comment.

   21. On or about October 25, 2016, the communications between Cohen, Davidson, Howard and Pecker picked up again, apparently concerning a transaction involving Clifford. Specifically, based on my review of toll records, information obtained pursuant to the Cohen Email Warrants and iCloud Warrant, as well as my review of public sources, I have learned the following:

   a. On October 25, 2016, at 6:09 p.m., Howard sent Cohen a text message stating: "Keith calling you urgently. We have to coordinate something on the matter he's calling you about or its [sic] could look awfully bad for everyone." One minute later, Davidson sent Cohen a text message stating "Call me." Cohen and Davidson called each other several times over the next half hour but appear not to have connected. At 6:42 p.m., Cohen and Davidson spoke for about eight minutes. At 7:11 p.m., they spoke for another two minutes.

   b. The next morning, on or about October 26, 2016, at 8:26 a.m., Cohen called Trump and spoke to him for approximately three minutes. At 8:34 a.m., Cohen called Trump again and connected for a minute and a half.

   c. At approximately 9:04 a.m.—less than thirty minutes after speaking with Trump—Cohen sent two emails to the person who had incorporated Resolution Consultants and Essential Consultants for him, and stated "can you send me asap the filing receipt" and then, in the second

14

email, "for Essential Consultants LLC." That person responded with the filing receipt two minutes

later at 9:06 a.m. and with the certification of formation 23 minutes later, at 9:27 a.m.

      d.   Shortly after that, Cohen contacted a particular employee at First Republic ("First

Republic Employee-2") and told him, in sum and substance, that he decided not to open an account

in the name of "Resolution Consulting" and instead would be opening a real estate consulting

company in the name of "Essential Consultants." Cohen told First Republic Employee-2 that he

was at Trump Tower, and wanted to go to a First Republic branch across the street to open the

account, so First Republic Employee-2 called another employee of First Republic ("First Republic

Employee-1"), a preferred banker at that branch, to assist Cohen. At 11:00 a.m., First Republic

Employee-1 called Cohen. I know from my participation in an interview with First Republic

Employee-1, that around the time of the call he went to Cohen's office in Trump Tower—on the

same floor as the Trump Organization—and went through account opening questions, including

know your customer questions, with Cohen. In response to a series of know-your-customer

questions about the purpose of the account—the answers to which First Republic Employee-1

entered into a form—Cohen stated, in sum and substance, that he was opening Essential

Consultants as a real estate consulting company to collect fees for investment consulting work,

and all of his consulting clients would be domestic individuals based in the United States. Based

on my review of records obtained from First Republic, it appears that this account (the "Essential

Consultants Account") was created at a time between 11:00 a.m. and 1:00 p.m.

      e.   At 1:47 p.m., Cohen called Davidson and they spoke for approximately two

minutes. At approximately 1:49 p.m., Davidson emailed Cohen wiring instructions for an attorney

client trust account at City National Bank.

f.   After the Essential Consultants Account was opened on October 26, 2016, Cohen transferred $131,000 from a home equity line of credit that Cohen had at First Republic to the Essential Consultants Account.  Following the transfer, at approximately 4:15 p.m. on October 26, 2016, First Republic Employee-2's assistant emailed Cohen at his Trump Organization email address to tell him that the funds had been deposited into the Essential Consultants Account. Cohen forwarded that email to the Cohen Gmail Account and then forwarded it to Davidson.

