IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IN THE MATTER OF THE USE OF A CELL-
SITE SIMULATOR TO LOCATE THE
CELLULAR DEVICES ASSIGNED CALL
NUMBERS ████████ AND ████████

Case No.

**18 MAG   2974**

**Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, ████████ being first duly sworn, hereby depose and state as follows:

#### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique, which is described in Attachment B, to determine the location of the cellular devices assigned call numbers ████████ and ████████ (the "Target Cellular Devices"), which are described in Attachment A.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI").  I have been a Special Agent with the FBI since 2009.  In the course of my experience and training in these positions, I have participated in criminal investigations into federal offenses involving a wide array of financial crimes, including offenses involving public corruption.  I also have training and experience executing warrants for cellphone location data.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      One purpose of applying for this warrant is to determine with precision the Target Cellular Devices' location.   However, there is reason to believe the Target Cellular Devices are currently located somewhere within this district because the Target Cellular Devices' owner is known to spend most of his time in this district.   Pursuant to Rule 41(b)(2), law enforcement may locate the Target Cellular Devices outside the district provided the device is within the district when the warrant is issued.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 52 U.S.C. §§ 30116(a)(1)(A) and 30109(d)(1)(A)(1) (illegal campaign contributions) (the "Subject Offense") has been committed, are being committed, and will be committed by Michael Cohen and others.   There is also probable cause to believe that the location of the Target Cellular Devices will lead to evidence of the Subject Offense, as detailed below.

6.      Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41.   See 18 U.S.C. §§ 3121-3127.   This warrant therefore includes all the information required to be included in a pen register order.   See 18 U.S.C. § 3123(b)(1).

## PROBABLE CAUSE

### Introduction

7.      The United States Attorney's Office for the Southern District of New York ("USAO") and the FBI are investigating a criminal violation of the campaign finance laws by Michael Cohen, a lawyer who holds himself out as the personal attorney for President Donald J. Trump.   As detailed below, there is probable cause to believe that Cohen made an excessive in-kind contribution to the presidential election campaign of then-candidate Donald Trump in the

form of a $130,000 payment to Stephanie Clifford, an individual who is alleged to have had an extramarital affair with Trump, in exchange for her agreement not to disclose that alleged affair on the eve of the 2016 presidential election.

8.      The Target Cellular Devices referenced in this Affidavit are the cellphones assigned call numbers ▓▓▓▓▓ and ▓▓▓▓▓ As further discussed below, the Target Cellular Devices are subscribed to in the name of Michael Cohen (the "Subscriber"). The Subscriber is believed to use the Target Cellphones and is a Target Subject of this investigation. AT&T is the Service Provider for the Target Cellphones.

### Prior Relevant Process

9.      In connection with an investigation then being conducted by the Office of the Special Counsel ("SCO"), the FBI sought and obtained from the Honorable Beryl A. Howell, Chief United States District Judge for the District of Columbia, three search warrants for emails and other content information associated with two email accounts used by Cohen, and one search warrant for stored content associated with an iCloud account used by Cohen.   Specifically:

a.   On or about July 18, 2017, the FBI sought and obtained a search warrant for emails in the account ▓▓▓▓▓@gmail.com (the "Cohen Gmail Account") sent or received between January 1, 2016 and July 18, 2017 (the "First Cohen Gmail Warrant").

b.   On or about August 8, 2017, the FBI sought and obtained a search warrant for content stored in the iCloud account associated with Apple ID ▓▓▓▓▓@gmail.com (the "Cohen iCloud Account" and the "Cohen iCloud Warrant").

c.   On or about November 13, 2017, the FBI sought and obtained a search warrant for emails in the Cohen Gmail Account sent or received between June 1, 2015 and November 13, 2017 (the "Second Cohen Gmail Warrant").

3

d.   On or about November 13, 2017, the FBI sought and obtained a search warrant for

emails in the account ███████████ (the "Cohen MDCPC Account") sent or received

between the opening of the Cohen MDCPC Account[1] and November 13, 2017 (the "First Cohen

MDCPC Warrant").

10.   The SCO has since referred certain aspects of its investigation into Cohen

to the USAO, which is working with the FBI's New York Field Office.

11.   On or about February 28, 2018, the USAO and FBI sought and obtained

search warrants for emails in Cohen Gmail Account and Cohen MDCPC Account, among other

accounts, sent or received between November 14, 2017 and February 28, 2018 (the "Third Cohen

Gmail Warrant" and "Second Cohen MDCPC Warrant").[2]

12.   The above-described warrants are referred to herein as the "Cohen Emails

Warrants" and, with respect to the iCloud Warrant, the "Cohen iCloud Warrant."

### The Illegal Campaign Contribution Scheme

13.   From my review of public sources, I have learned the following:

a.   In or around October 2011, there were rumors published on the gossip website

*TheDirty.com* that Trump had had an extramarital affair with Clifford, an adult film actress whose

screen name is Stormy Daniels, in or around July 2006.   In or about October 2011, *Life & Style*

---

[1] Based on my review of this warrant and the affidavit in support of it, I know that the warrant did not specify a time period, but the affidavit indicated that, pursuant to court order, the service provider had provided non-content information for the Cohen MDCPC Account that indicated that the account contained emails from the approximate period of March 2017 through the date of the warrant.

[2] On or about February 28, 2018 and April 7, 2018, the USAO and FBI sought and obtained Rule 41 search warrants authorizing the search of emails and content obtained pursuant to previously issued warrants for additional subject offenses.

*Magazine*, a tabloid sold in supermarkets, also published an article, based on the report in *TheDirty.com*, alleging an affair had occurred between Trump and Clifford. Both Trump and Clifford, through their representatives, issued denials in response to the articles.

b. Specifically, on or about October 11, 2011, Keith Davidson, who identified himself as Clifford's attorney, sent a cease and desist letter to *TheDirty.com*, demanding that the article regarding Trump and Clifford be removed from the website. Additionally, on or about October 12, 2011, Cohen, who was then Executive Vice-President and Special Counsel to the Trump Organization, stated to *E! News* that "[t]he totally untrue and ridiculous story . . . emanated from a sleazy and disgusting website. . . . The Trump Organization and Donald J. Trump will be bringing a lawsuit . . . [and] Mr. Trump and the Trump Organization would like to thank and commend Stormy Daniels and her attorneys for their honesty and swift actions."

14. On or about June 16, 2015, Trump formally launched his 2016 presidential campaign. On or about May 4, 2016, Trump became the presumptive Republican Party nominee for president, and on July 19, 2016, Trump officially became the nominee. Based on my review of public sources, I have learned that while it does not appear that Cohen had an official title as part of the Trump campaign, on multiple occasions Cohen made public statements on behalf of Trump or his campaign. For instance, on or about August 18, 2016, Cohen appeared on CNN to defend Trump's polling numbers.

15. On or about October 7, 2016, *The Washington Post* published online a video and accompanying audio in which Trump referred to women in what the article described as "vulgar terms" in a 2005 conversation with Billy Bush, who was then the host of *Access Hollywood*. The following day, on October 8, 2016, Trump appeared in a video in which he stated, among other things, "I've said and done things I regret and words released today on this

5

more than a decade old video are one of them.   Anyone who knows me knows these words don't reflect who I am.   I said it.   I was wrong and I apologize."   Based on my review of public sources, I also know that representatives of the Trump Campaign stated, in sum and substance, that the *Access Hollywood* comment was an old and isolated incident.

16.     Based on my review of public sources, including an article published in *Slate* magazine by a reporter who interviewed Clifford, that around this same time, in or about October 2016, Clifford was in discussions with ABC's *Good Morning America* show and *Slate* magazine, among other media sources, to provide these media outlets with her statement about her alleged relationship with Trump.   According to the article in *Slate*, which the author based on conversations with Clifford over the telephone and by text message, Clifford wanted to be paid for her story or be paid by Trump not to disclose her accusation.   As Cohen summarized in a 2018 email obtained pursuant to the Cohen Email Warrants: "In October 2016, I was contacted by counsel for Ms. Clifford stating that news outlets, including *ABC News*, were pursuing the 2011 story of an alleged affair between Mr. Trump and Ms. Clifford."

17.     From my review of telephone toll records[3] and information produced pursuant to the iCloud Warrant and Cohen Email Warrants, I have learned that in the days following the *Access Hollywood* video, Cohen exchanged a series of calls, text messages, and emails with Keith Davidson, who was then Clifford's attorney, David Pecker and Dylan Howard

---

[3] My attribution of certain telephone numbers to certain individuals as described in this affidavit is based on my review of the vCard (virtual contact file) and text messages obtained from Cohen's telephone pursuant to the iCloud Warrant.

of American Media, Inc. ("AMI"), the publisher of the *National Enquirer*,[4] Trump, and Hope

Hicks, who was then press secretary for Trump's presidential campaign.   For these text messages

and calls—as well as all of the text messages and calls referenced in this affidavit involving

Cohen—Cohen used one of the Target Cellular Devices for the communication.

18.   Based on the timing of the calls in the days following the *Access Hollywood*

story, and the content of the text messages and emails, I believe that at least some of these

communications concerned the need to prevent Clifford from going public, particularly in the wake

of the *Access Hollywood* story.   In particular, I have learned the following:

a.   On October 8, 2016, at approximately 7:20 p.m., Cohen received a call from Hicks.

Sixteen seconds into the call, Trump joined the call, and the call continued for over four minutes.[5]

Based on the toll records that the USAO has obtained to date, I believe that this was the first call

Cohen had received or made to Hicks in at least multiple weeks, and that Cohen and Trump spoke

on the telephone about once a month prior to this date – specifically, prior to this call on October

---

[4] Pecker is President of AMI and, according to his own statements in public reports, a personal friend of Trump.   Howard is the chief content officer of AMI, who according to public records reports directly to Pecker.

[5] I believe that Trump joined the call between Cohen and Hicks based on my review of toll records.   Specifically, I know that a call was initiated between Cohen's telephone number and Trump's telephone number at the same time the records indicate that Cohen was talking to Hicks. After the Cohen-Trump call was initiated, it lasted the same period of time as the Cohen-Hicks call.   Additionally, the toll records indicate a "-1" and then Trump's telephone number, which, based on my training and experience, means that the call was either transferred to Trump, or that Trump was added to the call as a conference or three-way call participant.   In addition, based on my conversations with another law enforcement agent who has spoken to a law enforcement agent who has interviewed Hicks, I have learned that Hicks stated, in substance, to the best of her recollection, she did not learn about the allegations made by Clifford until early November 2016. Hicks was not specifically asked about this three-way call.

