ELIJAH E. CUMMINGS, MARYLAND
CHAIRMAN

ONE HUNDRED SIXTEENTH CONGRESS

JIM JORDAN, OHIO
RANKING MINORITY MEMBER

# Congress of the United States
## House of Representatives

COMMITTEE ON OVERSIGHT AND REFORM
2157 RAYBURN HOUSE OFFICE BUILDING
WASHINGTON, DC 20515-6143

MAJORITY (202) 225-5051
MINORITY (202) 225-5074

http://oversight.house.gov

July 19, 2019

Ms. Audrey Strauss
Deputy United States Attorney
United States Attorney's Office
Southern District of New York
1 Saint Andrews Plaza
New York, NY 10007

Dear Ms. Strauss:

On January 8, 2019, the Committee launched an investigation of "hush money" payments that President Donald Trump made through his longtime personal attorney, Michael Cohen, to silence women alleging affairs with the President during the 2016 presidential campaign, as well as the President's failure to report hundreds of thousands of dollars in payments and liabilities on statutorily mandated financial disclosure forms.

The Committee's investigation is broad and includes oversight of the President's compliance with the Ethics in Government Act of 1978, the accuracy of the President's financial reporting to the Office of Government Ethics and other federal entities, the President's compliance with campaign finance laws, the accuracy of the President's statements to the American people about these payments, multiple inaccurate assertions by White House and Trump Organization representatives to government ethics officials that the President's payments were made pursuant to a "retainer" agreement with Mr. Cohen, and other matters.

At the same time, the Committee understands that your office has been conducting a criminal investigation into the narrower issue of whether these hush money payments violated federal campaign finance laws. As a result of your office's investigation, Mr. Cohen pleaded guilty and is now serving a three-year sentence. Although your office has now concluded its investigation, no one else has been held accountable for participating in these crimes.

The Committee is seeking to determine whether the internal Department of Justice policy against indicting a sitting President—the same policy that prevented Special Counsel Robert Mueller from bringing an indictment against President Trump for obstruction of justice in the Russian election interference investigation—played any role in your office's decision not to indict President Trump for these hush money crimes. If prosecutors identified evidence of criminal conduct by Donald Trump while serving as President—and did not bring charges as they would have for any other individual—this would be the second time the President has not been held accountable for his actions due to his position. The Office of the President should not be used as a shield for criminal conduct.

E-1

Ms. Audrey Strauss
Page 2

The Committee also requests the evidence your office has amassed relating to these crimes, as well as information regarding whether Attorney General William Barr or other Department leaders influenced the decisions in this case in any way.

The Committee is writing to you as the top official at the Southern District of New York charged with overseeing this investigation and leading prosecutors and investigators in their work—and their decisions. You serve in a parallel capacity to that of Special Counsel Mueller, who issued a detailed report to Congress about his investigation and will be testifying next week about his findings.

The Committee is also writing to you directly because Attorney General Barr failed to relay information to Congress and the American people in an independent, neutral, and factual way regarding prosecutors' findings relating to President Trump when he fundamentally mischaracterized the findings of the report issued by Special Counsel Mueller.[1]

As a result of this and other incidents, the Committee has expanded its investigation to include examining the Department's process in the decisions in this case and whether they were influenced by politics, Department policy, or Department leadership in any way.

In ordering the unsealing of Mr. Cohen's records yesterday, a federal court found that this matter is one of "national importance" and that "it is time that every American has an opportunity to scrutinize the Materials."[2] The Committee agrees. It is also critical for Congress to conduct its Constitutional role of overseeing the President, particularly when the Justice Department is constrained from doing so.

### Southern District's "Hush Money" Investigation

On August 21, 2018, Mr. Cohen pleaded guilty to criminal charges in the Southern District of New York, including two counts for illegal campaign contributions for payments during the 2016 presidential campaign to silence women alleging extramarital affairs with then-candidate Trump. According to your prosecutors, Mr. Cohen played a central role in arranging:

- a $150,000 payment by the *National Enquirer*'s parent, American Media, Inc. (AMI), to Karen McDougal, a former model and actress, in August 2016 as part of a so-called "catch-and-kill," so her story would never be published; and

---

[1] *See, e.g.,* Letter from Special Counsel Robert S. Mueller, III to Attorney General William P. Barr, Department of Justice (Mar. 27, 2019) (noting that Attorney General Barr "did not fully capture the context, nature, and substance of this Office's work and conclusions," that he caused "public confusion about critical aspects of the results of our investigation," and that he threatened "to undermine a central purpose for which the Department appointed the Special Counsel: to assure full public confidence in the outcome of the investigations").

