(Case called)

DEPUTY CLERK: Appearances for the United States Attorney's Office.

MR. ROOS: For the United States Attorney's Office, good morning.

Nicks Roos, Thomas McKay, Rachel Maimin and Andrea Griswold.

DEPUTY CLERK: Appearances for Special Counsel's Office.

MS. RHEE: Jeannie Rhee on behalf of Special Counsel's Office. I'm joined here today by Andrew Goldstein and Rush Atkinson. Also in the courtroom in the back, we're joined by FBI Heather D'Agostino and Mickey Robinson.

DEPUTY CLERK: Appearances for the defendant.

MR. PETRILLO: Good morning, your Honor.

Guy Petrillo and Amy Lester for Michael Cohen.

THE COURT: Good morning to all of you, and I note the presence of the defendant, Mr. Cohen, at counsel table.

This matter is on for sentencing. Are the parties ready to proceed?

MR. ROOS: Yes, your Honor.

MR. PETRILLO: Yes, your Honor.

MS. RHEE: Yes, your Honor.

THE COURT: First, Mr. Petrillo, have you reviewed with your client the presentence investigation report?

MR. PETRILLO: I have, your Honor.

THE COURT: Are there any factual matters set forth in the report that you believe warrant modification or correction?

MR. PETRILLO: Not at this time, your Honor. Thank you.

THE COURT: Mr. Roos, are there any factual matters set forth in the presentence report that the government believes warrant modification or correction?

MR. ROOS: No, your Honor.

THE COURT: What about the Special Counsel's Office?

MS. RHEE: No, your Honor.

THE COURT: Very well.

MR. PETRILLO: Your Honor, just to confirm, did the Court receive our letter of last night?

THE COURT: I did.

MR. PETRILLO: Very well.

THE COURT: I did.

Now, the parties here, before I hear from them, have a difference of opinion concerning the guidelines calculation, and, in particular, the grouping analysis for 18 CR 602.

Defense counsel argues that the tax evasion counts are not closely related to the other counts and, therefore, should not be grouped together. The government counters that Section 3D1.2 specifically enumerates guidelines that are to be grouped, which include Section 2T1.1 for the tax evasion

counts, Section 2B1.1 for the false statement count, and Section 2C1.8 for the illegal campaign contributions counts.

This Court finds the government's argument to be correct as a matter of law where the offense levels are principally determined by the amount of loss. *See United States v. Gordon*, 291 F.3d 181, 192 (2d.Cir 2002).

Accordingly, this Court makes the following guidelines calculations: Grouping all eight counts of 18 CR 602 together, the base offense level is 7. Because the loss here exceeded $1.5 million, but was less than $3.5 million, an increase of 16 levels is warranted.

Further, because the offense involved the use of sophisticated means, including Mr. Cohen's creation of shell companies and fake invoices, a further two-level enhancement is appropriate.

Finally, because Mr. Cohen used special skills as a licensed attorney to facilitate the commission and concealment of these offenses, a further two-level enhancement is warranted. Thus, the adjusted offense level for group one, that is, the counts charged in 18 CR 602, is 27.

Now, Mr. Cohen pled guilty to these crimes in a timely manner before me and, accordingly, I grant him a three-level reduction for acceptance of responsibility. Thus, his total offense level is 24. The defendant has no prior criminal convictions, and, therefore, his Criminal History Category is







I. With a total offense level of 24 and a Criminal History Category of I, Mr. Cohen's guideline range is 51 to 63 months of imprisonment on the eight charges of income tax evasion, making false statements to a banking institution, and the two campaign finance crimes.

Now, with respect to Mr. Cohen's plea to making false statements to Congress, that is separately grouped and has a base offense level of 6. This Court agrees with the Special Counsel's Office and Mr. Cohen that no enhancements are appropriate. Mr. Cohen pled guilty to this crime before my colleague, Judge Carter, and, accordingly, I grant him a two-level reduction for acceptance of responsibility on this offense. So, with a total offense level of 4 and a Criminal History Category of I, his guidelines range for making false statements to Congress is zero to six months of imprisonment. Accordingly, no multiple account adjustment applies.

And so with the guidelines calculation resolved, I will hear now from the parties.

Mr. Petrillo, do you wish to be heard on behalf of Mr. Cohen?

MR. PETRILLO: I do, your Honor. Thank you.

Your Honor, may it please the Court, thank you.

My partner, Amy Lester, and I have the privilege of representing Michael Cohen and the honor of having met some of the members of his family who are present here today. The

group is larger than I've met, but it includes his mother and father, his mother-in-law and his father-in-law, his wife and children, and his brother and sisters, along with a niece and a cousin.

Your Honor, we have made a sentencing submission with numerous letters in support of the character of Mr. Cohen, and it would not be our purpose today to repeat all of what we have already written. Rather, unless your Honor would like me to proceed otherwise, I would like first to address the remarkable nature and significance of the life decision made by Mr. Cohen to cooperate with the DOJ Special Counsel and the relevance and, respectfully, the importance of that cooperation, not only to this specific man and your Honor's evaluation of this specific man, but also to the Court's consideration of how Mr. Cohen's cooperation promotes respect for law and the courage of the individual to stand up to power and influence.

