# EXHIBIT A

NYS Attorney General v.
Donald Trump, et al.

William Kelly; Michael Cohen
October 24, 2023

---

**W. KELLY - PLAINTIFF - REDIRECT(MR. FINKELSTEIN)  Page 2180**

1   Q   I congratulate you that after fearing litigation --
2        THE COURT: No. It has to be a question. That's
3   what you are here for, to ask questions. He is here to
4   answer them and I make sure -- I'm here to make sure that
5   that happens.
6        MR. SUAREZ: Your Honor, I have no further
7   questions other than I congratulate the witness to have the
8   fortitude to put that in the letter.
9        THE COURT: Will there be any re-direct?
10       MR. SOLOMON: One minute of re-direct, Your Honor.
11       THE COURT: One minute, you got it.
12       THE COURT: Please proceed with your one-minute
13   redirect.
14       MR. KISE: Are they on the clock?
15       THE COURT: Yes. It is 12:09. I will stop him
16   him by 12:11.
17   REDIRECT EXAMINATION
18   BY MR. FINKELSTEIN:
19   Q   Do you recall on cross-examination you were asked about
20   your investigation about prior to resigning the engagement?
21       THE COURT: Sorry. I can't hear that question. I
22   didn't hear that question.
23   Q   Do you recall on cross-examination you were asked about
24   your investigation prior to resigning the engagement?
25   A   In general, yes.

---

**M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)  Page 2182**

1        THE COURT: Any recross-examination? Let's get the
2   next witness. The witness is excused.
3        THE WITNESS: Thank you.
4        (Witness excused.)
5        MS. FAHERTY: Your Honor, on behalf of the People,
6   Colleen Faherty, we call Michael Cohen as our next witness.
7        THE COURT: Okay. I had a feeling you would.
8        THE COURT OFFICER: Witness entering.
9        THE COURT OFFICER: Please raise your right hand.
10   Do you solemnly swear or affirm that any testimony you give
11   will be the truth, the whole truth and nothing, but the
12   truth?
13       THE WITNESS: I do.
14       THE COURT OFFICER: Please have a seat. State your
15   name and either business or home address for the record.
16       THE WITNESS: Michael Cohen, 502 Park Avenue, New
17   York, New York 10022.
18   M I C H A E L   C O H E N, a witness called by the Plaintiff,
19   after having been first duly sworn by the Clerk of the Court,
20   took the witness stand and testified as follows:
21       THE COURT: Please commence the direct examination
22   of Mr. Cohen.
23       MS. FAHERTY: Thank you, Your Honor.
24   DIRECT EXAMINATION
25   BY MS. FAHERTY:

---

**W. KELLY - PLAINTIFF - REDIRECT(MR. FINKELSTEIN)  Page 2181**

1   Q   During the investigation, did you learn that the Trump
2   Organization had failed to provide certain information to
3   Mazars?
4   A   The investigation was done through and with counsel, so
5   I'm -- I think it's a privileged issue that I'm not going to
6   talk about.
7        THE COURT: Will you accept that?
8        MR. SOLOMON: Your Honor, finding out whether there
9   was or wasn't information withheld, without getting into the
10   details of what that information was, is not privileged. If
11   the witness -- but if the witness is taking that position.
12       MR. KISE: This is consistent with the position the
13   witness took in the deposition that all of these matters are
14   completely off limits, they're all privileged, and both
15   sides -- the Attorney General didn't question that. We
16   didn't question that. So to ask him that now and put him in
17   a position where he's got to make that determination is
18   inadmissible.
19       THE COURT: This is off the clock, though. I'm
20   sorry. It is only one minute.
21       MR. SOLOMON: Your Honor, the witness has asserted
22   privilege. And if Your Honor upholds that assertion, we
23   have nothing further.
24       THE COURT: I am upholding it. That's it.
25       MR. FINKELSTEIN: Nothing further.

---

**M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)  Page 2183**

1   Q   Good afternoon.
2   A   Good afternoon.
3   Q   Before we begin, I just want to ask you a question.
4   Are you currently taking any medications that would impact your
5   ability to testify today truthfully and accurately?
6   A   No.
7   Q   Okay, thank you.
8        Can you, please, describe your educational background
9   after high school for me?
10   A   College, four years, American University. Then three
11   years law school, Western Michigan Thomas M. Cooley School of
12   Law.
13   Q   Did you say Cooley School of Law?
14   A   Correct.
15   Q   What year did you graduate from the Cooley School of
16   Law?
17   A   1991.
18   Q   Do you hold any professional certifications or
19   licenses?
20   A   Not any longer.
21   Q   Did you previously hold any professional certifications
22   or licenses?
23   A   I did.
24   Q   What professional certification or license did you
25   previously possess?

---

NYS Attorney General v.
Donald Trump, et al.

William Kelly, Michael Cohen
October 24, 2023

---

**M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)**    Page 2184

1   A   JD, New York State Bar Association.
2   Q   You were a licensed attorney?
3   A   Yes.
4   Q   You don't hold any accounting degrees, right?
5   A   Correct.
6   Q   What state were you licensed as an attorney?
7   A   New York State.
8   Q   Do you recall at what point in time your license was
9 revoked to serve as an attorney of law?
10   A   2018.
11   Q   And what was the basis for your license to practice law
12 was revoked?
13   A   The charges that emanated from the Southern District of
14 New York.
15   Q   Fair to say that you have been convicted of a crime,
16 sir?
17   A   Correct.
18   Q   And just to refresh your recollection, if I stated that
19 there was a committee decision filed on February 28, 2019, do
20 you have any basis to dispute that that was the date --
21   A   Oh, it would be 2019. Sorry. Yes.
22   Q   Thank you.
23      What were the crimes that you were convicted of in
24 reference to your testimony just now about the Southern District
25 of New York?

---

**M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)**    Page 2185

1   A   I pled guilty to five counts of tax evasion, one count
2 of misrepresentation to a financial institution, two counts of
3 campaign finance violation as well as one count of
4 misrepresentation to Congress, 1001 violation.
5   Q   So let me see if I have these correct. You pled guilty
6 to five counts of evasion of assessment of personal income tax
7 pursuant to 26 U.S. Code Section 7201?
8   A   Correct.
9   Q   And would that be for the calendar years of 2012
10 through 2016?
11   A   Yes.
12   Q   Was that related in connection with what business was
13 that tax evasion crime related to?
14   A   It wasn't connected to any specific business. It was
15 personal tax.
16   Q   Okay. Was it related to anything in connection with a
17 taxi and limousine business you operated?
18   A   I owned New York City taxi medallions which were leased
19 to an agent. I had income from that agent which it was stated
20 was not reflected in my tax returns.
21   Q   And that -- the guilty plea in connection with those
22 five counts of personal income tax evasion was accepted by a
23 Federal Court in the Southern District of New York, correct?
24   A   Correct.
25   Q   And with regards to the sixth count in the Southern

---

**M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)**    Page 2186

1 District of New York, is it correct that that was the criminal
2 charge of making a false statement to a financial institution in
3 connection with the credit decision between the years 2015 to
4 2016.
5   A   It was in connection with a HELOC, a home equity line
6 of credit, application that they stated had a misrepresentation
7 on it.
8   Q   And that's H-E-L-O-C?
9   A   Correct. Acronym.
10   Q   And that would be in violation of 18 U.S. Code Section
11 1014, correct?
12   A   Correct.
13   Q   And the seventh count, is it correct that you pled
14 guilty to willfully causing an unlawful corporate contribution
15 from in or about June to October of 2016?
16   A   Yes.
17   Q   And that is in violation of 52 U.S. Codes Sections
18 30118 (a), 30109 (d)(1)(a) and 18 USC Section 2(b)?
19   A   Yes.
20   Q   And then the eighth count of that criminal indictment
21 in the Southern District of New York was a plea of guilty to
22 making an excessive campaign contribution in or about October of
23 2016, yes?
24   A   Yes.
25   Q   Then I think you also said that you pled guilty to a

---

**M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)**    Page 2187

1 ninth count; is that correct?
2   A   That's correct.
3   Q   Was that in a separate prosecution dated November 29th,
4 to 18?
5   A   It was 2018. Yes, it was.
6   Q   Was that pursuant to a plea agreement with the Special
7 Counsel's Office that you made false statements to the United
8 States Congress in violation of 18 USC Section 1001(a)(2)?
9   A   Yes.
10   Q   And you were sentenced for those crimes?
11   A   I was.
12   Q   And did you attempt at any point to cooperate with the
13 government in connection with your guilty pleas?
14   A   I did cooperate with the government, yes.
15   Q   However, you did not receive 5K1 or substantial
16 assistance letter from the federal government, did you?
17   A   No, I refused.
18   Q   Did you receive any downward variance or departure in
19 your sentencing guidelines as a result of any cooperation you
20 may have provided to the government?
21   A   No.
22   Q   There was no downward variance associated with the
23 sentencing guidelines?
24   A   The downward variance was a result of the plea, not
25 because of any benefit that I would receive.

---

NYS Attorney General v.
Donald Trump, et al.

William Kelly, Michael Cohen
October 24, 2023

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2188 | M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2190 |
|---|---|
| 1  Q  And the downward variance, about how long -- do you<br>2  recall the length of the sentence you were sentenced to?<br>3  A  36 months incarceration, 36 months between home<br>4  confinement and supervised release.<br>5  Q  Was there also a concurrent two-month sentence imposed<br>6  as a result of the additional Special Counsel's Office<br>7  information?<br>8  A  Yes.<br>9  Q  And you did, in fact, serve that time in a federal<br>10  correctional facility?<br>11  A  I did.<br>12  Q  Have you ever made any public statements concerning the<br>13  legitimacy of those convictions?<br>14  A  More than one.<br>15  Q  And why did you do that?<br>16  A  Because there was no tax evasion. At best, it could be<br>17  characterized as a tax omission. I have never in my life not<br>18  paid taxes. I have never requested an extension until 2017.<br>19  Every year I had paid, no extensions on time, what my CPA<br>20  accountant directed me to pay.<br>21  Q  Were there, in fact, crimes that you pled guilty to<br>22  that you did feel you were guilty of committing those crimes?<br>23  A  Yes.<br>24  Q  So why, then, are you making statements about the<br>25  legitimacy of the Southern District convictions if there are | 1  to J. Sekulow, Ivanka, Jared, Abby Gold (ph), Ty Cobb, many<br>2  people were involved in the formation of that statement. My<br>3  complicity resulted in -- from me reading it into the record<br>4  and asking that the document be made part of the record.<br>5  MR. KISE: Your Honor, I just move to strike that<br>6  entire answer. I don't know if that was a book that he was<br>7  writing, but it wasn't responsive at all to the question. I<br>8  mean, it was just a long narrative about, you know,<br>9  invective about Trump and who knows how many other people.<br>10  I'm sure I'm going to be included here soon, but I<br>11  don't -- I don't think that that was at all responsive to<br>12  the question.<br>13  THE COURT: Overruled. I believe it was<br>14  responsive. Could have been shorter, but it was responsive.<br>15  Q  Fair to say you still stood up in court and said to the<br>16  Southern District of New York, "I'm guilty of certain crimes."<br>17  "I accept responsibility for the crimes." And you served<br>18  federal incarceration in connection with those crimes, correct?<br>19  A  Correct.<br>20  Q  And fair to say a prosecutor stood up in front of the<br>21  Southern District of New York and stated, "The" factual<br>22  allegations in support of the crimes for which you had been<br>23  indicted and pled guilty," correct?<br>24  A  Correct.<br>25  Q  And a federal judge accepted those factual allegations, |

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2189 | M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2191 |
|---|---|
| 1  some that you feel, for example, were not crimes like a tax<br>2  omission?<br>3  A  One has nothing to do with the other. The tax<br>4  violations as I've stated many times should not have been<br>5  brought in and of itself. The same with the HELOC violation. I<br>6  had had a HELOC on my property for more than a decade and I<br>7  wanted to correct the record because when all of this started,<br>8  it was overwhelming, the amount of misinformation,<br>9  disinformation, mal information about me was overwhelming and<br>10  enormous.<br>11  On top of that, there was also the second campaign<br>12  finance violation which dealt with Karen McDougal. I<br>13  acknowledged my complicity in the Stormy Daniels matter, but the<br>14  Karen McDougal, I never paid Karen McDougal. I was tasked to<br>15  review documents to ensure that Mr. Trump was protected and that<br>16  was done through AMI, National inquirer and David Pecker, but I<br>17  am also lastly complicit with the lie to Congress and as I have<br>18  stated many times, it is important to finish the sentence and<br>19  talk about what that lie was. That lie was the number of times<br>20  that I stated to the Senate Permanent Select Committee on<br>21  Intelligence how many times I spoke to Mr. Trump about the<br>22  failed Moscow -- Trump Tower Moscow project.<br>23  I had stated three. The true answer was ten and I did<br>24  that at the direction of, in concert with and for the benefit of<br>25  Mr. Trump. There was a whole group of people from Alan Garten | 1  that they would be proved in connection with your guilty plea,<br>2  correct?<br>3  A  Correct.<br>4  Q  And I believe you stated it, but in connection with the<br>5  crimes alleged concerning an unlawful corporate contribution,<br>6  was that alleged conduct performed during the course of your<br>7  employment at that time?<br>8  A  Employment at the Trump Organization?<br>9  Q  Yes, sir.<br>10  A  Yes.<br>11  Q  And for the crimes alleged concerning an excessive<br>12  campaign contribution, was the alleged conduct there performed<br>13  during the course of your employment at that time?<br>14  A  Yes.<br>15  Q  And who was your employer at that time?<br>16  A  Donald J. Trump.<br>17  Q  And for the crimes alleged concerning making a false<br>18  statement to Congress, was the alleged conduct performed during<br>19  the course of your employment at that time?<br>20  A  Yes.<br>21  Q  And who was your employer at that time?<br>22  A  Donald J. Trump.<br>23  Q  Am I correct that you were Mr. Donald J. Trump's<br>24  personal counsel, sir?<br>25  A  I was. |

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2192 | M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2194 |
|---|---|
| 1 Q So let's take a step back and I want to talk further<br>2 about your professional background before the criminal<br>3 convictions, okay?<br>4 A Sure.<br>5 Q What was the nature of your legal practice when you<br>6 first began working as an attorney, just generally?<br>7 A Negligence, tort, medical malpractice.<br>8 Q Where did you work after you graduated law school?<br>9 A It is called Estrin & Associates, 225 Broadway.<br>10 Q Med-mal negligence firm?<br>11 A Yes.<br>12 Q How long were you there?<br>13 A Five years.<br>14 Q Any titles associated with that position?<br>15 A Associate.<br>16 Q Any other titles?<br>17 A No, ma'am.<br>18 Q Did there come a point in time when you left Estrin?<br>19 A Yes.<br>20 Q Where did you work after Estrin?<br>21 A I left Estrin & Associates because I bought into a<br>22 company called Manhattan Maintenance. It was a New York City<br>23 yellow cab medallion company. I started my own law firm at the<br>24 time, but I also operated the yellow cabs out of the same<br>25 facility. | 1 as well as representing various different business owners, some<br>2 of whom were in the auto business.<br>3 Q And did there come a point in time when you joined a<br>4 firm named Phillips Nizer?<br>5 A Yes.<br>6 Q When was that?<br>7 A 2015, 2016. I'm sorry. 2006, 2007, somewhere in that<br>8 area. I'm sorry. 2005, 2006, in that area.<br>9 Q 2005 or 2006?<br>10 A Yeah.<br>11 Q And what happened to the Michael D. Cohen & Associates<br>12 firm?<br>13 A Merged it into Phillips Nizer.<br>14 Q At Phillips Nizer, did you have a title when you merged<br>15 together?<br>16 A I did.<br>17 Q What was your title?<br>18 A I was a partner.<br>19 Q And how about once you joined Phillips Nizer; what was<br>20 the nature of your practice then?<br>21 A Business development as well as continuing with my<br>22 client base.<br>23 Q The client base that you had developed when you were in<br>24 private practice at Michael D. Cohen & Associates?<br>25 A Correct. |

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2193 | M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2195 |
|---|---|
| 1 Q And for how long were you there?<br>2 A From 1995 to 2002.<br>3 Q And was it just the title of being the owner at<br>4 Manhattan Maintenance or was there another title associated with<br>5 that work?<br>6 A I also had a law practice.<br>7 Q Was there a name of a law practice?<br>8 A Michael D. Cohen & Associates.<br>9 Q In 2002, did there come a point in time when you left<br>10 the Manhattan Maintenance Company?<br>11 A Yes.<br>12 Q Tell me about that departure.<br>13 A I sold my half of the company to my ex-partner and<br>14 decided to take a little time for myself and ultimately then<br>15 created -- continued with the law practice elsewhere.<br>16 Q The Michael D. Cohen & Associates law practice?<br>17 A Yes.<br>18 Q And what was the nature of the Michael D. Cohen law<br>19 practice?<br>20 A It was predominantly negligence, tort, similar to what<br>21 I started with, but then I started doing some real estate and<br>22 some business law.<br>23 Q Was that transactional work or can you describe for me<br>24 the nature of the real estate work you engaged in at that time?<br>25 A It was acquisitions of real estate on behalf of clients | 1 Q Fair to say that your practice included commercial real<br>2 estate work?<br>3 A Yes.<br>4 Q Residential work as well?<br>5 A Mostly for myself.<br>6 Q Was it -- would you characterize the practice as a<br>7 litigation practice?<br>8 A We had some litigation, but I would not say it<br>9 was -- it was primarily litigation at that time.<br>10 Q And did there ever come a point in time when you<br>11 stopped working for Phillip Nizer?<br>12 A Yes.<br>13 Q When was that?<br>14 A That was in 2007.<br>15 Q And what occurred such that you stopped working for the<br>16 Phillip Nizer firm?<br>17 A I had had a meeting with Mr. Trump at the Trump<br>18 Organization and he had asked me to join his company as<br>19 executive vice-president of the Trump Organization and special<br>20 counsel to him.<br>21 Q So in or about 2007, you joined the Trump Organization<br>22 to work --<br>23 A March of 2007.<br>24 Q And that was to work for Donald J. Trump?<br>25 A Correct. |

NYS Attorney General v.
Donald Trump, et al.

