# EXHIBIT A

# COURT INVOLVED SUPERVISED RELEASE UPDATE

© 2022 Richard M. Berman, U.S.D.J.

April 19, 2022

TABLE OF CONTENTS

I.     Introduction ...................................................................................................1

II.    Recent Developments ......................................................................................3

       (1)    Encouraging Outcomes ........................................................................ 3

              Increase in the Number of Supervised Release Hearings ...................... 3

              Early Terminations ............................................................................. 4

              Normal Course Terminations ................................................................ 5

              Cost Effectiveness ............................................................................. 10

              Felony Re-Arrests .............................................................................. 11

              Probation Violations By Grade ............................................................ 16

              Violation Outcomes ........................................................................... 17

              Employment ....................................................................................... 32

       (2)    Mental Health Therapy & Drug Treatment .......................................... 37

              Mental Health Therapy ....................................................................... 39

              Drug Treatment .................................................................................. 40

       (3)    Planning for Post-Supervision ............................................................. 42

       APPENDIX A (Hon. Sarah L. Cave and Kassandra Collazzo Bios) .............................45

## Court Involved Supervised Release

### I.  Introduction

This report updates our court involved supervised release project.[1] Recent results convince us that district judges—working in tandem with probation officers and others—are uniquely positioned to help supervisees fulfill their supervised release obligations and safely and successfully navigate out of the criminal justice system.[2]

Dedicated supervisees have shown they can achieve positive outcomes (for themselves and for the community) working through a series of individual hearings presided over by the sentencing judge. Present at each hearing is the judge, the supervisee, the probation officer, the supervisee's therapist and/or drug counsellor (if available), defense counsel, and the Assistant U.S. Attorney. The Court participates throughout each hearing by actively listening and by providing coordination, encouragement, and direction. The hearings are supplemental to the on-going and indispensable work of the SDNY

---

[1] We issued an initial Report on April 6, 2021 ("Report") describing the Court's supervised release program and its Study Population of 152 supervisees. *See* Report at 20. On September 2, 2021, we issued the first update which focused primarily upon 13 "early terminations" which had the effect of raising the overall rate of early terminations from **34%** in April 2021 to **40.7%** in September 2021. *See* Sept. Update at 1. Today we report a **44.2%** rate of early terminations, as a result of 8 supervisees who qualified for early terminations after September 2, 2021.

[2] "[J]udges, working in tandem with support staff and key actors in the criminal justice system . . . may have a unique opportunity to enhance an ex-offender's prospects of permanent reintegration into the community by actively participating in programs that 'go beyond' punishment." Marvin L. Astrada, *Reentry Philosophies, Approaches, and Challenges*, 102 Judicature 2, 39 (Summer 2018).

Probation Department. They are held throughout the term of supervision; are open to the public; and are transcribed.[3]

While there is considerable work yet to be done, some of the outcomes already achieved by Study Population supervisees are well worth mentioning. They include: **(i)** the number of supervised release hearings has increased from 148 per year in 2016 to 257 per year in 2021; **(ii)** the early terminations rate is 44.2%; **(iii)** the normal course terminations plus early terminations rate is 85.8%; **(iv)** 76% of supervision violations were Grade C (the least serious grade) and 49.84% of all violations were dismissed; **(v)** 89.5% of Study Population supervisees have never been incarcerated for a supervision violation; **(vi)** the Study Population's average employment rate was 76.25% for the period 2018 to 2021; **(vii)** successful supervision—in addition to facilitating successful re-entry—saves money; and **(viii)** 94.1% of supervisees have participated in mental health and/or drug programs; and **(ix)** in addition to the primary goals of safe and successful re-entry and reduced recidivism, court involved supervision is rewarding and challenging to the supervisees and to the Court.[4]

---

[3] Our supervised release team now also includes the Hon. Sarah L. Cave, U.S. Magistrate SDNY, and Fordham University MSW graduate student Kassandra Collazo. *See* Appendix A.

[4] "Recidivism is arguably one of the greatest challenges facing the criminal justice system today. Reoffending not only has relevance for public safety, but has resource and cost implications related to incarceration and other criminal justice costs." James L. Johnson, Probation Administrator, Administrative Office of the U.S. Courts, *Comparison of Recidivism Studies: AOUSC, USSC, and BJS*, 81 Fed. Probation J. 1, 1 (2017).

Our evaluation of outcomes is informed by recidivism reports from the U.S. Sentencing Commission, the Administrative Office of the U.S. Courts, and the U.S. Department of Justice Bureau of Justice Statistics. *See* below at pp. 12–15, 18–19. The Court recognizes that comparing outcomes is often problematic because studies and programs vary significantly in methodology, size, time, and duration. And, adequate comparable data and statistics are not always collected and/or analyzed.

## II.   Recent Developments

### (1) Encouraging Outcomes

### Increase in the Number of Supervised Release Hearings

Chart 1 below shows the total number of supervised release hearings we conducted each year from 2016 to 2021, as compared to the Court's yearly average of 125 hearings between 2011–2015. Chart 1 shows a significant increase in hearings in 2020 and 2021 during the COVID-19 pandemic.

**Chart 1: Supervised Release Hearings by Year**





3

Most of the hearings in 2020—and all of the hearings in 2021—were conducted remotely (virtually) due to the COVID-19 pandemic. The Court perceived few difficulties—and saw many positives—with telephonic proceedings. The positives included efficiency, ease of access, and engagement. *See* Jacqueline Thompson, *Virtual Court Hearings Are Here to Stay Post-Pandemic, Survey Finds*, Nat'l L. J., Aug. 18, 2021 ("[M]any of the pivots made during the [pandemic] will far outlive the pandemic.").

> [J]udges [saw] increased participation as the leading improvement to come from the move to virtual proceedings. The boost in [the number of] court [proceedings] that followed the shift to virtual hearings is consistent with pre-pandemic assertions that reducing the day-to-day costs of coming to court—such as transportation, child care, lost wages, and travel time— would increase people's ability to meaningfully engage in court cases.

PEW Charitable Trusts, How Courts Embraced Technology, Met the Pandemic Challenge, and Revolutionized Their Operations (Dec. 1, 2021).

**Early Terminations**

The April 2021 Report advised that **34%** of supervised release terminations involving the Court's Study Population were early terminations. *See* Report at 31; *see also* 18 U.S.C. § 3583(e) ("The court may . . . terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release . . . if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice."). The September 2021 update reported that between March 3, 2021 and September 3, 2021 thirteen additional supervisees were granted early termination. This raised the rate to **40.7%**. *See* Sept. Update at 1. Subsequent to September

2021, eight more supervisees were granted early termination. As Chart 2 below shows, the latest early terminations brought the Study Population percentage to **44.2%**.[5]

Many of our early termination decisions are made with the unanimous consent of the defense, the probation officer, and the government. The government sometimes defers to the judgment of the probation officer and the Court. We are confident that these outcomes can be duplicated by other courts and judges.



Chart 2: Early Terminations as of April 2022

**Normal Course Terminations**

While early termination is a positive objective—and a significant motivational tool—another equally important but sometimes overlooked measure of successful supervised release is the total number of supervision expirations, *i.e.*, the combination of early and normal course terminations.[6] U.S. Sentencing Commission, *Federal Offenders Sentenced to Supervised Release*, at 61 (July 2010) ("As a general rule, a case is classified as a 'successful' closure if the term of supervision expired or was terminated without

---

[5] This percentage is calculated by dividing the number of early terminations by the total number of terminations.

[6] "Normal course termination," as used here, means expiration at the end of the term of supervision imposed at sentencing.

revocation."). The U.S. Sentencing Commission has reported that "two-thirds (**67%**) of the 35,724 active supervised release cases closed during 2008 were successfully closed, including those that were terminated early in the interest of justice." *Id.* In other words, terminations—whether or not they are early or completed in the normal course—reflect that supervisees have been successful.

Chart 3 below reflects that early terminations plus normal course terminations in the Court's Study support an **85.8% "**success" rate. Chart 3 also shows that 8.8% (or 10 supervisees) completed an extended term of supervision (where, for example, the parties and the Court may have agreed to additional supervision).[7] This chart also includes a category called "Sentence without Supervised Release" which refers to supervisees who may have been sentenced following a probation violation but were not given an additional term of supervision. The category "Other" includes persons who died or were deported.