g.   At 6:37 p.m., Cohen asked Pecker by text message, "Can we speak?  Important." Cohen called Pecker at 6:49 p.m. and connected for thirty seconds.  At 6:57 p.m., Cohen sent Howard a text message, stating: "Please call me. Important."  Cohen called Howard at 7:00 p.m. and connected for about thirty seconds.  At 7:06 p.m., Cohen called Pecker again and they spoke for nearly thirteen minutes.  At 7:24 p.m., Howard sent a text message to Cohen that: "He said he'd call me back in 20 minutes.  I told him what you are asking for his [sic] reasonable.  I'll get it sorted."  Approximately an hour later, at 8:23 p.m., Howard told Cohen by text message to "check your Gmail for email from my private account."  In an email sent at 8:23 p.m. by Howard to Cohen and Davidson, with the subject line "Confirmation," Howard stated, "Thank you both for chatting with me earlier.  Confirming agreement on: - Executed agreement, hand-signed by Keith's client and returned via overnight or same-day FedEx to Michael, - Change of agreement to reflect the correct LLC, - Transfer of funds on Thursday AM to be held in escrow until receipt of agreement."  After receiving that email, at approximately 8:27 p.m., Cohen asked Howard by text message, "Can you and David [Pecker] give me a call."  Howard promptly responded: "David is not around I think. I'll call."  At 8:28 p.m., Howard called Cohen and they spoke for three minutes.

22. On October 27, 2016, Cohen made a payment to Davidson of $130,000—with the funds intended for Clifford—for the purpose of securing her ongoing silence with respect to the allegations that she had an extramarital affair with Trump. Specifically, based on my review of toll records, bank records, and information obtained pursuant to the iCloud Warrant and Cohen Email Warrants, I have learned the following:

a. At 9:47 a.m., Cohen sent Davidson an email, stating: "Keith, kindly confirm that the wire received today, October 27, 2016 shall be held by you in your attorney's trust account until such time as directed for release by me, in writing. Additionally, please ensure that all paperwork contains the correct name of Essential Consultants LLC. I thank you in advance for your assistance and look forward to hearing from you later."

b. At approximately 10:01 a.m., according to records provided by First Republic Bank, Cohen completed paperwork to wire $130,000 from the Essential Consultants Account— which had been funded a day prior from Cohen's home equity line of credit—to the attorney client trust account at City National Bank that Davidson had specified in the wiring instructions he sent to Cohen. The wire transfer was made shortly thereafter.

c. At 10:02 a.m., Davidson responded to Cohen's email from 9:47 a.m., stating: "I confirm that I will work in good faith & that no funds shall be disbursed unless & until the plaintiff personally signs all necessary settlement paperwork, (the form of which will match the prior agreement). The settlement docs will name the correct corporation, (Essential Consultants LLC). Plaintiff's signature will be notarized and returned to you via FedEx. Only after you receive FedEx will I disburse. Fair?"

d. At 10:50 a.m., First Republic Employee-1 sent Cohen an email confirming that the payment had been sent and providing him with the wire number.

17

23. On October 28, 2016, and the days that followed, Cohen finalized the transaction with Davidson. Specifically, based on my review of toll records, information obtained pursuant to the iCloud Warrant, public sources, and bank records, I know the following:

a. On October 28, 2016, at 11:48 a.m., Cohen spoke to Trump for approximately five minutes. Beginning at 1:21 p.m., Cohen attempted a series of phone calls to Davidson, Pecker, and Howard throughout the day, although it appears he may only have connected with Howard.

b. Later that day, at approximately 7:01 p.m., Davidson stated to Cohen by text message that "all is AOK. I should have signed, notarized docs on Monday. You should have them on Tuesday." Cohen thanked him and said "I hope we are good." Davidson responded, "I assure you. We are very good." Howard also texted Cohen at 7:08 p.m., "Keith [Davidson] says we are good." Cohen then responded "OK" to Howard and "Excellent" to Davidson. At approximately 10:30 p.m., Cohen spoke to Hicks for three minutes.

c. On October 31, 2016, Cohen called Howard at 8:22 p.m. and they spoke for over three minutes. At 8:32 p.m., Cohen received text messages from both Howard and Davidson. Howard said: "You'll have paperwork tomorrow says KD." Davidson said: "We are AOK. You will be receiving a package tomorrow." Cohen responded "Thank you" to Howard and "Thanks Keith. Will call you then" to Davidson. From my involvement in this investigation, I believe Davidson was referring to a signed nondisclosure agreement when he told Cohen that he would receive a package.

d. Based on my review of court filings that became public in 2018, I have learned that on or about October 28, 2016, "EC, LLC and/or David Dennison" entered into a "confidential settlement agreement and mutual release" with "Peggy Peterson," pursuant to which "Peterson" agreed not to disclose certain "confidential information pertaining to [Dennison]" in exchange for