8, 2016, Cohen and Trump had spoken once in May, once in June, once in July, zero times in August, and twice in September.

b.  Approximately ten minutes after the call ended, Hicks and Cohen spoke again for about two minutes.

c.  At 7:39 p.m., immediately after the second call with Hicks ended, Cohen called David Pecker (as noted above, the President of American Media Inc., or AMI) and they connected for thirty seconds.  Approximately four minutes later, Cohen called Pecker again and they spoke for more than a minute.  Three minutes after ending his call with Pecker, Cohen received a call from Dylan Howard (as noted above, the Chief Content Officer of AMI), and they spoke for approximately a minute.  According to toll records, it does not appear that Cohen and Howard spoke regularly prior to October 8, 2016, as it had been over a month since they had called each other.

d.  At 7:56 p.m., approximately eight minutes after his call with Howard ended, Cohen called Hicks and they connected for two minutes.  At approximately the same time this call ended, Cohen received a call from Pecker, and they spoke for about two minutes.  At 8:03 p.m., about three minutes after ending his call with Pecker, Cohen called Trump, and they spoke for nearly eight minutes.

e.  At 8:39 p.m. and 8:57 p.m., Cohen received calls from Howard and spoke to him for about four and six minutes, respectively.  At 9:13 p.m., about ten minutes after Cohen and Howard hung up from the second of these calls, Howard sent Cohen a text message that said: "Keith will do it. Let's reconvene tomorrow."  Based on my involvement in this investigation, I believe that when Howard wrote "Keith," he was referring to Keith Davidson, the attorney for Stephanie Clifford.  At 3:31 a.m., now on October 9, 2016, Cohen sent Howard a text message in

response that said: "Thank you." Eight minutes later, Cohen sent Howard a text message that said: "Resolution Consultants LLC. is the name of the entity I formed a week ago. Whenever you wake, please call my cell."

      f.   The following day, on October 10, 2016, at 10:58 a.m., Howard sent a text message to Cohen and Davidson, which stated: "Keith/Michael: connecting you both in regards to that business opportunity. Spoke to the client this AM and they're confirmed to proceed with the opportunity. Thanks. Dylan. Over to you two." At 12:25 p.m., Davidson sent Cohen a text message that stated: "Michael – if we are ever going to close this deal – In my opinion, it needs to be today. Keith." Davidson and Cohen then spoke by phone for about three minutes. Based on my participation in this investigation, I believe that when Howard wrote that the "client" was "confirmed to proceed with the opportunity," he was referring to Clifford's agreement in principle to accept money from Cohen in exchange for her agreement not to discuss any prior affair with then-candidate Trump.[6]

      g.   Based on my review of records obtained pursuant to the Cohen Email Warrants, I know that on or about October 10, 2016, Clifford and Davidson appear to have signed a "side letter agreement" that stated it was an exhibit to a "confidential settlement agreement and mutual release" between "Peggy Peterson" and "David Dennison." The purpose of the document, according to the agreement, was to define the "true name and identity" of persons named by

---

[6] As set forth below, AMI was also involved in a payment to model Karen McDougal. However, because these communications were in close temporal proximity to the events involving the negotiation of a payment to Clifford, the execution of the agreement with Clifford, and the payment of money to Clifford, I believe that these communications were related to Clifford. Additionally, based on my review of public statements by McDougal, I have learned that she negotiated an agreement with AMI several months prior to these communications between Cohen and Pecker, Howard, and Davidson.

pseudonym in "confidential settlement agreement and mutual release." The side letter agreement specifies the identity of "Peggy Peterson" to be Clifford, but the space for "Dennison's" identity is blank. The agreement also includes a signature page for "Peterson," "Dennison," and their attorneys. The signature page is signed by "Peterson" and his attorney, Davidson, but the document is unsigned by "Dennison" and his attorney. Based on my involvement in this investigation, I believe that Davidson sent Cohen this partially-signed "side letter agreement" in order to facilitate the closing of a deal between Davidson's client and Cohen or his client on October 10, 2016.

19.     It appears that on October 13, 2016, and the days that followed, Cohen took steps to complete a transaction with Davidson, including attempting to open an account from which Cohen could transfer funds to Davidson. Specifically, from my review of toll records, information obtained pursuant to the iCloud Warrant and Cohen Email Warrants, records maintained by First Republic Bank ("First Republic"), as well as my participation in interviews with employees of First Republic, I have learned the following:

a.   On the morning of October 13, 2016, at 8:54 a.m., Cohen sent Pecker a text message that stated: "I need to talk to you." At 9:06 a.m., Pecker sent a text message to Cohen that stated, "I called please call me back." The tolls between Cohen and Pecker do not show a telephone call between 8:54 a.m. and 9:06 a.m. However, based on my review of text messages, I have learned that Cohen and Pecker communicate with each other over Signal, which is an encrypted communications cellphone application that allows users to send encrypted text messages and make encrypted calls.

b.   At 9:23 a.m., Cohen sent an email that stated "call me" to a banker at First Republic Bank ("First Republic Employee-2"). The email attached documents from the Secretary of State

of Delaware indicating that Cohen had formed a limited liability company called "Resolution Consultants LLC" on September 30, 2016.   As noted above, "Resolution Consultants" is the name of the entity that Cohen had told Howard he had formed recently after Howard said Davidson would "do it."   At 10:44 a.m., Cohen called First Republic Employee-2 and told him, in sum and substance, that he needed an account in the name of "Resolution Consultants" opened immediately, and that he did not want an address on the checks written out of the account.   Later that day, another employee at First Republic emailed Cohen account opening paperwork to complete. Cohen returned the account opening documents partially completed, but failed to provide a copy of his driver's license or passport, and did not respond to the employee's question of how he wanted to fund the account.   As a result, the account was never opened.

c.   On October 17, 2016, Cohen incorporated Essential Consultants LLC in Delaware. That same day, he filed paperwork to dissolve Resolution Consultants LLC.

20.   Despite these steps taken by Cohen, it appears that the negotiation between Cohen and Davidson was not progressing sufficiently fast enough for Davidson or his client, Clifford, and they threatened to go public with Clifford's allegations just days before the presidential election.   Specifically, based on my review of toll records, information obtained pursuant to the iCloud Warrant, and public sources, I know the following:

a.   According to an article in *The Washington Post*, which quoted emails sent from Cohen's email account hosted by the Trump Organization, on October 17, 2016, Davidson emailed Cohen and threatened to cancel the aforementioned "settlement agreement" by the end of the day

if Cohen did not complete the transaction.[7]   According to the article, Davidson sent Cohen a second email later in the day that stated in part, "Please be advised that my client deems her settlement agreement canceled and void."   At 4:00 p.m. that day, Cohen called Davidson and they spoke for over five minutes.

      b.   Cohen's 4:00 p.m. call with Davidson and/or Davidson's threats to cancel the "settlement agreement" appear to have touched off a flurry of communications about the settlement agreement and whether Clifford would go public.   Specifically:

      i.   At 4:43 p.m., Howard sent Cohen a text message that stated: "I'm told they're going with DailyMail.   Are you aware?"   One minute later, Cohen responded: "Call me." Based on my involvement in this investigation, I understand Howard's text to mean that he heard that Clifford was going to take her story of an extramarital affair with Trump to the *Daily Mail*, a tabloid newspaper.

      ii.   At 4:45 p.m., Howard called Cohen and they spoke for over two minutes. Moments later, Davidson and Cohen spoke for about two minutes.

      iii.   At 5:03 p.m., Cohen attempted to call Trump, but the call only lasted eight seconds.   This was Cohen's first call after he spoke with Davidson.

      iv.   At 5:25 p.m., Cohen texted Howard, stating: "Well???"

      v.   At 6:44 p.m., Howard responded to Cohen's text, stating: "Not taking my calls."   Cohen responded one minute later: "You're kidding. Who are you trying to reach?" Howard responded one minute later: "The 'agent.'"   Based on my involvement in this

---

[7] Due to the partially covert nature of the investigation to this date, the USAO has not requested documents from the Trump Organization or Davidson, and thus does not possess the email referenced in this article.

investigation, I understand Howard's text messages to mean that he attempted to contact Davidson about the matter involving Clifford, but that Davidson was not taking Howard's calls.

      vi.      At 6:49 p.m., Cohen called Howard and they spoke for nearly four minutes.

      c.    The following day, on October 18, 2016, *TheSmokingGun.com*, a website that publishes legal documents and mugshots, published an article called: "Donald Trump and the Porn Superstar," which alleged that Trump had an extramarital affair with Clifford.     However, the article noted that Clifford had declined to comment.

      21.    On or about October 25, 2016, the communications between Cohen, Davidson, Howard and Pecker picked up again, apparently concerning a transaction involving Clifford.  Specifically, based on my review of toll records, information obtained pursuant to the Cohen Email Warrants and iCloud Warrant, as well as my review of public sources, I have learned the following:

      a.   On October 25, 2016, at 6:09 p.m., Howard sent Cohen a text message stating: "Keith calling you urgently. We have to coordinate something on the matter he's calling you about or its [sic] could look awfully bad for everyone."  One minute later, Davidson sent Cohen a text message stating "Call me."  Cohen and Davidson called each other several times over the next half hour but appear not to have connected.  At 6:42 p.m., Cohen and Davidson spoke for about eight minutes.  At 7:11 p.m., they spoke for another two minutes.

      b.   The next morning, on or about October 26, 2016, at 8:26 a.m., Cohen called Trump and spoke to him for approximately three minutes.  At 8:34 a.m., Cohen called Trump again and connected for a minute and a half.

      c.   At approximately 9:04 a.m.—less than thirty minutes after speaking with Trump—Cohen sent two emails to the person who had incorporated Resolution Consultants and Essential

Consultants for him, and stated "can you send me asap the filing receipt" and then, in the second email, "for Essential Consultants LLC." That person responded with the filing receipt two minutes later at 9:06 a.m. and with the certification of formation 23 minutes later, at 9:27 a.m.

      d. Shortly after that, Cohen contacted a particular employee at First Republic ("First Republic Employee-2") and told him, in sum and substance, that he decided not to open an account in the name of "Resolution Consulting" and instead would be opening a real estate consulting company in the name of "Essential Consultants." Cohen told First Republic Employee-2 that he was at Trump Tower, and wanted to go to a First Republic branch across the street to open the account, so First Republic Employee-2 called another employee of First Republic ("First Republic Employee-1"), a preferred banker at that branch, to assist Cohen. At 11:00 a.m., First Republic Employee-1 called Cohen. I know from my participation in an interview with First Republic Employee-1, that around the time of the call he went to Cohen's office in Trump Tower—on the same floor as the Trump Organization—and went through account opening questions, including know your customer questions, with Cohen. In response to a series of know-your-customer questions about the purpose of the account—the answers to which First Republic Employee-1 entered into a form—Cohen stated, in sum and substance, that he was opening Essential Consultants as a real estate consulting company to collect fees for investment consulting work, and all of his consulting clients would be domestic individuals based in the United States. Based on my review of records obtained from First Republic, it appears that this account (the "Essential Consultants Account") was created at a time between 11:00 a.m. and 1:00 p.m.

      e. At 1:47 p.m., Cohen called Davidson and they spoke for approximately two minutes. At approximately 1:49 p.m., Davidson emailed Cohen wiring instructions for an attorney client trust account at City National Bank.