[2] *Prosecutors Have 'Concluded' Michael Cohen Campaign Finance Probe, Judge Says*, Washington Post (July 17, 2019) (online at www.washingtonpost.com/national-security/prosecutors-have-concluded-michael-cohen-campaign-finance-probe-judge-says/2019/07/17/733391a0-a8b1-11e9-9214-246e594de5d5_story.html).

E-8

Ms. Audrey Strauss
Page 3

- a $130,000 payment by Mr. Cohen to Stephanie Clifford, a.k.a. Stormy Daniels, through a shell company he created called Essential Consultants LLC in October 2016.[3]

Mr. Cohen did not act alone. As he admitted in open court:

[I]n coordination with, and at the direction of, a candidate for federal office, I and the CEO of a media company at the request of the candidate worked together to keep an individual with information that would be harmful to the candidate and the campaign from publicly disclosing this information. … I participated in this conduct … for the principal purpose of influencing the election.[4]

During a hearing before the Committee on February 27, 2019, Mr. Cohen confirmed that, "for the record, Individual Number 1 is President Donald J. Trump." He also elaborated on the role of AMI Chief Executive Officer David Pecker in the "catch-and-kill" practices and Trump Organization Chief Financial Officer Allen Weisselberg in reimbursing Mr. Cohen for the hush money payments and structuring the payments.[5]

Corroborating his testimony, Mr. Cohen produced copies of checks drawn from the President's personal and trust accounts to reimburse Mr. Cohen for the hush money payments. One check, dated August 1, 2017, came from President Trump's personal account, and the other, dated March 17, 2017, came from the Donald J. Trump Revocable Trust. These checks demonstrate the President's personal involvement and the apparent interchangeable nature of his personal account and his trust account—from which he supposedly had removed himself to address conflicts of interest.

President Trump and his trustees, Donald Trump Jr. and Allen Weisselberg, wrote these checks in 2017, while Mr. Trump was serving as President. Your office found that Mr. Cohen was reimbursed $420,000 in monthly installments of $35,000, including $130,000 for the hush money payment to Ms. Clifford, $50,000 for "tech services," which were "'gross[ed] up' to $360,000 for tax purposes," and a $60,000 "bonus." According to your prosecutors, the President's company "falsely accounted for these payments as 'legal expenses.'"[6]

---

[3] Department of Justice, U.S. Attorney's Office for the Southern District of New York, Government's Information (Aug. 21, 2018), *United States v. Cohen*, S.D.N.Y. (No. 1:18 CR 00602).

[4] U.S. District Court, Southern District of New York, Transcript of Court Proceedings, Defendant's Plea (Aug. 21, 2018), *United States v. Cohen*, S.D.N.Y (No. 1:18 CR 00602) (online at https://assets.documentcloud.org/documents/4780185/Cohen-Court-Proceeding-Transcript.pdf).

[5] Committee on Oversight and Reform, *Hearing with Michael Cohen, Former Attorney to President Donald Trump* (Feb. 27, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Printed%20Transcript%20Ser.%20No.%20116-03-FC%20Michael%20Cohen.pdf).

[6] Department of Justice, Southern District of New York, Government's Sentencing Memorandum (Dec. 7, 2018), *United States v. Cohen*, S.D.N.Y. (No. 1:18 CR 00602).