When Mr. Cohen authorized us to contact the Special Counsel's Office in July, he did so to offer his relevant knowledge to the investigation knowing that he would face as a result when his offer became public a barrage of attack by the President. He knew that the President might shut down the investigation, and he knew that there might come a time when he would appear in court, and there would be no Special Counsel to stand up for him, as there is today.

He moved forward nonetheless. So it is true, as has

been pointed out by the government, that part of what Mr. Cohen did in coming forward is similar to what many folks who are expecting criminal charges do in that expectation. At that time he acknowledged that it was more than possible that his case might proceed from mere investigation to charges and that his offer to assist could help him in some fashion should there be charges and should there be a proceeding. But it is also the case that his decision was an importantly different decision from the usual decision to cooperate. He came forward to offer evidence against the most powerful person in our country. He did so not knowing what the result would be, not knowing how the politics would play out, and not knowing whether the Special Counsel would even survive, nor could he anticipate the full measure of attack that has been made against him; not only by the President, who continues to say that people like Mr. Cohen who cooperate with the Special Counsel are weaklings and those who hold fast and clam up are heroes, but also attacks by partisans and by citizens who happen to be aligned with the President. And those attacks have included threats against him and his family.

So, respectfully, this is not a standard case of cooperation. The cooperation here should be viewed under a non-standard or in a non-standard framework. The SCO's investigation, the Special Counsel's investigation is of the utmost national significance, no less than seen 40 plus years

ago in the days of Watergate. In the light of that reality, respectfully, your Honor, it is important that others in Mr. Cohen's position who provide assistance to this historic inquiry take renewed courage from this proceeding, and that law enforcement and the promotion of respect for law also receive a boost from what happens here today. Mr. Cohen would want me to say that he's always respected law enforcement. He's always supported it.

In the plea agreement with the Special Counsel, the Special Counsel committed, subject to conditions that have been fully satisfied, to bring to your Honor's attention for sentencing purposes in both cases the nature and extent of Mr. Cohen's cooperation with that office. The Special Counsel says Mr. Cohen has gone to significant lengths to assist the investigation, providing information on core topics under investigation, and is committed to continue to assist.

The office says the information provided has been credible and consistent with other evidence obtained in its investigation. The office further says that it has been useful cooperation in four specific respects that are detailed in the Special Counsel letter to the Court. And, finally, Mr. Cohen, according to the Special Counsel, has made substantial and significant efforts to remediate his own misconduct, accept responsibility for his actions, and assist the Special Counsel's investigation.

Even the Southern District which has submitted a somewhat sharp memo, which I will comment on in a few minutes, to the Court, agrees that Mr. Cohen's assistance to the Special Counsel was significant. That's at page 17 of its memo. And that his provision of information to law enforcement in matters of national interest is deserving of credit. And that's at page 37 of the memo.

Your Honor, in this exceptionally important matter, Mr. Cohen's cooperation is overwhelmingly the factor, we submit, that should substantially mitigate his sentence, and his action stands in profound contrast to the decision of some others not to cooperate and allegedly to double deal while pretending to cooperate.

But that's not all. We also ask the Court respectfully that it consider Mr. Cohen's life of good works as it considers the sentence in this case. As we set forth in our memo, and as supported by the letters sent with the memo, he has been a prodigious fundraiser for the St. Jude's Children's Hospital.

He has been the key figure at a Manhattan private school in the raising of funds committed to financial aid for students without means to attend and who otherwise would not be able to attend absent his efforts.

He has done likewise impressive fundraising for Operation Smile and assisted the Weatherford Foundation with

active personal efforts to advance the role model program of that athletes' organization.

Your Honor has read, I have no doubt, of the aid and assistance Mr. Cohen provides regularly to children and friends when they need to find medical care and stands by them in their times of illness and hard times.

Whatever millions of words are said and written about Mr. Cohen, and certainly he's in the paper every day, and on TV there's coverage, sometimes it appears 24/7, this is a man of generous spirit and the submissions to the Court demonstrate that.

There is some mention in the Southern District's memo regarding emphasis on his own contributions financially, but I don't find it in our memo. The crux of what we're saying is that he puts himself out to raise money for very, very worthwhile organizations. He puts his whole body into it, and this is a man whose first instinct is to help.

When it comes to Mr. Cohen's capacity to follow through in his commitment to lead a good and law-abiding life, I would also like to underscore what the Court has been informed of by several members of the bar. All portray a man of integrity and honorable intentions and care for the underserved, a man who does not engage in sharp business practices.