William Kelly, Michael Cohen
October 24, 2023

---

**Page 2196**

M. Cohen - Plaintiff - direct (Faherty)

1  Q   Can you broadly describe that process about how -- of
2  how you came to work for the Trump Organization, just broadly,
3  please?
4  A   I was introduced to Mr. Trump through his son Don, Jr.
5  and it emanated from a dispute that took place at one of the
6  properties. I had owned a unit there, family members owned
7  units there, friends owned units there, and the goal was to
8  remove the board and to replace the board with a more favorable
9  board.
10      We did it successfully. As a result, I was asked to
11  handle a few other matters for Mr. Trump which also resulted
12  successfully and ultimately while sitting in his office, he
13  asked me if I would like to leave that sleepy, old firm, meaning
14  Phillip Nizer, and join him.
15      (Continued on the next page.)

---

**Page 2197**

M. Cohen - Plaintiff - direct (Faherty)

1  Q   Fair to say you accepted that invitation to join the
2  Trump Organization in 2007?
3  A   I did.
4  Q   And when I joined the Trump Organization in March of
5  2007, did you have a title?
6  A   I did.
7  Q   What was your title?
8  A   It remained the same from beginning to end, executive
9  vice president of the Trump Organization and special counsel to
10  Donald J. Trump.
11  Q   Let's take to those in turn.
12      Executive vice president of what? Was there a
13  particular department division that you were an EVP over?
14  A   No, it was of the Trump Organization. It was just a
15  standing. There were -- after Mr. Trump there were about a
16  dozen plus executive vice presidents, including the three
17  children and then others were vice presidents and so on. So it
18  was basically a title of standing.
19  Q   Did EVP reflect a level within the hierarchy?
20  A   Yes.
21  Q   And where within the executive level hierarchy would an
22  EVP have standing?
23  A   Directly under Mr. Trump.
24  Q   Thank you.
25      And you also stated you had a second title, "special

---

**Page 2198**

M. Cohen - Plaintiff - direct (Faherty)

1  counsel?"
2  A   Correct.
3  Q   What was your understanding of what special counsel
4  meant?
5  A   I reported and only handled work for Mr. Trump and so I
6  was his special counsel. Whatever issues he had, whatever
7  created ire for him, he would bring it to me in order to
8  resolve.
9  Q   So you were specifically serving as a personal counsel
10  to Donald J. Trump?
11  A   Correct.
12  Q   Who did you report to at the Trump Organization?
13  A   Donald Trump.
14  Q   Anyone else?
15  A   No.
16  Q   Was that true for the entire time that you worked at
17  the Trump Organization?
18  A   Yes.
19  Q   So the only person who asked you to perform work was
20  Donald J. Trump?
21  A   Correct.
22  Q   And the only person who would provide approval for the
23  work you performed was Donald J. Trump?
24  A   Correct.
25  Q   Okay. And just so that I have the same understanding

---

**Page 2199**

M. Cohen - Plaintiff - direct (Faherty)

1  as you. I've used the phrase, "The Trump Organization."
2      What is your understanding of what the phrase "The
3  Trump Organization" means?
4  A   The Trump Organization is a company that is
5  predominantly in real estate as well as branding. During the
6  times that I was there as well it also had television and media
7  operations as well.
8  Q   And are there a series of common enterprise of
9  corporate entities that operate under this umbrella term, "The
10  Trump Organization?"
11  A   Yes.
12  Q   Do you know who owns or is the beneficial owner of that
13  enterprise of corporate entities under the umbrella "Trump
14  Organization?"
15  A   Yes.
16  Q   Who is that?
17  A   Mr. Trump.
18  Q   Okay. Focusing on the organization, were there
19  different departments at the Trump Organization, for example, an
20  accounting department, a legal department?
21  A   Yes.
22  Q   You didn't fit within the legal department, did you?
23  A   No.
24  Q   Your position was held outside of the legal department,
25  yes?

---

NYS Attorney General v.
Donald Trump, et al.

William Kelly, Michael Cohen
October 24, 2023

| M. Cohen - Plaintiff - direct (Faherty) | Page 2200 |
| --- | --- |

1  A   Correct.
2  Q   But there was an accounting department there?
3  A   Yes.
4  Q   Who do you understand worked in the accounting
5  department at the Trump Organization?
6  A   Well, several people worked at the accounting, but the
7  CFO for the Trump Organization was Allen Weisselberg.
8  Q   Anyone else you know who worked in the accounting
9  department other than the CFO, Mr. Weisselberg?
10  A   There were many people, Deborah Tarasoff, Jeff
11  McConney.  When I first started there there was a gentleman by
12  the name of Eric Sacher who then got replaced with -- I
13  apologize.  I am blanking on his name, but there was quite a few
14  people in the accounting department.
15  Q   And in the legal department, did you ever have occasion
16  to work with members who were employed within the legal
17  department at the Trump Organization?
18  A   Yes.
19  Q   Does the name Jason Greenblatt sound familiar to you?
20  A   When I started Jason Greenblatt was general counsel
21  along with George Ross.
22  Q   And was he still at the Trump Organization by the time
23  you departed in 2017?
24  A   Yes.
25  Q   How about Allan Garten?  Is that a name you're familiar

| M. Cohen - Plaintiff - direct (Faherty) | Page 2201 |
| --- | --- |

1  within the legal department?
2  A   Yes.
3  Q   Who is Alan Garten?
4  A   He was an attorney at the Trump Organization, also an
5  executive, but he'd ultimately became general counsel after
6  Jason Greenblatt's departure to go pursue negotiations with
7  Middle East after Mr. Trump became president elect.
8  Q   And fair to say you did not report to either of those
9  individuals, yes?
10  A   Correct.
11  Q   I'd like to talk about some of the other Trump
12  Organization executives.
13      Are you familiar with the name Donald Trump, Jr.?
14  A   Yes.
15  Q   How are you familiar with that name?
16  A   That's how I was first introduced to Mr. Trump was
17  through his son and he is the namesake of his father.
18  Q   And Mr. Trump, Jr., did he have a title during the time
19  when you worked at the Trump Organization?
20  A   Yes.
21  Q   What was his title?
22  A   Executive vice president and there was a second part to
23  it, which had to do with development.
24  Q   Do you recall the specific title?
25  A   I don't.

| M. Cohen - Plaintiff - direct (Faherty) | Page 2202 |
| --- | --- |

1  Q   So it may have been something along the lines of
2  executive vice president of development and acquisitions?
3  A   Development and acquisitions, yes.
4  Q   Did that refresh your recollection about the title?
5  A   Yes.
6  Q   Okay.  Thank you.
7      And what is your understanding of Mr. Donald Trump,
8  Jr.'s role during the time that you were employed at the Trump
9  Organization?
10  A   Development in acquisitions of real estate
11  opportunities that would be presented to the Trump Corporation.
12  Q   And when we were talking about that hierarchy before,
13  fair to say that Mr. Donald Trump, Jr., he was at the top of the
14  hierarchy with the title executive vice president similar to
15  you?
16  A   Yes.
17  Q   Okay.  Are you familiar with the name Eric Trump?
18  A   I am.
19  Q   How are you familiar with that name?
20  A   Worked at the company as well as I was on his Eric
21  Trump Foundation board, which benefits St. Jude Children's
22  Hospital working with family.
23  Q   Another one of the Trump family members; correct?
24  A   Correct.
25  Q   And did Mr. Eric Trump hold the title during the time

| M. Cohen - Plaintiff - direct (Faherty) | Page 2203 |
| --- | --- |

1  while you were working at the Trump Organization?
2  A   Yes.
3  Q   What was Mr. Eric Trump's title?
4  A   Same as Don, Jr.'s executive vice president and
5  development and acquisitions.
6  Q   And what is your understanding of the work Mr. Eric
7  Trump performed at the Trump Organization during the time you
8  worked there?
9  A   Same development and acquisitions of real estate
10  opportunities.
11  Q   Any particular areas that you're familiar with that he
12  had a specialty in?
13  A   He concentrated on golf as well as again different
14  opportunities that would come in to the company.  Don, Eric and
15  Ivanka would split various opportunities where each one was
16  attached to a specific opportunity.
17  Q   And you beat me to my next question.
18      Are you familiar with the name Ivanka Trump?
19  A   I am.
20  Q   How are you familiar with the name Ivanka Trump?
21  A   Also one of Mr. Trump's three children, plus we also
22  live in the same building.
23  Q   And did Ms. Ivanka Trump have any titles during the
24  time when you were employed with the Trump Organization?
25  A   Yes.

People of the State of New York by Letitia James, Attorney General of the State of New York, Attorney General v.

Donald Trump, et al.

William Kelly; Michael Cohen

October 24, 2023

| M. Cohen - Plaintiff - direct (Faherty) | Page 2204 |
| --- | --- |

1    Q    What was the title Ms. Ivanka Trump held?
2    A    Executive vice president of development and
3    acquisitions as well.
4    Q    And I didn't ask this question about Mr. Eric Trump,
5    but Ivanka, Donald, Jr. and Eric Trump, they all held the title
6    executive vice president, yes?
7    A    Yes.
8    Q    And they were in that higher level of the hierarchy,
9    yes?
10   A    Yes.
11   Q    Ivanka Trump, Eric Trump, Donald Trump, Jr., did they
12   report to you at anytime during your employment with the Trump
13   Organization?
14   A    No, ma'am.
15   Q    To whom did those three individuals report to while you
16   were employed by the Trump Organization?
17   A    Their father.
18   Q    Okay.  Anyone else?
19   A    No, ma'am.
20   Q    We've already stated the name Allen Weisselberg.  He
21   was the CFO of the Trump Organization, yes?
22   A    Yes.
23   Q    What understanding do you -- if any, do you have as to
24   his role at the Trump Organization?
25   A    He was the chief financial officer.  Every financial

| M. Cohen - Plaintiff - direct (Faherty) | Page 2205 |
| --- | --- |

1    transaction went through his office.
2    Q    Can you give me an example?  What do you mean by that?
3    A    If there was an invoice that came to me, I would be
4    required to approve that invoice, put a line on, write
5    "approved," sign my name, put another line underneath it and
6    that would then get presented to Allen.  It would then, of
7    course, go to Mr. Trump's office for initial signature before a
8    check would be processed.
9    Q    So Allen Weisselberg managed the financials of the
10   Trump Organization?
11   A    Yes.
12   Q    Are you familiar with the name Jeff McConney?
13   A    I am.
14   Q    How are you familiar with the name Jeff McConney?
15   A    Worked with him at the Trump Organization.
16   Q    And what is your understanding of Jeff McConney's
17   titles that he -- title that he held while you were employed at
18   the Trump Organization?
19   A    He was comptroller.  He worked predominantly for Allen
20   Weisselberg.
21   Q    So Mr. McConney worked in the accounting department,
22   yes?
23   A    Yes.
24   Q    Was he a direct report to Mr. Weisselberg?
25   A    Yes.

| M. Cohen - Plaintiff - direct (Faherty) | Page 2206 |
| --- | --- |

1    Q    Do you know if he reported to anyone else at the Trump
2    Organization?
3    A    Mr. Trump, if it would be necessary.
4    Q    Anyone else?
5    A    Not that I'm aware of.
6    Q    And your general understanding of Mr. McConney's role?
7    A    He handled all of the bookkeeping.
8    Q    Anything else you recall about Mr. McConney's role?
9    A    No, ma'am.
10   Q    Are you familiar with a document titled the Statement
11   of Financial Condition for Donald J. Trump?
12   A    I am.
13   Q    And how are you familiar with that title?
14   A    I've seen them as well as I've worked on them.
15   Q    Describe that for me.  What do you understand generally
16   that document to be?
17   A    That was a complete listing of all of the assets of the
18   Trump Corporation, the Trump Organization with each asset broken
19   down into an asset class, the asset class described and the
20   value was placed on the asset, as well as any existing
21   liabilities.  The goal was to basically create a statement of
22   financial worth.
23   Q    For whom?
24   A    Donald J. Trump.
25   Q    And do you have any understanding about why the

| M. Cohen - Plaintiff - direct (Faherty) | Page 2207 |
| --- | --- |

1    document was created?
2    A    Initially.
3    Q    Yes.
4    A    No.
5    Q    During the time you were working at the Trump
6    Organization did you form any understanding about why the
7    document was created?
8    A    It was to be used for purposes of demonstrating net
9    worth for acquisitions for insurance purpose.
10   Q    Any other reasons?
11   A    Not that I'm aware of.
12   Q    And when you say that this document was to be used to
13   demonstrate net worth for acquisition for insurance purposes, is
14   it your understanding that the document was to be shared with
15   third parties or was that for internal purposes?
16   A    Shared with third parties.
17   Q    Do you have any understanding as to the ways in which
18   the Statement of Financial Condition in particular was used?
19   A    Yes.
20   Q    Describe for me some of those ways.
21   A    So as it related to insurance the document would be
22   presented to the various insurance brokers such as, AON.  They were permitted to
23   the company from the main broker, AON.  They were permitted to
24   take notes off of the document but not permitted to keep the
25   actual document itself and the benefit was showing that the

NYS Attorney General v.
Donald Trump, et al.

William Kelly; Michael Cohen
October 24, 2023

---

**M. Cohen - Plaintiff - direct (Faherty)**                    Page 2208

1  assets had extremely high values with low liabilities in order
2  to obtain better insurance premiums.
3     Q   You also mentioned acquisitions. Were the statements
4  of financial conditions presented to any third parties for
5  purposes of an acquisition?
6     A   Yes.
7     Q   What third parties are you familiar with?
8     A   I was involved in the potential acquisition of the
9  buffalo bills.
10    Q   Any other acquisitions you can think of?
11    A   The Miami Doral property.
12    Q   Anything else?
13    A   Not off the top of my head.
14        MS. FAHERTY: And I just want to check on timing,
15  Your Honor.
16        THE COURT: I was going to give you the five-minute
17  warning in one minute. So we'll break at 12:55.
18        MS. FAHERTY: Thank you, Your Honor.
19    Q   Turning back to the creation of the document focusing
20  on the time that you were employed at the Trump Organization.
21  And I'll draw your attention to the period beginning in 2011.
22  Do you have any understanding as to who created the document?
23    A   I do not.
24    Q   Do you have any understanding as to whether -- as to
25  what, if any, individuals at the Trump Organization worked on

---

**M. Cohen - Plaintiff - direct (Faherty)**                    Page 2209

1  the specific numbers contained in that Statement of Financial
2  Condition beginning in 2011?
3     A   In 2011, I don't recall, but 2012 and '13, '14, and
4  '15, I do.
5     Q   I'm going to show you some documents that have already
6  been admitted into evidence.
7        MS. FAHERTY: So Tommy, if you don't mind handing
8  to the witness Plaintiff's Exhibit PX 787.
9     Q   I'm going to hand you five of these documents and we'll
10  briefly just look at them, okay, Mr. Cohen?
11    A   Yes.
12        MS. FAHERTY: Tommy, the second document will be PX
13  815, the third will be PX 707, the fourth will be PX 730,
14  and the fifth will be PX 729. So we can start with PX 787.
15    A   Is it up on the screen?
16    Q   PX 787 is on the screen.
17    A   Okay.
18    Q   And just take a quick look at this document and tell
19  me, generally, if you recognize the form of this document, sir.
20    A   I do.
21    Q   What do you recognize this to be?
22    A   This is the Statement of Financial Condition for Donald
23  J. Trump.
24    Q   And is it dated as of June 30, 2011?
25    A   Yes, it states June 30th of 2011.

---

**M. Cohen - Plaintiff - direct (Faherty)**                    Page 2210

1     Q   Does this appear to be a document you may have worked
2  on during the time you were employed at the Trump Organization?
3     A   I don't recall.
4     Q   I'll draw your attention to the third page -- page four
5  of this document, and it ends in the number 3134.
6     A   Yes.
7     Q   Do you see that page there?
8     A   I do.
9     Q   Do you recognize this page as a document page you may
10  have worked on during your time period working for the Trump
11  Organization?
12    A   I do.
13    Q   How do you recognize this page? What do you recognize
14  it to be?
15    A   I recognize the entire document.
16    Q   Describe for me that recognition.
17    A   It's a document that I have seen before. It's a
18  document that I had in my possession and a document that I just
19  recognize.
20    Q   Were you ever asked to perform work on Mr.
21  Donald J. Trump's Statement of Financial Condition?
22    A   Yes.
23    Q   And before you tell me more about the work you were
24  asked to perform, was that work asked in your capacity as
25  Mr. Donald J. Trump's personal attorney or was it for a business

---

**M. Cohen - Plaintiff - direct (Faherty)**                    Page 2211

1  reason?
2     A   For business reason.
3     Q   And what was the work you were asked to perform for
4  Mr. Donald J. Trump with regards to the Statement of Financial
5  Condition?
6     A   I was tasked by Mr. Trump to increase the total assets
7  based upon a number that he arbitrarily elected and my
8  responsibility along with Allen Weisselberg predominantly was to
9  reverse engineer the various different asset classes, increase
10  those assets in order to achieve the number that Mr. Trump had
11  tasked us.
12    Q   And when you say "achieve the number," what number are
13  you talking about?
14    A   Whatever number Mr. Trump told us to.
15    Q   Was it Mr. Trump's ultimate net worth as identified on
16  the Statement of Financial Condition?
17    A   Yes.
18        MS. FAHERTY: I think now would probably be a good
19  time to take a break, Your Honor.
20        THE COURT: Okay. You're giving up two minutes
21  here.
22        All right, we're going to break for lunch. See you
23  all if you want to come back at 2:15 on time, please.
24        (Whereupon, there is a luncheon recess in the
25  proceedings.)