---

[7] In some instances, a case may be made for including as successful terminations supervision that had been extended. Had they been included here, the total percentage of "successful" supervised release outcomes would increase from **85.8%** up to **94.7%.**

**Chart 3: Termination of Supervised Release**



Early Termination 44.25%
Normal Course Termination 41.59%
Sentence without Supervised Release 1.77%
Deported/Deceased 3.54%
Completed Extended Term 8.85%

The following three colloquies from our court involved hearings illustrate that termination of supervised release serves as an important incentive:

Example #1

**Court**: [W]hat is the end game here? You know what I mean? What does one expect is going to happen?

**Supervisee**: I know what the end game is. It's very simple. The end game is, I am going to complete my supervised release. . . . I am going to live my life, the rest of my life, like a normal person, and that's going to be the end game.

Example #2

**Court**: [Your supervised release expiration date in two and a half years is] something I wanted to discuss with you. If you are able to pull this off, you know, for a sustained amount of time, I'm happy to consider lopping off a year or maybe even more.

**Supervisee**: Wow . . . Now you are giving me an incentive[,] something to work toward.

## Example #3

**Court:** Please tell us in some detail how things are working out.

**Probation**: Well, your Honor, . . . He continues to work at [Company X], not full time, he's more on a part time basis, because he started a new job . . . working for [Company Y] in the Bronx, where he's working full time overnight earning 20-dollars per hour, it's a pretty good salary. . . . [A]t some point he is looking to terminate [] employment [at Company X] because it doesn't allow him time to rest and time to spend with his family.

**Court:** I'll ask [supervisee] in a minute, but to your knowledge, how about the other aspects of supervision? When we terminated treatment in 2021 was that mental health or just drug treatment?

**Probation:** It was individual substance abuse disorder counseling, so it was just drug treatment, in which he was subjected to a toxicology and all of his toxicologies since 2020 have resulted negative. He's been compliant, generally, pretty much with everything else. He's very polite and he follows through with instructions and he communicates well. So everything else in the supervision, in addition to his financial responsibility has been satisfied.

**Supervisee:** Your Honor, I'm just trying to stay on the good path. I'm not trying to mess up or nothing. I'm on a straight, clean path this time around. . . .

**Court:** I'm really glad to hear. This is a success is story. And I think it's terrific. . . . I'm going to ask other people who are on this call what their impression is and what their suggestion is.

**AUSA:** Judge, thanks. So I agree with everything that's been said so far today. I expect that if probation recommends an early termination and the Court reaches a point where it's ready to act on it, I don't think the government will object, considering everything continues in the same way. I agree that [supervisee's] progress . . . has been excellent. . . .

And I think it's worth remembering . . . [that supervisee] had started to turn his life around . . . it was very unfortunate for him that he was indicted after he began working, I believe, in auto repair at the time. The fact is the government had very strong evidence of a pretty serious crime, but I think

it's worth recognizing that [supervisee] was trying to get on the right path, so I don't anticipate a government objection.

**Court**: That's an interesting situation, I do recall it now. I did not remember it before you reminded us. Whenever it comes, I think that's the right time.

**Probation:** Your Honor, given his ongoing compliance . . . I believe [supervisee has] earned his time[.] [T]wo years in [supervision] did him well. . . .

**Court:** And, we have defense counsel on this call as well.

**Defense Counsel**: [As] someone who has grown up in the same environment that [supervisee] has, I grew up in Brownsville, Brooklyn, I was very aware at a young age of the structural position I was in concerning society and trying to navigate through that. And unfortunately, sometimes our best efforts and our commitment to changing our positions is not met with a lot of luck. And to see this young man survivor, a federal indictment and incarceration, but before that, [he took] it upon himself with his community and try to get out of the social, political and economic [situation] that often young men like [supervisee] are in, I find that to be commendable. And I certainly don't think that if there is an opportunity for him to terminate early, I think that is something that I would obviously advocate for.

**And this is on a personal note** [emphasis added]. I'm 50 years old this year. When I went to college in 1990, I think the homicide rate in New York was perhaps two to 3,000 people were killed. Years later, around that time, I eventually -- I ended up getting in trouble. I ended up actually in Virginia getting a federal misdemeanor [and] my federal probation was transferred to Eastern District and just this week, as I'm on PACER doing something, I decided to pull up my case, and in 1993 or four, which was my first year of law school, 22 years of age, Judge Jack B. Weinstein, on the suggestion of federal probation, terminated my probation early. I went on to become an assistant district attorney in the Kings County district attorney's office, I went on to become a professor at Fordham Law School and represent people charged with capital, federal, death penalty statute as well as CJA cases in federal, state courts. And it made me really reflect and think about what is punishment, what is necessary so that people's lives can perhaps go in a different direction.

And, I'm glad everybody is on the same page in realizing that this young man is a complicated human being, like most humans and he was making

strides before his unfortunate criminal conduct to figure his life out. And it would be a bright light in a very dark space that the Government and the Court and probation and everyone is on the same page with terminating this young man's supervision early.

**Cost Effectiveness**

In August 2021, the Administrative Office of the U.S. Courts reported that the per capita average cost for supervision by probation officers is $4,454 per year. This includes "the costs incurred by the U.S. Marshals Service . . . and Administrative Office of U.S. Courts for . . . monitoring, treating, and supervising those . . . convicted of federal crimes." *See* Memorandum, Cost of Community Supervision, Detention, and Imprisonment, Administrative Office of the United States Courts (Aug. 27, 2021). This report suggests that—beyond the primary goals of supervision which are safe and successful re-entry and, relatedly, reduced recidivism—effective supervised release can also be cost effective.

For example, assuming that 100 supervisees had their supervision terminated early by one year, those 100 early terminations would save taxpayers roughly **$445,400**. That number is reached by multiplying 1 (year) by 100 (early terminations) by $4,454 (the per capita average cost for supervision). As another hypothetical: assuming that 5% of Federal supervisees had their supervision terminated early by one year, those early terminations would save the Government approximately $26 million. That number is reached by multiplying 1 (year) by 6,000 (5% of persons on supervision) by $4,454 (the per capita cost

of supervision). The numbers of early terminations used in these hypothetical examples (100 supervisees and 5% of Federal supervisees) are readily attainable.[8]

Saving money is not, of course, the only purpose of achieving successful supervision outcomes. Rather, the primary purpose is to assist in the defendant's safe "transition into the community." *See Quinones v. United States,* 936 F. Supp 153, 155 (S.D.N.Y. 1996). But if saving money follows from successful supervised release, that would also constitute a significant and positive result.

**Felony Re-Arrests**

Our Study Population outcomes relating to felony re-arrests are also encouraging.

We consider felony arrests during the term of supervised release to be one appropriate measure of recidivism and have included our rearrest rate in the first column of Chart 4 below. In calculating felony rearrests, we include arrests for both state and federal felonies but not for misdemeanors or violations of supervision.

---

[8] Each year approximately 60,000 persons nationwide begin terms of supervision and that at any one point in time up to 120,000 persons are serving terms of supervised release. *See* Post-Conviction Supervision – Judicial Business 2021, Table 8: Federal Post-Conviction Supervision Fiscal Years 2017 – 2020.



**Chart 4: Re-Arrests**

In April 2021, we reported that **17.8%** of the Study Population (or 27 supervisees) had been arrested on felony charges. *See* Report at 33. Since then, 2 more supervisees were arrested on felony charges, bringing the percentage to **19%** (or 29 individuals). To identify felony arrests, we reviewed data generated by the U.S. Probation & Pretrial Services Automated Case Tracking System ("PACTS") and, as a cross check, we also reviewed case files for each supervisee. *Id.*

We also include in Chart 4 rearrest rates reported by the U.S. Sentencing Commission, the Administrative Office of the U.S. Courts, and the U.S. Department of Justice Bureau of Justice Statistics. Our rearrests—and those reported by the Sentencing

Commission, the AO, or the BJS—do not include an adjudication or disposition. "Because not all arrests result in conviction or incarceration, rearrests can overstate recidivism." U.S. Sentencing Commission, *Recidivism of Federal Offenders Released in 2010* at 6 (Sept. 30, 2021).