18

$130,000. The agreement provided that "EC, LLC" would wire the funds to "Peterson's" attorney, who would then transfer funds to "Peterson." Cohen signed the agreement on behalf of "EC, LLC." The agreement stated that the address for "EC, LLC," which was later referred to in the agreement as "Essential Consultants, LLC," was Cohen's residence.

      e. Consistent with the "confidential settlement agreement and mutual release," on or about November 1, 2016, Davidson transferred $96,645 from his attorney client trust account at City National Bank to a bank account in Clifford's name. The wire had the annotation "net settlement." On the same day, at approximately 9:48 a.m. Davidson sent Cohen a text message with a picture of a FedEx delivery confirmation, stating that at approximately 9:09 a.m. a package shipped by Davidson the previous day had arrived for Cohen at his Trump Organization address. On the same day, at approximately 6:14 p.m., Davidson sent Cohen an email with an audio file attached and said "Give this a lesson [sic] and then call me." The audio attachment was titled "Stormy.mp3" and was a five-minute recording of Davidson interviewing Clifford about recent public allegations made by an adult film star named Jessica Drake regarding her alleged past affair with Trump; in the recording, Clifford explained the reasons she believed that Drake was not credible. Less than an hour later, at approximately 7:05 p.m., Cohen called Trump, but it appears that they did not connect. Cohen then called a telephone number belonging to Kellyanne Conway, who at the time was Trump's campaign manager. They did not connect. At approximately 7:44 p.m., however, Cohen received a return call from Conway, which lasted for approximately six minutes.

      24. On November 4, 2016, just three days after the Clifford transaction was completed and just four days before the presidential election, the *Wall Street Journal* published an article alleging that the *National Enquirer* had "Shielded Donald Trump" from allegations by *Playboy* model

19

Karen McDougal that she and Trump had an affair. The article alleged that AMI had agreed to pay McDougal to bury her story. McDougal, like Clifford, had been represented by Davidson. Based on my review of toll records, information obtained pursuant to the Cohen Email Warrants and iCloud Warrant, and public sources, it appears that Cohen spoke frequently to Davidson, Howard, Pecker, and Hicks around the time of this article's publication—just days before Election Day—about the importance of preventing the McDougal and Clifford stories from gaining national traction. Specifically, I have learned the following:

   a.   Between 4:30 and 8:00 p.m. on November 4, Cohen communicated several times with Howard, Pecker and Davidson. For instance, at approximately 4:49 p.m., Cohen sent Howard a text message with a screenshot of an email forwarded to him by another Trump Organization lawyer. The forwarded email was from a Wall Street Journal reporter, and asked for comment from Trump and/or the campaign on the story. Cohen also spoke with Hicks several times, including shortly before and/or after calls with Pecker, Howard and Davidson. Indeed, at approximately 7:33 p.m., using two different cellphones subscribed to him, Cohen appears to have been talking to Davidson and Hicks at the same time.

   b.   At approximately 8:51 p.m., Cohen sent Howard a message, stating: "She's being really difficult with giving Keith a statement. Basically went into hiding and unreachable." One minute later, Howard responded: "I'll ask him again. We just need her to disappear." Cohen responded, "She definitely disappeared but refuses to give a statement and Keith cannot push her." At approximately 8:55 p.m., Howard responded to Cohen's text: "Let's let the dust settle. We don't want to push her over the edge. She's on side at present and we have a solid position and a plausible position that she is rightfully employed as a columnist." Based on my involvement in this investigation, I believe Cohen and Howard were referring to Karen McDougal when they were

20

discussing "she" and "her." Additionally, I believe Howard's statement that "we have . . . a plausible position that she is rightfully employed as a columnist" was a reference to the fact that AMI had given McDougal payments for her role as a purported columnist for the company.