f.   After the Essential Consultants Account was opened on October 26, 2016, Cohen transferred $131,000 from a home equity line of credit that Cohen had at First Republic to the Essential Consultants Account.  Following the transfer, at approximately 4:15 p.m. on October 26, 2016, First Republic Employee-2's assistant emailed Cohen at his Trump Organization email address to tell him that the funds had been deposited into the Essential Consultants Account.  Cohen forwarded that email to the Cohen Gmail Account and then forwarded it to Davidson.

g.   At 6:37 p.m., Cohen asked Pecker by text message, "Can we speak?  Important." Cohen called Pecker at 6:49 p.m. and connected for thirty seconds.  At 6:57 p.m., Cohen sent Howard a text message, stating: "Please call me. Important."  Cohen called Howard at 7:00 p.m. and connected for about thirty seconds.  At 7:06 p.m., Cohen called Pecker again and they spoke for nearly thirteen minutes.  At 7:24 p.m., Howard sent a text message to Cohen that: "He said he'd call me back in 20 minutes.  I told him what you are asking for his [sic] reasonable.  I'll get it sorted."  Approximately an hour later, at 8:23 p.m., Howard told Cohen by text message to "check your Gmail for email from my private account."  In an email sent at 8:23 p.m. by Howard to Cohen and Davidson, with the subject line "Confirmation," Howard stated, "Thank you both for chatting with me earlier.  Confirming agreement on: - Executed agreement, hand-signed by Keith's client and returned via overnight or same-day FedEx to Michael, - Change of agreement to reflect the correct LLC, - Transfer of funds on Thursday AM to be held in escrow until receipt of agreement."  After receiving that email, at approximately 8:27 p.m., Cohen asked Howard by text message, "Can you and David [Pecker] give me a call."  Howard promptly responded: "David is not around I think. I'll call."  At 8:28 p.m., Howard called Cohen and they spoke for three minutes.

15

22.     On October 27, 2016, Cohen made a payment to Davidson of $130,000—with the funds intended for Clifford—for the purpose of securing her ongoing silence with respect to the allegations that she had an extramarital affair with Trump.   Specifically, based on my review of toll records, bank records, and information obtained pursuant to the iCloud Warrant and Cohen Email Warrants, I have learned the following:

a.  At 9:47 a.m., Cohen sent Davidson an email, stating: "Keith, kindly confirm that the wire received today, October 27, 2016 shall be held by you in your attorney's trust account until such time as directed for release by me, in writing. Additionally, please ensure that all paperwork contains the correct name of Essential Consultants LLC. I thank you in advance for your assistance and look forward to hearing from you later."

b.  At approximately 10:01 a.m., according to records provided by First Republic Bank, Cohen completed paperwork to wire $130,000 from the Essential Consultants Account—which had been funded a day prior from Cohen's home equity line of credit—to the attorney client trust account at City National Bank that Davidson had specified in the wiring instructions he sent to Cohen.   The wire transfer was made shortly thereafter.

c.  At 10:02 a.m., Davidson responded to Cohen's email from 9:47 a.m., stating: "I confirm that I will work in good faith & that no funds shall be disbursed unless & until the plaintiff personally signs all necessary settlement paperwork, (the form of which will match the prior agreement). The settlement docs will name the correct corporation, (Essential Consultants LLC). Plaintiff's signature will be notarized and returned to you via FedEx. Only after you receive FedEx will I disburse. Fair?"

d.  At 10:50 a.m., First Republic Employee-1 sent Cohen an email confirming that the payment had been sent and providing him with the wire number.

16

23.    On October 28, 2016, and the days that followed, Cohen finalized the transaction with Davidson.    Specifically, based on my review of toll records, information obtained pursuant to the iCloud Warrant, public sources, and bank records, I know the following:

a.   On October 28, 2016, at 11:48 a.m., Cohen spoke to Trump for approximately five minutes.   Beginning at 1:21 p.m., Cohen attempted a series of phone calls to Davidson, Pecker, and Howard throughout the day, although it appears he may only have connected with Howard.

b.   Later that day, at approximately 7:01 p.m., Davidson stated to Cohen by text message that "all is AOK.   I should have signed, notarized docs on Monday.   You should have them on Tuesday."   Cohen thanked him and said "I hope we are good."   Davidson responded, "I assure you.   We are very good."   Howard also texted Cohen at 7:08 p.m., "Keith [Davidson] says we are good."   Cohen then responded "OK" to Howard and "Excellent" to Davidson.   At approximately 10:30 p.m., Cohen spoke to Hicks for three minutes.

c.   On October 31, 2016, Cohen called Howard at 8:22 p.m. and they spoke for over three minutes.   At 8:32 p.m., Cohen received text messages from both Howard and Davidson. Howard said: "You'll have paperwork tomorrow says KD." Davidson said: "We are AOK. You will be receiving a package tomorrow." Cohen responded "Thank you" to Howard and "Thanks Keith. Will call you then" to Davidson.   From my involvement in this investigation, I believe Davidson was referring to a signed nondisclosure agreement when he told Cohen that he would receive a package.

d.   Based on my review of court filings that became public in 2018, I have learned that on or about October 28, 2016, "EC, LLC and/or David Dennison" entered into a "confidential settlement agreement and mutual release" with "Peggy Peterson," pursuant to which "Peterson" agreed not to disclose certain "confidential information pertaining to [Dennison]" in exchange for

$130,000. The agreement provided that "EC, LLC" would wire the funds to "Peterson's" attorney, who would then transfer funds to "Peterson." Cohen signed the agreement on behalf of "EC, LLC." The agreement stated that the address for "EC, LLC," which was later referred to in the agreement as "Essential Consultants, LLC," was Cohen's residence.

e. Consistent with the "confidential settlement agreement and mutual release," on or about November 1, 2016, Davidson transferred $96,645 from his attorney client trust account at City National Bank to a bank account in Clifford's name. The wire had the annotation "net settlement." On the same day, at approximately 9:48 a.m. Davidson sent Cohen a text message with a picture of a FedEx delivery confirmation, stating that at approximately 9:09 a.m. a package shipped by Davidson the previous day had arrived for Cohen at his Trump Organization address. On the same day, at approximately 6:14 p.m., Davidson sent Cohen an email with an audio file attached and said "Give this a lesson [sic] and then call me." The audio attachment was titled "Stormy.mp3" and was a five-minute recording of Davidson interviewing Clifford about recent public allegations made by an adult film star named Jessica Drake regarding her alleged past affair with Trump; in the recording, Clifford explained the reasons she believed that Drake was not credible. Less than an hour later, at approximately 7:05 p.m., Cohen called Trump, but it appears that they did not connect. Cohen then called a telephone number belonging to Kellyanne Conway, who at the time was Trump's campaign manager. They did not connect. At approximately 7:44 p.m., however, Cohen received a return call from Conway, which lasted for approximately six minutes.

24. On November 4, 2016, just three days after the Clifford transaction was completed and just four days before the presidential election, the *Wall Street Journal* published an article alleging that the *National Enquirer* had "Shielded Donald Trump" from allegations by

*Playboy* model Karen McDougal that she and Trump had an affair.   The article alleged that AMI had agreed to pay McDougal to bury her story.   McDougal, like Clifford, had been represented by Davidson.   Based on my review of toll records, information obtained pursuant to the Cohen Email Warrants and iCloud Warrant, and public sources, it appears that Cohen spoke frequently to Davidson, Howard, Pecker, and Hicks around the time of this article's publication—just days before Election Day—about the importance of preventing the McDougal and Clifford stories from gaining national traction.   Specifically, I have learned the following:

      a.   Between 4:30 and 8:00 p.m. on November 4, Cohen communicated several times with Howard, Pecker and Davidson.   For instance, at approximately 4:49 p.m., Cohen sent Howard a text message with a screenshot of an email forwarded to him by another Trump Organization lawyer.   The forwarded email was from a Wall Street Journal reporter, and asked for comment from Trump and/or the campaign on the story.   Cohen also spoke with Hicks several times, including shortly before and/or after calls with Pecker, Howard and Davidson.   Indeed, at approximately 7:33 p.m., using two different cellphones subscribed to him, Cohen appears to have been talking to Davidson and Hicks at the same time.

      b.   At approximately 8:51 p.m., Cohen sent Howard a message, stating: "She's being really difficult with giving Keith a statement. Basically went into hiding and unreachable." One minute later, Howard responded: "I'll ask him again. We just need her to disappear." Cohen responded, "She definitely disappeared but refuses to give a statement and Keith cannot push her." At approximately 8:55 p.m., Howard responded to Cohen's text: "Let's let the dust settle. We don't want to push her over the edge. She's on side at present and we have a solid position and a plausible position that she is rightfully employed as a columnist."   Based on my involvement in this investigation, I believe Cohen and Howard were referring to Karen McDougal when they were

19

discussing "she" and "her."   Additionally, I believe Howard's statement that "we have . . . a plausible position that she is rightfully employed as a columnist" was a reference to the fact that AMI had given McDougal payments for her role as a purported columnist for the company.

c.   At approximately 8:58 p.m. on November 4, 2016, Howard attempted to reassure Cohen about the effect of the forthcoming *Wall Street Journal* article, texting, "I think it'll be ok pal.  I think it'll fade into the distance."   Cohen responded, "He's pissed."   Howard wrote back, "I'm pissed!  You're pissed.  Pecker is pissed.  Keith is pissed.  Not much we can do."   Based on my involvement in this investigation, I believe Cohen was referring to Trump when he stated "he's pissed."   Cohen asked Howard at approximately 9:00 p.m. how the *Wall Street Journal* could publish its article if "everyone denies."   Howard responded, "Because there is the payment from AMI. It looks suspicious at best."

d.   At approximately 9:03 p.m., Hicks called Cohen and they spoke for two minutes. At approximately 9:11 p.m., Cohen called Howard and spoke to him for five minutes.   At approximately 9:15 p.m., Hicks called Cohen and they spoke for nearly seven minutes.   Again, Cohen used different phones for these two calls, such that he appears to have been on both calls for about a minute of overlap.   At approximately 9:32 p.m., Cohen texted Pecker, "The boss just tried calling you.  Are you free?"   A minute later, Cohen texted Howard, "Is there a way to find David quickly?"

e.   At approximately 9:50 p.m., the *Wall Street Journal* article was published online. Howard and Hicks both sent web links for the article to Cohen.   Over the next half hour, Cohen and Howard exchanged several text messages commenting on how the story came across. The next morning on November 5, 2016, at approximately 7:35 a.m., Cohen texted Hicks, "So far I see only 6 stories. Getting little to no traction."   Hicks responded, "Same. Keep praying!!   It's

20

working!"  Cohen wrote back, "Even CNN not talking about it. No one believes it and if

necessary, I have a statement by Storm denying everything and contradicting the other porn stars

statement. I wouldn't use it now or even discuss with him as no one is talking about this or cares!"