E-3

**Unsealed Warrant Applications Show Direct Coordination with President**

Warrant materials released yesterday shed additional light on this hush money payment scheme, including dozens of references to President Trump's knowledge and actions. According to the affidavit for the warrant application on April 8, 2018, Mr. Cohen regularly communicated with President Trump as he committed these crimes. In fact, President Trump communicated directly with Mr. Cohen immediately before Mr. Cohen made arrangements for payments to silence these women, according to the FBI agent who made the report. The affidavit for the warrant application states:

> Based on the timing of these calls, and the content of the text messages and emails, I believe that at least some of these communications concerned the need to prevent Clifford from going public, particularly in the wake of the *Access Hollywood* story. In particular, I have learned the following:
>
> a. On October 8, 2016, at approximately 7:20 p.m., Cohen received a call from Hicks. Sixteen seconds into the call, Trump joined the call, and the call continued for over four minutes. Based on the toll records that the USAO has obtained to date, I believe that this was the first call Cohen had received or made to Hicks in at least multiple weeks, and that Cohen and Trump spoke about once a month prior to this date—specifically, prior to this call on October 8, 2016, Cohen and Trump had spoken once in May, once in June, once in July, zero times in August, and twice in September.
>
> b. Approximately ten minutes after the call ended, Hicks and Cohen spoke again for about two minutes.
>
> c. At 7:39 p.m., immediately after the second call with Hicks ended, Cohen called David Pecker (as noted above, the President of American Media Inc., or AMI) and they connected for thirty seconds.[7]

The affidavit for the warrant application also indicates that President Trump later spoke with Mr. Cohen less than 30 minutes before Mr. Cohen prepared the shell corporations he used for the hush money payments:

> b. The next morning, on or about October 26, 2016, at 8:26 a.m., Cohen called Trump and spoke to him for approximately three minutes. At 8:34 a.m., Cohen called Trump again and connected for a minute and a half.
>
> c. At approximately 9:04 a.m.—less than thirty minutes after speaking with Trump—Cohen sent two emails to the person who had incorporated Resolution Consultants and Essential Consultants for him, and stated "can you send me asap the filing receipt" and then, in the second email, "for Essential Consultants LLC." That person responded with the filing receipt

---

[7] Department of Justice, U.S. Attorney's Office for the Southern District of New York, Letter, Exhibit 1 (July 18, 2019), *United States v. Cohen*, S.D.N.Y. (No. 1:18 CR 00602).

E-4

two minutes later at 9:06 a.m. and with the certification of formation 23 minutes later, at 9:27 a.m.[8]

Despite this evidence, your office reportedly has not conducted certain interviews prosecutors requested with Trump Organization officials regarding these payments.[9] In addition, as your office stated in the affidavit for the April 8, 2018, warrant application, "Due to the partially covert nature of the investigation to this date, the USAO has not requested documents from the Trump Organization or Davidson."[10]

## Justice Department Policy Against Indicting Sitting President

In March, Special Counsel Robert Mueller issued his report examining Russian interference in the 2016 presidential election and other matters. The Special Counsel's report described ten alarming incidents in which the President attempted to obstruct justice, ranging from attempting to remove the Special Counsel to encouraging witnesses to lie and to destroy or conceal evidence.[11]

The Special Counsel's report confirmed that he did not exonerate the President. To the contrary, the report stated:

> [I]f we had confidence after a thorough investigation of the facts that the President clearly did not commit obstruction of justice, we would so state. Based on the facts and the applicable legal standards, however, we are unable to reach that judgment.[12]

Instead, the report made clear that the Special Counsel had to follow a Department of Justice policy not to indict the sitting President:

> The Office of Legal Counsel (OLC) has issued an opinion finding that "the indictment or criminal prosecution of a sitting President would impermissibly undermine the capacity of the executive branch to perform its constitutionally assigned functions" … [T]his Office accepted OLC's legal conclusion for the purpose of exercising prosecutorial jurisdiction.[13]

---

[8] *Id.*

[9] *Prosecutors Unlikely to Charge Trump Org Executives, Sources Say*, CNN (July 12, 2019) (online at www.cnn.com/2019/07/12/politics/trump-organization-federal-prosecutors/index.html) ("In January, one month after Cohen was sentenced to three years in prison, prosecutors requested interviews with executives at the company, CNN reported. But prosecutors never followed up on their initial request, people familiar with the matter said, and the interviews never took place.").

[10] Department of Justice, U.S. Attorney's Office for the Southern District of New York, Letter, Exhibit 1 (July 18, 2019), *United States v. Cohen*, S.D.N.Y. (No. 1:18 CR 00602).

[11] Special Counsel Robert S. Mueller, III, Department of Justice, *Report on the Investigation into Russian Interference in the 2016 Presidential Election* (March 2019) (online at www.justice.gov/storage/report.pdf).