To be sure, the Southern District points out that like

many clients that lawyers meet from time to time, Mr. Cohen has occasionally erupted in frustration at what he perceives to be wrongs. For example, as the Southern District points out, he became very angry when a bank refused to focus on a transaction that would have allowed him to sell his taxi medallions at a time when doing so would have been lucrative, waited so long before they approved the transactions, that the transaction melted away as the market dipped. He expressed frustration, and that is cited in the Southern District's memo as evidence of a bad character. I have so many clients who come into my office on a regular basis frustrated with life. That's an immature and meaningless observation in my view as to his character. It's simplistic and it's unfair.

Mr. Alpstein says, a lawyer who's worked with Mr. Cohen on transactions, "Every seller of a transaction on which I've represented Michael would say without equivocation that Michael was and is an honest, responsible, and fair businessman."

The man is 52 years old. There's a long record of how he has conducted himself in business and with financial institutions. No bank has ever lost money dealing with Michael Cohen. I'll say that again: No bank has ever lost money dealing with Michael Cohen. No friend in need has ever been turned away.

Your Honor, we addressed the offense conduct, and I

had not planned to say more than a few words about it until I read the Southern District's memo, and I just want to say few words in response to the memo. And I don't want to belabor it; I know that you've read all the materials. No one is saying, at least of all, Michael Cohen, or has said that a false statement to a bank is other than serious. In this case, we simply made the point that the home equity line of credit as to which the application was false was ten times oversecured at the time of the application and that no money damage resulted. Does that make it right? No. It does not make it right. But it puts the conduct into some kind of proportion.

No one is saying, least of us, Michael Cohen, that tax evasion of any kind is other than serious. The speaking information in this case, however, says that the crux of the conduct was failing to identify deposits as income to an accountant who received bank statements. Does that make it right? No. It doesn't make it right. But it puts in proportion and points out that the Court here is not dealing with a mastermind of tax deception.

Ms. Lester and I were given three to four days to speak to the tax charges in this case before they were filed. They were not specified. When asked questions about what they entailed, I was met with stony silence and no realistic opportunity to meet with the tax division, as is common. I believe that we would have had a very strong chance of

diverting the case from the criminal track had we had that opportunity.

But life is tough and Michael Cohen accepts that. We accept it. Our point is not to explain the conduct away. Our point is to say that the offense is well within the heartland of cases that are routinely treated in a non-criminal context, solely so that your Honor can consider the punishment aspect associated with the criminal tax evasion that has been admitted, and that no one is trying to push away as someone else's fault.

I will say very little on the campaign charges, the campaign finance charges, and the statement to the legislature. I do want to point out what Mr. Gerber, a lawyer in New York, writes to the Court. He's a former member of the grievance committee, and he's written on behalf of Mr. Cohen that he's seen many attorneys succumb to the wishes of a particularly persuasive client. "Mr. Cohen," he writes, "had a client whose extraordinary power of persuasion got him elected to the highest office in the land." Again, the conduct is quite serious, but Mr. Gerber's experience is certainly worthy of note, as the Court takes into account the human element of what happened here.

Based on all these factors, your Honor, most importantly cooperation, good works, and the nature of the offenses, we respectfully submit that the case calls for a full

consideration of mercy as your Honor sentences our client, Michael Cohen.

A few words on what the Southern District has submitted. It is not the case that Mr. Cohen has declined to answer questions from the Southern District or from our duly authorized U.S. Attorney's Offices, state law enforcement entities, and Congress. He's ready to do that. He is wary of a long-term cooperation agreement for personal reasons and because he wants both to remove himself and to remove his family from the glare of the cameras and try to work his way and their way back from an abnormal life. The period of such an agreement would be indeterminate. The press is overwhelming in this case. But none of this is to say he will not make himself available for questioning on investigated matters, and indeed, as you know, he's already met with the Southern District on one of those matters.

But it's also unfair and it's mere innuendo that Mr. Cohen would not describe his own misconduct, as the government says twice, "if any." I know the Court is aware that search warrants were executed in this case. As a result, all of his papers, computers, devices, phones, and recordings were seized and dozens of agents, and at least four Assistant U.S. Attorneys and supervisors questioned dozens and dozens of witnesses and reviewed the evidence. They know what is there. He pled to what he pled to, and the plea agreement immunized

him for the conduct that the plea agreement immunized him for. When the government repeats twice that Mr. Cohen declined to disclose his prior bad acts "if any," they come forward with nothing to suggest that they don't know everything already, much less that there's anything there.

At the end of the day, it's not that important, your Honor. I just don't think it's fair. I don't really understand the strident tone of the memo, and trying to put it into context, I'm looking at the beginning of the case. First, an unwillingness to delineate charges, a claim that I should already know what they are. A few days to respond once three categories of alleged offenses were set forth. And then after the plea, a courthouse press conference on a plea of guilty. I submit, your Honor, that no other defendant would be treated in this fashion on these offenses, but Mr. Cohen had the misfortune to have been counsel to the President.

This rush to charge and media display suggest, respectfully, that the Court should take with a healthy grain of salt the contentions by the Southern District of New York that Mr. Cohen left them at the altar of a Southern District cooperation agreement. Rather, he made a personal and rational decision that he would respond truthfully to any investigative topic, but that it was not in his or his family's interest to remain in the constant glare and under the requirements of a cooperation agreement which could go on for months and months

and years and years. And he sat down with Southern, and they found him "forthright and credible." Page 15.