---

NYS Attorney General v.
Donald Trump, et al.

William Kelly, Michael Cohen
October 24, 2023

| M. Cohen - Plaintiff - direct (Faherty) | Page 2212 |

```
 1          AFTERNOON    SESSION
 2          THE COURT OFFICER: All rise. Part 37 is back in
 3    session. The Honorable Judge Arthur Engoron presiding.
 4    Make sure all cell phones are on silent. Laptops and cell
 5    phones will be permitted, but only to members of the press.
 6    There is absolutely no recording or photography of any kind
 7    allowed in the courtroom. Now be seated and come to order.
 8          THE COURT: We just need a witness.
 9          THE COURT OFFICER: Witness entering.
10          (Whereupon, the witness enters the courtroom and
11    approaches the witness stand.)
12          THE COURT: Okay. Let's continue with the direct
13    examination of Mr. Cohen.
14          MS. FAHERTY: Thank you, Your Honor.
15    CONTINUED DIRECT EXAMINATION
16    BY MS. FAHERTY:
17    Q    Mr. Cohen, you recall at the break you testified to
18    reverse engineering numbers on the statements of financial
19    condition each year while you were working at the Trump
20    Organization, yes?
21    A    Yes.
22    Q    And I believe you were deposed in this case. Did you
23    testify that between 2011 and 2015 you worked on those years'
24    Statement of Financial Condition?
25    A    Again, I stated I don't recall if I worked on 2011, but
```

| M. Cohen - Plaintiff - direct (Faherty) | Page 2213 |

```
 1    '12, '13, '14, '15, yes.
 2    Q    And you -- who assigned you the role of working on the
 3    Statement of Financial Condition?
 4    A    Mr. Trump.
 5    Q    Anyone else?
 6    A    Mr. Trump.
 7    Q    And did you work with anyone in connection with your
 8    work on the Statement of Financial Condition?
 9    A    Yes.
10    Q    Who?
11    A    Allen Weisselberg.
12    Q    Anyone else?
13    A    Directly with Allen Weisselberg.
14    Q    Describe that for me. What was the work that you did
15    with Allen Weisselberg on the Statement of Financial Condition?
16    A    We would take a look at the various different asset
17    classes that are broken down in the document and based upon the
18    number that Mr. Trump wanted the document to ultimately state we
19    would look at the assets and increase its values in order to
20    achieve the number.
21    Q    And would you look at a particular document in order to
22    perform that task?
23    A    No.
24    Q    Let's pull out the 2011 Statement of Financial
25    Condition, Plaintiff's Exhibit PX 787. It's already in
```

| M. Cohen - Plaintiff - direct (Faherty) | Page 2214 |

```
 1    evidence.
 2    Q    And I believe you testified before you have seen this
 3    document before; correct?
 4    A    Correct.
 5          MS. FAHERTY: And let's turn to the third page of
 6    this Document. One more.
 7    Q    Was this particular page of assets relevant to the work
 8    you performed on the Statement of Financial Condition?
 9    A    Yes.
10    Q    How is this particular page relevant to the work you
11    performed on the Statement of Financial Condition?
12    A    We would take this specific list of assets and we would
13    figure out which specific line to increase the number again to
14    reverse engineer it into the total asset that Mr. Trump sought.
15          MR. KISE: Your Honor, objection on foundational
16    grounds. The witness has testified that he didn't look at
17    any particular documents and then he testified before that
18    -- that he doesn't recall having anything to do with 2011.
19    So now we're looking at 2011 and I don't believe the witness
20    has any foundation to look at 2011.
21          THE COURT: Did he say he wasn't sure about 2011?
22          MR. KISE: We can look back. I believe he said "I
23    don't recall working on 2011," but does recall working on
24    '12, '13, '14, '15.
25          THE WITNESS: That's not what I said.
```

| M. Cohen - Plaintiff - direct (Faherty) | Page 2215 |

```
 1          MS. HABBA: When he first took on the stand he said
 2    he did not work on 2011.
 3          MS. FAHERTY: And, Your Honor, I always appreciate
 4    when learned counsel can give me a -- I'm happy to ask some
 5    additional questions to make the record clear, if that's
 6    okay.
 7          THE COURT: All right. Well, let's lay a
 8    foundation if one can be laid for this.
 9    Q    So what would be the basis for doing, for example, the
10    work you performed on 2012? Would you make numbers out of thin
11    air or was there a document or information you looked at in
12    order to calculate new numbers?
13    A    We would have taken the document that you have up right
14    now, the June 30, 2011 document, and we would mark it up by hand
15    in order to increase each of the asset lines, again, to get to
16    the total asset number that Mr. Trump tasked us to achieve.
17    Q    And when you say, "we," who are you referring to?
18    A    Myself and Allen Weisselberg.
19    Q    Did this conversation or these conversations marking up
20    the 2011 document, for example, occur in the presence of anyone
21    else?
22    A    Yes.
23    Q    Who?
24    A    Mr. Trump.
25    Q    And what, if anything, do you recall Mr. Trump would
```

| M. Cohen - Plaintiff - direct (Faherty)          Page 2216 | M. Cohen - Plaintiff - direct (Faherty)          Page 2218 |

**Page 2216**

1  say about marking up the document referring in this instance to
2  the 2011 Statement of Financial Condition for the 2012 numbers?
3    A   I would receive a phone call, generally it would be
4  from Rhona Graff, Mr. Trump's executive assistant, "Mr. Trump
5  would like to see you" and I would come into the office. Allen
6  Weisselberg would either already be there or come with me and
7  the topic was the Statement of Financial Condition. He would
8  look at the total assets and he would say, "I'm actually not
9  worth four and a half billion dollars. I'm really worth more,
10  like, six." Okay. He would then direct Allen and I to go back
11  to Allen's office and return after we achieved the desired goal.
12    Q   And I'll direct your attention to the following page.
13  And at the bottom of this page do you see a line entry at the
14  top, it says, "liabilities and net worth." Do you see that
15  there?
16    A   I do.
17    Q   And at the bottom there is a line entry. It says "net
18  worth." Do you see that there?
19    A   I do.
20    Q   And was this particular number the number you were
21  tasked with bringing up according to Mr. Trump's directive as
22  you just testified?
23    A   Yes.
24    Q   Okay. Now, turning back to the first page.
25        Was there a particular procedure for you and

**Page 2217**

1  Mr. Weisselberg to distribute the assets on this page that you
2  would alter or backup the numbers into?
3    A   There was no specific program within which to change
4  the numbers. It was, again, reverse engineering.
5        So, for example, if they brought on a new asset we, of
6  course, would add that to the list of assets, but then there
7  were also other assets like Trump Park Avenue. We would take
8  the number of units that Mr. Trump owned as the sponsor
9  developer of the property and we would look at numbers that were
10  being achieved elsewhere; what's the highest price per square
11  foot achieved in the city, and we would use those numbers in
12  order to inflate the value of these apartments.
13    Q   Are those called comparables?
14    A   Comparables -- you could call them comparables, but
15  comparables imply that they are similar.
16    Q   And is it your understanding that the quote/unquote
17  "comparables" were not similar?
18    A   No.
19    Q   What is your basis for saying that?
20    A   Some of the comps or comparables were predicated off of
21  ground up developments with nine, ten feet ceilings,
22  unobstructed views, not inhibited by rent stabilized or other
23  programs, so no, they were not comparables. They are just
24  different.
25    Q   So Mr. Trump would task you with reaching a number for

**Page 2218**

1  2012, you would look at the prior year's number; correct?
2    A   Correct.
3    Q   And you would go into Allen Weisselberg's office to
4  review the numbers to see where you could add value. Is that
5  fair?
6    A   Fair.
7    Q   And was anybody present for those conversations?
8    A   There were people who had come in to the office that
9  were providing Allen with information, but these conversations
10  were primarily between Mr. Trump, myself and Allen Weisselberg.
11    Q   And in the conversations between you and
12  Mr. Weisselberg in his office, how would you find these
13  comparable numbers? Was there a particular search you would do
14  or research you performed?
15    A   Well, some of the assets that we used as comparables I
16  just know because I am in the real estate industry, so I read an
17  article about an apartment that, you know, that traded or I
18  would look on Google.
19    Q   And did you keep the notes of your meetings with
20  Mr. Weisselberg as to the values you were adding to the asset
21  categories on Mr. Trump's Statement of Financial Condition?
22    A   No.
23    Q   Why not?
24    A   I would sit down with Allen and we would make the
25  changes. That document would then be photocopied that had all

**Page 2219**

1  of the changes at which point in time Allen and I would return
2  to Mr. Trump demonstrate that we achieved or close to the number
3  that he was seeking and I had no use for that document any
4  longer.
5        Transcript continues on the following page....

NYS Attorney General v.
Donald Trump, et al.

William Kelly; Michael Cohen
October 24, 2023

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)   Page 2220 | M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)   Page 2222 |
|---|---|

**Page 2220**

1 Q And at some point, did you become aware that the
2 numbers -- the values you had added to the Statement of
3 Financial Condition, let's focus on 2012, that they were
4 accepted by Mr. Trump?
5 A Yes, he's the only one that could accept them.
6 Q How did you come to understand that Mr. Trump accepted
7 the values you added to the Statement of Financial Condition for
8 2012?
9 A Because he knew the Statement of Financial Condition
10 would be printed by Mazars who is the accounting firm for the
11 Trump Organization and we would receive the bounded copy.
12 Q Did you have any relationship with Mazars in the
13 process of drafting the Statement of Financial Condition?
14 A No.
15 Q Who, if anyone, do you understand to have been
16 interacting with Mazars in the creation of the Statement of
17 Financial Condition?
18 A Mr. Trump and Allen Weisselberg.
19 Q And with regards to the process between the time Mr.
20 Trump tasked you with reverse engineering that net worth number
21 to the time when you met with Allen Weisselberg in his office to
22 eventually returning back to Mr. Trump with the numbers for his
23 approval, about how long did that process take?
24 A For the most part, several days.
25 Q And what, if any, understanding do you have as to who

**Page 2222**

1 appears to call for speculation based on the foundation that
2 has not yet been laid, but I don't -- I don't -- it is not
3 clear what he's testifying to at all.
4 MS. FAHERTY: Your Honor, that appears to be a
5 perfectly fair question by me with a responsive answer and
6 if Mr. Kise disagrees with the response, he's perfectly
7 entitled to cross-examine.
8 THE COURT: You want to just read it again for
9 everybody's benefit out loud, obviously.
10 Q You made mention of the three adult children. What is
11 your understanding as to the three adult children's role in
12 assisting Mr. Weisselberg in valuing the assets in the Statement
13 of Financial Condition?
14 MR. KISE: He has no foundation other than hearsay.
15 If that's what he's saying, unless he's testifying that he
16 spoke with the children directly, that's different.
17 THE COURT: Well, I don't think he had to speak to
18 them. I think it was more of an observation, but see if you
19 can ask it again with -- either ask a foundation or the
20 question with more of a foundation. I'm not sure exactly
21 also the phrase "what's your understanding." What did you
22 see, observe, hear?
23 Q Did you have -- you had a general understanding as to
24 Eric Trump's role at the Trump Organization while you were
25 employed there, yes?

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)   Page 2221 | M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)   Page 2223 |
|---|---|

**Page 2221**

1 Mr. Weisselberg relied on to assist him in adding value to the
2 numbers on these Statements of Financial Condition?
3 A Jeffrey McConney.
4 Q Anyone else?
5 A Potentially the children Don, Ivanka and Eric.
6 Q What, if anything, is your understanding Mr. McConney
7 provided to Mr. Weisselberg on the asset values?
8 A He had all the numbers. He was the one that controlled
9 the computer with the fobs in order to see, for example, cash
10 and marketable securities. He would also be the one to provide
11 Allen with the gross rent roll for 40 Wall Street or any of the
12 other assets that Mr. Trump owns that were being rented or
13 leased.
14 Q And you made mention of the three adult children. What
15 is your understanding as to the three adult children's role in
16 assisting Mr. Weisselberg in valuing the assets in the
17 Statements of Financial Condition?
18 A Well, first would be which projects that they
19 individually were spearheading and then to ask them what other,
20 you know, values exist for the purpose of this asset.
21 MR. KISE: Objection, Your Honor. I'm not sure
22 that's entirely responsive, if at all responsive. Is the
23 witness testifying that he spoke with these individuals or
24 this is his understanding that one else spoke with these
25 individuals? The question calls for -- the question

**Page 2223**

1 A Yes.
2 Q You similarly formed an understanding as to Donald
3 Trump, Jr.'s role at the Trump Organization while you worked
4 there?
5 A Yes.
6 Q Similarly, you formed an understanding of Ivanka
7 Trump's role while working at the Trump Organization?
8 A Yes.
9 Q Did you have occasion to observe Mr. Weisselberg
10 interacting with those three adult children as it concerned the
11 Statement of Financial Condition and his preparation of values?
12 A I did not observe them specifically engage in
13 conversation.
14 Q Did you at any point form an understanding that Mr.
15 Weisselberg was, in fact, consulting with the three adult
16 children with regards to his valuations on the Statements of
17 Financial Condition?
18 A Yes.
19 MR. KISE: Objection.
20 THE COURT: I think the next question is taken with
21 the first question is acceptable, so...
22 Q How did you form that understanding?
23 A Allen would state that, "I need to speak to Don,
24 Ivanka, Eric" regarding whatever the asset was.
25 THE COURT: Well, did he state that he did speak to

NYS Attorney General v.
Donald Trump, et al.

William Kelly, Michael Cohen
October 24, 2023

---

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)  Page 2224 |
|---|

1  them beyond "I have to speak to them"?
2       THE WITNESS: No, he did not actually make that
3  overt statement. However, at the end, there was a new
4  Statement of Financial Condition that was compiled that had
5  the changes.
6       THE COURT: How do you know that the children had
7  any input into those new numbers?
8       THE WITNESS: I do not.
9  Q   Any other understanding as to others who worked with
10  Mr. Weisselberg on the valuations for the Statements of
11  Financial Condition?
12  A   Jeff McConney.
13  Q   Other than Mr. McConney?
14  A   I don't know who else Allen spoke with.
15  Q   And just to clarify, what were the methods of
16  communication you employed at the Trump Organization? Did you
17  communicate frequently via e-mail?
18  A   No.
19  Q   How about via text message?
20  A   No.
21  Q   How about handwritten notes concerning the Statements
22  of Financial Condition?
23  A   Only to the extent that we changed the numbers and the
24  changed numbers would be in red pen.
25  Q   And you didn't retain copies of those communications,

---

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)  Page 2225 |
|---|

1  right?
2  A   I do not believe so.
3  Q   So looking at this exhibit, which is still on the
4  screen, the 2011 Statement of Financial Condition, focusing on
5  the work you performed for the 2012 valuation, what, if any, of
6  these assets do you recall that you provided valuations for?
7  A   Trump Park Avenue, Trump World Tower at United Nations,
8  100 Central Park South to the extent it was part of the
9  commercial portion; properties under development specifically
10  with Beverly Hills, Miss Universe Pageant and potentially other
11  assets.
12  Q   And as to the other assets, was Allen Weisselberg
13  responsible for those assets?
14  A   Yes.
15       MS. FAHERTY: Let's put that to the side. Can we
16  pull out 2012, please.
17       Your Honor, I'm handing up to the witness the
18  June 30, 2012 Statement of Financial Condition. It is
19  marked already as an Exhibit PX 815.
20  Q   Do you recognize this document, Mr. Cohen?
21  A   I do.
22  Q   And do you recognize this as a document that you worked
23  on in connection with Mr. Trump's assignment that you reverse
24  engineer the values on Donald J. Trump's Statement of Financial
25  Condition?

---

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)  Page 2226 |
|---|

1  A   Yes.
2  Q   For what year were you using the 2012 Statement of
3  Financial Condition to perform work on Mr. Trump's Statement of
4  Financial Condition?
5  A   That would then go for the 2013.
6  Q   So let's turn to the third page of this document. We
7  have it on the screen here. Similar to the prior year Statement
8  of Financial Condition, right, listing of assets?
9  A   Correct.
10  Q   Then if we turn to the next page, "liabilities" and
11  "net worth," yes?
12  A   Yes.
13  Q   And there's a net worth entry at the bottom of the
14  page, correct?
15  A   Correct.
16  Q   Was that another net worth number that you were
17  directed to reverse engineer to a higher number?
18  A   Yes.
19       MS. FAHERTY: Going back to the very first page.
20  Thank you, Ashley. The assets page.
21  Q   Do you recall which assets for the 2013 values that you
22  worked on in connection with your assignment to reverse engineer
23  the values on the Statement of Financial Condition?
24  A   Possibly Trump Tower, Trump Park Avenue, Trump World
25  Tower United Nations, possibly 100 Central Park South to the

---

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)  Page 2227 |
|---|

1  extent of the commercial, mansion at Seven Springs, Miss
2  Universe Pageant as well as possibly other assets.
3  Q   And again, the ways in which you would increase the
4  values of these particular asset classes, what would you do?
5  A   Again, we would take a look at either comparables or
6  new potential lease tenants, for example, in Trump Tower and
7  come up with a multiple if you were taking that to market to
8  securitize it.
9  Q   Any other ways in which you would inflate the assets on
10  these asset classes for the 2013 Statement of Financial
11  Condition?
12  A   Again, looking at comparables into the area Seven
13  Springs was a little different because there was a deal that was
14  struck to subdivide the property. So we would look at if it was
15  for the -- for this year, it could have been 2013 or -- with
16  the subdivision to provide some sort of number attached to each
17  individual parcel.
18  Q   So is it fair to say you would Google a number for
19  assigning a value to the lots at the mansion at Seven Springs?
20       MR. KISE: Objection. Leading.
21  Q   Describe for me the number.
22       THE COURT: Sustained.
23  Q   Describe for me the number that you would use for Seven
24  Springs.
25  A   You look at some of the other homes that are in the

---

NYS Attorney General v.
Donald Trump, et al.