It is also important to appreciate that the methodologies differ among our study and the rearrest studies from the Sentencing Commission, AO, and BJS as follows:

**(i)** The Sentencing Commission study measured recidivism by the number of rearrests for felonies (state and federal), misdemeanors, and violations of supervision over an eight-year period, including arrests that occurred following supervision. The study population consisted of 32,135 Federal offenders who began supervision in 2010. *See* U.S. Sent'g Comm'n, *Recidivism of Federal Offenders Released in 2010* (Sept. 30, 2021). The Sentencing Commission found that **49.3%** of supervisees were rearrested within eight years of commencing supervision and that **43.1%** of supervisees were rearrested within 5 years. *Id.* at 21. **The U.S. Sentencing Commission's study Table 2, reprinted below, showed no improvement in recidivism rates between federal offenders released in 2010 and those released in 2005. The recidivism rates for offenders released in 2010 were the exact same as the rates for offenders released in 2005, *i.e.*, 49.3%.**

**Table 2. USSC Comparison of Overall Rearrest Findings
(Federal Offenders Released in 2010 and 2005)**

|  | Offenders Released in 2010 | Offenders Released in 2005 |
|---|---|---|
| Percent Rearrested | 49.3% | 49.3% |
| Median Months to Rearrest | 19 | 21 |
| Median Number of Rearrests | 2 | 2 |
| Most Common Post Release Offense | Assault (20.7%) | Assault (23.3%) |
| Median Age at Release | 33 years old | 33 years old |

**(ii)** The BJS measured recidivism by rearrests for felonies (state and federal), misdemeanors, and violations of supervision, but not for arrests for "minor traffic offenses." U.S. Department of Justice Bureau of Justice Statistics, *Recidivism of Offenders Placed on Federal Community Supervision in 2005: Patterns from 2005 to 2010* (June 2016). Its study population consisted of 42,977 Federal offenders who had been placed on supervised release or probation in 2005. The BJS reported that **43%** of supervisees were rearrested within five years of commencing supervision and that **35%** were rearrested within three years. *See id.* at 3.

**(iii)** The AO measured recidivism by rearrests for state and federal felonies ("major offenses") during the period of supervision, but not including arrests for misdemeanors or violations of supervision. *See* Laura M. Baber, Probation and Pretrial Services Office, *Administrative Office of the U.S. Courts, Inroads to Reducing Federal Recidivism,* 79 Fed. Probation J. 3 (Dec. 2015) ("AO Recidivism Report"). Its study population consisted of 454,223 Federal supervisees who commenced supervision between 2004 and 2014. The

AO found that **27.7%** of supervisees were rearrested within five years of commencing supervision and that **20.8%** were rearrested within three years. *See id.* at 5.

The AO also provided rearrest rates "**that are adjusted for inherent risk of the offender population**." *Id.* at 4 (emphasis added). The AO adjusted its rearrest rates because "persons who enter federal supervision each year are at increased risk to recidivate," which "has caused gradual upward pressure on rearrest and revocation rates." *Id.* at 5, 7. According to the Chief of the Probation and Pretrial Services Office of the AO,

> [an] interesting aspect of the article is that it reveals that recidivism, again controlling for the nature of the supervision population, is actually declining. . . . While the decline is probably influenced by many factors, it has coincided with the federal probation and pretrial services system's implementation of advanced actuarial assessment devices to help officers stratify their caseloads and prioritize issues within cases.

AO Recidivism Article at 3.

The AO did not include adjusted five-year rearrest rates but it did include an "adjusted" three-year rearrest rate of **16.3%** for supervisees who commenced supervision in 2011. *Id.* at 7. It should be noted that only the AO study controls for risk and adjusts its recidivism rates, which is one of the reasons that direct comparisons among the various studies are so difficult. *See* James L. Johnson, Probation Administrator, Administrative Office of the U.S. Courts, *Comparison of Recidivism Studies: AOUSC* [Administrative Office of the U.S. Courts]*, USSC* [Sentencing Commission]*, and BJS* [Bureau of Justice Statistics], 81 Fed. Probation J. 1, 1 (2017) ("Even when using similar data, discrepancies can exist based on definitional and methodological differences."). The AO study is also the

15

only study (of the four included in Chart 4) that reports that "**recidivism . . . is decreasing**."

AO Recidivism Report at 4 (emphasis added).

### Probation Violations By Grade

There are three grades of violations, as follows:

> (1) **Grade A Violation** (the most serious grade) — conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment exceeding one year that (i) is a crime of violence, (ii) is a controlled substance offense, or (iii) involves possession of a firearm or destructive device of a type described in 26 U.S.C. § 5845(a); **or** (B) any other federal, state, or local offense punishable by a term of imprisonment exceeding twenty years;

> (2) **Grade B Violation** — conduct constituting any other federal, state, or local offense punishable by a term of imprisonment exceeding one year;

> (3) **Grade C Violation** (the least serious grade) — conduct constituting (A) a federal, state, or local offense punishable by a term of imprisonment of one year or less; **or** (B) a violation of any other condition of supervision. U.S. Sentencing Commission, § 7B1.1 *Guidelines Manual* (Nov. 2021).

The SDNY Probation Department submits a "Violation of Supervised Release Report" to the court which includes a description of the violation(s) alleged. See U.S.S.G. § 7B1.2 ("The probation officer shall promptly report to the court any alleged . . . violation" of supervised release, unless "such violation is minor" and "non-reporting will not present an undue risk to an individual or the public . . . ."). In April 2021, we reported that **302** violations were filed against **40** supervisees (or **26%** of the Study Population). (Some supervisees received more than one violation.) Of the 302 violations, **9%** were Grade A violations, **16%** were Grade B violations, and **75%** were Grade C violations. *See* Report at 35. Since April 2021, there have been 19 additional violations filed against 6 supervisees:

16

**5%** were Grade A violations, **11%** were Grade B violations, and **84%** were Grade C violations. These additional violations brought the total to **321** and the percentage of supervisees to **28%** of the Study Population (42 supervisees). At the same time, **72%** of the Study Population (or 110 supervisees) had not had any violations filed against them.

### Violation Outcomes

The Court's objective in supervision is to help supervisees achieve successful re-entry—and not to impose additional punishment unless necessary. At the first supervised release hearing, the Court advises the supervisee and the other supervision stakeholders of its approach. **Court**: "The idea of court involved supervised release is to assist supervisees reintegrate into the community and to become productive citizens. It is not intended as a punishment but rather to assist supervisees to become more successful in their lives." We are substantially and prudently achieving that goal; 136 supervisees, or **89.5%** of the Study Population, have not received any incarceration as a result of violations.[9] "A violation of the terms of supervised release tends to confirm the judgment that help was necessary, and if any prisoner might profit from the decompression stage of supervised release, no prisoner needs it more than one who has already tried liberty and failed." *Johnson v. United States*, 529 U.S. 694, 709 (2000).

18 U.S.C. § 3583(e) provides that district courts have authority to "terminate," "extend," or "revoke" a term of supervised release. The meanings of "terminate" and

---

[9] **89.5%** is calculated by dividing the number of supervisees who have not been sentenced to additional incarceration (as a result of violations) by the number of supervisees in the Study Population.

"extend" appear to be self-evident, but exactly what "revoke" means or when "revocation" comes into play is sometimes unclear. 18 U.S.C. § 3583 does not define "revoke" or "revocation." Indeed, revocation appears to be a "relic" of the parole system which was replaced years ago by supervised release.

> The term "revoke" appears to be somewhat of a misnomer. Parole was based on early release from prison—by the grace of the parole board a person was conditionally released from prison, and the leniency could be "revoked." [By contrast,] a person on supervised release has completed his or her prison term and is serving an independent term of supervision separately ordered by the court. Supervised release is not being "revoked"; rather, a supervisee is being punished for violating conditions [of supervision] . . . .