c. At approximately 8:58 p.m. on November 4, 2016, Howard attempted to reassure Cohen about the effect of the forthcoming *Wall Street Journal* article, texting, "I think it'll be ok pal. I think it'll fade into the distance." Cohen responded, "He's pissed." Howard wrote back, "I'm pissed! You're pissed. Pecker is pissed. Keith is pissed. Not much we can do." Based on my involvement in this investigation, I believe Cohen was referring to Trump when he stated "he's pissed." Cohen asked Howard at approximately 9:00 p.m. how the *Wall Street Journal* could publish its article if "everyone denies." Howard responded, "Because there is the payment from AMI. It looks suspicious at best."

d. At approximately 9:03 p.m., Hicks called Cohen and they spoke for two minutes. At approximately 9:11 p.m., Cohen called Howard and spoke to him for five minutes. At approximately 9:15 p.m., Hicks called Cohen and they spoke for nearly seven minutes. Again, Cohen used different phones for these two calls, such that he appears to have been on both calls for about a minute of overlap. At approximately 9:32 p.m., Cohen texted Pecker, "The boss just tried calling you. Are you free?" A minute later, Cohen texted Howard, "Is there a way to find David quickly?"

e. At approximately 9:50 p.m., the *Wall Street Journal* article was published online. Howard and Hicks both sent web links for the article to Cohen. Over the next half hour, Cohen and Howard exchanged several text messages commenting on how the story came across. The next morning on November 5, 2016, at approximately 7:35 a.m., Cohen texted Hicks, "So far I see only 6 stories. Getting little to no traction." Hicks responded, "Same. Keep praying!! It's

21

working!" Cohen wrote back, "Even CNN not talking about it. No one believes it and if necessary, I have a statement by Storm denying everything and contradicting the other porn stars statement. I wouldn't use it now or even discuss with him as no one is talking about this or cares!" Based on my involvement in this investigation, I believe Cohen was referring to the above-referenced recorded audio statement by Clifford that he obtained from Davidson, and was stating that such a statement could be used to influence potential negative media relating to Trump, but was unnecessary at that time. Based on a text message from Hicks to Cohen, I believe that later that morning, Pecker spoke to Trump.

25. On or about November 8, 2016, Trump won the election for President of the United States.

26. On or about January 12, 2018, the *Wall Street Journal* first reported that Cohen arranged a payment to Clifford. On or about January 22, 2018, Common Cause, a government watchdog group, filed a complaint with the Federal Election Commission, alleging that Cohen had violated campaign finance laws by making the payment to Clifford. Based on my review public sources following that report, as well as emails obtained pursuant to the Cohen Email Warrants, I have learned the following:

a. On or about January 23, 2018, the day after Common Cause filed its complaint, Cohen began emailing himself drafts of statements describing his payment to Clifford. Additionally, on January 23, 2018, Cohen emailed the following draft of that statement to an individual who appears to be writing a book on Cohen's behalf:

> In October 2016, I was contacted by counsel for Ms. Clifford stating that news outlets, including ABC news, were pursuing the 2011 story of an alleged affair between Mr. Trump and Ms. Clifford. Despite the fact that both parties had already denied the allegation, as Mr. Trump's longtime special counsel and protector, I took it upon myself to match the offer and *keep the story from breaking*. I knew the allegation to be false, but *I am*

22

> *also a realist who understands that just because something is false doesn't mean that it doesn't create harm and damage. I could not allow this to occur.* I negotiated a non-disclosure agreement with Ms. Clifford's counsel and tendered the funds. I did this through my Delaware LLC and transferred personal funds to cover the agreement. I was not reimbursed any monies from Mr. Trump, the Trump Organization, any third party or the Presidential campaign. At no point did I ever advise Mr. Trump of my communications or actions regarding this agreement. As outlandish and unusual as this may appear, the Trumps have been like family to me for over a decade. It's what you do for family.