Based on my involvement in this investigation, I believe Cohen was referring to the above-

referenced recorded audio statement by Clifford that he obtained from Davidson, and was stating

that such a statement could be used to influence potential negative media relating to Trump, but

was unnecessary at that time.  Based on a text message from Hicks to Cohen, I believe that later

that morning, Pecker spoke to Trump.

        25.     On or about November 8, 2016, Trump won the election for President of

the United States.

        26.     On or about January 12, 2018, the *Wall Street Journal* first reported that

Cohen arranged a payment to Clifford.  On or about January 22, 2018, Common Cause, a

government watchdog group, filed a complaint with the Federal Election Commission, alleging

that Cohen had violated campaign finance laws by making the payment to Clifford.  Based on my

review public sources following that report, as well as emails obtained pursuant to the Cohen Email

Warrants, I have learned the following:

        a.   On or about January 23, 2018, the day after Common Cause filed its complaint,

Cohen began emailing himself drafts of statements describing his payment to Clifford.

Additionally, on January 23, 2018, Cohen emailed the following draft of that statement to an

individual who appears to be writing a book on Cohen's behalf:

> In October 2016, I was contacted by counsel for Ms. Clifford stating that
> news outlets, including ABC news, were pursuing the 2011 story of an
> alleged affair between Mr. Trump and Ms. Clifford.  Despite the fact that
> both parties had already denied the allegation, as Mr. Trump's longtime
> special counsel and protector, I took it upon myself to match the offer and

*keep the story from breaking.* I knew the allegation to be false, but *I am also a realist who understands that just because something is false doesn't mean that it doesn't create harm and damage. I could not allow this to occur.* I negotiated a non-disclosure agreement with Ms. Clifford's counsel and tendered the funds. I did this through my Delaware LLC and transferred personal funds to cover the agreement. I was not reimbursed any monies from Mr. Trump, the Trump Organization, any third party or the Presidential campaign. At no point did I ever advise Mr. Trump of my communications or actions regarding this agreement. As outlandish and unusual as this may appear, the Trumps have been like family to me for over a decade. It's what you do for family.

(Emphasis added.) Based on my involvement in this investigation, I believe that the above email is an acknowledgement that the allegation of the affair had existed for some time ("...*the 2011 story*..."), but that Cohen was motivated to "keep the story from breaking" again in October 2016.

　　　b.　On or about February 13, 2018, Cohen said in a statement to *The New York Times* that "Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford. The payment to Ms. Clifford was lawful, and was not a campaign contribution or a campaign expenditure by anyone." Cohen declined to answer follow-up questions including whether Trump had been aware of the payment, why Cohen made the payment, or whether similar payments had been made to other people.

　　　c.　On or about February 14, 2018, Cohen was asked by *The New York Times* whether Trump had reimbursed him, whether he and Trump had made any arrangement at the time of the payment, or whether he had made payments to other women. Cohen stated in response, "I can't get into any of that." On or about February 14, 2018, Cohen also stated to *The Washington Post* that: "In a private transaction in 2016, I used my own personal funds to facilitate a payment of $130,000 to Ms. Stephanie Clifford. Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford, and neither reimbursed me for the payment, either directly or indirectly."

d.  On or about March 9, 2018, Cohen stated to *ABC News* that "the funds were taken from my home equity line and transferred internally to my LLC account in the same bank."

27.  For the foregoing reasons, there is probable cause to believe that Cohen committed the Subject Offense by making an in-kind contribution to Trump or the Trump campaign in the form of a $130,000 payment to Clifford on the election. Indeed, while Cohen denies having given an unlawful contribution, in his own statements Cohen has admitted that he paid $130,000 of his "personal funds" to Clifford and that the payment occurred less than two weeks before the election, as Trump was facing negative media allegations about his behavior toward women, even though allegations of an affair between Trump and Clifford existed since 2011.

28.  I have reviewed records maintained by AT&T, from which I have learned, in substance and in part, that the Target Cellular Devices are still active.  Based on my training and experience, my familiarity with this investigation, and the information set forth above, I therefore believe that the requested data will lead to evidence of the Subject Offense. Specifically, information will lead to the present location of the Target Cellular Devices; law enforcement may then obtain evidence from the Target Cellular Devices, by subpoena or search warrant, including but not limited to contact lists containing contact information for participants in the illegal campaign contribution scheme and well as text messages between these participants.

## MANNER OF EXECUTION

29.  In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications.  When sending or receiving a communication, a cellular device broadcasts certain cellular and wifi signals to the cellular tower

that is routing its communication. These cellular and wifi signals include a cellular device's unique identifiers.

30. To facilitate execution of this warrant to determine the location of the Target Cellular Devices, law enforcement may use an investigative device or devices capable of broadcasting cellular and wifi signals that will be received by the Target Cellular Devices or receiving cellular and wifi signals from nearby cellular devices, including the Target Cellular Devices. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the Target Cellular Devices and nearby cellular devices and thereby prompt them to send cellular and wifi signals that include the unique identifier of the device. Law enforcement may monitor the cellular and wifi signals broadcast by the Target Cellular Devices for non-content signal information and use that information to determine the Target Cellular Devices' location, even if it is located inside a house, apartment, or other building. The device will not intercept the contents of the Target Cellular Devices' communications, such as telephone calls, text messages, and other electronic communications. Further, the device will not collect any other data stored on the Target Cellular Devices, including e-mails, text messages, contact lists, images, or Global Positioning System (GPS) data.

31. The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the Target Cellular Devices, the device may briefly exchange cellular and wifi signals with all phones or other cellular devices in its vicinity to determine whether those devices' unique identifiers match the identifiers of the Target Cellular Devices. These cellular

and wifi signals may include cell phone identifiers.   The device will not complete a connection with cellular devices determined not to be the Target Cellular Devices, and law enforcement will limit collection of information from devices other than the Target Cellular Devices.   To the extent that any information from a cellular device other than the Target Cellular Devices is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Devices from all other cellular devices.

## AUTHORIZATION REQUEST

32.      Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.   The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

33.      I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days from the end of the period of authorized surveillance.   This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.   Providing immediate notice to the subscriber or user of the Target Cellular Devices would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, and notify confederates.   *See* 18 U.S.C. § 3103a(b)(1).   There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

34.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cellular Devices outside of daytime hours.

35.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

36.     A search warrant may not be legally necessary to compel the investigative technique described herein.  Nevertheless, I hereby submit this warrant application out of an abundance of caution.

Respectfully submitted,

Federal Bureau of Investigation

Subscribed and sworn to before me *BY TELEPHONE*

On: _APRIL 8, 2018_

UNITED STATES MAGISTRATE JUDGE

26

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

IN THE MATTER OF THE USE OF A CELL-
SITE SIMULATOR TO LOCATE THE
CELLULAR DEVICES ASSIGNED CALL
NUMBERS ▆▆▆▆▆ AND ▆▆▆▆▆
▆▆▆

Case № **18 MAG   2974**

**Filed Under Seal**

## WARRANT AND ORDER OF AUTHORIZATION

**TO:   Special Agents of the Federal Bureau of Investigation and Other Authorized
Personnel**

### I.    Findings

The Court hereby finds:

1.     Upon an affidavit of Special Agent ▆▆▆▆▆ of the Federal Bureau of
Investigation ("Affidavit") and pursuant to Federal Rule of Criminal Procedure 41, there is
probable cause to believe that violations of 52 U.S.C. §§ 30116(a)(1)(A) and 30109(d)(1)(A)(1)
(illegal campaign contributions) (the "Subject Offense") have been committed by Michael Cohen
(the "Target Subject"), and that the Target Subject uses cellular devices assigned call numbers
▆▆▆▆▆▆▆▆▆ the ("Target Cellular Devices"), which are described in
Attachment A.   Further, there is probable cause to believe that the location of the Target Cellular
Device will constitute evidence of the Subject Offense.   Specifically, there is probable cause to
believe that the location of the Target Cellular Devices will constitute evidence of those criminal
violations, including leading to the location of the Target Cellular Devices, on which there is
probable cause to believe evidence of these offenses exist, as detailed below.

2.     Pursuant to 18 U.S.C. § 3123(b)(1), the Government has certified that the pen
register information for the Target Cellular Devices is relevant to an ongoing investigation by the

Investigating Agency of the Target Subject and others unknown in connection with suspected violations of the Subject Offense.

NOW, THEREFORE, pursuant to Fed. R. Crim. P. 41, 18 U.S.C. §§ 3121 *et seq.*, and 18 U.S.C. § 3103a, IT IS HEREBY ORDERED:

**II.   Warrant and Order of Authorization**

3.     **Warrant.**   Law enforcement agents and other authorized law enforcement officials are hereby authorized to employ an electronic investigative technique, which is described in Attachment B, to the determine the location of the Target Cellular Devices, which are described in Attachment A.

4.     **Data Collection and Retention.**   In the course of employing the technique, law enforcement agents and other authorized law enforcement officials (a) must make reasonable efforts to limit interference with cellular devices other than the Target Cellular Devices, (b) must promptly delete information collected from cellular devices other than the Target Cellular Devices once the Target Cellular Devices is located, and (c) are prohibited from using data acquired beyond that necessary to locate the Target Cellular Devices, absent further order of the Court.

5.     **Delayed Notice.**   Pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), the Court authorizes the officer executing the warrant to delay in notice until 30 days from the end of the period of authorized surveillance.   This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.   Providing immediate notice to the subscriber or user of the Target Cellular Devices would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, and notify confederates.   *See* 18 U.S.C. § 3103a(b)(1).   There is reasonable necessity

2

for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

      6.    **Time of Execution.**    The Court authorizes execution of this Warrant at any time of day or night, owing to the potential need to locate the Target Cellular Devices outside of daytime hours.

      7.    **Sealing.**  This Warrant and Order, and the supporting Agent Affidavit, shall be sealed until further order of the Court, except that the Government may without further order of this Court: provide copies of the Warrant and Order or the supporting Application and Agent Affidavit as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

_____4-5-18_____
Date Issued

_____9:50 am_____
Time Issued

_____
UNITED STATES MAGISTRATE JUDGE
Southern District of New York

3

## **ATTACHMENT A**

This warrant authorizes the use of the electronic investigative technique described in Attachment B to identify the location of the cellular devices assigned phone numbers ▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉ whose wireless provider is AT&T, and whose listed subscriber is Michael Cohen.

**ATTACHMENT B**

Pursuant to an investigation of Michael Cohen for a violation of 52 U.S.C. §§ 30116(a)(1)(A) and 30109(d)(1)(A)(1) (illegal campaign contributions) (the "Subject Offense"), this Warrant authorizes the officers to whom it is directed to determine the location of the cellular devices identified in Attachment A by collecting and examining:

1. radio cellular and wifi signals emitted by the target cellular device for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and

2. radio cellular and wifi signals emitted by the target cellular device in response to radio cellular and wifi signals sent to the cellular device by the officers;

for a period of thirty days, during all times of day and night. This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. *See* 18 U.S.C. § 3103a(b)(2).