[12] *Id.*

[13] *Id.*

E-5

Ms. Audrey Strauss
Page 6

In addition to issuing this report, the Special Counsel held a press conference on May 29, 2019, in which he explained this Justice Department policy in greater detail. He stated:

> A special counsel's office is part of the Department of Justice, and by regulation, it was bound by that department policy. *Charging the president with a crime was therefore not an option we could consider.*[14]

The Special Counsel also highlighted during his press conference the critical role of Congress, stating that "the Constitution requires a process other than the criminal justice system to formally accuse a sitting president of wrongdoing."[15]

The policy the Special Counsel was referring to is a memo issued by OLC in 2000. That memo argued that "indictment or criminal prosecution of a sitting President would impermissibly undermine the capacity of the executive branch to perform its constitutionally assigned functions." The OLC memo asserted that, under the doctrine of separation of powers, conviction of the President would conflict with the "conduct of the Presidency."[16]

The OLC memo also explicitly recognized the role of Congress:

> Finally, 'under our constitutional plan as outlined in Article I, sec. 3, only the Congress by the formal process of impeachment, and not a court by any process should be accorded the power to interrupt the Presidency or oust an incumbent.'[17]

The OLC memo also stated:

> Where the President is concerned, only the House of Representatives has the authority to bring charges of criminal misconduct through the constitutionally sanctioned process of impeachment.[18]

The OLC memo emphasized that "the President is not above the law, and that he is ultimately accountable for his misconduct that occurs before, during, and after his service to the country."[19]

---

[14] Press Conference with Special Counsel Robert S. Mueller, III, Department of Justice (May 29, 2019) (online at www.nytimes.com/2019/05/29/us/politics/mueller-transcript.html) (emphasis added).

[15] *Id.*

[16] *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222 (2000) (OLC Op.) (online at www.justice.gov/sites/default/files/olc/opinions/2000/10/31/op-olc-v024-p0222_0.pdf).

[17] *Id.*

[18] *Id.*

[19] *Id.*

E-6

## Requests for Documents and Information

Given the gravity of these matters, the conclusion of your office's investigation, and the importance of these issues to the American people, the Committee requests that you produce the following documents by August 2, 2019:

1. All evidence collected referring or relating to the role of any other individual in connection with the campaign finance violations charged against Michael Cohen, including any evidence referring or relating to the President of the United States; and

2. Copies of all immunity deals granted, or informal immunity agreement letters or non-prosecution agreements entered into, in this investigation.

In addition, the Committee requests that you submit written answers to the following questions by August 2, 2019:

1. Did your office conduct an investigation into potential criminal conduct by the President of the United States?

2. Did your office collect evidence of the President's direct participation in potential criminal conduct?

3. Did your office not indict the President due, in part or in whole, to the Department of Justice policy described in the OLC memo?

4. Did the Department of Justice policy described in the OLC memo play any role in your office's deliberations regarding whether to indict the President? If so, what role did it play?

5. Although the Special Counsel refrained from rendering a prosecutorial judgment after his investigation, the Attorney General ultimately made the decision to decline prosecution of the President. For any potential crimes relating to your investigation, did your office, the Attorney General, or any other Department official render a prosecutorial judgment with respect to the President?

6. Please identify the potential crimes by the President that were evaluated by your office, when any determination not to prosecute was made, who made that determination, when that determination was communicated, and the basis for that determination.

7. What was the involvement or influence of the Attorney General in any decisions in this case?

8. Did your office request interviews of any Trump Organization or Trump campaign officials in connection with your investigation?

E-7

9. Did your office conduct interviews of any Trump Organization or Trump campaign officials in connection with your investigation? If not, why not?

10. Did your office submit document requests to the Trump Organization? If so, did they comply in whole or in part?

11. Has your office collected evidence of communications between Mr. Cohen and the President referring or relating to Stephanie Clifford or Karen McDougal, or payments to Stephanie Clifford or Karen McDougal?

12. Why have no other participants in the campaign finance violations been charged with a crime?

The Committee on Oversight and Reform is the principal oversight committee of the House of Representatives and has broad authority to investigate "any matter" at "any time" under House Rule X. In addition, House Rule X, clause 3(i) specifically charges the Committee with conducting oversight of "the operation of Government activities at all levels, including the Executive Office of the President."