The rules of the Southern District of New York as to how every case of cooperation should proceed, of course, were given to us by the minor gods and woe unto those who fail to follow their scriptures, but they don't mean that they work in every situation, no matter the facts, no matter the circumstances. They don't mean the prosecutor is always right about how the standard procedure will play out.

And, effectively, your Honor, the Southern District would have this Court penalize Mr. Cohen because he did not follow their standard form agreement and procedure even though he cooperated with the Special Counsel, provided them with forthright and credible information, and offered, and hereby offers, to respond to any other questions, and they would do it without putting forth anything to suggest that there's any there there by way of prior bad acts. This approach, your Honor, is erroneous. It's error to consider what they are asking you to consider. It's fundamentally unfair for a prosecutor to ask a Court to sentence a defendant on hypothetical facts and circumstances rather than based on the facts and circumstances that the Court actually knows. Those facts and circumstances do not present a mystery of the kind that the office's memorandum seeks to suggest. I don't know what's behind it, and it's peculiar in a context in which a

sibling office of the DOJ agrees that Mr. Cohen cooperated as set forth in the plea agreement and as reported to your Honor in the Special Counsel's letter.

I'm not going to overly speculate about what's going on here. I think the Court has as much experience as I in these matters, but I would suggest that power to the Southern District if they want to make a bigger case than they've already made, God bless them. And maybe there's a little bit of pride involved here in not being at the center of attention. Who knows? Maybe all those articles about a big financial fraud case and a big taxi medallion case followed by these pleas is somehow disappointing. It's not for me to say.

We respectfully request, your Honor, a variance under the guidelines and the exercise of leniency in the imposition of sentence on Mr. Cohen, and we request that on behalf of our client and his family. He has done, Michael has, a good deal to help, not only the Special Counsel but a lot of people. He is a very good man.

Thank you.

THE COURT: Thank you, Mr. Petrillo.

Ms. Rhee, does the Special Counsel's Office wish to be heard?

MS. RHEE: Yes, your Honor.

Thank you, your Honor. On behalf of the Special Counsel's Office, our remarks will be brief. We rely, and we

speak primarily through our written submission which has already been submitted to this Court. In supplement to that, we just have two discrete, important points that we want to highlight for the Court's attention.

The first is that the offense that Mr. Cohen pled to in 18 CR 850 was a serious criminal violation. As Mr. Petrillo alluded to, the subject at issue here that Mr. Cohen actively misled Congress about was an issue of national importance and interest, and Mr. Cohen intentionally repeated many of the false statements to us at the Special Counsel's Office initially when we met with him in July. And those false statements were intended to limit ongoing investigations into Russian interference in a U.S. presidential election, and the question of any links or coordination between a campaign and a foreign government. Our submission elucidates why those lies were material, why those lies were consequential.

But what we really want to leave with the Court today for the Court's consideration is Mr. Cohen's interactions with the Special Counsel's Office since that initial voluntary interview in July. The government has agreed with Mr. Cohen to bring his assistance to your attention for due consideration at this sentencing, and what we want to say about that is that Mr. Cohen has endeavored from his second session with us in September of this year going forward to this day, he has endeavored to account for his criminal misconduct in numerous

ways. He has fully accepted responsibility for the lies that he told Congress. He has provided our office with credible and reliable information about core Russia-related issues under investigation and within the purview of the Special Counsel's office. There is only so much that we can say about the particulars at this time given our ongoing investigation, but we hope that we have sufficiently outlined for the Court that they were ranging, and that they were helpful.

Finally, your Honor, what we want to highlight for this Court is that one of the things that we and the Special Counsel's Office have most appreciated about Mr. Cohen's assistance is that he has provided valuable information, investigative information, to us while taking care and being careful to note what he knows and what he doesn't know. Rather than inflate the value of any information that he has brought forward to us in what he had to provide, Mr. Cohen has sought to tell us the truth, and that is of utmost value to us as we seek in our office to determine what in fact occurred.

And so we want to highlight that for the Court and to underscore what we set out in our submission about the value, the nature, the reliability, and the credibility of Mr. Cohen's assistance.

THE COURT: Thank you, Ms. Rhee.

MS. RHEE: Thank you, your Honor.

THE COURT: Mr. Roos, does the United States

Attorney's Office wish to be heard?

MR. ROOS: Yes, your Honor. Thank you.

Your Honor, I'd like to start where Mr. Petrillo ended, which is to share a few words about the information th Mr. Cohen provided to law enforcement and the credit that is appropriate.

Now, we agree that Mr. Cohen's decision to provide information to the Special Counsel's Office in matters of national interest is deserving of credit, and we defer to SCO' description of Mr. Cohen's assistance to them and in their investigation. We don't dispute any of that assessment or the assessment, frankly, that defense counsel has made.