William Kelly; Michael Cohen
October 24, 2023

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) | Page 2228 |

1   area and you use that as a basis for the subdivision parcel
2   lots.
3   Q   When you're looking up the -- these numbers, are you
4   calculating time as a factor in those values?
5   A   No.
6   Q   Is the value an immediately-achieved number that you're
7   assigning?
8   A   No.
9   Q   Is the number a comparable or a reasonable comparable,
10  I think we spoke about comparables before, to the asset class?
11  A   It would depend.
12      MR. KISE: Objection. Is this witness now
13  testifying as an expert witness on real estate or are we
14  going to add that to his series of credentials? I don't
15  know that he is -- that question calls for expert -- an
16  expert conclusion. Is it a reasonable comparable? That's
17  the province of an expert and unless Mr. Cohen -- the
18  prosecution wants to qualify Mr. Cohen as an expert in that,
19  I'm sure he'll answer it and say he is.
20      THE COURT: I found it a confusing question. I
21  will sustain the question.
22      MS. FAHERTY: That's okay. I want to ask the
23  question in a non-objectionable way, Your Honor, so give me
24  a moment, please.
25      THE COURT: Of course.

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) | Page 2229 |

1   Q   So you made mention that the Seven Springs asset was a
2   little different. Your testimony just now, was that specific to
3   the particular year 2013 or is that a general recollection?
4   A   General recollection. I don't know if it was 2012,
5   '13.
6   Q   You generally have a recollection, though, that you
7   were looking at other comparable assets that could value the
8   subdivided property at Seven Springs; is that fair?
9   A   Yes.
10      MR. KISE: Objection. Leading.
11  Q   How would you describe --
12      THE COURT: Wait. Wait. Sustained.
13  Q   How would you describe those comparable assets that you
14  were looking at for the purpose of that Seven Springs
15  subdivision?
16  A   I'm sorry. I don't understand your question.
17  Q   What were you looking at? How were you coming up with
18  the numbers?
19  A   So I know the area where Seven Springs is located.
20  It's the top of the hill, the very top and we looked at -- I
21  looked at, for example, the value of a house that was beneath
22  Mr. Trump's property, Nelson Peltz, and we took that as a number
23  and then we added to it because it would be new construction, it
24  is higher up the hill and so on, and that's how we ended up
25  increasing.

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) | Page 2230 |

1   Q   And do you know if any of the adult children also
2   performed work at the Seven Springs, LLC,
3   a Trump Organization entity?
4   A   I don't know which one, no.
5   Q   Same question that I was asking before about 2013. Who
6   tasked you with adding values to the Statement of Financial
7   Condition for that year?
8   A   That would be Mr. Trump.
9   Q   And who did you perform that work with with inflating
10  the assets for 2013?
11  A   Allen Weisselberg.
12  Q   Similar to the work you performed in 2012?
13  A   Yes, it was an annual recurring process.
14  Q   Approximately how long in 2013 would that take to go
15  from being assigned adding the value to the time you brought it
16  to Mr. Trump for his approval?
17  A   Again, several days.
18  Q   Any understanding whether or not Mr. Trump did approve
19  of the asset values you added to the Statement of Financial
20  Condition for that year?
21  A   In the same way as previously described.
22  Q   And if I asked you the same questions for the following
23  year, for 2014 --
24  A   Yes.
25  Q   -- would your answers be any different?

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) | Page 2231 |

1   A   No.
2   Q   How about in 2015; would your answers be any different?
3   A   No.
4   Q   And let's just take a quick look at the 2013 Statement
5   of Financial Condition which is -- Tommy, I'm so sorry. 707.
6       Do you recognize that document there?
7   A   I do.
8   Q   Let's turn to the third page. Do you recognize that
9   asset page?
10  A   I do.
11  Q   And that was the asset page you worked on to increase
12  the values for the 2014 Statement of Financial Condition?
13  A   Correct.
14  Q   And turning to the next page, do you see that net worth
15  entry there?
16  A   Yes.
17  Q   Is that the net worth line that you were tasked with
18  reverse engineering higher by Mr. Trump?
19  A   Yes.
20      MS. FAHERTY: Can we pull out 2015, which is we are
21  looking at 730. Sorry, Tommy. 729. Thank you. Can you
22  pull out 730, too.
23  Q   So I put 2014 -- let's look at 2014 first which is 730
24  in front of you. Do you recognize that document?
25  A   I do.

NYS Attorney General v.
Donald Trump, et al.

William Kelly; Michael Cohen
October 24, 2023

---

M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)    Page 2232

1    Q    That's the 2014 Statement of Financial Condition?
2    A    Yes.
3    Q    And turn to page three of this document. Again, this
4    is the assets page that you and Mr. Weisselberg worked on
5    together?
6    A    Correct.
7    Q    And then turning to the next page, that net worth line
8    appears to have gone up from prior year, yes?
9    A    Correct.
10   Q    That was the net worth number that Mr. Trump assigned
11   you to inflate back into?
12   A    Correct.
13   Q    And then turning to Exhibit 729, you recognize that
14   document there?
15   A    I do.
16   Q    Same assets page that you were assigned?
17   A    Yes.
18   Q    Turning to the following page, net worth number there
19   now six million. You see that there?
20   A    Yes.
21   Q    And that was a net worth number you were tasked with
22   backing into to make higher pursuant to Mr. Trump's direction?
23   A    Correct.
24   Q    You can put those down. Thank you.
25        Do you recall when you stopped working on the

---

M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)    Page 2233

1    Statements of Financial Condition?
2    A    I believe around for the 2016.
3    Q    What is your understanding as to why you stopped
4    working on the Statement of Financial Condition values?
5    A    I was busy doing other things.
6    Q    Were you ever in possession of one of Mr. Donald J.
7    Trump's Statement of Financial Condition in final form?
8    A    Yes.
9    Q    That was yours to use for business purposes?
10   A    It was given to me to use for business purpose.
11   Q    And when would you use that Statement of Financial
12   Condition? Can you provide me an example?
13   A    So in 2013, there was a journalist for a New York
14   centric magazine called The Real Deal. The journalist's name
15   was Katherine Clarke and Katherine Clarke was going to do a
16   story, a feature story on Mr. Trump's net worth. And so when
17   she came to see me at the office, I presented her with the
18   document. She could not keep it. She could take notes in order
19   to create the story about how much Mr. Trump was actually worth.
20   Q    So is that generally how you would come to use the
21   Statement of Financial Condition?
22   A    That's one example.
23   Q    That's one example. Another example, do you have any?
24   A    When Mr. Trump was interested in putting in a bid for
25   the Buffalo Bills, we used that statement in order to

---

M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)    Page 2234

1    demonstrate his ability to purchase the team.
2    Q    And did you have the permission of Mr. Trump to be able
3    to use the Statement of Financial Condition?
4    A    Yes.
5    Q    Were you directed by Mr. Trump to use the Statement of
6    Financial Condition to flout his wealth?
7    A    Yes.
8    Q    I want to turn your attention to insurance. Did you
9    work on the insurance program for the Trump Organization?
10   A    I did.
11   Q    Did you work with others on the -- at the Trump
12   Organization on the insurance program?
13   A    Yes.
14   Q    Who did you work with at the Trump Organization?
15   A    Allen Weisselberg, CFO; Matthew Calamari, Sr., chief
16   operating officer; and Ronald Lieberman.
17   Q    Did that group of four individuals have a specific
18   title or association that they were known by?
19   A    The gang of four.
20   Q    Did you say, "the gang of four"?
21   A    Some called it the group of four or the gang of four.
22   Q    And how did you know Matthew Calamari, Ron Lieberman,
23   Allen Weisselberg come to be known as the gang of four?
24   A    I believe Pam Newman from Aon came up with the name.
25   Q    And can you remind me who Aon is?

---

M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)    Page 2235

1    A    Aon is the broker that handled the insurance for the
2    Trump Organization for all the insurance.
3    Q    So a broker, they go out and find insurance programs to
4    present to the organization?
5    A    Correct.
6    Q    They didn't provide the actual insurance, right?
7    A    No, they're brokers.
8    Q    You said the name was Pam Newman?
9    A    Correct.
10   Q    Who assigned you and those three other individuals, Mr.
11   Weisselberg, Mr. Calamari, Mr. Lieberman, to work on the
12   insurance program?
13   A    All final decisions were done by Mr. Trump.
14   Q    Mr. Cohen, I'm handing you an exhibit. We marked for
15   identification as PX-3119. I'll give you a minute to take a
16   look at that document. I also put it on the screen. Do you see
17   that document in front of you, sir?
18   A    I do. Can I have just one moment to look through it?
19   Q    Yes. Absolutely.
20   A    Thank you.
21        (Witness reviewing document.)
22   A    Okay.
23   Q    So drawing your attention to the top of this e-mail, do
24   you recognize the name Martha Blackman or
25   martha.blackman@aon.com?

---

NYS Attorney General v.
Donald Trump, et al.

William Kelly; Michael Cohen
October 24, 2023

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)   Page 2236 | M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)   Page 2238 |
|---|---|
| 1  A   Yes. | 1   Q   What does it mean that his role was coverage buying |
| 2  Q   Who do you recognize that name to you? | 2   decisions? |
| 3  A   She worked for Pamela Newman at Aon. | 3   A   Ultimately, he would be the one to take the premium |
| 4  Q   Is that acknowledged in the following line on behalf of | 4   after we negotiated and that would be again Matt Calamari, Ron |
| 5  Pamela Newman right below? | 5   Lieberman, myself and Allen to Mr. Trump in order to bind the |
| 6  A   Yes. | 6   policies. |
| 7  Q   This appears to be an e-mail sent on February 14, 2013 | 7   Q   Was he in charge of financial information with regards |
| 8  addressed to Allen Weisselberg at the Trump Organization, | 8   to the insurance program as well? |
| 9  Matthew Calamari, Ron Lieberman and you.  That's your e-mail | 9   A   Yes. |
| 10  address, mcohen@trumporg.com? | 10   Q   Was he in charge of sharing financial information with |
| 11  A   It was. | 11   regards to the insurance program? |
| 12  Q   Thank you for the clarification.  The cc line, do you | 12   A   To whom? |
| 13  recognize generally that those are e-mail addresses associated | 13   Q   Sharing financial information. |
| 14  with employees at Aon, the insurance broker? | 14   A   But share it with whom? |
| 15  A   Yes. | 15   Q   We'll come back to that question. |
| 16  Q   The subject is, "Forward, the Trump/Aon team-suggested | 16   A   Okay. |
| 17  work style going forward (draft memo number 4 with updated | 17   Q   And next is Matthew Calamari, the executive |
| 18  timeline)" and then there's an attachment.  Do you see that? | 18   vice-president and chief operating officer of the Trump |
| 19  A   I do. | 19   Organization, yes? |
| 20  Q   Drawing your attention to the body of the message, it | 20   A   Yes, ma'am. |
| 21  says, "Gentlemen, Aon is committed to delivering to the Trump | 21   Q   What is your understanding of his role with property |
| 22  Organization the best service and the best results."  Then it | 22   claims? |
| 23  states, "Work style-A, team of four." | 23   A   So Matthew Calamari, Sr. handled all of the claims as |
| 24       Is that a reference to what you were just describing a | 24   it related to anything that dealt with the insurance.  If there |
| 25  moment ago, the gang of four who worked on the insurance | 25   was an auto accident, he would handle it.  If there was a |

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)   Page 2237 | Page 2239 |
|---|---|
| 1  program? | 1   Workers' Compensation claim, he would handle it.  If there was a |
| 2  A   Yes. | 2   loss, an insurance loss, he would handle it. |
| 3       MS. FAHERTY: Your Honor, I move to admit this into | 3   Q   He was responsible for those aspects of the insurance |
| 4  evidence. | 4   program, right? |
| 5       MS. HABBA: Objection.  Statute of limitations. | 5   A   Yes, ma'am. |
| 6       THE COURT: Overruled.  It is in evidence. | 6   Q   And then Mr. Lieberman, he's next in the line, |
| 7       (Whereupon, the Document was marked in evidence as | 7   executive vice-president management and development, what is |
| 8  Plaintiff's Exhibit 3119.) | 8   your understanding of his role as described here in this box? |
| 9       MS. FAHERTY: Thank you. | 9   A   During the process, things that would be looked at, of |
| 10  Q   So this paragraph under, "A team of four" states, "Aon | 10   course, as casualty risk, again claims and also coverage buying |
| 11  is excited that the Trump Organization has created a team of | 11   decisions in terms of what needed, what didn't -- his |
| 12  four to review the Trump Organization's insurance program, | 12   background is he came from the City Parks Department and so he |
| 13  insurance policy buying decisions, claims management and risk | 13   had a good understanding of casualty risk. |
| 14  protection protocols." | 14   Q   And then you're the fourth person in this box, yes? |
| 15       Is this an accurate description that it was the Trump | 15   A   Correct. |
| 16  Organization that created the "team of four" or "gang of four" | 16   Q   And what does that mean, "coverage terms and |
| 17  as you referred to it just a moment ago? | 17   conditions" associated with your role? |
| 18  A   Yes. | 18   A   It sort of encompasses the other boxes whereby we |
| 19  Q   And then it states that the "team of four and each | 19   needed to make sure that the coverage terms were advantageous to |
| 20  member's role is outlined below."  Do you see the box in the | 20   the Trump Organization and the conditions of the insurance |
| 21  middle of the page there? | 21   properly insured the assets. |
| 22  A   I do. | 22       (Continued on the next page.) |
| 23  Q   First it identifies Allen Weisselberg, he was the | 23 |
| 24  executive vice-president and CFO of the Trump Organization, yes? | 24 |
| 25  A   Correct. | 25 |

NYS Attorney General v.
Donald Trump, et al.

William Kelly, Michael Cohen
October 24, 2023

| M. Cohen - Plaintiff - direct (Faherty) | Page 2240 |
|---|---|

1    Q    You can put that to the side.  Thank you.
2         Are you aware if the Statement of Financial Condition,
3    we talked a little bit about it, whether the statements of
4    financial condition were ever presented during any of the
5    gang-of-four meetings with underwriters?
6    A    Yes.
7    Q    What is your understanding as to when the Statement of
8    Financial Condition would be shared in these gang-of-four
9    meetings with underwriters?
10   A    Pamela Newman would set up a meeting that would include
11   various different insurance company executives and we would meet
12   in one of the conference rooms across the table from one another
13   and Allen would provide each and every one of them with a copy
14   -- a bound copy of the Statement of Financial Condition.
15        Once again, they were told that they can copy, they can
16   take notes off of it, but they cannot keep the original
17   document.
18   Q    So insurance underwriters were provided the statements
19   of financial condition by Allen Weisselberg, yes?
20   A    Yes, that was the word I was looking for, underwriter.
21   Q    And those underwriters were permitted to review those
22   statements, yes?
23   A    Encouraged to.
24   Q    And take notes?
25   A    Yes.

| M. Cohen - Plaintiff - direct (Faherty) | Page 2241 |
|---|---|

1    Q    On the information contained in those statements; is
2    that correct?
3    A    That's correct.
4    Q    I'd like to show you another document.
5         MS. FAHERTY:  Your Honor, I'm handing up to the
6    witness a document we've marked as Plaintiff's Exhibit
7    PX-588.
8    Q    And I'll represent to you, Mr. Cohen, this is the way
9    this document was provided to us.  It's four pages, but I think
10   the first two pages are identical to the second two pages, so if
11   you want to take a moment to review, I'll just focus your
12   attention on those first two pages, please.
13        Okay.  Do you see this document in front of you?  It's
14   on a letterhead "AON," right?  You see that in the upper right
15   hand corner?
16   A    Correct.
17   Q    And there is a heading, "Agenda, "The Trump
18   Organization LLC D&O Underwriting Meeting," dated Tuesday,
19   January 10, 2017, 10:00 a.m. and 11:00 a.m..
20        And is that the address of the Trump Organization, 725
21   Fifth Avenue?
22   A    It is.
23   Q    And then there is a -- in the center of the page, a
24   header "Attendees."  Do you see that there?
25   A    Yes.