*United States v. Trotter*, 321 F. Supp. 3d 337, 346 (E.D.N.Y. 2018) (Weinstein, D.J.) (internal citation omitted). The Supreme Court has also made reference to "the strangeness of Congress's unconventional sense of 'revoke.'" *Johnson*, 529 U.S. at 707 (holding that "district courts have the authority to order terms of supervised release following reimprisonment" even though "the conventional understanding of 'revoke' [is] simply 'to annul by recalling or taking back.'"). The Sentencing Commission advises that "[revocation] **generally refers** to the judicial act of canceling the supervision in response to the offender violating the terms of supervision, and imposing a term of incarceration." Glossary of Sentencing Terms, U.S. Sent'g Comm'n, https://www.ussc.gov/education/glossary (last visited April 14, 2022) (emphasis added). The Sentencing Commission also points out that **"[u]nlike original sentencings, courts do not use a standardized reporting system for sentences imposed following violations."** U.S. Sent'g Comm'n, *Federal Probation and Supervised Release Violations* at 12 (July 2020) ("Sentencing Commission Violations Report").

18

The Court perceives three (3) principal instances where revocation may come into play.

First, if the supervisee: (i) "possesses a controlled substance"; (ii) "possesses a firearm . . . in violation of Federal law"; (iii) "refuses to comply with drug testing"; or (iv) "tests positive for illegal controlled substances more than 3 times over the course of 1 year," he or she is subject to "mandatory" revocation. 18 U.S.C. § 3583(g).

Second, "(1) Upon a finding of a Grade A or B violation, the court shall revoke probation or supervised release; (2) Upon a finding of a Grade C violation, the court may (A) revoke probation or supervised release; or (B) extend the term of probation or supervised release and/or modify the conditions of supervision," according to section 7B1.3 of the U.S. Sentencing Guidelines. "Although part of §7B1.3 is written in mandatory terms ('the court shall revoke') for Grade A and B violations, . . . Chapter Seven . . . contains only non-binding policy statements." U.S. Sent'g Comm'n, *Federal Offenders Sentenced to Supervised Release* at 40 (2010).[10]

Third, a district court "may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) . . . revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of

---

[10] "Under 28 U.S.C. § 994(a)(3), the Sentencing Commission is required to issue guidelines or policy statements applicable to the revocation of probation and supervised release. . . . [T]he Commission has chosen to promulgate policy statements only. These policy statements will provide guidance while allowing for the identification of any substantive or procedural issues that require further review." U.S.S.G. Ch.1, Pt.A, intro. comment.

supervised release authorized by statute for the offense that resulted in such term of supervised release . . . if the court . . . finds by a preponderance of the evidence that the defendant violated a condition of supervised release . . . ." 18 U.S.C. § 3583(e)(3). This is referred to as "discretionary revocation." *See United States v. Doe*, 617 F.3d 766, 772 (3d Cir. 2010).

A total of **22** Study Population supervisees—or **14.5**% of the Study Population—may be said to have had supervision "revoked" following adjudication of a violation (which is typically imposed "on consent").

**4** of the 22 supervisees were subject to mandatory revocation and were sentenced to "time served" (that was limited to administrative processing) and no additional supervised release. These 4 supervisees pled guilty to failure to comply with drug testing or to use of a controlled substance (such as marijuana, cocaine, or methamphetamine).

**2** of the 22 supervisees pled guilty to Grade A or Grade B violations. One of the 2 supervisees committed a state crime of possession of a controlled substance which also constituted a Grade A violation of supervision. The second supervisee committed state crimes of forgery and possession of a forged instrument which constituted a Grade B violation of supervision. Both supervisees were sentenced to "time served" (that was limited to administrative processing) and additional terms of supervised release of 30 months and 5 years, respectively. (The 5-year term ran concurrently with the supervisee's state term of supervision.)

**16** supervisees, or **10.5%** of the Study Population, have been sentenced to a period of incarceration for violating supervision pursuant to 18 U.S.C. § 3583(e)(3). The sentences ranged from 10 days to 30 months. Excluding time that was "concurrent" with another sentence and/or was limited to administrative processing, **12** supervisees or **7.9%** of the Study Population were sentenced to actual jail time.

## Chart 5: Revocations



Bar chart showing revocation rates for three study populations:

- RMB Study Population (Jan. 1, 2016 to Mar. 31, 2022) — 152 persons studied: 14.5% During Supervision
- USSC Study Population (Oct. 1, 2013 to Sept. 30, 2017) — 127,538 persons studied (per FY average): 16.2% 2015, 18.4% 2017
- AO Study Population (Oct. 1, 2004 to Sept. 30, 2014) — 454,223 persons studied: 15.7% 3-year (2011 Adjusted), 21.9% 3-year (Unadjusted), 26.0% 5-year (Unadjusted)

RMB | Sentencing Commission | AO

Chart 5 includes the "revocation" rate of **14.5%** for our Study Population, along with rates reported by the Sentencing Commission and the AO. We have not identified a

BJS study that reports revocation rates. Chart 5 does **not** make direct comparisons because of the significant differences among the studies, which include the following:

**(i)** The 152 person Study Population rate of **14.5%** reflects: (a) "mandatory" revocation pursuant to 18 U.S.C. § 3583(g); (b) Grade A or Grade B violations pursuant to U.S.S.G. § 7B1.3(a); and (c) violations that resulted in incarceration under to 18 U.S.C. § 3583(e)(3).

**(ii)** The Sentencing Commission study analyzed 82,384 Federal supervisees over the five-year period from 2013 through 2017. Sentencing Commission Violations Report at 17. It reviewed cases in which the court ordered supervision revoked, including cases which may have resulted in "supervision only" or "community service only." *See id.* at 34, 46 n.87. The Sentencing Commission noted that "the 94 [Federal] judicial districts do not use a standardized reporting system for violation cases." *Id.* at 46 n.86. The Sentencing Commission "compared the number of violations for fiscal year 2017 in which the court ordered the supervision revoked to data on revocations collected by the Administrative Office of the United States Courts for that same fiscal year. This analysis indicated that the Commission had received 88.7 percent of all revocations during that period." *Id.* at 12–13.[11] The Sentencing Commission revocation rate is estimated by dividing total "violations

---

[11] "During the five-year period studied, the Commission received 108,115 reports of violation decisions from the courts. The documents the Commission received include: (1) the violation report, (2) the motion for revocation or petition for warrant of arrest or summons, (3) the waiver of hearing, (4) the summary of violation hearing, (5) the Judgment and Commitment Order, and (6) revocation worksheets." Sentencing Commission Violations Report at 13.

22

. . . in which the court ordered the supervision revoked" into the total number of supervisees for each year of its study and found that **16.2%** and **18.4%** of supervisees had their supervised release revoked in 2015 and 2017, respectively. *See id.* at 17.

**(iii)** The AO Recidivism Report analyzed 454,223 Federal supervisees who commenced supervision between 2004 and 2014. The AO reported that **26.0%** of supervisees had their supervision revoked within five years and that **21.9%** had their supervision revoked within three years. *See id.* at 6. The AO also provided revocation rates "**that are adjusted for inherent risk of the offender population**," including an adjusted three-year revocation rate of **15.7%** for persons who commenced supervision in 2011. *Id.* at 4, 7. It did not provide a five-year adjusted revocation rate.

Because of the difference(s) in approach to revocation, it is best to review the actual transcripts of individual hearings to illuminate the Study Population outcomes.

**(a) Mandatory Revocation pursuant to 18 U.S.C. § 3583(g)**

   **Example #4**

This supervisee was originally sentenced on November 5, 2001 to 151 months of incarceration followed by 5 years of supervised release for distribution and possession with intent to distribute cocaine. The conditions of his supervised release included substance abuse treatment and weekly therapeutic counseling. He began supervision on July 15, 2011. On September 8, 2015, after more than 4 years on supervision, the supervisee pleaded guilty to using marijuana, a Grade C

violation carrying a Guidelines policy range of 6–12 months incarceration.[12] At sentencing, the probation officer reported that the supervisee had complied with the conditions of supervision apart from the marijuana use. The Court sentenced the supervisee to time served that was limited to one day of administrative processing and no supervised release.