(Emphasis added.)  Based on my involvement in this investigation, I believe that the above email is an acknowledgement that the allegation of the affair had existed for some time ("...*the 2011 story...*"), but that Cohen was motivated to "keep the story from breaking" again in October 2016.

   b.   On or about February 13, 2018, Cohen said in a statement to *The New York Times* that "Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford. The payment to Ms. Clifford was lawful, and was not a campaign contribution or a campaign expenditure by anyone."  Cohen declined to answer follow-up questions including whether Trump had been aware of the payment, why Cohen made the payment, or whether similar payments had been made to other people.

   c.   On or about February 14, 2018, Cohen was asked by *The New York Times* whether Trump had reimbursed him, whether he and Trump had made any arrangement at the time of the payment, or whether he had made payments to other women.  Cohen stated in response, "I can't get into any of that."  On or about February 14, 2018, Cohen also stated to *The Washington Post* that: "In a private transaction in 2016, I used my own personal funds to facilitate a payment of $130,000 to Ms. Stephanie Clifford.  Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford, and neither reimbursed me for the payment, either directly or indirectly."

23

d.   On or about March 9, 2018, Cohen stated to *ABC News* that "the funds were taken from my home equity line and transferred internally to my LLC account in the same bank."

27.  For the foregoing reasons, there is probable cause to believe that Cohen used the Target Cellphones to commit the Subject Offense.  Cohen used the Target Cellphones to communicate with Davidson, Howard, Pecker, and others about the payment to Clifford on the eve of the election.  Indeed, while Cohen denies having given an unlawful contribution, in his own statements Cohen has admitted that he paid $130,000 of his "personal funds" to Clifford and that the payment occurred less than two weeks before the election, as Trump was facing negative media allegations about his behavior toward women, even though allegations of an affair between Trump and Clifford existed since 2011.  In addition, the communication records set forth above make evident that Cohen communicated—using the Target Cellphones—with members of the Trump campaign and others about his negotiation with Clifford's attorney and the need to preclude Clifford from making a statement that would have reflected negatively on the candidate in advance of the forthcoming election.

28.  I have reviewed records maintained by AT&T, from which I have learned, in substance and in part, that the Target Cellphones are still active.  Based on my training and experience, my familiarity with this investigation, and the information set forth above, I therefore believe that the Requested Information will lead to evidence of the Subject Offense.  Specifically, the Requested Information includes historical location data for the Target Cellphones, which may show where the Target Cellphones—and by extension Cohen—was on particular dates and times between October 1, 2016—the approximate time that negotiations regarding the Clifford payment began—and the present.  That location information can, among other things, be used to corroborate any in-

24

person meetings between the Cohen and the other individuals involved in the negotiations of the the payment to Clifford.

29. Based on my training and experience, I also know that historical location information can be useful to establish a pattern of behavior by a particular individual, which assists law enforcement in tracking such an individual—and, thereby, locating his electronic devices. Along with the historical information, the prospective information will also lead to the present location of the Target Cellphones; law enforcement may then obtain evidence from the Target Cellphones, by subpoena or search warrant, including but not limited to contact lists containing contact information for participants in the illegal campaign contribution scheme and well as text messages between these participants.

## III.  Request for Warrant and Order

30. Based on the foregoing I respectfully request that the Court require the Service Provider to provide the Requested Information as specified further in the Warrant and Order proposed herewith, including prospective precision location and cell site data for a period of 45 days from the date of this Order (or the date that the Target Cellphones are seized, whichever comes first), historical cell site data and toll records for the period from October 1, 2016 through the date of this November 8, 2018 and Order, and pen register information for a period of 60 days from the date of this Order. January 1, 2018 to present

31. **Nondisclosure.** The existence and scope of this ongoing criminal investigation are not publicly known. As a result, premature public disclosure of this affidavit or the requested Warrant and Order could alert potential criminal targets that they are under investigation, causing them to destroy evidence, flee from prosecution, or otherwise seriously jeopardize the investigation. Accordingly, I respectfully request that the Provider be directed not to notify the subscriber or others of the existence of the Warrant and Order for a period of 180 days, and that the Warrant and

25

Order and all supporting papers be maintained under seal until the Court orders otherwise, as

specified in the Application submitted in conjunction with this Affidavit.



United States Attorney's Office
Southern District of New York

Sworn to before me this
7th day of April, 2018

HONORABLE HENRY PITMAN
United States Magistrate Judge
Southern District of New York

26