5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE USE OF A CELL-SITE SIMULATOR TO LOCATE THE CELLULAR DEVICES ASSIGNED CALL NUMBERS ▮▮▮▮ AND ▮▮▮▮ ▮▮▮ | Case No. _____<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, ▮▮▮▮ being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique, which is described in Attachment B, to determine the location of the cellular devices assigned call numbers ▮▮▮▮▮▮▮ (the "Target Cellular Devices"), which are described in Attachment A.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI").   I have been a Special Agent with the FBI since 2009.   In the course of my experience and training in these positions, I have participated in criminal investigations into federal offenses involving a wide array of financial crimes, including offenses involving public corruption.   I also have training and experience executing warrants for cellphone location data.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.   This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     One purpose of applying for this warrant is to determine with precision the Target Cellular Devices' location.   However, there is reason to believe the Target Cellular Devices are currently located somewhere within this district because the Target Cellular Devices' owner is known to spend most of his time in this district.   Pursuant to Rule 41(b)(2), law enforcement may locate the Target Cellular Devices outside the district provided the device is within the district when the warrant is issued.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 52 U.S.C. §§ 30116(a)(1)(A) and 30109(d)(1)(A)(1) (illegal campaign contributions) (the "Subject Offense") has been committed, are being committed, and will be committed by Michael Cohen and others.   There is also probable cause to believe that the location of the Target Cellular Devices will lead to evidence of the Subject Offense, as detailed below.

6.     Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41.   See 18 U.S.C. §§ 3121-3127.   This warrant therefore includes all the information required to be included in a pen register order.   See 18 U.S.C. § 3123(b)(1).

## PROBABLE CAUSE

### Introduction

7.     The United States Attorney's Office for the Southern District of New York ("USAO") and the FBI are investigating a criminal violation of the campaign finance laws by Michael Cohen, a lawyer who holds himself out as the personal attorney for President Donald J. Trump.   As detailed below, there is probable cause to believe that Cohen made an excessive in-kind contribution to the presidential election campaign of then-candidate Donald Trump in the

2

form of a $130,000 payment to Stephanie Clifford, an individual who is alleged to have had an extramarital affair with Trump, in exchange for her agreement not to disclose that alleged affair on the eve of the 2016 presidential election.

8.     The Target Cellular Devices referenced in this Affidavit are the cellphones assigned call numbers ███████████████████ As further discussed below, the Target Cellular Devices are subscribed to in the name of Michael Cohen (the "Subscriber"). The Subscriber is believed to use the Target Cellphones and is a Target Subject of this investigation. AT&T is the Service Provider for the Target Cellphones.

### Prior Relevant Process

9.     In connection with an investigation then being conducted by the Office of the Special Counsel ("SCO"), the FBI sought and obtained from the Honorable Beryl A. Howell, Chief United States District Judge for the District of Columbia, three search warrants for emails and other content information associated with two email accounts used by Cohen, and one search warrant for stored content associated with an iCloud account used by Cohen.   Specifically:

a.   On or about July 18, 2017, the FBI sought and obtained a search warrant for emails in the account ████████@gmail.com (the "Cohen Gmail Account") sent or received between January 1, 2016 and July 18, 2017 (the "First Cohen Gmail Warrant").

b.   On or about August 8, 2017, the FBI sought and obtained a search warrant for content stored in the iCloud account associated with Apple ID ████████@gmail.com (the "Cohen iCloud Account" and the "Cohen iCloud Warrant").

c.   On or about November 13, 2017, the FBI sought and obtained a search warrant for emails in the Cohen Gmail Account sent or received between June 1, 2015 and November 13, 2017 (the "Second Cohen Gmail Warrant").

3

d.  On or about November 13, 2017, the FBI sought and obtained a search warrant for emails in the account ███████████ (the "Cohen MDCPC Account") sent or received between the opening of the Cohen MDCPC Account[1] and November 13, 2017 (the "First Cohen MDCPC Warrant").

10.    The SCO has since referred certain aspects of its investigation into Cohen to the USAO, which is working with the FBI's New York Field Office.

11.    On or about February 28, 2018, the USAO and FBI sought and obtained search warrants for emails in Cohen Gmail Account and Cohen MDCPC Account, among other accounts, sent or received between November 14, 2017 and February 28, 2018 (the "Third Cohen Gmail Warrant" and "Second Cohen MDCPC Warrant").[2]

12.    The above-described warrants are referred to herein as the "Cohen Emails Warrants" and, with respect to the iCloud Warrant, the "Cohen iCloud Warrant."

**The Illegal Campaign Contribution Scheme**

13.    From my review of public sources, I have learned the following:

a.  In or around October 2011, there were rumors published on the gossip website *TheDirty.com* that Trump had had an extramarital affair with Clifford, an adult film actress whose screen name is Stormy Daniels, in or around July 2006.  In or about October 2011, *Life & Style*

---

[1] Based on my review of this warrant and the affidavit in support of it, I know that the warrant did not specify a time period, but the affidavit indicated that, pursuant to court order, the service provider had provided non-content information for the Cohen MDCPC Account that indicated that the account contained emails from the approximate period of March 2017 through the date of the warrant.

[2] On or about February 28, 2018 and April 7, 2018, the USAO and FBI sought and obtained Rule 41 search warrants authorizing the search of emails and content obtained pursuant to previously issued warrants for additional subject offenses.

*Magazine*, a tabloid sold in supermarkets, also published an article, based on the report in *TheDirty.com*, alleging an affair had occurred between Trump and Clifford. Both Trump and Clifford, through their representatives, issued denials in response to the articles.

b. Specifically, on or about October 11, 2011, Keith Davidson, who identified himself as Clifford's attorney, sent a cease and desist letter to *TheDirty.com*, demanding that the article regarding Trump and Clifford be removed from the website. Additionally, on or about October 12, 2011, Cohen, who was then Executive Vice-President and Special Counsel to the Trump Organization, stated to *E! News* that "[t]he totally untrue and ridiculous story . . . emanated from a sleazy and disgusting website. . . . The Trump Organization and Donald J. Trump will be bringing a lawsuit . . . [and] Mr. Trump and the Trump Organization would like to thank and commend Stormy Daniels and her attorneys for their honesty and swift actions."

14. On or about June 16, 2015, Trump formally launched his 2016 presidential campaign. On or about May 4, 2016, Trump became the presumptive Republican Party nominee for president, and on July 19, 2016, Trump officially became the nominee. Based on my review of public sources, I have learned that while it does not appear that Cohen had an official title as part of the Trump campaign, on multiple occasions Cohen made public statements on behalf of Trump or his campaign. For instance, on or about August 18, 2016, Cohen appeared on CNN to defend Trump's polling numbers.

15. On or about October 7, 2016, *The Washington Post* published online a video and accompanying audio in which Trump referred to women in what the article described as "vulgar terms" in a 2005 conversation with Billy Bush, who was then the host of *Access Hollywood*. The following day, on October 8, 2016, Trump appeared in a video in which he stated, among other things, "I've said and done things I regret and words released today on this

more than a decade old video are one of them.   Anyone who knows me knows these words don't reflect who I am.   I said it.   I was wrong and I apologize."   Based on my review of public sources, I also know that representatives of the Trump Campaign stated, in sum and substance, that the *Access Hollywood* comment was an old and isolated incident.

16.     Based on my review of public sources, including an article published in *Slate* magazine by a reporter who interviewed Clifford, that around this same time, in or about October 2016, Clifford was in discussions with ABC's *Good Morning America* show and *Slate* magazine, among other media sources, to provide these media outlets with her statement about her alleged relationship with Trump.   According to the article in *Slate*, which the author based on conversations with Clifford over the telephone and by text message, Clifford wanted to be paid for her story or be paid by Trump not to disclose her accusation.   As Cohen summarized in a 2018 email obtained pursuant to the Cohen Email Warrants: "In October 2016, I was contacted by counsel for Ms. Clifford stating that news outlets, including *ABC News*, were pursuing the 2011 story of an alleged affair between Mr. Trump and Ms. Clifford."

17.     From my review of telephone toll records[3] and information produced pursuant to the iCloud Warrant and Cohen Email Warrants, I have learned that in the days following the *Access Hollywood* video, Cohen exchanged a series of calls, text messages, and emails with Keith Davidson, who was then Clifford's attorney, David Pecker and Dylan Howard

---

[3] My attribution of certain telephone numbers to certain individuals as described in this affidavit is based on my review of the vCard (virtual contact file) and text messages obtained from Cohen's telephone pursuant to the iCloud Warrant.

of American Media, Inc. ("AMI"), the publisher of the *National Enquirer*,[4] Trump, and Hope

Hicks who was then press secretary for Trump's presidential campaign. For these text messages

and calls—as well as all of the text messages and calls referenced in this affidavit involving

Cohen—Cohen used one of the Target Cellular Devices for the communication.

      18.    Based on the timing of the calls in the days following the *Access Hollywood*

story, and the content of the text messages and emails, I believe that at least some of these

communications concerned the need to prevent Clifford from going public, particularly in the wake

of the *Access Hollywood* story. In particular, I have learned the following:

      a.    On October 8, 2016, at approximately 7:20 p.m., Cohen received a call from Hicks.

Sixteen seconds into the call, Trump joined the call, and the call continued for over four minutes.[5]

Based on the toll records that the USAO has obtained to date, I believe that this was the first call

Cohen had received or made to Hicks in at least multiple weeks, and that Cohen and Trump spoke

on the telephone about once a month prior to this date – specifically, prior to this call on October

---

    [4] Pecker is President of AMI and, according to his own statements in public reports, a personal friend of Trump. Howard is the chief content officer of AMI, who according to public records reports directly to Pecker.

    [5] I believe that Trump joined the call between Cohen and Hicks based on my review of toll records. Specifically, I know that a call was initiated between Cohen's telephone number and Trump's telephone number at the same time the records indicate that Cohen was talking to Hicks. After the Cohen-Trump call was initiated, it lasted the same period of time as the Cohen-Hicks call. Additionally, the toll records indicate a "-1" and then Trump's telephone number, which, based on my training and experience, means that the call was either transferred to Trump, or that Trump was added to the call as a conference or three-way call participant. In addition, based on my conversations with another law enforcement agent who has spoken to a law enforcement agent who has interviewed Hicks, I have learned that Hicks stated, in substance, to the best of her recollection, she did not learn about the allegations made by Clifford until early November 2016. Hicks was not specifically asked about this three-way call.