An attachment to this letter provides additional instructions for responding to the Committee's request. If you have any questions regarding this request, please contact my staff at (202) 225-5051. Thank you for your prompt attention to this request.

Sincerely,

Elijah E. Cummings
Chairman

Enclosure

cc: The Honorable Jim Jordan, Ranking Member

E-8

## Responding to Committee Document Requests

1. In complying with this request, produce all responsive documents that are in your possession, custody, or control, whether held by you or your past or present agents, employees, and representatives acting on your behalf. Produce all documents that you have a legal right to obtain, that you have a right to copy, or to which you have access, as well as documents that you have placed in the temporary possession, custody, or control of any third party.

2. Requested documents, and all documents reasonably related to the requested documents, should not be destroyed, altered, removed, transferred, or otherwise made inaccessible to the Committees.

3. In the event that any entity, organization, or individual denoted in this request is or has been known by any name other than that herein denoted, the request shall be read also to include that alternative identification.

4. The Committees' preference is to receive documents in electronic form (i.e., CD, memory stick, thumb drive, or secure file transfer) in lieu of paper productions.

5. Documents produced in electronic format should be organized, identified, and indexed electronically.

6. Electronic document productions should be prepared according to the following standards:

    a. The production should consist of single page Tagged Image File ("TIF"), files accompanied by a Concordance-format load file, an Opticon reference file, and a file defining the fields and character lengths of the load file.

    b. Document numbers in the load file should match document Bates numbers and TIF file names.

    c. If the production is completed through a series of multiple partial productions, field names and file order in all load files should match.

    d. All electronic documents produced to the Committees should include the following fields of metadata specific to each document, and no modifications should be made to the original metadata:

        BEGDOC, ENDDOC, TEXT, BEGATTACH, ENDATTACH, PAGECOUNT, CUSTODIAN, RECORDTYPE, DATE, TIME, SENTDATE, SENTTIME, BEGINDATE, BEGINTIME, ENDDATE, ENDTIME, AUTHOR, FROM, CC, TO, BCC, SUBJECT, TITLE, FILENAME, FILEEXT, FILESIZE, DATECREATED, TIMECREATED, DATELASTMOD, TIMELASTMOD,

E-9

INTMSGID, INTMSGHEADER, NATIVELINK, INTFILPATH, EXCEPTION, BEGATTACH.

7. Documents produced to the Committees should include an index describing the contents of the production. To the extent more than one CD, hard drive, memory stick, thumb drive, zip file, box, or folder is produced, each should contain an index describing its contents.

8. Documents produced in response to this request shall be produced together with copies of file labels, dividers, or identifying markers with which they were associated when the request was served.

9. When you produce documents, you should identify the paragraph(s) or request(s) in the Committees' letter to which the documents respond.

10. The fact that any other person or entity also possesses non-identical or identical copies of the same documents shall not be a basis to withhold any information.

11. The pendency of or potential for litigation shall not be a basis to withhold any information.

12. In accordance with 5 U.S.C.§ 552(d), the Freedom of Information Act (FOIA) and any statutory exemptions to FOIA shall not be a basis for withholding any information.

13. Pursuant to 5 U.S.C. § 552a(b)(9), the Privacy Act shall not be a basis for withholding information.

14. If compliance with the request cannot be made in full by the specified return date, compliance shall be made to the extent possible by that date. An explanation of why full compliance is not possible shall be provided along with any partial production.

15. In the event that a document is withheld on the basis of privilege, provide a privilege log containing the following information concerning any such document: (a) every privilege asserted; (b) the type of document; (c) the general subject matter; (d) the date, author, addressee, and any other recipient(s); (e) the relationship of the author and addressee to each other; and (f) the basis for the privilege(s) asserted.

16. If any document responsive to this request was, but no longer is, in your possession, custody, or control, identify the document (by date, author, subject, and recipients), and explain the circumstances under which the document ceased to be in your possession, custody, or control.

17. If a date or other descriptive detail set forth in this request referring to a document is inaccurate, but the actual date or other descriptive detail is known to you or is otherwise apparent from the context of the request, produce all documents that would be responsive as if the date or other descriptive detail were correct.

F-10

18. This request is continuing in nature and applies to any newly-discovered information. Any record, document, compilation of data, or information not produced because it has not been located or discovered by the return date shall be produced immediately upon subsequent location or discovery.