But for the reasons that we've detailed in our sentencing memorandum, any downward variance that Mr. Cohen receives should be modest. Any successful assistance Mr. Cohe provided was in the context of a case where the guidelines range is zero to six months. It's within the context of the Special Counsel Office's case.

But here, he is facing three additional categories of crimes, eight total charges, and didn't come anywhere close to assisting this office in an investigation. There is no myster about this. No one is attempting to penalize Mr. Cohen for not cooperating. Quite the opposite, there is no obligation to cooperate, but for all the hypothesizing that Mr. Petrillo has done, Mr. Cohen can't have it both ways. There is a standard

way in which this office conducts cooperation. Your Honor is familiar with it. There is no reason, no matter the significance or the nature of the case, whether or not it receives public attention, for us to depart from that practice. We've treated Mr. Cohen just the way we treat every other defendant that deals with the United States Attorney's Office.

Now, Mr. Cohen, he chose not to pursue the path of full cooperation. He didn't provide substantial assistance to the government in this investigation, and he doesn't have a 5K letter. And for these reasons, our view is that a significant variance, the variance urged by the defendant isn't warranted here. To do so would send the wrong message. It would send the message that a defendant who chooses a different path, a selective cooperation on only particular subjects can receive the credit that so many defendants seek when they expose themselves completely to the government.

Now, I'd like to touch on two points, two of the 3553(a) factors that in the government's view are so important here, and they really go to what Mr. Petrillo said about the nature and the seriousness of these offenses.

So, first, the defendant pled guilty to four crimes here, your Honor, and Mr. Petrillo, he identified areas in which certain crimes in their view may not be as serious, but he pled guilty to four different crimes, and your Honor is sentencing Mr. Cohen not only on four different charges but

four separate crimes. Each of those charges is itself serious. Each merits punishment in its own right. Each cause a distinct harm, and taken together there is a compounding effect. Collectively, the charges portray a pattern of deception, of brazenness, and of greed that manifested in multiple aspects of Mr. Cohen's professional life.

In particular, Mr. Cohen's conduct related to the election is serious because of the tremendous societal cost associated with the campaign finance crimes and the lies to Congress. Mr. Cohen committed these deceptive acts to protect the political campaign from allegations of impropriety, and, by his own admission, he committed the campaign finance crimes for the purpose of influencing the election.

He also, quite brazenly, stole millions of dollars in income from the IRS. And on this subject, defense counsel describes the ways in which this is really nothing more than a civil matter. But that is not the case, your Honor. These tax crimes went on for at least five years. They involve millions of dollars of income that was deliberately not reported to the IRS. This is not a case of an assessed tax not being paid. It's something quite different. It was deliberate, it was willful, and that's what the defendant's plea reflects.

Now, together these crimes implicate core defining parts of our democracy: Government funded by the people, free and transparent elections. And in committing these crimes,

Mr. Cohen has eroded faith in the electoral process and compromised the rule of law. And so just as he asks for leniency because of what he claims he's done for the republic, the same can be true in the way in which he's undermined it. All of these facts, your Honor, favor a substantial custodial sentence.

But the second reason why a substantial custodial sentence is warranted here is because of the need to promote deterrence. And when it comes to Mr. Cohen, his training and experience as an attorney should have been a deterrent to his own criminal conduct. Instead, he used his legal license in furtherance of his crimes, and that is a significant point that should be taken into consideration in sentencing. A substantial sentence would serve as a deterrent to future criminal conduct by this particular defendant.

But more importantly, your Honor, a substantial sentence would also serve as a general deterrent to future criminal conduct by individuals like Mr. Cohen. This is particularly important in the context of tax evasion and the campaign's finance crimes, crimes that are difficult to detect, that are so frequently orchestrated through private transactions kept secret from the public. The unfairness here is not to Mr. Cohen. It's to the public. Particularly in light of the public interest in this case, a meaningful sentence of imprisonment, one that sends a message, an

appropriate message about the seriousness of these crimes is appropriate. That sort of message must be sent in this case, that even powerful and privileged individuals cannot violate these laws with impunity.

Unless the Court has any questions for the government, we otherwise rest on our submission

THE COURT: Thank you, Mr. Roos.

MR. PETRILLO: Just a point of clarification, your Honor, if I may.

THE COURT: Yes. Go ahead, Mr. Petrillo.

MR. PETRILLO: I just want to be clear because I wasn't sure whether Mr. Roos affirmed or failed to affirm that the government; that is, the Southern District, by a letter dated November 29 in this case captioned with this case number that is the first plea before your Honor, agreed that the defendant's provision of information to the Special Counsel is a factor to be considered by the Court under Title 18 U.S. Code, Section 3553(a) in the first case, not just the second case. And I wasn't sure whether I heard properly that Mr. Roos was delineating between the two cases. I may just have misheard, but I want to make sure it's clear.

MR. ROOS: Your Honor, if I may?

THE COURT: You may.