| M. Cohen - Plaintiff - direct (Faherty) | Page 2242 |
|---|---|

1    Q    And under the heading "Trump Organization," is that
2    your name listed there?
3    A    It is.
4    Q    And the other names Allen Weisselberg, Matthew
5    Calamari, Ron Leiberman.  That's the gang of four, yes?
6    A    Correct, the group of four.
7    Q    Group of four.
8         And then George Sorial, he's an employee of the Trump
9    Organization?
10   A    He is.
11   Q    How about Adam Rosen?
12   A    Yes.
13   Q    And what about Patrick Birney?
14   A    Yes.
15   Q    And there is another subheading, "AON."  Do you see
16   that there?
17   A    I do.
18   Q    Pam Newman, that's who we've been speaking about?
19   A    Yes.
20   Q    She was the broker?
21   A    Yes.
22   Q    And Regina Degnan, do you recognize that name?
23   A    I do.
24   Q    Who is Regina Degnan?
25   A    She was Pamela's executive vice president.  Ultimately

| M. Cohen - Plaintiff - direct (Faherty) | Page 2243 |
|---|---|

1    took her book of business when Pam retired.
2    Q    And fair to say Pam Newman was the relationship partner
3    at AON?
4    A    Yes.
5    Q    And Regina then succeeded her as the relationship
6    partner for the Trump Organization's relationship program?
7    A    Correct.
8    Q    Do you recognize the name John Vanasco?
9    A    I do.
10   Q    How do you recognize that name?
11   A    From the meetings.
12   Q    Okay.  And what about Michael Fetchko.  Do you
13   recognize that name?
14   A    I don't.
15   Q    Any reason to doubt that Mr. Fetchko was an employee of
16   AON?
17   A    No.
18   Q    Okay.  And then under that subheading there is another
19   subheading, "markets."  Do you have an understanding of the
20   markets?
21   A    They're talking about the various different insurance
22   markets because the Trump Organization is comprised of many
23   different assets and many different classes.
24   Q    So is this an example of an agenda for Trump
25   Organization D&O Underwriting Meeting that occurred at the Trump

FILED: NEW YORK COUNTY CLERK 11/15/2023 09:47 AM INDEX NO. 452564/2022
NYSCEF DOC. NO. 1637                                        RECEIVED NYSCEF: 11/15/2023

NYS Attorney General v.                                        Page 18 of 32
Donald Trump, et al.                          William Kelly; Michael Cohen
                                                          October 24, 2023

| M. Cohen - Plaintiff - direct (Faherty) | Page 2244 |
| --- | --- |

1  Organization on Tuesday, January 10, 2017?
2   A  Yes.
3   Q  Okay.
4      MS. FAHERTY: Your Honor, I move to admit this into
5  evidence.
6      THE COURT: Granted. It's in.
7      (Whereupon, the item previously referred to is
8  received and marked Plaintiff's Exhibit Number 588 in
9  evidence.)
10  Q  Do you have a specific recollection of recalling this
11  underwriting meeting, Mr. Cohen?
12  A  No, ma'am.
13  Q  Any reason to doubt that you didn't have an underwrite
14  -- D&O underwriting meeting on Tuesday, January 10, 2017?
15  A  No.
16  Q  Involving Everett?
17  A  No.
18  Q  Or HCC?
19  A  No.
20  Q  Okay. And just drawing your attention to the second
21  page of this agenda. Looking in the middle of this "questions,
22  discussions, topics agenda," do you see in the middle of the
23  page there is a subtopic "financial?"
24  A  I do.
25  Q  Is this a reference to the conversation we were having

| M. Cohen - Plaintiff - direct (Faherty) | Page 2245 |
| --- | --- |

1  a short while ago that underwriters would add as part of the
2  agenda wanting to see financials in connection with quoting
3  premiums for the Trump insurance program?
4   A  Yes.
5   Q  Okay.
6      MS. FAHERTY: We can put that to the side.
7   Thank you.
8   Q  And was Mr. Trump ever involved in these group of four
9  insurance meetings?
10  A  Yes.
11  Q  Describe that for me.
12  A  In two different ways: First way, would be on rare
13  occasion we would go to his office to discuss an insurance
14  issue, but for the most part about three quarters of the way
15  through the meeting Mr. Trump would then come in and there would
16  be a conversation about his extensive net worth, he's actually
17  richer than the insurance companies, "maybe we should go self
18  insured. We got to get a good premium."
19  Q  And would Mr. Trump ever appear at these meetings
20  talking about his net worth to the underwriters themselves?
21  A  Yes. That's what I was referring to three quarters
22  through the meeting he would generally show up.
23  Q  And would you coordinate these gang-of-four meetings
24  such that Mr. Trump could arrange to arrive like that?
25  A  It was coordinated that he would arrive like that.

| M. Cohen - Plaintiff - direct (Faherty) | Page 2246 |
| --- | --- |

1      MS. FAHERTY: Can we do 3166?
2      I'm going to ask Tommy to pull Exhibit 3166.
3      Tommy, my mistake. You don't have it.
4      Your Honor, I've marked for identification
5  plaintiff's PX 3166. I've handed it up to the witness.
6   Q  Mr. Cohen, I'll give you a moment to review that
7  document and let me know when you're ready.
8      MR. KISE: Your Honor, just briefly, what was the
9  last exhibit number? Was that in evidence, the one right
10  before this? What was the last exhibit? I'm sorry.
11      MS. FAHERTY: 588.
12      MR. KISE: 588, okay. Thank you.
13      MS. FAHERTY: And that was already in.
14      MR. KISE: It was already in, right.
15      MS. FAHERTY: Your Honor, I move to admit
16  Plaintiff's Exhibit 588.
17      THE COURT: Was it already in or wasn't it?
18      MS. FAHERTY: Apparently it wasn't already in. I
19  misunderstood.
20      THE COURT: It's now admitted into evidence.
21      MS. FAHERTY: Thank you, Your Honor. I appreciate
22  it.
23      MR. KISE: Thank you.
24      (Whereupon, the item previously referred to is
25  received and marked Plaintiff's Exhibit Number 588 in

| M. Cohen - Plaintiff - direct (Faherty) | Page 2247 |
| --- | --- |

1  evidence.)
2      THE COURT: The witness just going to take a little
3  motion break I'll call it. Says it will be a minute.
4      THE COURT OFFICER: Witness returning. Come to
5  order.
6      THE WITNESS: Thank you, Your Honor.
7      THE COURT: You're welcome. Let's continue.
8      MS. FAHERTY: Thank you.
9      THE WITNESS: Apologies.
10  Q  It's okay.
11      Did you have a moment to review the document in front
12  of you, Mr. Cohen?
13  A  I did.
14  Q  And looking at the top of this e-mail, it is from
15  SariRudman@AON.com.
16      Do you have any understanding as to who Sari Rudman is?
17  A  Yes.
18  Q  Who is that?
19  A  She also worked for Pam Newman at AON.
20  Q  And this is an e-mail sent on March 19, 2013. Again,
21  it's sent to the group of four, yes?
22  A  Correct.
23  Q  And there is a copy here to an individual named Rhona
24  Graff. Do you recognize that name?
25  A  I do.

| M. Cohen - Plaintiff - direct (Faherty)    Page 2248 | M. Cohen - Plaintiff - direct (Faherty)    Page 2250 |
|---|---|
| 1 Q Who is Rhona Graff?<br>2 A Mr. Trump's executive assistant.<br>3 Q Okay. How about the e-mail address<br>4 HLorenzo@Trumporg.com?<br>5 A That would be Holly Lorenzo.<br>6 Q Do you have any understanding as to who Ms. Lorenzo is?<br>7 A Yes.<br>8 Q Who is that?<br>9 A That's one of Mr. Trump's assistants. She was the<br>10 assistant for the executive assistant.<br>11 Q She was an assistant for Ms. Graff?<br>12 A Yes.<br>13 Q Thank you for the clarification.<br>14 And Ms. Newman? We spoke about her, yes?<br>15 A Correct.<br>16 Q Okay. And the subject of this e-mail is a forward<br>17 "Property casualty marketing meetings re: 2013 renewal-Tuesday,<br>18 April 9, 2013 at 3:00 p.m.-at The Trump Organization," yes?<br>19 A That's what it says, yes.<br>20 Q And in the body of this message, it says:<br>21 "Dear, gentlemen. Please note in your calendar Rhona<br>22 has kindly secured Mr. Trump's availability for Tuesday,<br>23 April 9, 2013 at 3:00 p.m. at the Trump Organization, 25th<br>24 floor. We will provide a list of all attendees in an agenda and<br>25 meeting purpose. Best, Pamela." Do you see that there? | 1 evidence.<br>2 THE COURT: Granted. It's in evidence.<br>3 (Whereupon, the item previously referred to is<br>4 received and marked Plaintiff's Exhibit Number 3166 in<br>5 evidence.)<br>6 MR. KISE: Statute of limitations, Your Honor.<br>7 THE COURT: Overruled. Did we get an answer? I'll<br>8 ask Ms. Faherty. Did he answer all your questions?<br>9 MS. FAHERTY: He answered my question.<br>10 THE COURT: No reason to dispute etc., etc.<br>11 THE WITNESS: And my answer was no.<br>12 THE COURT: No, okay.<br>13 MS. FAHERTY: Thank you, Your Honor.<br>14 THE COURT: Sure.<br>15 Q Mr. Cohen, I want to turn your attention to the Buffalo<br>16 Bills. You made mention of it earlier, okay?<br>17 A Correct.<br>18 Q All right. Do you recall who was involved in that<br>19 process with you from the Trump Organization?<br>20 A Mr. Trump, Allen Weisselberg and myself.<br>21 Q Anyone else? How about Jason Greenblatt?<br>22 A Yes, Jason Greenblatt.<br>23 Q What about Ivanka Trump?<br>24 A Not that I recall.<br>25 Q Okay. Did you work with Deutsche Bank on the process? |
| M. Cohen - Plaintiff - direct (Faherty)    Page 2249 | M. Cohen - Plaintiff - direct (Faherty)    Page 2251 |
| 1 A I do.<br>2 Q Is this the matter in which you will confirm<br>3 Mr. Trump's attendance at these insurance group of four<br>4 meetings?<br>5 A No.<br>6 Q Tell me what this.<br>7 A This was obviously Pam Newman's acknowledgement<br>8 Mr. Trump was going to appear, but we didn't need even this<br>9 letter to have already discussed that he would make the<br>10 appearance three quarters of the way through the meeting.<br>11 Q But this is an example that Mr. Trump did in fact have<br>12 it scheduled to appear for a Trump underwriting meeting, yes?<br>13 A Yes.<br>14 MR. KISE: Objection. Leading.<br>15 THE COURT: Sustained.<br>16 Q No reason to dispute that this is the -- this e-mail<br>17 identifies Mr. Trump's attendance of the Trump Organization<br>18 meeting?<br>19 MS. HABBA: That was leading. Objection.<br>20 THE COURT: Could you read that back?<br>21 (Whereupon, the requested portion of the<br>22 proceedings was read back by the court reporter.)<br>23 THE COURT: Overruled.<br>24 MS. FAHERTY: You can put that down.<br>25 And Your Honor, I actually move to admit this into | 1 MR. KISE: Objection. What process?<br>2 Q We turned our attention to the Buffalo Bills.<br>3 So what, if anything, do you recall about Deutsche<br>4 Bank's involvement in the attempt to purchase the Buffalo Bills?<br>5 A We had had a meeting in Mr. Trump's office with members<br>6 of Deutsche Bank's team for the purpose of securing a loan that<br>7 would be predicated off of his assets so that we could acquire<br>8 the -- or at least put in a bid to acquire the Buffalo Bills.<br>9 There is an interesting NFL scenario where you cannot<br>10 have more than ten percent of an NFL team financed --<br>11 MR. KISE: Objection. Move to strike the last<br>12 portion of that answer, Your Honor, unless Mr. Cohen is now<br>13 an expert on NFL acquisitions.<br>14 I mean, I represented, George Steinbrenner in 1995<br>15 in connection with the Tampa Bay Buccaneers purchase, but<br>16 I'm not an expert on that. I'm not sure if Mr. Cohen is an<br>17 expert on NFL acquisitions, but the last port portion of his<br>18 nonresponsive.<br>19 THE COURT: If it was nonresponsive that would be<br>20 my objection.<br>21 Sustained on the ground of nonresponsive, the last<br>22 part of it, the ten percent rule.<br>23 MS. FAHERTY: Understood.<br>24 Q Let's look at some documents. Maybe that will help the<br>25 conversation. |

NYS Attorney General v.
Donald Trump, et al.

William Kelly, Michael Cohen
October 24, 2023

---

| M. Cohen - Plaintiff - direct (Faherty) | Page 2252 |

1   A   Sure.
2       MS. FAHERTY: Your Honor, I've marked as
3  plaintiff's next exhibit PX 3159.
4   Q   Drawing your attention, Mr. Cohen, to the document on
5  your screen. Do you see that this is a message from
6  ITrump@Trumporg.com. Who do you understand that e-mail address
7  to be?
8   A   That's Ivanka Trump's e-mail address.
9   Q   And this e-mail is dated July 27, 2013 at 3:30 p.m.,
10  yes?
11   A   Correct.
12   Q   It's addressed to Jason Greenblatt?
13   A   It is.
14   Q   Allen Weisselberg?
15   A   Yes.
16   Q   And you?
17   A   Yes.
18   Q   This appears to be a forward with an attachment and the
19  attachment is titled, "DB to Morgan Stanley letter, (clean
20  version 2) 72514 [1].docx." Do you see that there?
21   A   I do.
22   Q   And the underlying message is a forward from Ivanka
23  Trump to Rosemary Vrablic dated July 26, 2014. Do you see that
24  there?
25   A   I do.

---

| M. Cohen - Plaintiff - direct (Faherty) | Page 2253 |

1   Q   Do you have any understanding as to whom Rosemary
2  Vrablic is?
3   A   She is an employee at Deutsche Bank.
4   Q   And what, if any, title did Ms. Vrablic have at
5  Deutsche Bank as it concerned the Trump Organization?
6   A   She was -- well, she is an executive at Deutsche Bank,
7  but she has a long history with Mr. Trump.
8   Q   Was she a relationship partner at Deutsche Bank to your
9  understanding?
10   A   Yes.
11   Q   Okay. And in Ms. Trump's message that she forwarded to
12  you and others, it states: "Hi, Rosemary. Thank you for
13  providing this draft confidence letter."
14       What is your understanding of a draft confidence
15  letter?
16   A   It was needed in order to get the process started.
17   Q   And what process are you referring to?
18   A   The process of putting in a bid to obtain the Buffalo
19  Bills.
20       THE COURT: Five-minute warning.
21       MS. FAHERTY: Yes, Your Honor.
22   Q   And the message continues: "I have inserted a couple
23  of comments and suggestions. Please see what you can do. I
24  will call you in the a.m. to discuss." Do you see that there?
25   A   I do.

---

| M. Cohen - Plaintiff - direct (Faherty) | Page 2254 |

1   Q   And in drawing your attention to the following page of
2  this document, the very top says, "Draft (DB letterhead)."
3       Do you see that there?
4   A   I do.
5   Q   Dated "July blank, 2014," yes?
6   A   Correct.
7   Q   And it appears that there is an addressee, Morgan
8  Stanley. Do you have any understanding as to why Morgan Stanley
9  is listed there?
10   A   Morgan Stanley was handling the sale.
11   Q   Of the Buffalo Bills?
12   A   Of the Buffalo Bills.
13   Q   Okay. And the address is blank, the attention is
14  blank, yes?
15   A   Correct.
16   Q   But it states "re: Mr. Donald Trump," yes?
17   A   Correct.
18   Q   And there is some language in the center here.
19       MS. FAHERTY: We can zoom out a little bit so we
20  can put the full letter up.
21   Q   Okay. And there is a second page to this letter. Do
22  you see in the capital -- all caps at the top of the second page
23  it states, "Can you not replace the whole following paragraph
24  with the below statement. It says the same thing without this
25  overkill belt" and it states "supenders" [sic]. I think that's

---

| M. Cohen - Plaintiff - direct (Faherty) | Page 2255 |

1  supposed to be "suspenders" --
2       THE COURT: I'm sure it is.
3   Q   Language. Do you see that there?
4   A   I do.
5   Q   Do you recall including language like this as an edit
6  to a Deutsche Bank financial wherewithal letter?
7   A   No.
8       MR. KISE: Objection.
9   Q   Any reason to dispute that you received this forward
10  from Ivanka Trump that included her edits to a letter to
11  Deutsche Bank?
12   A   Well, her requested edits to the letter and yes, it
13  came to my e-mail address.
14       MS. FAHERTY: Your Honor, I move to admit this into
15  evidence.
16       THE COURT: Granted. It's in.
17       (Whereupon, the item previously referred to is
18  received and marked Plaintiff's Exhibit Number 3159 in
19  evidence.)
20       MR. KISE: Your Honor, not only is it statute of
21  limitations. I'm just wondering -- I object on relevance
22  grounds. What does this have to do with anyone in the case?
23  Ms. Trump is no longer a party to the case and this
24  transaction as far as I know it doesn't form the basis for
25  any cause of action that's in the complaint at all, so I'm

---

NYS Attorney General v.
Donald Trump, et al.