> **Probation:** He continues to attend treatment [and] his attendance and participation has been deemed good. He continues to use marijuana. His last drug test in December tested positive for marijuana. [T]here's been no other noncompliance noted.

> **Defense Counsel**: Judge, I think based on everything I would ask the court at this point to terminate supervision for [the supervisee]. I think he's really doing as best as he can do and I think at the last conference there was at least a suggestion that if he continued to participate positively with his mental health treatment and there weren't any other incidents the court would consider that request. So I'm making that request at this time. . . . I think that would be the best resolution.

> **Court**: [Supervisee], what, if I were to terminate your supervision would you – what would you do in terms of therapy, in terms of medication, etc.? How would you handle that?

> **Supervisee**: Regardless if you let me off today, I still got to work on my behavior and control myself. And the [therapy] program is . . . a benefactor to me anyway. I need it. It helps me. They talk to me like nobody else could. I can't go to the street or nobody to get the kind of advice they can give me, especially for free like that, you know what I mean.

> **Court:** By all accounts [it] seems to me [that you are] doing quite well on supervision with one major exception, which everybody is aware of, and that is he continues to smoke marijuana. . . . Notwithstanding that I am of

---

[12] In New York, it is "legal for adults 21 and older to possess up to three ounces of cannabis [*i.e.*, marijuana] . . . for personal use . . . [and for] [a]dults [to] smoke or vape cannabis wherever smoking tobacco is allowed. . . . [However,] [u]nder federal law, cannabis possession and use in all forms remains illegal." Cannabis (Marijuana), N.Y.C. Dep't of Health, https://www1.nyc.gov/site/doh/health/health-topics/marijuana.page (last visited April 19, 2022).

the opinion that the appropriate sentence for [the supervisee] for violating his probation specification is a sentence of time already served.

I don't think – I don't think further incarceration would resolve the problem and so I'm not going to impose further incarceration which at this time would be solely for [the supervisee's] marijuana use. . . . I think such a sentence would be not only excessive but counterproductive. So I am going to give [the supervisee] the benefit of the doubt and terminate formal supervision. But that is subject to the AUSA and [defense counsel] figuring out the time-served technicality.

**AUSA**: My understanding from the probation department is that a sentence of time served and one day of processing would satisfy your Honor's concern [regarding time served].

**Court**: So then the sentence is modified to time served plus one day of processing.

### (b) Grade A or B violation revocations pursuant to U.S.S.G. § 7B1.3

### Example #5

This supervisee had been sentenced on July 23, 2012 to 70 months of incarceration followed by 5 years of supervised release for conspiracy to distribute and possess with the intent to distribute crack cocaine. On February 7, 2018, after more than 3 years on supervision, the supervisee was arrested and pleaded guilty in state court to possession of a controlled substance in the third degree; and he was sentenced to 3 years in state prison followed by 3 years of state supervision.

The state crime also constituted a Grade A violation of federal supervision and carried a Guidelines policy range of 24–30 months incarceration. In light of the 3-year state sentence, the Government recommended a sentence of 6 months incarceration for the violation. On September 4, 2019, the Court sentenced the supervisee to "time served" plus

a supervised release term of 5 years to run concurrently with the 3 years of state supervision.

> **AUSA**: [T]he government and [the probation officer] agree that the previous recommendation of probation of 30 months was without the benefit or awareness of the state sentence of three years and the following three years of parole [state] supervision that are also going along with the state sentence. And so, the government and probation agree that something that would be a variance of the policy lower level of 24 months is appropriate, and at this time would recommend something in the range of six months.

> **Court**: I was going to say that in light of the three-year state sentence . . . that an extensive federal sentence would be harsh, and I see you've come to that same conclusion.

> **AUSA**: Yes, we agree.

> **Defense Counsel**: I've known [supervisee] since September of [20]16, so it's been three years where we've all been working together to arrive at what we hoped to be a positive solution to this. And what I don't want to be lost in where we are now is some of the efforts he made throughout those three years. It wasn't all bad. There was a lot of good work by him. Certainly probation's spurring him to do it was a major factor, and he's fortunate he had that in his life, but the drug issues were ultimately addressed.

> **Court:** So it seems that everybody agrees, and I certainly do, that the state sentence is a relatively long one. I personally don't see . . . any need to impose any sentence that's in addition to the state sentence.

> Upon a release from [state] imprisonment, [the supervisee] will be placed on supervised release for a term of five years, and that is to run concurrent with the three-year term of post-release supervision by the state. . . . I would be open to reducing that period [of supervision] if the first three years [go well], and they would have to go quite well.

**(c) Discretionary revocation pursuant to 18 U.S.C. § 3583(e)**

16 supervisees (or 10.5% of the Study Population) were sentenced to incarceration for violating supervision. Their violations included 7 Grade A; 2 Grade B; and 40 Grade C violations.

- 12 of the 16 supervisees received actual jail time, *i.e.*, either "consecutive" or "standalone" or "time served" sentences of incarceration (consisting of 45 days; 3 months; 4 months and 20 days; 5 months; 7 months; and 14 months, respectively). The "time served" sentences reflected time they had actually spent in Federal detention prior to sentencing. These sentences were 10 days; 3 weeks; 5 weeks; 6 weeks; 7 weeks; and 2 months, respectively.

- 4 of the 16 supervisees received "concurrent" sentences. They had also been sentenced to a term of incarceration by another court (most often a state court). The Court's concurrent sentences of these supervisees (of 8 months; 18 months; 24 months; and 30 months, respectively) did not result in any additional jail time.

**Example #6**

This supervisee had originally been sentenced on November 3, 2010 to 4 years and 9 months imprisonment followed by 3 years of supervised release for being a felon in possession of a firearm. His conditions of supervised release included vocational training and weekly therapeutic counseling. The term of supervision began on October 24, 2014. On July 1, 2015, the supervisee was arrested and pleaded guilty in state court to second degree assault. This was also a Grade A violation of federal supervision which carried a Guidelines policy range of 24–30 months imprisonment. On July 27, 2015, and before the

27

supervisee was sentenced on the state assault charge, the Court sentenced the supervisee to 14 months imprisonment to run consecutive to the projected state term of imprisonment, and 3 years of supervised release to run concurrently with the projected state term of supervision.

> **Probation**: [W]e did have [the supervisee] reporting for random drug testing and he was reporting as directed and we had not received any positive drug submissions. I had not yet referred him for therapy treatment. . . . He was attending vocational [training] and he had told me that he was in line to get a job with his [relative] at the time of his [state] arrest.
>
> **Supervisee**: [T]hat incident was, you know, it happened so fast and I'm deeply – there's no, there's no way I can really describe the pain and just waking up every morning knowing that my future could possibly be going down the drain. I just, I'm deeply, deeply regretful.
>
> **Court**: So I intend to impose a sentence of 14 months of incarceration and that is to run consecutive to any state sentence. . . . [W]ith respect to supervised release I am imposing a term of supervision of three years . . . . The term of supervision is to run, unlike the term of incarceration, . . . concurrent with any term of supervision imposed by the state court . . . .

The supervisee completed his 14-month sentence. At a recent supervised release hearing, the Court was advised that the supervisee was "doing well" in therapy; that he was attending vocational training; that he was "abstaining from illicit drug use"; and that he was expecting a child with his partner.

### Example #7

This supervisee was originally sentenced on February 14, 2011 to 60 months of incarceration followed by 5 years of supervised release for possession of a firearm in connection with a drug trafficking offense. The conditions of his supervised release included participation in a substance abuse program and weekly therapeutic counseling.

He began supervision in November 2014. On September 14, 2017, *i.e.*, after 3 years of supervision, the supervisee pleaded guilty to violating a New York criminal court order of protection, a Grade C violation with a Guidelines policy range of 5–11 months incarceration. On November 22, 2017, the supervisee was sentenced to a standalone term of 4 months and 20 days incarceration and 4 years of supervision.

> **Probation**: [Supervisee] has been given numerous chances to comply with his conditions of supervised release and multiple warnings regarding the possibility of incarceration should he fail to control his behavior. The frequency with which he has encountered trouble with the law and his level of violence seems to have escalated. . . . Despite warnings to avoid such situations, he entered into a scenario which resulted in a physical altercation and serious harm to the victim.