8, 2016, Cohen and Trump had spoken once in May, once in June, once in July, zero times in August, and twice in September.

b. Approximately ten minutes after the call ended, Hicks and Cohen spoke again for about two minutes.

c. At 7:39 p.m., immediately after the second call with Hicks ended, Cohen called David Pecker (as noted above, the President of American Media Inc., or AMI) and they connected for thirty seconds. Approximately four minutes later, Cohen called Pecker again and they spoke for more than a minute. Three minutes after ending his call with Pecker, Cohen received a call from Dylan Howard (as noted above, the Chief Content Officer of AMI), and they spoke for approximately a minute. According to toll records, it does not appear that Cohen and Howard spoke regularly prior to October 8, 2016, as it had been over a month since they had called each other.

d. At 7:56 p.m., approximately eight minutes after his call with Howard ended, Cohen called Hicks and they connected for two minutes. At approximately the same time this call ended, Cohen received a call from Pecker, and they spoke for about two minutes. At 8:03 p.m., about three minutes after ending his call with Pecker, Cohen called Trump, and they spoke for nearly eight minutes.

e. At 8:39 p.m. and 8:57 p.m., Cohen received calls from Howard and spoke to him for about four and six minutes, respectively. At 9:13 p.m., about ten minutes after Cohen and Howard hung up from the second of these calls, Howard sent Cohen a text message that said: "Keith will do it. Let's reconvene tomorrow." Based on my involvement in this investigation, I believe that when Howard wrote "Keith," he was referring to Keith Davidson, the attorney for Stephanie Clifford. At 3:31 a.m., now on October 9, 2016, Cohen sent Howard a text message in

response that said: "Thank you." Eight minutes later, Cohen sent Howard a text message that said: "Resolution Consultants LLC. is the name of the entity I formed a week ago. Whenever you wake, please call my cell."

      f.   The following day, on October 10, 2016, at 10:58 a.m., Howard sent a text message to Cohen and Davidson, which stated: "Keith/Michael: connecting you both in regards to that business opportunity. Spoke to the client this AM and they're confirmed to proceed with the opportunity. Thanks. Dylan. Over to you two." At 12:25 p.m., Davidson sent Cohen a text message that stated: "Michael – if we are ever going to close this deal – In my opinion, it needs to be today. Keith." Davidson and Cohen then spoke by phone for about three minutes. Based on my participation in this investigation, I believe that when Howard wrote that the "client" was "confirmed to proceed with the opportunity," he was referring to Clifford's agreement in principle to accept money from Cohen in exchange for her agreement not to discuss any prior affair with then-candidate Trump.[6]

      g.   Based on my review of records obtained pursuant to the Cohen Email Warrants, I know that on or about October 10, 2016, Clifford and Davidson appear to have signed a "side letter agreement" that stated it was an exhibit to a "confidential settlement agreement and mutual release" between "Peggy Peterson" and "David Dennison." The purpose of the document, according to the agreement, was to define the "true name and identity" of persons named by

---

[6] As set forth below, AMI was also involved in a payment to model Karen McDougal. However, because these communications were in close temporal proximity to the events involving the negotiation of a payment to Clifford, the execution of the agreement with Clifford, and the payment of money to Clifford, I believe that these communications were related to Clifford. Additionally, based on my review of public statements by McDougal, I have learned that she negotiated an agreement with AMI several months prior to these communications between Cohen and Pecker, Howard, and Davidson.

pseudonym in "confidential settlement agreement and mutual release." The side letter agreement specifies the identity of "Peggy Peterson" to be Clifford, but the space for "Dennison's" identity is blank. The agreement also includes a signature page for "Peterson," "Dennison," and their attorneys. The signature page is signed by "Peterson" and his attorney, Davidson, but the document is unsigned by "Dennison" and his attorney. Based on my involvement in this investigation, I believe that Davidson sent Cohen this partially-signed "side letter agreement" in order to facilitate the closing of a deal between Davidson's client and Cohen or his client on October 10, 2016.

19. It appears that on October 13, 2016, and the days that followed, Cohen took steps to complete a transaction with Davidson, including attempting to open an account from which Cohen could transfer funds to Davidson. Specifically, from my review of toll records, information obtained pursuant to the iCloud Warrant and Cohen Email Warrants, records maintained by First Republic Bank ("First Republic"), as well as my participation in interviews with employees of First Republic, I have learned the following:

a. On the morning of October 13, 2016, at 8:54 a.m., Cohen sent Pecker a text message that stated: "I need to talk to you." At 9:06 a.m., Pecker sent a text message to Cohen that stated, "I called please call me back." The tolls between Cohen and Pecker do not show a telephone call between 8:54 a.m. and 9:06 a.m. However, based on my review of text messages, I have learned that Cohen and Pecker communicate with each other over Signal, which is an encrypted communications cellphone application that allows users to send encrypted text messages and make encrypted calls.

b. At 9:23 a.m., Cohen sent an email that stated "call me" to a banker at First Republic Bank ("First Republic Employee-2"). The email attached documents from the Secretary of State

of Delaware indicating that Cohen had formed a limited liability company called "Resolution Consultants LLC" on September 30, 2016.   As noted above, "Resolution Consultants" is the name of the entity that Cohen had told Howard he had formed recently after Howard said Davidson would "do it."   At 10:44 a.m., Cohen called First Republic Employee-2 and told him, in sum and substance, that he needed an account in the name of "Resolution Consultants" opened immediately, and that he did not want an address on the checks written out of the account.   Later that day, another employee at First Republic emailed Cohen account opening paperwork to complete. Cohen returned the account opening documents partially completed, but failed to provide a copy of his driver's license or passport, and did not respond to the employee's question of how he wanted to fund the account.   As a result, the account was never opened.

      c.   On October 17, 2016, Cohen incorporated Essential Consultants LLC in Delaware. That same day, he filed paperwork to dissolve Resolution Consultants LLC.

      20.   Despite these steps taken by Cohen, it appears that the negotiation between Cohen and Davidson was not progressing sufficiently fast enough for Davidson or his client, Clifford, and they threatened to go public with Clifford's allegations just days before the presidential election.   Specifically, based on my review of toll records, information obtained pursuant to the iCloud Warrant, and public sources, I know the following:

      a.   According to an article in *The Washington Post*, which quoted emails sent from Cohen's email account hosted by the Trump Organization, on October 17, 2016, Davidson emailed Cohen and threatened to cancel the aforementioned "settlement agreement" by the end of the day

11

if Cohen did not complete the transaction.[7]   According to the article, Davidson sent Cohen a second email later in the day that stated in part, "Please be advised that my client deems her settlement agreement canceled and void."   At 4:00 p.m. that day, Cohen called Davidson and they spoke for over five minutes.

b.   Cohen's 4:00 p.m. call with Davidson and/or Davidson's threats to cancel the "settlement agreement" appear to have touched off a flurry of communications about the settlement agreement and whether Clifford would go public.   Specifically:

i.      At 4:43 p.m., Howard sent Cohen a text message that stated: "I'm told they're going with DailyMail.   Are you aware?"   One minute later, Cohen responded: "Call me." Based on my involvement in this investigation, I understand Howard's text to mean that he heard that Clifford was going to take her story of an extramarital affair with Trump to the *Daily Mail*, a tabloid newspaper.

ii.     At 4:45 p.m., Howard called Cohen and they spoke for over two minutes. Moments later, Davidson and Cohen spoke for about two minutes.

iii.    At 5:03 p.m., Cohen attempted to call Trump, but the call only lasted eight seconds.   This was Cohen's first call after he spoke with Davidson.

iv.    At 5:25 p.m., Cohen texted Howard, stating: "Well???"

v.     At 6:44 p.m., Howard responded to Cohen's text, stating: "Not taking my calls."   Cohen responded one minute later: "You're kidding. Who are you trying to reach?" Howard responded one minute later: "The 'agent.'"   Based on my involvement in this

---

[7] Due to the partially covert nature of the investigation to this date, the USAO has not requested documents from the Trump Organization or Davidson, and thus does not possess the email referenced in this article.

investigation, I understand Howard's text messages to mean that he attempted to contact Davidson about the matter involving Clifford, but that Davidson was not taking Howard's calls.

      vi.      At 6:49 p.m., Cohen called Howard and they spoke for nearly four minutes.

      c.   The following day, on October 18, 2016, *TheSmokingGun.com*, a website that publishes legal documents and mugshots, published an article called: "Donald Trump and the Porn Superstar," which alleged that Trump had an extramarital affair with Clifford.     However, the article noted that Clifford had declined to comment.

      21.    On or about October 25, 2016, the communications between Cohen, Davidson, Howard and Pecker picked up again, apparently concerning a transaction involving Clifford.  Specifically, based on my review of toll records, information obtained pursuant to the Cohen Email Warrants and iCloud Warrant, as well as my review of public sources, I have learned the following:

      a.   On October 25, 2016, at 6:09 p.m., Howard sent Cohen a text message stating: "Keith calling you urgently. We have to coordinate something on the matter he's calling you about or its [sic] could look awfully bad for everyone."  One minute later, Davidson sent Cohen a text message stating "Call me."  Cohen and Davidson called each other several times over the next half hour but appear not to have connected.  At 6:42 p.m., Cohen and Davidson spoke for about eight minutes.  At 7:11 p.m., they spoke for another two minutes.

      b.   The next morning, on or about October 26, 2016, at 8:26 a.m., Cohen called Trump and spoke to him for approximately three minutes.  At 8:34 a.m., Cohen called Trump again and connected for a minute and a half.

      c.   At approximately 9:04 a.m.—less than thirty minutes after speaking with Trump— Cohen sent two emails to the person who had incorporated Resolution Consultants and Essential

Consultants for him, and stated "can you send me asap the filing receipt" and then, in the second email, "for Essential Consultants LLC." That person responded with the filing receipt two minutes later at 9:06 a.m. and with the certification of formation 23 minutes later, at 9:27 a.m.

      d. Shortly after that, Cohen contacted a particular employee at First Republic ("First Republic Employee-2") and told him, in sum and substance, that he decided not to open an account in the name of "Resolution Consulting" and instead would be opening a real estate consulting company in the name of "Essential Consultants." Cohen told First Republic Employee-2 that he was at Trump Tower, and wanted to go to a First Republic branch across the street to open the account, so First Republic Employee-2 called another employee of First Republic ("First Republic Employee-1"), a preferred banker at that branch, to assist Cohen. At 11:00 a.m., First Republic Employee-1 called Cohen. I know from my participation in an interview with First Republic Employee-1, that around the time of the call he went to Cohen's office in Trump Tower—on the same floor as the Trump Organization—and went through account opening questions, including know your customer questions, with Cohen. In response to a series of know-your-customer questions about the purpose of the account—the answers to which First Republic Employee-1 entered into a form—Cohen stated, in sum and substance, that he was opening Essential Consultants as a real estate consulting company to collect fees for investment consulting work, and all of his consulting clients would be domestic individuals based in the United States. Based on my review of records obtained from First Republic, it appears that this account (the "Essential Consultants Account") was created at a time between 11:00 a.m. and 1:00 p.m.

      e. At 1:47 p.m., Cohen called Davidson and they spoke for approximately two minutes. At approximately 1:49 p.m., Davidson emailed Cohen wiring instructions for an attorney client trust account at City National Bank.