19. All documents shall be Bates-stamped sequentially and produced sequentially.

20. Two sets of each production shall be delivered, one set to the Majority Staff and one set to the Minority Staff. When documents are produced to the Committee on Oversight and Reform, production sets shall be delivered to the Majority Staff in Room 2157 of the Rayburn House Office Building and the Minority Staff in Room 2105 of the Rayburn House Office Building. When documents are produced to the Committee on Financial Services, production sets shall be delivered to the Majority Staff in Room 2129 of the Rayburn House Office Building and the Minority Staff in Room 4340 of the O'Neill House Office Building. When documents are produced to the Permanent Select Committee on Intelligence, production sets shall be delivered to Majority and Minority Staff in Room HVC-304 of the Capital Visitor Center.

21. Upon completion of the production, submit a written certification, signed by you or your counsel, stating that: (1) a diligent search has been completed of all documents in your possession, custody, or control that reasonably could contain responsive documents; and (2) all documents located during the search that are responsive have been produced to the Committee.

## Definitions

1. The term "document" means any written, recorded, or graphic matter of any nature whatsoever, regardless of how recorded, and whether original or copy, including, but not limited to, the following: memoranda, reports, expense reports, books, manuals, instructions, financial reports, data, working papers, records, notes, letters, notices, confirmations, telegrams, receipts, appraisals, pamphlets, magazines, newspapers, prospectuses, communications, electronic mail (email), contracts, cables, notations of any type of conversation, telephone call, meeting or other inter-office or intra-office communication, bulletins, printed matter, computer printouts, teletypes, invoices, transcripts, diaries, analyses, returns, summaries, minutes, bills, accounts, estimates, projections, comparisons, messages, correspondence, press releases, circulars, financial statements, reviews, opinions, offers, studies and investigations, questionnaires and surveys, and work sheets (and all drafts, preliminary versions, alterations, modifications, revisions, changes, and amendments of any of the foregoing, as well as any attachments or appendices thereto), and graphic or oral records or representations of any kind (including without limitation, photographs, charts, graphs, microfiche, microfilm, videotape, recordings and motion pictures), and electronic, mechanical, and electric records or representations of any kind (including, without limitation, tapes, cassettes, disks, and recordings) and other written, printed, typed, or other graphic or recorded matter of any kind or nature, however produced or reproduced, and whether preserved in writing, film, tape, disk, videotape, or otherwise. A document bearing any notation not a

E-11

part of the original text is to be considered a separate document. A draft or non-identical copy is a separate document within the meaning of this term.

2. The term "communication" means each manner or means of disclosure or exchange of information, regardless of means utilized, whether oral, electronic, by document or otherwise, and whether in a meeting, by telephone, facsimile, mail, releases, electronic message including email (desktop or mobile device), text message, instant message, MMS or SMS message, message application, or otherwise.

3. The terms "and" and "or" shall be construed broadly and either conjunctively or disjunctively to bring within the scope of this request any information that might otherwise be construed to be outside its scope. The singular includes plural number, and vice versa. The masculine includes the feminine and neutral genders.

4. The term "including" shall be construed broadly to mean "including, but not limited to."

5. The term "Company" means the named legal entity as well as any units, firms, partnerships, associations, corporations, limited liability companies, trusts, subsidiaries, affiliates, divisions, departments, branches, joint ventures, proprietorships, syndicates, or other legal, business or government entities over which the named legal entity exercises control or in which the named entity has any ownership whatsoever.

6. The term "identify," when used in a question about individuals, means to provide the following information: (a) the individual's complete name and title; (b) the individual's business or personal address and phone number; and (c) any and all known aliases.

7. The term "related to" or "referring or relating to," with respect to any given subject, means anything that constitutes, contains, embodies, reflects, identifies, states, refers to, deals with, or is pertinent to that subject in any manner whatsoever.

8. The term "employee" means any past or present agent, borrowed employee, casual employee, consultant, contractor, de facto employee, detailee, fellow, independent contractor, intern, joint adventurer, loaned employee, officer, part-time employee, permanent employee, provisional employee, special government employee, subcontractor, or any other type of service provider.

9. The term "individual" means all natural persons and all persons or entities acting on their behalf.

E-18