MR. ROOS: I believe this was the first point I addressed, but to clarify any confusion, the government's view

is that the defendant provided information that was valuable to the Special Counsel's Office. We don't dispute that. And that's the reason why the government is seeking or recommends a modest variance in this case as opposed to seeking a guideline sentence. So I guess the answer to Mr. Petrillo's question is yes.

THE COURT: All right. Thank you.

Mr. Petrillo, does your client wish to address the Court before sentence is imposed?

MR. PETRILLO: He does, your Honor, and he's asked me just to clarify because he heard -- and, again, I may have heard it incorrectly, that -- the amount of restitution in this case; that is, the amount due and owing to the IRS is approximately $1.393 million, and he's under the impression the Court may have said that the guidelines range started where it did because the loss amount was one and a half million. And he just wanted to make sure that that point was entered into the record. It doesn't change our position on the guidelines though, and I am only noting it for the record.

And Mr. Cohen would like to be heard, your Honor.

THE COURT: Fine. I'll hear from Mr. Cohen now.

THE DEFENDANT: Your Honor, stand here or to the podium?

THE COURT: I think it would be best to take the podium.

THE DEFENDANT: Thank you, your Honor.

I stand before your Honor humbly and painfully aware that we are here today for one reason: Because of my actions that I pled guilty to on August 21, and as well on November

I take full responsibility for each act that I pled guilty to, the personal ones to me and those involving the President of the United States of America. Viktor Frankl in his book, "Man's Search for Meaning," he wrote, "There are forces beyond your control that can take away everything you possess except one thing, your freedom to choose how you will respond to the situation."

Your Honor, this may seem hard to believe, but today is one of the most meaningful days of my life. The irony is today is the day I am getting my freedom back as you sit at the bench and you contemplate my fate.

I have been living in a personal and mental incarceration ever since the fateful day that I accepted the offer to work for a famous real estate mogul whose business acumen I truly admired. In fact, I now know that there is little to be admired. I want to be clear. I blame myself for the conduct which has brought me here today, and it was my own weakness, and a blind loyalty to this man that led me to choose a path of darkness over light. It is for these reasons I chose to participate in the elicit act of the President rather than to listen to my own inner voice which should have warned me

that the campaign finance violations that I later pled guilty to were insidious.

Recently, the President Tweeted a statement calling me weak, and he was correct, but for a much different reason than he was implying. It was because time and time again I felt it was my duty to cover up his dirty deeds rather than to listen to my own inner voice and my moral compass. My weakness can be characterized as a blind loyalty to Donald Trump, and I was weak for not having the strength to question and to refuse his demands. I have already spent years living a personal and mental incarceration, which no matter what is decided today, owning this mistake will free me to be once more the person I really am.

Your Honor, I love my family more than anything in the world: My dad who is here today, my mom, my in-laws, siblings, love of my life, my wife Laura, my pride and joy, my daughter Samantha, my son, Jake. There is no sentence that could supersede the suffering that I live with on a daily basis, knowing that my actions have brought undeserved pain and shame upon my family. I deserve that pain. They do not.

I also stand before my children, for them to see their father taking responsibility for his mistakes, mistakes that have forced them to bear a shameful spotlight which they have done nothing to deserve, and this breaks my heart. For me, the greatest punishment has been seeing the unbearable pain that my

actions and my associations have brought to my entire family. My mom, my dad, this isn't what they deserve to see in their older age, especially when as a child they emphasized to all of us the difference between right and wrong. And I'm sorry.

I believed during this process that there were only two things I could do to minimize the pain to my family: Admit my guilt and move these proceedings along. This is why I did not enter into a cooperation agreement. I have elected to be sentenced without asking for adjournment. I have given information during countless hours of meetings with prosecutors that have been cited as substantial, meaningful and credible. I have chosen this unorthodox path because the faster I am sentenced, the sooner I can return to my family, be the father I want to be, the husband I want to be, and a productive member of society again. I do not need a cooperation agreement to be in place to do the right thing. And I will continue to cooperate with government, offering as much information as I truthfully possess.

I stand behind my statement that I made to George Stephanopoulos, that my wife, my daughter, my son have my first loyalty and always will. I put family and country first. My departure as a loyal soldier to the President bears a very hefty price.

For months now the President of the United States, one of the most powerful men in the world, publicly mocks me,

calling me a rat and a liar, and insists that the Court sentence me to the absolute maximum time in prison. Not only is this improper; it creates a false sense that the President can weigh in on the outcome of judicial proceedings that implicate him. Despite being vilified by the press and inundated with character assassinations over the past almost two years, I still stand today, and I am committed to proving my integrity and ensuring that history will not remember me as the villain of his story. I now know that every action I take in the future has to be well thought out and with honorable intention because I wish to leave no room for future mistakes in my life.

And so I beseech your Honor to consider this path that I am currently taking when sentencing me today. And I want to apologize to my entire family for what my actions have put them through. My family has suffered immeasurably in the home and the world outside. I know I have let them all down, and it will be my life's work to make it right, and to become the best version of myself.