William Kelly; Michael Cohen
October 24, 2023

Page 21 of 32

---

**M. Cohen - Plaintiff - direct (Faherty)**     Page 2256

1  not sure why we're talking about the Buffalo Bills other
2  than it does generate some press interest. I'm sure this is
3  the Buffalo Bills.
4      THE COURT: You know, I think Mr. Cohen referred to
5  Buffalo Bills many times and I'm thinking that's the
6  football team, right? Without saying the football team.
7  What's the relevance?
8      MS. FAHERTY: Your Honor, they're writing to
9  Deutsche Bank to get financing, they're providing comfort to
10  the bank to get financing, they're making financial
11  representations connection with the purchase of the Buffalo
12  Bills. It is an aspect of our complaint and the Attorney
13  General intends to prove the allegations within our
14  complaint. So this is square within the case that we have
15  brought. It is a continued pattern of fraud.
16      MR. KISE: There is no transaction at all
17  associated with it. Nothing ever happened and it's not --
18  it doesn't form the basis for any of the counts.
19      The counts are connected to loan transactions that
20  were actually consummated loan transactions and insurance
21  transactions and insurance policies. This is just simply a
22  free-for-all on anything that everyone went out at anytime
23  and place and where -- and Ms. Trump who sent this e-mail is
24  no longer a party to the case. So not only is it outside
25  the statute of limitations, but it just simply has nothing

---

**M. Cohen - Plaintiff - direct (Faherty)**     Page 2257

1  to do with the claims asserted in the complaint.
2      I realize there is 200-something pages and
3  800-something paragraphs and one of those paragraphs makes
4  some drive by mention of the Buffalo Bills. I do realize
5  that, but that doesn't make it relevant in this trial
6  proceeding now that the issues have been narrowed and the
7  case has been joined.
8      THE COURT: I think we can all agree that Mr. Trump
9  never owned the Buffalo Bills; right?
10      MS. FAHERTY: We can agree that that did not come
11  to fruition, Your Honor, yes.
12      THE COURT: Nevertheless, I will admit it as
13  possible evidence of pattern and practice of the
14  organization back at that time generally speaking and the
15  witness himself was on this. If it's not relevant, it's not
16  relevant, but I think it is anyway, so.
17      MS. FAHERTY: Your Honor, it might be a good moment
18  for a break.
19      THE COURT: Did we get an answer to the last
20  question?
21      MS. FAHERTY: I thought we did.
22      MR. SOLOMON: Yes.
23      THE COURT: All right. Ten-minute break. We'll
24  see you in 15 minutes.
25      (Whereupon, there is a recess in the proceedings.)

---

    Page 2258

1      Transcript continues on the following page....
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY)**     Page 2259

1      THE OFFICER: Come to order. Part 37 is back in
2  session. Please be seated and come to order.
3      THE COURT OFFICER: Witness entering.
4      (Witness resumes the stand.)
5      THE COURT: Okay. Please proceed.
6      MS FAHERTY: Thank you, Your Honor. I'd like to
7  hand up to the witness a document that I've marked for
8  identification as PX-3276.
9  Q  Mr. Cohen, I ask you to take a minute and look at the
10  document in front of you and then I'll ask you a question.
11      (Witness reviewing document.)
12  Q  Mr. Cohen, this document is an e-mail from Jason
13  Greenblatt to you, Ivanka Trump and Allen Weisselberg, yes?
14  A  Correct.
15  Q  Dated July 29, 2014?
16  A  Correct.
17  Q  With the subject "executed Buffalo Bills bid-related
18  documents," yes?
19  A  Yes.
20  Q  And then there appear to be a series of attachments in
21  included with this document?
22  A  Correct.
23  Q  And Mr. Greenblatt's message says, "All, FYI, attached
24  are copies of the documents executed today in connection with
25  the bid made by DJT." Do you have any understanding as to who

---

NYS Attorney General v.
Donald Trump, et al.

William Kelly; Michael Cohen
October 24, 2023

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2260 |
| --- |

1 DJT is?
2 A Donald J. Trump.
3 Q "For the Buffalo Bills." He then goes on to state,
4 "Items 1, 2, 3 submitted to Morgan Stanley. Items 4-5 are
5 documents between Trump and DB." Any understanding as to who DB
6 is?
7 A Deutsche Bank.
8 Q "(And were not submitted to Morgan Stanley)."
9 Do you see that there?
10 A I do.
11 Q And item number one appears to be a letter from DJT.
12 Donald J. Trump, yes?
13 A That's what it says, yes.
14 Q To Morgan Stanley?
15 A Yes.
16 Q Then two is "owner background form," correct?
17 A Correct.
18 Q And three is a letter from Deutsche Bank to Morgan
19 Stanley, yes?
20 A Yes.
21 Q And those were the three items submitted to Morgan
22 Stanley?
23 A Correct.
24 Q And then four and five, number four is a certification
25 of the financial position of DJT or Donald J. Trump, yes?

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2261 |
| --- |

1 A Yes.
2 Q Executed by J. McConney. Do you understand who J.
3 McConney is?
4 A Yes.
5 Q Who is that?
6 A Jeffrey McConney.
7 Q Item five is an executed letter from Deutsche Bank to
8 Donald J. Trump, "Re: No waiver of Deutsche Bank/Trump loan
9 terms," yes?
10 A Yes.
11 Q And do you recall putting documents together in
12 connection with the Buffalo Bills bid?
13 A I remember seeing these documents.
14 Q And this was something that you worked on when you were
15 at the Trump Organization, yes?
16 A Correct.
17 Q Turning your attention to the first attachment then,
18 I'll ask you to turn the page of this exhibit. This appears to
19 be a Trump Organization letterhead, yes?
20 A That's correct.
21 Q And this letter is dated July 29, 2014, yes?
22 A Yes.
23 Q Do you recall the name K. Don Cornwell?
24 A I recall the name.
25 Q Who do you understand K. Don Cornwell to be?

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2262 |
| --- |

1 A Managing director of Morgan Stanley. He was the
2 individual that was compiling all the bids on behalf of the
3 Buffalo Bills.
4 Q And so this is a letter -- and if we could just pull
5 back and turn to the second page of this letter. Do you
6 recognize the signature on this letter addressed to K. Don
7 Cornwell dated July 29, 2014?
8 A Yes.
9 Q Whose signature do you recognize that to be?
10 A Donald J. Trump.
11 Q And there's a title underneath the word "sincerely."
12 It is "Trump Acquisition, LLC." Do you see that there?
13 A I do.
14 Q The letterhead of this letter, however, is the Trump
15 Organization. What is the connection between the Trump
16 Organization and Trump Acquisition, LLC?
17 A It is a subsidiary for new acquisitions. They would do
18 it under its own specific LLC.
19 Q Was it still an entity contained under the umbrella of
20 the Trump Organization to your understanding?
21 A To my understanding, yes.
22 Q And you stated that's Donald J. Trump's signature, yes?
23 A Yes.
24 Q Now, turning back to the first letter, first page of
25 the letter, the first paragraph states, "Please let this letter

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2263 |
| --- |

1 serve to represent my bid to purchase the Buffalo Bills football
2 team for $1 billion."
3 Do you recall the bid made to purchase the Buffalo
4 Bills for $1 billion in 2014?
5 A $1 billion, yes.
6 Q Turning to the next paragraph, the letter continues, "I
7 have a net worth in excess of $8 billion (financial statements
8 to be provided upon request), comprised of substantial cash
9 balances, highly liquid assets (including Class A real estate)
10 and very little debt." Do you recall seeing that?
11 A I do.
12 Q Do you recall a representation made by Mr. Trump in
13 connection with his bid to buy the Bills asserting a net worth
14 in excess of $8 billion?
15 MR. KISE: Objection. In addition to this document
16 or this document?
17 THE COURT: I think that's a fair question. So
18 let's make the question more specific. By fair question, I
19 meant Mr. Kise's question.
20 Q Do you recall Mr. Trump, separate and apart from this
21 letter, making a representation that he had a net worth in
22 excess of $8 billion in connection with his attempt to purchase
23 the bills?
24 A Yes.
25 Q And that is reflected here in this letter, yes?

NYS Attorney General v.
Donald Trump, et al.

William Kelly, Michael Cohen
October 24, 2023

| M. COHEN - PLAINTIFF - DIRECT (MS. FAHERTY) Page 2264 | M. COHEN - PLAINTIFF - DIRECT (MS. FAHERTY) Page 2266 |
|---|---|
| 1   A   Yes. | 1   A   Correct. |
| 2   Q   And then this letter also states in the following | 2   Q   You will recall that Mr. Greenblatt's cover e-mail |
| 3   paragraph, "I'm enclosing a letter from Deutsche Bank which | 3   suggested that there are two other documents attached that were |
| 4   indicates my financial strengths, both from a liquidity and | 4   just transmitted to Deutsche Bank, right? |
| 5   asset value standpoint, and confirming that I have the financial | 5   A   Correct. |
| 6   capability to consummate the transaction, yes? | 6   Q   Turning your attention to the next page of this |
| 7   A   That's what it says. | 7   document, do you recognize the signature on the bottom of this |
| 8   Q   And this was submitted to Mr. Don Cornwell at Morgan | 8   page titled, "Certification of the Financial Position of Donald |
| 9   Stanley in connection with the Buffalo Bills bid, yes? | 9   J. Trump "? |
| 10   A   Yes. | 10   A   Yes. |
| 11   Q   And then I'll draw your attention to -- we'll skip the | 11   Q   Whose signature do you recognize that to be? |
| 12   background form which is the second attachment to this letter. | 12   A   That's Jeff McConney. |
| 13   So let's go to the third document that was attached to this | 13   Q   The Jeffrey McConney that we spoke about before? He |
| 14   letter and submitted to Morgan Stanley.  Go to page 17 of 22. | 14   worked in the accounting department at the Trump Organization? |
| 15       And this is a letter from Rosemary Vrablic, managing | 15   A   Yes, the controller. |
| 16   director at Deutsche Bank.  That was the relationship partner we | 16   Q   The controller? |
| 17   spoke about before, yes? | 17   A   Yes. |
| 18   A   Correct. | 18   Q   And if you see in that very first paragraph, it states, |
| 19   Q   Dated July 29, 2014? | 19   "I, Jeffrey McConney, controller;" is that right? |
| 20   A   Yes. | 20   A   That's correct. |
| 21   Q   Also addressed to Mr. Cornwell at Morgan Stanley? | 21   Q   And there are certain numbers included in here that |
| 22   A   Yes. | 22   "DT's current liquidity is approximately 310 million."  Do you |
| 23   Q   Drawing your attention to the first paragraph, do you | 23   have an understanding as to who DT is? |
| 24   recall that Deutsche Bank submitted a letter stating that they | 24   A   Donald Trump. |
| 25   have been asked by Mr. Donald J. Trump to provide this letter in | 25   Q   And then it states in paragraph B, "There has been no |

| M. COHEN - PLAINTIFF - DIRECT (MS. FAHERTY) Page 2265 | M. COHEN - PLAINTIFF - DIRECT (MS. FAHERTY) Page 2267 |
|---|---|
| 1   connection with his bid for the acquisition of the Buffalo Bills | 1   material decrease (in excess of 10%) in the aggregate value of |
| 2   of the National Football League (the transaction)? | 2   his illiquid assets since the financials were reported to |
| 3   A   Yes. | 3   Deutsche Bank as of June 30, 2013 that were certified by DT, |
| 4   Q   And drawing your attention to the third paragraph, the | 4   Donald Trump, on October 30, 2013," yes? |
| 5   letter reads, "Our understanding is that Mr. Donald J. Trump has | 5   A   That's what it says. |
| 6   made, or intends to make a bid for the Buffalo Bills in the | 6   Q   And those financials, do you have any understanding as |
| 7   amount of $1 billion in the aggregate.  Based on our preliminary | 7   to what those financials as of June 30, 2013 are? |
| 8   review of the current financial information of Mr. Donald J. | 8   A   The assets described in the Statement of Financial |
| 9   Trump made available to us, including liquidity and asset value, | 9   Condition. |
| 10   it is our assessment that Mr. Donald J. Trump would have the | 10       MS. FAHERTY: Your Honor, I move to admit this |
| 11   financial wherewithal to fund his bid." Do you see that there? | 11   document and the exhibits into evidence. |
| 12   A   I see that. | 12       MR. KISE: Your Honor, I'm not sure where to begin, |
| 13   Q   What, if anything, do you understand Deutsche Bank to | 13   but I'll start with statute of limitations. |
| 14   have reviewed to make this statement, "Based" on our preliminary | 14       THE COURT: Overruled. |
| 15   review of current financial information of Mr. Donald J. Trump | 15       MR. KISE: I know where you are going on that, but |
| 16   made available to us"? | 16   again, I'm not sure of the relevance of any of these |
| 17   A   The Statement of Financial Condition. | 17   documents to the proceeding.  I mean, is it the government's |
| 18   Q   And if we turn the page, you'll see that this document | 18   intention to establish that President Trump did not have the |
| 19   is signed.  Does that appear to be the signature of Rosemary | 19   financial capability to consummate the transaction?  Unless |
| 20   Vrablic of Deutsche Bank? | 20   they are going to connect this up somehow with some actual |
| 21   A   I don't know her signature, but yes, it says Rosemary | 21   alleged fraudulent activity, there's no -- there's no |
| 22   T. Vrablic. | 22   transaction that was ever consummated. |
| 23   Q   No reason to doubt that that's her signature, right? | 23       And in order to demonstrate that there's anything |
| 24   A   No. | 24   false or fraudulent here about this, we have to go into an |
| 25   Q   There is a copy here.  Is that for Mr. Donald J. Trump? | 25   entire, which we can, I guess if we are going to be here |

FILED: NEW YORK COUNTY CLERK 01/05/2023 09:47 AM INDEX NO. 452564/2022
NYSCEF DOC. NO. 1637     RECEIVED NYSCEF: 01/05/2023

Page 24 of 32

NYS Attorney General v.
Donald Trump, et al.

William Kelly, Michael Cohen
October 24, 2023

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2268 |
|---|

1   until next March, an entire analysis whether he had the
2   financial capability to consummate the transaction. The
3   documents are all hearsay, so I'm wondering what purpose
4   they're being offered for. What are we proving? What
5   relevance, what fact at issue that is material to the issues
6   before the Court is being established by this because on its
7   face, there's nothing to indicate that President Trump
8   didn't have the financial ability to consummate the
9   transaction and Deutsche Bank says itself based on their own
10   assessment, they say that he did.
11     So are we going to go down this path? This is the
12   danger of these hypothetical transactions that never took
13   place and they need to be more connected to some actual
14   cause of action.
15     THE COURT: Jeffrey McConney, who I believe the
16   witness has testified, signed the letter, submitted the
17   certification. He is a defendant, right?
18     MR. KISE: He is.
19     THE COURT: And whether everything in this document
20   is accurate or not, I think is a factual issue.
21     MR. KISE: Well, but if it is a factual issue, then
22   we have to go through whole society of facts and whether he
23   had the financial ability to consummate the transaction. It
24   doesn't just come in because it is a statement and then the
25   government gets to assume that there is some falsity here.

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2269 |
|---|

1   They are going to have to establish all of that which is why
2   it needs to be connected to some actual cause of action.
3     THE COURT: Do you plan to establish all that?
4     MS. FAHERTY: We do, Your Honor. I think that the
5   evidence has come in that it has established a significant
6   number of the facts relevant to the evidence we're putting
7   forward. I am concerned that there is an unnecessary
8   objection here. He's given testimony about this
9   transaction. We're seeing information about financials that
10   are being proffered in order to receive the benefit.
11     This is our case. Because the fraud was not fully
12   perpetrated does not mean it is not relevant to the
13   allegations made by the Attorney General. This is a
14   pattern and practice. There are co-defendants here. There
15   is a plethora of reasons why this evidence comes in, Your
16   Honor, respectfully.
17     MR. KISE: Your Honor, the entirety of Ms.
18   Faherty's presentation presumes the ultimate question. I'm
19   back to my point that they're presuming that there is some
20   fraudulent activity here without actually establishing that
21   he did not have the financial capability to consummate the
22   transaction.
23     THE COURT: But that isn't the only statement
24   inherent in this document.
25     MR. KISE: But it is because they're all connected

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2270 |
|---|

1   to that point. I mean, you can't just say that. Are we
2   going to debate whether his current liquidity was 310
3   million in 2014? I think it has already been established.
4   If this one piece they're focusing on right now, that's up
5   on the screen, but it is all part of one exhibit that
6   relates to no transaction that was ever consummated.
7   There's no connectivity to anything that's at issue.
8     It doesn't go to the element without establishing
9   that he did not, in fact, have the financial capability to
10   consummate the transaction which I would disagree with Ms.
11   Faherty. That has not been established. We don't know
12   that. I mean, there is certainly no evidence that would
13   indicate that he did or did not. I mean, with the evidence
14   that is before the Court as to this transaction, it
15   certainly seems sufficient that he had the financial
16   wherewithal to buy more than one NFL team. I mean, at the
17   time. That's what I'm saying.
18     Are we going to go down this path of debating
19   whether or not there is a truth or falsity here on an issue
20   that doesn't relate to the actual claims and causes of
21   action that are being presented? This is tangential and
22   remote and unless -- Ms. Faherty just admitted she does not
23   plan to connect this up. She's simply saying that the fraud
24   has already been established, that it is already
25   established, that this document is evidence itself of fraud

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2271 |
|---|

1   and I don't see how, how this exhibit is evidence of fraud.
2   He had the financial capability to consummate the
3   transaction and, again, perhaps more than one, maybe two or
4   three. You can't own more than one NFL team as far as I
5   know.
6     THE COURT: Are you testifying as an expert to the
7   NFL?
8     MR. KISE: I am more of an expert on --
9     THE WITNESS: You can't own more than one.
10     THE COURT: As part of this document, I only have
11   the one sheet in front of me now. Wasn't there a statement,
12   a claim that the defendant's net worth was $8 billion?
13     MR. KISE: Yes. Has that been disproved?
14     THE COURT: Well, we don't have to disprove it. We
15   are in the middle of a trial at this point.
16     Do you agree that his net worth was $8 billion at
17   that time?
18     MS. FAHERTY: No.
19     THE COURT: Are you going to try to prove that it
20   wasn't or do you feel you've already proved it wasn't?
21     MS. FAHERTY: For one, Your Honor, the inherent
22   falsity of a Statement of Financial Condition has already
23   been decided by this Court on summary judgment. Those have
24   been determined to be false. I don't think I need to prove
25   up or prove down. Although, there is evidence as to the