> **Defense Counsel**: [H]e had started with a new counselor, I believe . . . and I believe he had gone three times prior to his arrest . . . . If you give him a sentence of time served and he is released today, he's going to start that. If you give him additional jail time and a couple months from now when he gets out and back on supervision, he's going to go back to that. So [his anger issues will] be addressed either way.

> **Supervisee**: As far as my anger, I'm not making any excuses for my anger. I had a rough childhood and anger was instilled in me as a young child, at a young age. I grew up handling – being in group homes I grew up handling certain situations different than how normal people would handle these situations. Now me being 32 years old, I see that – I've been seeing it when I got locked up for five years. It's my anger. I have calmed down a lot. I still got a little problem. I'm still working on that, but I noticed that my anger, like my grandma said, I take myself wherever I go. And I've lived in different states and I'm always by myself in these predicaments because it's me. It's nobody else but me. I spoke to my wife about it. I would like to continue seeing [my therapist]. Even if I was released, and they was going to try to put me in a different program, I wanted to go back to that therapist. . . . I've been going there for therapy every Wednesday. I read anger management books. I even have a couple pamphlets I even sent them to my wife, the way that couples can resolve their problems without arguing and how to resolve problems without violence.

**Probation**: I think, as [supervisee] just said, he's made some progress. He's intelligent. He's insightful. However, with the numerous opportunities the Court has given, it's our opinion that something just above the recommended guideline range.

**Court**: I'm going to impose a sentence . . . [of] four months and 20 days. . . . So, I [have been] impressed . . . by [supervisee's] insight into the issues, and so I think this is an appropriate sentence. More to the point though, I'm hopeful that things will turn around or start to turn around and [supervisee] will have . . . an easier time of things and a more productive personal life and work life, as well.

This supervisee completed his term of incarceration and was scheduled to complete his term of supervision.  In the month before his supervision was scheduled to expire, the probation officer, defense, and Government all favored termination. The supervisee (and the Court) were not so sure:

**Probation Officer**: It's my belief that we have really given [the supervisee] all of the tools. He has them under his belt. He just has to use them. I don't know [how] much more, other than just monitoring him in the community, probation's going to be effective [] with him in rehabilitating him because I believe he's there. . . [H]e's going to be as good as he gets, right? And what I mean[] by that is supervision has really maximized its potential for him. He's going to continue to do great things, right?

**AUSA**: [M]y sense is that [the supervisee] has made tremendous progress over the course [of supervision] and if it his desire to terminate supervision, and it's probation's view that supervision is no longer helpful, we would respectfully defer to those views.

**Defense Counsel**: For [the supervisee,] supervision has been essential to the point where, perhaps, even lifesaving. I think if he had not been on supervision for as long as he had, quite frankly, he could possibly not be here today . . . . [T]o some extent, [supervision has] run its course, and now it's time to open up, to use a cliché, a new chapter [in the supervisee's] life.

**Supervisee**: I didn't ever picture I was working to[ward] – I'd be working two jobs and going to college because I [ca]n't even think I was capable

of doing that. . . . Like, after [to]day, there's no more help. It's scary, it's a scary feeling, man. Real scary. . . . **[O]f course, I would want off federal probation. Who wouldn't. It's been seven years. But I honestly feel, like, people probably think I'm crazy right now . . . man, I need this, man. I can't get off right now, man** [emphasis added]

**Court:** I think a little more supervision . . . with the opportunity to terminate . . . if things are going well, . . . and see if we can't, in a modest way, lend some assistance for [an additional period of time] . . . and just so [the supervisee] knows that everybody's around and everybody is available to help as best they can.

### Example #8

This supervisee was originally sentenced on January 10, 2011 to 120 months imprisonment followed by 5 years of supervised release for conspiracy to distribute and possess with intent to distribute crack cocaine. The conditions of his supervised release included substance abuse treatment and weekly therapeutic counseling. He began his supervised release on March 17, 2017. On April 17, 2018, the supervisee was arrested by federal law enforcement officers and charged with conspiracy to distribute and possess with intent to distribute narcotics. And, on May 30, 2019, he pleaded guilty to conspiracy in Federal court in the Eastern District of New York and was, thereafter, sentenced by the EDNY judge to 97 months imprisonment followed by 4 years of supervised release.

The EDNY drug conspiracy was also a Grade A violation of supervision with a Guidelines policy range of 30–37 months incarceration. On May 27, 2021, this Court sentenced the supervisee to 30 months imprisonment followed by 5 years of supervised release, to run concurrent—as to both jail time and supervision—with the EDNY sentence.

**Court**: I don't feel that any additional incarceration by me makes sense. I recall, of course, the underlying case that I had with [the supervisee]. That was also a conspiracy to possess with the intent to distribute narcotics that

31

resulted in a stiff sentence followed by five years of supervision[.] [W]e were in the supervised release phase. . . . I thought he was making a very positive adjustment. He was employed full-time by [company], he was compliant with his drug and mental health treatment regime, he had tested negative on all drug tests except for one in October of 2017. He was living with his [relatives] on Long Island.

**Defense Counsel**: I have had a number of conversations with [the supervisee] on the phone and in speaking with him he is feeling very low, for lack of a better word. He takes full responsibility for breaching the Court's trust. . . . And, as the Court recognized, while he was on pre-trial supervision he was doing fairly well in terms of reintegrating into society . . . .

**Court:** [I]t is my judgment that [supervisee] be committed to the custody of the Bureau of Prisons, be imprisoned for a term of 30 months, with that sentence to run concurrent with the sentence imposed in the Eastern District, and following his incarceration, upon release from imprisonment, . . . be placed on supervised release for a term of five years and that term of supervision also to run concurrent with the [4 year] term of supervision imposed by [EDNY].

**Employment**

Study Population employment outcomes are encouraging. From 2016 to 2021, the Court's Study Population performed reasonably well in terms of employment. Their employment rates were somewhat higher than all supervisees nationwide for the 4 year period 2018 to 2021 and all supervisees in the Southern District of New York for the 4 year period 2018 to 2021 per reports maintained and provided by the U.S. Probation Office.[13]

---

[13] A BJS study that examined 51,500 federal offenders released from incarceration in 2010 and during a four-year follow-up period showed that "the total [BJS] study population's employment did not exceed **40%** in any of the individual 16 quarters after release." Bureau of Justice Statistics, *Employment of Persons Released from Federal Prison in 2010*, at 2 (Dec. 2021). It should be noted that the BJS study examined employment between 2010 and 2014 and may have used a different measure of employment.

U.S. Probation and Pretrial Services Office, U.S. Courts, Employment Report - National Metrics 2018–2021 (on file with author).

Employment is an indicator of successful re-entry. And, it is also one of the so-called "standard conditions" of supervision recommended by the U.S. Sentencing Commission. *See* U.S.S.G. § 5D1.3 (2021). In nearly every judgment of conviction (which sets forth the details of a defendant's sentence), the following paragraph is included:

> You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer. . . .

"Employment" or "employed" refers to persons who did any work at all for pay or profit This includes all part-time and temporary work, as well as regular full-time, year-round employment. *See* Probation and Pretrial Services Automated Case Tracking System (indicating that the U.S. Probation Department considers full-time and part-time work to be employment). If a supervisee was employed at the outset of a calendar year or obtained employment during a calendar year, the supervisee was considered to be "employed." *See* Report at 37; Sept. Update at 3; *see also* U.S. Bureau of Labor Statistics, *How the Government Measures Unemployment*, at 4 (June 2014).