f.   After the Essential Consultants Account was opened on October 26, 2016, Cohen transferred $131,000 from a home equity line of credit that Cohen had at First Republic to the Essential Consultants Account.   Following the transfer, at approximately 4:15 p.m. on October 26, 2016, First Republic Employee-2's assistant emailed Cohen at his Trump Organization email address to tell him that the funds had been deposited into the Essential Consultants Account. Cohen forwarded that email to the Cohen Gmail Account and then forwarded it to Davidson.

g.   At 6:37 p.m., Cohen asked Pecker by text message, "Can we speak? Important." Cohen called Pecker at 6:49 p.m. and connected for thirty seconds.   At 6:57 p.m., Cohen sent Howard a text message, stating: "Please call me. Important."   Cohen called Howard at 7:00 p.m. and connected for about thirty seconds.   At 7:06 p.m., Cohen called Pecker again and they spoke for nearly thirteen minutes.   At 7:24 p.m., Howard sent a text message to Cohen that: "He said he'd call me back in 20 minutes.   I told him what you are asking for his [sic] reasonable.   I'll get it sorted."   Approximately an hour later, at 8:23 p.m., Howard told Cohen by text message to "check your Gmail for email from my private account."   In an email sent at 8:23 p.m. by Howard to Cohen and Davidson, with the subject line "Confirmation," Howard stated, "Thank you both for chatting with me earlier.   Confirming agreement on: - Executed agreement, hand-signed by Keith's client and returned via overnight or same-day FedEx to Michael, - Change of agreement to reflect the correct LLC, - Transfer of funds on Thursday AM to be held in escrow until receipt of agreement."   After receiving that email, at approximately 8:27 p.m., Cohen asked Howard by text message, "Can you and David [Pecker] give me a call."   Howard promptly responded: "David is not around I think. I'll call."   At 8:28 p.m., Howard called Cohen and they spoke for three minutes.

15

22.     On October 27, 2016, Cohen made a payment to Davidson of $130,000—with the funds intended for Clifford—for the purpose of securing her ongoing silence with respect to the allegations that she had an extramarital affair with Trump.   Specifically, based on my review of toll records, bank records, and information obtained pursuant to the iCloud Warrant and Cohen Email Warrants, I have learned the following:

a.   At 9:47 a.m., Cohen sent Davidson an email, stating: "Keith, kindly confirm that the wire received today, October 27, 2016 shall be held by you in your attorney's trust account until such time as directed for release by me, in writing. Additionally, please ensure that all paperwork contains the correct name of Essential Consultants LLC. I thank you in advance for your assistance and look forward to hearing from you later."

b.   At approximately 10:01 a.m., according to records provided by First Republic Bank, Cohen completed paperwork to wire $130,000 from the Essential Consultants Account—which had been funded a day prior from Cohen's home equity line of credit—to the attorney client trust account at City National Bank that Davidson had specified in the wiring instructions he sent to Cohen.   The wire transfer was made shortly thereafter.

c.   At 10:02 a.m., Davidson responded to Cohen's email from 9:47 a.m., stating: "I confirm that I will work in good faith & that no funds shall be disbursed unless & until the plaintiff personally signs all necessary settlement paperwork, (the form of which will match the prior agreement). The settlement docs will name the correct corporation, (Essential Consultants LLC). Plaintiff's signature will be notarized and returned to you via FedEx. Only after you receive FedEx will I disburse. Fair?"

d.   At 10:50 a.m., First Republic Employee-1 sent Cohen an email confirming that the payment had been sent and providing him with the wire number.

16

23.     On October 28, 2016, and the days that followed, Cohen finalized the transaction with Davidson.     Specifically, based on my review of toll records, information obtained pursuant to the iCloud Warrant, public sources, and bank records, I know the following:

a.     On October 28, 2016, at 11:48 a.m., Cohen spoke to Trump for approximately five minutes.     Beginning at 1:21 p.m., Cohen attempted a series of phone calls to Davidson, Pecker, and Howard throughout the day, although it appears he may only have connected with Howard.

b.     Later that day, at approximately 7:01 p.m., Davidson stated to Cohen by text message that "all is AOK.     I should have signed, notarized docs on Monday.     You should have them on Tuesday."     Cohen thanked him and said "I hope we are good."     Davidson responded, "I assure you.     We are very good."     Howard also texted Cohen at 7:08 p.m., "Keith [Davidson] says we are good."     Cohen then responded "OK" to Howard and "Excellent" to Davidson.     At approximately 10:30 p.m., Cohen spoke to Hicks for three minutes.

c.     On October 31, 2016, Cohen called Howard at 8:22 p.m. and they spoke for over three minutes.     At 8:32 p.m., Cohen received text messages from both Howard and Davidson. Howard said: "You'll have paperwork tomorrow says KD." Davidson said: "We are AOK.     You will be receiving a package tomorrow." Cohen responded "Thank you" to Howard and "Thanks Keith. Will call you then" to Davidson.     From my involvement in this investigation, I believe Davidson was referring to a signed nondisclosure agreement when he told Cohen that he would receive a package.

d.     Based on my review of court filings that became public in 2018, I have learned that on or about October 28, 2016, "EC, LLC and/or David Dennison" entered into a "confidential settlement agreement and mutual release" with "Peggy Peterson," pursuant to which "Peterson" agreed not to disclose certain "confidential information pertaining to [Dennison]" in exchange for

17

$130,000.   The agreement provided that "EC, LLC" would wire the funds to "Peterson's" attorney, who would then transfer funds to "Peterson."   Cohen signed the agreement on behalf of "EC, LLC."   The agreement stated that the address for "EC, LLC," which was later referred to in the agreement as "Essential Consultants, LLC," was Cohen's residence.

      e.   Consistent with the "confidential settlement agreement and mutual release," on or about November 1, 2016, Davidson transferred $96,645 from his attorney client trust account at City National Bank to a bank account in Clifford's name.   The wire had the annotation "net settlement."   On the same day, at approximately 9:48 a.m. Davidson sent Cohen a text message with a picture of a FedEx delivery confirmation, stating that at approximately 9:09 a.m. a package shipped by Davidson the previous day had arrived for Cohen at his Trump Organization address.   On the same day, at approximately 6:14 p.m., Davidson sent Cohen an email with an audio file attached and said "Give this a lesson [sic] and then call me."   The audio attachment was titled "Stormy.mp3" and was a five-minute recording of Davidson interviewing Clifford about recent public allegations made by an adult film star named Jessica Drake regarding her alleged past affair with Trump; in the recording, Clifford explained the reasons she believed that Drake was not credible.   Less than an hour later, at approximately 7:05 p.m., Cohen called Trump, but it appears that they did not connect.   Cohen then called a telephone number belonging to Kellyanne Conway, who at the time was Trump's campaign manager.   They did not connect.   At approximately 7:44 p.m., however, Cohen received a return call from Conway, which lasted for approximately six minutes.

      24.·   On November 4, 2016, just three days after the Clifford transaction was completed and just four days before the presidential election, the *Wall Street Journal* published an article alleging that the *National Enquirer* had "Shielded Donald Trump" from allegations by

*Playboy* model Karen McDougal that she and Trump had an affair.   The article alleged that AMI had agreed to pay McDougal to bury her story.   McDougal, like Clifford, had been represented by Davidson.   Based on my review of toll records, information obtained pursuant to the Cohen Email Warrants and iCloud Warrant, and public sources, it appears that Cohen spoke frequently to Davidson, Howard, Pecker, and Hicks around the time of this article's publication—just days before Election Day—about the importance of preventing the McDougal and Clifford stories from gaining national traction.   Specifically, I have learned the following:

a.   Between 4:30 and 8:00 p.m. on November 4, Cohen communicated several times with Howard, Pecker and Davidson.   For instance, at approximately 4:49 p.m., Cohen sent Howard a text message with a screenshot of an email forwarded to him by another Trump Organization lawyer.   The forwarded email was from a Wall Street Journal reporter, and asked for comment from Trump and/or the campaign on the story.   Cohen also spoke with Hicks several times, including shortly before and/or after calls with Pecker, Howard and Davidson.   Indeed, at approximately 7:33 p.m., using two different cellphones subscribed to him, Cohen appears to have been talking to Davidson and Hicks at the same time.

b.   At approximately 8:51 p.m., Cohen sent Howard a message, stating: "She's being really difficult with giving Keith a statement. Basically went into hiding and unreachable." One minute later, Howard responded: "I'll ask him again. We just need her to disappear." Cohen responded, "She definitely disappeared but refuses to give a statement and Keith cannot push her." At approximately 8:55 p.m., Howard responded to Cohen's text: "Let's let the dust settle. We don't want to push her over the edge. She's on side at present and we have a solid position and a plausible position that she is rightfully employed as a columnist."   Based on my involvement in this investigation, I believe Cohen and Howard were referring to Karen McDougal when they were

19

discussing "she" and "her." Additionally, I believe Howard's statement that "we have . . . a plausible position that she is rightfully employed as a columnist" was a reference to the fact that AMI had given McDougal payments for her role as a purported columnist for the company.

     c. At approximately 8:58 p.m. on November 4, 2016, Howard attempted to reassure Cohen about the effect of the forthcoming *Wall Street Journal* article, texting, "I think it'll be ok pal. I think it'll fade into the distance." Cohen responded, "He's pissed." Howard wrote back, "I'm pissed! You're pissed. Pecker is pissed. Keith is pissed. Not much we can do." Based on my involvement in this investigation, I believe Cohen was referring to Trump when he stated "he's pissed." Cohen asked Howard at approximately 9:00 p.m. how the *Wall Street Journal* could publish its article if "everyone denies." Howard responded, "Because there is the payment from AMI. It looks suspicious at best."

     d. At approximately 9:03 p.m., Hicks called Cohen and they spoke for two minutes. At approximately 9:11 p.m., Cohen called Howard and spoke to him for five minutes. At approximately 9:15 p.m., Hicks called Cohen and they spoke for nearly seven minutes. Again, Cohen used different phones for these two calls, such that he appears to have been on both calls for about a minute of overlap. At approximately 9:32 p.m., Cohen texted Pecker, "The boss just tried calling you. Are you free?" A minute later, Cohen texted Howard, "Is there a way to find David quickly?"

     e. At approximately 9:50 p.m., the *Wall Street Journal* article was published online. Howard and Hicks both sent web links for the article to Cohen. Over the next half hour, Cohen and Howard exchanged several text messages commenting on how the story came across. The next morning on November 5, 2016, at approximately 7:35 a.m., Cohen texted Hicks, "So far I see only 6 stories. Getting little to no traction." Hicks responded, "Same. Keep praying!! It's

working!"·  Cohen wrote back, "Even CNN not talking about it. No one believes it and if necessary, I have a statement by Storm denying everything and contradicting the other porn stars statement. I wouldn't use it now or even discuss with him as no one is talking about this or cares!" Based on my involvement in this investigation, I believe Cohen was referring to the above-referenced recorded audio statement by Clifford that he obtained from Davidson, and was stating that such a statement could be used to influence potential negative media relating to Trump, but was unnecessary at that time.   Based on a text message from Hicks to Cohen, I believe that later that morning, Pecker spoke to Trump.