Most all, I want to apologize to the people of the United States. You deserve to know the truth and lying to you was unjust. I want to thank you, your Honor, for all the time I'm sure you've committed to this matter and the consideration that you have given to my future.

Again, I want to thank my family, my friends, many who

are here today, who are with me, especially all the people who wrote letters on my behalf. In addition, I would like to thank the tens of thousands of strangers who despite not knowing me at all, not knowing me personally have shown kindness and empathy in writing letters to me and offering support and prayer. And I thank you, your Honor, I am truly sorry, and I promise I will be better.

THE COURT: You may be seated, Mr. Cohen.

THE DEFENDANT: Thank you.

THE COURT: The defendant, Michael Cohen, comes before this Court, having pled guilty to five counts of income tax evasion, one count of making false statements to a banking institution, one count of causing an unlawful corporate contribution, and one count of an excessive campaign contribution in the 18 CR 602 criminal case, and one count of making false statements to the U.S. Congress in 18 CR 850. Each of these crimes is a serious offense against the United States.

Now, I've reviewed the revised presentence investigation report, and I adopt the findings of fact in that report as my own. I will cause the report to be docketed and filed under seal as part of the record in each of these cases. I have also reviewed all of the memoranda submitted by counsel for the parties and the letters submitted on Mr. Cohen's behalf.

I previously reviewed the guidelines with all of you. Suffice it to say at this juncture that with respect to the first case, the guidelines range is 51 to 63 months of imprisonment, and the guideline range on the second case is zero to six months of imprisonment. Of course, the Sentencing Guidelines should be the starting point and the initial benchmark.

Turning to the 3553(a) factors, the question for this Court is what is the appropriate and just sentence for these crimes and this defendant. Mr. Cohen pled guilty to a veritable smorgasbord of fraudulent conduct: Willful tax evasion, making false statements to a financial institution, illegal campaign contributions, and making false statements to Congress. Each of the crimes involved deception and each appears to have been motivated by personal greed and ambition.

His extensive criminal conduct also has broader public consequences. Mr. Cohen evaded more than $1.3 million in personal income taxes for the tax years 2012 through 2016. He willfully failed to report $4 million earned through various streams of income from leasing taxi medallions to consulting fees and brokerage commissions. As Justice Oliver Wendell Holmes famously said, "Taxes are the price we pay for a civilized society."

Now, Mr. Cohen also made a series of false statements to financial institutions regarding his liabilities and monthly

expenses so that he would be approved for a $500,000 home equity line of credit.

Further, Mr. Cohen committed two campaign finance crimes on the eve of the 2016 presidential election with the intent to influence the outcome of that election. He made or facilitated payments to silence two women who threatened to go public with details of purported extramarital affairs, and Mr. Cohen admitted that he did so in coordination with and at the direction of Individual One.

Finally, in a separate criminal proceeding filed by the Special Counsel's Office, Mr. Cohen admitted that he made false statements about a proposed business project in Moscow to congressional committees investigating possible interference of the Russian government with the 2016 presidential election. Each of these crimes standing alone warrant serious punishment.

The financial harms are readily ascertainable. Mr. Cohen's tax evasion offenses cheated the federal government out of $1,393,858. His deception caused a bank to approve a $500,000 line of credit he did not deserve. And even his campaign finance crimes may be measured by the amount of unlawful contributions: The $150,000 hush money payment that he coordinated, and the $130,000 hush money payment that he funneled from his home equity loan through a shell corporation.

While this is his first conviction, the magnitude, breadth, and duration of his criminal conduct requires

deterrence. Tax and campaign finance prosecutions are rare, but unlike the mine-run tax evasion or campaign finance violation, Mr. Cohen's crimes implicate a far more insidious harm to our democratic institutions, especially in view of his subsequent plea to making false statements to Congress. Thus, the need for general deterrence is amplified in this case.

Now, Mr. Cohen had a comfortable childhood and enjoyed all the privileges of growing up in a close-knit, upper class suburb on Long Island. He and his siblings had loving parents who worked hard to provide everything for their children. He graduated from law school and practiced law in various law firms until the Trump organization hired him as an attorney in 2007. Thereafter, his entire professional life apparently revolved around the Trump organization. He thrived on his access to wealthy and powerful people, and he became one himself.

The letters submitted on his behalf reveal a man dedicated to his family and generous with his time and money to help people in his own orbit. A number of individuals have written to me describing how Mr. Cohen came to their aid without seeking anything in return. Of course, that kind of generosity is laudable. But somewhere along the way Mr. Cohen appears to have lost his moral compass and sought instead to monetize his new-found influence. That trajectory, unfortunately, has led him to this courtroom today.

While Mr. Cohen does not have a formal cooperation agreement with the United States Attorney's Office, he has nevertheless met with prosecutors on a number of occasions. The Special Counsel's Office notes that he has voluntarily provided information "about his own conduct and that of others on core topics under investigation" by the Special Counsel and that the information he has provided has been "relevant and useful."Further, the Special Counsel urges that any sentence imposed in connection with 18 CR 850 should be concurrent to any sentence imposed in the earlier case.