FILED: NEW YORK COUNTY CLERK 11/15/2023 09:47 AM 452564/2022

NYSCEF DOC. NO. 1637    RECEIVED NYSCEF: 11/15/2023

NYS Attorney General v.    William Kelly, Michael Cohen
Donald Trump, et al.    October 24, 2023

| M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2272 | M. COHEN - PLAINTIFF - DIRECT(MS. FAHERTY) Page 2274 |
|---|---|

**Page 2272**

1  inherent falsities and values contained in that Statement of
2  Financial Condition that we have put in evidence in this
3  trial and will continue to do so. So yes, we are continuing
4  to prove our case, Your Honor, and connect all of those
5  dots.
6      MR. KISE: But this document is not the Statement
7  of Financial Condition, this document, and I would disagree
8  strongly with Ms. Faherty. I mean, if we are in a place now
9  where the statements are irretrievably proven false, then
10  without a jury, a trial and now we are going to be
11  here and we're not -- why are we even putting on a defense
12  then if that's already been established? We might as well
13  close it up now. It doesn't make any sense what Ms. Faherty
14  is saying.
15      They have to establish the elements of their claims
16  and they can't simply rely on the fact that well, it's
17  established that it is false and, thereby, that establishes
18  the remainder of their claims. And here, we are not even
19  talking about an actual claim. We're talking about a
20  theoretical claim. It doesn't form the basis for any of the
21  counts that are at issue in the trial. And unless we're
22  going to go down the path, unless the government intends to
23  go down the path of proving up that President Trump, which I
24  don't think they can do that, that President Trump did not
25  have the financial capability to consummate this

**Page 2273**

1  transaction, this document has no relevance at all.
2      THE COURT: Couple of things. It is a non-jury
3  trial, of course. I tend to be somewhat liberal in what I
4  let in. I believe that I am evenhanded about what I'm
5  letting in and what I'm not letting in. I think it's
6  arguably fine, particularly, again, the $8 billion. I
7  don't -- arguably, I don't know whether Mr. Trump did or
8  didn't have the --
9      MR. KISE: But that's precisely the point, Your
10  Honor.
11      THE COURT: Wait. Wait, please. Well, yeah,
12  that's why we're having a trial. I think this
13  tends -- again, arguably tends to show a pattern and
14  practice of broad, to use a loaded term, so the objection is
15  overruled. Let's just move on.
16      MR. KISE: Again, I'm starting to feel like Paul
17  Newman at this point. Every objection is overruled. I
18  mean, this evidence should not come in respectfully. It
19  really shouldn't. There's no indication as to where that
20  even 8 billion -- 8 billion includes brand value. There's
21  so many issues here that again, we're going down this path
22  of litigating something that isn't even relevant to the
23  claims and causes of action before the Court.
24      THE COURT: One other thing. Maybe the only banned
25  word in my courtroom is "again." You don't have to say

**Page 2274**

1  things again. The objection is overruled for the reasons I
2  already stated and the reasons that Ms. Faherty stated.
3  It's duly noted that you strongly object. Let's move on.
4      MS. FAHERTY: One more document, Your Honor.
5      Q   Mr. Cohen, do you recall in connection with the motion
6  to purchase the Buffalo Bills that you attended a meeting in
7  Detroit called a management presentation?
8      A   Yes.
9      Q   Do you recall who was at that meeting in Detroit?
10      A   Myself, Mr. Trump, Jason Greenblatt, Allen Weisselberg,
11  and I don't recall if Ivanka was there.
12      MS. FAHERTY: Your Honor, I handed up to the
13  witness a document we've marked for identification as
14  PX-981.
15      Q   Take a quick look at that document, if you will, Mr.
16  Cohen, and then I'll ask you a quick question.
17      (Witness reviewing document.)
18      A   Yes.
19      Q   Just drawing your attention to the third page, there is
20  an e-mail sent by you to Alex Hill dated July 29, 2014 at
21  3:36 p.m. Do you see that message there?
22      A   I do.
23      Q   And do you recall who Alex Hill (IBD) is?
24      A   I don't recall him specifically.
25      Q   If I said the Morgan Stanley investment banking

**Page 2275**

1  division, would that refresh your recollection as to what IBD
2  stood for?
3      A   Yes. Again, I don't know him.
4      Q   Do you have any understanding that Mr. Hill was an
5  employee at Morgan Stanley?
6      A   Yes.
7      Q   So fair to say that this e-mail is a reflection that
8  you dropped off the bid packet for the Buffalo Bills, yes?
9      A   Correct.
10      Q   And then drawing your attention through the e-mail all
11  the way to the top, this is just a continued e-mail thread,
12  right?
13      A   Correct.
14      Q   You remain on the e-mail chain in this thread, right?
15      A   Correct.
16      Q   And on August 4th, the second message on that first
17  page, there's an e-mail from Alex Hill to you and Jason
18  Greenblatt with a copy to K. Don Cornwell, right?
19      A   Correct.
20      Q   And Mr. Hill says wanted to confirm if the 6th worked
21  for the management presentation. Do you see that there?
22      A   I do.
23      Q   And then following up on the 6th, Mr. Hill writes to
24  you again saying, "Michael, Jason, looking forward to meeting
25  you all today. One near term NFL item we would like you to all

NYS Attorney General v.
Donald Trump, et al.

William Kelly; Michael Cohen
October 24, 2023

---

M. COHEN - PLAINTIFF - DIRECT(MS. HABBA)          Page 2276

1  fill out and have Mr. Trump sign is the attached authorization
2  and consent to release records. If you all could get that back
3  to us home, that would be greatly appreciated. Also, we would
4  like to offer you all the opportunity to tour the
5  newly-modernized Ralph Wilson Stadium the week of the 18th.
6  Please let us know if there is a day that works that week for a
7  trip to Buffalo. Looking forward to meeting you."
8         Does this message reflect that a meeting occurred in
9  Detroit on August 6th in connection with the Buffalo Bills bid
10 package?
11 A   Yes.
12        MS. FAHERTY: Your Honor, I have no further
13 questions on this document and this witness. I would like
14 to move that document into evidence, please.
15        MR. KISE: Same objections, Your Honor. Statute of
16 limitations and relevance.
17        THE COURT: Same ruling. Granted. It is in.
18        (Whereupon, the Document was marked in evidence as
19 Plaintiff's Exhibit 981.)
20        MS. FAHERTY: I rest, Your Honor. Thank you.
21        THE COURT: Well, will there be any
22 cross-examination?
23 CROSS-EXAMINATION BY
24 MS. HABBA:
25 Q   Hello, Mr. Cohen.

---

M. COHEN - PLAINTIFF - DIRECT(MS. HABBA)          Page 2277

1  A   Hello, Ms. Habba.
2  Q   How are you?
3  A   Well. Thank you.
4  Q   We've met a few times, haven't we?
5  A   We have.
6  Q   Do you want me to call you Mr. Cohen today or Michael?
7  I know before, we've changed that up. What are you comfortable
8  with?
9  A   I think Mr. Cohen for the day since we are here in
10 court.
11 Q   I'll be Ms. Habba for the day. So I'm going to ask you
12 a series of questions today. Before I do, first of all, when I
13 do ask you my series of questions and I pace, I move when I am
14 on my feet, so I apologize. I am going to ask you questions
15 that are going to be yes-or-no questions and I'm going to try to
16 keep it that way other than when I ask you to read something, so
17 that we can move this along and make sure we get through
18 everything that's per the judge's instructions, but I will try
19 to make the questions super clear, so we have no issues.
20        Before we start, I want to discuss your health. I'm
21 not going to get into anything that's uncomfortable. I don't
22 really do that, but I need to make sure that you are able to
23 testify completely, clearly and understand what you're doing
24 today.
25        Do you have any health issues particularly at this

---

M. COHEN - PLAINTIFF - DIRECT(MS. HABBA)          Page 2278

1  moment that would cause you a reason to not be able to sit
2  through the testimony under oath in this court today?
3  A   Asked and answered.
4  Q   I forgot that you like to do this. You did this with
5  me in the depositions. Okay.
6         MR. KISE: The judge doesn't like that objection.
7  Q   That's not good. So here is how this is going to go.
8  They get to object. They get to object. We all get to do our
9  thing. You get to answer my questions. The more we do that,
10 this will go better. We are not in a deposition. That's the
11 judge. Ready? Mr. Cohen --
12        THE COURT: Even if you were asked before by a
13 different party particularly, just answer it. It will be
14 quicker.
15 Q   Answer the questions and we will be here until January.
16 Okay.
17        Mr. Cohen, are you on any medication that would affect
18 your ability to testify honestly to me today?
19 A   No.
20 Q   No. Okay. Do you have any medication that would
21 change your method of thinking at this moment, so that you're
22 not clear in any sort of way?
23 A   No.
24 Q   So you are fully prepared to testify to me today?
25 A   Yes.

---

                                                  Page 2279

1  Q   Under oath?
2  A   Yes.
3  Q   And you understand what "under oath" means? Is that
4  right, Mr. Cohen?
5  A   Yes.
6         (Continued on the next page.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

NYS Attorney General v.
Donald Trump, et al.

William Kelly, Michael Cohen
October 24, 2023

| M. Cohen - Plaintiff - cross (Habba) | Page 2280 |
|---|---|

1  Q  Good. And you've been deposed, even by me, many times
2  before, haven't you, Mr. Cohen?
3  A  I have.
4  Q  And you've been in courts many times before, haven't
5  you, Mr. Cohen?
6  A  I have.
7  Q  Good. Let's go through that.
8     So previously you pled guilty to a number of felonies.
9  Isn't that correct?
10  A  Yes.
11  Q  And today, alone, you testified that you pled guilty to
12  five counts of evasion and assessment of income tax liability
13  for 2012 to 2016 --
14     MS. HABBA: I'm sorry is that not making a weird
15  sound? Can you guys hear it?
16  Q  In violation of 26 USC Section 7201; is that correct?
17  A  Correct.
18  Q  And you pled guilty to making false statements to a
19  financial institution in connection with a credit decision in
20  violation of 18 USC Subsection 1014; is that correct?
21  A  I take your word that the sections are correct.
22  Q  No, no. I don't want you to take my word.
23     MS. HABBA: Let's pull up Exhibit D 951.
24  Q  Mr. Cohen, this document is an allocution dated
25  August 21, 2018 for financial crimes. Do you see this?

| M. Cohen - Plaintiff - cross (Habba) | Page 2281 |
|---|---|

1  A  I do.
2  Q  Do you see that it says "United States of America
3  versus Michael Cohen?"
4  A  I do.
5  Q  Do you see that it's case 1:18-CR-00602-JMF?
6  A  I do.
7  Q  It's filed on 9/14/18, that's 2018; is that correct?
8  A  Correct.
9  Q  Okay. Do you recognize this document by the Honorable
10  William H. Pauly, III?
11  A  I do.
12  Q  Okay. Do you recognize it as your allocution?
13  A  Not from this appearance page, no.
14  Q  Okay. Well, let's go through this.
15     So, if you go to --
16     MS. HABBA: Peter, have him pull up the next page,
17  please. No, I'm going to go to -- one second.
18  Q  Let me ask you this: You were a lawyer at one point;
19  right?
20  A  I was.
21  Q  Okay. And do you know what a docket number is?
22  A  I do.
23  Q  And does this have a docket number, this document that
24  I showed you, that I read it before?
25  A  Yes.

| M. Cohen - Plaintiff - cross (Habba) | Page 2282 |
|---|---|

1  Q  Yes, okay.
2     So that means it's a publicly filed court document;
3  right?
4  A  Correct.
5  Q  Okay. So do you see in line 19 here, I'm going to read
6  this to you, Mr. Cohen:
7     "How do you now plead to the charge in Count 1 of
8  evasion of personal income tax for the calendar year 2012."
9     And the judge asked you, "do you plead guilty or not
10  guilty?" Do you see that?
11  A  I do.
12  Q  And what was your answer, Mr. Cohen?
13  A  "Guilty, Your Honor."
14  Q  Correct.
15     And the Court said:
16     "And how do you plead to the charge in Count 2 of the
17  Information of evasion of personal income tax for the year 2013,
18  guilty or not guilty?" And what did you say?
19  A  "Guilty, Your Honor."
20  Q  Thank you.
21     So let's move on to the next one. This is all from the
22  same allocution that I'm showing you.
23     Did you plead guilty to causing an unlawful corporate
24  contribution in violation of 52 USC Subsection 30118 A and --
25     THE COURT REPORTER: I'm sorry, Ms. Habba.

| M. Cohen - Plaintiff - cross (Habba) | Page 2283 |
|---|---|

1     MS. HABBA: Sure.
2  Q  You pled guilty to causing an unlawful corporate
3  contribution in violation of 52 USC Subsection 30118 (A), that's
4  and 30109 (D)(1) (A) and 18 USC Section 2 (B); is that correct?
5  A  I don't see where you're reading from.
6  Q  No problem.
7  A  Can you provide me --
8  Q  I'm actually not reading it. I'm just asking, but we
9  can confirm it.
10     MS. HABBA: Can you please pull it up?
11  Q  I'm going to read from what they pulled up from your
12  allocution, which we identified before.
13     "How do you plead to the charge in Count 3 of evasion
14  of personal income tax for the year 2014, guilty or not guilty?"
15     What did you respond, Mr. Cohen?
16  A  "Guilty, Your Honor."
17  Q  Thank you.
18     Next, you pled guilty to making an excessive campaign
19  contribution in violation -- and I'm going to read this slow
20  into the record -- of 52 USC Section 30118 (A) -- excuse me --
21  I'll withdraw that.
22     52 USC 30116 (A) (1) (A), 30116 (A) (7) and 30109 (D)
23  (1) (A), as well as 18 USC Section 2 Subsection B.
24     You pled guilty to that; correct, Mr. Cohen?
25  A  Again, I don't see what you're reading.

FILED: NEW YORK COUNTY CLERK 11/05/2023 09:47 AM    INDEX NO. 452564/2022

NYSCEF DOC. NO. 1637    RECEIVED NYSCEF: 11/05/2023

NYS Attorney General v.
Donald Trump, et al.

William Kelly; Michael Cohen
October 24, 2023

Page 28 of 32

| M. Cohen - Plaintiff - cross (Habba) | Page 2284 |
|---|---|

```
1    Q    Sure.
2         MS. HABBA: Let's make that bigger, please?
3    Q    "How do you plead to the charge in Count 5 of evasion
4    of personal income tax for the calendar year 2016, guilty or not
5    guilty, Mr. Cohen?"  What did you respond?
6    A    "Guilty, Your Honor."
7    Q    Thank you.
8         MS. FAHERTY: Can I just note I think there is some
9    discrepancies, Ms. Habba.
10        MS. HABBA: I was getting to that.
11   Q    So I think that what you're not understanding is the
12   subsections, so let me just take --
13        MS. HABBA: I'm take a representation --
14   Q    Would you trust my word that those are the subsections
15   you pled guilty to in the allocution, now we're putting this
16   allocution in for evidence or would you like me to go through
17   the process?
18   A    No, I would take your word for it.
19   Q    Thank you, Mr. Cohen.
20        MS. HABBA: And first, I'm going to submit Exhibit
21   D 951, if it's already not submitted into evidence.  Okay.
22        MS. FAHERTY: No objection, Your Honor.
23        THE COURT: It's in evidence.
24        By the way, we'll go until 4:40 and I'll give you a
25   five-minute warning.
```

| M. Cohen - Plaintiff - cross (Habba) | Page 2285 |
|---|---|

```
1         (Whereupon, the item previously referred to is
2    received and marked Defendant's Exhibit Number D 951 in
3    evidence.)
4         MS. HABBA: Okay.  Thank you.
5    Q    Okay.  In connection with that proceeding that we just
6    discussed in the Southern District of New York there is a
7    sentencing memorandum submitted.  Do you recall that?
8    A    My sentencing memorandum or the government's sentencing
9    memorandum?
10   Q    It was at the U.S. Attorney for the Southern District
11   of New York Robert Cuzan?
12   A    That would be government's, yes.
13   Q    Do you remember that being submitted?
14   A    I do.
15   Q    Okay.  And that was submitted in reference to you
16   committing the crimes that you were motivated by personal greed.
17   Isn't that correct, Mr. Cohen?
18   A    That's what it's stated, yes.
19   Q    Do you remember that it stated in particular that you
20   as an attorney and businessman committed four distinct federal
21   crimes over the period of several years and that you were
22   motivated to do so by personal greed and repeatedly used your
23   power and influence for deceptive ends.  Do you remember that?
24   A    Those are the statements of the government.
25   Q    Great.
```

| M. Cohen - Plaintiff - cross (Habba) | Page 2286 |
|---|---|

```
1         And that you "repeatedly used your power and influence
2    for deceptive ends."  That was what it said, right, deceptive?
3    A    Again, yes.
4    Q    And deception is a form of lying, isn't it, Mr. Cohen?
5    A    I'll acknowledge that, yes.
6    Q    Okay.  In fact, he also noted that your crimes were
7    marked by a pattern of deception that permeated your
8    professional life, did he not?
9    A    He said that, yes.
10   Q    Okay.  And his quote was, I believe, "but the crimes
11   committed by Cohen were more serious than his submission allows
12   and were marked by a pattern of deception that permeated his
13   professional life and was evidently hidden from the friends and
14   family members who wrote on his behalf."  Is that correct?
15   A    This is what he wrote.
16   Q    I know that's what he wrote.
17   A    Do I agree with the statement?
18   Q    No, do you recollect him saying it; yes or no?
19   A    I recollect that it's written here and you're reading
20   it appropriately.
21   Q    Okay.  Didn't he also note that you abused both your
22   standing as an attorney and your relationship with my client,
23   President Trump?
24        MS. HABBA: Let's pull it up.
25        Peter, pull it up, please.
```

| M. Cohen - Plaintiff - cross (Habba) | Page 2287 |
|---|---|

```
1    Q    Those are the exact words.  Would you like me to read
2    them?
3    A    No.
4    Q    Okay.  Do you disagree that is what he said in
5    that statement?
6    A    I don't disagree that's what he said.  I disagree with
7    the premise.
8    Q    That's the question.  It's a yes-or-no question.
9         THE COURT: Just answer the question, please.
10   Q    Do you agree that is what he said?
11   A    That is what it says.
12   Q    Good.
13        And you ultimately accepted a plea deal for those eight
14   felony counts that were in the allocution that we put into the
15   evidence prior?
16   A    I did.
17   Q    And in connection with accepting your plea deal, you
18   appeared before the Honorable William Pauly of the Southern
19   District of New York on August 21, 2018.  Isn't that correct?
20   A    That's correct.
21   Q    Okay.  And you were required in that agreement to
22   answer a series of questions under oath, the same oath that you
23   had in your deposition with me on this case a few months ago and
24   the same oath that you're under today; isn't that correct?
25   A    That's correct.
```

NYS Attorney General v.
Donald Trump, et al.