33

**Chart 6: Study Population, SDNY, and Federal Supervisees (Nationwide) Employment (2018–2021)**



Chart 6 above includes rates of employment for the Study Population, all SDNY supervisees, and all federal supervisees from 2018 to 2021. Employment is defined at page 3 herein. Chart 6 shows employment rates as follows: in 2018 the Study Population supervisees had an employment rate of **81%**; all federal supervisees were next highest at **73.9%**; and SDNY supervisees were next at **72.3%**. In 2019, the Study Population supervisees had an employment rate of **79%**; all federal supervisees were next highest at **73.9%**; and SDNY supervisees were next at **73.1%**. In 2020, the Study Population supervisees had an employment rate of **78%**; all federal supervisees were next highest at **70.4%**; and SDNY supervisees were next at **66.1%**. In 2021, all federal supervisees had an employment rate of **69.2%**; the Study Population supervisees were next highest at **67%**; and SDNY supervisees were next at **62.6%**.

It has been reported that "formerly incarcerated people are unemployed at a rate of over 27%." Lucius Couloute & David Kopf, Prison Pol'y Initiative, *Out of Prison & Out of Work: Unemployment Among Formerly Incarcerated People* (July 2018). The rate of unemployment for formerly incarcerated people "has likely only gotten worse since the pandemic hit, though there's no up-to-date data on unemployment for this population, much less data for the current pandemic era." Justin Stabley, *People Leaving Prison Have a Hard Time Getting Jobs. The Pandemic Has Made Things Worse*, PBS News Hour (Mar. 31, 2021). Low rates of employment are, in part at least, attributable to having a criminal history. *See* D. Pager *et al.*, *Sequencing Disadvantage: Barriers to Employment Facing Young Black and White Men with Criminal Convictions*, 623 Annals American Acad. 195, 199 (2009) ("[A] criminal record has a significant negative impact on hiring outcomes, even for applicants with otherwise appealing characteristics. . . . [A] criminal record reduces the likelihood of a callback or job offer by nearly 50 percent[.]").

Supervisees' efforts to obtain and maintain employment have been especially challenging during the COVID-19 pandemic, starting in 2020. The Court believes that the COVID-19 pandemic may well account for most of the 2020–2021 drop in supervisee employment from 78% to 67%. "The COVID-19 pandemic has had a significant effect on labor market metrics for every state, economic sector, and major demographic group in the United States." Cong. Rsch. Serv., R46554, *Unemployment Rates During the COVID-19 Pandemic* (Aug. 20, 2021); *see also* Justin Stabley, *People Leaving Prison Have a Hard*

*Time Getting Jobs. The Pandemic Has Made Things Worse*, PBS News Hour, Mar. 31, 2021.

Employment is a topic frequently discussed at supervised release hearings. The following colloquies are illustrative:

**Example #9**

**Supervisee**: My second job is [] going quite well. As a matter of fact, I am here at my other job with my [employer]. He can vouch for me. And also he is my landlord because I live in one of his houses . . . . So [he] can join the call and vouch for me. Is that okay, your Honor?

**Court**: Yes. We'll be delighted to hear from him. . . .

**Employer**: Good morning, your Honor. . . . I can only reinforce what you already stated. [Supervisee] has been an exemplary worker. He has this full-time job Thursday through Saturday that he goes to routinely in the mornings. He comes to my apartment to do renovation. I talk to him virtually two or three times a day about different matters. And other than him overcharging me for the work, he is quite a good worker. He is also - - I have a house [] that I am the executor of that is my [relative's]. He passed away from COVID last year. I have let [supervisee] live there rent-free because he has been renovating [and] keeping it upgraded and removing snow. He has been taking very good care of it. I have nothing but positive things to say about it. Yeah, I think you are all right in your view of him that he has been more than responsible and helpful and I think he is on the road to being an upstanding citizen of the community. . . .

My background is I am a former federal agent. I retired in 2010 after 22 years. I worked at the World Trade Center before the attack and afterwards on 23rd Street and 26th Street in the city. Since I retired, I have been working a lot of CJA cases with various defense lawyers who hire me out to help out on investigations for people who can't afford lawyers.

**Example #10**

**Probation Officer**: I just wanted to inform you of the positive strides that [supervisee] has taken. [S]ince our last time together, he . . . has been at [Company X] as a facilities coordinator . . . . And I'm pleased to report that he continues to work hard there, and . . . the updates that I've received from his treatment provider and from [the supervisee are] that he's gaining

36

more responsibilities there, he has a good working relationship with his boss, and we're hearing nothing but positive things from his employer. So I'm very happy to hear that.

**Supervisee**: Sometimes I don't even believe how good it's going, you know. There is a little voice inside my head saying it's too good to be true. But I'm trying my best to take advantage of this second chance that I got. I definitely don't take it lightly. So, I am doing whatever it is that I can do to continue moving in the direction that I've been moving in.

<u>**Example #11**</u>

**Probation Officer**: I wanted to make your Honor informed that I had spoken with [the supervisee's] therapist who meets with [the supervisee] regularly. And he's pleased as well a[t] [the supervisee's] ability to create obtainable life goals and make the right decisions. Specifically, [the therapist] has stated that [the supervisee] has been taking such pride in his job and his career, and he considered [his] job to be an extremely motivating factor for him.

**Court:** That is great. I don't remember what kind of work [supervisee] is doing, what the company does.

**Supervisee**: We'll they're an advertising company, but I deal with, like, property management for all their offices that they have. And also, like, project coordinator, whenever there is any major repairs or an office move, I will deal with the logistics of that.

**(2) Mental Health Therapy & Drug Treatment**

Mental health therapy and drug treatment play very significant roles in court involved supervision. Indeed, it is difficult to overstate the importance of therapy and counselling in our program. Accordingly, at sentencing the Court very often includes therapy and drug treatment as "special conditions," as follows:

- Throughout the term of supervised release, defendant shall participate in weekly therapeutic individual counseling by a licensed therapist.

- Throughout the term of supervised release, defendant shall participate in a program for substance abuse which program shall include testing to determine whether the defendant has reverted to the use of drugs or alcohol.

*See* Report at 38.



**Chart 7: Supervisees Whose Sentences Include
Therapeutic Counseling and/or Substance Abuse Treatment**



Chart 7 reflects that **81%** of the Study Population participated in both therapeutic counseling and substance abuse treatment; **10%** participated in therapeutic counseling; and **3%** participated in substance abuse treatment. Thus, **94%** of the Study Population participated in therapeutic counseling, substance abuse treatment, or both; and 6% were **not** required to participate in therapeutic counseling or substance abuse treatment as a condition of their supervised release. *Id.*

38

**Mental Health Therapy**

"Compared with the 1990s, returning prisoners [who] have served longer prison sentences, [are] more [likely to be] disconnected from family and friends, have a higher prevalence of untreated substance abuse and mental illness, and [may be] less educated and employable." *See* Harvey Milkman & Kenneth Wanberg, Nat'l Inst. Corrections, *Cognitive-Behavioral Treatment: A Review and Discussion for Corrections Professionals* at 1–2 (May 2007). And, supervisees who have served terms of incarceration during the COVID pandemic may be especially at risk. *See, e.g.*, Roni Caryn Rabin, *Vulnerable Inmates Left in Prison as Covid Rages*, N.Y. Times (Feb. 27, 2021). **"[M]ental health . . . treatment in a court supervised [release] program can be expected to foster recovery and reduce recidivism."** Sara Gordon, *About A Revolution: Toward Integrated Treatment in Drug and Mental Health Courts*, 97 N.C. L. Rev. 355, 388–89 (2019) (emphasis added).

Simply stated, "[w]ithout help, many released inmates quickly return to crime." Milkman & Wanberg, *supra*, at 2. Supervisees "often have problems dealing with anger and hostility and have the stigma of being criminals, along with the guilt and shame that accompany this stigma." Center for Substance Abuse Treatment, *Substance Abuse Treatment For Adults in the Criminal Justice System*, HHS Publ'n No. (SMA) 13-4056 (2005). Therapy helps supervisees to address and change unproductive and detrimental beliefs, views, and thoughts. *See* Jack Bush, *To Help a Criminal Go Straight, Help Him Change How He Thinks*, Nat'l Pub. Radio (June 26, 2016) ("With effort and practice, even the most serious offenders can learn to change their thinking about other people and themselves. They can learn to be good citizens, and feel good about it."). Cognitive-

behavioral therapy (CBT) for supervisees "is based on an assumption that the foundations for criminal activity are dysfunctional patterns of thinking. By altering routine misinterpretations of life events [often through CBT], offenders can modify antisocial aspects of their personality and consequent behaviors." Milkman & Wanberg, *supra* p. 39, at 5.