25.    On or about November 8, 2016, Trump won the election for President of the United States.

26.    On or about January 12, 2018, the *Wall Street Journal* first reported that Cohen arranged a payment to Clifford.   On or about January 22, 2018, Common Cause, a government watchdog group, filed a complaint with the Federal Election Commission, alleging that Cohen had violated campaign finance laws by making the payment to Clifford.   Based on my review public sources following that report, as well as emails obtained pursuant to the Cohen Email Warrants, I have learned the following:

a.  On or about January 23, 2018, the day after Common Cause filed its complaint, Cohen began emailing himself drafts of statements describing his payment to Clifford. Additionally, on January 23, 2018, Cohen emailed the following draft of that statement to an individual who appears to be writing a book on Cohen's behalf:

> In October 2016, I was contacted by counsel for Ms. Clifford stating that news outlets, including ABC news, were pursuing the 2011 story of an alleged affair between Mr. Trump and Ms. Clifford.   Despite the fact that both parties had already denied the allegation, as Mr. Trump's longtime special counsel and protector, I took it upon myself to match the offer and

> *keep the story from breaking.*   I knew the allegation to be false, but *I am also a realist who understands that just because something is false doesn't mean that it doesn't create harm and damage. I could not allow this to occur.*   I negotiated a non-disclosure agreement with Ms. Clifford's counsel and tendered the funds. I did this through my Delaware LLC and transferred personal funds to cover the agreement. I was not reimbursed any monies from Mr. Trump, the Trump Organization, any third party or the Presidential campaign.   At no point did I ever advise Mr. Trump of my communications or actions regarding this agreement. As outlandish and unusual as this may appear, the Trumps have been like family to me for over a decade.   It's what you do for family.

(Emphasis added.)   Based on my involvement in this investigation, I believe that the above email is an acknowledgement that the allegation of the affair had existed for some time ("*...the 2011 story...*"), but that Cohen was motivated to "keep the story from breaking" again in October 2016.

     b.   On or about February 13, 2018, Cohen said in a statement to *The New York Times* that "Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford.   The payment to Ms. Clifford was lawful, and was not a campaign contribution or a campaign expenditure by anyone."   Cohen declined to answer follow-up questions including whether Trump had been aware of the payment, why Cohen made the payment, or whether similar payments had been made to other people.

     c.   On or about February 14, 2018, Cohen was asked by *The New York Times* whether Trump had reimbursed him, whether he and Trump had made any arrangement at the time of the payment, or whether he had made payments to other women.   Cohen stated in response, "I can't get into any of that."   On or about February 14, 2018, Cohen also stated to *The Washington Post* that: "In a private transaction in 2016, I used my own personal funds to facilitate a payment of $130,000 to Ms. Stephanie Clifford.   Neither the Trump Organization nor the Trump campaign was a party to the transaction with Ms. Clifford, and neither reimbursed me for the payment, either directly or indirectly."

d.   On or about March 9, 2018, Cohen stated to *ABC News* that "the funds were taken from my home equity line and transferred internally to my LLC account in the same bank."

27.     For the foregoing reasons, there is probable cause to believe that Cohen committed the Subject Offense by making an in-kind contribution to Trump or the Trump campaign in the form of a $130,000 payment to Clifford on the election. Indeed, while Cohen denies having given an unlawful contribution, in his own statements Cohen has admitted that he paid $130,000 of his "personal funds" to Clifford and that the payment occurred less than two weeks before the election, as Trump was facing negative media allegations about his behavior toward women, even though allegations of an affair between Trump and Clifford existed since 2011.

28.     I have reviewed records maintained by AT&T, from which I have learned, in substance and in part, that the Target Cellular Devices are still active.  Based on my training and experience, my familiarity with this investigation, and the information set forth above, I therefore believe that the requested data will lead to evidence of the Subject Offense. Specifically, information will lead to the present location of the Target Cellular Devices; law enforcement may then obtain evidence from the Target Cellular Devices, by subpoena or search warrant, including but not limited to contact lists containing contact information for participants in the illegal campaign contribution scheme and well as text messages between these participants.

**MANNER OF EXECUTION**

29.     In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications.  When sending or receiving a communication, a cellular device broadcasts certain cellular and wifi signals to the cellular tower

23

that is routing its communication. These cellular and wifi signals include a cellular device's unique identifiers.

30.     To facilitate execution of this warrant to determine the location of the Target Cellular Devices, law enforcement may use an investigative device or devices capable of broadcasting cellular and wifi signals that will be received by the Target Cellular Devices or receiving cellular and wifi signals from nearby cellular devices, including the Target Cellular Devices. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the Target Cellular Devices and nearby cellular devices and thereby prompt them to send cellular and wifi signals that include the unique identifier of the device. Law enforcement may monitor the cellular and wifi signals broadcast by the Target Cellular Devices for non-content signal information and use that information to determine the Target Cellular Devices' location, even if it is located inside a house, apartment, or other building. The device will not intercept the contents of the Target Cellular Devices' communications, such as telephone calls, text messages, and other electronic communications. Further, the device will not collect any other data stored on the Target Cellular Devices, including e-mails, text messages, contact lists, images, or Global Positioning System (GPS) data.

31.     The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the Target Cellular Devices, the device may briefly exchange cellular and wifi signals with all phones or other cellular devices in its vicinity to determine whether those devices' unique identifiers match the identifiers of the Target Cellular Devices. These cellular

24

and wifi signals may include cell phone identifiers.   The device will not complete a connection with cellular devices determined not to be the Target Cellular Devices, and law enforcement will limit collection of information from devices other than the Target Cellular Devices.   To the extent that any information from a cellular device other than the Target Cellular Devices is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Devices from all other cellular devices.

## AUTHORIZATION REQUEST

32.    Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41.   The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

33.    I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days from the end of the period of authorized surveillance.   This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.   Providing immediate notice to the subscriber or user of the Target Cellular Devices would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, and notify confederates.   *See* 18 U.S.C. § 3103a(b)(1).   There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

34.    I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cellular Devices outside of daytime hours.

35.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.   Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

36.    A search warrant may not be legally necessary to compel the investigative technique described herein.   Nevertheless, I hereby submit this warrant application out of an abundance of caution.

Respectfully submitted,

Federal Bureau of Investigation

Subscribed and sworn to before me

On: _____ April 8, 2018 _____

_____ S/Henry Pitman _____
UNITED STATES MAGISTRATE JUDGE

26

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE USE OF A CELL-SITE SIMULATOR TO LOCATE THE CELLULAR DEVICES ASSIGNED CALL NUMBERS ▮▮▮ | Case No. _____ <br><br> **Filed Under Seal** |

## WARRANT AND ORDER OF AUTHORIZATION

**TO:   Special Agents of the Federal Bureau of Investigation and Other Authorized Personnel**

**I.   Findings**

The Court hereby finds:

1.      Upon an affidavit of Special Agent ▮▮▮▮ of the Federal Bureau of Investigation ("Affidavit") and pursuant to Federal Rule of Criminal Procedure 41, there is probable cause to believe that violations of 52 U.S.C. §§ 30116(a)(1)(A) and 30109(d)(1)(A)(1) (illegal campaign contributions) (the "Subject Offense") have been committed by Michael Cohen (the "Target Subject"), and that the Target Subject uses cellular devices assigned call numbers ▮▮▮▮▮▮▮ the ("Target Cellular Devices"), which are described in Attachment A.   Further, there is probable cause to believe that the location of the Target Cellular Device will constitute evidence of the Subject Offense.   Specifically, there is probable cause to believe that the location of the Target Cellular Devices will constitute evidence of those criminal violations, including leading to the location of the Target Cellular Devices, on which there is probable cause to believe evidence of these offenses exist, as detailed below.

2.      Pursuant to 18 U.S.C. § 3123(b)(1), the Government has certified that the pen register information for the Target Cellular Devices is relevant to an ongoing investigation by the

Investigating Agency of the Target Subject and others unknown in connection with suspected violations of the Subject Offense.

NOW, THEREFORE, pursuant to Fed. R. Crim. P. 41, 18 U.S.C. §§ 3121 *et seq.*, and 18 U.S.C. § 3103a, IT IS HEREBY ORDERED:

## II.    Warrant and Order of Authorization

3.     **Warrant.**   Law enforcement agents and other authorized law enforcement officials are hereby authorized to employ an electronic investigative technique, which is described in Attachment B, to the determine the location of the Target Cellular Devices, which are described in Attachment A.

4.     **Data Collection and Retention.**   In the course of employing the technique, law enforcement agents and other authorized law enforcement officials (a) must make reasonable efforts to limit interference with cellular devices other than the Target Cellular Devices, (b) must promptly delete information collected from cellular devices other than the Target Cellular Devices once the Target Cellular Devices is located, and (c) are prohibited from using data acquired beyond that necessary to locate the Target Cellular Devices, absent further order of the Court.

5.     **Delayed Notice.**   Pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), the Court authorizes the officer executing the warrant to delay in notice until 30 days from the end of the period of authorized surveillance.   This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705.   Providing immediate notice to the subscriber or user of the Target Cellular Devices would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, and notify confederates.   *See* 18 U.S.C. § 3103a(b)(1).   There is reasonable necessity

2

for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

6.   **Time of Execution.**   The Court authorizes execution of this Warrant at any time of day or night, owing to the potential need to locate the Target Cellular Devices outside of daytime hours.

7.   **Sealing.**   This Warrant and Order, and the supporting Agent Affidavit, shall be sealed until further order of the Court, except that the Government may without further order of this Court: provide copies of the Warrant and Order or the supporting Application and Agent Affidavit as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

Dated: New York, New York

_____4/8/18_____
Date Issued

_____9:50 am_____
Time Issued


_____S/ HENRY PITMAN_____
UNITED STATES MAGISTRATE JUDGE
Southern District of New York

3

## ATTACHMENT A

This warrant authorizes the use of the electronic investigative technique described in Attachment B to identify the location of the cellular devices assigned phone numbers ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ whose wireless provider is AT&T, and whose listed subscriber is Michael Cohen.

4

**ATTACHMENT B**

Pursuant to an investigation of Michael Cohen for a violation of 52 U.S.C. §§ 30116(a)(1)(A) and 30109(d)(1)(A)(1) (illegal campaign contributions) (the "Subject Offense"), this Warrant authorizes the officers to whom it is directed to determine the location of the cellular devices identified in Attachment A by collecting and examining:

1. radio cellular and wifi signals emitted by the target cellular device for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and

2. radio cellular and wifi signals emitted by the target cellular device in response to radio cellular and wifi signals sent to the cellular device by the officers;

for a period of thirty days, during all times of day and night.   This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property.   The Court finds reasonable necessity for the use of the technique authorized above. *See* 18 U.S.C. § 3103a(b)(2).