While the United States Attorney's Office acknowledges that Mr. Cohen's assistance to the Special Counsel's Office was "significant" and warrants a modest variance from the guidelines range, they contend that it should not approach the type of credit typically given to cooperating witnesses in this district.

However, cooperation, even when it is not the product of a formal agreement, should be encouraged where information is provided that advances criminal investigations. Our system of justice would be less robust without the use of cooperating witnesses to assist law enforcement.

Based on the submissions of the parties, this Court agrees that Mr. Cohen should receive some credit for providing assistance to the Special Counsel's Office. While Mr. Cohen pledges to assist the Special Counsel's Office in further

investigations, that is not a matter that this Court can consider now.

There is an acute need for the sentence here to reflect the seriousness of the offenses and to promote respect for the law. As a lawyer, Mr. Cohen should have known better. Tax evasion undercuts the government's ability to provide essential services on which we all depend. False statements to banking institutions undermine the integrity of our financial system. Campaign finance violations threaten the fairness of elections, and false statements to Congress interfere with the fact finding process in matters of national importance.

While Mr. Cohen has taken steps to mitigate his criminal conduct by pleading guilty and volunteering useful information to prosecutors, that does not wipe the slate clean. Mr. Cohen selected the information he disclosed to the government. This Court cannot agree with the defendant's assertion that no jail time is warranted. In fact, this Court firmly believes that a significant term of imprisonment is fully justified in this highly publicized case to send a message to those who contemplate avoiding their taxes, evading campaign finance laws or lying to financial institutions or Congress. Our democratic institutions depend on the honesty of our citizenry in dealing with the government. And so it is against that backdrop that I am prepared to sentence the defendant.

Mr. Cohen I'd ask, sir, that you stand at this time.

Mr. Cohen, it's my judgment, sir, that on 18 CR 602 that you be sentenced to a term of 36 months of imprisonment to be followed by three years of supervised release on each count to be served concurrently with the sentence that I will impose in a moment on 18 CR 850. I'm imposing all of the standard conditions of supervised release and the following special condition: That you provide the probation department with access to any requested financial information.

Further, I'm going to enter an order of forfeiture in this case in the amount of $500,000, and I'm going to enter an order for restitution in the amount of $1,393,858. I am also going to impose a fine of $50,000, and the mandatory special assessment of $800.

Now, with respect to 18 CR 850, I sentence you to two months of imprisonment to be served concurrently with the term imposed in 18 CR 602 to be followed by three years of supervised release, also to be served concurrently with the term imposed in 18 CR 602, and with all of the standard conditions of supervised release.

In this case with respect to 18 CR 850, I am also going to impose a $50,000 fine in that case to recognize the gravity of the harm of lying to Congress in matters of national importance. And, once again, I will impose the mandatory special assessment in that case of $100.

Just to be clear, the sentence in the earlier case is concurrent on all counts in that information.

And so, Mr. Cohen, this constitutes the sentence of this Court. I advise you that to the extent you have not previously waived your right to appeal, you have the right to appeal. I advise you further that if you cannot afford counsel, counsel will be provided to you free of cost. Mr. Petrillo has done a superb job in navigating you through this matter and bringing the sentencing submissions before the Court. I'm confident that he and Ms. Lester will advise you further with respect to your appellate rights. You may be seated, sir.

Are there any further applications at this time?

MR. ROOS: Not from the government, your Honor.

THE COURT: Ms. Rhee.

MS. RHEE: Your Honor, the Special Counsel's Office would just like to confirm that there will be a separate $50,000 fine.

THE COURT: Yes.

MS. RHEE: Not to run concurrently.

THE COURT: No, it's a separate fine. It's a separate harm, and the guidelines in my view do not recognize the gravity of the offense of making false statements to Congress.

MS. RHEE: Thank you for the clarification.

THE COURT: Mr. Petrillo.

MR. PETRILLO: Your Honor, if you would, would the Court give consideration to voluntary surrender by the defendant and consider recommending the designation of Otisville as the place of imprisonment?

THE COURT: I will make that recommendation, and I will allow for a voluntary surrender in this case. What surrender date are you seeking?

MR. PETRILLO: I don't have one particularly in mind, but from past experience it seems to take about 10 or 12 weeks for the BOP to --

THE COURT: Right. Is March 6 all right? And if for some reason you've not been notified of a designated institution, just write a short note to me, and I will put the surrender date over.

MR. PETRILLO: Very well.

THE COURT: Go ahead.

MR. PETRILLO: I have one other thing for the record that doesn't require a ruling, but as you know, under *United States v. Ganais* in the Second Circuit, it's incumbent upon the defendant to demand his property back post a search procedure as part of protecting his rights under the Fourth Amendment. And so for the record, I'd like to make that demand and thus have no confusion as to where that stands.

THE COURT: All right. I'm confident there will be further briefing with respect to that matter after this

proceeding is concluded, and I will await receipt of some submission.

This matter is concluded. Have a good afternoon

(Adjourned)