William Kelly, Michael Cohen
October 24, 2023

| M. Cohen - Plaintiff - cross (Habba) | Page 2288 |
| --- | --- |

1   Q  And you understood on August 21, 2018 that by being
2  under oath, the same oath that you are on today and the same
3  oath that you were in when I deposed you, that you had a legal
4  obligation to testify truthfully and honestly; is that correct?
5   A  That's correct.
6   Q  Good. And you committed perjury in that proceeding,
7  didn't you?
8   A  Excuse me?
9   Q  You committed perjury under oath with Judge Pauly,
10  didn't you?
11     MS. FAHERTY: Objection, Your Honor.
12     MS. HABBA: It's a direct question. Yes or no?
13     THE COURT: Objection overruled.
14   A  Did I commit perjury to Judge Pauly?
15   Q  Did you lie to Judge Pauly when you said that you were
16  guilty of the counts that you said under oath that you were
17  guilty of? Did you lie to Judge Pauly?
18   A  Yes.
19   Q  You have an attorney here today, don't you, sir?
20   A  I do.
21   Q  You actually have several attorneys here. I recognize
22  them some from other cases they're here, aren't they?
23   A  They are.
24   Q  Good.
25     In connection with your guilty plea to Counts 1 through

| M. Cohen - Plaintiff - cross (Habba) | Page 2289 |
| --- | --- |

1  5 for evasion of assessment of income tax liability for the
2  calendar years 2012 through 2016, you testified that for the tax
3  years that I just identified you willfully evaded paying
4  substantial taxes on income that you received in which you knew
5  was not reflected in the returns you filed; correct?
6   A  I don't understand your question.
7     MS. HABBA: Okay. Let's pull up the next exhibit,
8  please, Peter.
9   Q  I'll quote you. You see right here it says:
10     "As to Counts 1 through 5 in the tax years of 2012 to
11  2016, I" -- and the "I" is you; correct, Mr. Cohen?
12   A  Correct.
13   Q  "I evaded paying substantial taxes on certain income
14  received that I knew was not reflected on the return and that I
15  caused to be filed. The income intentionally not included was
16  received by me in the Southern District of New York." Didn't
17  you say that?
18   A  I did.
19   Q  Okay. That doesn't say "tax omission," does it?
20   A  No, it does not.
21   Q  But you earlier testified today that you omitted, you
22  didn't evade, isn't that right?
23   A  I did say that.
24   Q  Right. So you lied when you said that you evaded taxes
25  to a judge under oath; is that correct?

| M. Cohen - Plaintiff - cross (Habba) | Page 2290 |
| --- | --- |

1   A  Yes.
2   Q  So during 2012 to 2016, did you ever tell your wife
3  that you were committing tax evasion, Mr. Cohen?
4     THE WITNESS: Objection, Your Honor.
5   Q  No. You don't get to object.
6   A  Actually, in all fairness, I absolutely do. Roswell
7  versus United States, 1954 Supreme Court. We can also go on to
8  Houston versus the United States. We can also go on to your
9  favorite case of United States versus Nixon.
10     THE COURT: One at a time.
11     MR. KISE: It's very simple. Did he tell his wife
12  that he was committing tax evasion at the time. That's a
13  simple yes-or-no question and it's perfectly within the
14  scope. He is a serial liar and if he lied to his wife, it's
15  relevant for impeachment. It's absolutely irrelevant for
16  impeachment.
17     THE WITNESS: It calls into question the fact that
18  there was no tax evasion.
19     MR. KISE: I'm not directing anything to you,
20  Mr. Cohen, I'm sorry.
21     THE COURT: Ms. Faherty?
22     MS. FAHERTY: Aside from the fact that the question
23  is palpably improper --
24     THE COURT: Well, on what grounds? I'm not
25  disagreeing.

| M. Cohen - Plaintiff - cross (Habba) | Page 2291 |
| --- | --- |

1     MS. FAHERTY: First, marital privilege. Let's
2  just get that out of the way --
3     THE COURT: Spousal privilege?
4     MS. FAHERTY: Please, Your Honor, and I think this
5  is below the belt he is giving testimony about the lies.
6  Let's keep this focus, Your Honor.
7     THE COURT: I think it falls right within the
8  spousal privilege. You don't have to testify about what you
9  and your spouse talked about. I'll make it simple and leave
10  it at that. Yes, go ahead.
11     MS. HABBA: Your Honor, I apologize, but his wife
12  was on that return and I will get to why it's important
13  because in his deposition we did discuss his wife, so I'm
14  sorry, but that wasn't objected to then, so it shouldn't be
15  objected to now.
16   Q  And clearly, I hit a trigger with you, so Mr. Cohen
17  noted, but I will say is it true or not true that your wife
18  signed those returns?
19     MS. FAHERTY: Objection.
20   A  Excuse me?
21   Q  Did she sign those returns?
22     MS. FAHERTY: Stop.
23     MS. HABBA: What? That's just a factual question.
24     THE COURT: Yes, I'll allow that.
25     MS. HABBA: Thank you.

FILED: NEW YORK COUNTY CLERK 11/15/2023 09:47 AM No. 452564/2022

NYSCEF DOC. NO. 1637                                          RECEIVED NYSCEF: 11/15/2023

Page 30 of 32

NYS Attorney General v.
Donald Trump, et al.

William Kelly, Michael Cohen
October 24, 2023

| M. Cohen - Plaintiff - cross (Habba) | Page 2292 |
| --- | --- |

1  Q  Mr. Cohen, did your wife sign those returns?
2  A  Yes.
3  Q  But you knew that the statement, this statement, was
4  false when you made it, didn't you?
5  A  Yes.
6  Q  So you lied to Judge Pauly which we've now established,
7  but I'm supposed to admit that you're not going to lie to me
8  now; is that correct?  It's a yes-or-no question.
9  A  Unfortunately, I'm going to have to object to that, as
10  well.
11  Q  Yes, you can't object.  That's not how this works.
12  See, if you still had your law license, you'd understand that.
13  It's a yes-or-no question.
14  A  And your question is?
15  Q  You lied to Judge Pauly; correct?
16  A  Asked and answered.
17  Q  No.  Again, yes or no?
18      THE COURT: Asked and answered.
19  A  How many times are you going to ask me the same
20  question?
21      MR. KISE: Your Honor, this witness is completely
22  out of control so I would ask the Court to direct the
23  witness to answer the questions.  I mean, the witness
24  doesn't get to sit here and play judge.  That's your job.
25      THE COURT: And I'm doing it the best I can.

| M. Cohen - Plaintiff - cross (Habba) | Page 2293 |
| --- | --- |

1      That question -- well, it's hard to say because it
2  was really more of a statement than a question.  There's
3  already -- we've already been through it.
4      Why don't we again start from scratch.  What
5  question would you like to ask?
6      MS. HABBA: Sure.  Why don't I instead play from
7  his deposition.  Let's pull that up.
8      (Whereupon, there is a pause in the proceedings
9  while a portion of video is played.)
10      THE COURT: Asked and answered many times already.
11  Q  Great.  And you have stated earlier --
12      THE COURT: Wait.  So I had said to --
13      MS. HABBA: I'll move on.
14      THE COURT: Ms. Faherty, when she was examining or
15  cross examining, please don't categorize the answers or your
16  point.  You said "great," she said "great."  Just ask
17  questions, he'll answer and I'll make sure that happens.
18      MS. HABBA: Sure, Your Honor.
19  Q  In the deposition that we just saw from April 28, 2023
20  -- well, first, let me just get some foundation questions.
21      You remember me deposing you on April 28, 2023, do you?
22  A  I do.
23  Q  And was that from your testimony when I deposed you?
24  A  Yes.
25  Q  Okay.  And in connection with your guilty plea to Count

| M. Cohen - Plaintiff - cross (Habba) | Page 2294 |
| --- | --- |

1  6 for making false statements to a financial institution in
2  connection with the credit decision, you testified that you
3  knowingly submitted an application for a HELOC loan that
4  contained false representations?
5  A  I'm sorry, can you repeat your question?
6  Q  Sure.
7      MS. HABBA: Your Honor, can I get a read back?
8      THE COURT: Read back, please.
9      (Whereupon, the requested portion of the
10  proceedings was read back by the court reporter.)
11  A  Again, I don't really understand your questions.  It's
12  a compound question.  I don't understand it.
13  Q  So you don't understand the question.
14      So let me do something else.
15      MS. HABBA: Let's pull up the Exhibit 951-22,
16  please.
17  Q  Okay.  This is the same document that we put in before.
18  It's the allocution.
19      Do you see that docket number?  I'll represent that
20  that's the same and this is the allocution that we put in as the
21  exhibit.
22  A  Correct.
23      MS. HABBA: Okay.  Can you just zoom in on that
24  portion?
25  Q  I'll read it to you.  You can have a minute to read it

| M. Cohen - Plaintiff - cross (Habba) | Page 2295 |
| --- | --- |

1  yourself, if you'd like.
2      "As to Count 6, on or about February of 2016, in order
3  to be approved for a HELOC, a home equity line of credit, I
4  reviewed an application form that did not accurately describe
5  the full extent of my liabilities.  I did not correct the
6  inaccurate information on the form.  I signed it knowing that it
7  would be submitted to the bank as part of their HELOC
8  application process.  The bank was federally insured and is
9  located in Manhattan.
10      As to Count 7:
11      THE COURT: Did you know that those statements were
12  false when you made them?
13      THE DEFENDANT: They were omitted" --
14      MS. HABBA: The defendant is you --
15      "They were omitted, Your Honor, as opposed to being
16  false.
17      THE COURT: While you knew it was false?
18      THE DEFENDANT: Yes, Your Honor."
19      MS. HABBA: Not that part.  Can you pull up the
20  right part?
21  Q  But I'm reading from your allocution.  They can pull it
22  up so you can review it.
23  A  Count 7 was campaign finance violation, not Count 6.
24  Q  It's 22:6-21.
25  A  Can you --

NYS Attorney General v.
Donald Trump, et al.

William Kelly; Michael Cohen
October 24, 2023

---

**M. Cohen - Plaintiff - cross (Habba)**            Page 2296

1  THE COURT: Okay. Two things. I advise all
2  attorneys on. People tend to read faster than they talk and
3  numbers are difficult for court reporters to take down, so
4  you have to really go slowly.
5  MS. HABBA: Noted, Your Honor.
6  A  The document is inaccurate on line 14 as to Count 7, 7
7  had nothing to do with the financial statements unless it refers to
8  the campaign finance violation. We're referring to Count 6.
9  Q  So you're saying that Judge Pauly's -- the transcript
10 from Judge Pauly's hearing is inaccurate?
11 A  I'm saying as to Count 7 and Count 6 are obviously two
12 different counts.
13 Q  Okay. Taking away the count number --
14 MS. HABBA: This is unbelievable.
15 Q  Okay. For your HELOC, Mr. Cohen, did you not say that
16 you submitted to the bank application process, a bank that was
17 federally insured and is located in Manhattan, that you omitted
18 information. Was that not true?
19 A  No. It states I did not correct the inaccurate
20 information on the form.
21 Q  Okay. Let's stop there. You did not correct the
22 inaccurate statement on the form. Did you sign that form?
23 A  Sign the form.
24 Q  Okay. So you did not correct the inaccurate
25 information? Is that your way of saying I didn't lie because

---

**M. Cohen - Plaintiff - cross (Habba)**            Page 2297

1  you didn't correct an inaccurate information?
2  A  No.
3  Q  Okay. Did you plead guilty to this?
4  A  I did.
5  Q  Okay.
6  MS. HABBA: This -- I believe you said we're going
7  to stop at 4:40. This might be a good space.
8  THE COURT: You don't want another five minutes?
9  MS. HABBA: Your Honor, if it's entertaining, I'm
10 happy to go all night. I can continue.
11 THE COURT: All right. If you're willing, I value
12 every five minutes.
13 MS. HABBA: Sure, sure.
14 Q  So when you --
15 THE COURT: Five-minute warning.
16 MS. HABBA: Noted.
17 Q  You knew that that statement to Judge Pauly that you
18 were guilty of the HELOC was false, didn't you?
19 A  Yes.
20 Q  You affirmed under oath that the HELOC statement and
21 the deposition in your April 28, 2023 deposition that you lied
22 to Judge Pauly about the HELOC; isn't that correct?
23 A  Correct.
24 Q  So I just want to understand you were not lying in your
25 deposition, but you were lying to Judge Pauly. Is that your

---

**M. Cohen - Plaintiff - cross (Habba)**            Page 2298

1  testimony today?
2  A  I took the plea.
3  Q  Do you understand -- did you have lawyers representing
4  you when you took the plea, Mr. Cohen?
5  A  I did.
6  Q  Okay. And did your lawyers explain to you what a plea
7  is?
8  A  Yes.
9  Q  And did your lawyers explain to you that when you plead
10 to something you are saying that you are guilty of that crime,
11 do you understand that?
12 A  Yes.
13 Q  And do you understand that right now in front of all
14 this press, in front of these lawyers, in front of the several
15 lawyers that you decided to bring in here today, you are
16 admitting that you lied to Judge Pauly. Do you understand that,
17 Mr. Cohen?
18 A  I've already stated that, yes.
19 Q  So that --
20 A  In fact, it's actually in the document that we
21 presented to Judge Pauly.
22 Q  Mr. Cohen, here's how this is going to work. You're
23 not on Mea Culpa. You're not on your podcast and you're not on
24 CNN. You're here with me?
25 MS. FAHERTY: Objection, Your Honor.

---

**M. Cohen - Plaintiff - cross (Habba)**            Page 2299

1  Q  You're going to answer them yes or no.
2  THE COURT: No speeches. Just ask the questions.
3  MS. HABBA: Well, it works both ways, Your Honor.
4  Q  You also submitted false sworn statements to the House
5  Select Committee approximately one year earlier on August 28,
6  2017. Isn't that correct?
7  A  Yes.
8  Q  And as a result of those false statements you pled
9  guilty to the crime of making false statements to the United
10 States Congress in violation -- and I'm going to say this slowly
11 -- of 18 USC 1001 Subsection A Subsection 2. Isn't that
12 correct?
13 A  That's correct.
14 Q  And in connection with accepting your plea deal, you
15 appeared before the Honorable Andrew Carter of the Southern
16 District of New York on November 29, 2018. Isn't that correct?
17 A  That's correct.
18 Q  And when you were in front of Judge Carter, you were
19 required to answer a series of questions under oath, the same
20 oath that you're under right now, isn't that correct?
21 A  That's correct.
22 Q  And you admitted under oath that on August 28, 2017,
23 you submitted a false sworn statement to the Senate Select
24 Committee on Intelligence. Isn't that correct?
25 A  Yes.

---

NYS Attorney General v.
Donald Trump, et al.

William Kelly; Michael Cohen
October 24, 2023

| M. Cohen - Plaintiff - cross (Habba) | Page 2300 |
|---|---|

1   Q   And unlike your other plea hearing, you were being
2  honest with the judge this time; is that correct?
3   A   Is there a question?
4   Q   Yes.
5   A   What is it?
6   Q   Do you need me --
7       MS. HABBA: Can we get a read back?
8       THE COURT: Read back, please.
9       (Whereupon, the requested portion of the
10  proceedings was read back by the court reporter.)
11   A   Yes, that was correct.
12   Q   And you stated that you did submit false sworn
13  statements to Congress, didn't you?
14   A   Yes.
15   Q   So you have lied under oath numerous times, Mr. Cohen,
16  isn't that correct?
17   A   That's correct.
18   Q   And you no longer have your law license, isn't that
19  correct?
20   A   Asked and answered.
21   Q   Answer the question, please, Mr. Cohen.
22       THE COURT: Just answer.
23   A   Yes.
24   Q   And that's because you were disbarred in 2019; correct?
25   A   Correct.

| | Page 2301 |
|---|---|

1       MS. HABBA: Your Honor?
2       THE COURT: You want to stop?
3       MS. HABBA: This is right before our next section.
4       THE COURT: Okay. We'll resume tomorrow at
5  10 o'clock.
6       MS. HABBA: Thank you.
7       MR. KISE: Please remind the witness he's not to
8  talk to anyone, including his lawyers about his testimony.
9       THE COURT: Mr. Cohen, I hereby order you not to
10  talk to anybody, including your lawyers about this trial or
11  your testimony or anything related.
12       THE WITNESS: Yes, Your Honor.
13       THE COURT: Thank you. Have a good evening
14  everyone.
15       (Whereupon, the trial proceedings are adjourned to
16  Wednesday, October 24, 2023 at 10:00 a.m.)
17
18
19
20
21
22
23
24
25