### Drug Treatment

**Our court involved supervised release program includes all supervisees sentenced by Judge Berman. It does not exclude anyone, including those who have serious addition issues.** Drug treatment is obviously a very important resource which is readily employed to help ensure Study Population supervisees' successful reentry. "Untreated substance use disorders among [supervisees] can lead to relapse and a path toward continued criminal behavior, which can lead to probation[] violations and an increased risk of reincarceration." Ctr. for Behavioral Health Statistics and Quality, SAMSHA, *The NSDUH Report: Trends in Substance Use Disorders Among Males Aged 18 to 49 on Probation or Parole, Substance Abuse and Mental Health Services Administration*, at 1 (Mar. 6, 2014). **"[S]ubstance abuse treatment in a court supervised [release] program can be expected to foster recovery and reduce recidivism."** Gordon, *supra* p. 39, at 388–89 (emphasis added); *see also* Center for Substance Abuse Treatment, *supra* p. 39, at xvii ("[S]trong empirical evidence over the past few decades consistently has shown that substance abuse treatment reduces crime."); Douglas B. Marlowe, *Integrating Substance Abuse Treatment and Criminal Justice*

40

*Supervision*, Sci. Pract. Perspect. (Aug. 2003), at 5–6 ("[I]dentifying drug abuse problems among offenders and referring those individuals to treatment in the community is considered to be potentially the most effective way to turn them away from drug abuse and repeated crime.").

The following colloquies help illustrate the importance of mental health therapy and drug treatment:

> ### Example #12
>
> **Court**: Have you found that the services that probation has offered, the therapy and the substance abuse programs, are they helpful to you and are you getting a lot out of it or how is that?
>
> **Supervisee**: Absolutely, 100 percent. I look forward to the meetings every week. I didn't think I would, but it turned out that [] I'm there like an hour early just waiting for them to start. And I brought up [to my therapist], my lawyer, and [my probation officer] that I don't want to even think about ending probation any time soon because of the opportunity I'm given by the government, pretty much to take advantage of all of that.
>
> ### Example #13
>
> **Therapist**: I want to share with everybody that, since our last court [hearing, supervisee] and I have made great progress in multiple life areas that [supervisee] has been working on. Substance abuse being primarily one of them, but also his family and his health and his connection to his support network as well as his community.
>
> These are areas that are essential to becoming stable and connected in order to actually have progress in recovery, in abstinence of any kind of substance abuse, as well as help with any kind of health issues or medical issues that he is concerned with. . . . [Supervisee] was very resistant to counseling at first . . . . [I]t took a little bit of effort, at least on my behalf, to actually hear what [supervisee's] complaints were and to actually get into his world a little bit deeper. I feel like since [our] last court

appearance, we've made great progress. We are talking about family areas that we hadn't discussed.

[The supervisee] has been much more open and receptive to counseling. I'm very pleased and confident that if we continue on this path, [supervisee] will continue to grow and eventually nourish and thrive.

**Court**: Is there anything we could . . . help you with more than you're being helped now . . . ?

**Supervisee**: As far as right now . . . my guy from [therapy], like, he really got into my head. He [is] really making me open up more to him. I really never was doing that. He gets a lot of conversations out of me, and it really level-heads me down and calms me down more. Make[s] me look at life even more, you can really sit and talk to somebody. You don't have to be angry all the time.

### (3) Planning for Post-Supervision

While we focus primarily upon each (individual) supervised release hearing, we must also make sure to consider—together with the supervisee—where supervision is heading. We know that "careful planning is essential if supervision . . . is to be effective." Al Havenstrite, *Case Planning in the Probation Supervision Process*, 44 Fed. Probation 57, 57 (June 1980).

We have learned that "[i]nitial and subsequent supervision planning should develop specific goal-directed objectives to be accomplished by th[e] [supervisee] during the term of supervision and the strategies that [are needed to] facilitate the accomplishment of those objectives." Administrative Office of the United States Courts Probation and Pretrial Services Office, *Overview of Probation and Supervised Release Conditions* at 6 (Nov. 2016). According to The Urban Institute Justice Policy Center, "[t]he supervision case plan

42

should build on valid risk and need assessments, strength[]-based assessments, and [supervisee] input as well as the input of other involved stakeholders." Amy Solomon *et al.*, The Urban Institute Justice Policy Center, *Putting Public Safety First: 13 Parole Supervision Strategies to Enhance Reentry Outcomes* at 26 (2008). The supervision case plan should reflect as one of the primary goals of supervision "to assist the offender in developing self-diagnosis [*i.e.*,] skills [to] help[] the offender to learn to identify antecedents that cause unlawful behaviors and avoid these behaviors that may lead to trouble (consequence[s])." Faye S. Taxman *et al.*, National Institute of Corrections, *Tools of the Trade: A Guide to Incorporating Science into Practice* (2004). With careful supervision planning, stakeholders can "chart a road to successful living on the part of the [supervisee]." Havenstrite, 44 Fed. Probation at 66.[14]

### Example #14

> **Court:** Something I have started to focus on is the development of [an actual] plan. We sometimes are so focused on the short term that we don't think about "where is this all going?" We need to think about some sort of plan that gets us beyond supervision.
>
> [Supervisee] has been in supervision . . . longer than he wants to be or anyone else wants [him] to be. But we have to come up with consensus about such a plan [and] with [supervisee] participating in its development.
>
> You, [supervisee,] and probation and your counsellors just need to come up with a plan that is meaningful to you and agreeable to them so everyone can be on the same page with what is expected to happen.  If you all can work that out, that would be the ideal . . . .

---

[14] The Urban Institute Justice Policy Center's "mission is to inform solutions to crime and safety challenges in the interests of promoting effectiveness in justice systems and operations." *See* About, The Urban Institute Justice Policy Center, https://www.urban.org/policy-centers/justice-policy-center#about.

**Example #15**

**Court**: So what do you think? Do you think you're ready to go – drop this supervised release, so to speak – not drop it but do you think you're able to function and live your life without the support system?

**Supervisee**: Your Honor, it's been a long road, many years. And I relapsed. That won't happen again. I stay focused. I stay away from people, places and things. My focus is my life and my family. I'm a hundred precent sure I'm ready, your Honor.

*      *      *

**APPENDIX A**

New Members of the Court's Supervised Release Team

In 2021 and early 2022, the Court's supervised release team expanded with two wonderfully capable and brilliant new members, *i.e.*, **Hon. Sarah L. Cave** and **Kassandra Collazo**. Judge Cave is a U.S. Magistrate Judge (SDNY) who conducts supervised release hearings (with a referral from the Court) "to monitor the status of [a] defendant's supervised release, and to conduct status hearings with the parties."

Ms. Collazo is studying for her Masters of Social Work at the Graduate School of Social Service at Fordham University.

The following sections of this report were written by Judge Cave and Ms. Collazo, respectively.

**Sarah L. Cave**

To date, I have observed 10 supervised release hearings and I have also conducted supervised release hearings in nine of the ten cases referred to me by Judge Berman. The parties and the probation officers have welcomed me to the proceedings. The supervisees have similarly been very cordial and receptive to me—and candid in their testimony. The progress each supervisee has made, and the efforts each has dedicated to successful reentry into the community, have been nothing if not memorable. One supervisee discussed hosting a 16th birthday party for his daughter, making plans to run his own fitness classes, and saving up to buy his own home. Another inspired me when he described his progress in completing mental health and substance abuse treatment, following which he felt that he

45

had developed the tools to manage stressful situations. In each case, these supervisees have worked hard to improve their lives and those of their families.

Becoming involved in oversight of supervised release has been my privilege, and I look forward to continued collaboration.

**Kassandra Collazo**

The experiences of being a part of the supervised release program and working closely with chambers staff and Judge Berman, have been eye-opening. Even as the field of social work begins to be integrated into a number of different arenas within society, working with a federal judge remains a unique field placement. It has become evident to me that the social work perspective is valuable and necessary in court-involved supervised release work.

*     *     *

46